# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>   v.<br><br>MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE,<br><br>        Defendants. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Miriam Edwards ("Plaintiff"), individually and on behalf of all others similarly situated, by and through her attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, her counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by McDermott International, Inc. ("McDermott" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by McDermott; and (c) review of other publicly available information concerning McDermott.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a class action on behalf of persons and entities that acquired McDermott securities between January 24, 2018 and October 30, 2018, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2. McDermott purports to provide engineering, procurement, construction, and installation and technology solutions to the energy industry. McDermott purportedly designs and builds infrastructure and technology solutions to transport and transform oil and gas into a variety of products.

3. On October 30, 2018, after the close of trading, McDermott reported financial results for third quarter 2018 that fell far below analysts' estimates. McDermott reported revenues of $2.29 billion, compared to midpoint estimates of $2.51 billion, and earnings per share of $0.20, versus midpoint estimates of $0.29.The Company also reported a $744 million change in the value of certain projects it had acquired from Chicago Bridge & Iron Company ("CB&I"). And, the Company further disclosed plans to sell McDermott's storage tank business and its U.S. pipe fabrication business, as those businesses, "are not core to the Company's long term strategic objectives."

4. On this news, the Company's share price fell $5.14 per share, nearly 40%, to close at $7.73 per share on October 31, 2018, on unusually heavy trading volume.

5. Throughout the Class Period, Defendants made materially false and/or misleading

statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company was facing strong headwinds and would fail to meet revenue and earnings estimates; (2) that there were material problems with the integration of the CB&I business; (3) that certain CB&I projects were reasonably likely to incur higher costs; (4) that, as a result, the fair value of these CB&I projects would be materially impacted; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

6. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

7. The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

8. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

9. Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District. In addition, the Company's principal executive offices are located in this district.

10. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

11.     Plaintiff Miriam Edwards, as set forth in the accompanying certification, incorporated by reference herein, purchased McDermott securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

12.     Defendant McDermott International, Inc. is incorporated under the laws of Panama with its principal executive offices located in Houston, Texas.  McDermott's common stock trades on the New York Stock Exchange ("NYSE") exchange under the symbol "MDR."

13.     Defendant David Dickson ("Dickson") was the President and Chief Executive Officer ("CEO") of the Company at all relevant times.

14.     Defendant Stuart Spence ("Spence") has been the Executive Vice President and Chief Financial Officer ("CFO") of the Company at all relevant times.

15.     Defendants Dickson and Spence, (collectively the "Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### Background

16.     McDermott purports to provide engineering, procurement, construction, and installation and technology solutions to the energy industry. McDermott purportedly designs and builds infrastructure and technology solutions to transport and transform oil and gas into a variety

of products.

## Materially False and Misleading
## Statements Issued During the Class Period

17. The Class Period begins on January 24, 2018. On that day, the Company updated its 2017 guidance and issued its 2018 guidance. The Company, in relevant part, stated: "The 2017 full year guidance updated above is being increased from the guidance included in McDermott's third quarter 2017 earnings release issued on November 1, 2017, due to strong operational performance, cost savings and better than anticipated weather and change orders during the fourth quarter of 2017."

18. On February 21, 2018, the Company announced its fourth quarter and full year 2017 financial results. The Company, in relevant part, stated:

> Revenues for the full year of 2017 were $2,984.8 million, an increase of $348.8 million, compared to revenues of $2,636.0 million for 2016. The key projects driving revenue for the full year of 2017 were the Saudi Aramco LTA II Lump Sum, Saudi Aramco Marjan power system replacement, Inpex Ichthys, ONGC Vashishta and Pemex Abkatun projects. The increase from the prior year was primarily due to increased activity in the Middle East, which was partially offset by lower activity in the Americas, Europe and Africa and Asia.
>
> Our operating income and operating margin for the full year of 2017 were $324.2 million and 10.9%, compared to $142.3 million and 5.4% for 2016. Our adjusted operating income and adjusted operating margin for the full year of 2017 were $327.9 million and 11.0%, excluding the transaction-related costs and MTM pension adjustment mentioned above. For 2016, we reported adjusted operating income and adjusted operating margin of $203.1 million and 7.7%, excluding the restructuring charges, impairment and MTM pension adjustment mentioned above. Operating income for 2017 was primarily driven by activity on the Saudi Aramco LTA II Lump Sum project and Marjan power system replacement projects and progress on the Inpex Ichthys project.

