UNITED STATES SOUTHERN DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated,<br><br>                            Plaintiff,<br><br>     v.<br><br>MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE,<br><br>                        Defendants. | Case No.: 4:18-cv-04330<br><br>AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF SECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934<br><br><u>JURY TRIAL DEMAND</u> |

## TABLE OF CONTENTS

**Page**

I.  NATURE AND OVERVIEW OF THE ACTION ................................................. 2

II.  JURISDICTION AND VENUE ........................................................ 9

III.  PARTIES .................................................................... 10

IV.  OVERVIEW OF THE EXCHANGE ACT VIOLATIONS ................................. 12

    A.  CB&I's Accounting And Business Practices Raised Numerous Red Flags That Heightened The Need For McDermott's Pre-Merger Due Diligence ......... 13

    B.  Four CB&I Focus Projects Were Subject To Heightened Scrutiny At The Time Of The Merger Announcement ................................... 17

    C.  CB&I Suspends Dividends, Revises Its Loan Covenants, And Announces Its Effort To Reduce Debts Due To The Focus Projects ..................... 19

    D.  McDermott And CB&I Announce The Merger On December 18, 2017 And The Market Expresses Concern Over McDermott's Exposure To CB&I's Focus Projects .......................................... 22

    E.  Following The Merger Announcement, Defendants Tout McDermott's Extensive Due Diligence Into CB&I's Focus Projects In An Effort To Sell The Deal To Investors............................................ 27

    F.  The Focus Projects Carried Hundreds Of Millions Of Dollars Of Known, Undisclosed Forecasted Costs At The Time Of The Merger.............. 33

V.  FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS IN THE PROXY SOLICITATIONS ........................................... 46

    A.  The Materially False And Misleading Statements To Investors Issued Before To The Proxy Statement .................................... 47

    B.  The Materially False And Misleading Statements On The Focus Projects In The Proxy Statement ....................................... 58

    C.  The Proxy Statement Omitted Material Information Concerning Known Adjustments To Fair Value................................ 63

    D.  Additional False And Misleading Statements Issued After The Proxy Statement.................................................. 65

VI.  THE MERGER IS APPROVED .......................................... 74

VII. MCDERMOTT ANNOUNCES A SERIES OF SURPRISE CHARGES
ASSOCIATED WITH THE FOCUS PROJECTS ............................................................ 76

    A.    McDermott Reveals An Additional $221 Million Of Changes To Cost
Estimates On July 31, 2018 .................................................................................. 76

    B.    McDermott Discloses An Additional $744 Million Of Changes To Cost
Estimates On October 30, 2018 .......................................................................... 78

    C.    Subsequent Announcements Continue To Reveal The Falsity Of The
Proxy Statements .................................................................................................. 87

VIII. CLASS ACTION ALLEGATIONS ...................................................................... 92

IX. CLAIMS FOR RELIEF ........................................................................................ 94

X. PRAYER FOR RELIEF ......................................................................................... 98

XI. JURY TRIAL DEMANDED ................................................................................. 99

1.     Lead Plaintiff, The Public Employees' Retirement System of Mississippi ("Lead Plaintiff" or "MissPERS"), individually and on behalf of all others similarly situated, by and through its attorneys, alleges the following upon information and belief, except as to those allegations concerning Lead Plaintiff, which are alleged upon personal knowledge.  Lead Plaintiff's information and belief is based upon, among other things, its counsel's investigation, which includes without limitation: (a) review and analysis of regulatory filings made by McDermott International, Inc. ("McDermott" or the "Company") and Chicago Bridge & Iron Company, N.V. ("CB&I"), with the United States ("U.S.") Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases issued by McDermott and CB&I; (c) interviews of former employees of McDermott and CB&I (referred to herein as "FE-__"); (d) review and analysis of news articles and analyst reports concerning McDermott and CB&I; (e) review and analysis of pleadings, other filings, court opinions and orders in litigation filed against McDermott and CB&I; (f) consultation with experts; and (g) review of other publicly available information concerning McDermott and CB&I.  Lead Plaintiff believes that substantial additional evidentiary support for its allegations will be developed after a reasonable opportunity for discovery.

2.     This class action is brought on behalf of McDermott shareholders of record as of April 4, 2018 who had the right to vote in connection with the proposed merger between McDermott and CB&I (the "Merger"), pursuant to the Joint Proxy Statement dated March 29, 2018 (the "Proxy Statement"), and were damaged thereby (the "Class").  The claims asserted herein are alleged against McDermott, its President and Chief Executive Officer (David Dickson), its Chief Financial Officer (Stuart Spence), CB&I, and CB&I's former President and Chief Executive Officer (Patrick K. Mullen) (collectively, "Defendants"), for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78n(a),

78t(a), and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9, promulgated thereunder.  Defendants and affiliated persons/entities are not members of the Class.

3.      The basis of Lead Plaintiff's claims is that Defendants' statements issued to solicit shareholder approval of the Merger, including the proxy solicitations filed by Defendants pursuant to SEC Rule 425 (which governs the filing of prospectuses and communications in connection with business combinations), contained materially untrue statements and omissions of material fact.  Lead Plaintiff's claims are based on negligence.  They are not based on any knowing or reckless conduct by or on behalf of Defendants, and Lead Plaintiff specifically disclaims any allegations of fraud, scienter, or recklessness in these non-fraud claims, except that any challenged statements of opinion or belief made in connection with the Merger between McDermott and CB&I are alleged to have been materially untrue statements of opinion or belief when made and at the time of the Merger.

I.      **NATURE AND OVERVIEW OF THE ACTION**

4.      McDermott engineers and builds infrastructure in the energy sector.  Traditionally, McDermott has focused on "upstream" field development, with projects such as production facilities, pipeline installations, and subsea systems for clients who are exploration and production companies.  In simple terms, McDermott is known for building offshore oil platforms.

5.      By 2017, the Company was concerned about its increasing lack of diversification.  For instance, almost two-thirds of the Company's revenue in 2017 came from a single client, Saudi Aramco, which also accounted for almost half of its contractual backlog.  Its second largest client contributed 11% of the Company's revenue that year.  Given its concentration of oil and gas production clients, McDermott remained sensitive to the cyclical nature of this industry and the fluctuations in oil and gas prices.  It also had an established upstream offshore presence in South and Central America and the Middle East, but little presence in the United States.  At the same

time, McDermott was viewed as a potential takeover target by its rivals.  McDermott reported 2017 revenue of almost $3 billion and net income of more than $178 million.

6.     Notwithstanding its essentially successful operations, because of its lack of diversification and dependence on oil prices, McDermott recognized that the significant decline in oil prices starting in 2014 adversely affected the demand for its services.  This decreasing demand, in turn, kept McDermott's share price relatively stagnant, at a pre-split price of approximately $7.00 per share from Dickson's late 2013 elevation as CEO until late 2017, immediately prior to the Merger announcement.

7.     CB&I was also an engineering and construction company that focused on the oil and gas industry, but unlike McDermott, CB&I focused its "downstream" on-shore operations in the United States, Middle East and Europe, and had a diverse client base.  CB&I was known for constructing petrochemical plants.  CB&I's 2017 reported revenue was more than $6.6 billion, but it also reported a net loss of more than $1.4 billion.

8.     After several public setbacks with certain large projects, CB&I, struggling to comply with its recently amended debt covenants, explored strategic options to prevent bankruptcy.  After a disastrous $3.3 billion acquisition of The Shaw Group, Inc. ("Shaw") in February 2013, CB&I had approximately $2.5 billion of debt, an over $1 billion impairment to goodwill that had been inflated for years, and potential liability stemming from securities litigation alleging that CB&I engaged in fraudulent accounting that catalyzed a $1 billion impairment charge.  According to CB&I's former Financial Operations Controller who was responsible for the financial reporting of CB&I for all oil and gas projects in the Americas until departing CB&I in November 2017, CB&I was "basically bankrupt" by the end of 2017.

9.      Under these circumstances, executives at McDermott and CB&I discussed the possibility of a merger in Fall 2017.  On December 18, 2017, the two companies entered into a business combination agreement to effectuate the Merger (the "Merger Agreement"), whereby CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity.

10.     From the beginning of the Merger discussions, investors and analysts focused on how McDermott would value four large projects that CB&I was struggling with in the United States (the "Focus Projects"):  two gas turbine projects known as Calpine and IPL, and two liquefied natural gas ("LNG") export facility projects known as Freeport and Cameron.  In fact, the very first question from an analyst on the December 18, 2017 joint conference call discussing the newly-announced Merger dealt with "the level [of] due diligence" around the transaction, particularly with respect to these problem projects.  Defendant Dickson stated that McDermott had "worked extensively with CB&I on due diligence," while Defendant Spence assured analysts that the due diligence on the Focus Projects was "significant."  Nonetheless, several analysts' first reports on the transaction focused on the need for McDermott to properly evaluate and account for the Focus Projects.

11.     Between the announcement of the Merger and the shareholder vote on May 2, 2018, the Defendants repeatedly reassured McDermott's investors that McDermott and its executives had conducted extensive due diligence into CB&I in general, and specifically the Focus Projects, so that the Company had "a strong understanding of the key drivers and [was] comfortable with what needs to be done with these projects going forward."  For example, when CB&I announced in February 2018 more than $100 million of operating charges related to the Focus Projects in the

fourth quarter or 2017, Defendant Dickson reassured investors that the situation was expected and under control: "The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence." The analysts following the Company repeated these reassurances in their reports.

12.     The concerns about the risks for McDermott taking over CB&I and the Focus Projects were so great that a member of the McDermott Board of Directors took the unusual step of voting against the Merger, based on his lengthy experience in the engineering and construction industry. However, the Defendants assured investors in the Proxy Statement and in various investor presentations, including presentations dated January 8, 2018, and March 22, 2018, filed by both companies with the SEC, that the risks of the Focus Projects that this director identified had been sufficiently mitigated through CB&I's prior accounting charges, CB&I's amended agreements with customers, and the McDermott Defendants' extensive due diligence of CB&I.

13.     After McDermott's repeated reassurances that it had controlled for the risk of the Focus Projects, the Merger was approved by a majority of McDermott shareholders, and closed on May 10, 2018 (the "Merger Date"). McDermott issued approximately 84.5 million shares of McDermott common stock to former CB&I shareholders with a market value (based on the $20.70 per share closing price on the Merger Date) of approximately $1.75 billion.

14.     Unbeknownst to investors, the risks posed by the Focus Projects were significant and readily evident and knowable from even a cursory attempt at due diligence by McDermott. For example, a former Director of Project Controls at the Cameron Project between June 2016 and June 2018 (FE-1), who was responsible for understanding the true costs of the Cameron Project, forecasting the costs of likely future events, and reporting those forecasted costs to management,

created detailed Risk Register Reports each quarter that revealed over $1.2 billion in forecasted costs for the Cameron Project alone as of December 31, 2017, a figure that increased to over $1.34 billion as of March 31, 2018.  This individual resigned in June 2018 after witnessing rampant "corporate override of the [Cameron] project['s]" costs at the end of 2017 and throughout the first quarter of 2018 to such an extent "that it [was] just a deception to stakeholders of the company." In an exit survey, FE-1 warned the management of McDermott that "***Cameron is going to lose an additional 700MM to 1.2B before this project is completed***."  FE-1 confirmed that CB&I's Project Controls Risk Registers and other forecasting documents are core documents common to all large construction projects, and would be central resources for a due diligence review.  While these documents composed for Cameron by FE-1 were central to any assessment of Cameron's future operational charges, no one from McDermott's due diligence team ever discussed the forecasts with FE-1.  Several other high-level former CB&I personnel confirm FE-1's account, including the Financial Operations Controller for the Americas and the Senior Vice President for Global Construction Operations, discussed below.

15.   McDermott reported a $221 million negative change in the value of the Focus Projects on July 31, 2018, assuring investors that this was a one time, kitchen-sink charge.  Yet, three months later, on October 30, 2018, after hours, McDermott issued a press release to announce its Q3 2018 financial results, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence.  In it, McDermott disclosed that it was recording ***$744 million*** total in changed estimates to the Calpine LNG project, the Freeport LNG Project, and the Calpine gas power project; that it was taking "significant steps" to address the performance issues on those projects. The ***$965 million aggregate negative change in value*** to the Focus Projects, within six months

after the Merger closed, represented ***more than 50% of the value*** of McDermott securities used to acquire CB&I.

16.     On this news, McDermott's stock price fell $5.14, an astounding ***40% single-day decline***, on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.  The overall decline in value of McDermott common stock from May 10 to October 31, 2018 was $12.97 per share (or 62.7%) from $20.70 to $7.73 per share.

17.     Immediately following the October 30, 2018 announcement, UBS analysts noted that the announced cost overruns "are surprisingly large," generously noting that McDermott "will now have a different business than what it envisioned when it agreed to acquire CB&I."  Unknown to analysts, of course, was the fact that CB&I's fourth quarter 2017 and first quarter 2018 internal forecast, all readily available to McDermott during due diligence, presaged these cost overruns in stark detail.

18.     On February 13, 2019, McDermott acknowledged that it was required to take an additional $168 million charge relating to the Cameron Project.  After the close of trading on July 29, 2019, McDermott further surprised investors by reporting a substantial net loss of $146 million or $0.80 per diluted share for its Second Quarter 2019 Financial and Operational Results and reduced guidance for the Company's full year 2019.  The loss and reduction in guidance was due to, among other things, McDermott's changes in assumptions about the expected performance of certain of the Focus Projects.

19.     On July 30, 2019, the first day of trading following this news, the stock price of McDermott dropped $3.56 per share to close at $6.52 per share—a one-day drop of 35.3%.  The overall decline in value of McDermott common stock from May 10, 2018 to July 30, 2019 was $14.18 per share (or 68.5%).

20.     Most recently, on September 18, 2019, trading for McDermott stock was halted for three hours and the price per share dropped 49% in morning trading based on news that the Company had hired Alix Partners, a company known for its work in restructurings and bankruptcies.  By midday, the Company issued a vague statement that acknowledged the hire but provided no other relevant information concerning the scope of Alix Partners' engagement.  No further details were released, and trading resumed in the afternoon.  However, the stock plunged again to a low of $1.44 per share—*a 75.5 percent intraday drop* from the Sept. 17 closing price of $5.88 per share—and a closing price of $2.14 per share, representing *a 63.6% drop* from the prior day's closing price.  In the wake of this news, Defendant Dickson abruptly canceled a planned September 19, 2019 presentation at an industry conference.  The stock decline continued the next day, closing at $1.58 per share on September 19, 2019.  By the end of the day, Moody's downgraded McDermott's corporate family rating based on the announcement and the higher than expected costs and cash outflows on the Focus Projects.

21.     The false and misleading statements regarding the Merger fall into three broad categories.  *First*, the Focus Projects were expected to incur substantially higher costs than publicly represented.  *Second*, CB&I overstated the fair value of these projects, and McDermott improperly "assumed that the fair value" of the Focus Projects as of the Merger Date was "equal [to] their respective carrying values."   *Third*, McDermott's representations that they had conducted substantial due diligence on CB&I prior to the date of the Proxy Statement were false or misleading because even minimal due diligence did, or should have, revealed the true risks posed by the Focus Projects and manifesting themselves as of the date of filing this Complaint.

22.     The truth behind these false statements should have been known to Defendants but for their negligence, at the time of the May 2, 2018 shareholder vote.  As discussed herein, former

employees with knowledge of the Focus Projects knew that these Projects were in much worse shape than CB&I or McDermott reported at the time of the Merger.  Some former CB&I employees were so surprised at the loose accounting at CB&I—including repeatedly revising forecasts for senior management—that they began to refer to CB&I as "Enron II."  Despite unequivocal representations about the thoroughness and robustness of McDermott's due diligence, high-ranking former employees who were uniquely situated to have knowledge about the planning for the Focus Projects were ignored by the due diligence team from McDermott.

23.     Because of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's stock price, Lead Plaintiff and other Class members have suffered substantial damages.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 14(a) and 20(a) of the Exchange Act (15 U.S.C. §§ 78n and 78t(a)).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are within this District.

27.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

III.    **PARTIES**

28.    Lead Plaintiff—The Public Employees' Retirement System of Mississippi—as set forth in the certification previously filed with the Court (ECF 1-2 in docket number 4:19-cv-00135), held 167,252 shares of McDermott common stock as of April 4, 2018 (pre-split), and suffered damages as a result of the federal securities law violations and false and misleading statements and material omissions alleged herein.

29.    Defendant McDermott International, Inc. is incorporated under the laws of Panama with its principal executive offices located in Houston, Texas.  McDermott is a provider of integrated engineering, procurement, construction and installation, front-end engineering and design, and module fabrication services for upstream field developments worldwide.[1]  McDermott claims to be "renowned for its extensive knowledge and experience, technological advancements, performance records, superior safety and commitment to deliver."  *See, e.g.*, Form 8-K filed March 29, 2018.  McDermott's common stock trades on the New York Stock Exchange ("NYSE") under the symbol "MDR."  The McDermott webpage lists eight different analysts that follow the Company, and millions of shares of the Company's common stock often trade each day.

30.    Defendant David Dickson ("Dickson") has been the President and Chief Executive Officer ("CEO") of the Company since December 2013, prior to which he served as the Executive Vice President and Chief Operating Officer beginning in October 2013.  Mr. Dickson has served as a member of the Board of Directors since December 2013.  According to McDermott's SEC

---

[1] For a discussion of the differences between upstream and downstream oil and gas operations, see https://www.investopedia.com/ask/answers/060215/what-difference-between-upstream-and-downstream-oil-and-gas-operations.asp:  "Upstream and downstream oil and gas production refer to an oil or gas company's location in the supply chain.  Upstream oil and gas production is conducted by companies who identify, extract, or produce raw materials [McDermott].  Downstream oil and gas production engages in anything related to the post-production of crude oil and natural gas activities [CB&I]."

filings, at the time of the Merger, Dickson had "more than 25 years of industry experience, including 11 years with Technip S.A. and its subsidiaries." From September 2008 to October 2013, he served as President of Technip U.S.A. Inc., overseeing Technip's entire North American operations. In addition to serving as the President of Technip U.S.A. Inc., Mr. Dickson also had responsibility for certain operations in Latin America. Mr. Dickson also supported the Technip organization by managing key customer accounts with international oil companies based in the United States.

31.      Defendant Stuart Spence ("Spence") has been the Executive Vice President and Chief Financial Officer ("CFO") of the Company since August 2014. According to McDermott's SEC filings, at the time of the Merger, Spence had "more than 25 years of financial and operation management experience with companies in oilfield products and services, and engineering and construction businesses."

32.      Because of their roles at McDermott, Defendants Dickson and Spence, (the "McDermott Individual Defendants," and collectively with McDermott, the "McDermott Defendants") possessed the power and authority to control the contents of McDermott's reports to the SEC and press releases and presentations to shareholders, securities analysts, money and portfolio managers, and institutional and retail investors, *i.e.*, the market. The McDermott Individual Defendants were provided with copies of McDermott's SEC filings, including the Proxy Statement and press releases, alleged herein to be misleading, prior to their issuance and had ultimate control over the contents of those documents.

33.      Defendant CB&I was a Dutch company headquartered in The Hague in the Netherlands with administrative offices in The Woodlands, Texas. CB&I was a provider of services to customers in the energy infrastructure market, including conceptual design, technology,

11

engineering, procurement, fabrication, modularization, construction, commissioning, maintenance, program management and environmental services.  At all relevant times, CB&I's business was aligned into four principal operating groups:  (1) Engineering, Construction and Maintenance, (2) Fabrication Services, (3) Technology, and (4) Government Solutions.  Until May 10, 2018, CB&I's common stock traded on the NYSE under the symbol "CBI."

34.     Defendant Patrick Mullen ("Mullen") (and collectively with CB&I, the "CB&I Defendants") was the President and Chief Executive Officer of CB&I from May 2017 through May 10, 2018.  Mullen served as CB&I's Chief Operating Officer from September 2016 to May 2017.  Previously, he served as CB&I's Executive Vice President and operating group President, Engineering & Construction from December 2013 to September 2016, and as Executive Vice President, Corporate Development from February 2013 to December 2013.  Mr. Mullen previously served as Senior Vice President, Business Development for Technology from 2007 to 2013 at CB&I, having joined CB&I after the ABB Lummus acquisition in 2007.

