# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated, | **Case No. 4:18-cv-4330-AB** |
| | **(Consolidated)** |
| Plaintiff, | **CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS ON BEHALF OF THE EXCHANGE ACT §10(B) CLASS** |
| v. | |
| MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, STUART SPENCE, | **JURY TRIAL DEMANDED** |
| Defendants, | |

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION..................................................................................1

II.     JURISDICTION AND VENUE............................................................................8

III.    PARTIES ............................................................................................................8

IV.     NON-PARTY CONFIDENTIAL WITNESSES ..................................................9

V.      SUBSTANTIVE ALLEGATIONS ....................................................................16

        A.      McDermott's Business & Operations ...................................................16

        B.      CB&I's Business & Operations ...........................................................17

        C.      McDermott & CB&I Announce Their Potential Merger ......................20

        D.      Post-Announcement Scrutiny Focused On The Four Focus Projects .................22

        E.      The Four Focus Projects Carried Undisclosed Forecasted Costs Of Well Over $1 Billion When The Merger Was Announced And When It Closed ......................24

                1.      *Undisclosed Facts and Risks Concerning The Cameron Project* .................25

                2.      *Undisclosed Facts and Risks Concerning The Calpine Project* ...................35

                3.      *Undisclosed Facts and Risks Concerning The Freeport Project*...................37

                4.      *Undisclosed Facts and Risks Concerning The IPL Project* ..........................39

                5.      *The Undisclosed Catastrophic Financial Impacts Of The Four Focus Projects*...................39

        F.      Materially False and Misleading Statements Issued During the Period ..............45

                1.      *Pre-Merger Business Operations Fraud* ......................................................45

                2.      *Post-Merger Business Operations Fraud* ....................................................81

                3.      *First Partial Corrective Disclosure On October 30, 2018*............................85

                4.      *Mid-Correctives Continuing Fraud* ...........................................................90

                5.      *Partial Corrective Disclosures On February 13, 2019, July 29, 2019, and*

*September 18, 2019* .................................................................................96

G.   Additional Facts Probative Of Scienter.......................................101

1.   *Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter* ...................................................................101

a.   McDermott's Extensive Pre-Announcement Due Diligence ......101

b.   McDermott's Extensive Post-Announcement / Pre-Merger Due Diligence ....................................................................109

c.   Additional Red Flags Around The Time Of The Merger ..........117

d.   With Defendants Dickson And Spence At The Helm, McDermott Knowingly Continued Improprieties After The Merger ............118

2.   *Defendants Dickson & Spence Were Financially Motivated To Commit Fraud* ........................................................................118

3.   *McDermott Raised Funds During The Class Period* ..................126

4.   *The Fraud Implicated Core Operations* ....................................127

5.   *Defendants Signed, Were Quoted In, Or SOX Certified The Alleged Misstatements* ................................................................130

6.   *The Fraud Violated McDermott's Corporate Code of Conduct* ..................130

VI.   NO SAFE HARBOR ........................................................................132

VII.   THE CLAIMS ARE TIMELY ........................................................133

VIII.   LOSS CAUSATION/ECONOMIC LOSS ......................................134

IX.   PRESUMPTION OF RELIANCE ..................................................135

X.   PLAINTIFFS' CLASS ACTION ALLEGATIONS ........................136

XI.   CLAIMS FOR RELIEF ..................................................................139

COUNT I...................................................................................................139

COUNT II..................................................................................................143

XII.   PRAYER FOR RELIEF ..................................................................144

XIII.   DEMAND FOR TRIAL BY JURY ..............................................................................145

The Nova Scotia Health Employees' Pension Plan ("NSHEPP"), Lead Plaintiff overseeing all claims arising under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 thereunder (the "10(b) Lead Plaintiff"), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, for its complaint against Defendants, allege the following based upon personal knowledge as to itself and its own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included a review of Defendants' public statements and publicly available documents, conference calls and announcements, SEC filings, wire and press releases published by and regarding McDermott International, Inc. ("McDermott"), analysts' reports and advisories and other press coverage about McDermott, McDermott's stock chart, McDermott's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain witnesses who were former employees of McDermott and/or Chicago Bridge & Iron Company, N.V. ("CB&I"), and information readily obtainable on the Internet.   10(b) Lead Plaintiff NSHEPP believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.     NATURE OF THE ACTION

1.     This is a federal securities class action brought on behalf of a class ("10(b) Class") consisting of all persons and entities who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017 and September 17, 2019, both dates inclusive ("10(b) Class  Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule

10b-5.  Excluded from the 10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

2.       During the 10(b) Class  Period, in press releases, SEC filings, and investor teleconferences, Defendants made extensive public statements about four large, challenging CB&I projects in the U.S. ("Four Focus Projects") that McDermott acquired as part of its May 2018 acquisition of CB&I:  two gas turbine projects known as the Calpine Gas Turbine Power Project ("Calpine") and the IPL Project ("IPL"), and two liquefied natural gas ("LNG") export facility projects known as the Freeport LNG Project ("Freeport") and the Cameron LNG Project ("Cameron").  The picture painted for analysts and investors was one of a strong company, capitalizing on a discounted acquisition of a complementary peer and seamlessly integrating its most significant projects, for which it had appropriately accounted.

3.       Defendants stated in their January 1, 2018 presentation and March 22, 2018 presentation, that the "Four focus projects have been **significantly de-risked** with respect to engineering, quantities and procurement." They went on to say, in the same two presentations, "We believe the four focus projects are not representative of the entire portfolio and have unique characteristics that will continue to be **de-risked** significantly in 2018."  During a February 21, 2018 Earnings Call, referencing CB&I having disclosed over $100 million of Q4 2017 operating charges related to the Four Focus Projects, Defendant Dickson reassured investors that the situation was expected and under control, and said:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects***

2

*was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.*

4.      Also, during an April 24, 2018 conference call, Dickson assured investors that McDermott, through its due diligence, had mitigated the risk to McDermott of CB&I's long-term construction contracts, and stated:

These projects respectively reached 84%, 82% and 84% completion and incurred *no material project charges* during the quarter. Through our integration planning process, *we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio.*

5.      However, unbeknownst to investors, as detailed by numerous confidential witnesses (CW) statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." For instance, CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.  CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March

3

2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.

6.     These undisclosed, material, adverse facts were known to Defendants before the Merger closed, through the extensive due diligence that McDermott stated it performed in advance.   McDermott extensive pre-Merger announcement due diligence and post-Merger announcement due diligence show the undisclosed, material, adverse facts were known to Defendants before the Merger closed. Before the Merger, in 2017 and early 2018, McDermott undertook due diligence such as project forecasts, actuals to date, quantities, accurate performance factors, project controls-type information, and indicators of project success and cost to date. They also devoted significant time and energy to meetings about the potential CB&I acquisition and had a dedicated, five-person special accounting team to vet the acquisition. CWs with extensive knowledge of McDermott's due diligence efforts corroborated this due diligence. After the Merger was announced, McDermott undertook extensive due diligence efforts in the form of integration planning using teams from both companies, visiting CB&I job sites, and integrating functional groups like sales and engineering. This was also corroborated by CWs with detailed knowledge of the inner workings of McDermott.

7.     On October 30, 2018, after hours, McDermott issued a press release to announce its Q3 2018 financial results, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence.  In it, McDermott disclosed that it was recording **$744 million** total in changed estimates to the Calpine LNG project, the Freeport LNG Project, and the Calpine gas power project; that it was taking "significant steps" to address the performance issues on those projects, including installation of a new Chief Operating Officer ("COO"); and that McDermott

4

had completed a strategic review, determined the tank storage business and U.S. pipe fabrication business to be "not core to our vertical integration," and developed plans to exit those markets and to seek buyers for those segments.  On this news, amidst shock and panic by analysts, McDermott's stock price fell $5.14, an astounding *40% single-day decline*, on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.

8.      Yet, Defendants continued to mislead analysts and investors.  Indeed, the October 20, 2018 press release itself stated, "We expect no further material changes in the cost estimates on these projects."

9.      However, on February 13, 2019, McDermott issued a press release, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, "commenting on its assessment of the financial position of the Cameron LNG project as of December 31, 2018."  It stated that for the fourth quarter of 2018, McDermott was recording another *$168 million* in adverse changed estimate, due to unfavorable labor productivity, and increases in subcontract, commissioning and construction management costs, which impacted McDermott's statements reported financials for the three months and year ended December 31, 2018.  On this news, which again caught analysts and the market off-guard, McDermott's stock price fell $2.48, a massive *26.7% single-day decline*, on extremely high volume, from its February 12, 2019 closing price of $9.30 to close at $6.82 on February 13, 2019.

10.     On July 29, 2019, McDermott issued an after-hours press release, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence.  In it, McDermott disclosed a $205 million cash burn for operating activities in the second quarter of 2019, reflecting both a $146 million net loss and the cash used on Cameron.  McDermott also lowered 2019 guidance due, *inter alia*, to changes assumptions about the performance of the Four Focus

Projects and a shift from 2019 to 2020 in the timing of remaining incentives on the Cameron project.  On this news, which again surprised analysts, McDermott's stock price fell $3.56, another huge *35.3% single-day decline*, on very high volume, from its July 29, 2019 closing price of $10.08 to close at $6.52 on July 30, 2019.

11.     On September 18, 2019, McDermott's stock plummeted a whopping 49% in morning trading, on high volume, amid leaks and rumors that it had hired a turnaround firm. The *Wall Street Journal* published an article reporting that McDermott "has engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses." That day, McDermott issued a cryptic statement that failed to deny an impending bankruptcy filing, effectively confirming it. Trading was halted for several hours, followed by multiple attempts to restart trading that had to be aborted due to volatility. The single-day decline of $3.72, from $5.88 to $2.16, ended up an unprecedented *63.3%.* Due to the multiple trading halts imposed during that day, the stock had not yet bottomed out.  On September 19, 2019, McDermott's stock fell another *22.6%*, on even higher volume, to close at $1.67.  The two-day decline of $4.21 represented *a wipeout of 71.6% of McDermott's stock price*.

12.     Defendants had significant financial motives both to close the acquisition of CB&I, notwithstanding the undisclosed problems with the Four Focus Projects, and to mislead investors about those projects both before and after the deal close.

13.     Incentive compensation and insider transactions support a scienter inference for Defendants Dickson and Spence. Both were motivated by incentive compensation to close the Merger, despite the findings of McDermott's due diligence, and to commit the securities fraud alleged herein. Attributable to their work on the Merger, Dickson and Spence received

Recognition bonuses of *$1,125,000* and *$637,500*, respectively. Despite the financial difficulties of fiscal year 2018, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger and post-Merger time periods to immunize Individual Defendants from the impact of charges taken post-merger on the Focus Projects. Further, the Merger elevated McDermott into a different peer group of companies, leading to Defendants Dickson and Spence receiving increases in their base and incentive compensation.

14.     Transactions during the 10(b) Class Period, while the fraud was raging and the true facts behind McDermott's business and operations remained hidden from investors, yielded the Individual Defendants a combined *$9,984,700*, along with 727,464 additional shares acquired at no expense in net ill-gotten gains from prices inflated by the fraud alleged herein. These transactions were suspicious in amount, a fact that further supports the scienter inference. Dickson's *$8,015,187* in insider transaction gains compare suspiciously against his 2018 salary of $1,125,000. Spence's *$1,969,513* in insider transaction gains compare suspiciously against his 2018 salary of $650,000. Additionally, the Individual Defendants' sale/exercise of PSUs and RSUs during the 20-month 10(b) Class Period compares suspiciously against their far lower sale/exercise of PSUs and RSUs in the preceding 20-month period.   These transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements and the alleged partial corrective disclosures, a fact that further supports the scienter inference.

15.     As a result of Defendants' wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of McDermott's securities, 10(b) Lead Plaintiff NSHEPP and the other 10(b) Class  members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

18.     Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as McDermott's U.S. headquarters are located within this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

19.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III.    PARTIES

20.     10(b) Lead Plaintiff Nova Scotia Health Employee's Pension Plan, as set forth in its accompanying Supplemental Certification, which is incorporated by reference herein, purchased McDermott's common stock at artificially inflated prices during the 10(b) Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

21.     Defendant McDermott is incorporated under the laws of the country of Panama, with its principal executive offices located at 757 North Eldridge Parkway, Houston, Texas 77079.  McDermott's common stock trades on the New York Stock Exchange under the ticker symbol "MDR." in Ontario, Canada.  The McDermott website lists eight different analysts who follow it, and millions of McDermott common shares typically trade daily.

22.     Defendant David Dickson ("Dickson") has served as President and Chief Executive Officer ("CEO") of McDermott since December 2013.

23.     Defendant Stuart Spence ("Spence") has served as Executive Vice President and Chief Financial Officer ("CFO") of McDermott since August 2014.

24.     Defendants Dickson and Spence are sometimes referred to herein, collectively, as the "Individual Defendants."   The Individual Defendants, because of their positions with McDermott, possessed the power and authority to control the contents of McDermott's SEC filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of McDermott's filings and press releases alleged herein to have been false or misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.   Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading.   The Individual Defendants are liable for the false and misleading statements alleged herein.

25.     Defendant McDermott and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV.     NON-PARTY CONFIDENTIAL WITNESSES

26.     CW1 worked at CB&I starting in May 2012, having come to CB&I as part of CB&I's 2013 acquisition of the Shaw Group, Inc. ("Shaw"), and most recently worked as Director of Project Controls.  CW1 worked in CB&I's headquarters for about a year before going to the Calpine project in Delta, PA.  In June 2016, CW1 went to work on-site at the Cameron project, where CW1 was in charge of change management and risk, reporting to Senior Director

9

of Project Controls Syed Kakakhel, until CW1 left the company in June 2018, just after McDermott closed the Merger.

27.     CW2 worked at CB&I from March 2008 until November 2017, for the final three years as the Financial Operations Controller for the USA Oil and Gas Division.  CW2 was responsible for the full financial reporting of CB&I for the Americas segment, which encompassed every oil and gas project in Canada, the U.S., Central America, and South America. CW2 was based out of the Woodland offices for the first seven or eight years and then the Westchase office, which was headquarters for the Americas segment.  For the America segment, CW2 reported directly to Dane Osborne, SVP of Operations for the Americas who was over the Cameron and Freeport projects.  Through the financial rollup, CW2 reported first to Travis Stricker and then to Adam Harwell.  CW2's divisional reporting went to Stricker or Harwell, who combined the Power, Oil & Gas, and Fabrication segments into a single report given to senior management.  CW2 said that Tom McCormick was President of the Americas segment until about a year before CW2 left, and was replaced in that role.  CW2 left the company in November 2017, when CB&I was in the process of merging with McDermott, which was a reason CW2 departed.

28.     CW3 worked at CB&I and, post-Merger, McDermott from April 2015 through February 2019, as the Cost Manager on the Cameron project, initially based in Houston during project engineering and then on-site during the construction phase starting in roughly July 2016. CW3 oversaw a group that managed costs and provided forecast information and reported to the Project Controls Manager, who was initially Tom Fuller, then Mike Samick, then Syed Kakakhel.

29.     CW4 worked at CB&I from July 2005 through May 10, 2018, leaving just as the Merger closed.  As Senior Vice President for Construction from 2009 onward, CW4 ran CB&I's global construction operations out of CB&I's Woodlands, Texas headquarters.  At its high point, CW4 oversaw over 27,000 people in the field for CB&I and was responsible for staffing the jobs and providing the necessary personnel, processes, procedures, and equipment to all of CB&I's ongoing projects, including the Four Focus Projects.  CW4 ran CB&I's global operations in the field for over ten years, with Vice Presidents from around the world reporting to CW4.  CW4 managed the construction for all four of the Four Focus Projects: Cameron, Freeport, Calpine, and IPL Projects.  CW4 self-described as "the most senior guy in the field" knowledgeable about the status of construction at CB&I's projects worldwide, including the Four Focus Projects.  CW4 reported directly to the CB&I Chief Operating Officer, first Lasse Pettersen and then, Patrick Mullen from September 2016 through June 2017, when Mullen become CB&I's CEO.  From July 2017 onward, CB&I operated without a COO, so CW4 reported directly to Duncan Wigney, Executive Vice President of Operations at CB&I, who in turn reported directly to Mullen.

30.     CW5 worked at CB&I and, after the Merger, McDermott, from 2011 through November 2018, most recently as Vice President of Construction at the Woodlands, Texas headquarters.  CW5 worked on Power projects, including Calpine and IPL.  CW5 reported to CW4.  CW5 was the corporate sponsor for the construction side of the projects, ensuring that they were manned with people having the right skills set, helping to manage the schedule, and managing tools for construction equipment.  CW5 served as Construction Director and Project Manager at Calpine from Mary 2017 through December 2017.

31.     CW6 worked at CB&I and, after the Merger, McDermott, from December 2013 through June 2018.  CW6, an electrical engineer, was a Project Procurement Manager II, working on the Cameron project while based in the Houston office for 2.5 years until February or March 2017, before shifting to another project.  CW6 reported, at various times, to Regional Director Jack Brown, Global Procurement Director Gene Nikstad, and Ramit Bajaj, Clay Coffee, and Andrew Hollywood.  CW6 was considered executive management and, therefore, received information to which most employees were not privy.  CW6 was supposed to transfer to the Freeport project toward the end of CW6's tenure and a lot of the people who worked for CW6 did go to Freeport, so CW6 also discovered the issues that CB&I had created at Freeport.

32.     CW7, a mechanical engineer, worked for CB&I and, post-Merger, for McDermott in a variety of capacities from April 2011 through November 2018, most recently as Senior Commissioning Superintendent at Cameron (in 2016) and at Freeport (from 2016-2018), having worked on four total LNG jobs for the company.  Commissioning oversees pre-start and start-up work at a unit.

33.     CW8 worked at CB&I and, post-Merger, McDermott as a Lead Cost/Change Management Engineer and PPL Engineer and Cost Specialist from November 2015 through August 2018 on the Cameron project.  As an Engineer and Cost Specialist, CW8 reported to Director of Project Controls John Thomas and Director of Project Controls Syed Kakakhel. CW8 was responsible for overseeing cost and change management for the construction portion of the Cameron project.  CW8 assisted the Director of Project Controls with cost and change management and helped deliver new information to the client for review and approval.  As a Lead Cost/Change Management Engineer, CW8 was responsible for change and risk management, assisting field engineers, and facilitating their proper workflow.

34.     CW9 worked for CB&I from April 2014 through January 2018, most recently as a Project Controls Cost Specialist from 2015 onward.  From November 2015 until leaving the company, CW9 focused on the Freeport project, working in the Pipe business unit.  CW9 worked at corporate headquarters and reported to Maan Hamdan.

35.     CW10 worked for CB&I's joint venture partner, Chiyoda International Corporation, from October 2014 through January 2017, during which time CW10 worked as a civil engineer on the Cameron project from the spring of 2015 through June or July 2016, and thereafter, as a Project Engineer through January 2017.

36.     CW11 worked for CB&I as a civil structural engineer from late 2014 until June 2017, based initially out of the Baton Rouge office and, later, the Houston office, where CW11 worked as a design engineer on LNG projects, including Cameron and Freeport.

37.     CW12 worked for CB&I from August 2014 through December 2017 as the Project Controls Director for the Cameron project.  CW12 reported to the Lead Project Controls Manager of the project, who was based in Houston.  CW12 was  based in the Houston office, oversaw six people, and came onto the Cameron project just before construction began, during a process of schedule development, which CW12 saw through the engineering and procurement side.

38.     CW13 worked for CB&I as a Principle Scheduling Specialist from April 2016 to December 2017.  CW13 was the senior scheduler onsite at the Calpine project.  CW13 reported to Gary Neal, the Project Controls Manager on Calpine. CW13 was responsible for managing and maintaining the entire construction schedule on Calpine.

39.     CW14 worked at CB&I headquarters from June 2014 through September 2017 as a Lead Expediter assigned to the Cameron project.  CW14 managed 15-20 expediters, monitored

suppliers' documentation and material, and ensured that suppliers delivered equipment and materials on time to the job site. CW14 managed the team that put together progress for the client so as to issue the client monthly invoices, backed by supporting documentation and evidence. CW14 reported to Arles Melet.

40.     CW15 worked for CB&I and, post-Merger, McDermott from February 2012 through May 2019, as a Regional Sourcing & Expediting Manager for the Americas from 2012-2015 and then as a Project Procurement Director from 2015-2018. CW15 was based out of the corporate office and reported to Tenny Way. CW15 worked on a single project at a time and served as its lead for all supply chain activities, such as purchasing, expediting, logistics, and materials management all the way through the project.

41.     CW16 worked for Shaw and CB&I from 2008 through January 3, 2018, when CW16's position was eliminated in conjunction with the Merger. CW16 worked in a variety of positions, including as Cost Analyst II from July 2010 to March 2017 and Senior Construction Tech Support II from March 2017 onward. In that latter capacity, CW16 supported the Senior Vice President of Construction, Stan Kukulka, and several of the senior engineering managers and some construction managers. CW16 worked in the Charlotte office and reported to Kukulka and James Brobeck. As a Senior Construction Tech Support II, CW16's responsibilities included preliminary work and tech support on new projects, including linking drawings and procedures together and inputting them into the software. As a Cost Analyst II, CW16's responsibilities included running financial reports for warranty projects, which was necessary once construction and commissioning on a power plant was completed. CW16 kept up with the construction on both Calpine and IPL, as any issues would affect warranty down the line.

42.     CW17 was a Project Accountant at McDermott from April 2012 through May 2017, based at the company headquarters in Houston, TX.   CW17was one of six Project Accountants, responsible for monitoring revenue, job expenses, cash management, financial reporting, and forecasting on assigned projects.   CW17 assisted finance management personnel with analysis and performed occasional research of variances from prior forecasts.   CW17 prepared weekly cashflow forecasts and monthly forecast financial packages with supplemental schedules.   CW17 maintained a variety of documentation and approvals to comply with company internal record keeping and reporting requirements and also prepared monthly general ledger account reconciliations.

43.     CW18 worked at CB&I from 2004 to 2016 as a Scheduler (2004-2010) and in Global Project Controls – Compliance, Processes & Training (2010-2016).   After a gap, CW18 returned and worked at CB&I, and post-Merger, at McDermott, for about a year as a Senior Scheduling Specialist from 2017 to August 2018.   In that capacity, CW18 reported to Abdullah Al Masry, who in turn reported to Amir Hadzic.   CW18 spent half of that time working in the corporate office and the rest on-site at projects.

44.     CW19 worked for CB&I, and post-Merger, at McDermott from May 2008 through September 2018, most recently as a Senior Labor Pricing Specialist.   CW19 reported to Lunetta "Sissy" Simpson, who in turn, reported to Susan Lafleur.   CW19 dealt with some of the billing on the Calpine and IPL projects.

45.     CW20 worked at Shaw, CB&I, and post-Merger, McDermott as a Project Administrator from April 2008 to December 2012, as a Warehouse Manager in the TES department from August 2015 to July 2018, and as an Executive Assistant January 2018 to July 2018.   As a Warehouse Manager and Project Administrator, CW20 worked with project

management on various sites and assisted with reporting, managing, and closing out projects. CW20 managed equipment and handled HR, timekeeping, accruals, expediting, and requisitions. CW20 also assisted sub-contractors in the field by approving invoices, reconciling discrepancies, and working with vendors and suppliers. As an Executive Assistant at CB&I and then McDermott, CW20 worked to support Construction Director Erwin Reyes Rodriguez, Contracts / Commercial Director – LNG Project Ivan Van Der Walt, Sit Project Director Tom Ram, and Don Hall – to all of whom CW20 reported. CW20 and CW20's supervisors all worked on the Cameron project.

## V.    SUBSTANTIVE ALLEGATIONS

### A.    McDermott's Business & Operations

46.    Headquartered in Houston, Texas, McDermott describes itself as a "premier, fully-integrated provider of technology, engineering and construction solutions to the energy industry" that has designed and built "end-to-end infrastructure and technology solutions to transport and transform oil and gas into the products the world needs today." Its corporate website states, "Customers rely on McDermott to deliver certainty to the most complex projects, from concept to commissioning. We call it the One McDermott Way.'"

47.    McDermott's website states that it operates in 54 countries, employees 32,000 people, and uses a "diversified fleet of specialty marine construction vessels and fabrication facilities around the world." It divides corporate operations into four geographic regions and six global product lines, of which the "North, Central and South America" region and the "LNG" (liquified natural gas) and "Power" segments are pertinent to the claims at issue.

48.    Traditionally, McDermott had focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies.

16

49.     McDermott was a healthy, profitable company, but by 2017, had grown concerned about its lack of diversification.  For instance, almost two-thirds of its 2017 revenue came from a single client, Saudi Aramco, which also accounted for almost half of its contractual backlog.  Its second largest client contributed 11% of revenues that year.  Given its concentration of oil and gas production clients, McDermott remained sensitive to the cyclical nature of this industry and the changes in commodity prices.  It also had an established upstream offshore presence in South and Central America and the Middle East, but little presence in the stable market of the United States.  At the same time, McDermott was viewed as a potential takeover target by its rivals.  McDermott reported 2017 revenue of almost $3 billion and net income of more than $178 million.

   **B.**  **CB&I's Business & Operations**

50.     CB&I was also an engineering and construction company that focused on the oil and gas industry, but unlike McDermott, CB&I focused its downstream onshore operations in the United States, Middle East and Europe, and had a diverse client base.  CB&I was known for constructing petrochemical plants.

51.     In the years leading up to the Merger, CB&I's performance increasingly depended on the Four Focus Projects, which represented a massive part of its backlog.

52.     CB&I first announced in December 2013 that its joint venture with Zachry Industrial, Inc. was awarded two contracts valued at $2.5 billion to construct two trains at the Freeport Liquefaction Project in Freeport, Texas.  In March 2015, CB&I announced that the project had expanded to include construction of a third train in a contract valued at over $2 billion.

53.     On March 17, 2014, CB&I and Chiyoda Corp. issued a joint press release stating that the two companies had entered into a joint venture and had been awarded a contract by

Cameron LNG, LLC to construct the Cameron Liquefaction Project in Hackberry, La.   The Cameron project was valued at approximately $6 billion ($3 billion each to CB&I and Chiyoda).

