# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MIRIAM EDWARDS, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:18-cv-04330 |
| McDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE, | § § § | |
| Defendants. | § § | |

# DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S § 10(b) CORRECTED CLASS ACTION COMPLAINT

TABLE OF CONTENTS

Table of Authorities ................................................................................................ iii

Introduction .......................................................................................................... 1

Argument .............................................................................................................. 2

    I.      The CCAC's Challenged Statements are non-actionable. ........................... 2

         A.     Many Challenged Statements are non-actionable puffery. ................ 2

         B.     The balance of the Challenged Statements are non-actionable opinions. ................................................................................................ 5

         C.     The Technology and Liquidity Statements are non-actionable. ........ 9

    II.     The CCAC fails for lack of particularized scienter allegations. ................ 10

         A.     Plaintiff cannot escape the utter implausibility of its basic theory. ............................................................................................... 11

         B.     The CCAC's scienter allegations do not salvage its implausibility. ..................................................................................... 16

              1.     The executive compensation allegations add nothing to scienter. .................................................................................. 16

              2.     The CCAC alleges no suspicious or probative "insider trading." .................................................................................. 18

              3.     The "raising funds" allegations are doubly flawed. .............. 23

              4.     The CW allegations do not give rise to an inference of scienter. .................................................................................. 24

              5.     The "due diligence," "red flags/SOX certifications/continued improprieties," "core operations," and "code of conduct" allegations add nothing to scienter. ............................................................ 28

         C.     Plaintiff's effort to "bolster" its scienter allegations fails. ............... 33

Conclusion ......................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abrams v. Baker Hughes Inc.*,
292 F.3d 424 (5th Cir. 2002) ................................................................... 20, 24, 29, 35

*Alaska Elec. Pension Fund v. Asar*,
768 F. App'x 175 (5th Cir. 2019) ......................................................... 21, 23

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
915 F.3d 975 (5th Cir. 2019) .......................................................................... 23

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ............................................................................ 4

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ................................................................. 14

*Applestein v. Medivation, Inc.*,
2011 WL 3651149 (N.D. Cal. Aug. 18, 2011) ........................................... 20

*Barrie v. Intervoice-Brite*,
397 F.3d 249 (5th Cir. 2005) ................................................... 16, 26, 27, 31

*Baum v. Harman Int'l Indus., Inc.*,
408 F. Supp. 3d 70 (D. Conn. 2019) ............................................................ 9

*Berger v. Compaq Comput. Corp.*,
1999 WL 33620108 (S.D. Tex. Dec. 22, 1999) ....................................... 21

*Blue Chip Stamps v. Manor Drug Stores*,
421 U.S. 723 (1975) ...................................................................................... 19

*Branca v. Paymentech, Inc.*,
2000 WL 145083 (N.D. Tex. Feb. 8, 2000) ............................................... 12

*Brody v. Zix Corp.*,
2006 WL 2739352 (N.D. Tex. Sept. 26, 2006) ......................................... 21

*Brophy v. Jiangbo Pharm., Inc.*,
781 F.3d 1296 (11th Cir. 2015) .................................................................. 34

*Carlton v. Cannon*,
184 F. Supp. 3d 428 (S.D. Tex. 2016) .................................................. 18, 33

*Cent. Laborers' Pension Fund. v. Integrated Elec. Servs. Inc.*,
  497 F.3d 546 (5th Cir. 2007) ................................................................ 18, 19

*Chamberlain v. Reddy Ice Holdings, Inc.*,
  757 F. Supp. 2d 683 (E.D. Mich. 2010) .............................................. 33

*City of Pontiac Gen. Emps Ret. Sys. v. Lockheed Martin Corp.*,
  875 F. Supp. 2d 359 (S.D.N.Y. 2012) .................................................... 4

*City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*,
  442 F. App'x 672 (3d Cir. 2011) ............................................................ 11

*Coates v. Heartland Wireless Commc'ns, Inc.*,
  100 F. Supp. 2d 417 (N.D. Tex. 2000) .................................................... 1

*Coates v. Heartland Wireless Commc'ns, Inc.*,
  26 F. Supp.2d 910 (N.D. Tex. 1998) ................................................ 15, 20

*Congregation of Ezra Sholom v. Blockbuster, Inc.*,
  504 F. Supp. 2d 151 (N.D. Tex. 2007) .............................................. 12, 14

*Darquea v. Jarden Corp.*,
  2007 WL 1610146 (S.D.N.Y. May 31, 2007) ........................................ 4

*Davidoff v. Farina*,
  2005 WL 2030501 (S.D.N.Y. Aug. 22, 2005) ...................................... 11

*Dutton v. D&K Healthcare Res.*,
  2006 WL 1778884 (E.D. Mo. June 23, 2006) ........................................ 4

*Fadem v. Ford Motor Co.*,
  352 F. Supp. 2d 501 (S.D.N.Y. 2005) .................................................... 11

*Fin. Acquisition Partners LP v. Blackwell*,
  440 F.3d 278 (5th Cir. 2006) ............................................................ 9, 31

*Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*,
  147 F. Supp. 3d 493 (E.D. La. 2015) .................................................... 14

*Fla. State Bd. Of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001) ................................................................ 16

*Freudenberg v. E*Trade Fin. Corp.*,
  712 F. Supp. 2d 171 (S.D.N.Y. 2010) .................................................... 5

*Gamboa v. Citizens, Inc.*,
2018 WL 2107205 (W.D. Tex. May 7, 2018) ............................................................ 29

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ................................................................ 16, 29, 31

*Heck v. Orion Grp. Holdings, Inc.*,
2020 WL 3403111 (S.D. Tex. June 19, 2020) ......................................................... 35

*Hering v. Rite Aid Corp.*,
331 F. Supp. 3d 412 (M.D. Pa. 2018) ..................................................................... 6

*Hutchinson v. Perez*,
2012 WL 5451258 (S.D.N.Y. Nov. 8, 2012) ........................................................... 34

*In re Advance Auto Parts, Inc., Sec. Litig.*,
2020 WL 599543 (D. Del. Feb. 7, 2020) ................................................................. 19

*In re AmTrust Fin. Servs., Inc. Sec. Litig.*,
2019 WL 4257110 (S.D.N.Y. Sept. 9, 2019) ............................................................ 6

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................. 25, 27, 28, 30, 31

*In re Azurix Corp. Sec. Litig.*,
198 F. Supp. 2d 862 (S.D. Tex. 2002) ..................................................................... 3

*In re Baker Hughes Sec. Litig.*,
136 F. Supp. 2d 630 (S.D. Tex. 2001) ............................................................... 11, 12

*In re BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Tex. May 31, 2016) ........................................................ 6, 7

*In re BP p.l.c. Sec. Litig.*,
843 F. Supp. 2d 712 (S.D. Tex. 2012) .................................................................... 23

*In re Capstead Mortg. Corp. Sec. Litig.*,
258 F. Supp. 2d 533 (N.D. Tex. 2003) ................................................................... 17

*In re Cardinal Health Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................. 16, 19

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) .......................................................... 27

*In re Dell Inc., Sec. Litig.*,
   591 F. Supp. 2d 877 (W.D. Tex. 2008) .......................................................... 25

*In re Dr. Reddy's Lab. Ltd. Sec. Litig.*,
   2019 WL 1299673 (D.N.J. Mar. 21, 2019) ........................................................ 5

*In re Elec. Data Sys. Corp. Sec. & ERISA Litig.*,
   298 F. Supp. 2d 544 (E.D Tex. 2004) ........................................................... 32

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   258 F. Supp. 2d 576 (S.D. Tex. 2003) ...................................................... 10, 18

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ........................................................ 2, 23

*In re Franklin Bank Corp. Sec. Litig.*,
   782 F. Supp. 2d 364 (S.D. Tex. 2011) .......................................................... 29

*In re Gander Mountain Co. Sec. Litig.*,
   2006 WL 140670 (D. Minn. Jan. 17, 2006) ................................................... 14

*In re Key Energy Servs., Inc. Sec. Litig.*,
   166 F. Supp. 3d 822 (S.D. Tex. 2016) ..................................................... 33, 35

*In re Keyspan Corp. Sec. Litig.*,
   383 F. Supp. 2d 358 (E.D.N.Y. 2003) .......................................................... 20

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
   667 F.3d 1331 (10th Cir. 2012) .................................................................... 4

*In re Life Partners Holdings, Inc.*,
   926 F.3d 103 (5th Cir. 2019) ...................................................................... 10

*In re Lions Gate Entm't Corp. Sec. Litig.*,
   165 F. Supp. 3d 1 (S.D.N.Y. 2016) ............................................................. 34

*In re Philip Morris Int'l Inc. Sec. Litig.*,
   437 F. Supp. 3d 329 (S.D.N.Y. 2020) ............................................................ 6

*In re Plains All Am. Pipeline, L.P., Sec. Litig.*,
   245 F. Supp. 3d 870 (S.D. Tex. 2017) ........................................................ 8, 32

*In re Plains All Am. Pipeline, L.P. Sec. Litig.*,
   307 F. Supp. 3d 583 (S.D. Tex. 2018) .......................................................... 33

*In re Sec. Litig. BMC Software, Inc.*,
  183 F. Supp. 2d 860 (S.D. Tex. 2001) .......................................................... 19

*In re TETRA Techs., Inc. Sec. Litig.*,
  2009 WL 6325540 (S.D. Tex. July 9, 2009) .................................................. 6

*In re Toronto-Dominion Bank Sec. Litig.*,
  2018 WL 6381882 (D.N.J. Dec. 6, 2018) ........................................ 23, 27, 32

*In re Tyson Foods, Inc. Sec. Litig.*,
  275 F. Supp. 3d 970 (W.D. Ark. 2017) .......................................................... 23

*In re Wash. Mut., Inc. Sec., Deriv. & ERISA Litig.*,
  694 F. Supp. 2d 1192 (W.D. Wash. 2009) ...................................................... 5

*Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*,
  537 F.3d 527 (5th Cir. 2008) ................................... 16, 17, 20, 21, 22, 24, 31

*Iron Workers Benefit & Pension Fund v. Anadarko Petrol. Corp.*,
  788 F. App'x 268 (5th Cir. 2019) ................................................................. 23

*Izadjoo v. Helix Energy Sols. Grp., Inc.*,
  237 F. Supp. 3d 492 (S.D. Tex. 2017) .......................................................... 25

*Jackson v. Microchip Tech. Inc.*,
  2020 WL 1170843 (D. Ariz. Mar. 11, 2020) ................................................ 29

*Kaltman v. Key Energy Servs., Inc.*,
  447 F. Supp. 2d 648 (W.D. Tex. 2006) .......................................................... 10

*Kelly v. Elec. Arts, Inc.*,
  71 F. Supp. 3d 1061 (N.D. Cal. 2014) ............................................................ 4

*Kohut v. KBR, Inc.*,
  2015 WL 11995250 (S.D. Tex. Sept. 3, 2015) ......................................... 6, 30

*Kurtzman v. Compaq Comput. Corp.*,
  2002 WL 32442832 (S.D. Tex. Mar. 30, 2002)......................................... 3, 35

