United States District Court
Southern District of Texas
**ENTERED**
April 14, 2021
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| MIRIAM EDWARDS, *et al*, § <br> § <br> Plaintiffs, § <br> VS. § <br> § <br> MCDERMOTT INTERNATIONAL, INC., § <br> *et al*, § <br> § <br> Defendants. § | CIVIL ACTION NO. 4:18-CV-4330 |

## MEMORANDUM OPINION AND ORDER

Plaintiff Public Employees' Retirement System of Mississippi ("Mississippi") is the lead plaintiff in this securities class action brought on behalf of shareholders of record of Defendant McDermott International, Inc. ("McDermott") as of April 4, 2018 who had the right to vote in connection with the proposed merger between McDermott and Chicago Bridge & Iron Company, N.V. ("CB&I"). The defendants are: (1) McDermott; (2) CB&I; (3) McDermott President and Chief Executive Officer David Dickson ("Dickson"); (4) McDermott Executive Vice President and Chief Financial Officer Stuart Spence ("Spence"); and (5) CB&I President and Chief Executive Officer Patrick Mullen ("Mullen") (collectively "Defendants"). The merger bankrupted McDermott and led to ongoing SEC and federal grand jury investigations.

Mississippi has pled claims against Defendants under Section 14(a) of the Securities Exchange Act of 1934 ("Section 14(a)") and Rule 14a–9 promulgated thereunder ("Rule 14a–9"). *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9. Mississippi has also pled claims of control person liability against Dickson, Spence, and Mullen

under Section 20(a) of the Securities Exchange Act of 1934 ("Section 20(a)"). *See* 15 U.S.C. § 78t(a).

Before the Court is a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) filed by the defendants. The motion (Dkt. 124) is **DENIED**.

## BACKGROUND

The pertinent factual allegations, drawn from Mississippi's live complaint and taken as true for the purposes of this motion, are as follows. McDermott provides technology, engineering, and construction services to the energy industry. (Dkt. 98 at p. 5) For much of its history, the company has "focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies." (Dkt. 98 at p. 5)

### *The Merger*

In 2017, McDermott "had an established upstream offshore presence in South and Central America and the Middle East[.]" (Dkt. 98 at pp. 5–6) But it was not well-diversified—nearly two-thirds of its 2017 revenue and nearly half of its 2017 contractual backlog came from a single client, Saudi Aramco—and it had "little presence in the United States." (Dkt. 98 at pp. 5–6) McDermott was also viewed as a "potential takeover target[.]" (Dkt. 98 at pp. 5–6)

CB&I was an engineering and construction company that worked in the oil and gas industry and focused on downstream onshore operations, particularly the construction of petrochemical plants. (Dkt. 98 at p. 6) By the end of 2017, CB&I was "basically

bankrupt[,]" with "approximately $2.5 billion of debt, an over $1 billion impairment to goodwill that had been inflated for years, and potential liability stemming from securities litigation alleging that [it] had engaged in fraudulent accounting[.]" (Dkt. 98 at p. 6)

In December of 2017, McDermott entered into a business combination agreement with CB&I to effectuate a merger between the two companies. (Dkt. 98 at p. 7) Under the terms of the merger agreement, "CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity." (Dkt. 98 at p. 7)

CB&I's contractual backlog included four large construction projects in the United States dubbed "the Focus Projects." (Dkt. 98 at p. 7) The Focus Projects consisted of two gas turbine projects, known as the Calpine Gas Turbine Power Project ("Calpine") and the IPL Project ("IPL"), and two liquefied natural gas export facility projects, known as the Freeport LNG Project ("Freeport") and the Cameron LNG Project ("Cameron"). (Dkt. 98 at p. 7) Analysts and investors homed in on the Focus Projects and how McDermott would value them from the moment the merger was announced: "the very first question from an analyst on the December 18, 2017 joint conference call discussing the newly-announced Merger dealt with the level of due diligence around the transaction." (Dkt. 98 at p. 7) Dickson said that McDermott had "worked extensively with CB&I on due diligence," and Spence stated that the due diligence on the Focus Projects was "significant." (Dkt. 98 at p. 7) In response to a question about how McDermott had "priced in the potential risk" on the Focus Projects, Dickson said that the Focus Projects

were "fairly well-progressed, so that takes out a lot of the risk that you would expect at the start-up." (Dkt. 98 at p. 52)