19. The same day, the Company filed an annual report on Form 10-K for the period ended December 31, 2017 that affirmed the financial results reported in the press release identified in ¶18.

20. On April 24, 2018, the Company announced its first quarter 2018 financial results. The Company, in relevant part, stated:

> We reported first quarter 2018 revenues of $607.8 million, an increase of $88.4 million, compared to revenues of $519.4 million for the prior-year first quarter. The

> key projects driving revenues for the first quarter of 2018 were the Saudi Aramco LTA II Lump Sum, Saudi Aramco Safaniya Phase 5, Inpex Ichthys and Pemex Abkatun-A2 projects. The increase from the prior-year first quarter was primarily due to the settlement of a significant change order in Asia and an increase in activity in the Middle East.
>
> Our operating income and operating margin for the first quarter of 2018 were $68.4 million and 11.3%, compared to $56.0 million and 10.8% for the first quarter of 2017. Our adjusted operating income and adjusted operating margin for the first quarter of 2018 were $82.4 million and 13.6%, excluding the transaction, integration planning and restructuring costs mentioned above. For the prior-year first quarter, there were no adjustments from GAAP. Operating income for the first quarter of 2018 was primarily driven by the settlement of a significant change order in Asia. A significant amount of the cost and a portion of the revenues associated with the change order were recognized in prior quarters.

21. The same day, the Company filed a quarterly report on Form 10-Q for the period ended March 31, 2018 that affirmed the financial results reported in the press release identified in ¶20.

22. On May 10, 2018, the Company announced that it had completed the merger with CB&I.

23. On July 31, 2018, the Company issued a press release to announce its financial results for second quarter 2018, in which it reported a $221 million change to the estimated costs associated with three projects it had acquired from CB&I. The Company, in relevant part, stated:

> McDermott International, Inc. (NYSE: MDR) ("McDermott" or the "Company") today reported revenue of $1.7 billion and net income of $47 million, or $0.33 per diluted share, for the second quarter of 2018. Results reflect solid execution and a tax benefit of $117 million related to an internal transfer of certain intellectual property rights, offset by $138 million of transaction costs, costs to achieve our Combination Profitability Initiative (CPI), debt extinguishment costs, and intangibles amortization.
>
> * * *
>
> In accounting for the acquisition of CB&I on May 10, 2018, McDermott recorded the fair value of the CB&I balance sheet, including identified intangible assets and updated cost estimates on the acquired backlog. The vast majority of the acquired portfolio did not require material changes to cost estimates. However, McDermott did record changes in estimated costs on three projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on the Company's net income for the second quarter.

> "We are clearly disappointed with the increased cost estimates for three of the legacy CB&I projects," said Dickson. "The increases are within the bounds of the scenarios we contemplated during our due diligence, and we believe that by applying our disciplined One McDermott Way to these projects, we can bring them to successful completion. We have already made significant changes to personnel, reporting structures, stakeholder relationships and execution plans on Cameron, for example, since the combination closed, and there are encouraging signs that these changes have made a difference. More importantly, we have moved forward to further strengthen our relationships with stakeholders. Going forward, we plan to continue to aggressively apply our McDermott approach to ensure appropriate risk evaluation and mitigation across the combined Company's portfolio – from bidding to execution."

24. The same day, the Company filed a quarterly report on Form 10-Q for the period ended June 30, 2018 that affirmed the financial results reported in the press release identified in ¶23.

25. The above statements identified in ¶¶17-24 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose to investors: (1) that the Company was facing strong headwinds and would fail to meet revenue and earnings estimates; (2) that there were material problems with the integration of the CB&I business; (3) that certain CB&I projects were reasonably likely to incur higher costs; (4) that, as a result, the fair value of these CB&I projects would be materially impacted; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Disclosures at the End of the Class Period**

26. On October 30, 2018, the Company issued a press release to announce its third quarter 2018 financial results. Therein, the Company, in relevant part, stated:

> McDermott International, Inc. (NYSE: MDR) ("McDermott", the "Company", "we" or "our") today reported revenues of $2.3 billion and net income of $2 million, or $0.01 per diluted share, for the third quarter of 2018. Results reflect solid execution across the portfolio of projects, partially offset by costs of $103 million related to intangibles amortization, the Combination Profitability Initiative ("CPI") and transaction costs associated with McDermott's combination with CB&I (the "Combination"). Net income in the quarter was also unfavorably impacted by higher than expected tax expense. The changes in estimates on the three projects discussed below are not reflected in the determination of net income for the third

quarter, as those amounts have instead been reflected in purchase accounting adjustments relating to the Combination.