35.     Because of his role at CB&I, Defendant Mullen possessed the power and authority to control the contents of CB&I's reports to the SEC and press releases and presentations to shareholders, securities analysts, money and portfolio managers, and institutional and retail investors, *i.e.*, the market.  Mullen was provided with copies of CB&I SEC filings, including the Proxy Statement, and press releases alleged herein to be misleading, prior to their issuance and had ultimate control over the contents of those documents.

36.     The McDermott Individual Defendants and Mullen are referred to collectively as the "Individual Defendants."

IV.    **OVERVIEW OF THE EXCHANGE ACT VIOLATIONS**

37.     The Merger Agreement required the affirmative vote of a majority of both the McDermott and CB&I shareholders to proceed with the Merger.  As a result, the Defendants issued

the Proxy Statement and other related materials for the shareholders to consider in advance of the required vote.  Section 14(a) of the Exchange Act protects McDermott's shareholders (i.e., the Class members) by requiring the Defendants to provide meaningful information in these materials that was not false or misleading.

38.    One of the most important areas of information for the shareholders related to how McDermott would address CB&I's Focus Projects, which had recently suffered hundreds of millions of dollars of losses just before the Merger was announced in December 2017.  CB&I's publicized scandals preceding the Merger also presented serious red flags that should have alerted the McDermott Defendants of the need to dig deeply into CB&I's accounting.

39.    To address these concerns, Defendants assured investors that McDermott had performed significant due diligence on CB&I and the Focus Projects, and, because of that due diligence, they had appropriately accounted for the risks associated with them going forward. However, Defendants' statements belied the true state of CB&I's financial well-being and the problems plaguing the Focus Projects.

A.    **CB&I's Accounting And Business Practices Raised Numerous Red Flags That Heightened The Need For McDermott's Pre-Merger Due Diligence**

40.    When the McDermott Defendants began investigating CB&I as a potential acquisition target in mid-2017, they should have heeded significant warning signs.  Not only was CB&I bogged down in notorious and complicated long-term projects incurring mounting costs and missing deadlines, but several third parties lodged credible accusations that CB&I's management made misrepresentations to investors concerning CB&I's financial statements.  Indeed, just as McDermott began its purported due diligence on CB&I in 2017, an amended complaint in a class action litigation alleged CB&I and its executives committed securities fraud related to material misrepresentations and omissions regarding massive losses in CB&I's nuclear business.  The

allegations in that amended complaint survived a motion to dismiss days after the McDermott and CB&I shareholders approved the Merger.

41.     As background, in July 2012, CB&I agreed to purchase Shaw for approximately $3.3 billion in cash and stock ($2.2 billion net of cash acquired), funded in part with $1.9 billion in debt financing (the "Shaw Purchase").  The Shaw Purchase closed in February 2013.  Shaw's crown jewel was its Stone & Webster subsidiary ("Stone & Webster"), a leading global fabricator of nuclear power plants.  Consequently, the Shaw Purchase made CB&I a major player in the nuclear power industry, in which it had not previously been involved.

42.     Stone & Webster was the construction contractor and fabricator for two projects that were under construction in 2012 (the "Nuclear Projects") using a design developed by Westinghouse Electric Corporation ("Westinghouse"):  the "Vogtle Plant" in Waynesboro, Georgia and the "V.C. Summer Plant" in Jenkinsville, South Carolina.  The various contracts relating to these Nuclear Projects (the "EPC Agreements") gave Stone & Webster a fixed price for its services, with additional compensation available only in certain specified circumstances when a change order applied.

43.     On June 17, 2014, Prescience Point, a research firm, issued a 38-page report on CB&I entitled "Acquisition Accounting Gone Nuclear" (the "Prescience Point Report").  The Prescience Point Report concluded that CB&I had manipulated contract liabilities and goodwill through purchase price adjustments, lowering the quality of CB&I's earnings and distorting its prospects.

44.     Immediately following the Prescience Point Report, *i.e.*, on that same day, CB&I issued a press release vigorously denying the accuracy of the Prescience Point Report and denying that it had masked undisclosed liability.  In the June 17, 2014 press release, CB&I's then CEO Phil

Asherman stated: ***"CB&I's management team operates our company with the absolute highest integrity, and we take great issue with [these] erroneous claims."***[2]   CB&I further discouraged investors from relying on the information in the Prescience Point Report, warning that Prescience Point holds "short positions in CB&I common stock and [Prescience Point] stand[s] to realize significant gains in the event that CB&I's stock price declines.  CB&I believes that this conflict of interest should cause the report and its conclusions to be viewed skeptically."

45.     Between October 1 and October 3, 2014, several articles were published identifying growing disputes between CB&I, Westinghouse, and the owners of the Nuclear Projects for liability for the growing costs associated with project delays and change orders.  Indeed, for nearly one year, the Vogtle and V.C. Summer Plants' owners disputed CB&I's claim for change orders due to cost overruns and delays under the EPC Agreements, including through litigation.  In May 2015, a Georgia court disclosed CB&I's sealed statement that it had already completed an estimate of future damage as a result of Vogtle delays.  *See Georgia Power, et al. v. Westinghouse Elec. Co. LLC and Stone & Webster, Inc.*, No. CV 1:12-167, Order dated May 13, 2015 (S.D. Ga.).

46.     On November 21, 2014, experts from Georgia Power, one of the owners of the Vogtle Plant, provided testimony to the Georgia Public Service Commission blaming construction delays on CB&I and Westinghouse.  The testimony sharply criticized the "various stop work orders," explained that CB&I and Westinghouse had breached their obligation to provide an accurate and complete project schedule which "runs counter to any prudent project management," and reiterated that Georgia Power intended to hold CB&I and Westinghouse "accountable."  *See* Nov. 21, 2014 Testimony of Jacobs and Roetger, available at https://psc.ga.gov/facts-advanced-search/document/?documentId=155941 (last visited Sept. 19, 2019).

---

[2]  Unless otherwise indicated, all emphasis is added.

47.     On October 27, 2015, CB&I announced it was selling its Stone & Webster unit to Westinghouse for a release of liabilities only, subject to adjustment for changes to networking capital after the target date of June 30, 2015 (to "true up" for any additional expenses that CB&I may incur between that date and deal closing).  CB&I also disclosed it would take a $1 billion loss on the sale of Stone & Webster.

48.     On April 28, 2016, pursuant to the sales contract, Westinghouse delivered its post-closing accounting "true up" to CB&I.  Westinghouse claimed that CB&I owed $2.1 billion in disputed liabilities between CB&I and Westinghouse, noting that CB&I's accounting for liability it faced for the Nuclear Projects was "not recorded in accordance with [Generally Accepted Accounting Principles ("GAAP")]" and that CB&I "should have recorded a reserve liability of hundreds of millions of dollars for losses."

49.     These problems also led to a class action litigation—styled *In Re Chicago Bridge & Iron Company N.V. Sec. Litig.*—which was filed in the U.S. District Court for the Southern District of New York on behalf of purchasers/acquirers of CB&I common stock during the period October 30, 2013 through June 23, 2015, inclusive (the "CB&I Class Complaint").

50.     In a nutshell, the CB&I Class Complaint alleged that, notwithstanding the delays and loss of profitability attributable to the Nuclear Projects, CB&I did not timely or truthfully report these mounting problems to its investors.  Instead, CB&I: (1) recorded unapproved change orders as assets and revenues in its financial statements contained in its Form 10-Ks and 10-Qs filed with the SEC in violation of GAAP in multiple respects; (2) overstated goodwill in CB&I's financial statements contained in Forms 10-Q and 10-K resulting in part from CB&I's improper recording of purchase price adjustments in the year following the Shaw Purchase, which caused the assets on CB&I's balance sheet to be overstated and the expense on its income statement to be

understated; (3) made materially false and misleading statements regarding the progress of the Nuclear Projects; and (4) later falsely stated that delays in construction would have no effect on CB&I's profitability.  In an Opinion dated May 24, 2018, the court in the CB&I Class Action denied the defendants' motion to dismiss the CB&I Class Complaint in its entirety. *See* 2018 U.S. Dist. LEXIS 87991 (S.D.N.Y. May 24, 2018).

51.     McDermott and the Individual Defendants were aware of the issues raised in the CB&I Class Complaint and failed to do adequate due diligence on the Merger to determine whether the same issues that had roiled CB&I's projects were still present.

B.     **Four CB&I Focus Projects Were Subject To Heightened Scrutiny At The Time Of The Merger Announcement**

52.     In the years leading up to the Merger, CB&I's performance increasingly depended on the Focus Projects, which were significant fixed-price projects in the United States:  two LNG[3] export facility projects known as Freeport and Cameron, and two gas turbine projects known as IPL and Calpine.

53.     ***Freeport Project***:  CB&I first announced in December 2013 that its joint venture with Zachry Industrial, Inc. had been awarded two contracts valued at $2.5 billion to construct two trains at the Freeport Liquefaction Project in Freeport, Texas (the "Freeport Project").  In March 2015, CB&I announced that the project expanded to include the construction of a third train in a contract valued in excess of $2 billion.

54.     ***Cameron Project***:  On March 17, 2014, CB&I and Chiyoda Corp. issued a joint press release stating that the two companies had entered into a joint venture and had been awarded

---

[3] According to the website for the Cameron Project, "Liquefied natural gas (LNG), is natural gas that is super-cooled to minus 260 degrees Fahrenheit (minus 162 degrees Celsius). At that temperature, natural gas transforms from a gaseous state into a liquid. When in liquid form, natural gas takes up to 600 times less space than in its gaseous state, making it feasible and more economical for transport over long distances."  https://cameronlng.com/lng-import-export/lng-and-liquefaction/ (last visited Sept. 19, 2019).

a contract valued at approximately $6 billion ($3 billion each) by Cameron LNG, LLC to construct the Cameron Liquefaction Project in Hackberry, La. (the "Cameron Project").

55.     *IPL Project*:  On June 19, 2014, CB&I issued a press release about a gas turbine project in Indiana (the "IPL Project") announcing that:

> it has been awarded a contract by AES Corporation subsidiary Indianapolis Power & Light Company valued at more than $500 million for the engineering, procurement and construction (EPC) of a combined-cycle gas turbine power station near Martinsville, Indiana. The 671-megawatt unit will be built adjacent to the existing Eagle Valley station.

56.     *Calpine Project*:  On November 11, 2014, CB&I issued a press release announcing that "it has been awarded a contract by Calpine Mid-Merit, LLC, . . . for the initial development phase of a combined-cycle gas turbine station in Peach Bottom Township, Pennsylvania" (the "Calpine Project").  CB&I subsequently disclosed in March 2018 that the value of the contract was approximately $300 million.

57.     The performance of all Focus Projects began to decline by 2017.  On May 8, 2017, prior to the opening of trading, CB&I issued a press release reporting first quarter 2017 operating results.  Among other things, CB&I reported that "solid earnings for the quarter" were "negatively impacted by underperformance on two union construction projects."   On the conference call conducted immediately after the issuance of the earnings release, CB&I quantified the charges at $167 million "due primarily to union construction projects."

58.     Although CB&I did not identify these projects by name as the Calpine and IPL Projects, investors were subsequently informed on the second quarter 2017 conference call of the identity of these two projects.

59.     Following announcements regarding the Focus Projects, several analysts revised their opinions of CB&I.  For example, on May 18, 2017, Bank of America Merrill Lynch analyst Anna Kaminskaya slashed her price target on CB&I to $20 from $31, citing more risks to the

company from incremental project charges, among other things.  CB&I common stock declined

that day by $0.86 from $20.21 per share to $19.35 per share.  On June 9, 2017, a Goldman Sachs

analyst (Jerry Revich) cut his price target on CB&I to $15 from $33, citing higher cost overrun

estimates on the Cameron Project in the second half of 2017 and 2018.  CB&I common stock

closed at $16.16 per share on June 9, 2017.  On June 21, 2017, Macquarie analyst Sameer Rathod

cut his price target on CB&I from $11.50 to $10 a share (when CB&I common stock closed at

$13.15 per share), citing delays at the Freeport Project that could lead to a possible cost overrun at

CB&I.

60.     CB&I subsequently acknowledged in the Proxy Statement (at 56) that, by early

June 2017, it had become concerned that there was a risk of default under its loan covenants and

that "[i]f a default occurred, such indebtedness would become immediately due and payable,

potentially requiring CB&I to seek protection under bankruptcy laws."

C.     **CB&I Suspends Dividends, Revises Its Loan Covenants, And Announces Its Effort To Reduce Debts Due To The Focus Projects**

61.     On August 9, 2017, after the close of trading, CB&I issued a press release reporting

on second quarter 2017 operating results.

62.     In the second quarter of 2017, CB&I's E&C Operating Group "reported an

operating loss of $525.7 million due to forecasted increases in costs on four fixed-price contracts

amounting to $548.0 million, as well as an additional $50 million from the current-quarter impact

of a lower margin percentage recognized on work performed during the period on the projects.

The projects that incurred these cost increases were two gas turbine projects [Calpine and IPL

Projects] and two LNG export facility projects [Freeport and Cameron Projects]."

63.     The second quarter release also reported that "[a]s of June 30, 2017, [CB&I] would

not have been in compliance with certain covenants required under CB&I's credit agreement

19

without amending the agreements.  Effective August 9, the company amended its credit agreements . . . to waive its current non-compliance and to revise future covenants."

64.     Given its financial condition, CB&I announced, among other things, that it was suspending its dividend and was "pursuing a sale of [its] Technology business" to "eliminat[e] the majority of [its] debt" and to "reinvest[ ] in our [Engineering & Construction] and Fabrication Services businesses."

65.     On the conference call after issuance of the second quarter release, defendant Mullen acknowledged that CB&I had recorded $367 million in charges on the Cameron and Freeport Projects, the majority of which were taken related to the Cameron Project.  "The charges represent CB&I's share of forecasted cost increases and were necessary because of lower-than-expected labor productivity, weather-related delays, increased costs for fabrication and craft labor, subcontractor and indirect costs associated with extensions of schedule. Some of these factors are within our control and some are not.  We are working with Cameron LNG towards a finalized schedule and are also beginning to engage in discussions regarding claims for extension of time and recovery of certain costs."

66.     In addition, Mullen stated on the August 9, 2017 conference call that $181 million in charges had been taken on the IPL and Calpine Projects:

> Of the charges recorded, $181 million was related to the 2 gas turbine power projects that we discussed to some extent on last quarter's call.  One is the IPL Eagle Valley project in Martinsville, Indiana; and the other is a project for Calpine in York, Pennsylvania. I'm sure you are as frustrated as we are to see additional charges on these projects. On the call last quarter, it was stated that we believed we had captured virtually all of the incremental costs, and that's exactly what our analysis showed.

67.     Later on the call (at 9), Mullen stated that the losses being taken in the second quarter reflected "a more conservative view of assumptions going forward," adding that "we've

got enough experience in the field right now with where we are in construction, and applying that to the future and taking the loss that we talked about today is what we've decided to do."

68.     An September 11, 2017 analyst report issued by Credit Suisse contained "takeaways" from "meetings with CBI including the new President and CEO Pat Mullen, EVO & CFO Mike Taff, and VP of IR, Scott Lamb." During those meetings, CB&I management provided an "update on problem projects" (i.e., the Focus Projects) and stated that "the charges taken in Q2'17 more accurately reflect the cost to complete the projects along with lower productivity levels vs prior estimates."

69.     When announcing the third quarter 2017 results on October 30, 2017, CB&I reported that it had revised the loan covenants, effective August 9, 2017, to maintain decreasing trailing 12-month EBITDA levels, among other requirements. Furthermore, the revised loan covenants excluded from the analysis of EBITDA certain unspecified "charges on certain projects which occurred" during the first half of 2017, and "an agreed amount for potential future charges for the same projects if they were to be incurred during the third and fourth quarters of 2017."

70.     On an October 30, 2017 conference call, conducted after the close of trading, Defendant Mullen acknowledged that CB&I had "moderat[ed]" its "cost forecasts of the IPL Eagle Valley power project in Martinsville, Indiana and the Calpine York 2 power project in Pennsylvania." Mullen also revealed that CB&I had taken "additional charges of approximately $38 million on these two projects during the quarter" Mullen stated that "the IPL Eagle Valley project is now 99% complete on construction and is in the commissioning phase." Mullen also stated that the "Calpine power project is approximately 75% complete."

71.     With respect to CB&I's LNG contracts, and the Cameron Project particularly, Mullen said that:

We're also continuing our discussions with Cameron LNG regarding claims for extension of time and recovery of certain costs on that project.  We are meeting with our customer regularly, and senior management at both companies have targeted a resolution before year's end.  At both the Cameron LNG and Freeport LNG projects, we were back up to full site staff levels within a couple of weeks after [Hurricane Harvey] and continue to make good progress.

D.     **McDermott And CB&I Announce The Merger On December 18, 2017 And The Market Expresses Concern Over McDermott's Exposure To CB&I's Focus Projects**

72.     On December 18, 2017, after the close of the U.S. securities markets, McDermott and CB&I issued a joint press release reporting that the two companies had "agreed to combine in an all-stock transaction to create a premier, fully vertically integrated onshore-offshore company, with a broad engineering, procurement, construction and installation service offering and market leading technology portfolio."   This press release was included, together with the Merger Agreement, in a Form 8-K filed by McDermott pursuant to SEC Rule 425 on December 19, 2017.

73.     From CB&I's perspective, the Merger was substantially motivated by difficulties CB&I had experienced in performance under the Focus Projects.  From December 3, 2016, through December 18, 2017, CB&I's common shares declined in value by 43.56%.  Defendant Dickson alluded to CB&I's difficulties when he was quoted in the press release as stating that: "[b]y applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture." Moreover, as recounted by CB&I's former Financial Operations Controller (FE-2), who was responsible for the financial reporting of CB&I for all oil and gas projects in the Americas until departing CB&I in November 2017, CB&I was "basically bankrupt" and "essentially in bankruptcy" by the end of 2017.  FE-2 knew this as FE-2 was the individual in charge of cash at CB&I and, as a result, spent significant time "figuring out how to pay people and keep the lights on."

74.     McDermott, on the other hand, was financially stable but was motivated to acquire a substantial company at distressed prices, with complementary businesses in different regions and markets where McDermott did not conduct operations.  Whereas McDermott had an established upstream offshore presence in South and Central America and the Middle East, CB&I focused its downstream on-shore operations in the United States, Middle East and Europe.  Dickson later acknowledged during McDermott's November 5, 2018 "Analyst Day," that "at one point, 60% of [McDermottt's] business would come from Saudi Aramco . . . .  [W]e really wanted to create an element of diversification and not just on our capabilities [downstream v. upstream], but also on our customer."  Moreover, Dickson noted on the same day that McDermott and CB&I were countercyclical:  "I look at the downstream versus upstream, historically, there've been two industries that have been countercyclical."

75.     McDermott held a joint conference call with CB&I on December 18, 2017 to explain the Merger to investors, the transcript of which was filed with the SEC on December 19, 2017 pursuant to Rule 425 (the "12/18/17 Conference Call").  On this call were Defendants Dickson, Spence and Mullen.  Defendant Dickson first extolled the benefits of the Merger to McDermott's shareholders:

> The transformational combination of McDermott and CB&I will create a $10 billion fully vertically integrated onshore-offshore EPCI provider with a market-leading technology and portfolio.  Our operations and capabilities are highly complementary, and we are extremely well positioned to capitalize on attractive trends driving growth in our markets.

> Further, this combination gives us a presence across onshore and offshore upstream downstream and markets.  This will make us more competitive and enable a more consistent predictable performance through market cycles.

> We will be able to provide our customers with an end-to-end solution to better meet their needs across the project lifecycle.  Our companies share a common culture and a similar approach to conducting business with a strong emphasis on safety and customer engagement, and we both primarily operate on the fixed-price lump-sum contracts.

23

Our scalable best-in-class operational expertise will be leveraged across the organization to maximize our ability, to execute product customers and unlock value in the near and long-term. The transaction will also deliver significant financial benefits, which we will provide more detail later in the presentation, but the combined company will be supported by a strong capital structure and will generate significant free cash flow.

The transaction is expected to be cash accretive, excluding onetime costs within the first year after closing. We also expect the combination will generate substantial costs and revenue synergies. The all-stock consideration will allow shareholders of both companies to participate in the upside of the combination.