54.     On June 19, 2014, CB&I issued a press release about a the IPL gas turbine project, announcing that it had been awarded a contract, valued at over $500 million, by AES Corporation subsidiary Indianapolis Power & Light Company for the engineering, procurement and construction ("EPC") of a 671-megawatt, combined-cycle gas turbine power station near Martinsville, Indiana.

55.     On November 11, 2014, CB&I issued a press release about the Calpine project, announcing that it has been awarded a contract by Calpine Mid-Merit, LLC for the initial development phase of a combined-cycle gas turbine station in Peach Bottom Township, Pennsylvania.   CB&I later disclosed the contract's value at roughly $300 million.

56.     By 2017, CB&I's performance on these Four Focus Projects was declining.   On May 8, 2017, prior to the trading open, CB&I issued a press release reporting Q1 2017 operating results, reporting, *inter alia*, that "solid earnings for the quarter" were "negatively impacted by underperformance on two union construction projects."   On the accompanying earnings call, CB&I quantified the charges at $167 million "due primarily to union construction projects." CB&I later identified, during its Q2 2017 earnings call, that the two projects as Calpine and IPL.

57.     Several analysts revised their opinions of CB&I in light of these and similar revelations about the Four Focus Projects.   For example, on May 18, 2017, Bank of America Merrill Lynch analyst Anna Kaminskaya slashed her price target on CB&I to $20 from $31, citing more risks to the company from incremental project charges, among other things.   On June 9, 2017, a Goldman Sachs analyst (Jerry Revich) cut his price target on CB&I to $15 from $33, citing higher cost overrun estimates on the Cameron Project in the second half of 2017 and 2018.

On June 21, 2017, Macquarie analyst Sameer Rathod cut his price target on CB&I from $11.50 to $10 a share, citing delays at the Freeport Project that could lead to a possible cost overrun at CB&I.

58.     Thereafter, CB&I faced financial difficulties and an uncertain future, burdened by execution of the Four Focus Projects.  CB&I's Q2 2017 earnings release on August 9, 2017, announced suspension of its dividend and pursuit of a sale of its Technology business to eliminate debt and to reinvest in its Engineering & Construction (E&C) and Fabrication Services businesses.  CB&I's E&C business reported an operating loss of $525.7 million "due to forecasted increases in costs on [the Four Focus Projects] amounting to $548.0 million, as well as an additional $50 million from the current-quarter impact of a lower margin percentage recognized on work performed during the period on the projects."  CB&I reported that "[a]s of June 30, 2017, [it] would not have been in compliance with certain covenants required under CB&I's credit agreement without amending the agreements.  Effective August 9, the company amended its credit agreements . . . to waive its current non-compliance and to revise future covenants."  On the Q2 2017 earning call, CB&I acknowledged taking $367 million in charges on Cameron (primarily) and Freeport and $181 million in charges on Calpine and IPL, which its CEO said reflected "a more conservative view of assumptions going forward," adding that "we've got enough experience in the field right now with where we are in construction, and applying that to the future and taking the loss that we talked about today is what we've decided to do."

59.     In announcing Q3 2017 results, CB&I reported that it had revised its loan covenants, effective August 9, 2017, to address CB&I's difficulties on the Four Focus Projects, *e.g.*, by requiring that it maintain decreasing trailing 12-month EBITDA levels while excluding

from the EBITDA calculation certain unspecified "charges on certain projects which occurred" during the first half of 2017, and "an agreed amount for potential future charges for the same projects if they were to be incurred during the third and fourth quarters of 2017." On the October 20, 2017 earnings call, CB&I's CEO acknowledged that it had "moderat[ed]" its cost forecasts for the IPL and Calpine projects and had taken $38 million in extra charges on them during the quarter. He also said that IPL was "99% complete on construction and is in the commissioning phase" and Calpine was "approximately 75% complete." He added that CB&I was at "full site staff levels" and "continue to make good progress" on the Cameron and Freeport projects and that it was "ccontinuing our discussions with Cameron LNG regarding claims for extension of time and recovery of certain costs on that project. We are meeting with our customer regularly, and senior management at both companies have targeted a resolution before year's end."

60.     Thus, heading into the 10(b) Class Period, CB&I struggled to stay afloat, amidst difficulties successfully executing the Four Focus Projects. Despite 2017 revenue over $6.6 billion, CB&I reported a net loss of more than $1.4 billion. After several public setbacks on its large projects, CB&I struggled to comply with its recently amended debt covenants and explored strategic options to prevent bankruptcy. CB&I had approximately $2.5 billion of debt and an over $1 billion impairment to goodwill, stemming from a $3.3 billion acquisition in February 2013. It looked to sell certain business units to raise badly needed capital. From December 3, 2016 through December 18, 2017, CB&I's common shares declined in value by 43.56% - a period during which McDermott's shares appreciated by 2.71%.

## C.     McDermott & CB&I Announce Their Potential Merger

61.     In this context, McDermott and CB&I discussed a potential merger (the "Merger") in the fall of 2017. On December 18, 2017, the two companies entered into a business

combination agreement to effectuate the Merger (the "Merger Agreement"), whereby CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity.  McDermott was acquiring its distressed peer, and purportedly solving both their problems by creating a "premier fully vertically integrated onshore-offshore company with a broad engineering, procurement, construction and installation service offering and market leading technologies portfolio."   The announcement quoted Defendant Dickson as stating, "By applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture."

62.    The next day, CB&I issued a press release announcing that it had reached a settlement with Cameron LNG, the client on the Cameron project (the "Cameron Settlement Agreement").  In it, CB&I's CEO called the agreement "an important milestone in resolving all past commercial issues and aligning all parties toward the successful completion of the project." He added, "We appreciate the collaboration of Cameron LNG and look forward to their continued support as we move forward with the safe and on-time completion of this significant energy infrastructure project."  Significantly, the agreement seemed to clear up any prior claims and potential future impacts from past difficulties on the Cameron project, as stated in the press release:

> The settlement resolves all known and unknown claims to date (including impacts from Hurricane Harvey) and includes the following key components:
>
> • Resolves all past commercial issues and increases the certainty of the project schedule, which has all three liquefaction trains producing LNG in 2019
>
> • Provides incentive bonus payments related to expedited project completion

- Waiver of any schedule-related liquidated damages related to the original contract and reestablishment of liquidated damage start dates according to the settlement.

### D.    Post-Announcement Scrutiny Focused On The Four Focus Projects

63.    From the beginning, analysts and investors focused on how McDermott would value the Four Focus Projects.  Indeed, the first question from an analyst on the conference call announcing the Merger dealt with "the level [of] due diligence" around the transaction, particularly with respect to these projects.  Defendant Dickson confirmed that McDermott had "worked extensively with CB&I on due diligence," while Defendant Spence assured the analysts that the due diligence was "significant."   Nonetheless, several analysts' first reports on the transaction focused on the need to properly evaluate the Four Focus Projects.

64.    Thereafter, Defendants consistently reassured analysts and investors that they did. Between the Merger announcement and the shareholder vote on May 2, 2018, Defendants continued to reassure analysts and investors that they had conducted extensive due diligence into CB&I in general, and specifically the Four Focus Projects, so that there was little risk for which they had not already accounted.

65.    For example, during the post-announcement / pre-Merger time period, on February 20, 2018, CB&I announced its Q4 2017 operating results, which disclosed $101 million in operating charges on the Four Focus Projects, as follows:

- Cameron LNG project: $39.0 million, resulting in part from the recognition of incremental costs resulting from Hurricane Harvey, which the company agreed to absorb in connection with the December 2017 settlement agreement with the project sponsor. The settlement considerably de-risks the project for CB&I, as it resolves all past commercial issues, provides significant cost coverage for certain past and current cost increases, includes an incentive bonus payment related to expedited project completion and, importantly, resets the trigger dates for any potential liquidated damages. As of December 31, 2017, the project was approximately 77 percent complete and is forecasted to be completed in the fourth quarter of 2019.

22

- Freeport LNG project: $20.0 million, due in part to the adjustment of contingency provisions in the existing contract. The company is continuing to evaluate and estimate the indirect impacts of Hurricane Harvey, including potential impacts to productivity and schedule-related prolongation costs. The company believes any costs incurred as a result of the hurricane are recoverable under contractual force majeure provisions. The pace of incremental progress on the project increased substantially during the fourth quarter as compared to prior quarters. As of December 31, 2017, the project was approximately 73 percent complete and is forecasted to be completed in the third quarter of 2019.

- Calpine combined-cycle gas turbine power project: $35.0 million, primarily resulting from disruption of construction activities caused by severe winter weather during the fourth quarter. The charge includes the benefit of a claims settlement (subject to final documentation) with the project owner, which resulted in a net increase in project price during the fourth quarter for schedule incentives (based on a revised schedule) and the resolution of schedule liquidated damages. As of December 31, 2017, the project was approximately 79 percent complete and is forecasted to be completed in the fourth quarter of 2018.

- IPL/Eagle Valley combined cycle gas turbine power project: $7.0 million associated with the close-out of the project, which is expected to be essentially completed by the end of this month.

66. CB&I's Form 10-K filed with the SEC on February 21, 2018, also reassured investors that forecasts on the Four Focus Projects were under control. For example, when discussing the gas projects, CB&I recognized the recent setbacks but stated that current forecasts "anticipate[ ] productivity levels that are consistent with our overall historical experience on the project and improved progress (due in part to anticipated improvement in weather conditions as the project moves out of the winter months), and actions to reduce our schedule related indirect costs." It added that the Cameron forecast "anticipates improvement in productivity from our overall historical experience on the project (as we anticipate improved construction performance for each subsequent LNG train) and actions to significantly reduce our schedule related indirect costs." CB&I also included similar reassurances in the Form 10-Q filed on April 24, 2018.

67.     In response to these CB&I disclosures, after McDermott completed its pre-announcement due diligence and while it was undertaking its post-announcement / pre-Merger due diligence, Defendants repeatedly reassured investors that the situation was under control. For instance, during the February 22, 2018 earnings call, Defendant Dickson gave reassurance, which were repeated by analysts in their reports thereafter:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional project charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence***.

68.     Lingering concerns about the risks of McDermott taking over CB&I and the Four Focus Projects were enough that one member of McDermott's Board of Directors took the unusual step of voting against the Merger, based on his lengthy experience in the engineering and construction industry.  However, McDermott argued that it had sufficiently mitigated the risks that this Director identified through their extensive due diligence of CB&I.

69.     After receiving Defendants' repeated reassurances that McDermott had controlled for the risk, the Merger was approved by a majority of McDermott shareholders and closed on May 10, 2018 (the "Merger Date").  McDermott issued approximately 84.5 million shares to former CB&I Shareholders with a market value (based on the $20.70 per share closing price on the Merger Date) of approximately $1.75 billion.

### E.     The Four Focus Projects Carried Undisclosed Forecasted Costs Of Well Over $1 Billion When The Merger Was Announced And When It Closed

70.     Contrary to Defendants' alleged misstatements, as discussed herein, former CB&I and McDermott employees, including those at senior or executive levels, and internal documents demonstrate that Defendants knew of or recklessly disregarded significant, material, undisclosed facts and financial risks to investors from the Four Focus Projects.  Moreover, these former

employees describe how information related to these risks was available to McDermott throughout its extensive due diligence period, which is discuss more fully in §V.G.1.a.-b. *infra*.

### 1. *Undisclosed Facts and Risks Concerning The Cameron Project*

71.     CW1 was the Director of Project Controls at Cameron from June 2016 through the closing of the Merger into June 2018.   The Project Controls team was responsible for understanding the cost of the Cameron project job site, to forecast the cost of future events, and to report those forecasted costs to management.   The Project Controls team had 25-30 people encompassing schedule, cost, earned value, and change management.   Work crews completed project impact notification forms to identify anything out of scope, incorrect, or fabricated incorrectly, which were reported up through foremen, general foremen, superintendents, and project managers to CW1.   CW1's group verified, *inter alia*, whether these costs were ones that the Cameron job site would have to absorb.

72.     CW3 was the Cost Manager on Cameron from April 2015 through February 2019 and described a similar process.   CW3 oversaw a group whose main task was managing the project cost and providing forecast information upward, by analyzing the schedule, contractor information, and performance metrics on labor to determine how much was left to spend and what the total cost / spend would be on the project to finish the job.   CW3 stated forecast reports were given to executives, including those close to Defendants Dickson and Spence, if not to them directly.

73.     CW1 explained that every month, the Project Controls team did their own due diligence and, based on actual projected impacts to the Project's costs, Kakakhel's team created a forecast of what they thought the true change in costs would be for Cameron LNG in addition to those already reported.   Risk factors were documented in "Risk Registers."   CW1 described how those "Risk Registers" were sent to the Project Controls Cost Manager for the Cameron LNG

project, CW3. CW3, together with Syed Kakakhel, the Senior Director of Project Controls at Cameron and CW1's supervisor, discussed CW1's forecasted costs with the on-site Project Managers and Project Directors. CW1 described how the Cameron Project Manager sent the forecasted numbers to management located at CB&I's Woodlands, Texas headquarters. CW3 corroborated that monthly forecasting was standard at CB&I when the Cameron project began, though said that it changed to quarterly reporting at some point.

74. CW1 stated that, by the end of 2017, forecasted costs on Cameron had escalated well beyond what CB&I was budgeting and forecasting publicly. CW1 reported how the forecasted costs were a "political hot potato" and, without fail, CW1's and Project Controls' forecasted costs for the Cameron Project were largely acknowledged internally and then ignored publicly by CB&I management such that the true costs were not accurately reported to in public disclosures. CW1 said that CB&I's home office would issue "ridiculous" challenges to the monthly Project Controls forecast, and thereafter CB&I would recognize only a "little bit of loss" while telling the team to find ways to mitigate the rest, even when Project Controls increased the monthly forecast by $200 million. CW1 said that the inaccuracy of reported forecasts got worse as the Cameron project went on. CW1 stated that it was "as clear as the nose on your face that the [existing] forecast was not adequate." CW1 explained that this approach resulted in, at times, the Cameron Project having already spent more than what the entire pertinent piece of the Project was forecasted to cost.

75. CW2 stated that Cameron had slippage every month of additional costs over what had been forecast, related to the performance factor, having to do with poor management and poor handling of materials. CW2 said that performance never improved as the project went on, as it had been projected to do. CW2 said that Project Controls was very accurate with the

forecast, so to see continuous monthly changes to the project costs meant that the company was trying to string out the forecast costs. CW2 said that Cameron and Freeport were two big projects and were watched very closely by everybody, and everyone in the management chain all the way up to Phil Asherman knew what the performance factor was. CW2 said that field performance could simply not keep track with what was required to keep Cameron track.

76. CW3 confirmed CW1's account that the Project Controls group was often instructed to change the numbers in their reports, as late as one day before they were due in the system. CW3 confirmed that this practice continued after McDermott completed the Merger, and CW3 recalled a Q3 2018 email from a regional VP overseeing the North, Central, and South America financials instructing employees to change the numbers. CW3 said that with both CB&I and McDermott, top executives, including the CEO and CFO received both the real forecasted numbers in initial reports and later revised forecasts with "better" numbers, which would be published. CW3 explained that Defendants Dickson and Spence "knew the numbers" because they came on site to Cameron, and CW3 went over the true cost estimates with Spence. CW3 also said that there were emails where Defendants Spence and Dickson received the complete package of Project Control's unaltered forecasts, including low-level details and their basis. CW3 stated that the Project Controls Group had begun tracking how far off the revised numbers in the reports were from the initial numbers three reporting quarters before the Merger and continued to do so after McDermott took over. CW3 believes the executives were very well aware of difference in the numbers and that there is no way they could claim they did not know. Indeed, CW3 recalled employees openly calling CB&I "Enron II." CW3 stated that a very experienced Project Director, Tom Rabb, was brought in to handle Cameron, but after the first update with McDermott, saw that things were not going to change and resigned.

77.     CW4 confirmed that the highest levels of CB&I were aware of the undisclosed facts regarding the Four Focus Projects. CW4 was confident that the CB&I CEO and CFO were updated "constantly" on the status of the Four Focus Projects.  CW4's "main focus" was on Cameron and Calpine, so CW4 had meetings "constantly" about those two projects, including meetings about fabrication, execution, and financial issues.  CW4 attended monthly meetings through April 2018, which covered all the projects in the division, with CB&I's executive board, including Duncan Wigney, Executive Vice President of Operations at CB&I, and Jim Sabin, Executive Vice President of Global Operations Services at CB&I (who was announced as the CB&I Integration Team Leader via an SEC rule 425 filing on December 19, 2017), and typically, Project Controls people such as CW3, CW1, Tom Rabb, and Syed Kakakhel.  The project director; the project senior team, including the construction manager, project manager, and the engineering manager from the home office; and employees responsible for financial reporting on project trending or for project controls also sometimes attended.  CW4 also attended focus meetings once or twice a month, which included executives up to the COO, about Cameron, Freeport, Calpine, and IPL.  Beyond that, every division (EPC, Tank, Fabrication) had formal monthly meetings covering the total health of projects in the division, including personnel, safety, finance, change orders, and client relations, for which CW4's division compiled information into a Powerpoint presentation, with results that went up to the entire C-suite, including the CEO, CFO, and CAO, who would have their own meetings into which CW4 sometimes called.  Every quarter until roughly six months before CW4 left the company, CW4 also presented to the Board of Directors in meetings of 50-60 people, where each group had 30 minutes to present their business unit and CW4 would present head count, safety issues, schedule opportunities, focus activities.

78.     At both formalized monthly meetings and breakout meetings, CW4 discussed construction operations and provided his view on how to improve negative construction and operations trends at the Four Focus Projects.   CW4 said that Project Controls for each Focus Project presented all the costs for each Focus Project and calculated a productivity factor based on progress to date for completion.   Based on that, Project Controls representatives analyzed trends, forecast what completion of the balance of the Focus Project would cost the company, and presented this information in the monthly meetings.   CW4 confirmed that the Project Controls forecasted numbers were "way above" what CB&I formally added in as a contingency due to circumstances like having to drive 23,000 piles for the Cameron project instead of the 18,000 piles that had been originally calculated, which corresponding increases in concrete, structural steel, and related materials.   CW4 stated that CB&I was "absolutely horrendous at getting their arms around the quantities" of such materials necessary to complete Cameron.

79.     CW2 corroborated CW4's statements about the monthly presentations.  CW2 said that during the course of projects, there were extensive monthly project controls reviews and financial reviews, with enormous Powerpoint presentations, called Project Status Reports, that were 20-40 pages long and contained all the detailed data.  CW2 said that the SVP of Operations for the Americas, Dane Osborne, would present the Project Status Reports to Mike Taff, CB&I President Phill Asherman, and CB&I's CEO and CFO.  CW2 described how monthly "strategy meetings," attended by the SVPs of the Americas (Operations, Construction, Project Controls), involving department heads for each leg (Engineering, Construction, Finance), Project Controls, and the next tier down would discuss the projects that were underwater like Cameron, including what was causing the poor performance factor and would could be done about it.  CW2 said that

29

the finance director and project director for each project would present a 40-70 page packet for the projects.  CW2 said that additional meetings would focus on each project.

80.     CW16 also described monthly presentations with the executive team on every project, which CW16 either attended or had access to the covered information via Intranet, where the senior cost person for each project gave a Powerpoint presentation, akin to a webinar, that included the financials and pictures of issues they were having.  CW16 said that CB&I's CEO and CFO participated in these presentations, if not in person, then at least by phone most of the time.  CW16 stated that the monthly presentation went through all major power projects and used to take two full days and, more recently, took up a full day, with supplemental one-off meetings not attended by everyone.  CW16 stated that the Power Division, which included Calpine and IPL, had its monthly meeting on a different day than the Oil & Gas Division, which included Cameron and Freeport, until late in CW16's tenure when they were consolidated into a single day.

81.     CW14 said that CB&I had to provide weekly reports on its suppliers and progress reports on how they were performing to the Project Controls for Cameron.  CW14 said that CB&I had a system called iDocs, which held the weekly supplier reports, the reports that went to the client, and the monthly reports generated for the client.  CW14 said that anyone in management had access to iDocs and assumed the CEO did as well.  As CW14 said, "Nothing was hidden, and it was not a secret."

82.     CW10, a civil engineer and Project Engineer with CB&I's joint venture partner, Chiyoda, on the Cameron project, stated that the additional costs on Cameron resulted from the engineering and that there was a lot of rework needed on the foundations and structures.  CW10 stated that there was no quality to the designs.  For instance, when CW10's team lead had to

present the foundation designs to go into construction, CW10 was asked to check the foundation design alone, a task that would typically require 2-3 people supplied with significant information. CW10 requested information like what the foundations would be carrying, what equipment would be on top of them, the weights, and the quantities, but was told to review the designs without it. CW10 did so but refused to sign off. CW10 said that CW10 saw a lot of mistakes and that the design "was a mess."

83.     The problems started at Cameron from the beginning. CW11, a CB&I civil structural engineer who worked on the LNG projects, including Cameron and Freeport, corroborated these statements. CW11 called both projects a mess and said that the front-end engineering design (FEED) was lacking, management for Cameron and Freeport were awful, and employees did not have the information and drawings to support construction. CW7, Senior Commissioning Superintendent at Cameron, was a senior project engineer when the FEED was done with regards to Cameron. CW7 called it a "light FEED," and it was done by the client's engineering company, S&G, which did very light weight engineering design, which they handed over to CB&I to verify and complete where processes were omitted. CW7 said that the civil engineering was the Cameron project weakness, as load tests and test bores determined that the design was insufficient and that additional pilings needed to be installed. CW7 said that changing the pilings meant that all the steel had to be redesigned, the steel in fabrication had to be cut up and redone, and the existing steel needed to be spread out to meet load requirements. CW7 said that these steps were a big deal as far as cost overruns. CW7 believes that Cameron was underbid by $2.5 - $3 billion.

84.     CW12, the Project Controls Director at Cameron, similarly characterized the Cameron project. CW12 said that the schedule was developed front to back in the home office,

with construction personnel to fill in details once out in the field.  CW12 said that the pile driving was a fiasco, because the company scheduled it just 4-5 months after the contract was awarded, when they did not know the weight or dimensions of equipment and, therefore, how to pile drive to support the equipment.  CW12 said that CB&I lacked enough batch plants to pour the concrete necessary to support the piles and, rather than procure more batch plants, halted construction for a couple of months around September 2014, a delay that cascaded down the schedule.  CW12 observed that pipe and equipment thereafter accumulated, requiring the company to truck it on and off-site, to rent over 500 "C-cans" (large containers that go on trucks and ships) for storage, and to buy up available warehouse space at the ports of Houston and New Orleans, thereby driving up costs beyond the budget.  CW12 said that CB&I needed to drive around 25,000 piles due to the bog-like soil.  CW12 also stated that CB&I was unable to meet the client's specifications for pulling a single, continuous cable from one termination to the other, due to Cameron's large plot size exceeding the length of available cable spools, likely necessitating installation of a marshalling panel, an interim termination point, and double the number of cable terminations (four instead of two), thereby increasing manhours and equipment needed.  When CW12 left in December 2016, Cameron was behind schedule and CB&I was in the "what the hell do we do now stage."

85.    CW6, who was considered executive management, was responsible for maintaining the budget on Cameron, making sure that there was clear accountability for every penny spent in the office and on the field, reporting to higher-level executive management the project budget and project spend, managing all employees on the project throughout the entire supply chain and workers in the field, and dealing with suppliers.  CW6's direct superiors would take CW6's report, refine it, and report it to their bosses, and the information would make it to

the company CEO.  CW6 ran reports and compiled project-level comparisons of actual versus budgeted numbers, based on accurate data in a JD Edwards system, which the finance team double checks and which CW6 verified line by line.  CW6 used the JD Edwards data to create spreadsheets used in monthly meetings with CW6's direct supervisor, his supervisor's superior, and executives, including at times the Global Director of Procurement, who reported on the project to the CEO.  CW6 was asked at times to change the reports but refused.  CW6 confirmed that the JD Edwards system was the primary data system for recording project-level costs versus budget/estimates and that executives including the CEO received reports generated from information in that system.

86.     The CWs indicated that the budget overages prompted CB&I to manipulate the timing of revenues and expenses related to the Cameron project.  According to CW1, the company improperly recognized change order revenue and engaged in accounting gimmicks.  Once, when the client at Cameron entered a change order in February or March 2018, there was a $200 million bonus structure for the completion of Train 1, a milestone in the project.  CW1 knows for sure that CB&I immediately recognized at least $50 million of that bonus right off the bat, without meeting any of the milestones for receipt, and that it went straight to the bottom-line as margin because it was reflected in the project cost report.  CW1 said that the instruction to recognize $50 million early would have come from CB&I's Woodlands home office.

87.     CW1 also stated that the company delayed payment to vendors for 60-90 days.  CW6 corroborated this claim, stating that personnel at the Woodlands headquarters had instructed the Cameron project not to pay suppliers for 30 days, a scheme that project employees referred to as "cooking the books."  CW6 said this occurred approximately once per quarter the while time CW6 oversaw Cameron, which CW6 described as a "nightmare," since CW6 dealt

directly with suppliers.  CW14 also said that CB&I held off paying invoicing on the Cameron project.

88.     CW15 discussed the "huge" impacts of these manipulations, which CW15 called "cooking the books" by retaining more money in the bank and said occurred in the weeks leading up to every quarter end,  on other projects.  CW15 said that the company would push vendors to expediate product shipping so as to meet project milestones, then delay payment to their suppliers.  CW15 said that by not paying suppliers on successful projects, the company was "robbing Peter to pay Paul" and using the money instead to fund Cameron and Freeport to keep those projects going.  However, CW15 said that this conduct caused vendors to shut down, refuse new purchase orders, and/or to refuse to ship materials for money-making projects because they had not been paid on Cameron or Freeport.  CW15 said that the project on which CW15 was working received its first big payment in October 2018, but the funds quickly went to Cameron and Freeport to get them back to a reasonable place with suppliers.  CW15 specifically recalled one supplier, Lockwood International, that at any given time, had 200-300 invoices overdue in excess of 90 days, out of 1200 invoices from CW15's project.  CW15 also stated that CB&I was not paying contractors, which fell under CW15's responsibility as well.  CW15 said that Project Procurement Managers did weekly reports to identify the most critical vendor payments, based on which vendors were going to refuse further purchase orders, after which point, senior management, the accounting group, and the finance group would decide which invoices got paid.  CW15 said that high-dollar invoices required CFO approval (if over $1 million) or CEO approval (if over $50 million) and were definitely delayed until quarter end – every single quarter. Significantly, CW15 confirmed that these practices, which had been ongoing since 2016, continued during the first year after the Merger under McDermott and that

any payments over $50 million first went to Defendant Spence, who would decide whether to act on it or go for higher approval from Defendant Dickson.