*Levy v. Gutierrez*,
  2017 WL 2191592 (D.N.H. May 4, 2017).................................................... 19

*Local 731 I.B. of T. Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*,
  810 F.3d 951 (5th Cir. 2016) ....................................................................... 15

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................. 4, 8, 11

*Magruder v. Halliburton Co.*,
  359 F. Supp. 3d 452 (N.D. Tex. 2018) ........................................................ 10

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
  513 F.3d 702 (7th Cir. 2008) .................................................................... 23

*Markman v. Whole Foods Mkt., Inc.*,
  2016 WL 10567194 (W.D. Tex. Aug. 19, 2016).................................... 10, 34

*Marksman Partners, L.P. v. Chantal Pharm. Corp.*,
  927 F. Supp. 1297 (C.D. Cal. 1996) .......................................................... 22

*McNulty v. Kanode*,
  2013 WL 12077503 (W.D. Tex. Nov. 6, 2013) ........................................... 34

*Melder v. Morris*,
  27 F.3d 1097 (5th Cir. 1994) .................................................................... 17

*Metzler Inv. GMBH v. Corinthian Colls., Inc.*,
  540 F.3d 1049 (9th Cir. 2008) .................................................................. 22

*MicroCapital Fund LP v. Conn's Inc.*,
  2019 WL 3451153 (S.D. Tex. July 24, 2019)....................................... 20, 34

*Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
  935 F.3d 424 (5th Cir. 2019) ........................................................ 13, 16, 17

*Neiman v. Bulmahn*,
  854 F.3d 741 (5th Cir. 2017) ................................ 23, 24, 25, 26, 32, 33, 34

*Nguyen v. New Link Genetics Corp.*,
  297 F. Supp. 3d 472 (S.D.N.Y. 2018)........................................................ 27

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
  575 U.S. 175 (2015) ......................................................................... 5, 8, 9

*Owens v. Jastrow*,
  789 F.3d 529 (5th Cir. 2015) ........................... 6, 19, 24, 25, 29, 30, 31, 32

*Peak v. Zion Oil & Gas, Inc.*,
  2020 WL 1047894 (N.D. Tex. Mar. 3, 2020) ............................................... 1

*Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*,
    499 F. App'x 345 (5th Cir. 2012) ................................................ 31

*Police Ret. Sys. of St. Louis v. Granite Constr. Inc.*,
    2020 WL 2559939 (N.D. Cal. May 20, 2020) ....................................... 6, 27

*Ranieri v. AdvoCare Int'l, L.P.*,
    336 F. Supp. 3d 701 (N.D. Tex. 2018) ........................................... 23

*Rok v. Identiv, Inc.*,
    2017 WL 35496 (N.D. Cal. Jan. 4, 2017) ......................................... 33

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .................................................. 2, 3

*Sanchez v. Centene Corp.*,
    407 F. Supp. 3d 831 (E.D. Mo. 2019) ............................................ 29

*Schieroni v. Deutsche Bank Nat'l Tr. Co.*,
    2011 WL 3652194 (S.D. Tex. Aug. 18, 2011) ...................................... 10, 33

*Schott v. Nobilis Health Corp.*,
    211 F. Supp. 3d 936 (S.D. Tex. 2016) ........................................... 35

*Shields v. Citytrust Bancorp, Inc.*,
    25 F.3d 1124 (2d Cir. 1994) .................................................... 15

*Sjunde AP-Fonden v. Gen. Elec. Co.*,
    417 F. Supp. 3d 379 (S.D.N.Y. 2019) ............................................ 7

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ............................................ 3, 8, 18, 23, 25

*Spitzberg v. Houston Am. Energy Corp.*,
    758 F.3d 676 (5th Cir. 2014) ................................................... 26, 29

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ........................................................ 1, 11, 25

*Thornton v. Micrografx, Inc.*,
    878 F. Supp. 931 (N.D. Tex. 1995) .............................................. 15, 20

*United States v. Skilling*,
    554 F.3d 529 (5th Cir. 2009) ................................................... 3

*Utesch v. Lannett Co., Inc.*,
   316 F. Supp. 3d 895 (E.D. Pa. 2018) ............................................................. 35

*Van Noppen v. InnerWorkings, Inc.*,
   136 F. Supp. 3d 922 (N.D. Ill. 2015) ............................................................. 17

*Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*,
   2016 WL 1261135 (S.D.N.Y. Mar. 30, 2016) ................................................. 6

*Wilson v. LSB Indus., Inc.*,
   2017 WL 7052046 (S.D.N.Y. Mar. 2, 2017) ................................................... 6

## INTRODUCTION[1]

The Opposition cannot salvage the non-actionable nature of the Challenged Statements—which range from classic corporate puffery, to opinions lacking the necessary *Omnicare* predicates, to statements that were not even allegedly false. The CCAC should be dismissed for lack of an actionable statement under the traditional 12(b)(6) standard.

"But this is no normal complaint, and thus no normal motion to dismiss." *Peak v. Zion Oil & Gas, Inc.*, 2020 WL 1047894, at *3 (N.D. Tex. Mar. 3, 2020). It is a securities-fraud claim that must meet not only Rule 9(b)'s strictures, but also the added rigor of the PSLRA. The PSLRA was designed to make it "substantively harder for plaintiffs to bring securities fraud cases," *Coates v. Heartland Wireless Commc'ns, Inc.*, 100 F. Supp. 2d 417, 422 (N.D. Tex. 2000), and requires a particularized, "strong inference" of scienter that is "cogent and at least as compelling" as competing, nonculpable inferences. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Cognizant of those burdens and the implausibility of its basic theory—that Defendants would willingly acquire a company they knew was destined for more than a billion dollars in cost overruns—Plaintiff tries first to disavow the CCAC's substance and then to overwhelm the Court with boilerplate scienter accusations—both pleaded and not pleaded—that fall flat under Fifth Circuit precedent.[2]

Equally telling is Plaintiff's approach to the caselaw. Recognizing that "the Fifth

---

[1] Capitalized terms have the same meanings as in Defendants' motion to dismiss, and all quotations from cited material have been omitted. All emphases and alterations are as they appear in the original sources.

[2] Consistent with its volumetric approach, Plaintiff appears to have set its line-spacing at "Exactly 24," rather than the double-spacing the Court requires, Ct. Proc. 7A. Doing so gave Plaintiff an extra two lines per page and 2,675 words (nearly 14%) more than Defendants' motion—*not counting* the ten extra pages Plaintiff requested and was granted.

Circuit is a difficult venue in which to plead and prosecute securities class actions based on § 10(b) claims," *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 794 (S.D. Tex. 2008), the Opposition pays a stunning lack of attention to the binding in-circuit authority detailed in Defendants' motion—burying much of it in footnotes and relying principally on out-of-circuit authority for key points. Under the controlling standards, however, the CCAC should be dismissed for lack of particularized scienter allegations, like so many that have come before it. *See* Mot. 34 n.15 (collecting cases).

ARGUMENT

I.      **The CCAC's Challenged Statements are non-actionable.**

        A.      **Many Challenged Statements are non-actionable puffery.**

Plaintiff starts by incorrectly suggesting that Defendants should have *separately* analyzed and explained why each Challenged Statement is puffery. Opp. 38. But courts routinely do as Defendants did—evaluate puffery based on categories and representative examples. *See, e.g.*, *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003) (dismissing "[t]he generalized, positive statements about the company's competitive strengths, experienced management, and future prospects" without statement-by-statement analysis). Plaintiff also incorrectly characterizes Defendants' appendix as a "second, spillover brief" that adds 83 pages of "legal argument," Opp. 39 n.24, when the appendix merely collects for the Court's convenience the publicly available statements quoted in the CCAC and adds one-word labels corresponding to the categories discussed in the motion.

On the merits, Plaintiff's out-of-circuit cases (many of which do not even mention puffery) and easily distinguishable in-circuit cases cannot overcome the reality that the

Fifth Circuit and courts in this District routinely categorize statements like those in the CCAC as puffery and dismiss associated fraud claims.[3]

<u>Post-Merger Company:</u> Defendants' motion highlighted Judge Lake's *Azurix* opinion, which the Fifth Circuit affirmed, to show how vaguely touting business prospects is mere puffery. Mot. 20 (citing 198 F. Supp. 2d at 881–82). Plaintiff responds as if Judge Lake and the Fifth Circuit silently reversed course a few years later in *United States v. Skilling*, 554 F.3d 529, 553 (5th Cir. 2009) (affirming Lake, J.), *aff'd in part, vacated in part on other grounds*, 561 U.S. 358 (2010), which held certain optimistic statements not to be puffery. Opp. 39. Not so. *Skilling*—which affirmed the criminal conviction of the former Enron CEO in the wake of perhaps the most infamous corporate fraud in American history—involved "statements . . . *strongly contrary* to verifiable *historical* facts." 554 F.3d at 554 (emphases added).[4] The statements here, *e.g.*, Mot. 20 (collecting statements), were far vaguer and thus more like those in *Azurix*.

<u>Synergies, Backlog, Cash Accretive, & Capital Structure:</u> As courts in this District have long recognized: "[m]erging companies always predict . . . that they will achieve 'synergies' from the combination. Reasonable investors know better than to rely on these statements, which are all too familiar to market observers." *Kurtzman v. Compaq Comput. Corp.*, 2002 WL 32442832, at *17 (S.D. Tex. Mar. 30, 2002). Plaintiff ignores that and

---

[3] *E.g.*, *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372, 374–75, 377–78, 380 (5th Cir. 2004) (holding statements were non-actionable puffery); *Rosenzweig*, 332 F.3d at 859, 869–70 (same); *In re Azurix Corp. Sec. Litig.*, 198 F. Supp. 2d 862, 870–71 (S.D. Tex. 2002) (Lake, J.) (same); *see* Mot. 20–24 (collecting statements).

[4] For instance, Skilling claimed EBS had "essentially strong growth on the intermediation side, strong growth on the content services side, in terms of people, budgets, the whole thing," when in fact "EBS had an unsupportable cost structure, was losing money, was reducing the number of its employees, and had few customers or profitable deals." 554 F.3d at 554.

instead cites a case that did not involve a merger, much less synergies. *See Lormand v. US Unwired, Inc.*, 565 F.3d 228, 249 (5th Cir. 2009) (alleged misstatements about benefits of program marketed to those with subprime credit). Plaintiff's other cited case does not even address puffery at all. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 224 (5th Cir. 2009) (merely noting earlier denial of motion to dismiss without approval or disapproval). Plaintiff's out-of-district cases fare no better.[5]

Due Diligence: Plaintiff concedes that the "CCAC does not allege that the scope or sufficiency of diligence was misrepresented." Opp. 42 n.31.