Two months later, on February 20, 2018, CB&I disclosed $101 million in project charges for the Focus Projects for the fourth quarter of 2017. (Dkt. 98 at p. 31); *see also* CB&I Form 8-K dated February 20, 2018.[1] Because of those project charges, CB&I's Engineering & Construction group posted a $41.2 million operating loss for the quarter. *See* CB&I Form 8-K dated February 20, 2018. CB&I reported a net loss of $1.5 billion for the full year 2017; CB&I had reported a net loss of $313.2 million in 2016. *See* CB&I Form 8-K dated February 20, 2018. Even though the news disclosed by CB&I was not good, Mississippi alleges that it actually should have been worse and that "[t]he $101 million in charges reported by CB&I was woefully inadequate to represent the true costs to complete the Focus Projects[.]" (Dkt. 98 at p. 60) Mississippi alleges that CB&I partially blunted the bad news by violating Generally Accepted Accounting Principles ("GAAP"): "Notwithstanding the GAAP requirement to use the 'most recent information' and its disclosed claim that it based its estimates on 'expected costs,' CB&I based its estimates on anticipated improvements in the weather, and on improvements in its productivity, which it knew had not been achieved." (Dkt. 98 at pp. 34–35)

CB&I's concerning news notwithstanding, Dickson said at a conference call the next day that Defendants were "even more confident" in the merger and that CB&I's

---

[1] The Court takes judicial notice of the February 20, 2018 Form 8-K filing, as well as the other SEC filings referenced in this opinion. *Izadjoo v. Helix Energy Solutions Group, Inc.*, 237 F. Supp. 3d 492, 506 (S.D. Tex. 2017) (J. Rosenthal) ("In securities cases, courts may take judicial notice of the contents of public disclosure documents that the law requires be filed with government agencies, such as the SEC, and that are actually filed with the agency.").

Case 4:18-cv-04330   Document 167   Filed on 04/13/21 in TXSD   Page 5 of 18

financial disclosures were no cause for alarm. (Dkt. 98 at pp. 59–60); *see also* McDermott Form 425 dated February 21, 2018. With regard to the Focus Projects specifically, Dickson told the analysts on the call that "[t]he potential for incremental overruns on [the Focus] projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence." (Dkt. 98 at pp. 59–60); *see also* McDermott Form 425 dated February 21, 2018.

McDermott and a subsidiary of CB&I filed proxy materials on January 24, March 2, March 23, March 27, and April 2, 2018. (Dkt. 98 at p. 61) The companies scheduled shareholder meetings on April 4, 2018 and May 2, 2018. (Dkt. 98 at p. 61) In its proxy solicitation materials, McDermott disclosed that one of its board members had voted against the merger with CB&I on the basis that the problems with the Focus Projects could "be difficult for McDermott's management to remedy (at least in the near term)[,]" rendering the transaction "too risky for McDermott[.]" (Dkt. 98 at p. 63–64); *see also* McDermott Form S-4/A dated March 27, 2018. In a warning that proved prescient, the dissenting director recounted his experience as president and CEO of a company that had gone bankrupt after suffering $2 billion in losses related to its acquisition of "a business with two significant, fixed-price, lump-sum combined-cycle gas power plant projects[.]" (Dkt. 98 at p. 64); *see also* McDermott Form S-4/A dated March 27, 2018.