"Our underlying results reflect solid operating performance, accelerated progress in identifying both revenue and cost synergies and implementing a new cost culture, an improving macro environment and strong customer receptivity to our recent combination, which contributed to a robust booking quarter and a record-setting revenue opportunity pipeline of $80.3 billion," said David Dickson, President and Chief Executive Officer of McDermott. "We have also had continued momentum with strong awards early in the fourth quarter, including the recently announced ONGC KG-DWN 98/2 award in consortium with BHGE and Larsen and Toubro. Our portion of that contract is approximately $700 million."

"Additionally, we have completed a strategic review of our business portfolio and have determined that the tank storage business and the U.S. pipe fabrication business are not core to our vertical integration. As such, we have developed plans to seek buyers for each of the two businesses, which together had 2017 revenues of approximately $1.5 billion. We anticipate receiving proceeds in excess of $1 billion upon the sale of those assets and expect to use a majority of the proceeds to reduce debt under our term loan. We have also entered into definitive agreements with investment funds managed by the Merchant Banking Division of The Goldman Sachs Group Inc. providing for the private placement of $300 million of redeemable preferred stock, together with warrants to purchase 3.75% of our common stock, subject to customary closing conditions. In addition, we have separately received commitments for a $230 million increase in letter of credit capacity, subject to closing conditions. Proceeds from the private placement are expected to provide liquidity to fund working capital needs, and the increase in letter of credit capacity will enhance the Company's readiness to book anticipated very strong order intake."

For the third quarter of 2018, McDermott recorded $744 million of changes in estimates on three projects, including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project and $68 million on the Calpine gas power project. Under the provisions of purchase accounting applicable to the Combination, these changes in estimates were reflected as a change in intangible assets, including goodwill, and, as a result, did not have a direct impact on the Company's net income for the third quarter.

"After five months of ownership, we now believe we have a thorough and definitive understanding of the schedule and cost position on each of the projects – and clear visibility into the operational and financial path to completion," said Dickson. "We have taken significant steps to address performance issues on the three projects. Specifically, we have installed a new executive leadership team – including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination – and made improvements in reporting structures, execution plans, forecast cost-base methodology and the flow of communication with our consortium members and customers. We expect no further material changes in the cost estimates on these projects. Additionally, significant progress has been made on the remaining projects in the portfolio and we have identified no additional projects with significant remaining execution risk."

Additional detail about the status of each project as of the end of the third quarter of 2018 is presented below.

- Cameron LNG Project – the changes in estimates followed a detailed reassessment of the schedule and cost base. The analysis included a comprehensive review of the work to go, including work for which we may not be compensated -- such as rework -- and a reduction in productivity estimates. The reassessed schedule and estimates reflect regional limitations on labor availability and quality, the elimination of an incentive opportunity and the addition of liquidated damages associated with the completion schedule. Operationally, the project continues to progress well, with commencement of commissioning expected in the fourth quarter and first LNG expected in the first quarter of 2019. As of the end of the third quarter of 2018, the project was 83% complete and had approximately $557 million of McDermott's portion of expected revenues to go until expected completion. During the quarter, the Cameron LNG project contributed $191 million to revenues and ($34) million to cash flows from operations. Phase 1 of the Cameron project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.

- Freeport LNG Project – the changes in estimates followed a detailed reassessment of the schedule and cost base and a reduction in forecasted labor productivity resulting from regional limitations on labor availability and quality. The change in estimates was also impacted by the Company's decision, reached in conjunction with ongoing customer discussions, to include liquidated damages associated with the pre-Hurricane Harvey schedule. The updated forecast is based on rigorous reassessments and views by project teams and site management, including the area supervisor's assessment of work to go. At the end of the third quarter of 2018, the project was approximately 82% complete and had approximately $622 million of McDermott's portion of expected revenues to go until completion. During the quarter, the Freeport LNG project contributed $220 million to revenues and ($115) million to cash flows from operations. Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.

- Calpine Gas Turbine Power Project – the changes in estimates resulted from our decision to decrease the productivity factor on the future work by 20%. The major driver of increased costs on Calpine has been labor productivity involving both direct-hire and sub-contract employees. The newly assumed productivity factor also considered lessons learned on the closeout experience on the recently completed IPL project and we believe is realistic and achievable. First fire is anticipated during the fourth quarter of 2018. During the quarter, the Calpine Gas Turbine Power project contributed $29 million to revenues and ($14) million to cash flows from operations. As of the end of the third quarter of 2018, the project was 91% complete and had approximately $27 million of expected revenues to go until expected completion in Q1 2019.