76.     Defendant Spence specifically addressed investor concerns over the Focus Projects and during the 12/18/17 Conference Call, emphasized that McDermott had "***dedicated a significant amount of time performing joint due diligence together with CB&I's team [and had] gotten to know one others['] operations very well.***"  Spence continued, stating that McDermott had "***performed a great deal of due diligence on CB&I's IPL Eagle Valley, Calpine, Freeport and Cameron projects***" and that "***[w]e feel confident that we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects***."  Spence emphasized again, later in the call, that "***we have done a significant amount of diligence around not only the four projects, but the overall portfolio***."

77.     McDermott's emphasis on due diligence and its ability to gauge and deflect concerns over the potential exposure to McDermott's bottom line from the Focus Projects was important to shareholders.   Indeed, the first question asked by an analyst on the 12/18/17 Conference Call (by Jamie Lyn Cook of Credit Suisse), squarely addressed the "level of due diligence" performed by McDermott and how that due diligence informed the Company's assessment of the "cost to complete" the Focus Projects:

David, can you just provide a time line on when you and CBI just started talking? Because I think that's important and how people think about the level of due diligence you guys were able to do on this transaction and sort of what your assumptions are broadly on the problem projects that CBI has and cost to complete? And then my second question is you talked about strong EBITDA growth and free

24

cash flow in order to delever, is there any context you can put around that so we can get comfortable with that?

78.     Dickson stated in response that:

*"[W]e have worked extensively with CB&I on due diligence as Stuart said, on the prepared remarks and obviously had a number of our team working with Pat's team through what Stuart referred to as 4 projects. So we are happy with [our] work that's been done a lot of time and a lot of effort has been put into that. So as I said, we're happy that the progress and obviously . . . we have some members of our team that have some experience in terms of onshore construction so that obviously helped us better understand the CB&I projects that are undergoing."*

79.     Dickson continued, stating: "we've spent a significant amount of time and resources on this" and noting that his "past background . . . gives me some better insight in how these projects evolve."  Dickson explained to investors that "these projects are at different stages of completion and all 4 of them are fairly well progressed.  So that takes a lot of the risk that the start-up.  So we're very happy with the work that we've done and the work to do . . . .  But what I said [in the prepared remarks and] what Stuart said is, an extensive amount of work has been done on these projects, and obviously with a lot of focus with the work that's left or the balance of the work that's left on what is being 4 critical projects for CB&I."  [Thomson Tr.[4] at 12].

80.     Defendants informed investors that McDermott's understanding of the Focus Projects would increase as the two companies installed integration teams.  To that end, Defendant Dickson explained during the 12/18/17 Conference Call that McDermott was "beginning the integration planning phase immediately . . . .  And in the coming weeks, we will build a cross-functional team comprised of representatives from both companies.  This team will develop a detailed plan so that we are ready to begin integrating our two companies immediately after close." *Id.* at 8-9.

---

[4] All references to "Tr. __" are to transcripts prepared by Thompson-Reuters.

81.     Analysts reacted immediately to news of the Merger, expressing surprise and some caution about the risks being undertaken by McDermott.  In a December 19, 2017 analyst report titled "Heading Onshore: MDR Acquires CBI," Deutsche Bank noted that "The key swing factor will be execution post the close, which remains uncertain" because, among other things, "MDR [is] taking on 3 large scale projects with execution issues."  The analyst report minimized this "swing factor," however, noting that McDermott "[b]egan the due diligence process in the summer (>3mos)," and "Mgmt feels very comfortable with 3 remaining problem projects (LPL nearly complete, Calpine, Cameron LNG, and Freeport LNG remain), ran a sensitivity analysis on productivity factors to get more comfortable."

82.     Other analysts also found management's representations concerning McDermott's due diligence and analysis of the Focus Projects sufficient to offset concerns.  For example, analysts from MKM Partners noted on December 19, 2017 that while "[t]he news comes as a surprise to investors," "MDR management said on the call that they had done exhaustive due diligence on CBI's backlog and are comfortable with the risks there regarding further charges." These concerns were further allayed the next day when CB&I announced a settlement concerning certain outstanding liabilities relating to the Cameron Project.

83.     On December 19, 2017, CB&I issued a press release prior to the opening of the U.S. securities market that provided additional (false) comfort to investors about continuing risks related to the Focus Projects.  On that day, CB&I announced that it had "reached a settlement with Cameron LNG" relating to the LNG liquefaction project (the "Cameron Settlement Agreement"). The press release stated that:

> "This settlement with Cameron LNG marks an important milestone in resolving all past commercial issues and aligning all parties toward the successful completion of the project," said Patrick K. Mullen, CB&I's President and Chief Executive Officer. "We appreciate the collaboration of Cameron LNG and look forward to their

continued support as we move forward with the safe and on-time completion of this significant energy infrastructure project."

The settlement resolves all known and unknown claims to date (including impacts from Hurricane Harvey) and includes the following key components:

- Resolves all past commercial issues and increases the certainty of the project schedule, which has all three liquefaction trains producing LNG in 2019

- Provides incentive bonus payments related to expedited project completion

- Waiver of any schedule-related liquidated damages related to the original contract and reestablishment of liquidated damage start dates according to the settlement.

84. Although the press release portrayed the Cameron Settlement Agreement positively, CB&I undertook obligations in that agreement that exposed it to potential liquidated damages estimated internally as exceeding $500 million, in addition to the $500 million in costs above the contract price that would be necessary for CB&I to complete the Project.

E. **Following The Merger Announcement, Defendants Tout McDermott's Extensive Due Diligence Into CB&I's Focus Projects In An Effort To Sell The Deal To Investors**

85. In the months between the Merger announcement and the issuance of the Proxy Statement and subsequent stockholder vote, both the McDermott and CB&I Defendants continued to market the value of the Merger to McDermott's stockholders in an effort to convince investors that the risks of CB&I's Focus Projects had been considered and incorporated into the Company's valuation of CB&I and decision to move forward with the Merger.

86. For example, in an January 8, 2018 joint investor presentation filed pursuant to Rule 425 (the "1/8/18 Merger Presentation"), Defendants made numerous affirmative statements highlighting the extent of McDermott's due diligence into the Focus Projects, and Defendants' assessment that the Focus Projects had been largely de-risked.

87.     On February 20, 2018, after the close of trading on the U.S. securities markets, CB&I issued its fourth quarter 2017 operating results.  Those results included $101 million of operating charges relating to the Focus Projects and were intended to influence the McDermott shareholder vote.  The operating results were issued as an exhibit to a Form 8-K filed with the SEC.  The $101 million in charges were described as follows:

- *Cameron LNG project: $39.0 million*, resulting in part from the recognition of incremental costs resulting from Hurricane Harvey, which the company agreed to absorb in connection with the December 2017 settlement agreement with the project sponsor. *The settlement considerably de-risks the project for CB&I, as it resolves all past commercial issues, provides significant cost coverage for certain past and current cost increases, includes an incentive bonus payment related to expedited project completion and, importantly, resets the trigger dates for any potential liquidated damages.*  As of December 31, 2017, the project was approximately 77 percent complete and is forecasted to be completed in the fourth quarter of 2019.

- *Freeport LNG project: $20.0 million*, due in part to the adjustment of contingency provisions in the existing contract. The company is continuing to evaluate and estimate the indirect impacts of Hurricane Harvey, including potential impacts to productivity and schedule-related prolongation costs. *The company believes any costs incurred as a result of the hurricane are recoverable under contractual force majeure provisions.*  The pace of incremental progress on the project increased substantially during the fourth quarter as compared to prior quarters. As of December 31, 2017, the project was approximately 73 percent complete and is forecasted to be completed in the third quarter of 2019.

- *Calpine* combined-cycle gas turbine power project: *$35.0 million, primarily resulting from disruption of construction activities caused by severe winter weather during the fourth quarter*.  The charge includes the benefit of a claims settlement (subject to final documentation) with the project owner, which resulted in a net increase in project price during the fourth quarter for schedule incentives (based on a revised schedule) and the resolution of schedule liquidated damages.  As of December 31, 2017, the project was approximately 79 percent complete and is forecasted to be completed in the fourth quarter of 2018.

- *IPL/Eagle Valley* combined cycle gas turbine power project*: $7.0 million* associated with the close-out of the project, which is expected to be essentially completed by the end of this month.

88.     CB&I's Form 10-K filed with the SEC on February 21, 2018, also encouraged shareholders to believe that the forecasts were under control.  For example, when discussing the gas projects, CB&I recognized the recent setbacks but stated that "our current forecast for the project anticipates productivity levels that are consistent with our overall historical experience on the project and improved progress (due in part to anticipated improvement in weather conditions as the project moves out of the winter months), and actions to reduce our schedule related indirect costs."  Similarly, CB&I stated that the Cameron Project forecast "anticipates improvement in productivity from our overall historical experience on the project (as we anticipate improved construction performance for each subsequent LNG train) and actions to significantly reduce our schedule related indirect costs."  CB&I also included similar reassurances in the Form 10-Q filed on April 24, 2018.

89.     CB&I stated in its 2017 Form 10-K (at 52) that it employed the percentage of completion ("POC") method to recognize revenue and expense in accounting for fixed price, long-term engineering, procurement and construction contracts.  Under the POC method, the aggregate of expenses are estimated over the life of the contract and profits and revenue are recognized over the life of the contract.  When adjustments are made in a current period to increase the cost to complete the contract, the underestimate of prior period expenses results in a current period cumulative charge that takes into account the total amount of overestimated profit and revenue in prior periods.

90.     For example, if a CB&I contract has a $3 billion contract price and CB&I estimates that its cost to perform under that contract will be $2 billion, assuming that CB&I stays on budget, 150% of the costs incurred in a period would be recognized as revenue and 50% of the costs incurred in a period would be recognized as profit.  Thus, if CB&I incurs $500 million of expenses

during a period, and assuming it stays on budget, it would recognize $750 million of revenue and $250 million of profit.

91.     If the cost to complete the contract is revised upward from $2 billion to $3 billion, all prior period profit recognized on that contract would be taken as a current period charge.  Also, all revenue recognized on that contract in excess of expenses would be reversed in the current period.  For example, in its 2017 Form 10-K (at 35), CB&I stated that "Our 2017 revenue was also impacted by lower revenue on our two U.S. LNG export facility projects (approximately $350.0 million combined), primarily due to the reversal of revenue resulting from a reduction in their percentage of completion due to increases in forecast costs on the projects."

92.     Pursuant to Accounting Standards Codification ("ASC") 605-35-25-46, "When the current estimates of total contract revenue and contract cost indicate a loss, a provision for the entire loss on the contract shall be made.  Provisions for losses shall be made in the period in which they become evident under either the percentage-of-completion method or the completed-contract method."  Accordingly, once a project is operated at a loss, all incremental estimates of additional expense must be recognized as a current period charge, rather than over the life of the contract.

93.     These two aspects of GAAP—retroactive revenue and profit adjustments based on expense adjustments, as well as providing for the entire loss on a contract upfront—made CB&I and McDermott's estimates of further expense highly material.

94.     Increases in CB&I's estimated costs under the percentage-of-completion method also constrained CB&I's 2017 profit margins and profitability, as explained in the 2017 Form 10-K:

> Our 2017 results were impacted by lower revenue volume and changes in estimated margins on four projects that resulted in a decrease to our income from operations of approximately $870.0 million (approximately $404.0 million for our two U.S. gas turbine power projects in the Northeast and Midwest ("Two Gas Projects") and

approximately $466.0 million for our two U.S. LNG export facility projects ("Two LNG Projects") as discussed further below.  The changes in estimated margins resulted in charges due to the accrual of additional losses for the Two Gas Projects resulting from increases in forecast costs on the projects, and the reversal of previously recognized revenue for the Two LNG Projects resulting from a reduction in their percentage of completion due to increases in forecast costs on the projects. Our results were also impacted by a lower margin percentage recognized on work performed during the periods for the LNG Projects (approximately $157.0 million) as a result of the changes in estimated margins on the projects during 2017.  [At 36]

95.    Because of the significant negative impact that would be felt on its financial statements, CB&I was under tremendous pressure not to report further increases in its costs to complete prior to the Merger.  CB&I's Form 10-K for 2017 stated, for example, that "[a]lthough our recent labor productivity and project progress were below our expectations (due in part to weather related impacts during the fourth quarter 2017), our current forecast for the project anticipates productivity levels that are consistent with our overall historical experience on the project and improved progress (due in part to anticipated improvement in weather conditions as the project moves out of the winter months), and actions to reduce our schedule related indirect costs."

96.    CB&I made almost identical disclosures in its Form 10-Q for the first quarter of 2018, filed with the SEC on April 24, 2018 (at 29-30).

97.    CB&I's financial statements and disclosures in its 2017 Form 10-K and Form 10-Q for the first quarter of 2018 violated GAAP, specifically ASC 605-35-25-52 which requires companies to base "estimates of costs to complete based on most recent information."

98.    Indeed in the Notes to its Financial Statements, CB&I claimed that its total estimated project costs were not based on the "most recent information," but rather were based on "anticipate[d] improvement in productivity from our overall historical experience on the project (as we anticipate improved construction performance for each subsequent LNG train) and actions to significantly reduce our schedule related indirect costs."

99.    Notwithstanding the GAAP requirement to use the "most recent information" and its disclosed claim that it based its estimates on "expected costs," CB&I based its estimates on anticipated improvements in the weather, and on improvements in its productivity, which it knew had not been achieved. *See infra* at ¶¶ 104–135.

100.    In fact, the very "use of the percentage-of-completion method depends on the ability to make reasonably dependable estimates, which . . . relates to estimates of the extent of progress toward completion, contract revenues, and contract costs." (ASC 605-35- 25-56).

101.    On February 21, 2018, McDermott issued its operating results for the fourth quarter and full year 2017.  On the McDermott conference call conducted that day after the issuance of the press release, Defendant Dickson assured investors that the CB&I "transaction is proceeding on track and on schedule" despite CB&I's poor news.  Dickson stated that:

> In addition to the compelling strategic and financial rationale underpinning the combination, we also believe that there are a number of ways we can begin capturing value in the near-term by applying our proven operational model, turnaround experience and cost discipline to CB&I's underlying businesses.
>
> *            *            *
>
> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional project charges attributable to the four focused projects.  ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.***
>
> *            *            *
>
> Further, as IPL Eagle Valley is in its very final stages of delivery, we are pleased that the focused four projects are now down to three. In addition, Freeport is currently stabilized and profitable.  We remain confident that our combination with CB&I will generate significant benefits for our shareholders by better positioning us to meet evolving customer needs, diversifying our portfolio of capabilities, as well as our geographic footprint providing a strong capital structure and by delivering significant synergies. In fact, the integration planning now well under way, ***we're even more confident in our synergy expectations and looking forward to a timely closing.***  [Tr. at 3.]

102.     Analysts honed in and relied on McDermott's assurances concerning CB&I's $101 million in charges to the Focus Projects, and McDermott's representation that these overruns were within the ranges contemplated as part of due diligence.  For example, in a February 21, 2018 analyst report, Credit Suisse analysts noted that market reaction to McDermott's own earning release "had more to do with CBI's earnings print versus its own, reflecting the pending merger" because "CBI reported another $101M in charges on the four known problem projects including Cameron."  Credit Suisse continued, reporting that:  "Even with the charges, MDR maintained the company is well within the ranges contemplated as part of due diligence.  CB&I had, in fact, under-accrued for the costs to complete the Focus Projects."  An analyst from Scotia Howard Weil reported the next day that:  "management was tested regarding its conviction regarding projections offered in the merger related filings given that a noisy 4Q17 CBI report invited some degree of skepticism."  Management then passed the test because:

> MDR offered that it has been kept apprised of any and all issues encountered by its other half and believes that the numbers it has offered remain in the range of outcomes contemplated by MDR during due diligence and it continues to gather optimism around greater synergy and cost savings figures.

103.     At the time of these assurances, McDermott was in the midst of ongoing due diligence with respect to CB&I's businesses, and specifically these Focus Projects.  As described below, any adequate due diligence would have informed McDermott that CB&I had grossly under-accrued for the Focus Projects, materially impacting McDermott's valuation and projections.

F.     **The Focus Projects Carried Hundreds Of Millions Of Dollars Of Known, Undisclosed Forecasted Costs At The Time Of The Merger**

104.     Contrary to McDermott's representations that, for example, "the risks related to the [Focus Projects] that have negatively impacted CB&I's results of operations in recent periods could be managed," that the Focus Projects "have been significantly de-risked," that the Cameron Settlement Agreement announced on December 19, 2017 had "result[ed] in a de-risking of the

project," and other similar statements, former senior employees and internal forecast and risk assessment documents circulated widely within CB&I and which were readily available to and should have been known to McDermott demonstrate that Defendants hid well over $1 billion in undisclosed costs related directly to the Focus Projects.

      1.    <u>Insiders Forecasted That the Cameron Project Alone Would Cost An Additional $700 Million to $1.2 Billion at the Time of the Proxy Statement and Proxy Solicitations</u>

105.    According to (FE-1), an individual with over twenty years' experience in the industry, who served as the Director of Project Controls – Risks at the Cameron Project from June 2016 to June 2018 (and who previously served in the same capacity at the Calpine Project from Spring 2015 until June 2016)), there was such rampant "corporate override of the [Cameron] project['s]" costs at the end of 2017 and throughout the first quarter of 2018, "that it [was] just a deception to stakeholders of the company." FE-1 did not keep this opinion secret. As discussed further below, FE-1 clearly expressed this belief, along with the warning that CB&I and, as of May 10, 2018, McDermott, would incur costs of $700 million to $1.2 billion in the near future based on assessments that had been widely circulated within CB&I for months.

106.    CB&I's Project Controls team at Cameron was responsible for understanding the cost of the Cameron Project job site, forecasting the cost of future events, reporting those forecasted costs to CB&I management in various documents and presentations on a monthly and quarterly basis. Each of the Focus Projects had a Project Controls team, which all reported to the corporate Project Controls group based out of CB&I's headquarters in The Woodlands, Texas. FE-1 explained that every month the Cameron Project Controls team would do its own due diligence on all potential negative cost impacts to the Cameron Project. Based on actual estimated impacts to the Cameron Project's costs, FE-1 confirmed that Syed Kakakhel, the Senior Director of Project Controls at Cameron and FE-1's supervisor, and his team created a forecast of what they

calculated the true change in costs would be for the Cameron Project in addition to those already reported.

107.    FE-1 personally compiled each month a detailed forecast of risks to the Cameron Project based on project discipline and input from every faction of the project's team, which were ultimately documented in detailed "Risk Registers."  FE-1 sent this detailed risk forecast to the Project Controls Cost Manager for the Cameron Project, FE-3.  FE-3, together with Syed Kakakhel, would discuss FE-1's forecasted risks with the on-site Project Managers and Project Directors, and assign a monetary value to each of the forecasted risks.  FE-1 described how the Cameron Project Manager (an individual named Thomas Rabb) sent the forecasted numbers to senior management located at headquarters.  FE-1 confirmed that Risk Registers are commonly used in the industry to internally project the likelihood and value of current risks to the future costs of a project.  A company with experience in the industry such as McDermott would have been fully aware of the existence, use and importance of Risk Registers to the due diligence related to a project's valuation.

108.    By the end of December 2017, when the Merger was first announced, FE-1's forecasted costs had escalated well beyond what was reported in CB&I's financial statements, rising to well over $1 billion above current reported costs.  These forecasted costs were not well-received.  Indeed, FE-1 explained how the forecasted costs were a "political hot potato."  FE-1 recounted how, without fail, Project Controls' forecasted costs for the Cameron Project were largely acknowledged internally at CB&I and then ignored publicly by management such that the true costs were not accurately reported in CB&I's public disclosures.  FE-1 stated that it was "as clear as the nose on your face that the [existing] forecast was not adequate."

109.    FE-1 described how the Cameron unreported forecasted costs steadily rose over time, recounting how these unreported figures grew troubling in 2017 and increased throughout the first quarter of 2018, the time period when Defendants needed to convince McDermott shareholders to vote to approve the Merger.