### 2.     *Undisclosed Facts and Risks Concerning The Calpine Project*

89.     CW1 also worked as Director of Project Controls on the Calpine job site and said that Calpine was "upside down from the beginning."  CW1 said that rank-and-file employees on Calpine "knew a long time ago that they were in trouble and losing money."  When CW1 left Calpine site in June 2016, CW1 told CB&I that it would lose $30 million on the project, but the company told him he was "nuts" and transferred him to Cameron.  CW1 said that labor at the Calpine job had a performance factor (PF) of 0.3 or 0.2, meaning that it was missing budget on the project by 70%.

90.     The underlying data to verify this performance factor was available and accurate. For instance, CW19, a Senior Labor Checking Specialist, worked to ensure that aspects of the labor data at Calpine was accurate.  CW19 took the piping and welding labor to be performed on each piece of equipment – going through the cut, the weld, and the labor for each piece of pipe – then price it out and ensure that it was input properly, so that the company could accurately charge and bill it.  CW19 had to ensure that the information was detailed and to check it with a fine-tooth comb.  Thereafter, CW19 said that the information went through a second group of checkers located in Baton Rouge, who ensured that CW19's group did not make any errors.

91.     CW4 relayed that the Calpine Project "was woefully late," dating back to the pre-CB&I days when the project was run by Shaw Group, because of bad engineering and the decision to mobilize the job too early.  Despite engineering that was "extremely late," CW4 stated that [Shaw] tried to mobilize the job on time and "cripple through."  CW4 stated this was a "horrific" thing to do because it sets the stage for "sloppy productivity," and once that went on for a year, "it was almost like a terminal disease for the project."  CW4 said that by early- to

mid-2016 Calpine was only 30% through engineering, rather than being done, and that 85% of the indirect and running costs had been spent before work ever got going in the field.  CW4 said that these long-term problems would have been obvious to McDermott or anybody thinking about taking over this project.  CW4 changed senior leadership at Calpine but the project continued to be "plagued by delays" by the end of 2017 and through 2018, delays that were "no secret to senior leadership at CB&I" because CW4 met with Wigney, Executive Vice President of Operations at CB&I, every week about Calpine to try and address the "calamity of errors" regarding engineering, material, and construction.

92.    CW18 stated that at the Calpine project, the company had two schedules, one to show the client and the other from which they were working.  CW18 said that CW18 did not see any post-Merger changes implemented by McDermott while CW18 was still at the company.

93.    CW16 called Calpine a "disaster from the get-go."  CW16 received monthly cost reports on Calpine, which reflected lots of additional costs on the project, which was significantly overestimate and significantly behind schedule.  CW16 said that the cost reports were posted on the intranet and that all executives had access to the cost reports.  CW16 stated that monthly overviews and financial reports on Calpine included progress reports and timelines.

94.    CW13, who was responsible for managing and maintaining the entire construction schedule at Calpine before leaving CB&I in December 2017, described "horrible, horrible delays" and observed that the project went over by more than 100% in terms of both schedule and cost.  CW13 said the overages were the result of poor engineering and poor execution.  CW13 said that usually, they only got half of the hours of work that they had planned for that week done at twice the cost.  CW13 said that the scheduled changed at least half a dozen times.  CW13 said that Calpine was already six or seven months behind when CW13 joined the project

in April 2016. CW13 worked in Project Controls and prepared all the data on Calpine, updating the schedule every week, which would also update cost estimates. CW13's group prepared monthly reporting of the data on Calpine, which CW13 described as relaying this is where the project is, and this is the date it is going to finish. CW13 said that the client and CB&I executives got monthly reporting on Calpine, which went "all the way to the top," meaning most people in the Charlotte office and everyone within the Power Division at the Woodlands office. CW13 was not aware of the reports being altered. CW13 described full-day quarterly project reviews, attended by CB&I's EVP over Project Controls, CB&I management, and client representatives, at which CW13 usually gave a 20-minute presentation.

### 3.    *Undisclosed Facts and Risks Concerning The Freeport Project*

95.    CW3 was told that CB&I and McDermott also changed the forecasts provided by CW3's team and the Project Controls group for the Freeport project, as was done on the Cameron project. This statement is corroborated by CW9.

96.    CW9 worked on a $220 million pipe project for Freeport, which was running probably six months behind, and said that the company's forecast was 10-20% different than CW9's forecast. CW9 said that the executive over Fabrication Services, Luke Scorsone, attended monthly forecast review meetings, one of which CW9 attended, included reports showing the forecasted costs versus the actual costs. CW9 stated that the cost per performance factor (a/k/a an FDI) at Freeport was trending at a much higher dollar value than the level at which they were forecasting the project to end, that those forecasts were reported to upper management in every single report and in monthly meetings, and that upper management at the VP level would thereafter give in-person instructions on hand-written paper to lower the forecast. CW9 assumed the instruction came down from a higher level than the VPs and that it was tied to short-term compensation concerns. CW9 said that VPs came directly to CW9 or to CW9's boss

with the instruction to lower the forecast.  CW9 cited this practice as CW9's reason for leaving the company - CW9 wanted nothing to do with it.

97.     CW4 attended the same monthly meetings with CB&I executives for the Freeport project as CW4 attended for the Cameron project, as discussed *supra*.  For these meetings as well, Project Controls would state accumulated costs within a time period and then forecast, based on those costs and progress to date, the productivity on the project.  CW4 confirmed that the Project Controls forecasted numbers were "way above" what CB&I formally added in as a contingency.  In the same meetings, CW4 discussed operations and how to improve the negative trends.

98.     CW6 said that some of the overruns were due to poor materials management occurring in the field and that there was also overage on the logistics side because of engineering issues creating a time crunch and requiring different, more costly measures, like shipping items air freight instead of by truck.  Indeed, CW6 said that, across the board at CB&I, engineering did just enough to get documentation out for companies to quote and a supplier to be secured, and only then did CB&I start validating specifics.  CW6 said that this practice was not typical in the industry.  CW6 said that by the time CW6 left the company in June 2018, Freeport was close to $100 million over budget.

99.     CW11 called the Freeport project "a mess," said the front-end engineering design was lacking, management was awful, and employees lacked information and drawings to support construction.  CW11 added that, at Freeport, engineers were rushed to issue drawings because the piling contractor was already onsite.

100.    CW7 worked a lot on the schedule at Freeport and said that they did new schedules and evaluations to remediate schedule slippages.  However, CW7 said that CB&I kept

two schedules, one that was real and one that they showed to the client.  CW7 confirmed that this practice continued after McDermott closed the Merger.

101.    CW6 confirmed that personnel at the Woodlands headquarters had instructed the Freeport project, like Cameron, not to pay suppliers for 30 days, which employees referred to as "cooking the books."

### 4.    *Undisclosed Facts and Risks Concerning The IPL Project*

102.    CW13, who was responsible for managing and maintaining the entire construction schedule at Calpine before leaving CB&I in December 2017, described IPL as the "twin sister" project to Calpine.  CW13 said that, upon learning that Calpine had a twin project, CW13 did a lot of schedule comparisons between the two projects and would fly to the IPL site to compare. CW13 said that it was "obvious" that IPL was behind schedule.  CW13 said that IPL was 6-8 months behind and 50% over cost estimates.

### 5.    *The Undisclosed Catastrophic Financial Impacts Of The Four Focus Projects*

103.    The CWs were clear that the Four Focus Projects were hugely behind schedule and massively over-budget before the Merger had even closed, such that to accurately account for them, McDermott needed to take *$1 billion* or more in charges at the Merger closing and to clearly state that the Four Focus Projects would create an ongoing cash burn in the hundreds of millions of dollars each quarter.

104.    CW1, an individual with over twenty years' experience in the industry, who served as the Director of Project Controls - Risks at the Cameron Project from June 2016 to June 2018 (and who previously served in the same capacity at the Calpine Project from Spring 2015 until June 2016)), said there was such rampant "corporate override of the [Cameron] project['s]"

costs at the end of 2017 and throughout the first quarter of 2018, "that it [was] just a deception to stakeholders of the company."

105.    CW6 said that by the time CW6 left the Cameron project around February or March 2017, Cameron was already $300 million over budget, meaning the amount of capital spend over what had been budgeted for the project, due to issues in the field, such as damaged equipment. CW6 also recalled a company-wide presentation, scheduled at different times to accommodate work schedules, indicating that Focus Projects were up to $500 - $600 million over budget and that Cameron and Freeport had specifically led to that number. CW6 stated that on Cameron, the overage was driven by material management in the field not being prepared to handle incoming materials, leading to CB&I incurring a lot of additional costs on things like shipping, storage, and leased land. CW6 also confirmed that CW6 saw no evidence that the Four Focus Projects had been de-risked while CW6 was at CB&I / McDermott. CW6 said that McDermott's claim that even the troubled "focus projects have been significantly de-risked with respect to engineering, quantities and procurement, remaining risk is assessed as mostly related to labor performance" did not seem to be true, because McDermott relied upon legacy CB&I executive management and employees.

106.    CW2 said that Cameron was about $1 billion over budget, if not more, and significantly behind the delivery date, by the time CW2 left the company in November 2017. CW2 said that the number they were using in their then-current trending was showing the project end costs to end up being $1 billion over project budget. CW2 thinks that the actuals were even worse. CW2 also said that Jerry Burns, who was in charge of Project Controls for the Americas segment, was demoted and then fired in 2017 after he raised a stink all the way up to the President, Phil Asherman, in December 2016 by saying that the cost overruns for Cameron were

going to be a heck of a lot more than what the company was reporting because management was ignoring Burns's forecast and using a more optimistic forecast.  CW2 also said that Freeport was darn close to being $1 billion over budget (though not yet over the project cost) when CW2 left the company in November 2017.

107.   By the end of December 2017, when the Merger was first announced, CW1's forecasted costs had escalated well beyond what was reported in CB&I's financial statements, rising to well over $1 billion above then-currently reported costs.  Internal CB&I documents shown to counsel for 10(b) Lead Plaintiff NSHEPP and, on information and belief based on the allegations in ¶¶V.G.1.a.-b. *infra*, part of the pre-Merger due diligence that McDermott conducted, confirm CW1's account that charges between $700 million and $1 billion would be incurred at Cameron before completion.  Specifically:

(a)   CW1 drafted and compiled, with the help of others on the Cameron Project Controls group documents titled "Risk Registers" that set out each itemized threat to the Cameron Project and assigned each risk a dollar value. The December 31, 2017 "Cameron Liquefaction Project Execution CCJV Risk Register," which was signed off on by Thomas Rabb, the Cameron Project Director, on January 25, 2018 (the "December 2017 Risk Register") identified $1,200,552,343 of itemized forecasted risks, 39% of which, totaling $468,740,165, carried a medium, high, or extreme severity level and a probability score of 4 or 5, which indicated that these risks carried a greater than 40% or greater than 60% probability of occurring. CW1 stated that any risk with a probability score of 4 or 5 should be charged to the project in CB&I's statements.   One risk—"Direct Craft Performance Factor" in the amount of $107,049,208—was rated "Extreme."   The largest single category of potential charges was $507,599,177 in potential liquidated damages.

(b)      CW1 also drafted and compiled, with the help of others on the Cameron Project Controls team, the First Quarter March 31, 2018 "Cameron Liquefaction Project Execution CCJV Risk Register," which was signed off on by Rabb on April 23, 2018 (the "March 2018 Risk Register").  The March 2018 Risk Register identified escalating risks at Cameron, reporting over $1.34 billion of itemized forecasted risks, 38% of which, totaling $513,198,182, carried a medium or high severity level and a probability score or 4 or 5.

(c)      These two Risk Registers confirm that risks at Cameron were escalating between the fourth quarter of 2017 and the first quarter of 2018, contrary to Defendants' repeated statements touting a de-escalation of risk at the Four Focus Projects.  For example, one forecasted risk line item in the December 2017 Risk Register projected an additional $36.5 million of at risk costs to reflect the "cumulative impact of unplanned work."  This Risk Register item clearly indicated that:  "The cumulative impact of many changes over time has only been accounted for on an incremental basis.  Unplanned work continues to mount as engineering changes, construction re-work, back charges, etc. causes scheduled creep/slip and increased cost.  The full scope of unplanned work should be identified and a response plan developed."

(d)      This risk line item (just one of 55 line items in the December 2017 Risk Register) was assigned the highest severity level and a probability rating of "5" out of 5, meaning, that it should have been incorporated into CB&I's reported financials.  That same line item concerning unplanned work was repeated in the March 2018 Risk Register (which now contained 65 line items), just as the Proxy was released to investors touting the "de-risking" of the Focus Projects, except by that time period, the cumulative impact of unplanned work had risen to $38.1 million.

(e)      Another forecasted risk line item in the December 2017 and March 2018 Risk Registers was unreported costs related to "Indirect Craft Labor Increases."  The December 2017

42

Risk Register identified $19 million in unreported costs, reporting that "[t]he current spend rate for indirect labor is higher than the current forecast" and that "[i]f this trend continues, it will impact indirect labor EAC forecast." This line item was also assigned the highest severity level and was assigned a probability rating of "4" out of 5, a level that CW1 stated should also have been incorporated into CB&I's reported financials. The trend of indirect labor not only continued, but it skyrocketed such that the March 2018 Risk Register reported unreported forecasted costs of $76.8 million the next quarter.

(f)      An April 2018 Project Controls "Cameron LNG 1st Quarter 2018 Forecast" PowerPoint presentation, that was delivered to CB&I management in early April 2018, openly detailed CW1's and the Project Control team's serious concerns (the "April 2018 Cameron Forecast Presentation"). In this document, Project Controls described how much work and analysis went into its project risks assessments, writing that "[i]n February, four weeks of detailed review meetings were held for every aspect of the cost forecast, first at the budget owner level, and then at a project management level," followed by "additional reviews . . . held with LNG operations and functional Corporate Management." The April 2018 Cameron Forecast Presentation made clear that the forecasted costs in the March 2018 Risk Register were all costs after taking into account the charges associated with the Cameron Settlement Agreement and any impact from Hurricane Harvey.

(g)      The April 2018 Cameron Forecast Presentation concluded that, at a *minimum*, CB&I should report an overall cost impact of $194.1 million of the projected $1.34 billion in costs reflected in the Risk Register. Project Controls emphasized that this figure was insufficient, writing in the April 2018 Cameron Forecast Presentation that the "Project team considers [the $194.1 million overall cost impact] aggressive in nature, mainly PF's [productivity

factors], and represents the best possible outcome." Project Controls noted that this figure contained "No provision for Client LD's [liquidated damages]" and "No provision for delays and limited allowances." CW1 explained that the purpose of the above warning language was to make clear that Project Controls did not believe that the $194.1 was at all sufficient to capture the known risks to the Cameron project's costs. Ultimately, however, even Project Control's minimum recommendation was rejected and CB&I, working with McDermott at this time to secure shareholder approval of the Merger, reported *no* operational charges to Cameron in its Q1 2018 financials.

108.     Despite forecasted increased charges of $1.2 billion as of December 31, 2017 and then $1.34 billion as of March 31, 2018, CB&I reported in its quarterly press releases and Forms 10-K and 10-Q, both filed with the SEC, only $39 million of operating charges to the Cameron project for Q4 2017 (largely attributed to costs related to the purported "force majeure" event caused by Hurricane Harvey), and not a penny of operating charges in the Q1 2018.

109.     CW1's concerns over CB&I's reporting of costs was one reason that prompted CW1 to leave the company on June 12, 2018. CW1 resigned from CB&I after believing that CB&I misreported its costs correctly. CW1 provided an exit interview survey in connection with resigning, in which CW1 informed management that "***Project cost forecast on the [Cameron] project is being overridden by corporate***," and that these actions were "***deceptive to our stakeholders***." CW1 continued with a stark, and prescient, warning: "***Cameron is going to lose an additional 700MM to 1.2B before this project is completed,***" "yet Project Controls is forced to report untruthful cost forecasts month after month," noting that the "last [cost forecast] (Q1 2018), didn't even make it to April before we had negative to complete items in the forecast." This report, which CW1 based on his work on the Risk Registers, was sent to McDermott

Human Resources, with copies to Syed Kakakhel, the VP of Project Controls at the home office, Amir Hadzic, Karla Ochoa, and the Senior Director of Project Controls at the home office.

110.    Thereafter, CW1 sent an email indicating that CW1 thought ***$700 million to $1 billion*** more in cost should be reported on Cameron to Syed Kakakhel, his superior at the Woodlands headquarters, Amir Hadzic, and Hadzic's superior at the Woodlands headquarters, VP of Project Controls Clay Briscoe.

### F.    <u>Materially False and Misleading Statements Issued During the Period</u>

111.    During the Class Period, Defendants made materially false and misleading statements that can be organized into four primary threads of the alleged fraud:  (i) the Pre-Merger Business Operations Fraud, (ii) the Post-Merger Business Operations Fraud, (iii) the Reported Results Fraud, and (iv) the Mid-Correctives Continuing Fraud.

### 1.    *Pre-Merger Business Operations Fraud*

112.    On December 18, 2017, McDermott issued a press release (the "12/18/2017 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K (the "12/18/2017 Form 8-K") signed by Defendant Spence, announcing that McDermott was acquiring CB&I through a proposed merger that would result in McDermott shareholders owning 53% of the combined company.  Several materially false and misleading misstatements and omissions of material information were made in the 12/18/2017 Press Release made, and in a subsequent McDermott filing with the SEC the same day pursuant to Rule 425 ("Rule 425") under the Securities Act of 1933 (the "Securities Act") deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, as follows:

(a)    The 12/18/2017 Press Release touted the combined company's ability to deliver and execute on "fixed price lump-sum contracts" like the ones in place for the Cameron, Freeport, and Calpine projects, stating, "***McDermott and CB&I's combined experience in***

*delivering* customer centric solutions and *fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects* for customers."

(b)　　The 12/18/2017 Press Release stated touted the merger as enhancing the ability to respond to customer needs while maximizing asset value in LNG and power projects:

> Greater ability to respond to evolving customer needs. *The combined company will offer customers engineered and constructed facility solutions and fabrication services across the full lifecycle, executed to maximize asset value. Customers will also benefit from enhanced exposure across diverse end markets, including* refining, petrochemicals, *LNG and power*.

(c)　　The 12/18/2017 Press Release touted the size of the post-merger company's backlog, without disclosing the extent to which it would be weighed down by the Cameron, Freeport, and Calpine projects, stating (with footnotes omitted), "On a pro forma combined basis, McDermott and CB&I would have combined revenues of approximately $10 billion and *a backlog of approximately $14.5 billion*."

(d)　　The 12/18/2017 Press Release also touted the merger's extensive purported opportunities for "synergies" and revenue impacts, after purportedly "one-time" costs:

> Cash accretive with opportunities for cost and revenue synergies. The transaction is expected to be cash accretive, *excluding <u>one-time</u> costs*, within the first year after closing. It is also expected to generate annualized cost synergies of $250 million in 2019. *This is in addition to the $100 million cost reduction program that CB&I expects to have fully implemented by the end of 2017 previously implemented* [sic]. The cost synergies are expected to come from operations optimization, G&A savings, supply chain optimization and other related cost savings. Further, McDermott and CB&I expect that the transaction will lead to substantial revenue synergies due to the enhanced capabilities of the combined company.

(e)　　The 12/18/2017 Press Release also quoted Defendant Dickson as stating, *inter alia*:

> Customers worldwide increasingly seek a single company that can offer end-to-end solutions, and the combination of McDermott and CB&I responds to these evolving customer needs *by creating a leading vertically integrated company*. This transaction combines *two highly complementary businesses* to create a

46

leading onshore-offshore EPCI company driven by technology and innovation, with the scale and diversification to better capitalize on global growth opportunities

113.   The foregoing misstatements were materially false and misleading.   As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I misrepresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.   CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.   CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.   By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.   CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.   According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.   Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to

"cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects. As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

114. Also on December 18, 2017, McDermott published a 30-page slide presentation (the "12/18/2017 Presentation"), which was attributed to Defendants Dickson and Spence therein and which was posted McDermott's corporate website and filed with the SEC as an attachment to the 12/18/2017 Form 8-K signed by Defendant Spence. The 12/18/2017 Presentation made several materially false and misleading misstatements, and omitted material information from the statements made, as follows. It touted the combined company's attributes, by stating (footnotes omitted) that the merger was purportedly "creating a premier $10 billion global, *fully vertically integrated* onshore-offshore EPCI provider" and "*combining complementary and diversified capabilities*." It highlighted the combined company's backlog and purported cost-saving synergies, stating that it would have "combined revenues of approximately $9.9Bn and a *backlog of $14.5Bn*" – of which $12.1 billion was CB&I backlog – and was "expected *$250 million annual cost synergies*," which it explained as "[e]xpected to generate *annualized cost synergies of $250m in 2019* (*in addition to the $100m cost reduction program that CB&I expects to have fully implemented by the end of 2017*)." It highlighted that a common "*focus*[ ] *on* safety, *fixed lump-sum contracting* and customer engagement will ensure seamless transition for partners and employees." Last, it reported these CB&I Non-GAAP Reconciliations:

48

# CB&I NON-GAAP RECONCILIATIONS

| | Three Months Ended Dec 31, 2016 | Nine Months Ended Sept 30, 2017 | Last Twelve Months Sept 30, 2017 |
|---|---|---|---|
| (Dollars in millions) | | | |
| GAAP Net Income (Loss) Attributable to CB&I[1] | $(21) | $(284) | $(305) |
| Plus: Non-GAAP Adjustments | | | |
| Receivable Reserve from Sale of Nuclear Operations[2] | 148 | - | 148 |
| Significant Project Charges[3] | 205 | 641 | 846 |
| Restructuring Costs[4] | - | 31 | 31 |
| Accelerated DIC Amortization[5] | - | 22 | 22 |
| Total Non-GAAP Adjustments | 353 | 694 | 1,047 |
| Tax Effect of Non-GAAP Changes[6] | (124) | (243) | (367) |
| Total Non-GAAP Adjustments (After Tax) | 229 | 451 | 680 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $208 | $167 | $375 |
| GAAP Net Income (Loss) Attributable to CB&I[1] | $(21) | $(284) | $(305) |
| Add: | | | |
| Depreciation & Amortization | 22 | 62 | 84 |
| Interest Expense, Net | 16 | 117 | 133 |
| Provision for Income Taxes | (137) | (158) | (295) |
| EBITDA[7] | $(120) | $(263) | $(383) |
| EBITDA | $(120) | $(263) | $(383) |
| Plus: Non-GAAP Adjustments | 353 | 672 | 1,025 |
| Non-GAAP Adjusted EBITDA[7] | $233 | $409 | $642 |

115.     The foregoing misstatements were materially false and misleading.   As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I misrepresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.   CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.   CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.   By December 2017, CW1's

forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.   CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.   According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.   Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.   As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

116.   Also on December 18, 2017, McDermott held an investor call (the "12/18/2017 Investor Call") regarding the proposed merger, on which Defendants Dickson and Spence spoke, a transcript of which was filed with the SEC by McDermott via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act.   During it, Defendants Dickson and Spence made several materially false and misleading misstatements, and omitted material information from the statements made, as follows.

(a)    In discussing the proposed merger, Defendant Dickson stated in prepared remarks, "***Our operations and capabilities are highly complementary***," and "***[o]ur companies share…a similar approach to conducting business***…and ***we both primarily operate on fixed price lump-sum contracts***." He added, "***We also expect the combination will generate substantial cost and revenue synergies***."

(b)    Defendant Spence stated in prepared remarks, regarding potential cost synergies:

> ***We expect to generate annualized cost synergies of $250 million in 2019. This is in addition to the $100 million cost reduction program that CB&I expects to be fully implemented by the end of 2017. We expect to incur a <u>onetime cost</u> of $210 million to realize these synergies*** of which $170 million will be in 2018 and the remaining $40 million in 2019.