De-risking, Progress, & Integration: Plaintiff discounts *Kelly v. Electronic Arts, Inc.*, 71 F. Supp. 3d 1061, 1070 (N.D. Cal. 2014), based on its so-called "context of risks of potential technological defects." Opp. 42 n.30. But Plaintiff never explains why "de-risking" in *this* context means anything different than the vague, commonsense meaning ascribed in *Kelly*—"improv[ing]" trouble spots in complex projects. 71 F. Supp. 3d at 1070. Plaintiff then turns to *In re Level 3 Communications, Inc. Securities Litigation*, but it held that numerous statements resembling the Challenged Statements were puffery. *Compare* 667 F.3d 1331, 1340 (10th Cir. 2012) (deeming puffery: "The integration of all the acquired companies is progressing well and we're beginning to see the benefits of synergies from

---

[5] In *City of Pontiac General Employees Retirement System v. Lockheed Martin Corp.*, the defendant claimed a key division "was doing well, *had no performance issues*, had a 'solid backlog,' and had a strong 'win rate' driving its performance," 875 F. Supp. 2d 359, 366 (S.D.N.Y. 2012) (emphasis added)—a far cry from Defendants' optimistic expectations for the post-Merger company, including its projected backlog, and vague post-Merger statements about acquired backlog. *E.g.*, CCAC ¶ 181 ("We remain confident in the fundamental soundness of the acquired backlog."). *Darquea v. Jarden Corp.*, 2007 WL 1610146, at *2 (S.D.N.Y. May 31, 2007), cited once in the last 13 years, did not address whether the statement "[t]he transaction is expected to be immediately accretive to earnings" was puffery. And *Dutton v. D&K Healthcare Resources*, 2006 WL 1778884, at *7 (E.D. Mo. June 23, 2006), did not mention puffery or discuss the "improved capital structure" statement, which appears only in one of many block-quoted statements analyzed.

those transactions"; "The overall integration effort is tracking within expectations in this regard[.]"), *with* Mot. 23–24 (describing similar statements). And Plaintiff closes with cases that are substantively distinguishable[6] or have nothing to do with de-risking.[7]

## B.     The balance of the Challenged Statements are non-actionable opinions.

As Defendants' motion explained, Mot. 24–32, many Challenged Statements fail under the Supreme Court's heightened rubric for opinion statements in *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015). Plaintiff incorrectly claims that Defendants "argue that their *every* statement over a two-year period" was an opinion, Opp. 43 (emphasis added), when Defendants' appendix plainly categorized as opinions only the "*challenged portion(s)*" of the quoted statements. Mot. App'x A (emphasis added). Plaintiff also repeats its baseless "puzzle pleading" accusation but ignores the countless pages that engaging in a statement-by-statement opinion analysis would have required due to *Plaintiff*'s choice to challenge nearly every subjective assertion Defendants made about the Merger. *Supra* 2.

On the substance, Plaintiff suggests that *Omnicare* does not apply because accounting estimates, including percentage-of-completion projections, are not opinions.

---

[6] Plaintiff cites two distinguishable, out-of-circuit cases in which financial institutions falsely represented that they had decreased their risk profile for mortgage lending in the lead up to the 2008 financial crisis. In *Freudenberg v. E*Trade Financial Corp.*, 712 F. Supp. 2d 171, 190 (S.D.N.Y. 2010), the court found that "statements touting risk management were . . . juxtaposed against detailed factual descriptions of the Company's woefully inadequate or non-existent credit risk procedures." The more relevant holding from Plaintiff's other case, *In re Washington Mutual, Inc. Securities, Derivative & ERISA Litigation*, 694 F. Supp. 2d 1192, 1215 (W.D. Wash. 2009), is that the statement "[the bank] acted in a 'prudent manner' with regard to higher-margin mortgage products" was "too vague to be considered a material misstatement." *Id.* at 1211; *compare* CCAC ¶ 198(b) ("So *we've taken a very, what I'd call, prudent position with regards to productivity.*").

[7] *E.g.*, *In re Dr. Reddy's Lab. Ltd. Sec. Litig.*, 2019 WL 1299673, at *11 (D.N.J. Mar. 21, 2019) (never addressing whether "de-risk" statements were puffery).

Opp. 43 n.35. But the Fifth Circuit has recognized the "subjective nature of the GAAP requirements" and referred to "accounting estimates" as "opinions." *Owens v. Jastrow*, 789 F.3d 529, 543–44 & n.14 (5th Cir. 2015); *see also Kohut v. KBR, Inc.*, 2015 WL 11995250, at *20 (S.D. Tex. Sept. 3, 2015) (quoting *Owens* on subjectivity of GAAP requirements in context of percentage-of-completion estimates). The same holds true for "[e]stimates and projections." *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779, at *8 (S.D. Tex. May 31, 2016).[8]

Plaintiff's two cases do not dictate otherwise. *Police Retirement System of St. Louis v. Granite Construction Inc.* involved "statements misrepresent[ing] *existing*, rather than future, overruns." 2020 WL 2559939, at *5 (N.D. Cal. May 20, 2020); *compare*, *e.g.*, CCAC § V.E. (discussing "undisclosed *forecasted* costs") (emphasis added). And *In re TETRA Technologies, Inc. Securities Litigation*, a pre-*Omnicare* case dealing with the PSLRA safe-harbor, simply found that "purported distortions in *past* numbers" were "not forward-looking." 2009 WL 6325540, at *29 (S.D. Tex. July 9, 2009) (emphasis added).

Plaintiff identifies a few more statements that it claims "lack indicia of an 'opinion.'" Opp. 44 & n.36. But each one either contains the sort of subjective, evaluative characteristics classic of opinion statements[9] or lacks allegations as to *why* it was false

---

[8] *See also Wilson v. LSB Indus., Inc.*, 2017 WL 7052046, at *1 (S.D.N.Y. Mar. 2, 2017) (concluding that statements regarding "cost and schedule estimates" were opinions).

[9] *Compare*, *e.g.*, CCAC ¶142(d) ("*Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement.*"), *with In re Philip Morris Int'l Inc. Sec. Litig.*, 437 F. Supp. 3d 329, 352 (S.D.N.Y. 2020) ("evidence collected to date is very encouraging, in terms of individual risk reduction potential" was statement of "subjective optimism"); *compare* CCAC ¶ 145(a) ("***Freeport is currently stabilized and profitable.***"), *with In re AmTrust Fin. Servs., Inc. Sec. Litig.*, 2019 WL 4257110, at *27 (S.D.N.Y. Sept. 9, 2019) ("warranty contract business was strong, growing, stable, performing well" was "speaker's subjective assessment of the business line and accordingly [we]re statements of opinion"); *compare* CCAC ¶198(b) ("*[O]n Cameron, we've done the cost estimate based on a number of methodologies from top down, bottom up, having the teams…really spending time and building up the cost and schedule.*"), *with Waterford Twp. Police & Fire Ret. Sys. v. Reg'l Mgmt. Corp.*, 2016 WL 1261135, at *7 (S.D.N.Y. Mar. 30, 2016) ("we will begin to get our arms around those . . . issues" deemed opinion); *compare* CCAC ¶ 204 ("***the project continues to progress well and in line with the schedule***"), *with Hering v. Rite*

(which is itself fatal).[10] All reflect the sort of "uncertainty or personal judgment" that renders them opinions subject to *Omnicare*, even though "unadorned with . . . express language" like "feel" or "believe." *In re BP*, 2016 WL 3090779, at *8.

<u>Subjective Disbelief:</u> Plaintiff recasts its subjective-disbelief allegation as merely "that [Dickson and Spence] knew [the Merger] was far riskier and subject to far greater undisclosed costs, write-downs, and/or risks than publicly disclosed." Opp. 45. That revisionist tactic, as discussed in more detail below for the overlapping scienter issue, *infra* 12–15, is fundamentally inconsistent with many allegations in the CCAC, including:

| Challenged Statement | Necessarily Alleged Belief |
|---|---|
| "***We also expect the combination will generate substantial cost and revenue synergies***." CCAC ¶ 139(a). | We do *not* expect the Merger to generate substantial cost and revenue synergies |
| "Everything is fixable." *Id.* ¶143(a). | Everything is *not* fixable. |
| "We believe that" the Merger will "***deliver compelling value***." *Id.* ¶ 168. | We do *not* believe the Merger will deliver compelling value. |
| "***After the Combination, McDermott expects to have a strong capital structure***." *Id.* ¶ 279. | We do *not* expect the Merger to result in a strong capital structure. |

For those Challenged Statements to be subjectively false, Dickson and Spence would have needed to *believe* the Merger would be unsuccessful and the Focus Projects unsalvageable.

The caselaw confirms that mere knowledge of negative information does not—as Plaintiff seems to suggest, Opp. 45—make for subjective falsity. Instead, a speaker needs to actually *believe* the contrary information. *See Sjunde AP-Fonden v. Gen. Elec. Co.*, 417

---

*Aid Corp.*, 331 F. Supp. 3d 412, 427 (M.D. Pa. 2018) ("statements that the review process was progressing as expected . . . reflect the subjective analysis of the Defendants").

[10] *E.g.*, CCAC ¶ 145(c) ("*[O]n the disclosure given by CB&I… all of it is within our evaluation that we did during this due diligence period.*"); ¶ 180 ("*The [cost] increases are within the bounds of the scenarios we contemplated during our due diligence.*").

F. Supp. 3d 379, 396 (S.D.N.Y. 2019) (collecting cases where "defendants allegedly possess[ed] facts which should have led them to make further inquiry, but which, without more, d[id] not sufficiently allege that the individuals disbelieve their stated opinions") (first alteration in original). As Defendants noted, the CCAC alleges no facts indicating that Dickson and Spence not only knew about the contrary, project-level projections, but accepted them and believed McDermott could not turn the projects around. Mot. 26–27. Plaintiff does not address this critical point.

Omitted Contrary Facts: Plaintiff's real claim remains under *Omnicare*'s omission prong.[11] But the Opposition fails to explain why omitting the alleged contrary "facts"— internal, project-level cost forecasts and risk projections—gives rise to *Omnicare* liability. Mot. 28–32. Plaintiff does not contest the need for particularized allegations of "each individual defendant's knowledge of material facts inconsistent with the subject opinion," Mot. 28 (quoting *In re Plains All Am. Pipeline, L.P., Sec. Litig.*, 245 F. Supp. 3d 870, 908, (S.D. Tex. 2017)), yet fails to provide such particularized allegations through its CW accounts. *Infra* 24–28.

As for "hedges, disclaimers, and apparently conflicting information" that further militate against *Omnicare* omission liability, 575 U.S. at 190 n.8, Plaintiff cites only cases dealing with the PSLRA's safe-harbor and derides the cautionary language here as "generic and formulaic." Opp. 47 (citing, *e.g.*, *Southland*, 365 F.3d at 372; *Lormand*, 565 F.3d at

---

[11] Although it references *Omnicare*'s inquiry prong, Plaintiff's theory is decidedly not of the inquiry variety. Such a theory requires the "absence" of an inquiry, *Omnicare*, 575 U.S. at 188, and Plaintiff repeatedly trumpets the extensiveness of Defendants' diligence and Dickson and Spence's purported knowledge. *E.g.*, Opp. 1.