In response to the dissenting director, the proxy materials stated that "McDermott's management team . . . expressed the belief that, based on McDermott's due diligence and the experience and capabilities of the McDermott management team,

5 / 18

Case 4:18-cv-04330   Document 167   Filed on 04/13/21 in TXSD   Page 5 of 18

financial disclosures were no cause for alarm. (Dkt. 98 at pp. 59–60); *see also* McDermott Form 425 dated February 21, 2018. With regard to the Focus Projects specifically, Dickson told the analysts on the call that "[t]he potential for incremental overruns on [the Focus] projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence." (Dkt. 98 at pp. 59–60); *see also* McDermott Form 425 dated February 21, 2018.

McDermott and a subsidiary of CB&I filed proxy materials on January 24, March 2, March 23, March 27, and April 2, 2018. (Dkt. 98 at p. 61) The companies scheduled shareholder meetings on April 4, 2018 and May 2, 2018. (Dkt. 98 at p. 61) In its proxy solicitation materials, McDermott disclosed that one of its board members had voted against the merger with CB&I on the basis that the problems with the Focus Projects could "be difficult for McDermott's management to remedy (at least in the near term)[,]" rendering the transaction "too risky for McDermott[.]" (Dkt. 98 at p. 63–64); *see also* McDermott Form S-4/A dated March 27, 2018. In a warning that proved prescient, the dissenting director recounted his experience as president and CEO of a company that had gone bankrupt after suffering $2 billion in losses related to its acquisition of "a business with two significant, fixed-price, lump-sum combined-cycle gas power plant projects[.]" (Dkt. 98 at p. 64); *see also* McDermott Form S-4/A dated March 27, 2018.

In response to the dissenting director, the proxy materials stated that "McDermott's management team . . . expressed the belief that, based on McDermott's due diligence and the experience and capabilities of the McDermott management team,

the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management." (Dkt. 98 at p. 64); *see also* McDermott Form S-4/A dated March 27, 2018. The proxy materials did not mention internal forecasts by CB&I personnel that are discussed in more detail below and that supported the dissenting director's position regarding the Focus Projects. (Dkt. 98 at pp. 63–65) The CB&I internal forecasts indicated that CB&I's financial statements were underreporting costs for the Focus Projects by $1 billion. (Dkt. 98 at p. 38)

The proxy materials also omitted consideration of the CB&I internal forecasts for the Focus Projects from their calculation of the fair value of assets. (Dkt. 98 at pp. 66–68) The proxy materials instead "assumed" that, for assets other than intangible assets, "the fair value of all assets and liabilities equal[ed] their respective carrying values." (Dkt. 98 at pp. 66–67); *see also* McDermott Form S-4/A dated March 27, 2018.

Defendants appeared to be somewhat vindicated just before the scheduled merger vote, when CB&I reported that it "did not incur any material project changes to the Focus Projects in the first quarter 2018[.]" (Dkt. 98 at pp. 68–71) In a Form 8-K dated April 24, 2018, McDermott stated that it had identified $350 million in potential savings in operating costs that could result from the merger. (Dkt. 98 at pp. 69, 73); *see also* McDermott Form 8-K dated April 24, 2018. In a conference call the same day, Dickson noted that McDermott had rejected a buyout offer from a competitor named Subsea 7 and was moving ahead with the CB&I merger. (Dkt. 98 at p. 71–73); *see also* McDermott

Form 425 dated April 24, 2018. Dickson stated that McDermott's management had "spent considerable time with CB&I reviewing the project portfolio" and felt "very comfortable with the progress" CB&I had made to "de-risk" the Focus Projects. (Dkt. 98 at pp. 74–75); *see also* McDermott Form 425 dated April 24, 2018.

The merger with CB&I closed on May 10, 2018. (Dkt. 98 at p. 8) It was a disaster for McDermott.

### *Defendants' Post-Merger Financial Disclosures and Statements*

On July 31, 2018, McDermott reported a $221 million change in cost estimates for the Focus Projects. (Dkt. 98 at p. 79); *see also* McDermott Form 8-K dated July 31, 2018. Dickson said that McDermott was "clearly disappointed with the increased cost estimates" but continued to insist that "[t]he increases [we]re within the bounds of the scenarios [McDermott] contemplated during [its] due diligence[.]" (Dkt. 98 at p. 79); *see also* McDermott Form 8-K dated July 31, 2018.