27. On this news, the Company's share price fell $5.14 per share, nearly 40%, to close at $7.73 per share on October 31, 2018, on unusually heavy trading volume.

**CLASS ACTION ALLEGATIONS**

28.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that acquired McDermott securities between January 24, 2018 and October 30, 2018, inclusive, and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

29.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, McDermott's common shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of McDermott common stock were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by McDermott or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

30.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

31.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

32.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of McDermott; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

33. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

34. The market for McDermott's securities was open, well-developed and efficient at all relevant times. As a result of these materially false and/or misleading statements, and/or failures to disclose, McDermott's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired McDermott's securities relying upon the integrity of the market price of the Company's securities and market information relating to McDermott, and have been damaged thereby.

35. During the Class Period, Defendants materially misled the investing public, thereby inflating the price of McDermott's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading. The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about McDermott's business, operations, and prospects as alleged herein.

36. At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading

statements about McDermott's financial well-being and prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

37. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

38. During the Class Period, Plaintiff and the Class purchased McDermott's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

39. As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding McDermott, their control over, and/or receipt and/or modification of McDermott's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning McDermott, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE
## (FRAUD-ON-THE-MARKET DOCTRINE)

40. The market for McDermott's securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, McDermott's securities traded at artificially inflated prices during the Class Period. On January 24, 2018, the Company's share price closed at a Class Period high of $26.94 per share. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of McDermott's securities and market information relating to McDermott, and have been damaged thereby.

41. During the Class Period, the artificial inflation of McDermott's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about McDermott's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of McDermott and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

42. At all relevant times, the market for McDermott's securities was an efficient market for the following reasons, among others:

(a) McDermott shares met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, McDermott filed periodic public reports with the SEC and/or the NYSE;

(c) McDermott regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d) McDermott was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

43. As a result of the foregoing, the market for McDermott's securities promptly digested current information regarding McDermott from all publicly available sources and reflected such information in McDermott's share price. Under these circumstances, all purchasers of McDermott's securities during the Class Period suffered similar injury through their purchase of McDermott's securities at artificially inflated prices and a presumption of reliance applies.

44. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

45. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-

looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of McDermott who knew that the statement was false when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and**
**Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

46. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

47. During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase McDermott's securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each defendant, took the actions set forth herein.

48. Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for McDermott's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

49. Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about McDermott's financial well-being and prospects, as specified herein.

50. Defendants employed devices, schemes and artifices to defraud, while in

possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of McDermott's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about McDermott and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

51.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

52.     Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing McDermott's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have

actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

53. As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of McDermott's securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired McDermott's securities during the Class Period at artificially high prices and were damaged thereby.

54. At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true. Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that McDermott was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their McDermott securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

55. By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

### SECOND CLAIM
### Violation of Section 20(a) of The Exchange Act
### Against the Individual Defendants

57. Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

58.     Individual Defendants acted as controlling persons of McDermott within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

59.     In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

60.     As set forth above, McDermott and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

(a)     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     Awarding compensatory damages in favor of Plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

  (c) Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

  (d) Such other and further relief as the Court may deem just and proper.

<u>**JURY TRIAL DEMANDED**</u>

  Plaintiff hereby demands a trial by jury.

Dated: November 15, 2018    **KENDALL LAW GROUP, PLLC**

    */s/ Joe Kendall*
    JOE KENDALL
    State Bar No. 11260700
    jkendall@kendalllawgroup.com
    JAMIE J. MCKEY
    State Bar No. 24045262
    jmckey@kendalllawgroup.com
    3811 Turtle Creek Blvd., Suite 1450
    Dallas, Texas 75219
    Telephone: (214) 744-3000
    Facsimile: (214) 744-3015

    **GLANCY PRONGAY & MURRAY LLP**
    Lionel Z. Glancy
    Robert V. Prongay
    Lesley F. Portnoy
    Charles H. Linehan
    1925 Century Park East, Suite 2100
    Los Angeles, CA 90067
    Telephone: (310) 201-9150
    Facsimile: (310) 201-9160

    **LAW OFFICES OF HOWARD G. SMITH**
    Howard G. Smith
    3070 Bristol Pike, Suite 112
    Bensalem, PA 19020
    Telephone: (215) 638-4847
    Facsimile: (215) 638-4867

    ***Attorneys for Plaintiff***