110.    Internal CB&I documents shown to counsel for Lead Plaintiff corroborate FE-1's account that charges between $700 million to in excess of $1 billion would be incurred at Cameron before completion.   As noted above, FE-1 drafted and compiled, with the help of others on the Cameron Project Controls group, Risk Registers that set out each itemized threat to the Cameron Project and assigned each risk a dollar value.  The December 31, 2017 "Cameron Liquefaction Project Execution CCJV Risk Register," which was signed off on by Thomas Rabb, the Cameron Project Director, on January 25, 2018 (the "December 2017 Risk Register") identified ***$1,200,552,343 of itemized forecasted risks***, 39% of which, totaling $468,740,165, carried a medium, high, or extreme severity level and a probability score of 4 or 5, which indicated that these risks carried a greater than 40% or greater than 60% probability of occurring.  FE-1 stated that any risk with a probability score of 4 or 5 should have been charged to the project in CB&I's financial statements.    One risk—"Direct Craft Performance Factor" in the amount of $107,049,208—was rated "Extreme."   The largest single category of potential charges was $507,599,177 in potential liquidated damages, which are sums CB&I would owe to its client for missing deadlines on account of project completion delay.

111.    FE-1 also drafted and compiled, with the help of others on the Cameron Project Controls team, the First Quarter March 31, 2018 "Cameron Liquefaction Project Execution CCJV Risk Register," which was signed off on by Rabb on April 23, 2018 (the "March 2018 Risk Register").  The March 2018 Risk Register identified escalating risks at Cameron, reporting over

*$1.34 billion of itemized forecasted risks*, 38% of which, totaling $513,198,182, carried a medium or high severity level and a probability score or 4 or 5.

112.     These two Risk Registers confirm that risks at Cameron were escalating between the fourth quarter of 2017 and the first quarter of 2018, contrary to Defendants' repeated statements touting a de-escalation of risk at the Focus Projects.  For example, one forecasted risk line item in the December 2017 Risk Register projected an additional $36.5 million of at risk costs to reflect the "cumulative impact of unplanned work."  This Risk Register item clearly indicated that:

> The cumulative impact of many changes over time has only been accounted for on an incremental basis.  Unplanned work continues to mount as engineering changes, construction re-work, back charges, etc. causes scheduled creep/slip and increased cost.  The full scope of unplanned work should be identified and a response plan developed.

113.     This risk line item (just one of 55 line items in the December 2017 Risk Register) was assigned the highest severity level and a probability rating of "5" out of 5, meaning, that it should have been incorporated into CB&I's reported financials.  That same line item concerning unplanned work was repeated in the March 2018 Risk Register, which contained an even larger total of 65 line items, just as the Proxy was released to investors touting the "de-risking" of the Focus Projects, except by that time period, the cumulative impact of unplanned work had risen to $38.1 million.

114.     Another forecasted risk line item in the December 2017 and March 2018 Risk Registers was unreported costs related to "Indirect Craft Labor Increases."  The December 2017 Risk Register identified $19 million in unreported costs, reporting that "[t]he current spend rate for indirect labor is higher than the current forecast" and that "[i]f this trend continues, it will impact indirect labor EAC forecast."  This line item was also assigned the highest severity level and was assigned a probability rating of "4" out of 5, a level that FE-1 stated should also have been incorporated into CB&I's forecasts.  The trend of indirect labor not only continued, but it

skyrocketed such that the March 2018 Risk Register reported unreported forecasted costs of $76.8 million the next quarter.

115.    Despite forecasted increased charges of $1.2 billion as of December 31, 2017 and then $1.34 billion as of March 31, 2018, CB&I reported in its quarterly press releases and Forms 10-K and 10-Q, both filed with the SEC, only $39 million of operating charges to the Cameron project for the fourth quarter of 2017 (largely attributed to costs related to the "force majeure" event caused by Hurricane Harvey), and not a penny of operating charges in the first quarter of 2018.  These SEC filings, and the failure to take appropriate operating charges, were intended to influence McDermott shareholders' vote on the Merger.

116.    FE-1 believed that CB&I's "override of the project forecast" reflected in the Risk Registers was "a deception to the stakeholders" of CB&I and McDermott.  An April 2018 Project Controls "Cameron LNG 1st Quarter 2018 Forecast" PowerPoint presentation, that was delivered to CB&I management in early April 2018, and reasonably available to McDermott's due diligence teams at least on request, openly detailed FE-1's and the Project Control team's serious concerns (the "April 2018 Cameron Forecast Presentation").  In this document, Project Controls described how much work and analysis went into its project risk assessments, writing that "[i]n February, four weeks of detailed review meetings were held for every aspect of the cost forecast, first at the budget owner level, and then at a project management level," followed by "additional reviews . . . held with LNG operations and functional Corporate Management."  The April 2018 Cameron Forecast Presentation made clear that the forecasted costs in the March 2018 Risk Register were all costs after taking into account the charges associated with the Cameron Settlement Agreement and any impact from Hurricane Harvey.

117.    The April 2018 Cameron Forecast Presentation concluded that, at a *minimum*, CB&I should report an overall cost impact of $194.1 million of the projected $1.34 billion in costs reflected in the Risk Register.  Project Controls emphasized that this figure was insufficient, writing in the April 2018 Cameron Forecast Presentation that the "Project team considers [the $194.1 million overall cost impact] aggressive in nature, mainly PF's [performance factors], and represents the best possible outcome."  Project Controls noted that this figure contained "No provision for Client LD's [liquidated damages]" and "No provision for delays and limited allowances."  FE-1 explained that the purpose of the above warning language was to make clear that Project Controls did not believe that the $194.1 was at all sufficient to capture the known risks to the Cameron project's costs.  Ultimately, however, even Project Control's minimum recommendation was rejected and CB&I, working with McDermott at this time to push the Merger through shareholder approval, reported *no* operational charges to Cameron in its first quarter financials.

118.    According to FE-1, CB&I also improperly recognized change order revenue and engaged in accounting gimmicks related to revenues from future, unmet incentives. For example, FE-1 recounted an instance when the client at Cameron entered a change order (meaning that the client adjusted the requested work on theproject) that included a $200 million bonus structure for the completion of Train 1, a milestone in the project, under certain circumstances.  FE-1 knew that the Company recognized $50 million of that bonus immediately after the change order was implemented, without meeting any of the milestones for receipt, and that it went straight to the bottom-line as margin because it was reflected in the project cost report.

119.    FE-1 recalled that the first time he was told that McDermott personnel were at the Cameron job site was in March or April 2018, months after the Merger was announced and after

the McDermott Defendants had assured investors of their extensive on-site due diligence. McDermott personnel were on-site for a couple of days, and during that time, talked to some members of management and visited job sites at the Cameron Project. FE-1—the Director of Project Controls—was never approached by McDermott. However, FE-1 stated that if McDermott had experience in construction—as they stated they did—competent due diligence would have included specific requests for Risk Registers and similar documents created by Project Controls that forecasted future cost changes to the immense Cameron Project.

120. FE-2, who worked at CB&I from March 2008 until November 2017, most recently as the Financial Operations Controller for the USA Oil and Gas Division, received the Project Controls Group's forecasts during his time at CB&I. FE-2 used the forecasts from all Focus Projects to calculate potential gains or losses to CB&I based on the actual reported figures and the forecasted figures. FE-2 was responsible for the full financial reporting of CB&I for the Americas, which encompassed every oil and gas project in Canada, the United States, Central America, and South America. FE-2 opined that, based on experience, the Project Controls Group, including specifically the Cameron Project Controls group, was very accurate with its forecast, noting that "those guys are amazing with their accuracy." FE-2 explained, however, that while a company like CB&I (or McDermott) could manipulate the financials because a company could play with unaudited numbers like performance factors and risk forecasts contained in the Project Controls assessment of risks.

121. FE-2 received the Risk Registers for the Focus Projects, including Cameron. FE-2 confirmed that the Risk Registers were operational management tools with no "window dressing." FE-2 provided due diligence materials that were understood to be then provided to the McDermott due diligence teams, including standard project forecasts, "actuals" to date, performance factors,

Project Controls information, and indicators of project success and then current costs to date.  FE-2 stated that he cannot imagine that McDermott would look at the Focus Projects without those documents because they are common industry tools and documents used by all EPC companies. Based on FE-2's recollection of the Risk Registers and other cost summaries, FE-2 stated that Cameron had "slippage" every month and it was widely known that the entire project was about $1 billion over budget when FE-2 departed in November 2017, a figure consistent with FE-1's recollection and the December 2017 Risk Register.

122.    FE-1 left the company on June 12, 2018, after giving notice one week after the Merger closed.  FE-1 provided a written exit survey in connection with the resignation.  This survey was presented directly to FE-1's supervisor at Cameron as well as the Director of Costs and Progress at CB&I headquarters.  In this survey, FE-1 informed management that "Project cost forecast on the [Cameron] project is being overridden by corporate," and that these actions were "deceptive to our stakeholders."  FE-1 continued with a stark, and prescient, warning: "***Cameron is going to lose an additional 700MM to 1.2B before this project is completed***," "yet ***Project Controls is forced to report untruthful cost forecasts month after month***."  FE-1 further noted that the "last [cost forecast] (Q1 2018), didn't even make it to April before we had negative to comp[l]ete items in the forecast," meaning that the total budgeted costs for the life of the project had already been surpassed for many of its components.  FE-1 noted that this assessment of the Cameron Project's unreported risks and charges was based directly on the detailed line items in the March 2018 Risk Register and the Project Controls team's extensive work, which was largely disregarded and buried by management.

123.     FE-1's dire warning proved to be very accurate.  By the end of October 2018, within months of the March 2018 Risk Register and FE-1's exit survey assessment of a minimum of $700 million in additional charges, McDermott reported $647 million in additional charges to Cameron.

124.     FE-3 worked with FE-1 at Cameron.  FE-3 was a Project Controls Manager for CB&I and McDermott from April 2015 until January 2019, and was assigned to the Cameron LNG project at all times during the course of FE-3's employment. For the Cameron LNG project, FE-3 explained that monthly forecasting was standard at CB&I when the project began, though it changed to quarterly reporting at some point.  FE-3 stated these reports were given to executives, including those close to Defendants Dickson and Spence, if not to them directly.

125.     FE-3 confirmed FE-1's account that the Project Controls group was often instructed to change the numbers in their reports, as late as one day before they were due in the system.  FE-3's main task from 2016 through February 2019 was managing the troubled Cameron Project's costs and providing forecast information. FE-3 explained that Defendant Spence proverbially "knew the numbers" because he came on site to Cameron and FE-3 went over the true cost estimates with him. FE-3 said that emails were sent to Defendants Spence and Dickson, who received "the complete package" of Project Control's un-doctored forecasts.  Additionally, FE-3 stated that the Project Controls group had begun tracking how far off the revised numbers in the reports were from the initial numbers three quarters before the Merger and continued to do so after McDermott took over.

126.     FE-3 stated that the executives were very well aware of the difference in the numbers.   Indeed, FE-3 recalled employees openly calling CB&I "Enron II," invoking a comparison between CB&I's (and later McDermott's) practices and those of the notorious

Houston, Texas-based energy company that went bankrupt in 2001 in the wake of criminal and fraudulent securities and accounting violations.

2.   Other Former Insiders Confirm That The Extent of the Focus Project
Losses and Risks Were Evident

127.   FE-4, the Senior Vice President for Global Construction Operations at CB&I from 2009 through May 10, 2018, ran CB&I's global construction operations out of CB&I's Woodlands, Texas headquarters.  By 2018, FE-4 oversaw approximately 18,000 people in the field for CB&I and was responsible for staffing the jobs and providing the necessary personnel, processes, procedures, and equipment to all of CB&I's ongoing projects (including, specifically, the Focus Projects).  FE-4 ran CB&I's global operations in the field for nearly ten years, with vice presidents from around the world reporting in to him.  As part of FE-4's role as Senior VP of Construction, FE-4 managed the construction for all of the Focus Projects. FE-4 was "the most senior guy in the field" knowledgeable about the status of construction at CB&I's projects worldwide, including the Focus Projects.  FE-4 reported directly to then Chief Operating Officer at CB&I, Defendant Patrick Mullen, from September 2016 until June 2017, when Mullen become CB&I's CEO.  From July 2017 through May 2018, FE-4 reported directly to Duncan Wigney, Executive Vice President of Operations at CB&I.  Wigney reported directly to Defendant Mullen from July 2017 through May 2018.

128.   FE-4 attended monthly meetings throughout April 2018 with his superiors and the heads of other groups, including operations and Project Controls, to discuss CB&I's projects, including specifically the Focus Projects.  FE-4 also attended meetings once or twice a month about the Focus Projects.  During these monthly meetings, high level executives including CB&I's COO, who was Defendant Mullen until July 2017, would attend.

43

129.    FE-4 also described other monthly meetings, attended by top executives of CB&I, that were devoted to discussions of projects underway, with breakout sessions to discuss individual projects from time to time, including the Cameron and Freeport Projects.   At these monthly meetings, executives responsible for each of the subject Focus Projects made presentations, with Project Controls staff such as FE-1 and FE-3 calling in on the phone.  The breakout sessions were attended exclusively by home office staff.  FE-4 discussed construction operations and provided views on how to improve negative construction and operations trends at the Focus Projects.  FE-4 confirmed that the Cameron Project Controls staff, including specifically FE-1 and FE-3, as well as the Project Controls staff for Freeport, Calpine and IPL Projects presented all of the costs for each of the Focus Projects, and also calculated a performance factor (PF) based on progress to date toward completion.  Based on that information, the Project Controls representatives would analyze trends and forecast what completion of the balance of the Focus Projects would cost to company. FE-4 confirmed that the Project Control Group's forecasted numbers were "way above" what CB&I formally added in as a contingency.  FE-4 is confident that CB&I's CEO Defendant Mullen and CFO Michael Taff were updated constantly on the state of the Focus Projects.

130.    FE-4 relayed that the Calpine Project "was woefully late," because of bad engineering and the decision to mobilize the job too early.  These problems dated back to the pre-CB&I days when Shaw managed the project.  Despite engineering that was "extremely late," FE-4 stated that [Shaw] tried to mobilize the job on time and "cripple through."  FE-4 stated this was a "horrific" thing to do because it set the stage for "sloppy productivity," and once that went on for a year, "it was almost like a terminal disease for the project" and these long-term problems would have been obvious to McDermott or anybody thinking about taking over this project.  In attempt to improve the situation, FE-4 changed senior leadership at Calpine but the project

continued to be "plagued by delays" by the end of 2017 and through 2018, delays that were "no secret to senior leadership at CB&I because [FE-4] met with Wigney [the EVP of Operations] every week about Calpine."

131.    By the middle of 2017, engineering and procurements for the Focus Projects had largely been completed and the bulk of remaining costs of the Projects were under FE-4's responsibility.  FE-4 explained that in an EPC (Engineering, Procurement, and Construction) business like CB&I, "the buck stops" at construction because the "accountants have nowhere else to hide the missed quantities or sloppy procurement issues from earlier in the process."  FE-4 said, CB&I "made construction the scapegoat to blame them for cost overruns on projects, especially the Focus Projects, no matter how many sins engineering or procurement committed."

132.    Prior to, and during, McDermott's period of due diligence, and therefore, before the Proxy Statement was issued, most of the engineering was completed and all the equipment had been purchased, so the climbing costs of the Focus Projects were related to field execution and labor.  Despite this circumstance, and FE-4 position and knowledge, FE-4 was never consulted or asked to provide information to assist McDermott in its due diligence of CB&I leading up to the Merger announcement or in the five months between the Merger announcement and the shareholder vote.  FE-4 confirmed that no one in the Construction Group participated in the Merger due diligence.  FE-4 expressed the view that FE-4 should have been included in due diligence discussions, and the failure to include FE-4 was "extremely strange."  FE-4 directly asked representatives from both the CB&I and McDermott due diligence teams, including Pat Mullen, CEO of CB&I, Duncan Wigney, the Executive Vice President of Operations, and the McDermott human resources director and an individual with oversight over field operations to include FE-4 in the due diligence process, but they did not.

133.     Despite the fact that FE-4 was not consulted personally during the due diligence period, FE-4 has no reason to believe that McDermott did not have access to documents and reports, including Project Controls reports, informing McDermott sufficiently of the problems and anticipated forecasted costs to the Focus Projects.

134.     FE-5, FE-4's direct report, corroborates FE-4's assessment of the Focus Projects. A Vice President of Construction at CB&I and then McDermott from 2015 until November 2018, FE-5 previously worked as a Construction Director at CB&I from 2010 to 2015.  FE-5 worked on the Calpine and IPL Projects, among others.  FE-5 dealt with manpower logistics, ensuring that the projects were staffed with the people who had the proper skill sets, and helped manage the schedule and tools for construction equipment.

135.     FE-5 met with individuals tasked with McDermott's due diligence for the Calpine Project in the fall of 2017, including individuals tasked with Project Controls.  FE-5 recalled that the McDermott team was onsite at Calpine for no more than one day, an amount of time that was insufficient to fully understand a project of that size. However, FE-5 confirmed that Project Controls documents, such as the Project Management Report and other documents reporting costs (likely the Risk Registers) were provided to McDermott such that McDermott has access to every report documenting the historical performance factor at Calpine.

V.    **FALSE AND MISLEADING STATEMENTS AND MATERIAL OMISSIONS IN THE PROXY SOLICITATIONS**

136.     McDermott and CB&I issued the Proxy Statement, and other related materials related to the Merger and leading up to the shareholder vote (the "Proxy Solicitations"), to encourage the Class to vote in favor of the Merger.  In that process, the McDermott and CB&I Defendants made many false and misleading statements of material fact, and omitted to state material facts necessary in order to make the statements therein not false or misleading, regarding

(i) the Focus Projects, which were internally secretly forecast to incur at least $1 billion in additional changes in cost in the near future; (ii) McDermott's assessment of the "fair value" of CB&I to the extent that valuation failed to include the internally forecast additional changes in cost to the Focus Projects; and (iii) McDermott's repeated assurances that it performed "extensive" due diligence of the Focus Projects sufficient to assess the fair value of CB&I and encourage shareholders to vote for the Merger.

137.    Including and in addition to the materially false and misleading statements and omissions set forth above, Defendants made the following materially false and misleading statements and omissions in connection with solicitation of the Merger.

### A.    The Materially False And Misleading Statements To Investors Issued Before To The Proxy Statement

138.    As discussed above in ¶¶ 72–74, on December 18, 2017, McDermott issued a press release (the "12/18/2017 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K (the "12/18/2017 Form 8-K") signed by Defendant Spence, announcing that McDermott was acquiring CB&I through a proposed merger that would result in McDermott shareholders owning 53% of the combined company.  The 12/18/2017 Press Release made several materially false and misleading misstatements, and omitted material information from the statements made, as follows:

- The 12/18/2017 Press Release touted the combined company's ability to deliver and execute on "fixed price lump-sum contracts" like the ones in place for the Cameron, Freeport, and Calpine projects, stating, "***McDermott and CB&I's combined experience in delivering*** customer centric solutions and ***fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects*** for customers."

47

- The 12/18/2017 Press Release touted the Merger as enhancing the ability to respond to customer needs while maximizing asset value in LNG and power projects:

  Greater ability to respond to evolving customer needs. ***The combined company will offer customers engineered and constructed facility solutions and fabrication services across the full lifecycle, executed to maximize asset value. Customers will also benefit from enhanced exposure across diverse end markets, including*** refining, petrochemicals, ***LNG and power***.

- The 12/18/2017 Press Release also touted the Merger's extensive purported opportunities for "synergies" and revenue impacts, after purportedly "one-time" costs:

  Cash accretive with opportunities for cost and revenue synergies. The transaction is expected to be cash accretive, ***excluding one-time costs***, within the first year after closing. It is also expected to generate annualized cost synergies of $250 million in 2019. ***This is in addition to the $100 million cost reduction program that CB&I expects to have fully implemented by the end of 2017 previously implemented*** [sic]. The cost synergies are expected to come from operations optimization, G&A savings, supply chain optimization and other related cost savings. Further, McDermott and CB&I expect that the transaction will lead to substantial revenue synergies due to the enhanced capabilities of the combined company.

139.    Also on December 18, 2017, McDermott held the 12/18/17 Conference Call, on which Defendants Dickson and Spence spoke, a transcript of which was filed by McDermott with the SEC pursuant to Rule 425 under the Securities Act of 1933 ("Rule 425") and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act.   During it, Defendants Dickson and Spence made several materially false and misleading misstatements, and omitted material information from the statements made, as follows.