(c)    During Q&A, Defendant Dickson had this exchange with an analyst concerning the Cameron LNG product and the Freeport LNG Project:

> [*Analyst*]:    David, when you came on to McDermott, obviously, it had its share of issues with fixed price projects, and again I think you've done a good job of cleaning them up. But CBI, as you mentioned, you guys have done a lot of due diligence on these projects, and people have covered these companies for a long time, we do hear that. And then ultimately, some companies still have issues.
>
> So, these are sort of big – a couple of these are really big projects, so how much experience have you had with the customers themselves? ***How much due diligence have you done in terms of really getting your arms around the couple – the bigger LNG projects so that you can sort of give us some comfortability factor that you've really sort of priced in the potential risk on these projects***?
>
> [*Defendant Dickson*]:  [W]e obviously, as said earlier, we have spent a significant amount of time and resources on this. As you know, with my past background, it gives me some better insight on how these projects evolve. And these projects are all at different stages of completion, and ***all four of them are fairly well progressed, so that takes out a lot of the risk that you would expect at the start-up***. So we're very happy with the work that we've done in the work to go.
>
> In terms of dialogue with the customer of those projects, obviously, I haven't been able to start any dialogue as we're being through a very confidential process. But what I can say is ***historically I've had experience with both working with the customer on the Cameron LNG and with the customer on the Freeport LNG***. So now that we have announced, that allows me to join with Pat and obviously get a bit closer with the customer on these things. But going back to what I said earlier

on the call and the prepared remarks in which Stuart said is, ***an extensive amount of work has been done on these projects and obviously with a lot of focus with the work that's left or the balance of the work that's left on what has been four critical projects for CB&I.***

117.    The foregoing misstatements were materially false and misleading.    As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.    CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.    CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.    By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.    CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.    According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.    Beyond

52

the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

118.   On January 8, 2018, McDermott filed a Form 8-K with the SEC (the "1/8/2018 Form 8-K"), signed by Defendant Spence, attaching as exhibits a press release (the "1/8/2018 Press Release" and an updated 48-page slide presentation (the "1/8/2018 Presentation") regarding the proposed CB&I acquisition that once again was attributed to Defendants Dickson and Spence, who were highlighted in "Management Profiles" in the presentation.  While the 1/8/2018 Presentation overlapped with the 12/18/2017 Presentation and repeated some of the misstatements first made therein, it differed in several ways, including that it expressly discussed the so-called "Four Focus Projects" being acquired with CB&I (the Cameron LNG Project, Freeport LNG Project, and Calpine Gas Turbine Power Project, along with another project, the IPL Project), it included accounting adjustments specific to the "Four Focus Projects," and it emphasized the "thorough due diligence" that McDermott had undertaken into CB&I's overall business and specifically into the "Four Focus Projects," which was described as giving Defendants "a strong understanding of the key drivers and [such that we] are comfortable with what needs to be done with these projects going forward."  The 1/8/2018 Presentation made

several materially false and misleading misstatements, and omitted material information from the statements made, as follows:

(a)      The 1/8/2018 Presentation, like the 12/18/2017 Presentation before it, touted the purported attributes of the combined, post-merger company, by stating (footnotes omitted) that the merger purportedly "[c]reates a premier $10 billion global, ***fully vertically integrated*** onshore-offshore EPCI provider" and "***combines complementary and diversified capabilities***." It highlighted the combined company's backlog and the purported cost-saving synergies to be achieved, stating that the post-merger company would have "combined revenues of approximately $9.9Bn and a ***backlog of $14.5Bn***" – of which $12.1 billion was CB&I backlog – and would be "[e]xpected to generate ***annualized cost synergies of $250m in 2019 (in addition to the $100m cost reduction program that CB&I has*** ***already implemented***)." Significantly, this revised language told investors that the CB&I "cost reduction program" referenced earlier in the 12/18/2017 Presentation had by this point been "*already implemented.*"

(b)      The 1/8/2018 Presentation stated that, since the 12/18/2017 Presentation, McDermott had made the accounting and financial reporting adjustments necessary to address the "Four Focus Projects" and that, significantly, these adjustments were "non-recurring." Specifically, it stated, "This deck includes certain non-GAAP financial metrics and ***adjustments that we believe to be*** ***non-recurring***, as we believe this provides a better understanding of the underlying business. These adjustments are consistent with those used in McDermott's adjusted financial metrics. ***The adjustments included primarily relate to*** the Four Focus Projects: IPL, ***Calpine, Freeport, and Cameron***." It then reported adjusted CB&I Non-GAAP Reconciliations, both for CB&I as a whole and as separately reported by its four business segments (Engineering

& Construction (E&C), Fabrication Services (FS), Technology (Tech), and Capital Services (CS)):

## CB&I NON-GAAP RECONCILIATION FOR LTM 9/30/17[11]

| | Three Months Ended Dec 31, 2016 | Nine Months Ended Sept 30, 2017 | Last Twelve Months Sept 30, 2017 |
|---|---|---|---|
| (Dollars in millions) | | | |
| GAAP Net Income (Loss) Attributable to CB&I, as reported[1] | $(666) | $(391) | $(1,056) |
| Less: Net Income (Loss) Attributable to Capital Services[2] | 645 | 107 | 752 |
| GAAP Net Income (Loss) Attributable to CB&I, on a continuing operations basis | (21) | (284) | (305) |
| Plus: Non-GAAP Adjustments | | | |
| Loss on Sale of Nuclear Operations[3] | 148 | - | 148 |
| Significant Project Charges | 128 | 769 | 897 |
| Restructuring Costs[5] | - | 31 | 31 |
| Accelerated DIC Amortization[6] | - | 22 | 22 |
| Total Non-GAAP Adjustments | 276 | 822 | 1,098 |
| Tax Effect of Non-GAAP Changes[7] | (97) | (288) | (384) |
| Total Non-GAAP Adjustments (After Tax) | 179 | 534 | 714 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $159 | $251 | $409 |
| GAAP Diluted EPS, as reported[1] | (6.65) | (3.87) | (10.52) |
| Non-GAAP Adjustments | 8.22 | 6.34 | 14.56 |
| Non-GAAP Diluted EPS | $1.57 | $2.47 | $4.04 |
| Shares | | | |
| Basic | 100 | 101 | 101 |
| Diluted | 101 | 102 | 101 |
| GAAP Net Income (Loss) Attributable to CB&I | $(21) | $(284) | $(304) |
| Add: | | | |
| Depreciation & Amortization, as reported | 29 | 66 | 95 |
| Interest Expense, Net, as reported | 22 | 6 | 28 |
| Provision for Income Taxes, as reported | (130) | (177) | (307) |
| Reclassification of Discontinued Operations and Adjustments[8] | (20) | 125 | 105 |
| EBITDA[10] | $(119) | $(263) | $(383) |
| EBITDA | $(119) | $(263) | $(383) |
| Plus: Non-GAAP Adjustments | 276 | 800 | 1,076 |
| Non-GAAP Adjusted EBITDA[9,10] | $157 | $537 | $694 |

(c)     The 1/8/2018 Presentation also included specific "Observations" regarding each of the Four Focus Projects, including certain "*Unique Characteristics that will continue to be de-risked significantly in 2018*."

(i)     For the Calpine Gas Turbine Power Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being "Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party product."  However, these were tempered by the "Assessment" that "*Additional two turbines*

55

*recently turned over for commissioning*" and a "Status as of 9/30/2017" as being "*76% complete*."

(ii)     For the Freeport LNG Project, with "Original Booking Value" of $2 billion, it listed just one "Unique Characteristic," that being "Higher level of indirect labor (limiting control)." Significantly, it *did **not** list* "Aggressive bidding by predecessor" – as was done for Calpine. The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs still being assessed as technical solutions are being determined," but that "*Train 1 steel erection milestone achieved*" and "*Zachery (JV Partner) is managing and performing project construction phase and has a demonstrated track record*." The "Status as of 9/30/2017" was "*Engineering complete, Procurement substantially complete, Construction remaining, project remains profitable*."

(iii)    For the Cameron LNG Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "Significant quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays." Significantly, as with Freeport, it *did **not** list* "Aggressive bidding by predecessor" – as was done for Calpine. The "Assessment" stated that "Majority of remaining risk related to labor and schedule," but that "*Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the trigger for any potential liquidated damage claims, increasing certainty of project schedule resulting in a de-risking of the project*." The "Status as of 9/30/2017" was "*Engineering complete, Procurement substantially complete, Construction remaining; targeting 2019 for all 3 trains*."

(d)     In this context, the 1/8/2018 Presentation also summarized the purported findings of McDermott's extensive due diligence over a "period of months" into CB&I's overall business

and the "Four Focus Projects" in particular. Using then-present or then-past tense language, it articulated as a "Key Assessment" that the "***Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement***." It stated that "remaining risk is assessed as mostly related to labor *performance*." It added, however, "***We believe the four focus projects*** are not representative of the entire portfolio and ***have unique characteristics that will continue to be de-risked significantly in 2018***."

119. The foregoing misstatements were materially false and misleading. As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit

interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor. Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects. As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

120.    On January 9, 2018, Defendant Dickson gave an interview with *Bloomberg Markets*, a transcript of which was filed by McDermott with the SEC via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. The *Bloomberg* piece referenced the proposed Merger and the "four projects dragging down profit" for CB&I, as well as McDermott's track record under Dickson in turning eight out of nine of McDermott's unprofitable projects into profitable ones. It said that Dickson vows to do at CB&I what he did at McDermott and quoted him as describing CB&I as follows: "***It has all the hallmarks of the McDermott of three or four years ago. Everything is fixable***."

121.    The foregoing misstatements were materially false and misleading. As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk

assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor. Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects. As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take

massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

122.    On February 21, 2018, McDermott held a conference call with analysts (the "2/21/2018 Earnings Call") regarding its Q4 2017 earnings release, on which Defendants Dickson and Spence discussed the Merger and the Four Focus Projects.  McDermott filed a copy of the 2/21/2018 Earnings Call transcript with the SEC on February 22, 2018, via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act.   During the 2/21/2018 Earnings Call, Defendants made several materially false and misleading misstatements, and omitted material information from the statements made, as follows:

(a)     In prepared remarks, Defendant Dickson expressed "even more confiden(ce)" in the Merger after telling analysts, *inter alia*, that IPL was essentially complete, such that the Four Focus Projects were "now down to three," and that Freeport was "stabilized and profitable," all leading to the impression that 50% of those projects were of no concern, as follows:

*[A]s IPL Eagle Valley is in its very final stages of delivery, we are pleased that the focused four projects are now down to three*. In addition, *Freeport is currently stabilized and profitable*. *We remain confident that our combination with CB&I will generate significant benefits for our shareholders by* better positioning us to meet evolving customer needs, diversifying our portfolio of capabilities, as well as our geographic footprint *providing a strong capital structure* and by delivering significant synergies. In fact, *the integration planning now well under way, we're even more confident in our synergy expectations* and looking forward to a timely closing.

(b)      In the context of CB&I's having disclosed over $100 million of Q4 2017 operating charges related to the Four Focus Projects, Defendant Dickson reassured investors that the situation was expected and under control, specifically referencing McDermott's robust due diligence into CB&I and the Four Focus Projects (discussed in §V.G.1.a.-b. *infra*), in the following remark, which was repeated by analysts following McDermott in their ensuing reports:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence***.

(c)      During Q&A, Defendants were again asked about the charges CB&I took regarding the Four Focus Projects, and again they referenced their due diligence as a basis for their informed remarks the charges were expected and not a cause for alarm, for instance in this exchange involving Defendant Dickson:

> [Analyst]:  I understand the comments you made about CBI's print and that they were contemplated within your downside risk scenario. But just to be clear, I mean does this imply that we're already starting off below where we wanted to or in line? And could you put that in sort of context with how we should think about CBI's guidance that they provided in their S-4 at least for 2018?

> [Defendant Dickson]:  So, ***on the disclosure given by CB&I yesterday***, as I said in my prepared remarks, ***all of it is within our evaluation that we did during this due diligence period***. Obviously, today, we're operating in separate companies, but credit to the CB&I management team they kept us posted as developments have occurred. So we're obviously monitoring the situation, but ***what I could say today is that it's in line with what we've been looking at and well within the work that we did during the due diligence***.

(d)      Defendant Spence made similar remarks during Q&A, as follows:

> [Analyst]:  And turning to CB&I, how was your expected pro forma funding post the deal changed over the last few months? Obviously, they had the [ph] December (52:00) settlement, which should drive some additional expected cash flows. Not sure if that was already fully in your expectation for the $3.3 billion of pro forma funding, but maybe if you could just talk a little bit about how that's developing.

[Defendant Spence]:  As David highlighted before, ***the Q4 results for CB&I were all within the parameters of our diligence and our understanding and the models that we built***. And ***as such, we're still looking at the same funding levels that we highlighted in December to fund the combination, which is the approximate $3.3 billion of funded debt***.

123.    The foregoing misstatements were materially false and misleading.  As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.  CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented

problems with bidding, engineering, materials, procurement, and performance factor.   Beyond

the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to

"cook the books" and try to optically improve the depiction of the Four Focus Projects, including

by consciously withholding overdue payments to suppliers and vendors to such an extent that it

impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of

CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take

massive additional charges to the Four Focus Projects, based on information available as of the

Merger, to incur significant ongoing costs associated with the projects, and to endure adverse

impacts to its capital structure as to teeter on the brink of bankruptcy.

124.   On March 22, 2018, McDermott filed a Form 8-K with the SEC (the "3/22/2018

Form 8-K"), signed by Defendant Spence, attaching as an exhibit an updated, 51-page version

(the "3/22/2018 Presentation") of the earlier-filed 1/8/2018 Presentation regarding the proposed

CB&I acquisition that once again was attributed to Defendants Dickson and Spence, who were

highlighted in "Management Profiles" in the presentation.  It against specifically discussed the

Four Focus Projects, included accounting adjustments specific to the Four Focus Projects, and

emphasized the "thorough due diligence" that McDermott had undertaken into CB&I's overall

business and specifically into the Four Focus Projects, which was described as giving Defendants

"a strong understanding of the key drivers and [such that we] are comfortable with what needs to

be done with these projects going forward."  The 3/22/2018 Presentation made several materially

false and misleading misstatements, and omitted material information from the statements made,

as follows:

(a)   The 3/22/2018 Presentation, like the 1/8/2018 Presentation and 12/18/2017

Presentation before it, touted the purported attributes of the combined, post-merger company, by

stating (footnotes omitted) that the merger purportedly "[c]reates a premier $10 billion global, *fully vertically integrated* onshore-offshore EPCI provider" and "*combines complementary and diversified capabilities*." It highlighted the combined company's backlog and the purported cost-saving synergies to be achieved, stating that the post-merger company would have "combined revenues of approximately $9.7Bn and a *backlog of $15.3Bn*" – of which $11.4 billion was CB&I backlog – and would be "[e]xpected to generate *annualized cost synergies of $250m in 2019 (in addition to the $100m cost reduction program that CB&I has <u>already implemented</u>*)." Significantly, this revised language told investors that the CB&I "cost reduction program" referenced earlier in the 12/18/2017 Presentation had by this point been "*already implemented*."

(b) The 3/22/2018 Presentation stated that McDermott had made the accounting and financial reporting adjustments necessary to address the "Four Focus Projects" and that, significantly, these adjustments were "non-recurring." Specifically, it stated, "This deck includes certain non-GAAP financial metrics and *adjustments that we believe to be <u>non-recurring</u>*, as we believe this provides a better understanding of the underlying business. These adjustments are consistent with those used in McDermott's adjusted financial metrics. *The adjustments included primarily relate to* the Four Focus Projects: IPL, *Calpine, Freeport, and Cameron*." It then reported adjusted CB&I Non-GAAP Reconciliations, both for CB&I as a whole and as separately reported by its four business segments (Engineering & Construction (E&C), Fabrication Services (FS), Technology (Tech), and Capital Services (CS)):

## CB&I NON-GAAP EBITDA RECONCILIATIONS FOR HISTORICAL RESULTS 2013 – 2017[1]

| | For the year ended | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| (Dollars in millions) | | | | | |
| GAAP Net Income (Loss) Attributable to CB&I, as reported[2] | $454 | $544 | ($504) | ($313) | ($1,458) |
| Add: Losses (Income) from Discontinued Operations | | | | | |
| Capital Services[3] | (9) | (37) | (43) | 621 | 105 |
| Nuclear Operations[4] | (37) | (93) | (131) | | |
| GAAP Net Income (Loss) from Continuing Operations Attributable to CB&I | $408 | $414 | $(679) | $308 | $(1,353) |
| | | | | | |
| Add: Non-GAAP Adjustments | | | | | |
| Charges Related to Nuclear Operations Sale[5] | - | - | 1,506 | 148 | - |
| Long-Term Incentive Change in Control Expense[6] | - | - | - | - | 12 |
| Significant Project Charges[7] | - | - | - | 197 | 870 |
| Restructuring, Acquisition and Integration Costs[8] | 81 | 31 | - | - | 115 |
| Net Gain from Insurance Proceeds[9] | - | - | - | - | (63) |
| Tax Law and Deferred Tax Valuation Impacts[10] | - | - | - | - | 1,002 |
| Normalized Interest Expense[11] | - | - | - | - | 97 |
| Total Non-GAAP Adjustments | 81 | 31 | 1,506 | 345 | 2,033 |
| Tax Effect of Non-GAAP Changes[12] | (28) | (11) | (371) | (121) | (353) |
| Total Non-GAAP Adjustments (After Tax) | 53 | 20 | 1,135 | 224 | 1,680 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $460 | $434 | $456 | $532 | $327 |
| | | | | | |
| GAAP Net Income (Loss) from Continuing Operations Attributable to CB&I | $408 | $414 | ($679) | $308 | ($1,353) |
| Add: | | | | | |
| Depreciation & Amortization, as reported | 180 | 181 | 161 | 123 | 88 |
| Interest Expense, Net, as reported | 81 | 75 | 86 | 92 | 226 |
| Provision for Income Taxes, as reported | 91 | 271 | (81) | 3 | 799 |
| Reclassification of Discontinued Operations and Adjustments[14] | (115) | (177) | (186) | (73) | - |
| EBITDA[15] | $644 | $765 | $(699) | $453 | $(240) |
| | | | | | |
| EBITDA | 644 | 765 | (699) | 452 | (240) |
| Plus: Adjustments | 81 | 31 | 1,506 | 345 | 934 |
| Non-GAAP Adjusted EBITDA[15] | $725 | $797 | $807 | $798 | $694 |

(c)     The 3/22/2018 Presentation also included specific "Observations" regarding each of the Four Focus Projects, including certain "***Unique Characteristics that will continue to be de-risked significantly in 2018***."

(i)     For the Calpine Gas Turbine Power Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being "Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party product." However, these were tempered by the "Assessment" that "***Additional two turbines recently turned over for commissioning***" and a "Status…as of year-end 2017" as being "~79% complete."

65

(ii)     For the Freeport LNG Project, with "Original Booking Value" of $2 billion, it listed three "Unique Characteristics," that being "Higher level of indirect labor (limiting control), impacted by Hurricane Harvey, and significant quantity growth." Significantly, it *did **not** list* "Aggressive bidding by predecessor" – as was done for Calpine.  The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs still being assessed as technical solutions are being determined," but that "***Train 1 steel erection milestone achieved***" and "***Zachery (JV Partner) is managing and performing project construction phase and has a demonstrated track record***."  The "Status…as of year-end 2017" was "~73% complete" and "Project remains profitable."

(iii)    For the Cameron LNG Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "Significant quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays."  Significantly, as with Freeport, it *did **not** list* "Aggressive bidding by predecessor" – as was done for Calpine.  The "Assessment" stated that "Majority of remaining risk related to labor and schedule," but that "***Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the schedule for any potential liquidated damages, increasing certainty of project schedule resulting in a de-risking of the project***."  The "Status…as of year-end 2017" was "~77% complete."

(d)     In this context, the 3/22/2018 Presentation also summarized the purported findings of McDermott's extensive due diligence over a "period of months" into CB&I's overall business and the "Four Focus Projects" in particular.  Using then-present or then-past tense language, it articulated as a "Key Assessment" that the "*Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement*."  It stated that

"remaining risk is assessed as mostly related to labor *performance*."  It added, however, "*We believe the four focus projects* are not representative of the entire portfolio and *have unique characteristics that will continue to be de-risked significantly in 2018*."

125.     On January 24, 2018, McDermott and a wholly-owned subsidiary of CB&I filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed three amendments on Forms S-4/A on March 2, March 23 and March 27, 2018. The March 27, 2018 Form S-4/A contained the definitive Proxy Statement, including the attached Merger Agreement.  On March 29, 2018, McDermott filed a Form 8-K pursuant to Rule 425 under the Securities Act announcing that the March 27, 2018 registration statement had been declared effective as of 2:00 pm Eastern Daylight Time on March 29, 2018, and, further, that McDermott and CB&I had established record dates of April 4, 2018 and meeting dates of May 2, 2018 for the special meetings of their respective shareholders to seek approvals related to the proposed combination. On March 29, McDermott and CB&I filed a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3) and McDermott mailed it to McDermott's shareholders.  On April 2, 2018, McDermott filed additional materials related to the Merger on Form DEFM14A.

126.     The Proxy Statement explained the terms and conditions of the Merger to shareholders, informed them about the background of the Merger, and set forth the reasons why the McDermott and CB&I boards of directors recommended that shareholders vote in favor of the Merger.  The Proxy Statement specifically incorporated by reference documents into the Proxy Statement that "contain important information about McDermott and CB&I and their respective financial performance."  These documents, discussed below, included Forms 10-Q filed by CB&I and McDermott as well as Forms 8--K filed by McDermott and CB&I on January 8, 2018 and March 22, 2018, all filed pursuant to Rule 425.

127.     On March 27, 2018, McDermott filed with the SEC Amendment No. 3 to a Form S-4 Registration Statement.  The Explanatory Note to the amendment (page *i*) stated that it contained, among other things, a joint proxy statement that would be used in connection with the special meeting of McDermott shareholders being held on May 2, 2018, and the special meeting of CB&I shareholders being held on May 2, 2018.

128.     The Amendment No. 3 and Proxy/Statement Prospectus (*i.e.* the Proxy Statement) were declared effective by the SEC on March 29, 2018, and was mailed to McDermott shareholders of record as of April 4, 2018.  The Merger was subject to a vote of both McDermott and CB&I shareholders, voting separately, pursuant to the Proxy Statement.  The record date for the vote was April 4, 2018.  On March 29, 2018, CB&I filed that same Proxy Statement with the SEC as an exhibit to a Schedule 14A.

129.     The Proxy Statement described ten days of meetings that took place between September 2017 and December 2017 during which representatives from McDermott met with representatives from CB&I and engaged in "due diligence."  The description of these meetings served to reinforce Defendants' earlier statements that the Company "performed thorough due diligence" such that it was "comfortable with what needs to be done with these projects going forward." For example, Defendants state in the Proxy Statement that "Mr. Freeman, other representatives of McDermott, Ms. David and respective advisors of McDermott and CB&I met in person or spoke by telephone on multiple occasions to conduct due diligence."  McDermott noted that its Board had "considered the challenges and potential costs of combining and integrating the businesses" when considering the Merger.

130.     Because McDermott's Board did not unanimously vote in approval of the Merger, McDermott was forced to provide additional information about its due diligence and risks to the Company and its shareholders presented by the Focus Projects.

131.     The Proxy Statement described that one member of McDermott's Board of Directors (the "Board"), Stephen Hanks, voted against the Merger.  According to McDermott's last Form 10-K before the merger with CB&I, filed on March 8, 2018, Mr. Hanks "held various roles with Washington Group International, Inc. (and its predecessor, Morrison Knudsen Corporation) ("Washington Group"), an integrated engineering, construction, and management solutions company for businesses and governments worldwide."  The 2018 10-K continues, "The Board of Directors believes Mr. Hanks is qualified to serve as a director in consideration of his extensive experience in the international engineering and construction business and his broad knowledge in accounting, auditing and financial reporting, and his legal background."

132.     McDermott reported that "Stephen G. Hanks, the dissenting director, did not vote in favor of the transaction due in large part to his stated belief that the business operated by CB&I is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods."  The Proxy Statement continued, noting that:

> At each of the meetings of the McDermott Board at which the potential business combination was discussed, Mr. Hanks consistently stated that he believes, based on his prior experience in the engineering and construction (E&C) industry, that the E&C business operated by CB&I (and historically operated by certain of its predecessors) is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods, that *these problems may be difficult for McDermott's management to remedy (at least in the near term) and, therefore, that the Combination is too risky for McDermott*, taking into account the combined balance sheet of the two companies.

133.     Notably, Mr. Hanks based his concerns "on his experience as President and Chief Executive Officer of Washington Group [], during which time that company acquired a business with two significant, fixed-price, lump-sum, combined-cycle gas power plant projects in the northeastern region of the United States that Mr. Hanks described as having generated over $2.0 billion in losses that led to Washington Group's filing for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code."  Dissenting Director Hanks was particularly well-positioned to offer an opinion on risks of the Merger.

134.     The Proxy Statement described McDermott management's response to Dissenting Director Hanks and the views of the other members of McDermott's Board, which ultimately prevailed in approving the Merger:

> Mr. Hanks also asked detailed questions of McDermott's management team, and McDermott's management, in turn, provided detailed responses and, ultimately, expressed the belief that, ***based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management***.

135.     The foregoing misstatements were materially false and misleading.  As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.  CW2 said that Cameron was $1 billion over budget, if not more, and significantly

70

behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.  Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

136.    The Proxy Statement contained an unaudited pro forma balance sheet.  Column 3 of this balance sheet has "Preliminary Purchase Price Allocation."  On page 173 of the Proxy Statement are the pro forma adjustments which reveal that other than intangible assets, no fair

value adjustments had been provided.  The following language appears under the table on that page:

> Other than the items listed above, ***we have assumed that the fair value of all assets and liabilities equal their respective carrying values***.  Until the Combination is complete, we will not have full access to all relevant information and will not have completed our evaluation.  As a result, fair value estimates are preliminary and subject to change.

> The final allocation of Combination consideration will be determined when we have completed the detailed valuations and necessary calculations.  The final allocation could differ materially from the preliminary allocation used in the pro forma adjustments.  The final allocation may include: (1) change for the fair value of CB&I's contracts in process, net of advance billings on contracts . . . .

137.   McDermott's fair value adjustments to the Focus Projects above were false and misleading because McDermott either recklessly disregarded information from readily available core documents, such as Risk Registers, that were widely-disseminated and discussed in monthly meetings, despite representing to shareholders the performance of due diligence sufficient to assess the risks and costs of the Focus Projects or, alternatively, did review this readily-available information and knowingly omitted over one billion dollars in necessary change in cost estimates.  Furthermore, as demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.  CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the

issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.   Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

138.    Moreover, the SEC's guidance for purchase accounting requires that, if an acquirer is waiting for additional information, the acquirer must "Furnish other available information which will enable a reader to understand the ***magnitude*** of any potential adjustment."  3250.1-h.  However, as detailed herein, given the material fair value impact and

higher costs recorded on CB&I's Focus Projects, as contemporaneously detailed in risk registers and other reports, that were revealed by McDermott within a short timeframe subsequent to the Merger, the Company did not comply with the SEC Guidance.  For example, as detailed below, McDermott made fair value adjustments to acknowledge loss contracts in their "preliminary purchase price allocations" which they disclosed in both the McDermott second and third quarter 2018 10-Qs.  These fair value adjustments were made to the fair value as of the acquisition date (May 10, 2018) thereby establishing that the relevant facts and circumstances regarding the fair value of the Focus Projects existed at that time.