245). That is, Plaintiff improperly conflates a safe-harbor analysis with an *Omnicare* inquiry (all while ignoring McDermott's robust, project-specific risk disclosures, *see* Defs.' § 14(a) Reply Br. 17–18 (discussing safe harbor)). Plaintiff's "boilerplate language" argument "*does not apply* to plaintiff's claim that defendants omitted a material fact, which . . . is governed by *Omnicare* rather than the body of law regarding forward-looking statements." *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 82 (D. Conn. 2019) (emphasis added). What matters for *Omnicare* is whether the disclaimers sufficiently diminished any certainty gleaned from an opinion. The disclosures did just that, rendering Defendants' opinions far from "guarantee[s]." *Omnicare*, 575 U.S. at 188; Mot. 30–31.

Perhaps most telling, Plaintiff offers *no Omnicare* case treating as actionable the omission of lower-level forecasts that diverged from management's more optimistic outlook—despite Defendants having offered three such cases *rejecting* liability under those circumstances. Mot. 31–32 (collecting cases). Plaintiff's attempt to "distinguish[]" those cases by pointing to the industries involved (*e.g.*, "kitchenware," "energy production") amounts to ignoring them. Opp. 48 n.41. The Court should dismiss the opinion statements.

### C.     The Technology and Liquidity Statements are non-actionable.

Technology: Acknowledging that the CCAC does not allege that any of the Technology Statements were false, Opp. 29, Plaintiff argues only that those statements were somehow misleading for not also including a discussion of the problems with the entirely separate Focus Projects. That makes no sense and does not come close to stating a § 10(b) claim. *See Fin. Acquisition Partners LP v. Blackwell*, 440 F.3d 278, 290 (5th Cir. 2006) (§ 10(b) plaintiff must allege that statement was "false  or misleading when made").

Liquidity: Plaintiff fails to distinguish the cases holding that statements about having "'plenty of' or 'considerable' liquidity" are "mere puffery." *See, e.g.*, *Magruder v. Halliburton Co.*, 359 F. Supp. 3d 452, 461–62 (N.D. Tex. 2018) ("statement that Halliburton could 'weather virtually any kind of a liquidity shortage' is just 'corporate cheerleading'"). Plaintiff cites *Kaltman v. Key Energy Services, Inc.*, 447 F. Supp. 2d 648, 661 (W.D. Tex. 2006), but the defendant there announced it would need to write down 22% of the value of its total fixed assets and *restate* "one or more prior years financial statements." *Id.* at 653, 659. No similar allegations exist here.[12]

## II.     The CCAC fails for lack of particularized scienter allegations.

Rule 9(b) requires particularized pleadings of the "who, what, when, where, and why as to the fraudulent conduct." *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 117 (5th Cir. 2019). Conspicuously missing here is a plausible answer to the last of those questions: Why would the Individual Defendants voluntarily acquire a company they *knew* had understated its upcoming costs by more than a billion dollars? Plaintiff's scienter inference is that the Individual Defendants did just that. That inference not only is economically irrational; it also pales in comparison to the nonculpable explanations: (1) the Individual Defendants did not know of the allegedly vastly higher forecasts, or (2) they knew of those forecasts but either disagreed with them or believed McDermott could turn

---

[12] Recognizing that its allegations do not cut it, Plaintiff tacks on an Item 303 claim that the CCAC never pleaded, even though "new allegations cannot be raised in response to a motion to dismiss." *Schieroni v. Deutsche Bank Nat'l Tr. Co.*, 2011 WL 3652194, at *6 (S.D. Tex. Aug. 18, 2011). Even if that claim were properly before the Court, it is one that courts in this Circuit have repeatedly found cannot serve as a basis for § 10(b) liability. *E.g.*, *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 258 F. Supp. 2d 576, 633 n.63 (S.D. Tex. 2003) (Harmon, J.) ("The Court agrees . . . that a violation of Item 303 does not establish a duty to disclose that may give rise to liability under § 10(b)."); *Markman v. Whole Foods Mkt., Inc.*, 2016 WL 10567194, at *10 (W.D. Tex. Aug. 19, 2016) (same).

the Projects around (as it had done before).

Plaintiff has no good answer for how its theory is the equally "compelling" one the PSLRA demands. *Tellabs*, 551 U.S. at 314. Instead, Plaintiff tries to recast the thrust of the CCAC to make it sound more palatable. But no amount of semantic massaging can fix the unfixable. Plaintiff also re-urges the CCAC's boilerplate scienter allegations and deficient CW statements, ignoring controlling Fifth Circuit authority and trying to pass off routine economic incentives as reason enough to torpedo the company. And Plaintiff tries to "bolster" the CCAC's allegations with additional contentions. None of these tactics works.

Plaintiff is right that scienter allegations are viewed collectively. Opp. 51. But that in no way diminishes the PSLRA-required "cogent" inference of "intentional deception" that must be "equally as compelling as any alternative inference." *Lormand*, 565 F.3d at 254. "[Z]ero plus zero [still] equals zero," and even "the *total* weight of [Plaintiff's] allegations" does not suffice. *City of Roseville Emps' Ret. Sys. v. Horizon Lines, Inc.*, 442 F. App'x 672, 675 (3d Cir. 2011).

**A.    Plaintiff cannot escape the utter implausibility of its basic theory.**

Courts consistently dismiss securities fraud theories that "def[y] economic reason[] and therefore do[] not yield a reasonable inference of fraudulent intent." *In re Baker Hughes Sec. Litig.*, 136 F. Supp. 2d 630, 644 (S.D. Tex. 2001), *aff'd*, 292 F.3d 424 (5th Cir. 2002); Mot. 36 & n.16.[13] And they have done so in the specific context of executives

---

[13] *See also, e.g., Davidoff v. Farina*, 2005 WL 2030501, at *11 n.19 (S.D.N.Y. Aug. 22, 2005) ("[I]t would have made no economic sense for defendants to invest literally billions of dollars in a venture that they knew would fail."); *Fadem v. Ford Motor Co.*, 352 F. Supp. 2d 501, 525 (S.D.N.Y. 2005) (rejecting theory that defendants engaged in "a recipe for economic disaster" they "thought . . . would enhance their bonuses"), *aff'd*, 157 F. App'x 398 (2d Cir. 2005).

pursuing deals they allegedly knew would harm the company. *See, e.g.*, *Branca v. Paymentech, Inc.*, 2000 WL 145083, at *10 (N.D. Tex. Feb. 8, 2000) (dismissing claim and agreeing "Defendants would not logically be motivated to push for a merger that they allegedly knew would cause significant harm to [the company] and its stock value").

Plaintiff relegates Defendants' five in-circuit cases on that issue to the last footnote on the last page of its brief, where it tries to distinguish them based on *other* scienter allegations in the cases. Opp. 75 n.81. But Plaintiff ignores the core holding in each—that an economically implausible scienter theory is anything but compelling. And the similarities between the scienter allegations in those cases and this one cannot be ignored:

- *Branca* also involved allegations regarding (1) executive compensation; (2) GAAP violations; (3) magnitude of errors in financials; (4) stock option compensation; and (5) executive's resignation. 2000 WL 145083, at *9–11.

- *Baker Hughes* also involved allegations regarding (1) desire to raise capital; (2) incentive compensation; (3) insider sales; (4) internal reports; and (5) GAAP violations. 136 F. Supp. 2d at 642–50.

- *Congregation of Ezra Sholom v. Blockbuster, Inc.* also involved allegations regarding (1) insider stock sales; (2) CW statements and internal reports; and (3) SOX certifications. 504 F. Supp. 2d 151, 165–66 (N.D. Tex. 2007)

The Opposition cites *no* case allowing a similar scienter pleading to escape dismissal.

Recasting of the CCAC: Lacking a plausible scienter theory, Plaintiff accuses Defendants of "hyperbolically distort[ing]" the CCAC. Opp. 74. Plaintiff claims it did not allege that Dickson and Spence knew "the Focus Projects would fail and the Merger would spell calamity," Mot. 27, but only that "the Focus Projects were far more over-budget, behind-schedule, and over-valued and that the Merger was far riskier than publicly disclosed." Opp. 74.

The CCAC tells a different story. It alleges Defendants knowingly concealed that "the Four Focus Projects were so far removed from forecasts that they were an *albatross* on the Technology Business and, if acquired, *McDermott's entire operations*" and would "drag[] the *whole of the business down*." CAC ¶¶ 5, 234 (emphases added). And it alleges knowledge of the Focus Project's "catastrophic" effect, including that they "*would* create an ongoing cash burn" and that massive charges "*would* be incurred"—not merely that those things "could" happen. *Id.* ¶¶ 8, 127, 131. Consider also the kinds of statements alleged to be subjectively "not believed," *id.* ¶ 398, and the inescapable implications of those allegations. *Supra* 7. Even Plaintiff's more anodyne spin does not change the CCAC's gist; saying Dickson and Spence "knew" the projects were "over-valued" by more than $1 billion is tantamount to knowing *CB&I* was overvalued by that sum. Opp. 74.

Ultimately, the cases reject Plaintiff's semantically reimagined scienter theory that the Merger was just "riskier" than disclosed. *Id.* By equating mere knowledge of contrary information with fraudulently concealing "riskiness," Plaintiff overlooks the holdings of the Fifth Circuit and others that knowledge of problems or contrary information "does *not* necessarily equate to knowledge of significant . . . risk"—in light of the competing "inference . . . that [executives] reasonably believed they could *fix* the . . . problem." *Mun. Emps.' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 432, 436 (5th Cir. 2019) (emphases added) (finding misguided optimism more plausible than illogical inference that "executives kept ordering more inventory when they supposedly knew deep down that they

would not be able to sell it").[14] "Misguided optimism is not a cause of action and does not support an inference of fraud." *Firefighters Pension & Relief Fund of the City of New Orleans v. Bulmahn*, 147 F. Supp. 3d 493, 529–30 (E.D. La. 2015) (rejecting scienter inference for optimistic liquidity statements despite CWs' internal disagreement), *aff'd*, 854 F.3d 741 (5th Cir. 2017). That is the takeaway from the analogous *Blockbuster* case, which found it "illogical and contrary to common sense to infer that two executives would believe that a new program would be disastrous, and nonetheless proceed," when there was no "indication that [they] *accepted* the [internal] models and proceeded nonetheless." 504 F. Supp. 2d at 166 (emphasis added). The CCAC must be dismissed for the same reason.

Pre- v. Post-Merger Theory: Plaintiff next suggests that even if it makes no sense that Dickson and Spence believed the Focus Projects would fail *before* the Merger, they surely did *after*, yet fraudulently concealed their knowledge. *See* Opp. 74 (asserting implausibility argument "only address[es] the pre-Merger period"). That fallback position is wholly inconsistent with the thrust of the CCAC: that Dickson and Spence *did* discover and *did* possess scienter during a litany of pre-Merger statements. CCAC ¶¶ 137–78. And it suffers from its own fatal flaws and far more cogent nonculpable inferences.