The next quarter brought worse news. On October 30, 2018, McDermott disclosed that, "[f]or the third quarter of 2018, [it] recorded $744 million of changes in estimates" for the Focus Projects. (Dkt. 98 at p. 81); *see also* McDermott Form 8-K dated October 30, 2018. Dickson and Spence acknowledged on a conference call that day that "the increased charges resulted from the Defendants' analyses of the facts in existence as of the Proxy Statement's dissemination and shareholder vote." (Dkt. 98 at pp. 84–85) They "did not contend on the conference call that there had been changes in the nature of the Focus Projects subsequent to the Merger." (Dkt. 98 at p. 84) The news caused McDermott's share price to fall by nearly 40% on October 31, 2018. (Dkt. 98 at p. 86)

There were additional material changes to the cost estimates. On February 13, 2019, McDermott disclosed that, "[f]or the fourth quarter of 2018, [it] expect[ed] to report an adverse change in estimate of approximately $168 million" for the Cameron project. (Dkt. 98 at pp. 87–88); *see also* McDermott Form 8-K dated February 13, 2019. The new estimate caused McDermott's share price to drop by 26%. (Dkt. 98 at p. 88) On July 29, 2019, McDermott then disclosed a net loss of $146 million and an operating loss of $61 million for the second quarter of 2019, along with a $205 million cash burn tied to the Cameron project. (Dkt. 98 at pp. 90–92); *see also* McDermott Form 8-K dated July 29, 2019. The disclosures caused McDermott's share price to drop by 35.3%. (Dkt. 98 at p. 92)

The Focus Projects ultimately sank McDermott. On September 18, 2019, news that McDermott had hired a company known for its restructuring and bankruptcy work halted trading on McDermott's stock, despite McDermott's denial that a bankruptcy was imminent. (Dkt. 98 at pp. 93–94) When trading resumed, McDermott's share price dropped over 75%. (Dkt. 98 at p. 94) On November 4, 2019, McDermott filed a Form 10-Q with the Securities and Exchange Commission ("SEC") in which the company disclosed that the SEC had served subpoenas on the company on July 26, 2019 and was "conducting an investigation related to disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project." *See* McDermott Form 10-Q dated November 4, 2019. Despite its prior denial that it was going bankrupt, McDermott filed for Chapter 11 bankruptcy protection on January 21, 2020. *See* Southern

District of Texas bankruptcy case number 20-30336.[2] On its website, McDermott explained that it filed for bankruptcy protection because "the 'focus projects' (Freeport and Cameron LNG) have significantly strained McDermott's finances, and have made it difficult to maintain a timely balance between cash received from customers and cash spent on projects."[3]

On May 8, 2020, McDermott filed a Form 10-Q in which the company reiterated that the SEC is "conducting an investigation related to disclosures [the company] made concerning the reporting of projected losses associated with the Cameron LNG project" and further disclosed that "a Federal Grand Jury is conducting a criminal investigation and [has] requested various documents, including cost forecasts and other financial-related information, related to the Cameron LNG project." *See* McDermott Form 10-Q dated May 8, 2020. The investigations are ongoing.

### *Mississippi's Allegations Regarding the Cost of the Focus Projects and the Companies' Internal Estimates*

According to CB&I and McDermott personnel discussed in Mississippi's complaint, "Defendants hid well over $1 billion in undisclosed costs related directly to the Focus Projects." (Dkt. 98 at p. 37) The Financial Operations Controller for CB&I's

---

[2] The Court takes judicial notice that the bankruptcy petition was filed. "[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record." *Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007).