- In discussing the proposed merger, Defendant Dickson stated in prepared remarks:

  ***Our operations and capabilities are highly complementary***," and "***[o]ur companies share…a similar approach to conducting business***…and ***we both primarily operate on fixed price lump-sum contracts***."  He added, "***We also expect the combination will generate substantial cost and revenue synergies***.

- Defendant Spence stated in prepared remarks, regarding potential cost synergies:

  We expect to generate annualized cost synergies of $250 million in 2019. This is in addition to the $100 million cost reduction program that CB&I expects to be fully

48

implemented by the end of 2017. We expect to incur a ***onetime cost*** of $210 million to realize these synergies of which $170 million will be in 2018 and the remaining $40 million in 2019.

- During Q&A, Defendant Dickson had this exchange with an analyst concerning the Cameron LNG product and the Freeport LNG Project:

[*Analyst*]:        David, when you came on to McDermott, obviously, it had its share of issues with fixed price projects, and again I think you've done a good job of cleaning them up. But CBI, as you mentioned, you guys have done a lot of due diligence on these projects, and people have covered these companies for a long time, we do hear that. And then ultimately, some companies still have issues.

So, these are sort of big—a couple of these are really big projects, so how much experience have you had with the customers themselves? ***How much due diligence have you done in terms of really getting your arms around the couple—the bigger LNG projects so that you can sort of give us some comfortability factor that you've really sort of priced in the potential risk on these projects***?

[*Defendant Dickson*]:  [W]e obviously, as said earlier, we have spent a significant amount of time and resources on this. As you know, with my past background, it gives me some better insight on how these projects evolve. And these projects are all at different stages of completion, and ***all four of them are fairly well progressed, so that takes out a lot of the risk that you would expect at the start-up***. So we're very happy with the work that we've done in the work to go.

In terms of dialogue with the customer of those projects, obviously, I haven't been able to start any dialogue as we're being through a very confidential process. But what I can say is ***historically I've had experience with both working with the customer on the Cameron LNG and with the customer on the Freeport LNG***. So now that we have announced, that allows me to join with Pat and obviously get a bit closer with the customer on these things. But going back to what I said earlier on the call and the prepared remarks in which Stuart said is, ***an extensive amount of work has been done on these projects and obviously with a lot of focus with the work that's left or the balance of the work that's left on what has been four critical projects for CB&I***.

140.    Defendants Dickson and Spence made additional false and misleading statements, and omitted material information from the statements made, about McDermott's due diligence of the Focus Projects and how that due diligence informed their valuation of the Merger and understanding of the risks posed, as detailed above in ¶¶ 75–80.

141.     The foregoing misstatements and omissions made on December 18, 2017 were materially false and misleading because, as demonstrated by the statements of former senior CB&I employees and the objective evidence set forth in CB&I's internal risk assessments, set forth in ¶¶ 104–135 herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company."   As the Cameron Project's Director of Project Controls stated, FE-1 prepared monthly and quarterly reports that detailed the likely projected cost changes to the Cameron Project based on actual reports from the job site, as well as other costs threatened by poor progress, such as contractual liquidated damages. Based on FE-1's regular risk assessments, the widely-circulated internal Risk Register projected at the end of 2017, increased costs of over $1.2 billion, nearly half of which—$468,740,165—should have been included in the public assessment of the Project's costs based on FE-1's assessment and probability scores.   These regularly produced and circulated Risk Registers and related documents were, according to CB&I's Financial Operations Controller (FE-2), core operational management tools, and were among the documents made available to McDermott as part of their due diligence.   FE-3, a Project Controls Manager who worked directly with FE-1 on the Cameron Project, confirmed that Defendants Spence and Dickson received "the complete package" of Project Controls' undoctored forecasts in connection with the Merger.   FE-4, the Senior Vice President for CB&I's Global Construction Operations at all relevant times throughout the Merger process, oversaw construction on each of the Focus Projects.   FE-4 explained how monthly meetings were held where the executives responsible for each Focus Project made presentations, including presentations from Project Controls concerning forecasted costs and productivity factors at each project.   FE-4 noted

that these monthly meetings were attended by high-level executives including CB&I's COO who, until July 2017, was Defendant Mullen.

142.    On January 8, 2018, McDermott and CB&I each released the 1/8/18 Merger Presentation, which stated that McDermott's "[d]ue diligence supports [the] underlying strength and profitability of CB&I" and that McDermott was "[c]onfident in [its] ability to apply McDermott's operational excellence and turnaround experience to unlock near- and long-term value from CB&I['s] portfolio."

143.    In the 1/8/18 Merger Presentation, Defendants explained certain adjustments that had been made to CB&I's financial metrics, which were "primarily" related to the Focus Projects. Defendants represented their belief that these adjustments were "non-recurring" and "provide[] a better understanding of the underlying business."   Defendants affirmatively allayed investors' concerns over future charges to the Focus Projects, stating that "We have performed ***thorough due diligence*** and believe we have a ***strong understanding of the key drivers*** and are ***comfortable with what needs to be done with these projects going forward***."   Defendants also specifically told investors that the Focus Projects "will continue to be de-risked significantly in 2018."

144.    Later in the 1/8/18 Merger Presentation in the section titled "Due Diligence," McDermott stated as its "Key Assessment" that "Four focus projects ***have been significantly de-risked*** with respect to engineering, quantities and procurement; ***remaining risk is assessed as mostly related to labor performance***."   Defendants' statements were misleading because the risks of performance extended beyond "labor performance" and the risks of "labor performance," which were minimized in the presentation, extended into the hundreds of millions of dollars.   Similarly, with respect to the Cameron Project, McDermott explained that the Cameron Settlement Agreement "result[ed] in a de-risking of the project."

145.   The 1/8/18 Merger Presentation highlighted McDermott's "observations" that the Focus Projects had been "significantly de-risked" and that the "remaining risk is assessed as mostly related to labor performance":



 

## DUE DILIGENCE CONDUCTED OVER PERIOD OF MONTHS

Diligence was concentrated on 14 E&C projects and 19 Fabrication projects, representing > 80% of the E&C and Fabrication Backlog

**FOCUSED ON 33 PROJECTS REPRESENTING ~80% OF TO-GO REVENUE[1][2]**

Other 1,567 Projects — 19%
33 Projects 81%

51% / 49%
■ 4 Focus Projects
■ 29 Remaining Projects

6%
16%
45% / 33%
■ LNG  ■ Power
■ Petro  ■ Refine

6%
Slide 40
■ 14 E&C
■ 19 Fab

**OVERVIEW AND KEY FINDINGS**

- Strong team of highly experienced E&C risk managers led project due diligence efforts, supported by independent consultants performing parallel analysis
- Site visits at key projects to supplement and confirm analysis
- Focus on 33 projects based on risk and revenue exposure
  - Particular focus on 14 E&C projects representing approximately 65% of the E&C and Fabrication backlog
- **Key Assessment**
  - Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement; **remaining risk is assessed as mostly related to labor performance**
  - Remaining 29 projects deemed relatively low risk
  - **1500+ contracts are profitable and relatively low risk**

[1]Include Shaw, Areva, Mox and Entergy Nola East legacy projects.
[2]As of 9/30/17.

40

## FOUR FOCUS PROJECTS: OUR OBSERVATIONS

 

| | IPL EAGLE | CALPINE | FREEPORT | CAMERON |
|---|---|---|---|---|
| **PROJECT TYPE** | Power | Power | LNG | LNG |
| **ORIGINAL BOOKING VALUE** | ~$0.5bn | ~$0.3bn | ~$2.0bn | ~$3.2bn |
| **UNIQUE CHARACTERISTICS** | • Union labor and absenteeism<br>• Aggressive bidding by predecessor | • Union labor and absenteeism<br>• Aggressive bidding by predecessor<br>• On-site assembly of third-party product | • Impacted by Hurricane Harvey<br>• Higher level of indirect labor (limiting control)<br>• Significant quantity growth | • FEED by Third Party<br>• Significant quantity growth<br>• Site reclamation (e.g. soil quality)<br>• Lower than anticipated productivity<br>• Adverse weather-related delays |
| **ASSESSMENT** | • First fire for turbines 1 and 2 achieved as expected<br>• Power being produced (on the grid) | • Additional two turbines recently turned over for commissioning | • Majority of remaining risk related to labor and schedule<br>• Train 1 steel erection milestone achieved<br>• Harvey costs still being assessed as technical solutions are being determined<br>• Zachry (JV Partner) is managing and performing project construction phase and has a demonstrated track record | • Majority of remaining risk related to labor and schedule<br>• Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the schedule for any potential liquidated damages, increasing certainty of project schedule resulting in a de-risking of the project |
| **STATUS** | ~99% complete as of February 2018 | ~79% complete as of year-end 2017 | ~73% complete as of year-end 2017; Project remains profitable | ~77% complete as of year-end 2017 |
| **4Q 2017 CHARGES** | ($7mm) | ($35mm) | ($20mm) | ($39mm) |

**FOUR FOCUS PROJECTS ARE NOT REPRESENTATIVE OF ENTIRE PORTFOLIO AND HAVE UNIQUE CHARACTERISTICS THAT WILL CONTINUE TO BE DE-RISKED SIGNIFICANTLY IN 2018**

146.     The 1/8/18 Merger Presentation also included specific "Observations" regarding each of the Focus Projects, including certain "***Unique Characteristics that will continue to be de-risked significantly in 2018***."

147.     For the Calpine Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being "Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party product." However, these were tempered by the "Assessment" that "***Additional two turbines recently turned over for commissioning***" and a "Status as of 9/30/2017" as being "***76% complete***."

148.     For the Freeport Project, with "Original Booking Value" of $2 billion, it listed just one "Unique Characteristic," that being "Higher level of indirect labor (limiting control)." Significantly, it ***did not list*** "Aggressive bidding by predecessor"—as was done for Calpine. The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs

still being assessed as technical solutions are being determined," but that "*Train 1 steel erection milestone achieved*" and "*Zachery (JV Partner) is managing and performing project construction phase and has a demonstrated track record.*"  The "Status as of 9/30/2017" was "*Engineering complete, Procurement substantially complete, Construction remaining, project remains profitable*."

149.   For the Cameron Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "*Significant* quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays."   Significantly, as with Freeport, it *did not list* "Aggressive bidding by predecessor"—as was done for Calpine.  The "Assessment" stated that "Majority of remaining risk related to labor and schedule," but that "*Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the trigger for any potential liquidated damage claims, increasing certainty of project schedule resulting in a de-risking of the project.*"  The "Status as of 9/30/2017" was "*Engineering complete, Procurement substantially complete, Construction remaining; targeting 2019 for all 3 trains*."

150.   On January 9, 2018, Defendant Dickson gave an interview with *Bloomberg Markets*, a transcript of which was filed by McDermott with the SEC via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act.  The *Bloomberg* piece referenced the proposed Merger and the "four projects dragging down profit" for CB&I, as well as McDermott's track record under Dickson in turning eight out of nine of McDermott's unprofitable projects into profitable ones.  It said that Dickson vows to do at CB&I what he did at McDermott and quoted him as describing CB&I as follows:  "*It has all the hallmarks of the McDermott of three or four years ago.  Everything is fixable.*"

151.    On March 22, 2018, CB&I and McDermott filed an updated version of the 1/8/18 Merger Presentation (the "3/22/18 Presentation"), which CB&I also filed pursuant to Rule 425. The March Merger Presentation updated the figures for the Financial Rationale and included new slides about McDermott, including one slide touting their success at turning around projects running at a loss.

152.    The foregoing misstatements and omissions made in the January Merger Presentation were materially false and misleading because, as demonstrated by the statements of former senior CB&I employees and the objective evidence set forth in CB&I's internal risk assessments, set forth in ¶¶ 104–135 herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company."  Contrary to Defendants' statements, the Focus Projects were not "de-risked."  Rather they carried well over $1 billion in excess costs that were not being accounted for by either CB&I or McDermott.

153.    As the Cameron Project's Director of Project Controls stated, FE-1 prepared monthly and quarterly reports that detailed the likely projected cost changes to the Cameron Project based on actual reports from the job site, as well as other costs threatened by poor progress, such as contractual liquidated damages.  Based on FE-1's regular risk assessments, the widely-circulated internal Risk Register projected at the end of 2017, increased costs of over $1.2 billion, nearly half of which—$468,740,165—should have been included in the public assessment of the Project's costs based on FE-1's assessment and probability scores.  These regularly produced and circulated Risk Registers and related documents were, according to CB&I's Financial Operations Controller (FE-2), core operational management tools, and were among the documents made available to McDermott as part of their due diligence.  FE-3, a Project Controls Manager who

worked directly with FE-1 on the Cameron Project, confirmed that Defendants Spence and Dickson received "the complete package" of Project Controls' undoctored forecasts in connection with the Merger.  FE-4, the Senior Vice President for CB&I's Global Construction Operations at all relevant times throughout the Merger process, oversaw construction on each of the Focus Projects.  FE-4 explained how monthly meetings were held where the executives responsible for each Focus Project made presentations, including presentations from Project Controls concerning forecasted costs and productivity factors at each project. FE-4 noted that these monthly meetings were attended by high-level executives including CB&I's COO who, until July 2017 was Defendant Mullen.

154.   On February 20, 2018, CB&I issued a Form 8-K announcing its fourth quarter and full-year financial results, followed by a Form 10-K filed the next day, on February 21, 2018. Those results reported $101 million of operating charges relating to the Focus Projects.  *See* ¶¶ 87–100 herein.  As discussed above, McDermott investors were focused on these results given the upcoming Merger and concern over the Focus Projects.  In response, in McDermott's own fourth quarter 2017 earnings conference call with investors (the "2/21/18 Conference Call), Defendants Dickson and Spence fielded questions concerning McDermott's awareness of and reaction to CB&I's negative financial results concerning the Focus Projects.  As discussed above, ¶¶ 101–103, Defendant Dickson assured investors that the "transaction is proceeding on track and on schedule" despite CB&I's poor news, and provided additional information concerning McDermott's in-depth access to and knowledge of CB&I's forecasts and risk assessments.  For example, Dickson stated that: "***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.***"  He continued, explaining that with

"integration planning now well under way, *we're even more confident in our synergy expectations and looking forward to a timely closing*."

155.    The foregoing misstatements and omissions made in CB&I's Form 10-K concerning charges to the Focus Projects and by Defendant Dickson during the 2/21/18 Conference Call were materially false and misleading because, as demonstrated by the statements of former senior CB&I employees and the objective evidence set forth in CB&I's internal risk assessments, set forth in ¶¶ 104–135 herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." The $101 million in charges reported by CB&I was woefully inadequate to represent the true costs to complete the Focus Projects, which, according to FE-1 as well as others, carried well over $1 billion in excess costs that were not being accounted for by either CB&I or McDermott.

156.    As the Cameron Project's Director of Project Controls stated, FE-1 prepared monthly and quarterly reports that detailed the likely projected cost changes to the Cameron Project based on actual reports from the job site, as well as other costs threatened by poor progress, such as contractual liquidated damages. Based on FE-1's regular risk assessments, the widely-circulated internal Risk Register projected at the end of 2017, increased costs of over $1.2 billion, nearly half of which—$468,740,165—should have been included in the public assessment of the Project's costs based on FE-1's assessment and probability scores. These regularly produced and circulated Risk Registers and related documents were, according to CB&I's Financial Operations Controller (FE-2), core operational management tools, and were among the documents made available to McDermott as part of their due diligence. FE-3, a Project Controls Manager who worked directly with FE-1 on the Cameron Project, confirmed that Defendants Spence and

Dickson received "the complete package" of Project Controls' undoctored forecasts in connection with the Merger.  FE-4, the Senior Vice President for CB&I's Global Construction Operations at all relevant times throughout the Merger process, oversaw construction on each of the Focus Projects.  FE-4 explained how monthly meetings were held where the executives responsible for each Focus Project made presentations, including presentations from Project Controls concerning forecasted costs and productivity factors at each project. FE-4 noted that these monthly meetings were attended by high-level executives including CB&I's COO who, until July 2017 was Defendant Mullen.

B.    **The Materially False And Misleading Statements On The Focus Projects In The Proxy Statement**

157.    On January 24, 2018, McDermott and a wholly-owned subsidiary of CB&I filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed three amendments on Forms S-4/A on March 2, March 23 and March 27, 2018.  The March 27, 2018 Form S-4/A contained the definitive Proxy Statement, including the attached Merger Agreement.  On March 29, 2018, McDermott filed a Form 8-K pursuant to Rule 425 under the Securities Act announcing that the March 27, 2018 registration statement had been declared effective as of 2:00 pm Eastern Daylight Time on March 29, 2018, and, further, that McDermott and CB&I had established record dates of April 4, 2018 and meeting dates of May 2, 2018 for the special meetings of their respective shareholders to seek approvals related to the proposed combination.  On March 29, McDermott and CB&I filed a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3) and McDermott mailed it to McDermott's shareholders.  On April 2, 2018, McDermott filed additional materials related to the Merger on Form DEFM14A.

158.    The Proxy Statement explained the terms and conditions of the Merger to shareholders, informed them about the background of the Merger, and set forth the reasons why

the McDermott and CB&I boards of directors recommended that shareholders vote in favor of the Merger.  The Proxy Statement specifically incorporated by reference documents into the Proxy Statement that "contain important information about McDermott and CB&I and their respective financial performance."  These documents, discussed below, included Forms 10-Q filed by CB&I and McDermott as well as Forms 8-K filed by McDermott and CB&I on January 8, 2018 and March 22, 2018, all filed pursuant to Rule 425.

159.    On March 27, 2018, McDermott filed with the SEC Amendment No. 3 to a Form S-4 Registration Statement.  The Explanatory Note to the amendment (page *i*) stated that it contained, among other things, a joint proxy statement that would be used in connection with the special meeting of McDermott shareholders being held on May 2, 2018, and the special meeting of CB&I shareholders being held on May 2, 2018.

160.    The Amendment No. 3 and Proxy/Statement Prospectus (*i.e.* the Proxy Statement) were declared effective by the SEC on March 29, 2018, and was mailed to McDermott shareholders of record as of April 4, 2018.  The Merger was subject to a vote of both McDermott and CB&I shareholders, voting separately, pursuant to the Proxy Statement.  The record date for the vote was April 4, 2018.  On March 29, 2018, CB&I filed that same Proxy Statement with the SEC as an exhibit to a Schedule 14A.

161.    The Proxy Statement described ten days of meetings that took place between September 2017 and December 2017 during which representatives from McDermott met with representatives from CB&I and engaged in "due diligence."  The description of these meetings served to reinforce Defendants' earlier statements that the Company "performed thorough due diligence" such that it was "comfortable with what needs to be done with these projects going forward."  For example, Defendants state in the Proxy Statement that "Mr. Freeman, other

representatives of McDermott, Ms. David and respective advisors of McDermott and CB&I met in person or spoke by telephone on multiple occasions to conduct due diligence."  McDermott noted that its Board had "considered the challenges and potential costs of combining and integrating the businesses" when considering the Merger.

162.    Because McDermott's Board did not unanimously vote in approval of the Merger, McDermott was forced to provide additional information about its due diligence and risks to the Company and its shareholders presented by the Focus Projects.

163.    The Proxy Statement described that one member of McDermott's Board of Directors (the "Board"), Stephen Hanks, voted against the Merger.  According to McDermott's last Form 10-K before the merger with CB&I, filed on March 8, 2018, Mr. Hanks "held various roles with Washington Group International, Inc. (and its predecessor, Morrison Knudsen Corporation) ("Washington Group"), *an integrated engineering, construction, and management solutions company* for businesses and governments worldwide."  The 2018 10-K continues, "The Board of Directors believes Mr. Hanks is qualified to serve as a director in consideration of his *extensive experience in the international engineering and construction business and his broad knowledge in accounting, auditing and financial reporting, and his legal background*."

164.    McDermott reported that "Stephen G. Hanks, the dissenting director, did not vote in favor of the transaction due in large part to his stated belief that the business operated by CB&I is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods."  The Proxy Statement continued, noting that:

> At each of the meetings of the McDermott Board at which the potential business combination was discussed, Mr. Hanks consistently stated that he believes, based on his prior experience in the engineering and construction (E&C) industry, that the E&C business operated by CB&I (and historically operated by certain of its

predecessors) is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods, that ***these problems may be difficult for McDermott's management to remedy (at least in the near term) and, therefore, that the Combination is too risky for McDermott***, taking into account the combined balance sheet of the two companies.