139.    Defendants were under a continuing duty to update and correct the Proxy Statement to disclose the material adverse facts set forth above.  As discussed below, as CB&I reported false financial statements for the first quarter of 2018 and CB&I's own Project Controls group estimated up to an additional $1.3 billion in costs to the Cameron Project alone, a marked increase in risk from the prior quarter, McDermott and CB&I filed several SEC Form 425 filings concerning the proposed Merger between April 2, 2018 and May 2, 2018 (the "Proxy Supplements").  By failing to correct or update any of Defendants' false and misleading statements in the Proxy Statement and incorporated documents, these supplemental Proxy Solicitations falsely affirmed that nothing in the earlier proxy solicitations was, or had become, materially false or misleading.

140.    On April 12, 2018, prior to the open of trading on the NYSE, as part of the proxy solicitation process, CB&I issued a press release reporting preliminary first quarter 2018 financial results.  The press release reported a range of operating results that CB&I "expect[ed] to report."

141.    The press release reported that CB&I did not incur any material project changes to the Focus Projects in the first quarter 2018 and stated that "CB&I's preliminary results reflect:"

> ***Excellent operating performance across the company's portfolio of projects, including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project***, which respectively reached 84%, 82% and 84% completion and incurred no material project changes during the quarter.

142.    On April 12, 2018, as part of the proxy solicitation process, McDermott provided its shareholders with an operational update for the quarter ended March 31, 2018, and reaffirmed its 2018 guidance originally issued on January 24, 2018, as previously reaffirmed on February 21, 2018.  McDermott and the Individual Defendants, as part of their due diligence, would have reviewed CB&I's April 12, 2018 press release and CB&I's underlying analyses and either knew or recklessly disregarded that CB&I had under-accrued for losses on the Focus Projects.

143.    Analysts viewed CB&I's quarterly results reflecting no charges to the Focus Projects positively and as supportive of the Merger.  Credit Suisse wrote in an April 12, 2018 analyst report titled "MDR-CBI Preannounce: Working Miracles," that "A clean quarter from CBI and a beat from MDR is a positive surprise and certainly timely given concerns the deal was at risk."  In another analyst report issued on April 12, 2018, Deutsche Bank stated: "we are encouraged that the MDR/CBI merger story has somewhat de-risked" and noted that the Focus Projects were now "under control."  Similarly, in an April 17, 2018 analyst report, Pareto stated that: "CB&I also released a PW on April 12th, which included no one-off charges on its four focus projects, which is a positive indicator for ongoing execution risk."

144.    On April 16, 2018, Defendants issued a further letter to shareholders that was filed with the SEC pursuant to Rule 425 and was part of the proxy solicitation process. Defendants assured investors as to their ongoing due diligence and the benefits of the Merger:

We believe that, together, McDermott and CB&I will span the entire value chain from concept to commissioning, *deliver compelling value*, be more competitive and *deliver more consistent, predictable performance* through market cycles.

In addition to being underpinned by a compelling strategic rationale, *the combination is also expected to deliver substantial financial benefits for stockholders*. Together, McDermott and CB&I will have significantly enhanced backlog and pro forma combined revenues, adjusted EBITDA and adjusted net income. The companies have reaffirmed the anticipated $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019, and have identified potential incremental savings of $100 million.

145. The foregoing misstatements were materially false and misleading. As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I misrepresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit

interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.  Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

146.    On April 23, 2018, prior to the opening of trading, CB&I issued a press release announcing financial results for the first quarter of 2018.  CB&I reported a 78 percent increase in net income versus the year-ago quarter, including "[s]olid operating performance in Fabrication Services, Technology, and E&C Groups, including no material charges on Cameron LNG, Freeport LNG and Calpine power projects."  CB&I did not hold a first quarter earnings conference call, it stated, "due to [the] pending combination with McDermott."

147.    The Form 10-Q filed by CB&I on April 24, 2018, included a discussion of the Cameron Project, which noted that "[t]he project was approximately 84% complete and had a reserve for estimated losses of approximately [$13 million] at March 31, 2018."

148.    On April 24, 2018, as part of the proxy solicitation process, McDermott issued a press release reporting first quarter 2018 operating results.  The headline of the press release

read:  "Strong Start to 2018 Driven by One McDermott Way."  With respect to the proposed acquisition of CB&I, the press release added that the parties had identified an additional $100 million of synergies anticipated from the Merger.

149.    Also on April 24, 2018, McDermott conducted a conference call with investors as part of the proxy solicitation process to discuss the first quarter operating results.  On the call, Defendant Dickson emphasized that McDermott's Board had rejected Subsea 7's "highly contingent" offer because the CB&I Merger presented a more "attractive alternative":

> This highly conditional proposal was subject to amongst other things, the termination of our combination with CB&I.  McDermott's board carefully reviewed and considered the proposal in consultation with its outside financial advisors and legal counsel.  The board concluded that the proposal was not in the best interest of the company or its stockholders as it significantly undervalued McDermott and was not an attractive alternative to our pending combination with CB&I.

> \*      \*      \*

> *We're very confident of the combination* and we're going to continue on the same path.

150.    Dickson also stated on the conference call that since the December 2017 announcement of the Merger, the parties had worked closely together and that "[t]ogether, we can provide certainty, innovation and added-value to energy projects around the world."

> *We have spent a great deal of time with CB&I since we initiated this effort last summer and are more enthusiastic than ever about the opportunities this combination will offer to our customers.* Together, we can provide certainty, innovation and added-value to energy projects around the world. And together, our complementary market positions and geographical footprint will create new opportunities for revenue growth and we will be more competitive and better able to deliver consistent predictable performance through market cycles.

> *As we've gotten to know CB&I better over the last 10 months*, we've seen first-hand, how this company values quality, innovation, safety and its employees, and more importantly, we have witnessed how it puts customers first. That is why coming together makes sense, and we are really excited about what's next.

78

151.    With respect to CB&I's long-term construction contracts, Dickson assured shareholders that McDermott, through its due diligence, had mitigated the risk to McDermott:

> We also note that CB&I reported results for Q1 2018 yesterday. CB&I reported excellent operating performance across its portfolio of projects *including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project.*
>
> These projects respectively reached 84%, 82% and 84% completion and incurred no material project charges during the quarter. Through our integration planning process, *we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio*.

These statements indicated Defendants' familiarity and comfort with the degree of completion on the Focus Projects and, therefore, the costs incurred and to be incurred in completing the Focus Projects.

152.    When asked about the Freeport Project, Dickson gave assurances to investors: "That was all known as we went through the due diligence and it's all subject to insurance, it is a force majeure situation and CB&I are working with the customer getting through that, but all in all, I would again emphasize that in our view, *Freeport is a good project*."

153.    The foregoing misstatements were materially false and misleading.    As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.    CW2 said that Cameron was $1 billion over budget, if not more, and significantly

79

behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.  Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

154.    To the extent Defendants' statements are determined to be statements of opinion, they were materially false and misleading because (i) they were either not believed by the Defendants and because they were objectively false (*i.e.,* the Focus Projects had not been de-

risked and McDermott's due diligence had not been extensive) and (ii) because McDermott's shareholders expected not just that Defendants believed the opinion (however irrationally), but that it fairly aligned with the information in their possession at the time.  Defendants' statements however did not fairly align with the information in their possession at the time and omitted material facts about the McDermott Defendants' inquiry into or knowledge of the Focus Projects. Specifically, it was known or knowable at the time of Defendants' statements that the Focus Projects had not been de-risked and that CB&I senior personnel internally were anticipating in excess of $1 billion in potential additional charges on Cameron alone, including charges for liquidated damages.  Those true facts were known or knowable to Defendants and conflicted with what a reasonable investor would take from Defendants' statements.

155.    Defendants' statements were not forward-looking statements but were existing statements of fact with respect to McDermott's due diligence into the Focus Projects and whether based on existing facts, those Projects had been de-risked by CB&I.

### 2.    *Post-Merger Business Operations Fraud*

156.    On May 10, 2018, the Company announced that on May 2, 2018, McDermott shareholders had overwhelmingly approved the Merger with CB&I.  Of the approximately 285.9 million shares eligible to vote, 219.3 million shares participated in the vote, of which 209.2 million shares voted in favor of the Merger (approximately 95.4% of the shares participating in the vote), 9.8 million shares voted against the Merger, and 227,000 shares abstained.  As a result of the Merger, McDermott stockholders owned approximately 53% of the combined business on a fully diluted basis, and CB&I shareholders owned approximately 47%.

157.    On July 31, 2018, McDermott issued a press release to announce its financial results for the second quarter 2018.  In the press release, McDermott reported a $221 million

change to the estimated costs associated with three projects it had acquired from CB&I:

Cameron, IPL and Calpine.  The Company, in relevant part, stated:

> In accounting for the acquisition of CB&I on May 10, 2018, McDermott recorded
> the fair value of the CB&I balance sheet, including identified intangible assets
> and updated cost estimates on the acquired backlog.  The vast majority of the
> acquired portfolio did not require material changes to cost estimates.  However,
> McDermott did record changes in estimated costs on three projects, including
> $165 million on the Cameron LNG project, $23 million on the Calpine project
> and $33 million on the now-completed IPL gas power project. These changes in
> cost estimates did not have a direct impact on the Company's net income for the
> second quarter.
>
> "We are clearly disappointed with the increased cost estimates for three of the
> legacy CB&I projects," said Dickson. "***The increases are within the bounds of
> the scenarios we contemplated during our due diligence***, and ***we believe that by
> applying our disciplined One McDermott Way to these projects, we can bring
> them to successful completion***.  We have already made significant changes to
> personnel, reporting structures, stakeholder relationships and execution plans on
> Cameron, for example, since the combination closed, and there are encouraging
> signs that these changes have made a difference. More importantly, we have
> moved forward to further strengthen our relationships with stakeholders. Going
> forward, we plan to continue to aggressively apply our McDermott approach to
> ensure appropriate risk evaluation and mitigation across the combined Company's
> portfolio—from bidding to execution."

158.    The foregoing misstatements were materially false and misleading.    As

demonstrated by the CW statements of former company employees, many of them at high-level

positions, and the objective evidence set forth in CB&I's internal documents including risk

assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the

Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such

an extent that it was "just a deception to stakeholders of the company." CW6 said that by

February or March 2017, Cameron was already $300 million over budget and that company-wide

presentations pegged the Four Focus Projects as being up to $500-$600 million over budget

combined.  CW2 said that Cameron was $1 billion over budget, if not more, and significantly

behind the delivery date, by November 2017, and that the individual in charge of Project

Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.   Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

159.    Moreover, Defendants had failed to disclose in the Proxy Statement that McDermott had contemplated as much as $200 million in negative changes in estimated costs for these three legacy CB&I Focus Projects during due diligence.  Indeed, the second quarter 2018 charges beg the question why no fair value adjustments had been made in the Proxy Statement

pro forma financial statements. Defendants' July 31, 2018 statements establish that Defendants knew but failed to disclose the need for additional charges to CB&I's financial statements as of March 27, 2018, and certainly no later than the May 2, 2018 shareholder vote.

160.     The same day, McDermott filed a quarterly report on Form 10-Q with the SEC for the period ended June 30, 2018 (the "2Q 2018 10-Q"), which affirmed the financial results reported in the press release.   Page 16 of the 2Q 2018 10-Q disclosed a purchase price adjustment:   "Note (2) Advance billings on contracts includes provisions for estimated losses on projects of $112 million."

161.     Page 19 of the 2Q 2018 10-Q, under the heading "Loss Projects" stated as follows:

> Included in the Combination were three projects in a substantial loss position at the Combination Date.  The loss positions include our changes in cost estimates of $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on our net income for the three months ended June 30, 2018 as the impact of their changes in estimates were included as adjustments to the fair value of the ***acquired balance sheet date.***

162.     Consequently, McDermott admitted that the facts and circumstances which led to these new purchase price adjustments existed at the time the Proxy Statement was disseminated to McDermott shareholders.   Analysts, however, responded with some hope that these negative results were one-time charges.  A UBS analyst report on July 31, 2018 noted that "some may see it as 'kitchen sinking' of the projects for MDR management to clear the deck going forward." Deutsche Bank echoed these sentiments in a July 31, 2018 analyst report titled "Tossing Out the Kitchen Sink," noting that "Mgmt struck a confident tone as they laid out a detailed risk mitigation framework for managing the existing problem projects and bidding new onshore prospects. . . ."

### 3. *First Partial Corrective Disclosure On October 30, 2018*

163.     On October 30, 2018, McDermott reported its Q3 2018 results in an after-hours press release (the "10/30/2018 Press Release"), which was filed with the SEC after the market close as an exhibit to a Form 8-K (the "10/30/2018 Form 8-K") signed by Defendant Spence. The 10/30/2018 Press Release revealed the following previously undisclosed facts to investors.

(a)     The 10/30/2018 Press Release revealed significant "purchase accounting adjustments" related to CB&I acquisition (referred to as the 'Combination'), which "were reflected as a change in intangible assets, including goodwill."  Specifically, it disclosed that, "[f]or the third quarter of 2018, McDermott recorded *$744 million* of changes in estimates on three projects, including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project, and $68 million on the Calpine gas power project."  It quoted Defendant Dickson as stating:

> *After five months of ownership*, *we now believe* we have a thorough and definitive understanding of the schedule and cost position on each of the projects – and clear visibility into the operational and financial path to completion.  We have taken *significant steps* to address performance issues on the three projects. Specifically, we have installed a *new executive leadership team* – including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination  and made *improvements in the reporting structures, execution plans, forecast cost-base methodology and the flow of communication* with our consortium members and customers.  *We expect no further material changes in the cost estimates on these projects*.

(b)     The 10/30/2018 Press Release revealed to investors previously undisclosed details as to the extensive, costly problems that had been plaguing the Cameron LNG Project, leading to *$482 million* in changed estimates, stating:

> Cameron LNG Project – *the changes in estimates followed a detailed reassessment of the schedule and cost base*. The analysis included a comprehensive review of the work to go, *including work for which we may not be compensated – such as rework* – and a *reduction in productivity estimates*. The reassessed schedule and estimates reflect *regional limitations on labor availability and quality*, the *elimination of an incentive opportunity* and the

*addition of liquidated damages* associated with the completion schedule. Operationally, the project continues to progress well, with commencement of commissioning expected in the fourth quarter and first LNG expected in the first quarter of 2019. As of the end of the third quarter of 2018, the project was 83% complete and had approximately $557 million of McDermott's portion of expected revenues to go until expected completion. During the quarter, the Cameron LNG project contributed $191 million to revenues and ($34) million to cash flows from operations. Phase 1 of the Cameron project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.

(c)     The 10/30/2018 Press Release also revealed undisclosed details of the problems

afflicting the Freeport LNG Project, leading to *$194 million* in changed estimates, stating:

Freeport LNG Project – *the changes in estimates followed a detailed reassessment of the schedule and cost base and a reduction in forecasted labor productivity resulting from regional limitations on labor availability and quality*. The change in estimates was also impacted by the Company's decision, reached in conjunction with ongoing customer discussions, *to include liquidated damages* associated with the pre-Hurricane Harvey schedule. The updated forecast is based on rigorous reassessments and views by project teams and site management,                        including                        the                        area supervisor's assessment of work to go. At the end of the third quarter of 2018, the project was approximately 82% complete and had approximately $622 million of McDermott's portion of expected revenues to go until completion. During the quarter, the Freeport LNG project contributed $220 million to revenues and ($115) million to cash flows from operations. Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.

(d)     The 10/30/2018 Press Release also revealed undisclosed details as to the issues

affecting the Calpine Gas Turbine Project, leading to *$68 million* in changed estimates, stating:

Calpine Gas Turbine Power Project – *the changes in estimates resulted from our decision to decrease the productivity factor on the future work by 20%. The major driver of increased costs on Calpine has been labor productivity involving both direct-hire and sub-contract employees*. The newly assumed productivity factor also considered lessons learned on the closeout experience on the recently completed IPL project and we believe is realistic and achievable. First fire is anticipated during the fourth quarter of 2018. During the quarter, the Calpine Gas Turbine Power project contributed $29 million to revenues and ($14) million to cash flows from operations. As of the end of the third quarter of 2018, the project was 91% complete and had approximately $27 million of expected revenues to go until expected completion in Q1 2019.

(e)     Finally, the 10/30/2018 Press Release also revealed that McDermott had **already decided to exit** both the tank storage and the U.S. pipe fabrication businesses, stating:

> [W]e have completed a strategic review of our business portfolio and have determined that the tank storage business and the U.S. pipe fabrication business are not core to our vertical integration.  As such, we have developed plans to seek buyers for each of the two businesses, which together had 2017 revenues of approximately $1.5 billion.  We anticipate receiving proceeds in excess of $1 billion upon the sale of those assets and expect to use a majority of the proceeds to reduce debt under our term loan.

164.    The same day, McDermott filed with the SEC its Form 10-Q for Q3 2018 (the "Q3 2018 10-Q"), which disclosed additional previously undisclosed facts to investors, as follows:

(a)     The Q3 2018 10-Q increased the goodwill associated with the CB&I merger by $782 million, driven by the $744 million in adjustments to the Cameron, Freeport and Calpine projects calculated as of the merger date. Specifically, it stated:

> **Significant changes in our preliminary purchase price allocations** since our initial estimates reported in the second quarter of 2018 primarily **related to fair value adjustments to three of our acquired loss contracts**.  **Adjustments to the Cameron LNG, Freeport LNG and Calpine projects were approximately $744 million combined and primarily impacted Advance billings on contracts** as further discussed in Note 4, *Revenue Recognition*.  **As a result** of these and other adjustments to the initial purchase price allocation, **goodwill increased by approximately $782 million** since the second quarter of 2018.  **Adjustments to the purchase price allocation are recognized in the period in which the adjustments are determined and calculated as if the accounting had been completed as of the Combination Date**.

(b)     The Q3 2018 10-further Q quantified the impacts project by project:

> Based on our assessment at September 30, 2018, **included in the preliminary purchase price allocation for the Combination** (see Note 3, *Business Combination*) **were four projects determined to be in substantial loss positions,** which included the **Cameron LNG, Freeport LNG Trains 1 & 2, Calpine** and the now-completed IPL gas power projects. Based on our assessment at June 30, 2018, our **Freeport LNG Trains 1 & 2** project was not estimated to be in a loss position; however, **as a result of changes in estimates during the third quarter of 2018, the project is now estimated to be in a loss position at completion**. Our Freeport LNG Train 3 project is not anticipated to be in a loss position. **Changes**

*since our initial preliminary assessments during the second quarter of 2018 reflect unfavorable changes in estimates of $482 million on the Cameron LNG project, $194 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $68 million on the Calpine project*. These changes in estimates did not have a significant direct impact on our net income for the three or nine months ended September 30, 2018, as the *impact of the changes in estimates were included as adjustments to the fair values reflected in the acquired balance sheet*.

*Our accrual of provisions for estimated losses on active uncompleted contracts at September 30, 2018 was $215 million and primarily related to the Cameron LNG, Freeport LNG Trains 1 & 2 and Calpine loss projects*. Our accrual of provisions for estimated losses on active uncompleted contracts at December 31, 2017 was not material.

(c)      Discussing the Cameron LNG project, the Q3 2018 10-Q blamed a purported

"reassessment" of schedule and underlying cost, related to conditions at the time of the merger:

*Cameron LNG*—At September 30, 2018, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 37% complete on a post-Combination basis (approximately 83% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $127 million.

*The increase in our cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily due to changes in estimates resulting from a detailed reassessment of schedule and underlying cost base. The schedule analysis included a reassessment of the work to go, including re-work for which we may not be fully compensated, and took into account revisions to the estimation of productivity based on historical efforts and the quality and availability of labor resources throughout the revised project schedule*. The revised schedule also results in loss of incentive revenue (approximately $40 million) and the application of contractual liquidated damages (approximately $17 million). These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, as *they resulted from refinements of estimates of conditions that existed as of the Combination Date*, and primarily impacted Advance billings on contracts.

(c)      The Q3 2018 10-Q contained similar revelations about the Freeport LNG project:

*Freeport LNG*—At September 30, 2018, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 43% complete on a post-Combination basis (approximately 86%

on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $28 million.

*The increase in the cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily due to changes in estimates resulting from a detailed reassessment of schedule and underlying cost base. The schedule analysis included a reassessment of the work to go, including re-work for which we may not be fully compensated, and took into account revisions to the estimation of productivity based on historical efforts and the quality and availability of labor resources throughout the revised project schedule.* Our changes in estimates for the project also reflect our decision, reached in conjunction with ongoing customer discussions, to include liquidated damages (approximately $53 million) associated with the pre-Hurricane Harvey schedule. These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, as *they resulted from refinements of estimates of conditions that existed as of the Combination Date*, and primarily impacted Advance billings on contracts.

(d)     The Q3 2018 10-Q similarly discussed the Freeport LNG project:

*Calpine Power Project*—At September 30, 2018, our U.S. gas turbine power project in the Northeast for Calpine (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 53% complete on a post-Combination basis (approximately 91% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $43 million. *The increase in the cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily associated with revisions to the estimation of productivity based on historical performance.* These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, *as they resulted from refinements of estimates of conditions that existed as of the Combination Date*, and primarily impacted Advance billings on contracts.

(e)     In describing McDermott's operating results, the Q3 2018 10-Q also stated, "The legacy CB&I operations included approximately $2.4 billion of negative working capital at the Combination Date, including approximately $1.2 billion of negative Project Working Capital associated with our Calpine power project and our proportionate shares of the Cameron LNG and Freeport LNG consortium projects (our "Focus Projects"). Negative Project Working Capital for the Focus Projects was approximately negative $760 million at September 30, 2018."   After

89

describing components of working capital that had provided cash during the quarter, the Q3 2018 10-Q stated that they were offset by "Contracts in progress/Advance billings on contracts—a net increase of $318 million, primarily due to the impact of progress on projects within our NCSA segment (including approximately $585 million from our Focus Projects), partially offset by projects within our MENA and APAC segments."

165.    By characterizing the $744 million in charges related to the Four Focus Projects as a change in estimate as of the Merger Date, rather than a current third quarter change, Defendants acknowledged that the facts warranting the charges existed at the time of the Merger.

166.    Following these disclosures, an analyst from UBS wrote in a report that the "additional cost overruns are surprisingly large, and we presume that MDR will now have a different business than what it envisioned when it agreed to acquire CB&I." Jamie Cook, the Credit Suisse analyst following McDermott, stated in an October 30, 2018 research report that "the magnitude" of the charges on the three projects "was larger and will create additional uncertainty on management's handle on the risk associated with the CBI deal. . . . We believe that quarter will drive more questions and uncertainty. As such, we believe the stock is in the penalty box until MDR can provide confidence to the market that the problem projects are under control." He soon thereafter lowered his price target on McDermott's stock by over 56%.

167.    On this news, amidst shock and panic by analysts, McDermott's stock price fell $5.14, an astounding *40% single-day decline*, on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.

### 4.    *Mid-Correctives Continuing Fraud*

168.    Despite the partial corrective impact of the October 30, 2018 disclosures, and their massive correlating stock declines, Defendants' fraud continued unabated. Starting with additional statements made on October 30, 2018 so as to mute the effects of the partial corrective

disclosures that day, Defendants continued to mislead analysts and investors up to the point where McDermott was on the brink of bankruptcy and its stock suffered a near-complete collapse, so severe that trading was repeatedly halted as the markets struggled to digest its downfall.

169.    Defendants muted the corrective effects of the 10/30/2018 Press Release by making additional false and misleading statements to falsely reassure investors and buoy McDermott's stock price in the face of the negative revelations that day.

170.    The 10/30/2018 Press Release had reassured investors that after five months of owning CB&I and its legacy projects, Defendants "now believe we have a thorough and definitive understanding of the schedule and cost position on each of the projects – and clear visibility into the operational and financial path to completion," they had taken "significant steps to address performance issues on the three projects," including installation of a new COO and executive leadership team, and had "made improvements in the reporting structures, execution plans, forecast cost-base methodology and the flow of communication with our consortium members and customers."   It also reassured investors that Defendants had performed a "detailed reassessment of the schedule and cost base" on the Cameron LNG Project, including a "comprehensive review of the work to go, including work for which we may not be compensated – such as rework – and a reduction in productivity estimates," before providing the $482 million in changed cost estimates for the Cameron project.   It then made the following false and misleading statement: "*We expect no further material changes in the cost estimates on these projects*."

171.    On the after-hours earnings call on October 30, 2018, after reiterating statements from the 10/30/2018 Press Release regarding the changed leadership team and purported

operational improvements for the CB&I projects at issue, Defendants made additional false and

misleading statements, as follows.

(a)      Defendant Dickson addressed the Cameron LNG Project in prepared remarks:

We have now completed our first full quarter of ownership of CB&I, which has given us the ability to ***fully grasp*** the magnitude of the challenges associated with our legacy Focus Projects and to complete a comprehensive portfolio review.

* * *

First to address concerns about Cameron and the other two Focus Projects, including the feedback from investors that these projects represent an overhang in our stock price, ***we have taken steps to significantly improve the way we are managing the projects and the way we are interacting with our customers and our consortium partners***.

* * *

***[W]e expect no further material changes in the cost estimates on the legacy Focus Projects, which we believe have been significantly and incrementally de-risked*** as compared to where we were in Q2 [2018].

* * *

Specifically on Cameron, our confidence in the path forward is now bolstered by three things.  First is a productivity improvement initiative set out to identify ways to improve the execution plan.  Second is a costs reduction plan that aims to review and improve the economics of our subcontractor and service relationships. Third is a revenue recovery plan through which we expect to obtain meaningful reimbursements from the customer for certain incremental costs.

(b)      During Q&A, analysts pressed Defendant Dickson on why they should put faith

in McDermott's going-forward assessment of the CB&I projects.  For instance, this exchange:

[Analyst]:      David, when you came to McDermott from Technip, you were able to get your arms around I think nine brown projects that McDermott had reasonably quickly.  Why do you think that you haven't been able to get on top of Cameron and Freeport in particular?  And why should the market – I mean, it's tough to ask this question, but ***why should the market believe you now*** that you have your arms around the project because in E&C we've tended to learn that once projects are bad, they tend to be bad until after the first fire, so.  And I know you've said all this stuff that you've done differently, but maybe help us understand why this really is it?