Consider what personal motive allegations remain after discarding Plaintiff's pre-Merger theory and the associated Merger bonus, peer-group raise, and position-retention

---

[14]*In re Gander Mountain Co. Sec. Litig.*, 2006 WL 140670, at *11 (D. Minn. Jan. 17, 2006) (dismissing § 10(b) claim, explaining that "if Defendants believed that [company's] strategy would be successful and that [company] would achieve the results projected . . . , then the projections *could not have been made with scienter*") (emphasis added); *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1238 (10th Cir. 2016) (dismissing § 10(b) claim when inference that "executives intentionally misrepresented or recklessly ignored economic realities" was "possible, but it [wa]s more probable that the [] executives were *overly optimistic* and failed to give adequate weight to financial red flags, for the plaintiffs supply *little reason to suspect malevolence rather than benign optimism*") (emphases added).

allegations (insufficient though they are, *infra* 16–23), Opp. 52–54—only Defendants'
purported "insider trading" gains. But the CCAC's own chart reveals that Dickson and
Spence sold precisely *zero* stock from when the Merger closed until February 26, 2019, by
which point McDermott had *already* disclosed $1.2 billion of the Focus Project charges
and its stock price had fallen from $20.70 to $8.61. CCAC ¶ 373. As explained more fully
below, *infra* 20–21, courts have dismissed as "nonsensical" "the notion that [an executive]
would engage in fraud and then wait for the stock price to plummet before selling his
securities without benefiting from the fraud." *Coates v. Heartland Wireless Commc'ns,
Inc.*, 26 F. Supp.2d 910, 920 (N.D. Tex. 1998).

Plaintiff gives no coherent reason to stray from those cases or the principle that "[i]t
is hard to see what benefits accrue from a short respite from an inevitable day of
reckoning." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994). The
converse inference—that Defendants *truthfully* disclosed cost overruns as they came to
understand them post-Merger—thus looms large over Plaintiff's supposition that Dickson
and Spence "committed fraud, they just weren't very good at it." *Thornton v. Micrografx,
Inc.*, 878 F. Supp. 931, 938 (N.D. Tex. 1995). Were Defendants "attempt[ing] to conceal"
forecasted cost overruns, disclosing $1.2 billion in charges in the three quarters after the
Merger would be an awfully "counterproductive" means of doing so. *Local 731 I.B. of T.
Excavators & Pavers Pension Tr. Fund v. Diodes, Inc.*, 810 F.3d 951, 960 (5th Cir. 2016).

Plaintiff's scienter theory—however rephrased, retooled, or revised—is therefore
far from cogent, much less at least as compelling as the competing inferences.

**B.    The CCAC's scienter allegations do not salvage its implausibility.**

**1.    The executive compensation allegations add nothing to scienter.**

Plaintiff tries desperately to get around the rule in this Circuit that "incentive compensation can hardly be the basis on which an allegation of fraud is predicated because the vast majority of corporate executives receive this type of compensation," *Pier 1*, 935 F.3d at 431, and only in "extraordinary" cases can such compensation be probative of scienter. *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 544 (5th Cir. 2008). Yet Plaintiff cites no case indicating that what amounts to a 75% base-salary bonus (50% guaranteed Merger bonus plus 25% peer-group raise) is sufficiently "extraordinary."[15] Instead, Plaintiff turns to *Barrie v. Intervoice-Brite*, 397 F.3d 249 (5th Cir. 2005), and *Goldstein v. MCI WorldCom*, 340 F.3d 238 (5th Cir. 2003), Opp. 52–54, both of which are self-distinguishing. *Barrie* involved a *175%* bonus and bona fide insider-trading allegations, 397 F.3d at 261, while *Goldstein* involved an executive who "stood to lose millions in compensation" and was incentivized to keep *$61 million* in personal loans from becoming due and payable—and even then, dismissal for lack of scienter was affirmed, 340 F.3d at 250. Thus, those cases involved a bonus that was "extremely high and other allegations support[ing] an inference of scienter." *Pier 1*, 935 F.3d at 431.[16]

This case has neither. The 75% bonuses are not "extremely high"; instead, they resemble the 65% bonuses *rejected* by the Fifth Circuit as non-probative in *Shaw*[17]—*i.e.*,

---

[15] Plaintiff evidently abandons its allegation about the *remaining* 50% performance bonus. Mot. 40–41.

[16] Plaintiff's out-of-circuit cases involve similarly extreme compensation. *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 736 (S.D. Ohio 2006) (four defendants "collected more than $245 million"); *Fla. State Bd. Of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 661 (8th Cir. 2001) (involving motive to receive $102 million bonus).

[17] *See Shaw Grp.*, No. 04-1685 (E.D. La. Nov. 3, 2015), ECF 137 ¶ 2 (alleging "cash payouts" starting at 65% of

ones that "while generous, were hardly extraordinary; as a motivation to commit fraud, they were minor." 537 F.3d at 544 (distinguishing *Barrie* and *Goldstein* as "extraordinary"). But even if they were extraordinary, they do not create a standalone inference of scienter, given the absence of "other [cognizable] allegations." *Pier 1*, 935 F.3d at 431; *see, e.g.*, *In re Capstead Mortg. Corp. Sec. Litig.*, 258 F. Supp. 2d 533, 564 (N.D. Tex. 2003) (dismissing § 10(b) claim notwithstanding motive allegations involving "$10 million in salaries, bonuses and DER-conversion proceeds").

Plaintiff also continues to strip the bonus figures of their surrounding context. Mot. 40–41. The bonuses seem meager by comparison to Dickson's and Spence's massive losses on their McDermott stock holdings. *See infra* 19; *Van Noppen v. InnerWorkings, Inc.*, 136 F. Supp. 3d 922, 944 (N.D. Ill. 2015) (rejecting scienter inference because "marginal bonus [defendants] would have received from committing securities fraud was not worth putting their fortunes and careers at stake"). Nor does Plaintiff have an answer for why Defendants would have passed up the Subsea 7 merger offer had they known of inherent problems at CB&I. Mot. 37. The best it can do is point to a supposed desire to "protect and enhance [one's] executive positions and substantial compensation and prestige" that courts have definitively rejected. *Melder v. Morris*, 27 F.3d 1097, 1102 (5th Cir. 1994). But that ignores that Dickson and Spence would have reaped *far greater* severance payments—more than $23 million and $7.4 million, respectively—had the Subsea 7 offer been accepted. *See* Mot. Ex. 24, 8/10/2018 MDR Proxy at 64 (listing "value of payments and benefits" payable

---

executives' salaries).

17

upon "change in control and termination as of December 31, 2017"). Thus, whether viewed in isolation or in context, the executive-compensation allegations add nothing to scienter.

### 2. The CCAC alleges no suspicious or probative "insider trading."

Plaintiff spills much ink on its allegations about Dickson's and Spence's stock sales—allegations that could only "enhance" a strong inference of scienter, not "create" one. *Cent. Laborers' Pension Fund. v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553 (5th Cir. 2007). Plaintiff labels their trading "suspicious" and draws heavily on out-of-circuit courts and their standards.[18] But missing is *this* Circuit's standard for when sales are "suspicious"—"only when dramatically out of line with prior trading practices at times calculated to maximize the personal benefit from undisclosed insider information." *Carlton v. Cannon*, 184 F. Supp. 3d 428, 481 (S.D. Tex. 2016) (quoting *Southland*, 365 F.3d at 368). Under it, Plaintiff cannot declare the Individual Defendants' trading as "ill-gotten gains," Opp. 32, without accounting for the following contextual realities:

- The Individual Defendants *increased* their total stock holdings over the Class Period, retaining more shares than they had when it started; as a result, they suffered a loss in stock value that dwarfed their purported "gains." Mot. 43.

- Their sales were anything but "at times calculated to maximize personal profit." Mot. 42, 46.

- Their pattern of exercising and selling stock options once they vested was far from "out of line" with past practices. Mot. 44–45.

<u>Retained Stock</u>: Plaintiff ducks the case-specific "[c]ontext [that] is critical to the analysis" of insider trading allegations, *Enron*, 258 F. Supp. 2d at 594, and picks battles

---

[18] For instance, Plaintiff references comparing stock sales to a defendant's salary, Opp. 58—an approach that has been applied elsewhere but *never* in the Fifth Circuit.

with strawmen. It points out that there are no "per se" rules that (1) "stock purchases negate any inference of scienter," Opp. 56 & n.57 (citing, *e.g.*, *In re Advance Auto Parts, Inc., Sec. Litig.*, 2020 WL 599543, at *8 (D. Del. Feb. 7, 2020)), or (2) "a defendant [must] sell all his stock" to have "scienter," *id.* at 56 & n.56 (citing, *e.g.*, *Levy v. Gutierrez*, 2017 WL 2191592, at *14 (D.N.H. May 4, 2017)).[19] But Defendants never said there were. Rather, they argued that the Individual Defendants' addition to and *net retention* of their holdings weigh against scienter *in the circumstances here*. Mot. 43. That is black letter Fifth Circuit law. *See, e.g.*, *Cent. Laborers'*, 497 F.3d at 553 ("continued ownership of a large amount of stock . . . indicates that [a defendant] did not possess scienter"); *see also Cardinal Health*, 426 F. Supp. 2d at 735 (cited at Opp. 56, explaining that "net acqui[sition] of shares by the end of the Class Period, points against, though does not wholly negate, a strong inference of [defendant's] scienter") (collecting cases).[20]

Plaintiff also claims that the downward spiral in the value of the stock the Individual Defendants retained cannot be considered a scienter-negating "loss, even colloquially," because it stems from purportedly "free" stock options (even though Plaintiff points exclusively to *sales* of those very options for its own theory). Opp. 55. That is wrong both practically and precedentially.[21] Dickson's and Spence's option-derived holdings were

---

[19] On this point, Plaintiff cites from *In re Securities Litigation BMC Software, Inc.*'s recitation of the plaintiff's argument as if it were the court's holding. Opp. 57 (citing 183 F. Supp. 2d 860, 912 (S.D. Tex. 2001)). In fact, the *BMC* court made no decision on insider trading and dismissed the claims. 183 F. Supp. 2d at 916–17.

[20] Plaintiff observes that *Owens* placed "little value" on a defendant's stock purchases, Opp. 56 n.57, but omits that the record there was "devoid of facts showing whether [the defendant] kept his holdings through the price drop—which *would* be some evidence of lack of scienter." 789 F.3d at 545 n.18 (emphasis added).

[21] Defendants' argument bears no resemblance to the claim rejected in *Blue Chip Stamps v. Manor Drug Stores*, Opp. 55, which dealt with statutory standing for § 10(b) *plaintiffs*. 421 U.S. 723 (1975).