[3] The Court takes judicial notice of this explanation on McDermott's website. *See Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 746 n.3 (N.D. Tex. 2018), *aff'd*, 935 F.3d 424 (5th Cir. 2019). The Court accessed the page at: https://www.mcdermott.com/CMSPages/GetAzureFile.aspx?path=~%5Cmdrsite%5Cmedia%5C pdf-docs%5Cfinal-public-faq-post-filing.pdf&hash=29edc26c55102ea2dd4d2ab923bafb487b128b646c1d77385a70ed0726714ef8.

USA Oil and Gas Division said that the Cameron project—the subject of the ongoing SEC and federal grand jury investigations—alone was $1 billion over budget as of November of 2017. (Dkt. 98 at pp. 43–44) The Controller's account was seconded by a Director of Project Controls who worked on both the Calpine and Cameron projects, who said there was such "rampant corporate override" of the Cameron project's cost estimates at the end of 2017 and throughout the first quarter of 2018 "that it was just a deception to stakeholders of the company." (Dkt. 98 at p. 9) The project controls director left McDermott on June 12, 2018, just after the merger closed, and stated in an exit interview and a report that Cameron would "lose an additional 700MM to 1.2B before th[e] project [wa]s completed." (Dkt. 98 at p. 9)

Mississippi alleges that requests for documents showing the accurate forecasts would have been part of Defendants' pre-merger due diligence; the project controls director said that "competent due diligence would have included specific requests for Risk Registers and similar documents created by Project Controls that forecasted future cost changes to the immense Cameron Project." (Dkt. 98 at p. 43) Those documents would have shown that the true cost of the Focus Projects was not being reported by CB&I; the project controls director, who helped compile CB&I's Risk Registers, stated that, "[b]y the end of December 2017, when the Merger was first announced, [the project controls director's] forecasted costs had escalated well beyond what was reported in CB&I's financial statements, rising to well over $1 billion above current reported costs." (Dkt. 98 at p. 38)

In sum, Mississippi, quoting the project controls director, alleges that "CB&I misrepresented the true costs of and risks to the Focus Projects by engaging in 'rampant corporate override' of the Focus Projects' costs to such an extent that it was 'just a deception to stakeholders of the company.'" (Dkt. 98 at p. 65) And Dickson, Spence, and McDermott "either failed to review and incorporate information from readily available core documents, such as Risk Registers, despite representing to shareholders the performance of due diligence sufficient to assess the risks and costs of the Focus Projects or, alternatively, did review this readily-available information and disregarded over one billion dollars in change in cost estimates." (Dkt. 98 at pp. 64–65)

## LEGAL STANDARDS

### *Rule 12(b)(6)*

Rule 8 of the Federal Rules of Civil Procedure requires a pleading to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A motion filed under Federal Rule of Civil Procedure 12(b)(6) tests a pleading's compliance with this requirement and is "appropriate when a defendant attacks the complaint because it fails to state a legally cognizable claim." *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001). A complaint can be dismissed under Rule 12(b)(6) if its well-pleaded factual allegations, when taken as true and viewed in the light most favorable to the plaintiff, do not state a claim that is plausible on its face. *Amacker v. Renaissance Asset Mgmt., LLC*, 657 F.3d 252, 254 (5th Cir. 2011); *Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*, 594 F.3d 383, 387 (5th Cir. 2010). As the Fifth Circuit has further clarified:

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. This includes the basic requirement that the facts plausibly establish each required element for each legal claim. However, a complaint is insufficient if it offers only labels and conclusions, or a formulaic recitation of the elements of a cause of action.
>
> *Coleman v. Sweetin*, 745 F.3d 756, 763–64 (5th Cir. 2014) (quotation marks and citations omitted).

Motions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted. *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011).