165. The Proxy Statement described McDermott management's response to Dissenting Director Hanks and the views of the other members of McDermott's Board, which ultimately prevailed in approving the Merger:

> Mr. Hanks also asked detailed questions of McDermott's management team, and McDermott's management, in turn, provided detailed responses and, ultimately, expressed the belief that, ***based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management***.

166. Notably, Mr. Hanks based his concerns "on his experience as President and Chief Executive Officer of Washington Group [ ], during which time that company acquired a business with two significant, fixed-price, lump-sum, combined-cycle gas power plant projects in the northeastern region of the United States that Mr. Hanks described as having generated over $2.0 billion in losses that led to Washington Group's filing for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code."  Dissenting Director Hanks was particularly well-positioned to offer an opinion on risks of the Merger.

167. The misstatements and omissions above in the Proxy Statement indicating that McDermott had "considered the challenges and potential costs of combining and integrating the businesses" through its due diligence, and that the "risks related to CB&I's four significant contracts . . . could be managed" were materially false and misleading.  McDermott either failed to review and incorporate information from readily available core documents, such as Risk Registers, despite representing to shareholders the performance of due diligence sufficient to

assess the risks and costs of the Focus Projects or, alternatively, did review this readily-available information and disregarded over one billion dollars in change in cost estimates. As demonstrated by the statements of former senior CB&I employees and the objective evidence set forth in CB&I's internal risk assessments, set forth in ¶¶ 104–135 herein, CB&I misrepresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." Former employees and internal documents demonstrate that, by March 29, 2018, risks related to increased costs at the Focus Projects had *increased* since the date of the Merger announcement in December 2017, such that the forecasted increased costs to the Cameron Project alone had escaled from $1.2 billion to $1.34 billion, even after taking into consideration any cost savings generated from the December 2017 Cameron Settlement Agreement.

168.    As the Cameron Project's Director of Project Controls stated, FE-1 prepared monthly and quarterly reports that detailed the likely projected cost changes to the Cameron Project based on actual reports from the job site, as well as other costs threatened by poor progress, such as contractual liquidated damages. Based on FE-1's regular risk assessments, the widely-circulated internal Risk Register projected at the end of March 2018, increased costs of over $1.34 billion, nearly half of which—$513,198,182—should have been included in the public assessment of the Project's costs based on FE-1's assessment and probability scores. These regularly produced and circulated Risk Registers and related documents were, according to CB&I's Financial Operations Controller (FE-2), core operational management tools, and were among the documents made available to McDermott as part of their due diligence. FE-3, a Project Controls Manager who worked directly with FE-1 on the Cameron Project, confirmed that Defendants Spence and Dickson received "the complete package" of Project Controls' undoctored forecasts in connection

with the Merger.  FE-4, the Senior Vice President for CB&I's Global Construction Operations at all relevant times throughout the Merger process, oversaw construction on each of the Focus Projects.  FE-4 explained how monthly meetings were held where the executives responsible for each Focus Project made presentations, including presentations from Project Controls concerning forecasted costs and productivity factors at each project.  FE-4 noted that these monthly meetings were attended by high-level executives including CB&I's COO who, until July 2017 was Defendant Mullen.

169.    To the extent the McDermott Defendants relied on McDermott's financial advisors (Goldman Sachs and Greenhill) to conduct due diligence, that reliance was misguided and negligent.  Neither Goldman Sachs nor Greenhill was motivated to question the merits or the underlying assumptions of the Merger (including McDermott's ability to manage the Focus Projects).  Specifically, according to the Proxy Statement (at 15), Goldman was paid a transaction fee of $16 million, "all of which [was] contingent upon consummation of the Combination."  Greenhill was also paid a transaction fee of $16 million, "$3.2 million of which [was] payable upon delivery of Greenhill's opinion to McDermott's Board and the rest of which [was] contingent upon consummation of the Combination."

C.    **The Proxy Statement Omitted Material Information Concerning Known Adjustments To Fair Value**

170.    The Proxy Statement contained an unaudited pro forma balance sheet.  Column 3 of this balance sheet has "Preliminary Purchase Price Allocation."  On page 173 of the Proxy Statement are the pro forma adjustments which reveal that other than intangible assets, no fair value adjustments had been provided.  The following language appears under the table on that page:

> Other than the items listed above, ***we have assumed that the fair value of all assets and liabilities equal their respective carrying values***.  Until the Combination is

complete, we will not have full access to all relevant information and will not have completed our evaluation.  As a result, fair value estimates are preliminary and subject to change.

The final allocation of Combination consideration will be determined when we have completed the detailed valuations and necessary calculations.  The final allocation could differ materially from the preliminary allocation used in the pro forma adjustments.  The final allocation may include: (1) change for the fair value of CB&I's contracts in process, net of advance billings on contracts . . . .

Had McDermott performed adequate due diligence as claimed, the "assumption" "that the fair value of all the assets and liabilities (of CB&I) equaled their respective carrying value" would not have represented what McDermott would have known at the time those statements were made. Simply put, McDermott used the fact that the fair value analysis was incomplete as their cover for not revealing what they should have known.  The Defendants, but for their negligence, would have known that the Focus Projects did not equal their carrying value.

171.   The SEC's guidance for purchase accounting requires that, if an acquirer is waiting for additional information, the acquirer must "Furnish other available information which will enable a reader to understand the *magnitude* of any potential adjustment."  3250.1-h.  However, as detailed herein, given the material fair value impact and higher costs recorded on CB&I's Focus Projects, as contemporaneously detailed in risk registers and other reports, that were revealed by McDermott within a short timeframe subsequent to the Merger, the Company did not comply with the SEC Guidance.  For example, as detailed below, McDermott made fair value adjustments to acknowledge loss contracts in their "preliminary purchase price allocations" which they disclosed in both the McDermott second and third quarter 2018 10-Qs.  These fair value adjustments were made to the fair value as of the acquisition date (May 10, 2018) thereby establishing that the relevant facts and circumstances regarding the fair value of the Focus Projects existed at that time.

172.   McDermott's fair value adjustments to the Focus Projects were false and misleading because McDermott either failed to review and incorporate information from readily

available core documents, such as Risk Registers, that were widely-disseminated and discussed in monthly meetings, despite representing to shareholders the performance of due diligence sufficient to assess the risks and costs of the Focus Projects or, alternatively, did review this readily-available information and disregarded over one billion dollars in change in cost estimates.

D.   **Additional False And Misleading Statements Issued After The Proxy Statement**

173.   Defendants were under a continuing duty to update and correct the Proxy Statement to disclose the material adverse facts set forth above.  As discussed below, as CB&I reported false financial statements for the first quarter of 2018 and CB&I's own Project Controls group estimated up to an additional $1.3 billion in costs to the Cameron Project alone, a marked increase in risk from the prior quarter, McDermott and CB&I filed several SEC Form 425 filings concerning the proposed Merger between April 2, 2018 and May 2, 2018 (the "Proxy Supplements").  By failing to correct or update any of Defendants' false and misleading statements in the Proxy Statement and incorporated documents, these supplemental Proxy Solicitations falsely affirmed that nothing in the earlier proxy solicitations was, or had become, materially false or misleading.

174.   On April 12, 2018, prior to the open of trading on the NYSE, as part of the proxy solicitation process, CB&I issued a press release reporting preliminary first quarter 2018 financial results.  The press release reported a range of operating results that CB&I "expect[ed] to report."

175.   The press release reported that CB&I did not incur any material project changes to the Focus Projects in the first quarter 2018 and stated that "CB&I's preliminary results reflect:"

> ***Excellent operating performance across the company's portfolio of projects, including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project***, which respectively reached 84%, 82% and 84% completion and incurred no material project changes during the quarter.

176.   On April 12, 2018, as part of the proxy solicitation process, McDermott provided its shareholders with an operational update for the quarter ended March 31, 2018, and reaffirmed

its 2018 guidance originally issued on January 24, 2018, as previously reaffirmed on February 21, 2018.  McDermott and the Individual Defendants, as part of their due diligence, would have reviewed CB&I's April 12, 2018 press release and CB&I's underlying analyses and either should have known or were negligent in failing to know that CB&I had under-accrued for losses on the Focus Projects.

177.    Days later, on April 16, 2018, Defendants issued a further letter to shareholders that was filed with the SEC pursuant to Rule 425 and was part of the proxy solicitation process. Defendants assured investors as to their ongoing due diligence and the benefits of the Merger:

> We believe that, together, McDermott and CB&I will span the entire value chain from concept to commissioning, ***deliver compelling value***, be more competitive and ***deliver more consistent, predictable performance*** through market cycles.
>
> In addition to being underpinned by a compelling strategic rationale, ***the combination is also expected to deliver substantial financial benefits for stockholders***.  Together, McDermott and CB&I will have significantly enhanced backlog and pro forma combined revenues, adjusted EBITDA and adjusted net income.  The companies have reaffirmed the anticipated $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019, and have identified potential incremental savings of $100 million.

178.    Analysts viewed CB&I's quarterly results reflecting no charges to the Focus Projects positively and as supportive of the Merger.  Credit Suisse wrote in an April 12, 2018 analyst report titled "MDR-CBI Preannounce: Working Miracles," that "A clean quarter from CBI and a beat from MDR is a positive surprise and certainly timely given concerns the deal was at risk."   In another analyst report issued on April 12, 2018, Deutsche Bank stated: "we are encouraged that the MDR/CBI merger story has somewhat de-risked" and noted that the Focus Projects were now "under control."  Similarly, in an April 17, 2018 analyst report, Pareto stated that: "CB&I also released a PW on April 12th, which included no one-off charges on its four focus projects, which is a positive indicator for ongoing execution risk."

179.    The misstatements and omissions above indicating that the Focus Projects incurred no material project charges in the first quarter of 2018, communicating effectively that the Focus Projects were de-risked and the Merger would "deliver substantial financial benefits for stockholders" were materially false and misleading.  As demonstrated by the statements of former senior CB&I employees and the objective evidence set forth in CB&I's internal risk assessments, set forth in ¶¶ 104–135 herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." Former employees and internal documents demonstrate that, by March 31, 2018, risks related to increased costs at the Focus Projects had **_increased_** since the date of the Merger announcement in December 2017, such that the forecasted increased costs to the Cameron Project alone had escalated from $1.2 billion to $1.34 billion, even after taking into consideration any cost savings generated from the December 2017 Cameron Settlement Agreement.  By early April, the April 2018 Cameron Forecast Presentation had been disseminated to CB&I leadership.  This document provided Project Controls' assessment that, at a minimum, CB&I should report $194 million of charges to the Cameron Project alone in the first quarter of 2018.  Project Controls emphasized that that figure was in itself insufficient as it was "aggressive in nature" and "represents the best possible outcome."   Despite this conservative recommendation, CB&I reported not a penny of charges to the Focus Projects, let alone the minimum amount recommended by Project Controls.

180.    As the Cameron Project's Director of Project Controls stated, FE-1 prepared monthly and quarterly reports that detailed the likely projected cost changes to the Cameron Project based on actual reports from the job site, as well as other costs threatened by poor progress, such as contractual liquidated damages. Based on FE-1's regular risk assessments, the widely-

circulated internal Risk Register projected at the end of March 2018, increased costs of over $1.34 billion, nearly half of which—$513,198,182—should have been included in the public assessment of the Project's costs based on FE-1's assessment and probability scores. These regularly produced and circulated Risk Registers and related documents were, according to CB&I's Financial Operations Controller (FE-2), core operational management tools, and were among the documents made available to McDermott as part of their due diligence. FE-3, a Project Controls Manager who worked directly with FE-1 on the Cameron Project, confirmed that Defendants Spence and Dickson received "the complete package" of Project Controls' undoctored forecasts in connection with the Merger. FE-4, the Senior Vice President for CB&I's Global Construction Operations at all relevant times throughout the Merger process, oversaw construction on each of the Focus Projects. FE-4 explained how monthly meetings were held where the executives responsible for each Focus Project made presentations, including presentations from Project Controls concerning forecasted costs and productivity factors at each project. FE-4 noted that these monthly meetings were attended by high-level executives including CB&I's COO who, until July 2017 was Defendant Mullen.

181.    On April 23, 2018, Subsea 7 S.A. ("Subsea 7"), a competitor to McDermott, issued a press release confirming that it had earlier made an unsolicited offer to acquire McDermott for $7.00 per share (pre-split) in cash or up to 50% in Subsea 7 stock and the balance in cash. This represented a premium of 16% to McDermott's common stock closing price on April 20, 2018 at $6.05 per share. The value of Subsea's offer was approximately $2 billion. The Subsea 7 offer was not subject to any financing conditions or Subsea 7 shareholder approval. The Subsea 7 shareholder offer, however, was subject to McDermott ending its proposed Merger with CB&I.

Subsea 7's offer said it would also consider increasing its proposed price upon further assessment of McDermott's business through discussions with McDermott management.

182.     Just three days after Subsea 7 made its offer, the board of directors of McDermott rejected Subsea 7's proposal, which McDermott confirmed in a press release on April 23, 2018. The press release stated in part:

> We remain fully committed to completing the transformational transaction [with CB&I] and our Board has reaffirmed its recommendation that our stockholders should support it.

183.     An article in *Business Guide* titled "McDermott rejects Subsea 7's takeover" on April 25, 2018, noted that, at the time of Subsea 7's proposal, McDermott and CB&I "have already chosen their new leadership and organizational structure with David Dickson, current CEO of McDermott, set to take that role in the new company as well."

184.     The article quoted Jean Cahuzac, Subsea 7's Chief Executive Officer, as stating: "Given the attributes of the proposed transaction and our stated ability to further enhance our proposed terms, we encourage the McDermott board of directors to reconsider this compelling opportunity to combine two complementary businesses."  He added: "Our proposal provides equity upside in a company with a robust financial position, as well as a meaningful premium.  We see significant merit in such a transaction for all shareholders, and with our financial and legal advisors continue to be open to discussions."

185.     Indeed, Subsea 7 "said it would be open to adjusting its $2 billion bid for McDermott International, Inc., after the engineering and construction company's recent rejection of the proposal, but said a new offer is possible only if the Houston-based firm agrees to come to the negotiating table."  In this connection, Cahuzac said "We would welcome the opportunity to engage with McDermott's board of directors and management to discuss our proposal and the substantial upside opportunity represented by ongoing participation in the equity, with a view to a

combination that would be in the best interests of our respective shareholders."  "Subsea 7 says: It's Open to Talks After McDermott Rejection," Law 360, April 25, 2018.

186.    Notwithstanding Subsea 7's invitation for further discussions and its willingness to increase its offer, McDermott never engaged Subsea 7 in any negotiations regarding a potential deal choosing, instead, to continue with the proposed Merger with CB&I, "a deal that was widely seen as a defensive merger," which would guarantee Dickson to be the combined company's man in charge as opposed to Subsea 7's proposal.  *See Riviera Maritime Media*, April 23, 2018, "Subsea 7 seeks merger to de-rail McDermott deal with CB&I."

187.    On April 23, 2018, prior to the opening of trading, CB&I issued a press release announcing financial results for the first quarter of 2018.  CB&I reported a 78 percent increase in net income versus the year-ago quarter, including "[s]olid operating performance in Fabrication Services, Technology, and E&C Groups, including no material charges on Cameron LNG, Freeport LNG and Calpine power projects."  CB&I did not hold a first quarter earnings conference call, it stated, "due to [the] pending combination with McDermott."

188.    The Form 10-Q filed by CB&I on April 24, 2018, included a discussion of the Cameron Project, which noted that "[t]he project was approximately 84% complete and had a reserve for estimated losses of approximately [$13 million] at March 31, 2018."

189.    On April 24, 2018, as part of the proxy solicitation process, McDermott issued a press release reporting first quarter 2018 operating results.  The headline of the press release read: "Strong Start to 2018 Driven by One McDermott Way."  With respect to the proposed acquisition of CB&I, the press release added that the parties had identified an additional $100 million of synergies anticipated from the Merger.

190.    Also on April 24, 2018, McDermott conducted a conference call with investors as part of the proxy solicitation process to discuss the first quarter operating results.  On the call, Defendant Dickson emphasized that McDermott's Board had rejected Subsea 7's "highly contingent" offer because the CB&I Merger presented a more "attractive alternative":

> This highly conditional proposal was subject to amongst other things, the termination of our combination with CB&I.  McDermott's board carefully reviewed and considered the proposal in consultation with its outside financial advisors and legal counsel.  The board concluded that the proposal was not in the best interest of the company or its stockholders as it significantly undervalued McDermott and was not an attractive alternative to our pending combination with CB&I.
>
> *       *       *
>
> ***We're very confident of the combination*** and we're going to continue on the same path.

191.    Dickson also stated on the conference call that since the December 2017 announcement of the Merger, the parties had worked closely together and that "[t]ogether, we can provide certainty, innovation and added-value to energy projects around the world."

> ***We have spent a great deal of time with CB&I since we initiated this effort last summer and are more enthusiastic than ever about the opportunities this combination will offer to our customers.*** Together, we can provide certainty, innovation and added-value to energy projects around the world. And together, our complementary market positions and geographical footprint will create new opportunities for revenue growth and we will be more competitive and better able to deliver consistent predictable performance through market cycles.
>
> ***As we've gotten to know CB&I better over the last 10 months***, we've seen first-hand, how this company values quality, innovation, safety and its employees, and more importantly, we have witnessed how it puts customers first. That is why coming together makes sense, and we are really excited about what's next.

192.    With respect to CB&I's long-term construction contracts, Dickson assured shareholders that McDermott, through its due diligence, had mitigated the risk to McDermott:

> We also note that CB&I reported results for Q1 2018 yesterday. CB&I reported excellent operating performance across its portfolio of projects ***including the***

> **Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project.**
>
> These projects respectively reached 84%, 82% and 84% completion and incurred no material project charges during the quarter. Through our integration planning process, **we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio**.

These statements indicated Defendants' familiarity and comfort with the degree of completion on the Focus Projects and, therefore, the costs incurred and to be incurred in completing the Focus Projects.

193.    When asked about the Freeport Project, Dickson gave assurances to investors: "**That was all known as we went through the due diligence and it's all subject to insurance**, it is a force majeure situation and CB&I are working with the customer getting through that, but all in all, I would again emphasize that in our view, **Freeport is a good project**."

194.    The misstatements and omissions emphasizing McDermott's due diligence on the Focus Projects, which included "**considerable time with CB&I reviewing the project portfolio**" to "**feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio**" were materially false and misleading. As demonstrated by the statements of former senior CB&I employees and the objective evidence set forth in CB&I's internal risk assessments, set forth in ¶¶ 104–135 herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." Former employees and internal documents demonstrate that, by March 31, 2018, risks related to increased costs at the Focus Projects had **increased** since the date of the Merger announcement in December 2017, such that the forecasted increased costs to the Cameron Project alone had escalated from $1.2 billion to $1.34 billion, even after taking into consideration any cost

savings generated from the December 2017 Cameron Settlement Agreement.  By early April, the April 2018 Cameron Forecast Presentation had been disseminated to CB&I leadership.  This document provided Project Controls' assessment that, at a minimum, CB&I should report $194 million of charges to the Cameron Project alone in the first quarter of 2018.  Project Controls emphasized that that figure was in itself insufficient as it was "aggressive in nature" and "represents the best possible outcome."   Despite this conservative recommendation, CB&I reported not a penny of charges to the Focus Projects, let alone the minimum amount recommended by Project Controls.

195.    As the Cameron Project's Director of Project Controls stated, FE-1 prepared monthly and quarterly reports that detailed the likely projected cost changes to the Cameron Project based on actual reports from the job site, as well as other costs threatened by poor progress, such as contractual liquidated damages. Based on FE-1's regular risk assessments, the widely-circulated internal Risk Register projected at the end of March 2018, increased costs of over $1.34 billion, nearly half of which—$513,198,182—should have been included in the public assessment of the Project's costs based on FE-1's assessment and probability scores.  These regularly produced and circulated Risk Registers and related documents were, according to CB&I's Financial Operations Controller (FE-2), core operational management tools, and were among the documents made available to McDermott as part of their due diligence.  FE-3, a Project Controls Manager who worked directly with FE-1 on the Cameron Project, confirmed that Defendants Spence and Dickson received "the complete package" of Project Controls' undoctored forecasts in connection with the Merger.  FE-4, the Senior Vice President for CB&I's Global Construction Operations at all relevant times throughout the Merger process, oversaw construction on each of the Focus Projects.  FE-4 explained how monthly meetings were held where the executives responsible for

each Focus Project made presentations, including presentations from Project Controls concerning forecasted costs and productivity factors at each project. FE-4 noted that these monthly meetings were attended by high-level executives including CB&I's COO who, until July 2017 was Defendant Mullen.