92

[Dickson]:    [L]et me go back to the McDermott story. The nine loss-making projects I think I first disclosed it to the Street about four months after I joined, here obviously we're getting close to six months. But obviously the scale and the size of these projects are considerably larger than what we've seen. I think in particular in Cameron the challenge we've had is, having to unwind what was a pure execution and strategy by CB&I and so that's taken a bit more time.  And then obviously mobilize the stronger teams and the stronger executive oversight has just taken a little bit longer.  The additional item here which you can't blame the past is the situation around the availability and quality of construction labor, specifically to the Lake Charles area, and that's resulted in this significant increase in cost.

Now come back to answer your question, what would give confidence in these projects? So if we look at the work that we have done. On the estimate, and I'm going to specifically talk about Cameron, because that's the bigger one. ***So on Cameron, we've done the cost estimate based on a number of methodologies from top down, bottom up, having the teams, let's say, invest – really spending time and building up the cost and schedule***. We also today, and I won't disclose where they are but are using productivity factors in certain trades, which are numbers which sometimes are difficult to understand because they're so low.  So ***we've taken a very, what I'd call, prudent position with regards to productivity***.

Now we've been spending a lot of time on building up the cost estimate to go and what I was trying to make clear on my opening remarks is now we've shifted away from containing the cost to say, hey, how do we reduce these losses, so in Cameron, we had $1.5 billion of loss, that loss does not include any productivity improvement that we're looking to see, where we can make changes, does not include any cost improvements that we could make and a significant part of what's happening in Cameron today is subcontract. And we also haven't included any cost recovery from our customer, and we're starting to engage discussions with our customer. And in particular, Cameron to get to the $1.5 billion loss, we actually unwind some incentives that had been included in the estimate.

So whilst we talk about the cost, the losses today in Cameron, we haven't included for any upside, resulting from those three initiatives. Secondly, I tried to indicate in my remarks is that, as we look to Cameron, we also benchmarked it against Freeport, and as we look at those two projects today with the estimated cost of completion, these are benchmarking very closely together, so that gives us even further confidence is that, we're getting to the end of where these projects would go.  But today, our more focus is on to recover the cost, reduce the cost rather than contain the cost.

172.   The foregoing misstatements were materially false and misleading.   As

demonstrated by the CW statements of former company employees, many of them at high-level

positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I misrepresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.  CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.  CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.  Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of

CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

173.    On July 31, 2019, McDermott hosted a breakfast meeting with analysts, during which Defendants stated that McDermott remained confident that the CB&I backlog will be significantly de-risked by the end of next year as Cameron and Freeport's Train 1 are commissioned, and Train 2 / 3 (of both projects) remain on schedule.

174.    The foregoing misstatements were materially false and misleading.    As demonstrated by the CW statements of former company employees, many of them at high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined.   CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016.   CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017.  By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of

itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018.  CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.  According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with bidding, engineering, materials, procurement, and performance factor.  Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.  As later disclosed, *see* §V.F.3. and 5.), due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger, to incur significant ongoing costs associated with the projects, and to endure adverse impacts to its capital structure as to teeter on the brink of bankruptcy.

5.     *Partial Corrective Disclosures On February 13, 2019, July 29, 2019, and September 18, 2019*

175.    Interspersed with the foregoing misstatements were three additional partial corrective disclosures that wiped out most of the company's share value.

176.    On February 13, 2019, McDermott issued a press release (the "2/13/2019 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K (the "2/13/2019 Form 8-K") signed by Defendant Spence, "commenting on its assessment of the financial position of the Cameron LNG project as of December 31, 2018."  The 2/13/2019 Press Release shocked the market, by directly contradicting the 10/30/2018 Press Release's statement, as regards the Cameron LNG Project, that "We expect no further material changes in the cost estimates on

these projects." Specifically, the 2/13/2019 Press Release stated, "For the fourth quarter of 2018, McDermott expects to report *an adverse change in estimate of approximately $168 million*, *due to unfavorable labor productivity, and increases in subcontract, commissioning and construction management costs*." It added, "*The change in estimate is expected to impact McDermott's statements of operations for the three months and year ended December 31, 2018*."

177.    On this news, which caught analysts off-guard, McDermott's stock price fell $2.48, a massive *26.7% single-day decline*, on extremely high volume, from its February 12, 2019 closing price of $9.30 to close at $6.82 on February 13, 2019.

178.    On July 29, 2019, McDermott issued a press release (the "7/29/2019 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K (the "7/29/2019 Form 8-K") signed by Defendant Spence, disclosing additional negative impacts from the CB&I projects at issue and adverse new information regarding McDermott's exit from the industrial storage tank and pipe fabrication businesses, as follows.

(a)    The 7/29/2019 Press Release disclosed an ongoing, substantial cash burn caused by the Cameron LNG Project, stating, "Cash used by operating activities in the second quarter of 2019 was $(205) million. This primarily reflected the company's net loss and the *usage of cash on the Cameron LNG project*." This contributed to a reported net loss of $146 million, or $0.80 per diluted shares, and an operating loss of $61 million in the second quarter of 2019.

(b)    Defendant Dickson noted that the "legacy CB&I projects," which were not "booked under McDermott's stringent risk management protocols," still represented 14% of McDermott's then-current backlog. Dickson added:

> [T]he company today has updated its guidance for 2019. The reduction in our
> guidance is due to four main factors: 1) weaker than expected operating results for

the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) *changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA* [North, Central and South America] *operating segment*; and 4) *a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives in the Cameron LNG project*.

(c)      Finally, the 7/29/2019 Press Release disclosed that the 10/30/2018 Press Release's articulation of the purported upside of McDermott's exiting the industrial storage tank and pipe fabrication businesses was overstated.   Specifically, the 7/29/2019 Press Release disclosed: "Our anticipated aggregate net cash proceeds from the pipe fabrication and storage tank transactions are now expected to be lower than the approximately $1 billion we previously estimated."

179.      During the earnings call that morning, these topics were further discussed, with Defendants reiterating the foregoing points and providing additional details to analysts.   During Q&A, the following exchange concerned the Cameron and Freeport projects:

[Analyst]:      … [A]s you guys know, it's been over a year since B&I closed.  So in general, when do you think that investors could get comfortable that the vast majority of your backlog at risk will get better?  And I know you mentioned that CB&I and NCSA backlog would be under $1 billion by the end of this year and $20[0] million by the end of '20.  But what's the risk that we have to wait until the end of 2020 for you to reduce the noise in the backlog?

[Dickson]:      *If you look at also the majority of this backlog still relates to Cameron and Freeport*. And as you can see in the supplemental deck, the completion dates for those projects haven't changed since Q1. So once we have those two, obviously, those two projects ongoing and we'll obviously continue to -- *these are zero margin revenue projects*. But the balance of the portfolio, I would say today that and I said in prepared remarks is obviously of our confidence level is growing as we've gone through with each and every one of them.

And as you're seeing once we get through to the back end of 2020, we're essentially through that, we only $200 million of the backlog left. So I think that after 12 months -- and obviously, *a lot of our focus* as you know *has been on Cameron and Freeport, because of the quantum -- the charges we'll have to take on both of those projects*. And what we'd say today is, obviously, we've

made a lot of good progress. The incentive discussion with the customer -- the customer has been very fair with us. But unfortunately, a large part of those incentives won't be realized until 2020. But generally over the portfolio, I think we're as times progress, we're getting our arms around it more and more. But *I think the two big remaining initiatives will always be Cameron and Freeport until we've got them completely done*.

180.    Analysts once again expressed disappointment.  On July 30, 2019, Deutsche Bank issued a research report titled "One Step Forward, Three Steps Back," rating an investment in McDermott a "Hold."  In the report, Deutsche Bank noted the following:

Our Thoughts

MDR's 2Q results fell short of expectations.  Not only did core numbers miss street estimates, but the company took charges on 2 projects (Freeport and Pemex) and cut guidance due to project delays (Marjan and Mozambique LNG got booked later than expected).  It also lowered performance expectations on legacy CB&I projects and recalibrated its asset sale proceeds outlook downward . . . . We lower our EPS estimates and cut our PT to $7 due to revenue slippage on several projects, changes in assumptions regarding legacy CB&I projects in the NCSA segment, and a shift in timing of Cameron incentives from 4Q19 to 2020.

*        *        *

Key Takeaways

Updated 2019 guidance – lowered revenue to $9.5B (vs. $10.0B previously), adj EBITDA revised to $725M (vs. $1.1B previously), and adj EPS-$0.32 (vs. $1.65 previously); 2) cut FCF guidance to -$640M (vs. -470M previously) and raised gross debt to $3.8B from $3.7B. . . . $110M of progress incentives recognized for Cameron LNG project ($75M in cash expected to be received in 2H19 of which $38M was received in July and $35M expected to be received in 2020), $38M project change for Freeport LNG….

181.    On this news, which again surprised analysts, McDermott's stock price fell $3.56, another huge *35.3% single-day decline*, on very high volume, from its July 29, 2019 closing price of $10.08 to close at $6.52 on July 30, 2019.

182.    On September 18, 2019, McDermott's stock price plummeted 49% in morning trading, on volume nearing 18 million shares (compared to its full-day average of 7.5 million shares), amid leaks and rumors that it had hired a turnaround firm, according to *Briefing.com*.

99

*MarketWatch* reported that McDermott was the NYSE's "leading loser" and "headed for the biggest one-day decline since the company went public in 1982 prior to the trading halt for news." Trading was halted for several hours, followed by multiple attempts to restart trading that had to be aborted due to volatility. In a section covering companies under "Pro Bankruptcy Distress," *The Wall Street Journal* published an article reporting that McDermott "has engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses." AlixPartners is one of the global leaders in turnaround and restructuring services. Thereafter, speaking publicly for the first time that day, McDermott issued a cryptic statement that failed to deny an impending bankruptcy filing and effectively confirming its hiring of a turnaround firm, stating that McDermott "routinely hires external advisors to evaluate opportunities for the Company. The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

183.   On this news, which utterly shocked the market and prompted numerous interim halts of trading, McDermott's stock price fell $3.72, an unprecedented ***63.3% single-day decline***, on volume of 77.95 million shares (10x the prior day's volume), from its September 18, 2019 closing price of $5.88 to close at $2.16 on September 18, 2019. Due to the multiple trading halts imposed during that day, the stock had not yet bottomed out. Declines continued, both in after-market trading that day and pre-market trading the next day. On September 19, 2019, McDermott's stock fell another ***22.6%***, on even higher volume of 81.35 million shares, to close at $1.67. The two-day decline of $4.21 represented ***a wipeout of 71.6% of McDermott's stock price***.

184.    McDermott's shareholders have been devastated.  Since the day McDermott announced its proposed Merger with CB&I, December 18, 2017, when its stock closed at $22.77, its share price has declined $21.10, *an evisceration of 93.7% of its market capitalization.*

185.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of McDermott's securities, 10(b) Lead Plaintiff NSHEPP and other 10(b) Class  members have suffered significant losses and damages.

G.      **Additional Facts Probative Of Scienter**

        1.      ***Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter***

186.    Defendants repeatedly touted the extensive due diligence they had done on CB&I, diligence that *focused* on the Cameron LNG Project, the Freeport LNG Project, and the Calpine Gas Turbine Power Project.

        a.      **McDermott's Extensive Pre-Announcement Due Diligence**

187.    During the 12/18/2017 Investor Call, held the day the proposed merger was announced, Defendant Spence told analysts, in prepared remarks:

> Over the course of this process we have dedicated a significant amount of time performing joint due diligence together with CB&I's team. We've gotten to know one another's operations very well.  In particular, *McDermott has performed a great deal of due diligence on CB&I's* IPL Eagle Valley, *Calpine, Freeport, and Cameron projects*.
>
> *We feel confident that we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects*.

188.    The first question posed by an analyst during Q&A on the 12/18/2017 Investor Call asked about the due diligence done.  In response, Defendant Dickson stated, in relevant part, "I'll tell you that we have worked extensively with CB&I on due diligence…and obviously had a number of our team working with passing through what Stuart referred to as core projects." Defendant Spence added, "[W]e have done a significant amount of diligence around not only the

four projects, but the overall portfolio."  Later, Defendant Dickson, when expressly asked by an analyst about labor and productivity issues at the Cameron LNG Project and the Freeport LNG Project, stated, *inter alia*, "[W]e've had a large number of people from our side working very closely with [CB&I CEO] Pat [Mullen] and his team through the due diligence process, including looking at the productivity on each of the projects at the sites" and "a lot of good work has been done and I would emphasize that a lot of good transparency from Pat and his team as we have gone through this process."  Defendant Spence added, in response to follow up questions, "[L]ike David said on the project side, we've done extensive due diligence.  We really understand the balance sheet in the position of the contracts, and we wouldn't add any further color at this time."

189.    The 1/8/2018 Presentation repeatedly emphasized the extensive due diligence that McDermott had undertaken into CB&I's overall business and the Four Focus Projects in particular.  Its graphics detailed the "months" of diligence done by "highly experienced E&C [Engineering & Construction] risk managers" and "independent consultants performing parallel analysis," with a "particular focus" on a limited set of projects including the Cameron LNG Project, the Freeport LNG Project, and the Calpine Gas Turbine Power Project.  Specifically, it stated:



# DUE DILIGENCE CONDUCTED OVER PERIOD OF MONTHS

## OVERVIEW AND KEY FINDINGS

- Strong team of highly experienced E&C risk managers led project due diligence efforts, supported by independent consultants performing parallel analysis
- Site visits at key projects to supplement and confirm analysis
- Focus on 33 projects based on risk and revenue exposure
  - Particular focus on 14 E&C projects representing approximately 65% of the E&C and Fabrication backlog
- **Key Assessment**
  - Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement; **remaining risk is assessed as mostly related to labor performance**
  - Remaining 29 projects deemed low risk
  - **1500+ contracts are profitable and low risk**

190.     Based on this extensive due diligence, the 1/8/2018 Presentation stated: "***Due diligence supports underlying strength and profitability of CB&I***."  As regards the Four Focus Projects specifically, it stated, "***We have performed <u>thorough due diligence</u> and believe we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects going forward***."

191.     McDermott's Proxy Statement, which was declared effective by the SEC on March 29, 2018, contained extensive discussion as to particulars of McDermott's extensive pre-announcement due diligence of CB&I's business, both independently and with the assistance of McDermott's investment bankers, including, *inter alia*, the following:

104

(a)      "Mr. Freeman, other representatives of McDermott, Ms. David and respective advisors of McDermott and CB&I met in person or spoke by telephone on multiple occasions to conduct due diligence."

(b)      "On September 13, 2017, members of management of McDermott met with members of management of CB&I in Houston, Texas to conduct mutual due diligence, and to discuss the scale and nature of potential synergies a business combination between the two companies could generate.  The parties each preliminarily estimated that a combination of the two companies could result in annualized cost synergies in the range of in excess of $200 million, but agreed that further analysis and information was needed in order to refine the parties' estimate."

(c)      "On October 10, 2017, Messrs.  Spence and Taff spoke by telephone to discuss transaction structure, considerations regarding possible financing structure and due diligence. Following this conversation, Messrs. Spence and Taff maintained direct communications and spoke by telephone on several occasions during October and November 2017."

(d)      "On October 24-26 and October 30, 2017, members of McDermott and CB&I management met in Houston, Texas in order to discuss their respective businesses and outlook and detailed business, financial and legal due diligence matters, as well as to discuss the scale and nature of potential synergies related to costs and revenues that could result from a business combination between the two companies."

(e)      "On November 11, 2017, the McDermott Board held a telephonic special meeting attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts.  Members of McDermott management provided an overview of the potential business combination to date and discussed the proposed transaction structure, the negotiation of the draft Business Combination

105

Agreement, due diligence and next steps. Representatives of Goldman Sachs and Greenhill reviewed financial information on McDermott and CB&I."

(f)     "On November 29, 2017, the McDermott Board held a telephonic special meeting attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts. Members of McDermott management provided an update on the status of the proposed business combination, including financial analyses with respect of the two companies, and information about due diligence, transaction structure, the negotiation of the draft Business Combination Agreement and financing."

(g)     "On December 17, 2017, the McDermott Board held a special meeting in Houston, Texas, attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts.  Members of McDermott management provided an update on the status of the proposed business combination, including financial analysis of the two companies, due diligence, transaction structure, the negotiation of the draft Business Combination Agreement and financing.   Representatives of Goldman Sachs and Greenhill reviewed their respective preliminary financial analyses of the Exchange Offer Ratio."

192.    The CWs also gave detailed descriptions of the extensive due diligence done by McDermott as to CB&I generally and the Four Focus Projects specifically.

193.    CW2, the Financial Operations Controller for the USA Oil & Gas Division responsible for the full financial reporting of the Americas segment that included the Cameron and Freeport projects, became aware of talks with McDermott around April/May 2017 or maybe a little earlier.  CW2 provided information for the due diligence, including standard project forecasts, actuals to date, quantities, accurate performance factors, Project Controls-type information, and indicators of project success and cost to date.  CW2 said that forecasts are often

understated, but that McDermott had access to the historical performance factors and should have been professional enough to recognize the issue. While CW2 questioned the time and resources available for McDermott's due diligence, CW2 said that McDermott should have seen the forecast trend and anybody worth their weight in Finance in this industry would have immediately raised a red flag. CW2 added that if people doing the due diligence knew what they were doing and were seasoned professionals, they would have known that performance factor declines and does not improve at the end of a project. CW2 could not imagine McDermott's diligence would not have included the Risk Registers, which CW2 saw, as they are common industry tools and documents possessed by all EPC companies that will highlight specific points in a project and what the mitigation plan was for a particular risk.

194.   CW17 corroborated that McDermott had done diligence well before the proposed Merger was announced in December 2017. CW17 stated that when CW17 was laid off in May 2017, McDermott was in the process of vetting CB&I for acquisition. CW17 said that a number of high-level McDermott people devoted significant time and energy to meetings about the potential CB&I acquisition, many of which took place at the company's Houston headquarters. CW17 stated that in May 2017, McDermott was assembling a dedicated, five-person special accounting team to help vet the CB&I acquisition.

195.   CW15 also corroborated that McDermott was doing due diligence in early- to mid-2017. CW15 stated that VP-level McDermott employees were paired up with CB&I counterparts at the same level – CW15 specifically recalls CB&I's VP of Engineering, VP of Finance, and VP of Construction – would come in for a week, and conducted on-site due diligence at multiple nearby job sites for a couple of days each, to meet with different management groups, review the job site, and talk about the plan. CW15 recalls the McDermott

diligence team  and their CB&I counterparts from corporate coming to CW15's job site, the LACC Project, twice during 2017, once in the middle of the year and again a quarter or two later. CW15 met with the McDermott and CB&I diligence team both times and also contributed data used in Powerpoint presentations given to the diligence teams, which CW15 watched and which covered project overviews, progress updates, safety records, and discussion of where the project was and how it was doing.  CW15 stated that the same people went to the Cameron and Freeport projects to conduct due diligence, having been so informed by people on those projects with whom CW15 spoke.

196.    CW15 confirmed that project forecasts versus actual results, including those related to budget and performance factor, were "definitely" part of the due diligence that was provided to the McDermott due diligence team.  CW15 provided that information for supply chain management as part of the diligence on the LACC Project and said that the company had SOPs in place so that all the projects were treated the same.  While CW15 did not always get input on the final presentations to McDermott, CW15 expressed confidence that the McDermott VP-level personnel received this information during the due diligence period.

197.    CW15 described monthly meetings, for which the Projects team took information provided by CW15 and combined it with information provided by Scheduling, Costs, and Construction into one big presentation for senior management.  CW15 recalled that the McDermott and CB&I diligence teams attended two such monthly meetings at CW15's project site, one likely during mid-year 2017 and one likely in Q3 or Q4 2017.

198.    CW15 learned that the due diligence done at Cameron and Freeport was comparable to the diligence done at CW15's project.  CW15 stated that in monthly meetings, Project Procurement Managers would go through each project, where everyone in attendance,

including CW15 would listen to an hour of what was happening at Cameron, then an hour of what was happening at Freeport, what was happening at CW15's project, and so on.  CW15 said that, once the due diligence started, the due diligence at each project was discussed in those meetings as well.  Also, the company had CMS and certain SOPs (standard operating procedures) that were followed, and all projects faced the same requirements.

199.    A February 21, 2018 McDermott press release, filed with the SEC as an attachment to a Form 8-K signed by Defendant Spence, disclosed that McDermott had already spent *$8.9 million* on transaction-related costs as of December 31, 2017 – just two weeks after the Merger was first announced.  On information and belief, based on the foregoing facts and circumstances regarding the scope of pre-announcement due diligence, the majority of these disclosed expenditures were devoted to pre-announcement due diligence and related activities vetting CB&I's business operations, including the Four Focus Projects.

**b.     McDermott's Extensive Post-Announcement / Pre-Merger Due Diligence**

200.    Defendants also made clear that the diligence, scrutiny, and planning did not end with the announcement of the proposed merger.  During the 12/18/2017 Investor Call, Defendant Dickson stated:

> [W]e know that the success of this combination will ultimately rest on our ability to integrate our two companies effectively. Let me state upfront that we are confident in our ability to do so. *We are beginning the integration planning phase immediately*. Our respective integration team leads have been identified, and in the coming weeks, they will build *a cross-functional team comprised of representatives from both companies*. This team *will develop a detailed plan so that we are ready to begin integrating our two companies immediately after close*.

201.    Indeed, in a Securities Act Rule 425 filing with the SEC on December 19, 2017, deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, McDermott announced the leaders of the Integration Team for the Merger:  McDermott VP of Corporate

109

Strategy Tony Brown, who served as McDermott's Chief Integration Officer, and CB&I Executive VP of Global Operations Services James Sabin. A week later, in a Securities Act Rule 425 filing with the SEC on December 26, 2017, deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Brown disclosed that a team had been assembled to lead the integration planning process and that a combined Integration Planning kick-off meeting had already been held with leaders from both the McDermott and CB&I planning teams.

202.    In a January 16, 2018 communication to McDermott employees, which was filed by McDermott with the SEC pursuant to Rule 425 under the Securities Act of 1933 (the "Securities Act") and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, the McDermott "Integration Planning Team" described the "Integration Management Office" as "responsible for being the enterprise wide driver or change and coordination" for the Merger and described its structure, team, and work streams, as follows:

| | |
|---|---|
| **Engineering:** | John Ashcroft, Director, Engineering, Dubai |
| **Fabrication:** | George Stapleton, Director, Fabrication |
| **Project Management & Controls:** | Frank Johnson, Senior Director, Global Project Controls |
| **QHSES:** | John Macpherson, Senior Director, QHSES |
| **Supply Chain:** | Albert Jeria, Director, SCM, Marine Assets & Operations |

Integration Management Office – Team Structure (updated)

203.    A February 5, 2018 communication to McDermott employees, which was filed by McDermott with the SEC pursuant to Securities Act Rule 425 and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, referenced a recent "full-day planning meeting" involving "senior leaders from both McDermott and CB&I" at McDermott's headquarters and stated, "This week, the integration planning teams from both companies will meet again for three days of detailed planning sessions."

204.    In a letter to employees, which was filed by McDermott with the SEC on February 27, 2018 pursuant to Securities Act Rule 425 and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Defendant Dickson disclosed the high level of personal involvement he was engaging in as part of the diligence and integration process, stating, "As we continue the planning process for the future integration of our combined company, I've had the pleasure of meeting many of you during my visits to CB&I and McDermott offices and sites over the past few weeks. The town halls and smaller discussion groups were very

productive, and your feedback has been extremely valuable as we design the combined company."

205.    In a letter to employees, which was filed by McDermott with the SEC on March 13, 2018 pursuant to Securities Act Rule 425 and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Defendant Dickson outlined the leadership team, which would consist of both McDermott and legacy CB&I personnel, the latter being even more knowledgeable about the CB&I portion of the post-merger company.   His correspondence presented these charts:



# A Look Inside Our Future Together:
**Building a leadership team to drive near-term value and long-term growth**

 

## THE EXECUTIVE LEADERSHIP TEAM

Comprised of extraordinary talent from both McDermott and CB&I, as well as the wider energy industry, the global leadership team will include:



**DAVID DICKSON**
President & Chief Executive Officer
- Nearly 30 years' experience in the oilfield engineering and construction industry, holding management positions in market development, project management, engineering and construction
- Oversees the strategic direction of McDermott, including responsibility for the company's international growth
- Previously spent 11 years with Technip S.A. and its subsidiaries, including as President of Technip U.S.A., Inc., with oversight for the company's North American operations



**STUART SPENCE**
Chief Financial Officer
- 20+ years of financial and operational management experience
- Responsible for financial and accounting operations, focused on sustainable, profitable growth and shareholder returns
- Previously served in senior management roles at Halliburton and other oilfield services companies



**IAN PRESCOTT**
Asia Pacific
- 28+ years of experience of extensive operational, marketing and business unit responsibilities
- Previously VP, Asia at McDermott and member of the company's Executive Committee
- Previously held top leadership positions at SNC-Lavalin and Global Process Systems



**BRIAN MCLAUGHLIN**
Commercial
- Experienced executive with international expertise in the oil and gas industry
- Previously served as McDermott's SVP, Commercial, and held multiple leadership roles since joining the company in 2006
- Before joining McDermott, held roles with several companies throughout the Middle East and other countries



**STEVE ALLEN**
Human Resources
- 20+ years of human resources experience
- Leadership roles in compensation, benefits, talent acquisition, talent management and real estate management
- Previously led HR functions at both Technip USA and Duke Energy



**TONY BROWN**
Integration
- Accomplished executive who has served in senior legal, sales and strategy roles
- Previously led Strategy for McDermott and is currently Integration planning lead for McDermott's combination with CB&I
- Career with McDermott includes leading global initiatives and strengthening relationships with customers



**RICHARD HEO**
North, Central & South America
- Seasoned executive with extensive sales and operations experience
- Led CB&I's Fabrication Services business
- Previous leadership roles and responsibilities include technology sales and operational oversight for project and construction management, fabrication shops and specialty engineered products



**LINH AUSTIN**
Middle East & North Africa
- 20+ years of progressive experience in directing oil and gas projects, strategy, P&L and change management
- Previously VP, Middle East and Caspian for McDermott after joining the company in 2015
- Prior to joining McDermott, served as Senior Advisor to the leadership of ADMA-OPCO in Abu Dhabi



**JONATHAN KENNEFICK**
Project Execution & Delivery
- 20+ years of experience in offshore construction projects
- Joined McDermott in 1992 and most recently served as SVP, Project Execution and Delivery
- Experience leading projects both in deepwater and shallow water infrastructure



**JOHN FREEMAN**
Legal
- 30+ years of legal experience in both the private and public sector
- Before joining McDermott, served as Special Advisor for the Integration of Technip and FMC
- Previously responsible for worldwide leadership of all legal and compliance matters at Technip, based in Paris



**TAREQ KAWASH**
Europe, Africa, Russia & Caspian
- Nearly 30 years of experience in the engineering and construction industry
- Previously led international operations for CB&I's Engineering & Construction business
- Career includes business development, operational and project management roles in Europe, the Middle East and Africa



**DANIEL MCCARTHY**
Technology
- 40+ years of experience in the energy industry
- Previously led CB&I's Technology business
- Leadership roles and responsibilities include process engineering and design, process licensing, global product marketing and management



**SCOTT MUNRO**
Corporate Development
- Extensive international management experience in the oil and gas industry
- Previously responsible for the growth and development of McDermott's business across the Americas, Europe and Africa
- Experience at oil and gas companies in the UK, U.S., Canada, Brazil and France



**GENTRY BRANN**
Communications
- 20+ years' experience in strategic communications, marketing, public affairs and investor relations
- Led global internal and external communications at CB&I
- Previously held communications and marketing leadership roles in engineering and construction, government, and advertising and public relations firms

**We are Driving Energy Forward with Integrated End-to-End Solutions**

206.     In a Form 8-K filed with the SEC on March 22, 2018 and signed by Defendant Spence, McDermott provided an updated joint venture presentation, attached as an exhibit, which reiterated the due diligence statements previously made in the 1/8/2018 Presentation, discussed *supra*.