19

hardly "free"; they were consideration for services rendered. *See Shaw*, 537 F.3d at 543 ("[E]xecutives are often paid in stock and stock options . . . ."). And, far from there being "no authority" on the topic, Opp. 55, numerous courts have reached the commonsense conclusion that similar, option-derived value losses weigh against scienter.[22]

Timing of the sales: Plaintiff points to its Appendix, but that simply lumps multiple months of statements and sales together, conspicuously omitting the price of those sales. Opp. App'x 1. A less superficial inquiry reveals that most of the sales occurred either (1) over *7 months before* the first alleged corrective disclosure in October 2018, or (2) *shortly after* the second alleged corrective disclosure (and significant stock price decline) in February 2019. *See MicroCapital Fund LP v. Conn's Inc.*, 2019 WL 3451153, at *16 (S.D. Tex. July 24, 2019), *R&R adopted*, 2019 WL 4673209 (Sept. 24, 2019) (sales "well before the . . . alleged corrective disclosures" negated scienter); *Coates*, 26 F. Supp. 2d at 920 (rejecting "notion that [executive] would engage in fraud and then wait for the stock price to plummet"). Thus, the problem is not that Dickson and Spence were not "perfectly prescient" or lacked a "crystal ball" in timing the Class Period high, *see* Opp. 60 (collecting cases); it is that their trading practices differ fundamentally from someone bent on profiting from the allegedly fraud-derived "inflated stock value." *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 434 (5th Cir. 2002); *see* Opp. 57 n.38 (conceding that *Thornton*, 878 F. Supp. at

---

[22] *See, e.g.*, *In re Keyspan Corp. Sec. Litig.*, 383 F. Supp. 2d 358, 383 (E.D.N.Y. 2003) ("defendants' retention of the shares so acquired [by exercising options] remains inconsistent with the allegation that defendants harbored information that the Company's financial health was in grave jeopardy" and "the *price* at which defendants acquired their shares *seems largely immaterial* to the decision on their part whether to hold or to sell the stock at any particular time") (emphases added) (collecting cases considering stock options); *Applestein v. Medivation, Inc.*, 2011 WL 3651149, at *8 (N.D. Cal. Aug. 18, 2011) (defendants "accumulated *vested options*—and thus lost more than" their alleged insider trading profits, negating scienter) (emphasis added).

938, rejected scienter when "defendants failed to sell their shares at fraud-inflated prices").

As for the sales themselves, Plaintiff begins with the unremarkable proposition that selling stock options *can* give rise to scienter. Opp. 58 (collecting cases). But those cases highlight what this case lacks: opportunistic offloading of securities at times calculated to maximize profit, in stark contrast to pre-Class Period behavior. *E.g.*, *Brody v. Zix Corp.*, 2006 WL 2739352, at *7 (N.D. Tex. Sept. 26, 2006) (executives each sold over 80% of their stock "when the price of the [] stock was allegedly inflated," when "*none* . . . had sold stock prior to the Class Period") (emphasis added); *Berger v. Compaq Comput. Corp.*, 1999 WL 33620108, at *17 (S.D. Tex. Dec. 22, 1999) (individual defendants sold $120 million in stock, with nearly half of those sales in the month before a corrective disclosure).

Here, Plaintiff does not contest that the periodic, vest-exercise-sale process predated the Class Period for both Restricted Stock Units ("RSU") and performance-based stock ("PSUs") (whether labeled Performance Units or Performance Shares).[23] Mot. 45–46. It is that *consistent pattern* of selling options as soon as they become available that the Fifth Circuit and others have held negates scienter—not the bare fact that options were at play.[24] *See Shaw*, 537 F.3d at 543 (refusing to "infer fraudulent intent from" fact that officers "will naturally trade those [stock options] in the *normal course* of events" and finding that

---

[23] Plaintiff's effort to erase the Individual Defendants' uncontested pre-Class Period sales of performance-based options fails. Opp. 59. For these purposes, the distinction between "Performance Units" and "Performance Shares" is in name only—both were identically payable in "shares of MDR common stock" or "cash equal to the fair market value of the shares of MDR common stock." *Compare, e.g.*, Mot. Ex. 4, 3/8/17 Dickson Form 4 (ECF pp. 93–94), *with* 3/7/18 Dickson Form 4 (ECF pp. 105–06). Plaintiff's arbitrary choice to exclude Performance Shares from its "PSUs" definition does not alter that fact.

[24] Plaintiff is wrong to cast aside the tax-liability impetus for the sales as irrelevant or procedurally improper. Opp. 57. That scienter-negating trait is not limited to a "Clinton-era change to the marginal tax rate," *id.* at 58 n.60, but rather was recognized *just last year* by the Fifth Circuit as both "weigh[ing] against a nefarious motive" and properly considered at the motion-to-dismiss stage. *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 182 (5th Cir. 2019).

executive's sale "only a few days . . . after the expiration of his 'lock-up' agreement not to sell shares" further negated scienter) (emphasis added); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049, 1067 (9th Cir. 2008) (no scienter when defendants "regularly sold as their options vested"). Plaintiff's refusal to grapple with these cases is telling.

Amount of the Sales: Plaintiff comes back to the bare allegation that Dickson and Spence sold *more* options during the Class Period than in the 20 months before. Opp. 57. But that is both partially misleading and ultimately irrelevant. For the RSUs, Plaintiff inexplicably combines the number converted and sold (361,167 for Dickson, 111,156 for Spence) and the number of converted but *not* sold (556,986 for Dickson, 170,478 for Spence) to reach a baseless conclusion that the Individual Defendants sold "140%" of "pre-Class Period" RSUs. *Compare* CCAC ¶ 373 (chart properly separating the figures), *with* Opp. 57 (combining them).[25] As Defendants' motion points out—whether as a matter of percentages or sheer volume, and even making the "apples-to-apples" comparison Plaintiff requests, Opp. 59 n.62—Dickson and Spence actually sold *more* RSUs in the 12 months before the Class Period than during the entire 20-month Class Period itself. *See* Mot. 45 (398,458 versus 361,167 for Dickson; 156,808 versus 111,156 for Spence).

For the PSU sales, Plaintiff does not deny that the disparity is the byproduct of a larger PSU award *years before* the purported fraud. Mot. 46. Nor does Plaintiff have any answer for the cases deeming irrelevant the size of such awards. Opp. 59 (conceding that

---

[25] Setting aside Plaintiff's erroneous discussion of the percentage of RSUs sold, Plaintiff never actually gives the comparative pre- and post-Class Period percentage-of-total-holdings-sold metric to which it alludes. Opp. 58. Regardless, as cases make clear, such figures must be viewed in context and are hardly dispositive one way or the other. *Compare, e.g., Marksman Partners, L.P. v. Chantal Pharm. Corp.*, 927 F. Supp. 1297, 1313 (C.D. Cal. 1996) (20% suspicious when no sales in prior 3 years), *with Shaw*, 537 F.3d at 544 (57% sale not suspicious in context).

*In re Toronto-Dominion Bank Sec. Litig.*, 2018 WL 6381882, at *15 (D.N.J. Dec. 6, 2018), held that the "amounts" of PSU awards added nothing to scienter); *see also In re Tyson Foods, Inc. Sec. Litig.*, 275 F. Supp. 3d 970, 1001 (W.D. Ark. 2017) (similar).

Applying this holistic, contextual analysis—and not relying on magic numbers or myopia—the Court should reject Plaintiff's insider-trading allegations for what they are: a reflection of the commonplace and hardly "suspicious" scenario whereby corporate executives continued exercising and selling stock options as they *always had*.

### 3.    The "raising funds" allegations are doubly flawed.

Two things are clear in this Circuit: (1) scienter must rest on the "individual corporate official or officials who make or issue the statement" and not "collective" corporate scienter, *Southland*, 365 F.3d at 366, and (2) "a routine need to raise capital" does not add anything to scienter, *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017).[26]

Plaintiff pushes back on *Southland*'s rejection of corporate scienter as somehow outdated. Opp. 61. But the Fifth Circuit applied *Southland*'s rule three times last year alone. *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 982 (5th Cir. 2019); *Asar*, 768 F. App'x at 189; *Iron Workers Benefit & Pension Fund v. Anadarko Petrol. Corp.*, 788 F. App'x 268, 269 (5th Cir. 2019).[27]

---

[26] Because the Fifth Circuit has spoken so clearly on these issues, Plaintiff's out-of-circuit caselaw, Opp. 61 nn.65, 67, is irrelevant. *See, e.g.*, *Enron*, 586 F. Supp. 2d at 794 ("*[U]nlike many other courts* the Fifth Circuit has rejected the group pleading doctrine.") (emphasis added).

[27] The district court cases that Plaintiff cites, *see* Opp. 61 (citing *Ranieri v. AdvoCare Int'l, L.P.*, 336 F. Supp. 3d 701 (N.D. Tex. 2018); *In re BP p.l.c. Sec. Litig.*, 843 F. Supp. 2d 712, 790 (S.D. Tex. 2012)), refer to the Seventh Circuit's "narrow[]" "*exception*" to the no-corporate-scienter rule in *Makor Issues & Rights, Ltd. v. Tellabs, Inc.* ("*Tellabs II*"), 513 F.3d 702, 710 (7th Cir. 2008). That exception—never applied by the Fifth Circuit—involves statements so "dramatical[ly]" out of line with irrefutable facts that they must have been approved by those who "kn[ew] that the [statement] was false." *Id.* ("General Motors announced that it had sold one million SUVs in 2006, and the actual number was zero."); *In re BP*, 843 F. Supp. 2d at 790 (statement so inconceivable it "appeared to have been invented

Plaintiff begrudgingly acknowledges that the Fifth Circuit requires a "more than routine need to raise capital" and one that is "necessary for the ongoing operation of the company," Opp. 61 n.66 (quoting *Neiman*, 854 F.3d at 748; *Owens*, 789 F.3d at 539), and claims "[t]he CCAC readily meets these standards." But Plaintiff provides no elaboration as to how or where. In fact, the CCAC's lone paragraph on the topic makes no mention of the dire straits or extraordinary need for capital that the Fifth Circuit requires for fundraising allegations to play *any* role. CCAC ¶ 377. The allegation fails as a result.

### 4. The CW allegations do not give rise to an inference of scienter.

Plaintiff does not dispute that "courts must discount allegations from confidential sources." *Shaw*, 537 F.3d at 535. Plaintiff claims to have 24 such witnesses at its disposal, but none alleges with the requisite particularity what Plaintiffs insinuates—that the Individual Defendants knew CB&I was hiding costs, had improper accounting, and had internal cost projections that would come to fruition. At most, what the chorus of CWs allege is the oft-made (and oft-rejected) accusation that the Individual defendants *"must have* been aware." *Abrams*, 292 F.3d at 432 (emphasis added); *see*, *e.g.*, CCAC ¶ 336 (CW1 guessed that "McDermott should have seen the forecast trend" on the projects and "could not imagine McDermott's diligence would not have included Risk Registers").

CW3 is the only CW who alleges any connection with the Individual Defendants, claiming to have gone over the "true cost" estimates on the Cameron Project with Spence. CCAC ¶ 96. But critically, CW3 does not say when this supposed conversation occurred,

---

out of thin air"). Plaintiff never explains how the CCAC resembles those extreme examples or qualifies for the narrow *Tellabs II* exception—even were it cognizable in this Circuit.

much less the substance of what was said or the date or author of the report purportedly shown to him. Courts in this Circuit routinely reject CW accounts lacking those critical corroborating details. *See* Mot. 55 (collecting cases).[28] Equally deficient is CW3's cursory allegation that "there were emails where ***Defendants Spence and Dickson received the complete package of Project Control's unaltered forecasts*." CCAC ¶ 96. CW3 never reveals how it knows that, who sent the emails, when Dickson and Spence received them, or if Dickson and Spence even reviewed them. *See Neiman*, 854 F.3d at 748 (requiring "corroborating details regarding the contents of allegedly contrary reports, their authors and recipients" and that defendant actually read them).