### *Section 14(a)*

Section 14(a) prohibits false statements in proxy solicitations associated with registered securities. *See* 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9. The elements of a section 14(a) claim are: (1) defendants misrepresented or omitted a material fact in a proxy statement; (2) defendants acted at least negligently in distributing the proxy statement; and (3) the false or misleading proxy statement was an essential link in causing the corporate actions. *In re Browning-Ferris Industries, Inc. Shareholder Derivative Litigation*, 830 F. Supp. 361, 365 (S.D. Tex. 1993). "An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

Although Plaintiffs in Section 14(a) actions are not required to comply with the scienter pleading requirement of the Private Securities Litigation Reform Act ("the PSLRA"), they must comply with the PSLRA's particularity requirement. *Hulliung v. Bolen*, 548 F. Supp. 2d 336, 341 n.4 (N.D. Tex. 2008). The PSLRA's particularity

requirement requires a plaintiff to "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, ... all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). But the PSLRA "was not enacted to raise the pleading burdens . . . to such a level that facially valid claims, which are not brought for nuisance value or as leverage to obtain a favorable or inflated settlement, must be routinely dismissed on Rule . . . 12(b)(6) motions." *ABC Arbitrage Plaintiffs Group v. Tchuruk*, 291 F.3d 336, 354 (5th Cir. 2002).

## ANALYSIS

In their motion to dismiss, Defendants argue that Mississippi's Section 14(a) claims must be dismissed because: (1) Mississippi pleads a derivative claim, rather than a direct one; (2) Mississippi has failed to plead loss causation; and (3) the statements relied on by Mississippi are puffery, non-actionable opinions, or forward-looking statements that fall within the PSLRA's safe harbor.[4] The Court disagrees with all of Defendants' contentions.

> i. *Mississippi is entitled to bring, and has pled, a direct claim.*

Under Supreme Court precedent, shareholders have long been able to bring direct Section 14(a) claims when those shareholders have been deprived of the right to cast an informed vote. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 381, 397 (1970) (upholding both direct and derivative claims under Section 14(a) based on a misleading merger

---

[4] Defendants attack Mississippi's Section 20(a) claims solely on the basis that the Section 14(a) claims are inadequately pled.

proxy); *see also TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 443–44 (1976) (allowing a direct claim under Section 14(a) based on a misleading merger proxy to proceed to trial). In *Mills*, the Supreme Court wrote that Section 14(a):

> stemmed from a congressional belief that fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange. The provision was intended to promote the free exercise of the voting rights of stockholders by ensuring that proxies would be solicited with explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.
> *Mills*, 396 U.S. at 381 (quotation marks, brackets, and citations omitted).

Mississippi has pled that it "and other members of the proposed Class were denied the opportunity to make an informed decision when voting on the Merger" because Defendants made "false and misleading statements of material fact" that were designed to "encourage the Class to vote in favor of the Merger." (Dkt. 98 at pp. 49–50, 97, 99) *Mills* and the Supreme Court's other cases discussing Section 14(a) allow Mississippi to plead a direct claim, and it has done so. *See Rudolph v. Cummins*, No. 4:06-CV-2671, 2007 WL 1189632, at *2 (S.D. Tex. Apr. 19, 2007) ("This allegation indicates that the shareholders' voting rights have been impaired, which suggests that the shareholders have been damaged and that the claim is direct.").

    ii.  *Mississippi has sufficiently pled loss causation.*

The PSLRA does not impose a heightened pleading requirement for loss causation. *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336, 347 (2005). In securities actions, a plaintiff must generally simply "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Id*.

More specifically, "a plaintiff satisfies [Section] 14(a)'s loss causation requirement by demonstrating that [the] defendant's misrepresentations induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction." *In re AOL Time Warner, Inc. Securities and ERISA Litigation*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004) (quotation marks omitted); *see also Mills*, 396 U.S. at 388–89 ("[M]onetary relief might be afforded to the shareholders [in a direct Section 14(a) action] if the merger resulted in a reduction of the earnings or earnings potential of their holdings."). Mississippi has pled facts sufficient to establish that the merger between McDermott and CB&I, and the misleading proxy materials that facilitated it, led to drastic drops in McDermott's stock price as the truth about the Focus Projects became known. (Dkt. 98 at pp. 86–94) These allegations are sufficient to plead loss causation. *Cf. Dura*, 544 U.S. at 347 (holding that allegations of an "artificially inflated purchase price" did not satisfy the economic loss requirement when the complaint "fail[ed] to claim that [the company's] share price fell significantly after the truth became known").

    iii. *Mississippi has sufficiently pled actionable misrepresentations and omissions.*

Defendants argue that all of the statements relied on by Mississippi are puffery, non-actionable opinions, or forward-looking statements that fall within the PSLRA's safe harbor.