196.    To the extent Defendants' statements are determined to be statements of opinion, they were materially false and misleading because (i) they were either not believed by the Defendants and because they were objectively false (*i.e.,* the Focus Projects had not been de-risked and McDermott's due diligence had not been extensive) and (ii) because McDermott's shareholders expected not just that Defendants believed the opinion (however irrationally), but that it fairly aligned with the information in their possession at the time.  Defendants' statements however did not fairly align with the information in their possession at the time and omitted material facts about the McDermott Defendants' inquiry into or knowledge of the Focus Projects. Specifically, it was known or knowable at the time of Defendants' statements that the Focus Projects had not been de-risked and that CB&I senior personnel internally were anticipating in excess of $1 billion in potential additional charges on Cameron alone, including charges for liquidated damages.  Those true facts were known or knowable to Defendants and conflicted with what a reasonable investor would take from Defendants' statements.

197.    Defendants' statements were not forward-looking statements but were existing statements of fact with respect to McDermott's due diligence into the Focus Projects and whether based on existing facts, those Projects had been de-risked by CB&I.

## VI.    THE MERGER IS APPROVED

198.    On May 10, 2018, the Company announced that on May 2, 2018, McDermott shareholders had overwhelmingly approved the Merger with CB&I.  Of the approximately 285.9 million shares eligible to vote, 219.3 million shares participated in the vote, of which 209.2 million

shares voted in favor of the Merger (approximately 95.4% of the shares participating in the vote), 9.8 million shares voted against the Merger, and 227,000 shares abstained.  As a result of the Merger, McDermott stockholders owned approximately 53% of the combined business on a fully diluted basis, and CB&I shareholders owned approximately 47%.

199.   On May 2, 2018, in light of McDermott's opposition to its proposal and the shareholder vote approving the Merger, Subsea 7 withdrew its $7.00 (pre-split) offer.

200.   The above statements identified in ¶¶ 136–193 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (1) the projected costs for the Focus Projects were grossly understated; (2) the fair value of the Focus Projects had been overstated and would be materially impacted (see, for example, the pro forma financial statements in the Proxy Statement discussed above); (3) the McDermott Defendants' representations that they had conducted substantial and adequate due diligence on CB&I, including on the Focus Projects contracts, were false or misleading.  As a result of the foregoing, Defendants' positive statements about CB&I's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

201.   Immediately prior to the Merger on May 10, 2018, McDermott shares split one-for-three.  Thus, for example, a holder of 300 McDermott shares with a closing market price of $6.64 per share on May 9, 2018, exchanged those shares for 100 shares of McDermott common stock (post-split), which closed on May 10, 2018 at $20.70 per share.  CB&I shares closed on May 10, 2018, immediately prior to the Merger, at $16.39 per share.  CB&I shareholders received 0.82407 McDermott shares in the Merger.  The Subsea 7 initial offer post-split would have been worth $21 per share in cash to McDermott shareholders.

75

202.     According to the Proxy Statement (at *xiii*), approximately 102.5 million shares of CB&I common stock were outstanding as of March 26, 2018.  Thus, the market value of the shares issued to CB&I shareholders on May 10, 2018, approximated $1.75 billion (a 0.82407 conversion ratio multiplied by a $20.70 per share market price multiplied by 102.5 million shares).

## VII.   MCDERMOTT ANNOUNCES A SERIES OF SURPRISE CHARGES ASSOCIATED WITH THE FOCUS PROJECTS

### A.    McDermott Reveals An Additional $221 Million Of Changes To Cost Estimates On July 31, 2018

203.     On July 31, 2018, McDermott issued a press release to announce its financial results for the second quarter 2018.  In the press release, McDermott reported a $221 million change to the estimated costs associated with three projects it had acquired from CB&I:  Cameron, IPL and Calpine. The Company, in relevant part, stated:

> In accounting for the acquisition of CB&I on May 10, 2018, McDermott recorded the fair value of the CB&I balance sheet, including identified intangible assets and updated cost estimates on the acquired backlog.  The vast majority of the acquired portfolio did not require material changes to cost estimates.  However, McDermott did record changes in estimated costs on three projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on the Company's net income for the second quarter.

> "We are clearly disappointed with the increased cost estimates for three of the legacy CB&I projects," said Dickson.  "***The increases are within the bounds of the scenarios we contemplated during our due diligence***, and we believe that by applying our disciplined One McDermott Way to these projects, we can bring them to successful completion.  We have already made significant changes to personnel, reporting structures, stakeholder relationships and execution plans on Cameron, for example, since the combination closed, and there are encouraging signs that these changes have made a difference.  More importantly, we have moved forward to further strengthen our relationships with stakeholders. Going forward, we plan to continue to aggressively apply our McDermott approach to ensure appropriate risk evaluation and mitigation across the combined Company's portfolio—from bidding to execution."

204.     Defendants had failed to disclose in the Proxy Statement that McDermott had contemplated as much as $200 million in negative changes in estimated costs for these three legacy

CB&I Focus Projects during due diligence.  Indeed, the second quarter 2018 charges beg the question why no fair value adjustments had been made in the Proxy Statement pro forma financial statements. Defendants' July 31, 2018 statements establish that Defendants knew but failed to disclose the need for additional charges to CB&I's financial statements as of March 27, 2018, and certainly no later than the May 2, 2018 shareholder vote.

205.    The same day, McDermott filed a quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q 2018 10-Q"), which affirmed the financial results reported in the press release.  Page 16 of the 2Q 2018 10-Q disclosed a purchase price adjustment:  "Note (2) Advance billings on contracts includes provisions for estimated losses on projects of $112 million."

206.    Page 19 of the 2Q 2018 10-Q, under the heading "Loss Projects" stated as follows:

Included in the Combination were three projects in a substantial loss position at the Combination Date.  The loss positions include our changes in cost estimates of $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on our net income for the three months ended June 30, 2018 as the impact of their changes in estimates were included as adjustments to the fair value of the *acquired balance sheet date.*

207.    Consequently, McDermott admitted that the facts and circumstances which led to these new purchase price adjustments existed at the time the Proxy Statement was disseminated to McDermott shareholders.

208.    Analysts, however, responded with some hope that these negative results were one-time charges.  A UBS analyst report on July 31, 2018 noted that "some may see it as 'kitchen sinking' of the projects for MDR management to clear the deck going forward."  Deutsche Bank echoed these sentiments in a July 31, 2018 analyst report titled "Tossing Out the Kitchen Sink," noting that "Mgmt struck a confident tone as they laid out a detailed risk mitigation framework for managing the existing problem projects and bidding new onshore prospects. . . ."

B.    **McDermott Discloses An Additional $744 Million Of Changes To Cost Estimates On October 30, 2018**

209.    On October 30, 2018, after the close of trading, McDermott issued a press release to announce its third quarter 2018 financial results.  Defendants shocked investors by stating in the press release that it was taking $744 million in additional charges on three of the Focus Projects to account for cost overruns, "including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project and $68 million on the Calpine gas power project."  These charges were more than three-times greater than the $221 million charge taken in the second quarter, and combined for a total of $965 million in charges for the Focus Projects that were not disclosed in the Proxy Statement.  Those charges, in the aggregate, exceeded one half of the $1.75 billion in value paid to CB&I shareholders in connection with the Merger (as measured by the market value of shares issued to CB&I shareholders).

210.    The press release stated, in relevant part:

"After five months of ownership, ***we now believe we have a thorough and definitive understanding of the schedule and cost position on each of the projects***—and clear visibility into the operational and financial path to completion," said Dickson. "We have taken significant steps to address performance issues on the three projects.  Specifically, we have installed a new executive leadership team—including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination – and made improvements in reporting structures, execution plans, forecast cost-base methodology and the flow of communication with our consortium members and customers.  We expect no further material changes in the cost estimates on these projects.  Additionally, significant progress has been made on the remaining projects in the portfolio and we have identified no additional projects with significant remaining execution risk."

Additional detail about the status of each project as of the end of the third quarter of 2018 is presented below.

Cameron LNG Project—the changes in estimates followed a ***detailed reassessment*** of the schedule and cost base.  The analysis included a ***comprehensive review*** of the work to go, including work for which we may not be compensated—such as rework—and a reduction in productivity estimates.  The reassessed schedule and estimates reflect regional limitations on labor availability and quality, the

elimination of an incentive opportunity and the addition of liquidated damages associated with the completion schedule.  Operationally, the project continues to progress well, with commencement of commissioning expected in the fourth quarter and first LNG expected in the first quarter of 2019.  As of the end of the third quarter of 2018, the project was 83% complete and had approximately $557 million of McDermott's portion of expected revenues to go until expected completion.  During the quarter, the Cameron LNG project contributed $191 million to revenues and ($34) million to cash flows from operations.  Phase 1 of the Cameron project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.

Freeport LNG Project—the changes in estimates followed a *detailed reassessment* of the schedule and cost base and a reduction in forecasted labor productivity resulting from regional limitations on labor availability and quality.  The change in estimates was also impacted by the Company's decision, reached in conjunction with ongoing customer discussions, to include liquidated damages associated with the pre-Hurricane Harvey schedule.  The updated forecast is based on *rigorous reassessments* and views by project teams and site management, including the area supervisor's assessment of work to go.  At the end of the third quarter of 2018, the project was approximately 82% complete and had approximately $622 million of McDermott's portion of expected revenues to go until completion.  During the quarter, the Freeport LNG project contributed $220 million to revenues and ($115) million to cash flows from operations.  Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.

Calpine Gas Turbine Power Project—the changes in estimates resulted from our decision to decrease the productivity factor on the future work by 20%.  The major driver of increased costs on Calpine has been labor productivity involving both direct-hire and sub-contract employees.  The newly assumed productivity factor also considered lessons learned on the closeout experience on the recently completed IPL project and we believe is realistic and achievable.  First fire is anticipated during the fourth quarter of 2018. During the quarter, the Calpine Gas Turbine Power project contributed $29 million to revenues and ($14) million to cash flows from operations.  As of the end of the third quarter of 2018, the project was 91% complete and had approximately $27 million of expected revenues to go until expected completion in Q1 2019.

211.    That same day McDermott filed a quarterly report on Form 10-Q with the SEC for the period ending September 30, 2018 (the "3Q 2018 10-Q"), which affirmed the financial results reported in the press release.

212.    Page 17 of the 3Q 2018 10-Q disclosed the latest purchase price adjustment. Specifically, Note (3) stated:

Advance billings on contracts includes accrued provisions for estimated losses on projects of $349 million. See the discussion below and in Note 4, Revenue Recognition, for information concerning our acquired significant loss projects, including changes since our initial preliminary estimates reported for the second quarter of 2018.

213.    On Page 22 of the 3Q 2018 10-Q, under the heading "Loss Projects," McDermott

stated the following:

Based on our assessment at September 30, 2018, included in the preliminary purchase price allocation for the Combination (see Note 3, Business Combination) were four projects determined to be in substantial loss positions, which included the Cameron LNG, Freeport LNG Trains 1 & 2, Calpine and the now-completed IPL gas power projects. Based on our assessment at June 30, 2018, our Freeport LNG Trains 1 & 2 project was not estimated to be in a loss position; however, as a result of changes in estimates during the third quarter of 2018, the project is now estimated to be in a loss position at completion. Our Freeport LNG Train 3 project is not anticipated to be in a loss position. Changes since our initial preliminary assessments during the second quarter of 2018 reflect unfavorable changes in estimates of $482 million on the Cameron LNG project, $194 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $68 million on the Calpine project. These changes in estimates did not have a significant direct impact on our net income for the three or nine months ended September 30, 2018, as ***the impact of the changes in estimates were included as adjustments to the fair values reflected in the acquired balance sheet***.

214.    Thus, once again, McDermott admitted that the facts and circumstances which led to yet another round of purchase price adjustment to Focus Projects existed at the time the Proxy Statement was disseminated to McDermott shareholders.

215.    Defendants did not contend that any of the information reflected in this extraordinary write-off was unavailable to the Defendants when they disseminated the Proxy Statement or made other statements integral to the Proxy solicitation process with respect to the Merger, nor did Defendants explain why this accounting assessment and comprehensive portfolio review had not been conducted during the due diligence prior to the CB&I acquisition and referenced in the Proxy Statement or other Proxy-related materials.

216.    Defendants were negligent in failing to estimate and disclose the need for these charges in the Proxy Statement and other related materials.  Defendants should have disclosed either the magnitude of the charges or that they lacked the expertise or ability to conduct due diligence to make an accurate assessment of these charges.  Investors were shocked by these disclosures because they had been advised that a detailed assessment of the Focus Projects had been made during due diligence **_prior_** to the Merger.

217.    Following the disclosures, an analyst from UBS wrote in a report that the "additional cost overruns are surprisingly large, and we presume that MDR will now have a different business than what it envisioned when it agreed to acquire CB&I."

218.    On the conference call conducted on October 30, 2018 after the issuance of the press release, defendant Dickson acknowledged that previously McDermott had not "complete[d] a comprehensive portfolio review."  Tr. at 2 of 13.  Dickson emphasized that McDermott had "taken steps to significantly improve the way we are managing the projects."  *Id.*

219.    As a result, Dickson said "we expect no further material changes in the cost estimates on the legacy Focus Projects, which we believe have been significantly and incrementally de-risked as compared to where we were in Q2."

220.    As a result of the losses anticipated on the Focus Projects, and the inability to otherwise reduce debt, Dickson reported that McDermott would seek to sell its tank storage business and U.S. pipe fabrication business "with the majority of proceeds to be used for debt reduction."  *Id.*

221.    As it had in the press release, Dickson and other members of senior management did not contend on the conference call that there had been changes in the nature of the Focus Projects subsequent to the Merger.  Rather, the increased charges resulted from the Defendants'

analyses of the facts in existence as of the Proxy Statement's dissemination and shareholder vote. Thus, with respect to the Cameron Project, Dickson stated that "the headwinds on this project began the day the contract was signed. [The] widely held view in the industry is that the job was significantly underbid . . . . So the contract was unfavorable to begin with and then moved into lengthy periods in which CB&I underperformed." Tr. 4 of 13.

222.    Defendant Spence added on the conference call with respect to the Cameron Project, that the "$482 billion in changes in estimates resulted primarily from a detailed reassessment of the schedule and cost base." Tr. at 6 of 13. According to Spence, the $194 million change in estimate at the Freeport Project was "due primarily to a reduction in forecasted labor productivity resulting from regional limitations on labor availability and quality." *Id.* The change in estimate on the Freeport Project was also the result of "ongoing customer discussions to include liquidated damages . . . . The updated schedule and forecast is based upon rigorous reassessments and views by the project team and site management, including the area supervisor's assessment of work to go."

223.    Dickson admitted that his and McDermott's initial statements prior to the Merger that McDermott had thoroughly analyzed and understood the Cameron and Freeport Projects was in error:

> [T]he scale and size of these projects are considerably larger than what we've seen . . . . [I]n particular in Cameron the challenge we've had is, having to unwind what was a poor execution and strategy by CB&I and so that's taken a bit more time and then obviously mobilizing the stronger teams and the stronger executive oversight has just taken a little bit longer.

224.    With respect to the Calpine Project, Spence acknowledged that the "$68 million increase in costs on the Calpine project resulted from our decision to decrease the productivity factor on the future work by 20% . . . . [T]he major factor at Calpine has been labor productivity involving both direct hire and subcontract employees." *Id.* at 7 of 13.

225.    By characterizing the $744 million in charges relating to the Focus Projects as a change in estimate as of the Merger Date, rather than a current third quarter charge, the McDermott Defendants acknowledged that the facts warranting the charges existed as of the time of the Merger.

226.    Jamie Cook, the Credit Suisse analyst following McDermott, stated in an October 30, 2018 research report that "the magnitude" of the charges on the three projects "was larger and will create additional uncertainty on management's handle on the risk associated with the CBI deal. . . .  We believe that quarter will drive more questions and uncertainty.  As such, we believe the stock is in the penalty box until MDR can provide confidence to the market that the problem projects are under control."

227.    As a result of the third quarter earnings release, and specifically the $744 million change in estimate on three of the Focus Projects, Cook subsequently (on November 6, 2018), reduced his price target on McDermott common stock dramatically from $23.00 a share to $10.00 a share.

228.    Chad Dillard, the Deutsche Bank analyst, reduced his price target on McDermott from $15.50 to $10.50, citing "a second consecutive round of charges" that "was not priced in" by the market.

229.    On this news, the Company's share price fell $5.14 per share, nearly 40%, to close at $7.73 per share on October 31, 2018, on unusually heavy trading volume of 42.2 million shares (compared to average 2018 trading volume of approximately 2 million shares).

230.    Dickson acknowledged on a subsequent November 5, 2018 "Investor Day" conference call that the three "focus projects" were "the main story" behind the October 31, 2018 stock price reaction.  Tr. at 3.

231.    McDermott shares and CB&I shares converted to McDermott shares had declined from $20.70 per share on May 10, 2018, to $7.73 per share on October 31, 2018—a decline of $12.97 per share (or 62.7%).  Thus, the Merger with CB&I resulted in an astonishing loss in value to McDermott's legacy shareholders of $1.18 billion based on McDermott's approximately 286 million shares outstanding (pre-split) at the time of the Merger (286 million shares divided by 3 and then multiplied by $12.97 per share).

232.    On November 2, 2018, after the close of the U.S. stock market, Moody's Investors Service ("Moody's") issued a press release reporting that it had downgraded McDermott Technology (Americas), Inc.'s "corporate family rating to B1 from Ba3, its probability of default rating to B1-PD from Ba#-PD, its senior credit facilities rating to Ba3 from Ba2, and its senior unsecured notes rating to B3 from B2."

233.    Michael Corelli, Moody's Vice President—Senior Credit Officer and lead analyst for McDermott Technology (Americas), Inc.—was quoted as stating that the downgrade in "ratings reflect the substantial increase in costs expected to complete a few large projects and the negative impact this will have on the company's cash flows, liquidity and credit metrics.  It also reflects the risk of further cost overruns considering the recent poor bidding and project execution track record of CB&I prior to the combination with McDermott."

234.    On February 13, 2019, McDermott issued a press release titled: "McDermott Offers Comment on Cameron LNG Project" (the "4th Q 2018 earnings release").  In this press release McDermott "commented on its assessment of the financial position of the Cameron LNG project as of the end of the fourth quarter of 2018," reporting an additional $168 million adverse change in the estimate made in the pro forma financial statements contained in the Proxy Statement.  The press release went on to state:

McDermott's comment follows the release on February 13, 2019 of quarterly financial results by Chiyoda Corporation, a member of the joint venture, along with McDermott, working on the project. For the fourth quarter of 2018, McDermott expects to report an adverse change in estimate of approximately $168 million, due to unfavorable labor productivity, and increases in subcontract, commissioning and construction management costs. The change in estimate is expected to impact McDermott's statements of operations for the three months and year ended December 31, 2018. McDermott and Chiyoda are executing the project under a 50-50 joint venture arrangement and are fully aligned at the joint-venture level regarding the change in estimate.

235.    That same day, McDermott's share price fell $2.48 per share, or 26%, from $9.30 to close at $6.82 per share.

236.    On February 25, 2019, McDermott reported revenues of $2.1 billion and a net loss of $2.8 billion, or $15.33 per diluted share, for the fourth quarter of 2018 in a press release attached as Ex. 99.1 to a Form 8-K filing with the SEC (the "4Q 2018 8-K").  In addition to the previously announced $168 million change, McDermott reported a $31 million change in estimate on the Calpine Project.  The press release stated that:

[O]*ur operating performance was unfavorably impacted by a change in estimate on the Calpine gas turbine project, the previously announced change in estimate on the Cameron LNG project* and a number of other discrete operating items as noted below.  We also recorded an ***unfavorable change in estimate related to*** the claim associated with damages sustained from Hurricane Harvey on ***the Freeport LNG project*** as an adjustment to the purchase price allocation for the combination with CB&I.