207.     Confidential witnesses corroborated McDermott's statements as to the extent of its post-announcement / pre-merger due diligence.

208.     CW1 reported that, after the merger was announced in December 2017, McDermott representatives started visiting CB&I job sites and talking to management.  CW1 recalled that McDermott representatives conducted due diligence meetings on-site at the Cameron project, for a couple of days in March or April 2018, in the project management complex, one of the three trailer complexes of offices located there.  CW1 did not meet with them, but stated that they spoke with other management-level employees and assumed that they met with the Project Director, the lead cost manager on-site, and the Senior Director of Project Controls.  CW1 said that competent due diligence would have included specific requests for Risk Registers and similar documents created by Project Controls that forecasted future cost changes to an immense project like Cameron.

209.     CW3 knew that McDermott was provided with the schedule analysis on the Cameron project and, therefore, could see that the project was consistently not achieving the stated milestones.  CW3 believes that McDermott was given access to performance factors, the metrics that indicate, *e.g.*, whether workers are performing 10 hours of work in 10 hours (a performance factor of 1.0) or if they are deviating up (12 hours would be a performance factor of 0.8) or down (8 hours would be a performance factor of 1.2).  CW3 said that McDermott should

have been able to see that CB&I had been estimating a 0.7 - 0.8 performance factor, but had realized a 0.4 - 0.5 performance factor.

210.     CW4 observed a tremendous amount of McDermott activity prior to the closing of the Merger.  CW4 stated that, during this time period, McDermott started placing McDermott and CB&I employees together to figure out how best to set up the company permanently and that McDermott was integrating functional groups like sales and engineering for the planning of "D-Day" in order to have a smooth transition.  As the "most senior" person in the field, CW4 had no reason to believe that McDermott did not have access to documents and reports, including Project Controls reports, informing them of the problems and anticipated forecasted costs of each of the Four Focus Projects.

211.     CW6 began receiving requests for information related to McDermott's due diligence as of the first of the year 2018.  For instance, CW6 was asked for information regarding what was on project reports or even regarding specific items such as air coolers that had been damaged at the port leading to a $300,000 cost and insurance claim.  CW6 also said that McDermott came for a tour of his project in April 2018, during which time a legacy CB&I executive manager spoke with CW6 about the Cameron project.  That manager told CW6 that the two CEOs had take a day to have meetings onsite at Cameron during March or April 2018 to meet with people on the project and figure out what was going on.

212.     CW5 was involved with the due diligence on the Calpine project.  According to CW5, Jonathan Parks and Jonathan Kennefick, the global Senior Vice Presidents for the Calpine project, were given the Project Management Report and project cost reporting.  CW5 said that Perks and Kennefick were aware of what was going on with the project, and asked questions about what was going on, what it would take to finish the project, and how much it would cost.

CW5's team gave them the best knowledge they could.  CW5 stated that McDermott had access to every report on what the productivity factor was and what the history of the productivity factor for that project was – "they had all of that information."   CW5 also said that CB&I never instructed employees to mislead McDermott.

213.   CW18 was involved in McDermott's due diligence and met with McDermott personnel before the Merger closed.  CW[Schill] described these meetings as ones with corporate groups to ensure that they were aligned with coding.

214.   CW8 said that prior to the acquisition, McDermott sent a team of high-level executives to talk with CB&I management at the Hackberry, LA site.  CW8 said, "They did audits on our paperwork.  They had to be real ignorant not to know how much over-budget we were" on the Cameron project.  CW8 also said, "The executives who visited talk to upper management; they didn't talk to me or my peers."

215.   CW20, who worked on the Cameron project, corroborated CW8 by stating, "The top executives from McDermott visited – eight to ten of them."   CW20 saw the McDermott executives from McDermott come by the Cameron site while CW20 was working with the directors of the Cameron project.  CW20 added, "So many people [from McDermott were in and out."  CW20 said that four or five of the McDermott executives came from Houston, and others from Australia and other overseas locations also visited.  CW20 added that Cameron was experiencing serious cost-overruns at the time when McDermott was vetting CB&I for acquisition.

216.   Given the foregoing, it would have been impossible for CB&I to hide issues of the magnitude of what the CWs described as occurring on the Four Focus Projects, and doing so would have opened CB&I up to liability twice – once with its own shareholders and then again

to McDermott if it lied or withheld information during the due diligence phase.  On information and belief, McDermott has not filed any action or otherwise sought legal recourse due to any actions by CB&I or its management team during the pre-Merger due diligence that McDermott conducted.

### c.  Additional Red Flags Around The Time Of The Merger

217.  On May 24, 2018, a motion by CB&I and certain of its executives to dismiss a securities class action complaint against them was denied in full.  *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018). This lawsuit, filed in early 2017, alleges that, between October 2013 and June 2015, CB&I had failed to fully apprise investors regarding delays and loss of profitability of other large-scale projects and instead:  (a) recorded unapproved change orders as assets and revenues, in violation of GAAP, in financial statements in Forms 10-K and 10-Q filed with the SEC; (2) overstated goodwill in financial statements in Forms 10-K and 10-Q resulting in part from CB&I's improper recording of purchase price adjustments following a 2013 corporate acquisition, thereby overstating those assets on CB&I's balance sheet and understating expenses on its income statement; and (3) made materially false and misleading statements regarding the progress of those projects and falsely stated that construction delays would have no effect on CB&I's profitability.

218.  Given the similarity of underlying misconduct, this decision put Defendants on renewed notice as to red flags in CB&I's business and operations that gave rise to an additional duty to investigate the Four Focus Projects, a duty to speak the truth about them, and a duty to correct their prior false and misleading statements about them.

117

> **d.    With Defendants Dickson And Spence At The Helm, McDermott Knowingly Continued Improprieties After The Merger**

219.    As discussed in greater detail in §V.E. *supra*, the CWs put the undisclosed, material, adverse information into the hands of Defendants.  For instance, CW3 stated that the practice of upper management altering cost forecasts downward before publicly reporting them continued unabated after McDermott closed the Merger.  CW3 said that with both CB&I and McDermott, top executives, including the CEO and CFO, received both the real forecasted numbers in initial reports and later revised forecasts with better numbers, which would be published.  CW3 explained that Defendants Dickson and Spence knew the numbers because they came on site to Cameron, and CW3 went over the true cost estimates with Spence.  CW3 also described emails where Defendants Spence and Dickson received the complete package of Project Control's undoctored forecasts, including low-level details and their basis.  CW3 believed they were very well aware of difference in the numbers and that there is no way they could claim they did not know.

> **2.    *Defendants Dickson & Spence Were Financially Motivated To Commit Fraud***

220.    Defendants Dickson and Spence had significant personal financial motivations, unique to them, to disregard the findings of McDermott's due diligence, to proceed with the Merger, and to engage in the securities fraud alleged herein.

*Defendants Dickson & Spence Were Motivated By Compensation Increases Tied To The Merger*

221.    Defendants Dickson and Spence were motivated by their increased compensation packages to close the Merger, despite the findings of McDermott's due diligence, and to commit the securities fraud alleged herein.  First, as disclosed in a Form 8-K filed with the SEC on March 7, 2018, Defendants Dickson and Spence were awarded on March 1, 2018, by

118

McDermott's Compensation Committee, "Recognition Bonuses" attributable to their work on the Merger. Defendant Dickson was awarded a Recognition Bonus of $1,125,000, and Defendant Spence was awarded a Recognition Bonus of $637,500. One-half of each Recognition Bonus was paid in March 2018, immediately upon the award – during McDermott's post-announcement/pre-merger due diligence – and the other half of the Recognition Bonus was deferred until May 2020, the first-year anniversary of the Merger, based on certain performance criteria.

222.   Moreover, although fiscal 2018 was a bad year for McDermott and legacy CBI shareholders, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger and post-Merger time periods to immunize Defendants Dickson and Spence from the impact of charges taken post-merger on the Focus Projects. Although the Merger closed on the tenth day of the fifth month of 2018, they were paid 50% (rather than one-third) of their full year 2018 incentive compensation for their four plus months' work. Thus, for 2018, Defendant Dickson was paid – primarily for his four plus months' work prior to the Merger – total executive compensation of $11,294,007, and Defendant Spence was paid total executive compensation of $7,530,641.

223.   Further, according to the Proxy Statement, because the Merger elevated McDermott into a different peer group of companies, Defendants Dickson and Spence received increases in their base and incentive compensation. For example, Defendant Dickson received a 25% increase in his 2018 annual base salary of $1,125,000.

*Suspicious, Widespread Insider Trading During the 10(b) Class Period Evidences Scienter*

224.   Defendants' scienter is further evidenced by the 10(b) Class Period transactions in McDermott stock, options, and stock-related units by the Individual Defendants, suspicious in

timing and amount, accumulating millions of dollars in ill-gotten gains during the fraud alleged herein.  Specifically, such sales included the following:

(a)    Defendant Dickson's 10(b) Class  Period Transactions

Defendant Dickson entered the 10(b) Class Period with balances of 924,327 McDermott shares, 0 PSUs,[1] and 642,925 RSUs.[2]  Defendant Dickson's transactions during the 10(b) Class Period were as follows:

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 11/6/2018 | Purchase | 39,800 | $ 9.9581 | ($396,332) |
| | | | | |
| **Sub-Total Stock Purchases** | | 39,800 | **Cost** | ($396,332) |
| **Performance Unit and Restricted Stock Unit Transactions** | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/16/2018 | Award of PSUs | 739,762 | 3/5/2018 | n/a | $0 |
| 2/26/2018 | RSUs converted to shares | (120,040) | 2/26/2018 | n/a | $0 (120,040 shares) |
| 2/26/2018 | RSUs converted to | (77,783) | 2/26/2018 | $7.62 | $592,706 |

---

[1]    As noted in Figures 1 and 2 appended hereto, the definition of PSUs was set forth in McDermott's proxy statements and changed as regards PSUs awarded in 2017 or earlier versus those awarded in 2018 or later.

[2]    As defined in McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule 14A, on August 10, 2018, and consistently in McDermott's other proxy statements, Restricted Stock Units (RSUs) were defined as follows: "Restricted stock units, or RSUs, are intended to promote the retention of employees, including the NEOs. The RSUs granted in 2017 generally vest in one-third increments on the first, second and third anniversaries of the grant date. The RSUs may be paid out in shares of McDermott common stock, cash equal to the fair market value of the shares otherwise deliverable, or any combination thereof, at the sole discretion of the Compensation Committee."

| | | | | | |
|---|---|---|---|---|---|
| | shares and sold | | | | |
| 2/28/2018 | RSUs converted to shares | (65,923) | 2/28/2018 | n/a | $0 (65,923 shares) |
| 2/28/2018 | RSUs converted to shares and sold | (42,771) | 2/28/2018 | $7.30 | $312,228 |
| 3/1/2018 | RSUs awarded | 331,491 | (three equal installments beginning 3/1/2019) | n/a | $0 |
| 3/5/2018 | RSUs converted to shares | (149,975) | 3/5/2018 | n/a | $0 (149,975 shares) |
| 3/5/2018 | RSUs converted to shares and sold | (97,304) | 3/5/2018 | $7.51 | $730,753 |
| 3/5/2018 | PSUs converted to shares and sold | (739,762) | 3/5/2018 | $7.51 | $5,555,613 |
| 5/10/2018 | RSUs awarded | 197,824 | 2/26/2019 | n/a | $0 |
| 5/10/2018 | RSUs awarded | 108,696 | 2/28/2020 | n/a | $0 |
| 6/6/2018 | RSUs awarded | 82,584 | (three equal installments beginning 6/6/2019) | n/a | $0 |
| 2/26/2019 | RSUs converted to shares | (94,097) | 2/26/2019 | | $0 (94,097 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (77,780) | 2/26/2019 | $8.61 | $669,686 |
| 2/26/2019 | RSUs converted to shares | (65,941) | 2/26/2019 | n/a | $0 (65,941 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (25,947) | 2/26/2019 | $8.61 | $223,404 |
| 2/27/2019 | RSUs awarded | 468,396 | (three equal installments beginning 2/27/2020) | n/a | $0 |

| 2/28/2019 | RSUs converted to shares | (21,975) | 2/28/2019 | n/a | $0 (21,975 shares) |
|---|---|---|---|---|---|
| 2/28/2019 | RSUs converted to shares and sold | (14,257) | 2/28/2019 | $8.48 | $120,899 |
| 3/1/2019 | RSUs converted to shares | (22,339) | 3/1/2019 | n/a | $0 (22,339 shares) |
| 3/1/2019 | RSUs converted to shares and sold | (14,493) | 3/1/2019 | $9.11 | $132,031 |
| 6/6/2019 | RSUs converted to shares | (16,696) | 6/6/2019 | n/a | $0 (16,696 shares) |
| 6/6/2019 | RSUs converted to shares and sold | (10,832) | 6/6/2019 | $6.85 | $74,199 |
| | | | | | |
| **Sub-Total Awards of PSUs** | | 739,762 | | **Cost** | $0 |
| **Sub-Total Conversions/Sales of PSUs** | | (739,762) | | **Proceeds** | $5,555,613 |
| **Sub-Total Awards of RSUs** | | 1,188,991 | | **Costs** | $0 |
| **Sub-Total Conversions/Sales of RSUs** | | (361,167) | | **Proceeds** | $2,855,906 |
| **Sub-Total Conversions of RSUs** | | (556,986) | | **Proceeds** | $0 (556,986 shares) |
| | | **270,838** | | **Proceeds** | **$8,411,519** |
| | | | | | |
| **Totals** | **Shares Purchased** | 39,800 | **Transaction Costs** | | ($396,332) |
| | **Awards of PSUs** | 739,762 | **Transaction Costs** | | $0 |
| | **Conversions/Sales of PSUs** | (739,762) | **Transaction Proceeds** | | $5,555,613 |
| | **Awards of RSUs** | 1,188,991 | **Transaction Costs** | | $0 |
| | **Conversions/Sales of RSUs** | (361,167) | **Transaction Proceeds** | | $2,855,906 |
| | **Conversions of RSUs** | (556,986) | **Transaction Proceeds** | | $0 (556,986 |

| | | | shares) |
|---|---|---|---|
| | | **Net Gain to Defendant Dickson** | **$8,015,187** |

      (b)    <u>Defendant Spence's 10(b) Class Period Transactions</u>

Defendant Spence entered the 10(b) Class Period with balances of 252,520 McDermott shares, 0 PSUs, and 197,823 RSUs.  Defendant Spence's transactions during the 10(b) Class Period were as follows:

| Stock Transactions | | | | |
|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | **Price** | **Funds Spent / Gained** |
| 11/6/2018 | Purchase | 25,000 | $9.9783 | ($249,458) |
| | | | | |
| **Sub-Total Stock Purchases** | | 25,000 | **Cost** | ($249,458) |
| **Performance Unit and Restricted Stock Unit Transactions** | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/16/2018 | Award of PSUs | 177,543 | 3/5/2018 | n/a | $0 |
| 2/26/2018 | RSUs converted to shares | (41,768) | 2/26/2018 | n/a | $0 (41,768 shares) |
| 2/26/2018 | RSUs converted to shares and sold | (27,470) | 2/26/2018 | $7.62 | 209,321 |
| 2/28/2018 | RSUs converted to shares | (20,601) | 2/28/2018 | n/a | $0 (20,601 shares) |
| 2/28/2018 | RSUs converted to shares and sold | (13,365) | 2/28/2018 | $7.30 | 97,565 |
| 3/1/2018 | RSUs awarded | 103,590 | (three equal installments beginning 3/1/2019) | n/a | $0 |
| 3/5/2018 | RSUs converted to | (35,994) | 3/5/2018 | n/a | $0 |

| | | | | |
|---|---|---|---|---|
| | shares | | | (35,994 shares) |
| 3/5/2018 | RSUs converted to shares and sold | (23,353) | 3/5/2018 | $7.51 | $175,381 |
| 3/5/2018 | PSUs converted to shares and sold | (177,543) | 3/5/2018 | $7.51 | $1,333,348 |
| 5/10/2018 | RSUs awarded | 69,239 | 2/26/2019 | n/a | $0 |
| 5/10/2018 | RSUs awarded | 33,968 | 2/28/2020 | n/a | $0 |
| 6/6/2018 | RSUs awarded | 11,796 | (three equal installments beginning 6/6/2019) | n/a | $0 |
| 2/26/2019 | RSUs converted to shares | (41,883) | 2/26/2019 | n/a | $0 (41,883 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (27,356) | 2/26/2019 | $8.61 | $235,535 |
| 2/26/2019 | RSUs converted to shares | (13,999) | 2/26/2019 | $8.61 | $0 (13,999 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (9,081) | 2/26/2019 | n/a | $78,187 |
| 2/27/2019 | RSUs awarded | 112,866 | (three equal installments beginning 2/27/2020) | n/a | $0 |
| 2/28/2019 | RSUs converted to shares | (6,867) | 2/28/2019 | n/a | $0 (6,867 shares) |
| 2/28/2019 | RSUs converted to shares and sold | (4,455) | 2/28/2019 | $8.48 | $37,778 |
| 3/1/2019 | RSUs converted to shares | (6,981) | 3/1/2019 | n/a | $0 (6,981 shares) |
| 3/1/2019 | RSUs converted to shares and sold | (4,529) | 3/1/2019 | $9.11 | $41,259 |
| 6/6/2019 | RSUs converted to | (2,385) | 6/6/2019 | n/a | $0 |

| | | | | | |
|---|---|---|---|---|---|
| | shares | | | | (2,385 shares) |
| 6/6/2019 | RSUs converted to shares and sold | (1,547) | 6/6/2019 | $6.85 | $10,597 |
| | | | | | |
| **Sub-Total Awards of PSUs** | | 177,543 | | **Cost** | $0 |
| **Sub-Total Conversions/Sales of PSUs** | | (177,543) | | **Proceeds** | $1,333,348 |
| **Sub-Total Awards of RSUs** | | 331,459 | | **Costs** | $0 |
| **Sub-Total Conversions/Sales of RSUs** | | (111,156) | | **Proceeds** | $885,623 |
| **Sub-Total Conversions of RSUs** | | 170,478 | | **Proceeds** | $0 (170,478 shares) |
| | | **405,256** | | **Proceeds** | **$2,218,971** |

| **Totals** | **Shares Purchased** | 25,000 | **Transaction Costs** | ($249,458) |
|---|---|---|---|---|
| | **Awards of PSUs** | 177,543 | **Transaction Costs** | $0 |
| | **Conversions/Sales of PSUs** | (177,543) | **Transaction Proceeds** | $1,333,348 |
| | **Awards of RSUs** | 331,459 | **Transaction Costs** | $0 |
| | **Conversions/Sales of RSUs** | (111,156) | **Transaction Proceeds** | $885,623 |
| | **Conversions of RSUs** | (170,478) | **Transaction Proceeds** | $0 (170,478 shares) |
| | | **Net Gain to Defendant Spence** | | **$1,969,513** |

225.   These transactions during the 10(b) Class Period, while the fraud was raging and the true facts regarding McDermott's business and operations, in particular those regarding the Merger and the Four Focus Projects, as alleged herein, remained hidden from investors, yielded

the Individual Defendants a combined *$9,984,700* ($8,015,187 for Dickson, $1,969,513 for Spence), along with 727,464 additional shares acquired at no expense (556,986 for Dickson, 170,478 for Spence) in net ill-gotten gains from prices inflated by the fraud alleged herein. These transactions and proceeds constitute strong evidence of scienter.

226.    These transactions were suspicious in amount, a fact that further supports the scienter inference.   Dickson's $8,015,187 in insider transaction gains compare suspiciously against his 2018 salary of $1,125,000.    Moreover, the fact that Defendant Dickson sold/exercised 739,762 PSUs and 918,153 RSUs during the 20-month 10(b) Class Period compares suspiciously against his sale/exercise of just 0 PSUs and 547,142 RSUs in the 20-month period before the 10(b) Class Period.   Spence's $1,969,513 in insider transaction gains compare suspiciously against his 2018 salary of $650,000.    Moreover, the fact that Defendant Dickson sold/exercised 177,543 PSUs and 281,634 RSUs during the 20-month 10(b) Class Period compares suspiciously against his sale/exercise of just 0 PSUs and 299,756 RSUs in the 20-month period before the 10(b) Class Period.

227.    These transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements and the alleged partial corrective disclosures, a fact that further supports the scienter inference.

### 3.    *McDermott Raised Funds During The Class Period*

228.    During the Class Period, McDermott announced its intention to raise hundreds of millions of dollars in funds while its stock was trading at prices elevated by the fraud alleged herein. In an October 30, 2018 Form 8-K and press release, and an October 31, 2018 Form 8-K filed with the SEC, McDermott announced that it entered into a Securities Purchase Agreement to issue and sell in a Private Placement, 300,000 shares of 12% Redeemable Preferred Stock, par value $1.00 per share, and a number of Series A warrants equal to the product of 3.75% times the

total number of shares of its common stock, par value $1.00 per share, outstanding as of the closing date, with an initial exercise price of $0.01, for a total purchase price of $289.5 million. Also, in the same press release and Forms 8-K, McDermott announced a Letter of Credit Facility for extensions of credit in the form of performance letters of credit in the aggregate face amount of up to $230 million. On November 29, 2018, in a press release and Form 8-K, McDermott announced the closing of this $289.5 million Private Placement offering, and the availability of the $230 million Letter of Credit Facility. These transactions, which took place during the fraud alleged herein, are evidence of McDermott's corporate scienter.

### 4.    *The Fraud Implicated Core Operations*

229.    The fraud alleged herein implicates the core operations of McDermott.  The Merger with CB&I was McDermott's largest and most important strategic transaction, both in size and timing, and, upon its closing, the CB&I's backlog represented a massive 74.5% of McDermott's post-Merger multi-billion-dollar backlog.

230.    As regards timing, when the Merger was announced, McDermott had been a potential takeover target by its rivals.  Indeed, on April 23, 2018, Subsea 7 S.A. ("Subsea 7"), a competitor to McDermott, confirmed that it had earlier made an unsolicited offer to acquire McDermott for $7.00 per share (pre-split) in cash or up to 50% in Subsea 7 stock and the balance in cash.  This represented a premium of 16% to McDermott's common stock closing price on April 20, 2018 at $6.05 per share.  The value of Subsea's offer was approximately $2 billion. The Subsea 7 offer was not subject to any financing conditions or Subsea 7 shareholder approval. The Subsea 7 shareholder offer, however, was subject to McDermott ending its proposed Merger with CB&I.  Subsea 7's offer said it would also consider increasing its proposed price upon further assessment of McDermott's business through discussions with McDermott management.

231.     However, McDermott's Board of Directors swiftly rejected Subsea 7's proposal, as confirmed in a McDermott press release on April 23, 2018, which stated, "We remain fully committed to completing the transformational transaction [with CB&I] and our Board has reaffirmed its recommendation that our stockholders should support it."

232.     Once the rejected bid was public, press coverage on April 25, 2018, indicated that Subsea 7 was willing to offer more.  A *Business Guide* article quoted Jean Cahuzac, Subsea 7's CEO, as stating: "Given the attributes of the proposed transaction and our stated ability to further enhance our proposed terms, we encourage the McDermott board of directors to reconsider this compelling opportunity to combine two complementary businesses."  He added: "Our proposal provides equity upside in a company with a robust financial position, as well as a meaningful premium.  We see significant merit in such a transaction for all shareholders, and with our financial and legal advisors continue to be open to discussions."  A Law360 article reported that Subsea 7 had said it would be open to adjusting its $2 billion bid for McDermott, but that a new offer was possible "only if the Houston-based firm agrees to come to the negotiating table."  It quoted Cahuzac as saying, "We would welcome the opportunity to engage with McDermott's board of directors and management to discuss our proposal and the substantial upside opportunity represented by ongoing participation in the equity, with a view to a combination that would be in the best interests of our respective shareholders."

233.     At this time, analysts also stated their optimism that Subsea 7's original bid was just a first offer and that even if Subsea 7 increased its bid, the deal would still be accretive.  For example, UBS published an analyst report on April 24, 2018, noting, *inter alia*, that Subsea 7 could still have a value accretive deal at an increased bid of $4/share more.  Similarly, Arctic Securities published and analyst report on April 25, 2018 estimating that a bid of just about

$2/share more would still result in an accretive deal and that the original $7/share bid was just a first move to initiate a dialog.