Plaintiff responds with *Tellabs*, Opp. 67 n.74—a curious choice since "the Fifth Circuit has applied *Tellabs* to require district courts to *discount* allegations from confidential sources." *Izadjoo v. Helix Energy Sols. Grp., Inc.*, 237 F. Supp. 3d 492, 510 (S.D. Tex. 2017) (emphasis added). In any event, Plaintiff misunderstands *Tellabs*'s point that "irrefutable" or "smoking-gun" evidence is not required for an inference of scienter. Opp. 67 (citing 551 U.S. at 324). There is more than one way to plead scienter, and securities plaintiffs do not always rely on CWs. But that does not lower the bar for what a

---

[28] *E.g.*, *Owens*, 789 F.3d at 542 n.13 (no inference of scienter where complaint did not "plead with particularity the dates of the ALCO meetings or the substance of the conversations, alleging only that they began in the fourth quarter of 2007 and continued into 2008"); *Southland*, 365 F.3d at 382 (rejecting CW allegation based on "overly vague identification of the meeting, [because] it contain[ed] no information suggesting such knowledge on the part of any identified individual"); *In re Dell Inc., Sec. Litig.*, 591 F. Supp. 2d 877, 895 (W.D. Tex. 2008) ("[P]laintiffs must allege with particularity *when* a comment was made to a confidential source, or, if the source alleges a conversation took place, when and *where* [it] occurred.") (second emphasis added); *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 719 (W.D. Tex. 2010) ("Many of the CWs simply state their own conclusions about what occurred . . . CW 10 states that [defendant] attended 'weekly staff meetings every Tuesday or Wednesday that were attended by all the top executives and lasted for about 90 minutes,' and solely on this basis concludes that all the executives in the meetings 'knew what was going on.'").

CW must do when a plaintiff *does* take that path. Not only must the CW be in a position to "possess the information pleaded," *Barrie*, 397 F.3d at 259; the CW also must adequately connect that information with what defendants knew when they made their alleged misstatements. *Supra* n.28. That is the governing standard that the CCAC fails to meet.

Plaintiff next tries to shoehorn its allegations into Fifth Circuit cases. Citing *Pier 1*, Plaintiff suggests that CW allegations of access to internal corporate reports like the risk registers can suffice if the information is linked to the defendants in a "persuasive way." Opp. 68. But Plaintiff never articulates what the "persuasive way" test means. *Pier 1* itself did not reach the issue; rather, it just cited back to *Neiman*, which found plaintiffs had failed to connect reports to a defendant in a "persuasive way" because they merely alleged what Plaintiff claims here—that the defendant "received weekly emails containing [the] reports." *Neiman*, 854 F.3d at 748. *Neiman* held that mere receipt of such reports is insufficient because it cannot be inferred that the individual defendant "either *actually reviewed* the production reports, or was severely reckless in not doing so, from the fact that he received them." *Id.* (emphasis added).

Plaintiffs' reliance on *Spitzberg v. Houston American Energy Corp.* is likewise misplaced. Opp. 64. Houston American was a three-person company that publicly stated that a test well that was drilled by its partner, SK Innovation/SK Energy, showed "strong inflows" and "significant shows" of oil and gas. 758 F.3d 676, 681, 688 (5th Cir. 2014). But the CW—an SK Innovation employee and Management Committee representative along with Houston American—provided contrary information demonstrating those statements to be false. *Id.* at 682. Given the CW's role, there could be no dispute that the

defendants knew the contrary information when they made the alleged misstatements.

Plaintiff's last Fifth Circuit case, *Barrie*, is likewise distinguishable, for there, the individual defendant had *requested* a report *and* reviewed it. 397 F.3d at 258 ("CW13 gave this report to Graham *in January 2000*, and claims that Graham and the Company *used the analysis* in deciding whether to fraudulently recognize the revenue and take a 'charge' later.") (emphases added). That is altogether different from what Plaintiff posits here: that Dickson and Spence had *access* to non-specified documents and *must have* known about the cost overruns on the Four Focus Projects. *See* Mot. 52–53 (collecting CW statements).

Without a foothold in Fifth Circuit authority, Plaintiff resorts to out-of-circuit cases, some of which reinforce that CWs must make specific allegations about individual defendants' knowledge to suffice,[29] and some of which are incompatible with the Fifth Circuit standards outlined above.[30] And Plaintiff's lengthy rehashing of the CCAC's CW allegations simply calls attention to the fact that the CWs make only vague references to the corporate hierarchy—"HQ," "Senior management at HQ," McDermott "management," and CB&I "leadership," Opp. 66–69—not specific references to the Individual Defendants. The Fifth Circuit rejects such "group pleading." *Barrie*, 397 F.3d at 261.

To close, the absence of *ArthroCare* from Plaintiff's CW discussion (despite Plaintiff's reliance on it elsewhere, *infra* 30) is most telling. There, the court *rejected* any

---

[29] *See, e.g.*, *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *3 (S.D.N.Y. May 24, 2018) (finding scienter based on CWs' statements that defendants "*did*" access reports) (emphasis added), *Granite Constr.*, 2020 WL 2559939, at *7 (complaint "allege[d] more than mere access to a report containing accounting errors").

[30] *See, e.g.*, *Nguyen v. New Link Genetics Corp.*, 297 F. Supp. 3d 472, 484 (S.D.N.Y. 2018) (scienter based on CWs who "spoke personally with Defendant Vahanian about the design of [the Phase 3 trial]," but did not say when or where) (alteration in original); *Toronto-Dominion*, 2018 WL 6381882, at *13 (scienter based on CW allegations concerning an "underlying, nationwide illegal scheme" within the company and emails from "the corporate office").

inference of scienter from CW allegations that contained "far too little detail, and far too many conclusory, unsupported assertions about what the Individual Defendants knew." 726 F. Supp. 2d at 720 (noting "hardly a single instance where a CW alleges that they had a conversation with a defendant," and many "state their own conclusions about what occurred, without giving any meaningful details to support those conclusions"). That sums up the CW allegations here, and they should be rejected for the same reason.

> **5.    The "due diligence," "red flags/SOX certifications/continued improprieties," "core operations," and "code of conduct" allegations add nothing to scienter.**

Last up is Plaintiff's grab-bag of "should have known" scienter allegations based on diligence, purported accounting irregularities, and the Individual Defendants' corporate positions. Plaintiff's defense of these allegations yet again pays little respect to Defendants' in-circuit authority. *See* Opp. 70–73 (mentioning only *Shaw* and *Neiman* out of the ten Fifth Circuit cases cited at Mot. 56–62).

Before briefly addressing each theory, one framing issue bears note. Most of these theories are aimed more at the "severe recklessness" strand of scienter than at the knowing-falsity theory to which the CCAC and Opposition hitch themselves. *E.g.*, Opp. 51 (referring only to the standard for "intentional deception"). Plaintiff makes only passing, conclusory references to "recklessness," but never to the controlling standard itself:

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an *extreme departure* from the standard of ordinary care, and *that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.*

*Owens*, 789 F.3d at 536 (emphases added). Plaintiff never articulates how the CCAC meets that "very high standard," *Gamboa v. Citizens, Inc.*, 2018 WL 2107205, at *2 (W.D. Tex. May 7, 2018), *R&R adopted*, 2018 WL 2422764 (May 29, 2018), which requires "a mental state so culpable that it approximates an actual intent to aid in the fraud." *In re Franklin Bank Corp. Sec. Litig.*, 782 F. Supp. 2d 364, 402 (S.D. Tex. 2011), *aff'd*, 464 F. App'x 334 (5th Cir. 2012). Nor does Plaintiff even begin to explain how the CCAC surpasses cases in which the Fifth Circuit *rejected* severe recklessness[31] or aligns with the few-and-far-between cases finding such a scienter theory cognizable.[32]

Due Diligence: As Defendants explained, Mot. 56–57, allegations of management's "access to information" and what the individual defendants allegedly "should have known" based on their positions do not fly in the Fifth Circuit. *Abrams*, 292 F.3d at 432–33. Plaintiff's reliance on out-of-circuit cases, Opp. 70 & n.76 (citing, *e.g.*, *Sanchez v. Centene Corp.*, 407 F. Supp. 3d 831, 846 (E.D. Mo. 2019) (relying on defendants' alleged "access to information"); *Jackson v. Microchip Tech. Inc.*, 2020 WL 1170843, at *11 (D. Ariz. Mar. 11, 2020) (relying on information allegedly given to "company management")), does nothing to overcome the Fifth Circuit's rule.

Red Flags/SOX Certifications: Plaintiff's arguments that there were "red flags

---

[31] *E.g.*, *Goldstein*, 340 F.3d at 243, 249, 254 (no severe recklessness where defendants allegedly failed to write off over $500 million of uncollectible accounts receivable despite knowing of "no less than $685 million of grossly delinquent, disputed and uncollectible receivables" "because the complaint [] present[ed] what could best be described as allegations of mismanagement of WorldCom's accounts receivable situation, perhaps even gross mismanagement . . . rather than severe recklessness by [defendants] individually").

[32] *E.g.*, *Spitzberg*, 758 F.3d at 691–92 (finding severe recklessness for statements that defendants owned 1 to 4 billion barrels of oil reserves—more than the entire recoverable reserves in the country in which they operated—despite the fact that there had been no geologic testing, and "neither oil nor flowable hydrocarbons" were found in the test well).

galore" (due to the denial of CB&I's motion to dismiss an unrelated lawsuit) and "glaring accounting irregularities" (despite SOX certifications to the contrary), Opp. 71, both fail.

For the purported "red flag," Plaintiff declares with no elaboration that the CB&I lawsuit (about a business CB&I sold back in 2015) was "nearly identical" to the allegations here. Opp. 71; *but see Kohut*, 2015 WL 11995250, at *25 (rejecting "red flag" allegations when they involved different contracts). But Plaintiff ignores the Fifth Circuit's determination that when the alleged red flags "become knowable" only after "many of the alleged misrepresentations occurred" and were "disclosed to the public," that cuts heavily against scienter. *See Owens*, 789 F.3d at 540.

Plaintiff instead points to *Arthrocare*, Opp. 71, but its *dicta*—that "*quick settlement*" of a related suit can "add *somewhat* to an inference of scienter," 726 F. Supp. 2d at 721 (emphasis added)—is irrelevant here. The red-flag allegations that *Arthrocare* actually credited were beyond the pale—the individual defendants (1) were "directly confronted" by media reports with evidence of the precise fraud, and (2) falsely "reassure[d] investors [that] the reports were lies, rumor-mongering, and propaganda." *Id.* at 711–18. The CCAC pleads nothing even remotely resembling that kind of blind recklessness.