"Under the judicially created puffery doctrine, general, forward-looking, optimistic corporate statements that are so vague and indefinite that they do not affect the

price of a security because a reasonable investor would not rely on them in deciding whether to purchase or sell stock, are immaterial as a matter of law and should be dismissed." *Kurtzman v. Compaq Computer Corp.*, No. 4:99-CV-779, 2000 WL 34292632, at *37–38 (S.D. Tex. Dec. 12, 2000). The term "puffery" can also refer to "predictive or forward-looking statements" that "neither rise to the level of a guarantee nor include a specific statement of fact." *Id*.

The Fifth Circuit does not have a *per se* rule for dismissing puffery. *Id*. Rather, courts in this Circuit must "examine each corporate statement in the context in which it was made." *Id*. "Materiality is not judged in the abstract, but in light of the surrounding circumstances." *Krim v. BancTexas Group, Inc.*, 989 F.2d 1435, 1448 (5th Cir. 1993).

Similarly, opinion statements can also be actionable, since "the disclosure required by the securities laws is measured not by literal truth, but by the ability of the statements to accurately inform rather than mislead prospective buyers." *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 248 (5th Cir. 2009). In order to make an opinion statement actionable, a plaintiff must "call into question the issuer's basis for offering the opinion." *Omnicare, Inc. v. Laborers Dist. Council Const. Industry Pension Fund*, 575 U.S. 175, 194 (2015). "The investor must identify particular (and material) facts going to the basis for the issuer's opinion—facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*.

Under the PSLRA's safe harbor provisions, a forward-looking statement is not actionable if: (1) it is identified as forward-looking and is accompanied by "meaningful

cautionary statements identifying important factors that could cause actual results to differ materially;" (2) it is immaterial; or (3) the plaintiff fails to plead that the forward-looking statement was made with actual knowledge that it was false or misleading. *Lormand*, 565 F.3d at 243. "Whether or not a statement is forward-looking is governed by the nature of the statement, not a litigant's allegations about the statement." *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corporation*, No. 4:20-CV-576, 2021 WL 182316, at *6 (S.D. Tex. Jan. 19, 2021) (J. Atlas) (quotation marks omitted).

Here, as set out above, Mississippi has pled sufficient facts to establish that Defendants' repeated assurances regarding the Focus Projects were material and made with actual knowledge that they were misleading. Internal CB&I forecasts and risk registers showed that, at the time of the merger, McDermott and CB&I were understating the costs associated with the Focus Projects by about $1 billion. A project controls director who worked on both the Calpine and Cameron projects at CB&I left McDermott shortly after the merger because the company, like CB&I before the merger, refused to report the additional costs and was engaging in "a deception to stakeholders of the company." Defendants did not disclose the existence of the estimates, which ultimately proved to be correct. Defendants' repeated assurances regarding the Focus Projects omitted material facts about the costs of the Focus Projects, and those omissions are actionable. *See Anadarko*, 2021 WL 182316 at *6 ("[B]y the time Defendants made 'forward-looking' statements during the Class Period regarding Shenandoah, Defendants already knew that the potential for Shenandoah was being exaggerated and needed 'a significant downward adjustment.'").

Under the circumstances, Mississippi has established an entitlement to further discovery in this case.

## CONCLUSION

The defendants' motion to dismiss (Dkt. 124) is **DENIED**. Discovery in this case may proceed.

SIGNED at Houston, Texas, this 13th day of April, 2021.

                                        GEORGE C. HANKS, JR.
                                      UNITED STATES DISTRICT JUDGE