237.    The 4th Q 2018 earnings release also discussed negative changes in estimates for the Focus Projects.  Specifically, the release stated:

Update on Estimated Costs on Selected Projects

***For the fourth quarter of 2018, McDermott recorded a total of $199 million of changes in estimates on the Cameron LNG and Calpine Gas Turbine Power projects. The changes directly impacted McDermott's income statement for the fourth quarter.*** Expected completion dates for the projects are unchanged.

•    Cameron LNG Project—Operationally, the project continues to progress well and in line with the schedule presented in the third quarter of 2018. The gas turbine solo run was completed ahead of schedule, cold circulation of

hot oil in Train 1 was completed during the fourth quarter and flare ignition testing was successfully completed on all flares. All of these events are crucial steps in the commissioning of Train 1, and we expect to achieve a major milestone with feed gas into the facility in the first quarter of 2019. As of the end of the fourth quarter of 2018, the project was 85% complete and had approximately $445 million of McDermott's portion of expected revenues remaining until expected completion. During the quarter, the project contributed $116 million to revenues and used $39 million of cash flows from operations. Phase 1 of the Cameron LNG project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively. ***The $168 million change in estimate resulted from unfavorable labor productivity and subcontract, commissioning and construction management costs***.

- Calpine Gas Turbine Power Project—First fire was achieved in December 2018, the steam blows have been completed successfully and systems have been turned over to commissioning. During the fourth quarter of 2018, the project contributed $3 million to revenues and used $28 million of cash flows from operations. As of the end of the fourth quarter of 2018, the project was 95% complete, and substantial completion is expected in March 2019. ***The $31 million change in estimate resulted from increased labor construction costs associated with achieving first fire and substantial completion.***

(4Q 2018 8-K – Ex. 99.1 at 4)

238.    Separately, McDermott recorded a change in estimate of $102 million on the Freeport Project in the fourth quarter of 2018.   "The change in estimate related primarily to McDermott's view of a reduction in the assumed recovery of the claim and liquidated damages estimates that were filed with the customer relating to damages sustained as a result of Hurricane Harvey. That claim was outstanding at the time of the Combination and, as a result, the reduction in the claim has been recorded under the provisions of purchase accounting as a change in intangible assets. As such, the change in estimate did not directly impact McDermott's statements of operations. Expected completion dates for the project are unchanged."  (4Q 2018 8-K – Ex. 99.1 at 4.)  Previously McDermott had falsely told the public that any damages sustained as a result of Hurricane Harvey would be covered by "contractual force majeure provisions."  *See* ¶¶ 81, 87.

239.    In further discussing the Freeport LNG Project, the same press release went on to

say:

> Operationally, the project continues to perform well, with the completion of lube
> oil flushing of the propane compressors on Train 1 and beginning of the lube oil
> flushing on Train 2. As of December 31, 2018, Freeport LNG was approximately
> 88% complete and had approximately $411 million of McDermott's portion of
> expected revenues remaining until completion. During the fourth quarter of 2018,
> the project contributed $175 million to revenues and used $186 million of cash
> flows from operations. Trains 1, 2 and 3 are expected to be completed in Q3 2019,
> Q1 2020 and Q2 2020, respectively.

C.    **Subsequent Announcements Continue To Reveal The Falsity Of The Proxy
       Statements**

240.    On July 5, 2019, McDermott issued a press release titled:  "McDermott Announces

Agreement with Cameron LNG."   The press release stated that McDermott "and its joint venture

member Chiyoda have reached an agreement with Cameron LNG related to the construction of its

LNG liquefaction project in Louisiana."   According to the press release, the agreement includes

the following key components:

> Provides the opportunity for incentive bonus payments for achieving construction
> and commissioning milestones on specified dates for Trains 2 and 3;

> Aligns the start dates for any scheduled-related liquidated damages to be consistent
> with the current schedule;

> Fully aligns and strengthens the commitment of CCJV to complete the project in
> accordance with the current schedule."

241.    The press release went on to state that "[t]he favorable impact of the agreement is

incorporated in McDermott's previously issued guidance for 2019."

242.    On July 29, 2019, after the close of the market at 4 p.m. CST, McDermott reported

its Second Quarter 2019 Financial and Operational Results ("2Q 2019 Results").  In its Form 8-K

SEC filing on that date (the "2Q 2019 8-K"), McDermott reported a net loss of $146 million, or

$0.80 per diluted share, and an operating loss of $61 million for the second quarter of 2019.  The Company also reduced guidance for its full year 2019.

243.     The July 29, 2019 press release discussing McDermott's 2Q 2019 Results, quoting defendant Dickson, said "This is a year of transition as we position McDermott to fully optimize the benefits of our combination with CB&I and as we steadily advance toward completion of the Cameron and Freeport projects."  [Ex. 99.1 to 2Q 2019 8-K at 1-2.]  Dickson noted, however, "[n]evertheless, the company has updated its guidance for 2019.  The reduction is due to four main factors:  1) the weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) *changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA [North, Central, and South America] operating segment*; and 4) *a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives on the Cameron LNG project*.  Full-year guidance assumes a sharp improvement in operating income in the fourth quarter of 2019, as the company builds momentum heading into 2020."

244.     According to the 2Q 2019 Results press release at p. 2, "McDermott's adjusted operating income in the second quarter of 2019 was $71 million, which included:

> The benefit of a settlement agreement on the Cameron LNG project, under which $110 million of progress incentives were recognized during the quarter;
>
> $38 million in charges on the Freeport LNG project as a result of increased construction and subcontractor costs; and
>
> $3.3 million on the Company's offshore projects for Pemex in the Gulf of Mexico related to disagreements with the customer that have arisen coincident with changes in the Company's leadership team and the country's political landscape."

245.     In further describing the second and third points above, the investor relations section of the Company's website stated as follows:

Three and six months ended June 30, 2019

Segment operating income for the three and six months ended June 30, 2019 was impacted by net unfavorable changes in estimates totaling approximately $135 million and $116 million, respectively, primarily in our NCSA [North, Central and South America] and MENA [Middle East and North Africa] segments. Changes in estimates in our EARC [Europe, Africa, Russia and Caspian] and APAC [Asia Pacific] segments were not material.

NCSA—Our segment results for the three and six months ended June 30, 2019 *were negatively impacted by net unfavorable changes in cost estimates, recognized during the period, aggregating approximately $131 million and $155 million, respectively. The net unfavorable changes were due to cost increases on:*

- *the Freeport LNG project taken as a whole—$38 million and $49 million for the three- and six-month periods ended June 30, 2019, respectively;*

- *Calpine—$11 million for both the three- and six-month periods ended June 30, 2019, respectively;*

(2Q 2019 8-K - Ex. 99.1.)

246.    As compared to the Company's financial results for the second quarter of 2018 ("2Q 2018"), the 2Q 2019 Results were awful.  For example, operating income went from $49 million for 2Q 2018 to a loss of $61 million in 2Q 2019.  Regarding McDermott's cash and liquidity, "[c]ash used by operating activities in the second quarter of 2019 was $(205) million. This primarily reflected the company's net loss and the *usage of cash on the Cameron LNG project*."  (2Q 2019 8-K - Ex. 99.1 at 4.)

247.    On July 30, 2019, the first day of trading following the 2Q 2019 Results announcement, the stock price of McDermott dropped $3.56 per share (from $10.08 to $6.52 per share); a drop of *35.3%*.  The substantial drop affirmed that the market was once again shocked at the depth of the on-going problems at McDermott, many of which stemming from the Merger.

248.    Analysts quickly expressed their disappointment at the 2Q 2019 Results.  On July 30, 2019, Deutsche Bank issued a research report titled "One Step Forward, Three Steps Back," rating an investment in McDermott a "Hold."  In the report, Deutsche Bank noted the following:

Our Thoughts

MDR's 2Q results fell short of expectations.  Not only did core numbers miss street estimates, but the company took charges on 2 projects (Freeport and Pemex) and cut guidance due to project delays (Marjan and Mozambique LNG got booked later than expected).  It also lowered performance expectations on legacy CB&I projects and recalibrated its asset sale proceeds outlook downward . . . . We lower our EPS estimates and cut our PT to $7 due to revenue slippage on several projects, changes in assumptions regarding legacy CB&I projects in the NCSA segment, and a shift in timing of Cameron incentives from 4Q19 to 2020.

\*       \*       \*

2Q19 Results

MDR reported underwhelming 2Q19 results, as sales of $2,137B missed expectations (-5% below cons. $2,260B), while adj. EPS also fell short (-$0.07 vs cons. $0.11).  The EPS miss was largely driven by lower operating income, as margins missed expectations in EARC (-578bps vs cons.), MENA (-1,038bps vs cons.), APAC (-919bps vs cons.) and Tech (-295bps vs cons.), more than offsetting outperformance in NCSA (+385bps vs cons.).

\*       \*       \*

Key Takeaways

Updated 2019 guidance – lowered revenue to $9.5B (vs. $10.0B previously), adj EBITDA revised to $725M (vs. $1.1B previously), and adj EPS-$0.32 (vs. $1.65 previously); 2) cut FCF guidance to -$640M (vs. -470M previously) and raised gross debt to $3.8B from $3.7B. . . . $110M of progress incentives recognized for Cameron LNG project ($75M in cash expected to be received in 2H19 of which $38M was received in July and $35M expected to be received in 2020), $38M project change for Freeport LNG, $33M project change for offshore projects for Pemex related to disagreements with customer, and $101M noncash loss on the sale of Alloy Piping Products.

249.    Deutsche Bank dropped its price target for McDermott from $11.00 to $7.00 per share (-36.4%) and EPS from $1.66 to -$0.33 (-119.8%).

250.    On September 18, 2019, trading for McDermott stock was halted on news that the Company had hired Alix Partners, a company known for its work in restructurings and bankruptcies.  At approximately 1.40 p.m., McDermott issued a cryptic statement that neither admitted nor denied that it had hired Alix Partners, but only stated that the Company "routinely

hires external advisors to evaluate opportunities for the Company.  The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."  No further details were released.

251.    When trading resumed, the stock plunged again to a low of $1.44 per share—a 75.5 percent drop from the September 17 closing price of $5.88 per share—and a closing price of $2.14 per share, representing a 63.6% drop from the prior day's closing price.

252.    On September 19, 2019, McDermott common stock continued its decline, trading as low as $1.66 per share to close at $1.58 per share.  According to a *Bloomberg* article, the meltdown in McDermott's stock and bond prices "comes . . . as [McDermott] struggles to cope with a $4.3 billion debt hangover from its 2018 purchase of [CB&I]."

253.    After the close of the market that day, Moody's downgraded McDermott's corporate family rating, explaining that the downgrade "reflects the hiring of advisors to evaluate strategic options in light of the higher than expected costs and cash outflows on a few problem projects [i.e., the Focus Projects] and the lower than expected proceeds from asset sales."

254.    Defendants Dickson and Spence were financially motivated to pursue the Merger.  As disclosed in a Form 8-K filed with the SEC on March 7, 2018, McDermott's Compensation Committee awarded Dickson and Spence "Recognition Bonuses" attributable to their work on the Merger.  Dickson was awarded a Recognition Bonus of $1,125,000 and Spence was awarded a Recognition Bonus of $637,500.  One-half of each Recognition Bonus was paid in March 2018 immediately upon the award, and one-half of the Recognition Bonus was deferred until May 2020, the first year anniversary of the Merger, based on certain performance criteria.

255.    Moreover, although fiscal 2018 was a disastrous year for McDermott and legacy CB&I shareholders, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger

and post-Merger periods to immunize Dickson and other members of McDermott senior management from the impact of the charges taken post-Merger on the Focus Projects. Although the Merger closed on the tenth day of the fifth month of 2018, Dickson and Spence were paid 50% (rather than one-third) of their full year 2018 incentive compensation for their four plus months' work at McDermott. Thus, for 2018, Dickson was paid—primarily for his four plus months' work prior to the Merger—total executive compensation of $11,294,007 and Spence was paid total executive compensation of $7,530,641. *See* McDermott 2019 Proxy Statement at 44 and 62.

256.   Further, according to the Proxy Statement, because the Merger elevated McDermott into a different peer group of companies, each of Dickson, Spence and other members of McDermott senior management received increases in their base and incentive compensation. For example, Dickson received a 25% increase in his 2018 annual base salary of $1,125,000.

## VIII.   CLASS ACTION ALLEGATIONS

257.   Lead Plaintiff brings this action individually and as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the class, consisting of all persons and entities that held McDermott common stock on April 4, 2018, who had the right to vote on the Merger and were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of McDermott and CB&I at relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

258.   This action is properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

259.   The members of the Class are so numerous that joinder of all members is impracticable. As of April 4, 2018, approximately 286 million shares of McDermott common stock (pre-split), each with the right to vote, were outstanding. While the exact number of Class

members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Record owners and other members of the Class who held McDermott shares as of April 4, 2018 may be identified from records maintained by McDermott or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice like that customarily used in securities class actions.

260.    Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

261.    Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

262.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants in the Proxy Statement or in other Proxy-related materials described above omitted and/or misrepresented material facts about the business, operations, and prospects of McDermott; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

263.    Damages in this matter can be computed on a class-wide basis for all Class members using a common methodology that is consistent with Lead Plaintiff's theory of liability.

264.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

IX.   **CLAIMS FOR RELIEF**

**COUNT I**

**Claim For Violations of Section 14(a) of the Exchange Act and Rule 14a-9
Promulgated Thereunder Against All Defendants**

265.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

266.     On March 29, 2018, McDermott and CB&I jointly filed the Proxy Statement with the SEC, which was subsequently mailed to McDermott and CB&I shareholders of record as of April 4, 2018.  The Proxy Statement solicited proxies from McDermott and CB&I shareholders to vote in favor of the Merger at a special meeting to be held on May 2, 2018.  Defendants also made other statements detailed above that were intended to influence the McDermott shareholders in their proxy vote (the "Other Proxy Solicitations").   The Proxy Statement and Other Proxy Solicitations are referred to herein collectively as "Proxy Solicitations."

267.     Each share of McDermott common stock was to be split one for three, and each share of CB&I common stock was to be exchanged for 0.82407 shares of McDermott stock.

268.     This Count is asserted against the Defendants under Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder on behalf of Lead Plaintiff and the members of the proposed Class who were damaged thereby.

269.    Section 14(a) of the Exchange Act, 15 U.S.C. §78n(a), provides that "[it] shall be unlawful for any person by use of the mails or by any means of instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to Section 12 of this title [15 U.S.C. §78(1)]."

270.    SEC Rule 14a-9, 17 C.F.R. §240.14a(9), promulgated pursuant to Section 14(a), prohibits the issuance of "any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false and misleading with respect to any material fact, or which omits to state any material fact necessary to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

271.    In the Proxy Solicitations, Lead Plaintiff and other members of the proposed Class were solicited to vote to approve the Merger between McDermott and CB&I.  A shareholder vote was required to approve this proposal.  Consequently, the Proxy Solicitations were essential links in the accomplishment of this proposal.

272.    Defendants provided information that was contained in the Proxy Solicitations, allowed their names to be used in conjunction with the Proxy Solicitations and solicitation of votes, had a substantial financial interest in the outcome of the votes being sought by the Proxy Solicitations, solicited votes under the Proxy Solicitations, and caused the Proxy Solicitations to

be disseminated to the Lead Plaintiff and the other members of the proposed Class through the use of the United States mails and the means and instrumentalities of interstate commerce.

273.    Defendants solicited approval for the Merger from the Lead Plaintiff and other members of the proposed Class by means of Proxy Solicitations which contained false and misleading statements, concerning, *inter alia*, the Merger and its benefits to shareholders and the issues with CB&I's Focus Projects, as well as the extent McDermott had done due diligence on CB&I (especially in light of CB&I's pre-Merger published troubles, the public warnings by large McDermott shareholder Hotchkis & Wiley, and the resistance to the Merger by McDermott Board member Hanks), while also omitting to state material facts which were necessary to make their statements contained therein not false or misleading.  Defendants made Other Proxy Solicitations, as alleged herein, prior and subsequent to the mailing of the Proxy Statement that were similarly false and misleading and were intended to influence the shareholder vote.

274.    The misrepresented or omitted facts are material because under all the circumstances, there is a substantial likelihood a reasonable shareholder would consider the false and misleading statements or omitted facts important in deciding how to evaluate the issues and opinions described in the Proxy Solicitations, or a material part of the mix of information available to the Class members in determining how to exercise their voting rights.

275.    Lead Plaintiff and other members of the proposed Class were denied the opportunity to make an informed decision when voting on the Merger.

276.    None of the materially false and misleading statements contained in the Proxy Solicitations, or material matters omitted from the Proxy Solicitations, as described above, were known to the public (including Lead Plaintiff) at the time the vote on the Merger occurred.

277.     Defendants violated §14(a) of the Exchange Act and Rule 14a-9 by issuing the false and misleading Proxy Solicitations to solicit and obtain the votes of the McDermott shareholders to approve the Merger.  In their Proxy Solicitations, Defendants made what they should have known, or were negligent in not knowing, were untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading.

278.     Lead Plaintiff and other members of the proposed Class have suffered damages as a result of the Merger, which was approved through the use of the Proxy Solicitations in violation of Section 14(a) of the Exchange Act of and Rule 14a-9 promulgated thereunder.

279.     As a direct and proximate result of the dissemination of the materially incomplete and misleading Proxy Solicitations that Defendants used to obtain shareholder approval of the Merger, Lead Plaintiff and the Class have suffered damages and actual economic losses (i.e., loss causation) in an amount to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9.

280.     As a consequence of the foregoing, Lead Plaintiff and the other members of the proposed Class have been damaged.

281.     Lead Plaintiff and the Class are entitled to damages.

## COUNT II

### Claim for Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

282.     Lead Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

283.     As alleged herein, the McDermott Individual Defendants acted as controlling persons of McDermott, and defendant Mullen acted as a controlling person of CB&I, within the meaning of Section 20(a) of the Exchange Act.  By virtue of their high-level positions and their

ownership and contractual rights, participation in, and/or awareness of their respective company's operations and intimate knowledge of the false statements filed by the respective company with the SEC and then disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of their respective company, including the content and dissemination of the various statements which Lead Plaintiff contends are false and misleading.  Individual Defendants were provided with or had unlimited access to copies of reports, risk registers, press releases, public filings, and other statements alleged to be misleading prior to and/or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

284.    The Individual Defendants had direct and supervisory involvement in the day-to-day operations of their respective company and, therefore, had the power to control or influence the transactions giving rise to the securities violations as alleged herein, and exercised the same.

285.    Each Defendant violated Section 14(a) and Rule 14a-9 by their acts and omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the McDermott Individual Defendants and Mullen are liable pursuant to Section 20(a) of the Exchange Act.

286.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their vote to approve the Merger.

287.    Lead Plaintiff and the Class are entitled to damages.

X.    **PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)    Awarding damages in favor of Lead Plaintiff and the other Class members against

all Defendants, jointly and severally, for all damages sustained as a result of Defendants'

wrongdoing in an amount to be proven at trial, including interest thereon;

      (c)      Such other and further relief as the Court may deem just and proper.

## XI.   **JURY TRIAL DEMANDED**

      Lead Plaintiff respectfully requests a trial by jury on all issues so triable.

Dated:  September 19, 2019          WOLF POPPER LLP

          *By:*     *Chet B. Waldman*

          Jeffrey W. Chambers
          Pennzoil Place
          711 Louisiana, Suite 2150
          Houston, TX  77002
          (713) 438-5244
          jchambers@wolfpopper.com

          Chet B. Waldman (admitted *pro hac vice*)
          Robert C. Finkel (admitted *pro hac vice*)
          Matthew Insley-Pruitt (admitted *pro hac vice*)
          Sean Zaroogian (admitted *pro hac vice*)
          845 Third Avenue, 12th Floor
          New York, New York 10022
          (212) 759-4600
          cwaldman@wolfpopper.com
          rfinkel@wolfpopper.com
          minsley-pruitt@wolfpopper.com
          szaroogian@wolfpopper.com

          ***Lead Counsel for Lead Plaintiff***

          BERNSTEIN LITOWITZ BERGER &
          GROSSMANN LLP
          Lauren McMillen Ormsbee (admitted *pro hac vice*)
          James M. Fee (*pro hac vice* forthcoming)
          1251 Avenue of the Americas
          New York, NY  10020
          Telephone: 212-554-1400
          lauren@blbglaw.com
          james.fee@blbglaw.com

          ***Counsel for Lead Plaintiff***