234.    Notwithstanding Subsea 7's invitation for further discussions and its willingness to increase its offer, McDermott never engaged Subsea 7 in any negotiations regarding a potential deal choosing, instead, to continue with the proposed Merger with CB&I.  On May 2, 2018, in light of McDermott's opposition to its proposal and the shareholder vote approving the Merger, Subsea 7 withdrew its $7.00 (pre-split) offer.

235.    As regards size, the Merger was McDermott's largest M&A transaction in a decade, if not its entire history, and would augment McDermott's own $3.9 billion backlog with CB&I's $11.4 billion backlog (as of December 31, 2017).

236.    The Merger also represented a massive expenditure of corporate resources, at the cost of turning down the higher premium offered by Subsea 7.

237.    Immediately prior to the Merger on May 10, 2018, McDermott shares split one-for-three.  Thus, for example, a holder of 300 McDermott shares with a closing market price of $6.64 per share on May 9, 2018, exchanged those shares for 100 shares of McDermott common stock (post-split), which closed on May 10, 2018 at $20.70 per share.  The Subsea 7 initial offer post-split would have been worth $21 per share in cash to McDermott shareholders.

238.    CB&I shares closed on May 10, 2018, immediately prior to the Merger, at $16.39 per share.  CB&I shareholders received 0.82407 McDermott shares in the Merger.  According to the Proxy Statement (at *xiii*), approximately 102.5 million shares of CB&I common stock were outstanding as of March 26, 2018.  Thus, the market value of the shares issued to CB&I shareholders on May 10, 2018, approximated $1.75 billion (a 0.82407 conversion ratio multiplied by a $20.70 per share market price multiplied by 102.5 million shares).

239.    In light of these facts, it is inconceivable that the Individual Defendants, McDermott's CEO and CFO, and its Board did not know the facts and circumstances of the fraud as alleged herein.   Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within McDermott, both generally and as specifically regards the Merger and the Four Focus Projects, and the litany of facts alleged herein regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including by the CW statements.

### 5.    *Defendants Signed, Were Quoted In, Or SOX Certified The Alleged Misstatements*

240.    As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, the Individual Defendants were under an obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully.  As alleged herein, they violated such duties.

241.    As the individuals who SOX certified SEC filings as described above, the Individual Defendants were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them.  As alleged herein, they violated such duties.

### 6.    *The Fraud Violated McDermott's Corporate Code of Conduct*

242.    McDermott's Code of Conduct, published on its website throughout the Class Period, barred all of the misconduct detailed by the extensive CW statements set forth above.

243.    In a section captioned "Integrity of Records and Accounting Procedures," the Code of Business Conduct ***required*** accurate reporting of the company's operations, expressly

130

including accurate measurements of progress to date and forecasts of cost on large construction projects like the Four Focus Projects.  For instance:

> We create documents and records in the normal course of business to assist in our decision-making process and to document our compliance with laws, regulations and Company policies and procedures. ***All entries in the Company's books, records and accounts must be complete, accurate and fairly reflect our business transactions conforming to applicable accounting standards and legal requirements***.

> Whatever your part in this process, you are required to be honest and forthcoming – if a transaction or payment cannot be accurately documented without raising legal questions or embarrassing the Company, the transaction should not be consummated and the payment should not be made.

> All of the Company's records, from your expense account forms to the Company's annual report must accurately reflect the facts. ***In most of our construction operations we report financial results and are compensated on a percent-of-completion basis and may be paid by our customers on a milestone basis. This requires an accurate measurement of progress to date and an accurate forecast of cost to complete, as that has a direct impact on the earnings reports filed by the Company and reported to the SEC and the Company's shareholders.*** Corporate funds and assets must be recorded according to Company procedures. False or misleading entries are unlawful and will not be tolerated. No one may establish undisclosed or unrecorded funds or assets for any purpose. Except for normal and customary petty cash funds, which are strictly controlled, cash transactions are not allowed.

> * * * *

> ***All Company records and documents must be accurately and honestly created and maintained, and all accounts and reports must fully reflect all relevant facts. This is Company policy and it is the law.*** In following these requirements, activities such as embezzlement, money laundering and ***holding "off the books" cash or slush funds are prohibited.***

244.    McDermott's 10-K filings during the Class Period, which directed investors to where the Code of Business Conduct was posted on the Company's website, stated, "We have adopted a Code of Business Conduct for our employees and directors, including, specifically, our chief executive officer, our chief financial officer and our other executive officers.  Our code satisfies the requirements for a 'code of ethics' within the meaning of SEC rules.  A copy of the

code is posted on our Web site, www.mcdermott.com/ under 'Ethics-Code of Business Conduct.'" This language made clear that, throughout the Class Period, the Code of Business Conduct governed the Individual Defendants' conduct at issue, which they knew and understood, inasmuch as they signed and SOX-certified those Form 10-K filings.

245.    Defendants' flagrant violation of express corporate policy further buttresses the inference of Defendants' scienter, whether based on their knowledge or their recklessness.

## VI.    NO SAFE HARBOR

246.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made.   To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.   Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to CB&I's and McDermott's then-ongoing misconduct as alleged herein, including without limitation as regards the Merger and the Four Focus Projects.   Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

247.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable, because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized

and/or approved by one or both of the Individual Defendants or an executive officer of McDermott who knew that those statements were false when made.

248.    For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

## VII.    THE CLAIMS ARE TIMELY

249.    The claims set forth herein were timely filed.

250.    The market was not even arguably aware until October 30, 2018, at the earliest, that credible allegations existed to the effect that McDermott had misrepresented and/or failed to disclose material facts about its business and operations, particularly including without limitation as regarded the Merger and the Four Focus Projects.

251.    It was also not until October 30, 2018, at the earliest, that Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the 10(b) Class Period.  In the absence of publicly available information prior to then suggesting that McDermott's pronouncements in its SEC filings and other public statements during the 10(b) Class Period were materially false and/or misleading, 10(b) Lead Plaintiff NSHEPP was not under any duty to inquire as to the truthfulness of McDermott's public statements.  Therefore, 10(b) Lead Plaintiff NSHEPP's duty in that regard arose no earlier than October 30, 2018.

252.    Prior to October 30, 2018, 10(b) Lead Plaintiff NSHEPP and 10(b) Class Members could not have been on any inquiry notice of possible claims under the Securities Exchange Act.  Even assuming this early date for inquiry notice, Plaintiffs' Securities Exchange Act claims against Defendants were brought within two years.  Therefore, Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

## VIII.   LOSS CAUSATION/ECONOMIC LOSS

253.    The market for McDermott shares was open, well-developed, and efficient at all relevant times.  During the 10(b) Class  Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated McDermott's share price and operated as a fraud or deceit on 10(b) Class  Period purchasers of McDermott shares by misrepresenting the material facts as detailed herein.  As detailed above, at the end of the 10(b) Class  Period, when Defendants' prior misrepresentations became known to the public, through a series of corrective disclosures, the price of McDermott shares fell precipitously, as the prior artificial inflation came out.  As a result of their purchases of McDermott shares during the 10(b) Class  Period, 10(b) Lead Plaintiff NSHEPP and the other 10(b) Class  members suffered economic loss, *i.e.*, damages, under the U.S. federal securities laws.

254.    During the 10(b) Class  Period, Defendants presented a misleading picture of McDermott's financial condition, revenues, performance, and business prospects, including without limitation as regarded the Merger and the Four Focus Projects.  Defendants' false and misleading statements had the intended effect and caused McDermott shares to trade at artificially inflated prices throughout the 10(b) Class  Period and until the truth was fully revealed to the market.

255.    In response to the issuance of partially corrective disclosures on October 30, 2018, February 13, 2019, and July 29, 2019, and September 18, 2019, the price of McDermott shares sharply dropped, on high volume, as detailed herein, thereby removing inflation from the price of McDermott shares, causing real economic loss to 10(b) Lead Plaintiff NSHEPP and the 10(b) Class  Members, investors who had purchased McDermott shares during the 10(b) Class Period.

134

256.    The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market.  The timing and magnitude of the price decline in McDermott shares negates any inference that the loss suffered by 10(b) Lead Plaintiff NSHEPP and the other 10(b) Class  members was caused by changed market conditions, macroeconomic factors or McDermott-specific facts unrelated to Defendants' fraudulent conduct.

257.    The economic loss, *i.e.*, damages, suffered by 10(b) Lead Plaintiff NSHEPP and other 10(b) Class  members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate McDermott's share price and the subsequent significant decline in the value of McDermott shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX.    PRESUMPTION OF RELIANCE

258.    At all relevant times, the market for McDermott shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a)    McDermott met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "MDR", a highly efficient and automated market;

(b)    McDermott had approximately 284,032,088 million shares outstanding as of February 16, 2018, and, post-Merger, 180,796,580 shares outstanding as of February 21, 2019, such that its stock was liquid.  During the 10(b) Class Period, numerous shares of McDermott stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for McDermott stock and permitting a strong presumption of an efficient market;

(c)    As a regulated issuer, McDermott filed periodic public reports with the SEC;

(d)     McDermott regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)     McDermott was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the 10(b) Class Period; and

(f)     Unexpected material news about McDermott was rapidly reflected and incorporated into McDermott's stock price during the 10(b) Class Period.

259.    As a result of the foregoing, the market for McDermott shares promptly digested current information regarding McDermott from all publicly available sources and reflected such information in the price of its stock.  Under these circumstances, all purchasers of McDermott stock during the 10(b) Class Period suffered similar injury through their purchase of McDermott stock at artificially inflated prices and a presumption of reliance applies.

260.    Alternatively, 10(b) Lead Plaintiff NSHEPP and the 10(b) Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their 10(b) Class Period statements in violation of a duty to disclose such information, as detailed above.

## X.     PLAINTIFFS' CLASS ACTION ALLEGATIONS

261.    Plaintiffs bring this federal securities action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the 10(b) Class, consisting of all persons and entities, other than Defendants, their family members, and their subsidiaries, affiliates, and any entities in which they owned a controlling interest, who purchased or otherwise acquired the common stock

136

of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and September 17, 2019, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5.

262.    Excluded from the 10(b) Class are Defendants herein, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

263.    The 10(b) Class members are so numerous that joinder of all of them is impracticable. Throughout the 10(b) Class Period, McDermott stock was actively traded on the NYSE. While the exact number of 10(b) Class members is unknown to 10(b) Lead Plaintiff NSHEPP at this time and can be ascertained only through appropriate discovery, 10(b) Lead Plaintiff NSHEPP believes that there are hundreds or thousands of them. Record owners and other 10(b) Class members may be identified from records maintained by McDermott or its transfer agent and may be notified of this action's pendency by mail, with 10(b) Class members not so identified being notified through publication notice, using forms of notice similar to those customarily used in securities class actions.

264.    10(b) Lead Plaintiff NSHEPP's claims are typical of the claims of the 10(b) Class members, as all 10(b) Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

265.    10(b) Lead Plaintiff NSHEPP will fairly and adequately protect the interests of the 10(b) Class members and has retained counsel competent and experienced in class and

securities litigation.  10(b) Lead Plaintiff NSHEPP has no interests antagonistic to or in conflict with those of the 10(b) Class.

266.    Common questions of law and fact exist as to all 10(b) Class  members and predominate over any questions solely affecting individual 10(b) Class  members.  Among the questions of law and fact common to the 10(b) Class  are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the 10(b) Class  Period misrepresented material facts about the business, operations and management of McDermott, including without limitation as regarded the Merger and the Four Focus Projects;

- whether the Individual Defendants caused McDermott to issue false and misleading financial statements during the 10(b) Class  Period;

- whether Defendants acted knowingly or recklessly in issuing the false and misleading statements alleged herein;

- whether the prices of McDermott common stock during the 10(b) Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,

- whether the 10(b) Class  members have sustained damages and, if so, what is the proper measure of damages.

267.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all 10(b) Class  members is impracticable. Furthermore, as the damages suffered by individual 10(b) Class  members may be relatively small, the expense and burden of individual litigation make it impossible for 10(b) Class members to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

268.    As alleged herein, 10(b) Lead Plaintiff NSHEPP will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as

Defendants made public misrepresentations or failed to disclose material facts during the 10(b) Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of McDermott's securities; and 10(b) Lead Plaintiff NSHEPP and the 10(b) Class members purchased or otherwise acquired McDermott common stock between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

## XI.   CLAIMS FOR RELIEF

### COUNT I

### (Against All Defendants For Violations Of
### Exchange Act Section 10(b) And Rule 10b-5 Promulgated Thereunder)

269.   10(b) Lead Plaintiff NSHEPP repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

270.   This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

271.   During the 10(b) Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon 10(b) Lead Plaintiff NSHEPP and the other members of the 10(b) Class ; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the 10(b) Class Period, did: (i) deceive the investing public, including 10(b) Lead Plaintiff NSHEPP and other 10(b) Class

members, as alleged herein; (ii) artificially inflate and maintain the market price of McDermott securities; and (iii) cause Plaintiffs and other members of the 10(b) Class  to purchase or otherwise acquire McDermott common stock and options at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

272.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, teleconferences with analysts and investors, and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for McDermott securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about McDermott's operations, finances and business prospects, including without limitation as regards the Merger and the Four Focus Projects.

273.     Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at McDermott, and intended thereby to deceive Plaintiffs and the other members of the 10(b) Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

274.    Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the consummation of the Merger and the sale of McDermott securities.

275.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  Defendants' first-hand knowledge is alleged herein.  Moreover, as the senior managers and/or directors of McDermott, who among other things oversaw the due diligence into the Merger, the Merger, and the post-Merger operations of the Four Focus Projects, the Individual Defendants had knowledge of the details of McDermott's operations, business, and internal affairs, including without limitation those regarding the Merger and the Four Focus Projects.

276.    The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of McDermott.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to McDermott's businesses, operations, financial condition and prospects, including without limitation as regarded the Merger and the Four Focus Projects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of McDermott securities was artificially inflated throughout the 10(b) Class Period.  In ignorance of the adverse facts concerning McDermott's business, operations and financial condition concealed by Defendants, including without limitation those regarding the Merger and the Four Focus Projects, 10(b) Lead Plaintiff NSHEPP and the other 10(b) Class  members purchased or otherwise acquired McDermott common stock at artificially inflated prices and relied upon the

price of McDermott's securities, the integrity of the market for those securities and/or upon statements disseminated by Defendants, and were damaged thereby.

277.    During the 10(b) Class Period, McDermott common stock was traded on an active and efficient market.  10(b) Lead Plaintiff NSHEPP and the other 10(b) Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of McDermott at prices artificially inflated by Defendants' wrongful conduct.  Had 10(b) Lead Plaintiff NSHEPP and the other 10(b) Class members known the truth, they would not have purchased or otherwise acquired said shares or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by 10(b) Lead Plaintiff NSHEPP and the 10(b) Class, the true value of McDermott stock was substantially lower than the prices paid by Plaintiffs and the other 10(b) Class members.  The market price of McDermott stock declined sharply upon public disclosure of the fraud alleged herein, to the injury of 10(b) Lead Plaintiff NSHEPP and 10(b) Class members.

278.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

279.    As a direct and proximate result of Defendants' wrongful conduct, 10(b) Lead Plaintiff NSHEPP and the other 10(b) Class members suffered damages in connection with their respective purchases, acquisitions and sales of McDermott's common stock during the 10(b) Class Period, upon the disclosures that McDermott had been disseminating materially misstatements and omissions to the investing public.

## COUNT II

### (Against The Individual Defendants For Violations Of
### Section 20(a) Of The Exchange Act)

280.    10(b) Lead Plaintiff NSHEPP repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

281.    During the 10(b) Class  Period, the Individual Defendants participated in the operation and management of McDermott, and conducted and participated, directly and indirectly, in the conduct of McDermott's business affairs.  Because of their senior positions, they knew the adverse non-public information about McDermott's business, operations, finances, and prospects, and through their pre-Merger due diligence and post-Merger oversight, that knowledge extended to and included without limitation the adverse non-public information about CB&I's business and the Four Focus Projects.

282.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to McDermott's business, operations, financial condition, results of operations, and prospects, including without limitation those related to the Merger and the Four Focus Projects, and to correct promptly any public statements issued by McDermott which had become materially false or misleading.

283.    Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which McDermott disseminated in the marketplace during the 10(b) Class  Period concerning McDermott's business, operations, financial condition, results of operations, and prospects, including without limitation those related to the Merger and the Four Focus Projects.  Throughout the 10(b) Class  Period, the Individual Defendants exercised their

143

power and authority to cause McDermott to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of McDermott within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of McDermott stock.

284.    Each of the Individual Defendants, therefore, acted as a controlling person of McDermott.   By reason of their senior management positions and/or being directors of McDermott, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, McDermott to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations and business of McDermott and possessed the power to control the specific activities that comprise the primary violations about which the 10(b) Lead Plaintiff and the other members of the 10(b) Class  complain.

285.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by McDermott.

## XII.    PRAYER FOR RELIEF

**WHEREFORE**, 10(b) Lead Plaintiff NSHEPP hereby demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying the 10(b) Lead Plaintiff NSHEPP as the class representative for the 10(b) Class ;

B.    Requiring Defendants to pay damages sustained by the 10(b) Lead Plaintiff NSHEPP and the 10(b) Class  by reason of the acts and transactions alleged herein;

C.      Awarding the 10(b) Lead Plaintiff NSHEPP and the other members of the 10(b)

Class  prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert

fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## XIII.   DEMAND FOR TRIAL BY JURY

10(b) Lead Plaintiff NSHEPP hereby demands a trial by jury.

Respectfully submitted,                    **POMERANTZ LLP**

                                           */s/Matthew L. Tuccillo*
                                           Matthew L. Tuccillo
                                           (S.D. Tex. Federal Bar Number 1467939)
                                           Jeremy A. Lieberman
                                           (S.D. Tex. Federal Bar Number 1466757)
                                           J. Alexander Hood II
                                           (S.D. Tex. Federal Bar Number 3086579)
                                           600 Third Avenue, 20th Floor
                                           New York, NY 10016
                                           Telephone: (212) 661-1100
                                           Facsimile: (212) 661-8665
                                           Email: jalieberman@pomlaw.com
                                           Email: mltuccillo@pomlaw.com
                                           Email: ahood@pomlaw.com

                                           *Counsel for §10(b) Lead Plaintiff Nova Scotia
                                           Health Employees' Pension Plan and Lead Counsel
                                           for the §10(b) Class*


                                           **THE BRISCOE LAW FIRM, PLLC**

                                           */s/Willie C. Briscoe*
                                           Willie C. Briscoe
                                           Texas Bar No.: 24001788
                                           Southern District No.: 25157
                                           1980 Park Oak Blvd.
                                           Houston, TX  77056
                                           Telephone: 713-752-2600
                                           Facsimile: 832-201-9950
                                           wbriscoe@thebriscoelawfirm.com

                                           *Attorney-In-Charge,   Counsel   for   §10(b)   Lead*

145

*Plaintiff Nova Scotia Health Employees' Pension Plan, and Liaison Counsel for the §10(b) Class*

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS ON BEHALF OF THE EXCHANGE ACT §10(B) CLASS**

## FIGURE 1

As defined in McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule 14A, on August 10, 2018, Performance Units (PSUs) awarded in 2017 or earlier were defined and illustrated as follows:

> Performance Units. Performance units are intended to align the NEOs' interests with those of our stockholders, with a focus on long-term results. The performance units awarded in 2017 are structured to be paid out, if at all, in shares of McDermott common stock, cash equal to the fair market value of the shares otherwise deliverable, or any combination thereof, at the sole discretion of the Compensation Committee, at the end of a three-year performance period, to the extent the applicable performance goals are met. Relative return on average invested capital, or ROAIC, was used as the performance metric for the performance units granted in 2017, as the Compensation Committee believed that this metric tied specifically to our strategy of appropriately investing capital to grow the business. The number of performance units earned is determined based on both (1) our average ROAIC, and (2) our relative ROAIC improvement as compared to a competitor peer group comprised of both domestic and international peers, in each case over the three-year performance period. Based on this performance, up to 200% of a participant's target award may be earned, with earned awards between the amounts shown calculated by linear interpolation. We compute McDermott's ROAIC improvement by subtracting McDermott's 2016 ROAIC from the three-year performance period average ROAIC. Similar calculations are done for each member of the competitor peer group, following which the median competitor peer group ROAIC improvement is calculated. The amount by which McDermott's ROAIC improvement exceeds the competitor peer group median ROAIC improvement determines whether the threshold, target or maximum earned award is achieved.

| Performance Level | MDR 3-Year Average ROAIC — Amount by which MDR ROAIC Improvement Exceeds Competitor Peer Group Median ROAIC Improvement | < 6% Earned Award | ≥ 6% and < 10% Earned Award | ≥ 10% Earned Award |
|---|---|---|---|---|
| Maximum | ≥ 6% | 50% | 200% | 200% |
| Target | 2% | 50% | 100% | 100% |
| Threshold | 0% | 50% | 50% | 50% |
| | < 0% | 0% | 0% | 50% |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES
LAWS ON BEHALF OF THE EXCHANGE ACT §10(B) CLASS**

## FIGURE 2

As defined in McDermott's Definitive Proxy Statement filed with the SEC on Form DEF

14A, Schedule 14A, on March 22, 2019, Performance Units (PSUs) awarded in 2018 or later

were defined and illustrated as follows:

> Performance Units. Performance units are intended to align the NEOs' interests
> with those of our stockholders, with a focus on long-term results. The number of
> performance units awarded in 2018 which will ultimately be earned and vest, if
> any, will be determined with (1) 50% based on aggregate consolidated order
> intake for the performance period from July 1, 2018 through December 31, 2020,
> and (2) 50% based on McDermott's relative total shareholder return as compared
> to the Performance Peer Group (as defined on page 53 of this CD&A) for the
> performance period from May 10, 2018 through December 31, 2020.
>
> The Compensation Committee identified order intake as a performance metric for
> 50% of the 2018 performance unit awards based on its belief that this metric ties
> specifically to McDermott's strategy of positioning itself for future growth by
> capitalizing on its robust revenue opportunity pipeline and growing end markets.
> The Compensation Committee also believes the performance units should remain
> highly sensitive to McDermott's stock price, in order to further align
> management's interests with those of our stockholders, and, accordingly,
> identified relative total shareholder return as the performance metric for the
> remaining 50% of the 2018 performance unit awards. For the 50% portion of the
> 2018 performance units based on aggregate consolidated order intake, up to 150%
> of a participant's target award may be earned, and for the 50% portion of the 2018
> performance units based on relative total shareholder return, up to 200% of a
> participant's target award may be earned, to further the alignment of
> management's interests with those of our stockholders. If earned, 2018
> performance units are structured to be paid out in shares of McDermott common
> stock, cash equal to the fair market value of the shares otherwise deliverable, or
> any combination thereof, at the sole discretion of the Compensation Committee.

The earned award with respect to the aggregate consolidated order intake metric over the performance period from July 1, 2018 through December 31, 2020 will be determined as follows:

| Performance Level* | Earned Award |
|---|---|
| Maximum | 150% |
| Target | 100% |
| Threshold | 50% |
|  | 0% |

\* Due to the nature of our business, order intake goals are competitively sensitive and therefore are not disclosed. The performance goals were established based on McDermott's internal forecast.

The earned award with respect to the relative total shareholder return metric over the performance period from May 10, 2018 through December 31, 2020 will be determined as follows:

| Total Shareholder Return Percentile Rank | Earned Award |
|---|---|
| 90th Percentile | 200% |
| 50th Percentile | 100% |
| 25th Percentile | 50% |
| <25th Percentile | 0% |

149

## SUPPLEMENTAL CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Stefan Cowell, on behalf of the Nova Scotia Health Employees' Pension Plan ("NSHEPP"),

as Chief Executive Officer, with authority to enter into litigation on behalf of NSHEPP, make this declaration

pursuant to Section 27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or Section 21D(a)(2) of the

Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform

Act of 1995.

2.      I understand that by order dated June 4, 2019, the Court appointed NSHEPP as lead plaintiff

in the consolidated action *Edwards v. McDermott International, Inc., et al.*, 4:18-cv-04330 (S.D. Tex.) (the

"Action") for all claims related to Section 10(b) of the Exchange Act.  NSHEPP remains willing to serve as a

representative party for all such claims on behalf of a class of investors who purchased or acquired the

securities of McDermott International, Inc. ("McDermott") during the Class Period as specified in the Class

Action Complaint For Violation Of The Federal Securities Laws On Behalf Of The Exchange Act §10(b) Class

(the "§10(b) Complaint"), including providing testimony at deposition and trial, if necessary.

3.      I have reviewed the initial Complaint filed against McDermott and the pertinent lead plaintiff

filings in the Action, and, with authority to enter into litigation on behalf of NSHEPP, do hereby authorize the

filing of the §10(b) Complaint on behalf of NSHEPP.

4.      NSHEPP did not purchase or acquire McDermott securities at the direction of plaintiffs'

counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

5.      To the best of my current knowledge, the attached sheet lists all of NSHEPP's transactions in

McDermott securities during the revised Class Period as specified in the §10(b) Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, in

addition to this Action, NSHEPP has sought to serve as a representative party on behalf of a class under the

federal securities laws in the following actions:

- *Melucci v. Corcept Therapeutics Incorporated et al.*, 5:19-cv-01372 (N.D. Cal.);

- *In re Aegean Marine Petroleum Network Inc. Securities Litigation*, 1:18-cv-04993

(S.D.N.Y.); and

- *Shenk v. Mallinckrodt plc et al.*, 1:17-cv-00145 (D.D.C.).

7.     NSHEPP agrees not to accept any payment for serving as a representative party on behalf of the class as set forth in the §10(b) Complaint, beyond its *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.     I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, information, and belief.

**Executed: September 19th, 2019**

_____
Stefan Cowell
Chief Executive Officer
Nova Scotia Health Employees' Pension Plan

2

**Schedule A to Supplemental Certification of Nova Scotia Health Employees' Pension Plan**
**List of Purchases and Sales During Class Period of 12/18/2017 - 9/17/2019**

**McDermott International, Inc. (MDR)**

| Date | Purchase or Sale | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| 5/14/2018 | Purchase | 25,052 | $20.6700 |
| 5/14/2018 | Sale | 1 | $21.9640 |