Plaintiff's accounting irregularities/SOX certification allegations likewise add nothing to scienter.[33] First, the Fifth Circuit has rejected arguments that "the magnitude of the valuation errors contributes to a strong inference of scienter," even in cases with write-

---

[33] Plaintiff lumps its "continued improprieties" allegations under this umbrella by focusing on the fact that Dickson and Spence remained at the helm and signed SOX certifications after McDermott acquired CB&I and allegedly continued the wrongful accounting practices. Opp. 72. In other words, Plaintiff offers no response to Defendants' point that the CCAC's McDermott-wide post-Merger "misconduct" allegations must be disregarded under the Fifth Circuit's rejection of the group pleading doctrine. Mot. 58.

downs of similar or greater magnitude than here. *E.g.*, *Owens*, 789 F.3d at 541 (no scienter from impairment of "$1.62 billion," representing an "overvaluation of the . . . portfolio of 100%"); *Goldstein*, 340 F.3d at 249–51 (no scienter from $685 million write-off).

Second, it is black letter law that "[t]he mere publication of inaccurate accounting figures, or a failure to follow GAAP, without more, does not establish scienter." *Barrie*, 397 F.3d at 264; *see Blackwell*, 440 F.3d at 290 ("[F]ailure to follow accounting standards, without more, does not establish scienter."). SOX certifications fall in the same boat, Mot. 58–59 (collecting cases), because the alleged failure to "maintain effective control over certain account [metrics]" does not "show that [the company] or any of its officers acted with scienter in making the initial inaccurate financial statements." *Pipefitters Local No. 636 Defined Benefit Plan v. Zale Corp.*, 499 F. App'x 345, 350 (5th Cir. 2012). Nor does the fact that "accounting policies were violated" or SOX certifications were inaccurate "show that the Individual Defendants . . . knew about the inaccurate information or recklessly ignored evidence of its falsity." *Id.*; *see Shaw*, 537 F.3d at 535–45 (rejecting allegation that defendants "must have been aware" of or were personally involved in percentage-of-completion accounting errors, highlighting that, as here, "there [had been] no mea culpa from the company in the form of acknowledged wrongdoing or restated financial reports" and "contract[]" valuations involved "the application of sophisticated accounting standards" that "leave broad scope for judgment and informed estimation"); *see Owens*, 789 F.3d at 541 (rejecting similar accounting irregularities claim).[34] The CCAC's

---

[34] Contrast *Shaw*, *Owens*, and this case with Plaintiff's only responsive in-circuit authority. *See* Opp. 71, 72 n.79. *Arthrocare* involved a "restatement" of four years of financials, coupled with egregious red flags, discussed *supra* 30. 726 F. Supp. 2d at 712–18, 722. And *In re Electronic Data System Corp. Securities & ERISA Litigation*, involved

unadorned GAAP violation and SOX certification allegations are thus plainly deficient.

Core Operations Doctrine: Plaintiff defends its core-operations allegations by pointing to (1) McDermott's rejection of the Subsea 7 offer, (2) the size of the Merger, and (3) the size of CB&I's backlog—as if those things satisfied three of the four "special circumstances" factors outlined in *Neiman*. Opp. 72. But Plaintiff never discusses a single in-circuit case discussing the doctrine, let alone what the relevant factors actually are:

> [1] the smaller the company the more likely it is that corporate executives would be familiar with the intricacies of day to day operations[;] [2] the transaction at issue may have been critical to the company's continued vitality[;] [3] the misrepresented or omitted information at issue would have been readily apparent to the speaker[;] [and] [4] the defendant's statements were internally inconsistent with one another.

*Neiman*, 854 F.3d at 749–50. Applying that proper framework,[35] Plaintiff ignores that McDermott's size alone (factor one) precludes the doctrine. Mot. 60–61; *see also In re Plains All Am. Pipeline*, 245 F. Supp. 3d at 924 (Rosenthal, C.J.) (company's 4,700-plus employees "alone takes this case outside" the doctrine). Plaintiff's argument about the Merger's size and CB&I's backlog concerns the second factor, but it misunderstands that even an "undeniably a large and important business asset" does not matter if "it is not alleged to have been [the company's] single product" or "critical to the company's continued vitality." *Owens*, 789 F.3d at 540 (first two quotes); *Neiman*, 854 F.3d at 749 (third quote). Plaintiff made no such allegations, meaning not even one factor, much less

---

particularized accusations that the individual defendants actually "knew" a contract was "not generating revenues but continued to issue press releases and earnings statements to the contrary." 298 F. Supp. 2d 544, 558 (E.D Tex. 2004).

[35] Plaintiff's reliance exclusively on Third Circuit precedent is revealing, as courts there take a decidedly laxer approach to the core operations doctrine. Opp. 72 n.78 (citing, *e.g.*, *Toronto-Dominion*, 2018 WL 6381882, at *46–48 (applying the doctrine simply because "Plaintiffs have alleged the importance of the Canadian retail segment and Individual Defendants' position within [the company]")).

the requisite "combination," exists here. *Neiman*, 854 F.3d at 749.

Code of Conduct: Plaintiff ignores the authority rejecting use of aspirational codes of conduct to demonstrate scienter. *See* Mot. 62 (citing, *e.g.*, *In re Plains All Am. Pipeline, L.P. Sec. Litig.*, 307 F. Supp. 3d 583, 624–26 (S.D. Tex. 2018)).[36] Plaintiff's lone case *recognized* this principle: "generally a company's code of ethics, which is essentially mandatory under SEC regulations, is thought to be inherently aspirational and unable, standing alone, to support an inference of scienter." *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, n.7 (E.D. Mich. 2010).

## C.  Plaintiff's effort to "bolster" its scienter allegations fails.

To compensate for the CCAC's shortcomings, Plaintiff claims that the following post-Class Period "misconduct" "strongly bolsters" its scienter claim: (1) McDermott's November 4, 2019 disclosure of a July 27, 2019 SEC letter and subpoena; (2) Spence's November 5, 2019 resignation; (3) McDermott's hiring a bankruptcy consultant and eventual bankruptcy filing in January 2020; and (4) a federal grand jury investigation of McDermott. Opp. 34–35, 73. Even if these new allegations were properly before the Court,[37] they fail under the weight of the cases and cannot salvage Plaintiff's scienter allegations. *See Carlton*, 184 F. Supp. 3d at 477–80 (rejecting scienter allegation based on, among other things, CW accounts, defendant's knowledge of the company's increasing

---

[36] *See also In re Key Energy Servs., Inc. Sec. Litig.*, 166 F. Supp. 3d 822, 872 (S.D. Tex. 2016) (rejecting scienter allegation based on code of conduct that "all-too-vaguely described internal controls," noting a failure to allege "any breach by any particular Defendant, with scienter, of any employee responsibility in any particular statement set forth in those documents"); *Rok v. Identiv, Inc.*, 2017 WL 35496, at *15 (N.D. Cal. Jan. 4, 2017) (rejecting scienter based on code of conduct that, like here, committed to "accurate and reliable preparation and maintenance of [the company's] financial[s]"), *aff'd*, 716 F. App'x 663 (9th Cir. 2018).

[37] "[N]ew allegations cannot be raised in response to a motion to dismiss." *Schieroni*, 2011 WL 3652194, at *6.

debt and net operating losses, defendant's abrupt resignation, and an SEC investigation).

SEC Letter and Subpoena: McDermott had no obligation to disclose the mere "existence of an investigation." *Markman*, 2016 WL 10567194, at *8; *see also In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 21 (S.D.N.Y. 2016) (no duty to disclose Wells Notice or SEC investigation until it produces "pending or threatened litigation"). And the existence of the SEC investigation itself "contributes little, if at all, to an inference of scienter." *MicroCapital Fund*, 2019 WL 3451153, at *18.[38]

Bankruptcy: "[T]here is no requirement to disclose the retention of counsel to examine the possibility of future bankruptcy." *McNulty v. Kanode*, 2013 WL 12077503, at *12 (W.D. Tex. Nov. 6, 2013); *see also Neiman*, 854 F.3d at 750–51 (holding that hiring bankruptcy counsel just weeks after declaring company was financially stable had no bearing on the scienter inquiry because "many companies engage bankruptcy counsel to explore restructuring options before management is sure that the company will fail"). And McDermott's bankruptcy filing itself proves nothing about the Individual Defendants' mental states during the class period. *See Hutchinson v. Perez*, 2012 WL 5451258, at *5–6 (S.D.N.Y. Nov. 8, 2012) (dismissing for lack of scienter when company filed for bankruptcy 4 months after executives said they had "no intention" of doing so).

Spence's Resignation: "The resignation of officials is, in and of itself, unavailing as proof of the commission of fraud when no specific evidence indicates the resigning

---

[38] Nor does Plaintiff allege how the investigation bears any relevance to the Individual Defendants' scienter. *See Brophy v. Jiangbo Pharm., Inc.*, 781 F.3d 1296, 1304 (11th Cir. 2015) (existence of an SEC investigation does not add to the scienter analysis without additional details as to how it relates to a defendant's knowledge).

officials or their replacements knew of any [alleged misconduct]." *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 956 (S.D. Tex. 2016). After all, "there are many reasons not related to fraud why people resign and more is needed before one *reasonably* could infer, no less before a *strong* inference arises, that the resignations were motivated by anything besides [the resignee's proffered explanation]." *Kurtzman*, 2002 WL 32442832, at *10. Spence's resignation "to pursue other opportunities," Ex. 31, 11/5/19 MDR Press Release, has no bearing on scienter. *See Abrams*, 292 F.3d at 428, 437 (resignation added nothing to scienter where executives stated they resigned "to pursue other interests").

 Grand Jury Investigation: The mere existence of a grand jury investigation demonstrates only that certain activities have triggered scrutiny and is not probative of defendants' knowledge during the alleged relevant period. *Utesch v. Lannett Co., Inc.*, 316 F. Supp. 3d 895, 907 (E.D. Pa. 2018) (no scienter despite receipt of grand jury subpoena); *see also Key Energy*, 166 F. Supp. 3d at 863 (company's internal investigation of misconduct is not relevant as to scienter).

Collectively, Plaintiff's allegations regarding post-Class Period "misconduct" fail to move the needle on scienter, and granting Plaintiff leave to replead them would be futile.[39]

## CONCLUSION

For the foregoing reasons, and for those given in Defendants' motion, the Court should grant their motion to dismiss the CCAC in its entirety.

---

[39] *See, e.g., Heck v. Orion Group Holdings, Inc.*, 2020 WL 3403111, at *24 (S.D. Tex. June 19, 2020) (Lake, J.) (granting defendants' first motion to dismiss plaintiffs' 10b-5 complaint and denying leave to amend as futile).

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*

      David D. Sterling
        *Attorney-In-Charge*
      State Bar No. 19170000
      Federal I.D. No. 07079
      Amy Pharr Hefley
      State Bar No. 24046046
      Anthony J. Lucisano
      State Bar No. 24102118
      Federal I.D. No. 3369146
      Elizabeth P. Furlow
      State Bar. No. 24109899
      Federal I.D. No. 3402815
      910 Louisiana Street
      Houston, Texas 77002
      Telephone: (713) 229-1234
      Fax: (713) 229-1522
      david.sterling@bakerbotts.com
      amy.hefley@bakerbotts.com
      anthony.lucisano@bakerbotts.com
      elizabeth.furlow@bakerbotts.com

**ATTORNEYS FOR DEFENDANTS**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via ECF and/or electronic mail on all counsel of record on this 5th day of August, 2020.

*/s/ Amy Pharr Hefley*
Amy Pharr Hefley