Refiled Per Court Order

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated, | **Case No. 4:18-cv-4330** **(Consolidated)** |
| Plaintiff, | **MEMORANDUM OF LAW IN SUPPORT OF §10(B) PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF §10(B) CLASS REPRESENTATIVES AND §10(B) CLASS COUNSEL** |
| v. |  |
| MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, STUART SPENCE, | **ORAL ARGUMENT REQUESTED** |
| Defendants, |  |

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

PROCEDURAL HISTORY ................................................................................... 3

STATEMENT OF FACTS ...................................................................................... 7

I.     THE CWS DETAILED THE ALLEGED FRAUD ................................... 7

     A.     THE CB&I / FOCUS PROJECT FRAUD ........................................ 9

     B.     THE TECHNOLOGY BUSINESS FRAUD ................................. 11

     C.     THE CAPITAL STRUCTURE / LIQUIDITY FRAUD .............................. 13

II.     DEFENDANTS' SCIENTER ................................................................. 15

III.     PARTIAL REVELATIONS OF FRAUD DAMAGED CLASS MEMBERS ....... 18

ARGUMENT ........................................................................................................ 20

I.     APPLICABLE LEGAL STANDARDS ................................................... 20

II.     THE CLASS SHOULD BE CERTIFIED UNDER FED. R. CIV. P. 23 WITH THE §10(B) PLAINTIFFS AS §10(B) CLASS REPRESENTATIVES .............. 22

     A.     Rule 23(a)'s Four Requirements Are All Satisfied .................................. 22

          1.     There Is Numerosity ................................................................. 22

          2.     There Is Commonality ................................................................. 23

          3.     There is Typicality ................................................................. 25

          4.     There Is Adequacy Of Representation ............................................. 26

     B.     Rule 23(b)(3) Class Action Certification Is Appropriate ............................ 30

          1.     Common Questions Predominate ................................................... 30

a. The Fraud-On-The-Market Doctrine Presumes Reliance ..... 31

    i. *Cammer* 1: McDermott Actively Traded On NYSE .................................................................... 34

    ii. *Cammer* 2: Analysts Widely Covered McDermott........................................................... 35

    iii. *Cammer* 3: Market Makers Facilitated Trading ....... 36

    iv. *Cammer* 4: McDermott Filed Forms S-3 ................. 37

    v. *Cammer* 5: A Cause-and-Effect Relationship Existed .................................................................. 37

    vi. *Krogman / Unger* Factors Show Market Efficiency........................................................... 38

b. Reliance Is Also Presumed Under *Affiliated Ute* ................ 39

c. Individual Calculations Will Not Defeat Predominance ..... 40

2. Class Adjudication Is Superior To Other Available Methods ......... 41

3. §10(b) Plaintiffs Should Be Approved As Class Representatives ... 43

III. §10(B) LEAD AND ADDITIONAL §10(B) COUNSEL WILL ADEQUATELY PROTECT THE §10(B) CLASS AND SHOULD BE APPOINTED ....................................................................................... 44

CONCLUSION ................................................................................................ 45

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Affiliated Ute Citizens v. U.S.*,
  406 U.S. 128 (1972) .................................................................................................. 39

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) .................................................................................... 21

*Amchem, Prods. v. Windsor*,
  521 U.S. 591 (1997) ............................................................................ 21, 29, 30, 31

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  568 U.S. 455 (2013) ............................................................................ 21, 31, 32, 33

*Asarco LLC v. Ams. Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ................................................................................ 35

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ............................................................................................ 32, 40

*Bell v. Ascendant Solutions, Inc.*,
  422 F.3d 307 (5th Cir. 2005) .................................................................................... 34

*Berger v. Compaq Computer Corp.*,
  257 F.3d 475 (5th Cir. 2001) .................................................................................... 27

*Buettgen v. Harless*, No. 09-cv-791-K,
  2011 WL 1938130 (N.D. Tex. May 19, 2011) .......................................................... 42

*Bywaters v. U.S.*,
  196 F.R.D. 458 (E.D. Tex. 2000) .............................................................................. 20

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) .......................................... 23, 33, 34, 35, 36, 37, 38

*City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275,
  2015 WL 5097883 (D.N.J. Aug. 31, 2015) ............................................................... 38

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ............................................................................................ 40, 41

*Dura Pharm., Inc. v. Broudo*,
    544 U.S. 336 (2005) ................................................................................................ 20

*Erica P. John Fund, Inc. v. Halliburton Co.*,
    563 U.S. 804 (2011) ........................................................................................... 21, 31

*Feder v. Elec. Data Sys. Corp.*,
    429 F.3d 125 (5th Cir. 2005) ............................................................................. 27, 29

*Finkel v. Docutel/Olivetti Corp.*,
    817 F.2d 356 (5th Cir. 1987) .................................................................................. 39

*Halliburton Co. v. Erica P. John Fund. Inc.*,
    573 U.S. 258 (2014) ................................................................................................ 32

*Halliburton Co. v. Erica P. John Fund. Inc.*,
    573 U.S. 258, 263 (2014) ....................................................................................... 32

*Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST,
    2016 WL 7406418 (N.D. Cal. Dec. 22, 2016) ........................................................ 23

*Horton v. Goose Creek Indep. Sch. Dist.*,
    690 F.2d 470 (5th Cir. 1982) .................................................................................. 20

*In re Banc of Cal. Sec. Litig.*,
    326 F.R.D. 640 (C.D. Cal. 2018) ........................................................................... 23

*In re Blech Sec. Litig.*,
    187 F.R.D. 97 (S.D.N.Y. 1999) .............................................................................. 41

*In re BP p.l.c. Sec. Litig.*, No. 10-md-2185,
    2014 WL 2112823 (S.D. Tex. May 10, 2014),
    *aff'd sub nom., Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ...................... 41

*In re Cobalt Int'l Energy, Sec. Litig.*, No. H-14-3428,
    2017 WL 2608243 (S.D. Tex. June 15, 2017) .................................................. 24, 25

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ............................................................................ 24, 29

*In re Dell Inc.*, No. A-06-CA-726-SS,
    2010 WL 2371834 (W.D. Tex. June 11, 2010),
    *aff'd, appeal dismissed sub nom., Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
    669 F.3d 632 (5th Cir. 2012) .................................................................................. 22

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2001),
   *abrogated on other grounds by Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
   568 U.S. 455 (2013) ...................................................................... 32, 35

*In re Dynegy, Inc. Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2005) .................................................. 31

*In re Elec. Data Sys. Corp. Sec. Litig.* (*EDS*),
   226 F.R.D. 559 (E.D. Tex. 2005),
   *aff'd sub nom., Feder v. Elec. Data Sys. Corp.*,
   429 F.3d 125 (5th Cir. 2005) ........................... 22, 25, 29, 31, 43

*In re Enron Corp. Sec. Derivative & "ERISA" Litig.*,
   529 F. Supp. 2d 644 (S.D. Tex. 2006) ......................... 2, 20, 21, 25, 27, 34, 38

*In re JPMorgan Chase & Co. Sec. Litig.*, No. 12-cv-03852 (GBD),
   2015 WL 10433433 (S.D.N.Y. Sept. 29, 2015)........................... 41

*In re Reliant*,
   2005 WL 2000707 ........................................................................ 42

*In re Reliant Sec. Litig.*, No. H-02-1810,
   2005 WL 8152605 (S.D. Tex. Feb. 18, 2005) ........................... 23

*Johnson v. U.S.*,
   208 F.R.D. 148 (W.D. Tex. 2001) .............................................. 20

*KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS,
   2013 WL 2443217 (W.D. Tex. June 3, 2013) ...................... 37, 39

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ...................... 34, 37, 38, 39

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004) ................................................ 29

*Ludlow v. BP, p.l.c.*,
   800 F.3d 674 (5th Cir. 2015) ...................................................... 40

*Marcus v. J.C. Penney*, No. 13-cv-736-MHS-KNM,
   2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) ................ 24, 25, 40, 42

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985)............................................................... 2, 21

*Prause v. TechnipFMC, PLC*, No. 17-cv-2368,
   2020 WL 3549686 (S.D. Tex. March 9, 2020) ............................................ 2, 26, 28, 30

*Rooney v. EZCORP, Inc.*,
   330 F.R.D. 439 (W.D. Tex. 2019),
   *appeal dismissed sub nom., In re EZCORP, Inc. Sec. Litig.*, No. 19-
   50258, 2019 WL 4667555 (5th Cir. June 6, 2019) .................................................... 23

*Rougier v. Applied Optoelectronics, Inc.*, No. 17-cv-02399,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019),
   *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex.
   Dec. 20, 2019) ........................................................................... 35, 38, 40, 41

*Slade v. Progressive Sec. Ins. Co.*,
   856 F.3d 408 (5th Cir. 2017) ..................................................................... 26

*Stirman v. Exxon Corp.*,
   280 F.3d 554 (5th Cir. 2002) ..................................................................... 25

*Stoffels v. SBC Communs., Inc.*,
   238 F.R.D. 446 (W.D. Tex. 2006) ............................................................... 28

*Stott v. Cap. Fin. Servs.*,
   277 F.R.D. 316 (N.D. Tex. 2011) ............................................................... 30

*Strougo v. Barclays PLC*,
   312 F.R.D. 307 (S.D.N.Y. 2016) ............................................................... 37

*Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*,
   No. 05-cv-1898 (SAS), 2006 WL 2161887 (S.D.N.Y. Aug. 1, 2006),
   *aff'd*, 546 F.3d 196 (2d Cir. 2008) ............................................................ 35

*Tellabs, Inc. v. Makor Issues and Rights, Ltd.*,
   551 U.S. 308 (2007) ........................................................................ 15, 20

*Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ,
   2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ..................................................... 36

*Torres v. S.G.E. Mgmt., L.L.C.*,
   838 F.3d 629 (5th Cir. 2016) ..................................................................... 31

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ................................................. 33, 34, 35, 37, 38, 39

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) .................................................................................. 24

*Wilson v. LSB Indus., Inc.*, No. 15 Civ 7614 (RA),
    2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ............................................ 36

*Zeidman v. J. Ray McDermott & Co., Inc.*,
    651 F.2d 1030 (5th Cir. 1981) .................................................................. 22

## **Statutes**

Private Securities Litigation Reform Act ............................................... 6, 29

Securities Exchange Act §10(b) ............................................................ *passim*

Securities Exchange Act §14(a) .............................................................. 3, 4

Securities Exchange Act §20(a) ........................................................... 3, 4, 7

## **Rules**

Fed. R. Civ. P. 15.................................................................................... 2, 6

Fed. R. Civ. P. 23................................................. 1-3, 20-27, 30-31, 41, 43-44

Fed. R. Civ. P. 23(a) ............................................... 3, 21-27, 31, 44

Fed. R. Civ. P. 23(a)(1) .......................................................................... 22

Fed. R. Civ. P. 23(a)(2) ......................................................................23-24

Fed. R. Civ. P. 23(a)(3) .......................................................................... 25

Fed. R. Civ. P. 23(a)(4) ......................................................................26-27

Fed. R. Civ. P. 23(b) ..........................................................................30-31

Fed. R. Civ. P. 23(b)(3) ..................................................................30-31, 41

Fed. R. Civ. P. 23(c) .............................................................................. 43

Fed. R. Civ. P. 23(d) .............................................................................. 43

Fed. R. Civ. P. 23(g)(1)(A).................................................................... 44

Fed. R. Civ. P. 26(f)............................................................................ 1, 5, 6

Local Rule 7.1.................................................................................................. 1, 6

Securities and Exchange Commission Rule 10b-5....................................................... 3, 7

§10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("NSHEPP" or "§10(b) Lead Plaintiff") and additional §10(b) Plaintiff City of Pontiac General Employees' Retirement System ("Pontiac") (together, "§10(b) Plaintiffs") respectfully move, pursuant to Fed. R. Civ. P. 23, for an Order (i) certifying the *Edwards* consolidated §10(b) actions ("§10(b) Action") as a class action, (ii) certifying the §10(b) Class (defined below), (iii) appointing §10(b) Plaintiffs as §10(b) Class Representatives, and (iv) appointing §10(b) Plaintiffs' choice of counsel, Pomerantz LLP ("Pomerantz"), as Lead §10(b) Class Counsel, Robbins Geller Rudman & Dowd LLP ("RGRD") as additional §10(b) Class Counsel, and the Briscoe Law Firm ("Briscoe") as §10(b) Liaison Counsel. Pursuant to Local Rule 7.1(d)(1), §10(b) Plaintiffs' counsel has conferred with Defendants' counsel and the parties cannot agree about the disposition of this motion, as set forth in the parties' previously filed Rule 26(f) Report (Dkt. No. 179) at 3, 4.[1]

## PRELIMINARY STATEMENT

§10(b) Plaintiffs' claims are ideally suited for class adjudication. They were allegedly injured, like all other §10(b) Class members, by Defendants' material misrepresentations and omissions regarding three separate threads of alleged fraud at Defendant McDermott International, Inc. ("McDermott") – the CB&I/Focus Project Fraud, Technology Business Fraud, and Capital Structure / Liquidity Fraud – all arising from

---

[1] Herein, unless stated otherwise: "¶" references are to the numbered paragraphs of the corrected Class Action Complaint (Dkt. No. 105) ("CCAC"), "Supp. ¶" references are to the numbered paragraphs of Plaintiffs' proposed Supplement to the CCAC (Dkt. No. 190-1) ("Supplement" or "Supp."), capitalized terms have the definitions assigned in the CCAC or the Supplement, "Dkt. No." references are to entries on the *Edwards* docket, all emphasis is added, and all internal citations and quotations are omitted.

McDermott's merger with Chicago Bridge & Company, N.V. ("CB&I"), its acquisition of the deeply-troubled "Four Focus Projects," the disastrous effects of the Merger and those projects on McDermott's capital structure and liquidity, and McDermott's inability to integrate and capitalize on CB&I's valuable Lummus technology business or otherwise sell it to solve its financial problems and avoid bankruptcy. Trial of the claims will focus on issues common to all §10(b) Class members: control, falsity, materiality, scienter, reliance, and loss causation. Simply put, this is a quintessential securities fraud class action, where class certification is appropriate and where, given McDermott's bankruptcy and limited sources of potential recovery, it should be granted expeditiously.

"Rule 23 is a remedial rule [and, as such, is to] be construed liberally to permit class actions, especially in the context of securities fraud suits." *In re Enron Corp. Sec. Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006). Certification of class actions to adjudicate securities claims like those at issue here is commonplace and well-justified. *See, e.g.*, *Prause v. TechnipFMC, PLC*, No. 17-cv-2368, 2020 WL 3549686, at *1 (S.D. Tex. March 9, 2020) (granting motion for class certification); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) ("most of the plaintiffs would have no realistic day in court if a class action were not available.").

Prior to filing this motion, §10(b) Plaintiffs filed their motion seeking leave to supplement under Fed. R. Civ. P. 15(d) the operative §10(b) pleadings to expand the class period, to add additional named §10(b) Plaintiff Pontiac, and to allege additional post-pleading misstatements, corrective events, stock drops, and scienter facts as part of Defendants' continuing fraud. This motion assumes that the Rule 15(d) motion will be

granted.  As such, §10(b) Plaintiffs seek certification of the following §10(b) Class, as defined in ¶4 of the proposed Supplement (Dkt. No. 190-1): All persons and entities (the "§10(b) Class members") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. Excluded from the §10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.  The §10(b) Class warrants certification because it satisfies both Fed. R. Civ. P. 23(a) and (b)(3) requirements.[2]

## PROCEDURAL HISTORY

Plaintiff Miriam Edwards filed the initial complaint on November 15, 2018, styled *Edwards, et al. v. McDermott, Int'l, Inc, et al.*, No. 18-cv-04330 (S.D. Tex.) (Dkt. No. 1), alleging Exchange Act §§10(b) and 20(a) claims.  On January 14, 2019, Plaintiff Public Employees' Retirement System of Mississippi ("MSPERS" or "§14(a) Lead Plaintiff")

---

[2]      Assuming, *arguendo*, that the Court was inclined to deny the §10(b) Plaintiffs leave to expand the §10(b) Class Period, as pled in the proposed Supplement, then the §10(b) Plaintiffs still seek class certification of the §10(b) Class for the unexpanded §10(b) Class Period as alleged in ¶1 of the operative CCAC.  Significantly, the operative Rule 23 analysis and the underpinnings, analysis, and conclusions of the Expert Report of Zachary Nye ("Nye Report") do not materially change if the Court evaluates proposed certification of the §10(b) Class for the unexpanded rather than the expanded §10(b) Class Period.

filed a related class action complaint, styled *Public Employees' Retirement System of Mississippi, et al. v. McDermott Int'l, Inc., et al.*, No. 19-cv-0135 (S.D. Tex.) (Dkt. No. 9), alleging Exchange Act §§14(a) and 20(a) claims ("§14(a) Action").  On February 7, 2019, Defendants filed a motion (Dkt. No. 55) to consolidate the §10(b) and §14(a) Actions, which was granted orally on March 11, 2019, provided that separate lead plaintiffs were to be later appointed (Dkt. No. 74), and in writing by Order dated June 4, 2019 (Dkt. No.84).

Six competing lead plaintiff motions were timely filed in the §10(b) Action on January 15, 2019 (*see* Dkt. Nos. 10, 14, 18, 20, 21, 22), including NSHEPP's motion (Dkt. No. 22) with Certification (Dkt. No. 24-2), Pontiac's motion (Dkt. No. 21) with Certification (Dkt. No. 21-3), and motions by one other institutional investor and three individual investors.  MSPERS was the only investor to file a motion (Dkt. No. 16) seeking a lead plaintiff appointment in the §14(a) Action.  On June 4, 2019, the Court granted NSHEPP's motion and appointed it to serve as §10(b) Lead Plaintiff overseeing "***all*** claims related to §10(b) of the Securities Exchange Act" and Pomerantz to serve as §10(b) Lead Counsel.  *See* Dkt. No. 84 at 2.  The Court also granted MSPERS's motion for appointment to serve as §14(a) Lead Plaintiff and its choice of counsel as §14(a) Lead Counsel.  *Id.*

On October 4, 2019, §10(b) Lead Plaintiff filed the operative CCAC with a supplemental Certification (together, Dkt. No. 105), on a twice-extended deadline (*see* Dkt. Nos. 93, 100), amidst pertinent facts still unfolding in August / September 2019 regarding continued negative impacts of the Four Focus Projects, McDermott's deteriorating financial condition, its potential sale of the Lummus technology business, and its potential

bankruptcy.  The second extension had been opposed by Defendants.  *See* Dkt. No. 96.

Defendants were due to move to dismiss by January 21, 2020 (Dkt. No. 111). Instead, on January 22, 2020, Defendants filed a Suggestion of Bankruptcy (Dkt. No. 120).

On January 30, 2020, Defendants belatedly filed their voluminous motion to dismiss the CCAC (Dkt. No. 125).  On June 19, 2020, §10(b) Lead Plaintiff filed its opposition (Dkt. No. 145).  On July 30, 2020, Defendants filed their reply (Dkt. No. 150).  On March 31, 2021, the Court entered an Order (Dkt. No. 163) and on April 13, 2021, it entered an Opinion and Order (Dkt. No. 168, 2021 WL 1421609) ("MTD Order"), denying in full the motion to dismiss.  On May 14, 2021, Defendants filed their Answer (Dkt. No. 177).

On July 28, 2020, §10(b) Lead Plaintiff filed a motion to consolidate (Dkt. No. 147) with and into the §10(b) Action the related, tag-along class action styled *Ahnefeldt, et al. v. Dickson, et al.*, No. 20-cv-02539-ASH (S.D. Tex.) ("*Ahnefeldt* Action"), which purported to pursue Exchange Act §10(b) claims against Defendants on a class-wide basis. On August 18, 2020, oppositions were filed by the *Ahnefeldt* plaintiffs (Dkt. No. 151) and Defendants (Dkt. No. 152).  On August 25, 2020, §10(b) Lead Plaintiff filed a reply (Dkt. No. 153).  On March 31, 2021, the Court entered an Order (Dkt. No. 164), and on April 12, 2021, it entered an Opinion and Order (Dkt. No. 166; 2021 WL 1415900), which granted the consolidation motion's request to consolidate the *Ahnefeldt* Action with and into the §10(b) Action under the oversight of §10(b) Lead Plaintiff.

On April 28, 2021, §10(b) Lead Plaintiff, §14(a) Lead Plaintiff, and Defendants, through their counsel, held their Rule 26(f) conference.  Thereafter, §10(b) Lead Plaintiff, §14(a) Lead Plaintiff, and Defendants, through counsel, further communicated on the

issues, then negotiated, drafted, and filed a joint Rule 26(f) report on May 21, 2021 (Dkt. No. 179), which set forth the Parties' agreements and disputes pertaining to all milestones necessary to bring the §10(b) Action and the §14(a) Action to trial.

In accordance with the Rule 26(f) report, discovery in the §10(b) Action and the §14(a) Action then began.  The parties served written requests on May 25, 2021, initial disclosures on June 1, 2021, and objections and responses to initial requests on June 25, 2021.  In August / September 2021, the §10(b) Lead Plaintiff, §14(a) Lead Plaintiff, and Defendants, through counsel, engaged in an ongoing meet and confer process with four lengthy teleconferences and the exchange of various written communications.  Both sides have also made initial document productions and have proffered lists of proposed Defendant document custodians whose documents would be gathered and searched.

On September 29, 2021, the Court formalized that §10(b) Plaintiff is the PSLRA lead plaintiff overseeing the claims previously asserted in the *Ahnefeldt* Action, by an Order entered on the *Ahnefeldt* docket that granted NSHEPP's lead plaintiff motion, to the extent necessary given the prior consolidation of the *Ahnefeldt* Action.  *See* No. 4:20-CV-2539, Dkt. No. 49.  The same day, §10(b) Plaintiffs filed their motion (Dkt. No. 189) for leave to supplement the CCAC pursuant to Fed. R. Civ. P. 15(d) and LR 7.1 and in accordance with the Rule 26(f) Report, along with the proposed Supplement (Dkt. No. 190-1).  The motion is now pending and must still be fully briefed.

**STATEMENT OF FACTS**

**I.    THE CWS DETAILED THE ALLEGED FRAUD**

Defendant McDermott is headquartered in Houston with common stock traded on the NYSE under the ticker "MDR."    ¶28.   It provides energy industry technology, engineering, and construction services.   ¶57.  During the §10(b) Class Period, Defendant Dickson was its President / CEO and Defendant Spence its EVP / CFO.  ¶¶29-30.

As alleged in the CCAC and the Supplement, Defendants violated Exchange Act §§10(b) and 20(a) (15 U.S.C. §§78j(b) and 78t(a)) and SEC Rule 10b-5 (15 C.F.R. §240.10b-5) by making public misstatements and omissions in the §10(b) Class Period, with scienter, in press releases, SEC filings, and investor teleconferences and presentations, regarding the true risks and costs of McDermott's May 2018 Merger with CB&I and its acquisition of four CB&I Focus Projects (the CB&I / Focus Projects Fraud) (¶¶135-217); the importance of McDermott's acquisition, integration, and operation of CB&I's Lummus technology business or its ability to sell Lummus to shore up its balance sheet outside of Chapter 11 (the Technology Business Fraud) (¶¶218-275; Supp. ¶¶7-16); and the strength and viability of McDermott's post-Merger financial health, capital structure, and liquidity, and its ability to avoid bankruptcy (the Capital Structure / Liquidity Fraud) (¶¶276-305; Supp. ¶¶7-16).   Defendants falsely depicted McDermott as a strong company that capitalized on a discounted acquisition of a complementary peer and was successfully integrating and appropriately accounting for its most significant projects and assets.

Unbeknownst to investors, as detailed by numerous confidential witnesses ("CWs") and internal company documents referenced in the CCAC, the true costs of and risks of the

7

Focus Project and by extension the Merger were dramatically understated.  ¶¶87-134.  The CWs, many of them high-level CB&I and/or McDermott employees directly responsible for cost and risk analysis, quantification, and management (¶¶8, 33-56, 93-98, 108-131), consistently described how vast underbidding and inadequate engineering on the Focus Projects resulted in massive rework, delays, and cost overruns, which Defendants handled by underreporting costs, inadequately reducing forecasts, insufficiently increasing cost estimates, manipulating internal project controls documents, maintaining two sets of books, and delaying vendor and contractor payments to inflate financials – practices that McDermott continued post- Merger.  ¶¶93-131.  As described by the CWs and documented on internal Risk Registers, when the Merger closed, Cameron alone had underreported costs of $1 billion+ and was on pace to lose $700 million - $1.2 billion (¶¶8, 127-134), while CB&I was "basically bankrupt." ¶¶73-74.  Yet, McDermott paid ~$1.75 billion to acquire CB&I and its disastrous Focus Projects, rather than its valuable Lummus technology business alone, after rejecting a $2 billion offer by Subsea 7 S.A. to acquire McDermott at a 16% premium.  ¶¶2-3, 70-85, 379-387.  In denying Defendants' motion to dismiss, the Court rejected challenges to the CW allegations, credited the CW statements, and relied on them in its analysis.  *See, e.g.*, MTD Order, 2021 WL 1421609 at *2, *9.

The CCAC alleged a multi-year three-prong fraud, which the Supplement alleges continued past the CCAC's filing up to McDermott's January 2020 bankruptcy.  In denying the motion to dismiss, the Court fully upheld the fraud as alleged in the CCAC, while taking judicial notice of the post-Class Period events.  MTD Order, 2021 WL 1421609 at *9-*10.

A.   **THE CB&I / FOCUS PROJECT FRAUD**

As distilled in §10(b) Lead Plaintiff's motion to dismiss opposition ("MTD Opposition") §IV.F.1., Dkt. No. 145 at 26-29, the "CB&I/Focus Project Fraud" included pre-Merger (¶¶137-178) and post-Merger (¶¶179-217) misstatements and omissions about the scope, management, reporting of, and accounting for the costs and risks of the Focus Projects and the Merger.

Pre-Merger, Defendants misstated that the Focus Projects had been "de-risked" or that progress had "take[n] out a lot of the risk," without disclosing $1 billion+ in forecasted, undisclosed costs. *See, e.g.*, ¶¶3, 139(c), 142(c)-(d), 148(c)-(d), 175-176.  Defendants misstated the Merger accounting, by assuming that the fair value of all assets and liabilities equaled their carrying values, which was impermissible given the scope and probability of those forecasted, undisclosed costs. *See e.g.*, ¶¶161-163.  They also highlighted post-Merger backlog (¶¶137(c), 138, 142(a), 148(a)) and claimed the Merger would yield $250-$350 million in annual cost synergies (¶¶138, 139(b), 142(a), 148(a), 173) and be cash accretive the first year excluding "one-time costs" (¶137(d)), without disclosing the Focus Projects' cost forecasts and cash burn.  They described January 2018 reporting adjustments as "non-recurring" (¶142(b), 148(b)), downplayed CB&I's $100 million in Q4 2017 charges on the Focus Projects (¶¶3, 145(b)-(d)), and expressed false confidence in the Merger's benefits for shareholders (¶¶145(a), 168).

Post-Merger, Defendants concealed the Focus Projects' true risks, necessary write-downs, and impacts.  On July 31, 2018, they recorded $221 million in cost estimate changes (25% of undisclosed Cameron forecasted costs), calculated as of the Merger date, while

downplaying the significance of the costs.   ¶¶180, 183, 186.   They touted the CB&I portfolio as "fundamentally sound," "progressing well," and "not require[ing] a material change to cost estimates."   ¶¶180-181, 187.   They claimed in September 2018 that no "changes in estimate (project charges)" were needed on Freeport or Cameron (¶¶190-191), before recording $744 million in changed estimates on the Focus Projects and increasing Merger goodwill by $782 million, calculated as of the Merger date, on October 30, 2018 (¶¶10, 307(e)).   They downplayed the impacts of the changed estimates, while failing to disclose the Focus Projects' ongoing risks and cash burn (¶¶193, 197, 203), while claiming there would be "no further material changes in the cost estimates on these projects," which were "significantly and incrementally de-risked as compared to where we were in Q2 [2018]" (¶¶195, 198(a)).   When McDermott recorded $168 million more in changed estimates on February 13, 2019 (¶¶12, 312), Defendants continued to misleadingly tout project progress and completion percentage (¶¶196, 198(b), 200, 202, 204, 207, 213), claim stronger "operating cash flow" and "reduced outflows on the focus projects" (¶205), and highlight that they "completed our integration efforts" and implemented "disciplined execution on these projects" (¶¶208-209).   By July 29, 2019, McDermott disclosed a $205 million cash burn (¶¶12, 315), but Defendants claimed that McDermott was "optimizing the benefits" of the Merger and expressed confidence that the "challenges" since the Merger would be "behind us" by year end (¶214).   News of McDermott's' potential bankruptcy leaked ~45 days later, on September 18, 2019 (¶¶14-15, 320-323), with more bankruptcy-related disclosures emerging right up to the CCAC's early October filing, on September 23-24 (¶¶16, 324) and September 27, 2019 (¶¶17, 325), and continuing

thereafter until McDermott's bankruptcy filing in January 2020, as the Supplement alleges.

In denying Defendants' motion to dismiss, the Court upheld as actionable all the CCAC's alleged misstatements.  *See* MTD Opinion, 2021 WL 1421609 at *9 ("Nova Scotia has pled sufficient facts to establish that Defendants' repeated assurances regarding the Focus Projects before and after the merger were material and misleading" and "Defendants' repeated assurances regarding the Focus Projects before and after the merger omitted material facts and are actionable").

## B.    THE TECHNOLOGY BUSINESS FRAUD

As distilled in §10(b) Lead Plaintiff's MTD Opposition §IV.F.2., Dkt. No. 145 at 29-30, in the "Technology Business Fraud" (¶¶218-275), which the Court upheld, MTD Opinion, 2021 WL 1421609 at *9-*10, Defendants touted the benefits of acquiring Lummus in a full Merger with CB&I, rather than acquiring it alone, by saying the Merger's "compelling strategic rationale" was to use "strong technology offering and capabilities" and "market-leading technology" to "support increased pull-through work, but this will not be possible without CB&I's tier-one technology business" (¶¶5, 219, 222-223, 225, 231-232), without revealing that Lummus was CB&I's only valuable asset, and that acquiring all of CB&I, including the Focus Projects, vastly increased the deal risks and needlessly jeopardized McDermott's ability to retain Lummus.  ¶¶5-6, 218.  Post-Merger, Defendants touted Lummus's strengths, operating margin, and earnings contributions, even as McDermott massively wrote down the Focus Projects in October 2018, without disclosing negative trends within the full acquired CB&I portfolio.  ¶¶243-248, 250-258, 260-261, 265-268, 271-275.  In July 2019, two months before leaks of McDermott's potential

bankruptcy, they lauded Lummus's market position and its providing "unparalleled insight into upcoming EPC opportunities" worth $40 billion.  ¶¶271-272, 274.

The Technology Business Fraud continued after the CCAC's filing, up to McDermott's bankruptcy, with the narrative pivoting toward a potential full or partial Lummus sale being a path toward McDermott's long-term balance sheet and liquidity health.  *See* Supp. ¶¶7-16.  As word leaked of McDermott's hiring a restructuring consultant and its stock price cratered (¶¶321, 323), on September 20, 2019, Defendants buoyed the stock by touting unsolicited inquiries into potential full or partial sales of Lummus and saying that McDermott was "exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through" and that Lummus sale proceeds would be used "to strengthen our balance sheet."  Supp. ¶9.  On October 21, 2019, and November 4, 2019, and December 2, 2019, Defendants said McDermott continued to pursue a strategic alternatives process for Lummus (Supp. ¶¶11-13), and, after characterizing new lending agreements as addressing near-term liquidity concerns, framed a Lummus deal as a "long-term solution[ ] to our liquidity needs" (Supp. ¶¶11(b), 12(b)).  These misstatements concealed that, by late September 2019, there was no hope of integrating Lummus into McDermott, even in part, a bankruptcy reorganization was McDermott's only viable path forward, and any Lummus sale transaction would occur only within the context of a Chapter 11 proceeding.  Supp. ¶¶16.

### C.   THE CAPITAL STRUCTURE / LIQUIDITY FRAUD

As distilled in §IV.F.3. of §10(b) Lead Plaintiff's MTD Opposition, Dkt. No. 145 at 30-31, in the "Capital Structure/Liquidity Fraud" (¶¶276-305), Defendants made extensive pre-Merger and post-Merger assurances as to McDermott's post-Merger balance sheet, working capital, and capital structure, without disclosing the underlying negative trends and risks posed by the Focus Projects' cash burn, $1 billion+ in undisclosed cost estimates, and needed write-downs.   Pre-Merger, after 10 months of due diligence, Defendants said the Merger "[p]rovides capital structure with liquidity to fund growth and manage downside scenarios," "sufficient funded debt…to strengthen balance sheet and provide liquidity to manage working capital needs, timing and [F]ocus [P]rojects," and "a strong capital structure."  ¶¶7, 277, 279, 281.  Post-Merger, they cited McDermott's cash, cash from operations, credit facilities, lines of credit, and external sources of liquidity like debt and equity instruments as being "sufficient to finance our capital expenditures… settle our commitments and contingencies…and address our normal, anticipated working capital needs for the foreseeable future" (with minor phrasing variations) on July 31, 2018 (¶283), October 2018 (¶¶286-290), February 2019 (¶¶292-294), April 2019 (¶¶296-299), and July 2019 (¶¶301-304).   Leaks of an ongoing liquidity crisis and potential bankruptcy emerged six weeks later, on September 18, 2019 (¶¶14-15, 321-323), September 23-24, 2019 (¶¶16, 324), and September 27, 2019 (¶¶17, 325) – just days before the CCAC was filed.

The Capital Structure/Liquidity Fraud continued after the CCAC's filing, up to McDermott's bankruptcy in January 2020. *See* Supp. ¶¶7-16.  As leaks about McDermott's hiring of AlixPartners cratered its stock price (¶¶321, 323), on September 20, 2019,

Defendants reversed the declines by not only touting a potential Lummus sale (*see* Facts §I.B., *supra*), but also more broadly stating, "[t]he process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure." Supp. ¶9. After rumors as to McDermott's needing financing (¶324), on October 21, 2019, Defendants miscast $1.7 billion in new financing as being used "to finance working capital and support the issuance of required performance guarantees on new projects," being sufficient to "address our liquidity concerns in the near term and [to] allow us to continue to evaluate all potential long-term solutions to our liquidity needs," and being "a continued signal from our lenders that they support McDermott, our underlying business, growth strategy and ability to achieve a long-term balance sheet solution[.]" Supp. ¶¶11(a)-(b). On November 4, 2019, they said the agreements signaled lenders' "confidence in our underlying business," described "[c]ontinuing collaborative effort with lenders and noteholders to achieve a long-term balance sheet solution," and touted "retain[ing] legal and financial advisors to help us evaluate strategic and capital structure alternatives" as "actions [that] provide an opportunity for us to address our liquidity needs for the next 12 months and [ ] allow us to continue to evaluate potential solutions to our liquidity needs." Supp. ¶¶12(a)-(b). On December 2, 2019, Defendants said the second tranche funding enabled "required performance guarantees on new projects" and permitted "continue[d] collaborative discussion regarding a long-term balance sheet solution." Supp. ¶13. On December 13, 2019, they stated an intent to cure an NYSE delisting notice. Supp. ¶14. As late as January 15, 2020, they said, "McDermott continues to engage in constructive conversations with holders of the Senior Notes." Supp.

¶15.  These statements were materially false and misleading, *inter alia*, for concealing that by late September 2019, McDermott's financial situation was untenable, Defendants had pivoted fully to a consensual bankruptcy reorganization where Lummus would be sold in Chapter 11, and the new lending was merely bridge financing to permit preparation and filing of a prepackaged bankruptcy that enriched McDermott's lenders and insiders while extinguishing common stockholders.  Supp. ¶16.

## II.   DEFENDANTS' SCIENTER

The CCAC pled a 34-page section (¶¶328-394) of detailed factual allegations supporting a strong inference of Defendants' scienter.  The Supplement augments that scienter pleading with an additional 10 paragraphs of post-CCAC allegations.  Supp. ¶¶26-36.  In denying Defendants' motion to dismiss, the Court held that the CCAC sufficiently pled "at minimum" deliberate recklessness, via, *inter alia*, its CW allegations and citations of internal company documents and its extensive motive allegations based on Defendants' compensation packages, incentive bonuses, and insider transactions, coupled with facts the court judicially noticed at the motion to dismiss stage, such as McDermott's three-month delay in disclosing the SEC's investigation and subpoena, which it concealed from July 2019 to November 4, 2019.  *See* MTD Order, 2021 WL 1421609 at *9.  The Supplement adds additional scienter allegations based on those judicially noticed facts and others that arose after the CCAC's filing, and its scienter pleading, under binding precedent, must be viewed holistically together with the CCAC's allegations.  *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 308, 322 (2007).  Simply put, the Supplement only strengthens the already strong and judicially upheld inference of Defendants' scienter.

The CCAC alleged, *inter alia*, that the true, undisclosed risks of the Focus Projects and the Merger were known to Defendants or disregarded by them with deliberate recklessness by no later than McDermott's pre-Merger due diligence, which both the CWs and Defendants themselves described as exhaustive (¶¶328-361), and throughout McDermott's post-Merger ownership and operational control over CB&I and those Projects (¶¶364-368). Not only were the issues well-documented internally (¶¶93-101, 127-134), but McDermott perpetuated the improper Merger accounting and continued ongoing misconduct, such as by internally manipulating project forecasts reflected on two sets of books and delaying payments to vendors and contractors, for multiple post-Merger operating quarters, with Dickson and Spence's knowledge and involvement. ¶¶96, 110, 119, 124, 364-368. In denying Defendants' motion to dismiss, the Court already credited the CCAC's scienter allegations. *See* MTD Opinion, 2021 WL 1421609 at *9 ("Nova Scotia has also alleged sufficient facts to establish that Dickson and Spence behaved in a manner that was, at a minimum, severely reckless.").

The CCAC also pled motive allegations that supported a strong scienter inference of scienter. ¶¶369-377. On March 1, 2018, Dickson and Spence received large Recognition Bonuses for advancing the Merger, *see* ¶370 ($1.125 million for Dickson, $637,500 for Spence), which they would have lost had McDermott instead pursued a deal with Subsea 7. ¶¶174, 379-383. The Merger also elevated McDermott into a different peer group of companies, such that Dickson and Spence received base and incentive compensation increases. ¶372. Dickson and Spence also engaged in extensive, highly suspicious insider transactions in stock, stock options, and stock units that netted them

$9.98 million in ill-gotten gains, as well as 727,464 additional shares at no expense. *See* ¶374-376 ($8.02 million plus 556,986 shares for Dickson, $1.97 million plus 170,478 shares for Spence). McDermott also raised hundreds of millions of dollars via a suspiciously timed private placement offering. ¶377. In denying Defendants' motion to dismiss, the Court expressly credited these allegations, finding that Dickson and Spence "stood to, and did, benefit greatly" from staving off the Subsea 7 deal, closing the Merger, receiving Merger-related bonuses and compensation increases, and engaging in "suspicious stock, performance unit, and restricted stock unit transactions during the Class Period." *See* MTD Opinion, 2021 WL 1421609, at *9.

The Supplement continues, expands, and strengthens these allegations underlying the Court's rulings. It alleges that Dickson and Spence benefitted from suspicious, extravagant bonus compensation during the expanded §10(b) Class Period, while investors were kept in the dark about McDermott's upcoming bankruptcy, including retention bonuses announced on October 17, 2019 ($3.375 million for Dickson and $1.3 million for Spence, one-third payable immediately and the rest payable upon the second and third tranches of credit agreement funding). Supp. ¶29. These bonuses were authorized to be fully paid upon the bankruptcy filing, despite tranche three never funding. *Id.* McDermott also sought and received bankruptcy court approval for an executive retention plan to pay Dickson and insiders up to $12.6 million more, and a management incentive plan that reserved 7.5% of McDermott equity for Dickson and insiders, even as the Class members' stock holdings were eviscerated. Supp. ¶¶30-31. The Supplement alleges, as the Court judicially noticed in its MTD Opinion, that while Dickson and Spence engaged in insider

trading, McDermott delayed revealing until November 4, 2019, that, back in July 2019, the SEC had launched an investigation into Defendants' disclosures of the Cameron project's projected losses and had served a related subpoena. Supp. ¶32. The Supplement alleges that Spence suspiciously resigned, effective November 4, 2019, "to pursue other opportunities," though he received both his October 2019 retention bonus payment and a lavish separation package with an $866,666 lump-sum payment, accelerated vesting of stock units, and immediate vesting and payment of all executive compensation plan benefits. Supp. ¶¶33-35. It alleges that Dickson continued selling stock into March 2020, Supp. ¶28, even as McDermott delayed revealing until May 2020 that, back in February 2020, the U.S. Attorney for the Southern District of Texas had sent notification of a Federal Grand Jury investigation and served a subpoena. Supp. ¶36.

## III.    PARTIAL REVELATIONS OF FRAUD DAMAGED CLASS MEMBERS

The CCAC alleges that a series of events began to partially reveal Defendants' fraud, driving $21.07 in total stock declines from its December 18, 2017, closing price of $22.77 by late September 2019 – a 92.5% market capitalization loss. ¶18. They included: (1) McDermott's recording $744 million in changed Focus Project estimates, disclosing that fair value adjustments on the projects increased goodwill by $782 million "calculated…as of the [Merger] Date," and announcing an intent to sell businesses (¶¶10, 307(e), 308(a)), which caused a 40% stock drop of $5.14 per share (¶¶10, 311); (2) its recording $168 million in changed Q4 2018 Cameron estimates on February 13, 2019, which caused a 26.7% drop of $2.48 (¶¶12, 312-314); (3) its disclosing a $205 million Q2 2019 operating cash burn, reflecting a $146 million net loss and cash used on Cameron,

and its lowering 2019 guidance due to changed Focus Project assumptions on July 29, 2019, which caused a 35.3% drop of $3.56 (¶¶12, 315, 317-319); (4) leaks of McDermott's hiring a turnaround firm, which caused a trading halt before the stock closed down 63.3% or $3.72 on September 18, 2019 (¶¶14, 320-322); (5) an after-hours report that Lummus could be sold to generate needed cash to counteract negative working capital, which dropped the stock 22.7% on September 19, 2019 (¶¶15, 323); (6) reports that McDermott needed a $1.7 billion bridge loan to cover its working capital deficit until Lummus was sold, which dropped its stock 8.5% on September 23-24, 2019 (¶¶16, 324); and (7) an analysis deeming it "virtually impossible" for McDermott to get super-senior debt and calling the bridge loan necessary to keep operations afloat, which caused a 9.1% stock drop on September 27, 2019 (¶¶17, 325).  Thus, stockholders were nearly wiped out by the time the CCAC was filed on October 4, 2019, with then-ongoing revelations about a potential bankruptcy driving then-ongoing stock declines.  ¶¶326-327.

The CCAC alleges that these events and correlating declines partially and incrementally revealed Defendants' fraud and removed artificial inflation from McDermott's stock, causing real economic loss to the §10(b) Lead Plaintiff and §10(b) Class members.  ¶¶403-407.  Defendants' motion to dismiss failed to challenge these loss causation and economic loss allegations.

The Supplement pleads additional corrective events and correlating stock drops during the expanded §10(b) Class Period that further partially revealed the alleged, ongoing fraud, correcting both the CCAC's originally pled misstatements and omissions and the Supplement's newly pled misstatements and omissions.  Supp. ¶¶17-25.  They included:

(1) McDermott's November 4, 2019 after-hours disclosure that the SEC had launched an investigation into its disclosures about Cameron's projected losses and had served a document subpoena by letter dated July 26, 2019, and its November 5, 2019 announcement that Defendant Spence had resigned, which dropped its stock 6.35% or $0.11 on November 5, 2019 (Supp. ¶¶18-19); and (2) McDermott's filing a prepackaged bankruptcy on January 21, 2020 and disclosing that proceeds from Lummus's $2.725 billion sale would protect and equitize debt creditors while common stockholders were extinguished (Supp. ¶20), which after a trading halt and more revelations occurred on January 22-23, 2020 (Supp. ¶¶21-23), dropped the stock 83% or $0.58 on January 23, 2020 (Supp. ¶24).

## ARGUMENT

### I.   APPLICABLE LEGAL STANDARDS

The U.S. Supreme Court has long "recognized that meritorious private actions to enforce federal antifraud securities laws are an essential supplement to criminal prosecutions and civil enforcement actions[.]" *Tellabs*, 551 U.S. at 313 (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 345 (2005)).   As courts in the Fifth Circuit consistently hold, "Rule 23 is a remedial rule [and, as such, is to] be construed liberally to permit class actions."  *Enron*, 529 F. Supp. 2d at 670.   The Fifth Circuit has held that "judges should err in favor of certification." *Horton v. Goose Creek Indep. Sch. Dist.*, 690 F.2d 470, 487 (5th Cir. 1982); *see Johnson v. U.S.*, 208 F.R.D. 148, 166 (W.D. Tex. 2001) (Given that Rule 23 "provides a district judge with great flexibility…, the Fifth Circuit has held that judges should err in favor of certification."); *Bywaters v. U.S.*, 196 F.R.D. 458, 462-63 (E.D. Tex. 2000) (same).  By aggregating smaller claims into a single lawsuit, thus

promoting judicial economy, "[c]lass actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually. [M]ost of the plaintiffs would have no realistic day in court if a class action were not available." *Phillips Petroleum Co.*, 472 U.S. at 809. Securities lawsuits are particularly appropriate for class action treatment. *Amchem*, *Prods. v. Windsor*, 521 U.S. 591, 625 (1997) (class action requirements are "readily met in certain cases alleging . . . securities fraud"); *Enron*, 529 F. Supp. 2d at 670.

To certify a putative class, the Court must determine whether four threshold requirements of Fed. R. Civ. P. 23(a) – (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation – are met and whether the action is maintainable under Fed. R. Civ. P. 23 (b)(1), (2) or (3). *Amchem*, 521 U.S. at 613. The preponderance of evidence standard applies to evidence proffered to establish these requirements. *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 228 (5th Cir. 2009) (citation omitted).

Significantly, in determining if the Rule 23 elements are established, the Court is not to "engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent…that they are relevant to determining whether the [Rule 23] prerequisites for class certification are satisfied." *Id.* Accordingly, while it is appropriate to consider whether a securities market was efficient to support a presumption of reliance, it is not appropriate to delve into merits issues such as materiality, scienter, or loss causation. *Amgen*, 568 U.S. at 465-66; *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 812-13 (2011) ("*Halliburton I*").

21

## II.     THE CLASS SHOULD BE CERTIFIED UNDER FED. R. CIV. P. 23 WITH THE §10(B) PLAINTIFFS AS §10(B) CLASS REPRESENTATIVES

### A.     Rule 23(a)'s Four Requirements Are All Satisfied

The four requirements of Rule 23(a) – numerosity, commonality, typicality, and adequacy of representation – are readily established here for the expanded §10(b) Class Period alleged in ¶4 of the proposed Supplement.[3]

### 1.     There Is Numerosity

Rule 23(a)(1) requires that a class be so numerous that joinder of all members is "impracticable." A plaintiff need not allege the exact number or identity of class members. *See In re Elec. Data Sys. Corp. Sec. Litig*. (*EDS*), 226 F.R.D. 559, 564 (E.D. Tex. 2005), *aff'd sub nom. Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125 (5th Cir. 2005). Indeed, the Fifth Circuit has held the numerosity requirement is "generally assumed to have been met in class action suits involving nationally traded securities" because "any class composed of the sellers of a nationally traded security during a period in which hundreds of thousands or even millions of shares of the security were traded must necessarily be 'so numerous that joinder of all members is impracticable.'" *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981); *In re Dell Inc*., No. A-06-CA-726-SS, 2010 WL 2371834 (W.D. Tex. June 11, 2010), *aff'd, appeal dismissed sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012).

---

[3]     In the alternative, the analysis does not change if, *arguendo*, the Court were to reject the class period expansion urged by §10(b) Plaintiff's motion to supplement and to instead consider only whether the §10(b) Class should be certified for the unexpanded §10(b) Class Period pled in CCAC ¶1. Rule 23(a) requirements are met for both class period iterations.

McDermott stock actively traded on the NYSE during the §10(b) Class Period, so while the exact number of §10(b) Class members is unknown and can be ascertained only through appropriate discovery, it is believed to be at least hundreds or thousands of geographically dispersed members.  ¶413.  During the §10(b) Class Period, McDermott had an average of approximately 165.5 million shares outstanding and traded heavily, with an average weekly trading volume of 34.4 million shares.  *See* Nye Report, submitted herewith, at ¶¶26, 59.[4]  Joinder is thus impracticable.  *See Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019), *appeal dismissed sub nom. In re EZCORP, Inc. Sec. Litig.*, No. 19-50258, 2019 WL 4667555 (5th Cir. June 6, 2019) (numerosity satisfied where 50 million+ shares outstanding with average weekly trading volume of 2.7 million shares); *In re Reliant Sec. Litig.*, No. H-02-1810, 2005 WL 8152605, at *4 (S.D. Tex. Feb. 18, 2005) (numerosity assumed where 60 million nationally traded shares at issue).

### 2.    There Is Commonality

Rule 23(a)(2) commonality exists if the class "claims [] depend upon a common contention . . . of such a nature that it is capable of class wide resolution -- which means that determination of its truth or falsity will resolve an issue that is central to the validity

---

[4]    Dr. Nye is a leading financial economics expert for securities fraud litigation.  He holds an A.B. in Economics from Princeton University, an M.Sc. in Finance from the London Business School, and a Ph.D. in Finance from the Paul Merage School of Business at the University of California, Irvine.  *See* Nye Report, ¶1.  He frequently opines on market efficiency, and his opinions are often cited by courts in finding market efficiency.  *See, e.g.*, *In re Banc of Cal. Sec. Litig.*, 326 F.R.D. 640, 648 (C.D. Cal. 2018) (describing Dr. Nye's report as "key evidence"); *Hayes v. MagnaChip Semiconductor Corp.*, No. 14-cv-01160-JST, 2016 WL 7406418, at *7 n.3  (N.D. Cal. Dec. 22, 2016) (noting that "Nye faithfully followed the *Cammer* factors").

of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "The threshold for commonality is not high." *Marcus v. J.C. Penney*, No. 13-cv-736-MHS-KNM, 2016 WL 8604331, at *3 (E.D. Tex. Aug. 29, 2016). "To satisfy the commonality requirement under Rule 23(a)(2), class members must raise at least one contention that is central to the validity of each class member's claims." *In re Deepwater Horizon*, 739 F.3d 790, 810 (5th Cir. 2014).

Commonality is satisfied because §10(b) Plaintiffs and §10(b) Class members were injured by Defendants' same course of conduct, which deceived the market and artificially inflated McDermott's stock price during the §10(b) Class Period by misrepresenting and omitting material facts, until the stock price fell precipitously each time their fraud was partially revealed and the prior artificial inflation incrementally came out, thereby causing economic loss for the §10(b) Plaintiffs and §10(b) Class members. Common questions include, *inter alia*, whether: (i) Defendants violated the federal securities laws; (ii) Defendants' public statements misrepresented or omitted material facts; (iii) the Individual Defendants caused McDermott to issue false and misleading statements; (iv) Defendants acted with scienter; (v) McDermott's stock price was artificially inflated during the §10(b) Class Period; and (vi) §10(b) Plaintiffs and §10(b) Class members sustained damages and, if so, their proper measure. ¶416. Courts routinely find commonality to be met in cases like this one. *See e.g.*, *In re Cobalt Int'l Energy, Sec. Litig.*, No. H-14-3428, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017).

### 3. There is Typicality

Rule 23(a)(3) requires that the claims of a class representative be typical claims of absent class members. "Like commonality, the test for typicality is not demanding." *Marcus*, 2016 WL 8604331, at *3. "[T]he critical inquiry is whether the class representatives' claims have the same essential characteristics of those of the putative class." *EDS*, 226 F.R.D. at 565. "Plaintiffs can satisfy the typicality requirement by showing that class representatives' claims arise from a similar course of conduct and share the same legal theory." *In re Cobalt Int'l Energy, Inc. Sec. Litig.*, No. H-14-3428, 2017 WL 2608243, at *2 (S.D. Tex. June 15, 2017) (citing *Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002)). "Factual differences do not defeat typicality if the claims arise from a similar course of conduct and share the same legal theories." *EDS*, 226 F.R.D. at 565; *Marcus*, 2016 WL 8604331, at *3; *Enron*, 529 F. Supp. 2d at 700 (when the same allegedly unlawful conduct was directed at or affected both the plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in fact patterns underlying individual claims).

§10(b) Plaintiffs' claims are typical of absent class members' claims, as all §10(b) Class members were similarly affected by Defendants' wrongful conduct as alleged in the CCAC (¶414) and as expanded in the Supplement. They assert the same legal theory arising from Defendants' common misrepresentations and omissions, violating Exchange Act §10(b), revelation of which caused artificial inflation to dissipate and thus damages. ¶403. The typicality requirement is met.

### 4.      There Is Adequacy Of Representation

Rule 23(a)(4) requires evidence that plaintiffs will "fairly and adequately protect the interests of the class," based on three factors: (1) "the zeal and competence of the representative[s'] counsel," (2) "the willingness and ability of the representative[s] to take an active role in and control the litigation and to protect the interests of absentees," and (3) the risk of "conflicts of interest between the named plaintiffs and the class they seek to represent."   Prause, 2020 WL 3549686, at *4 (quoting *Slade v. Progressive Sec. Ins. Co*., 856 F.3d 408, 412 (5th Cir. 2017)).

*First*, §10(b) Lead Plaintiff selected as §10(b) Lead Counsel highly qualified counsel, Pomerantz, which has secured some of the largest-ever securities litigation recoveries on behalf of investors, and a respected, experienced Texas counsel, Briscoe, to serve as §10(b) Liaison Counsel.  *See* Declaration of Matthew L. Tuccillo, Esq. ("Tuccillo Decl."), Ex. A (Pomerantz Firm Resume); Ex. B (Briscoe Firm Resume).  As detailed in the Procedural History section *supra*, the highly efficient, successful litigation of the claims to date confirms that §10(b) Class members' interests are being adequately represented. §10(b) Lead Plaintiff's and §10(b) Lead Counsel's efforts thus far, often in coordination and collaboration with the §14(a) Lead Plaintiff and its counsel, have included, *inter alia*, an extensive investigation, detailed pleadings, successful preservation of the §10(b) Class's rights in McDermott's bankruptcy, successful opposition of Defendants' motion to dismiss that was fully denied, successful consolidation of tag-along litigation, and substantial and ongoing discovery efforts – demonstrating counsel's zeal and competence.

Moreover, §10(b) Lead Plaintiff has filed a motion (Dkt. No. 189) seeking leave to

file the proposed Supplement, which not only expands the §10(b) Class Period and adds substantive allegations in the months just before McDermott's bankruptcy, but also seeks to broaden and strengthen the representation of the §10(b) Class by adding an additional named Plaintiff, Pontiac, and additional non-lead class counsel, RGRD.   Pontiac was among the original, timely lead plaintiff movants (Dkt. No. 21), and thus faces no unique defenses or barriers to service as a class representative, and its chosen counsel, RGRD, is likewise among the most skilled securities litigation firms.   *See* Tuccillo Decl. Ex. C (RGRD Firm Resume).   These additions will bring enhanced firepower to this litigation as discovery ramps into full gear and motion practice intensifies regarding class certification, supplementation of the CCAC, discovery disputes, and summary judgment, ensuring that the claims in the Supplement's expanded §10(b) Class Period receive focused attention, if and when required.   Together, the three firms – Pomerantz, Briscoe, and RGRD – unquestionably have the talent, resources, and willingness to zealously and successfully prosecute this §10(b) Action through trial.

*Second*, Rule 23(a)(4) "requires the class representatives to possess a sufficient level of knowledge and understanding to be capable of 'controlling' or 'prosecuting' the litigation." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 131-32 (5th Cir. 2005) (quoting *Berger v. Compaq Computer Corp.*, 257 F.3d 475, 482-83 (5th Cir. 2001)).   Class representatives "need not be legal scholars." *Feder*, 429 F.3d at 132 n.4 (citation omitted). Class representatives are considered adequate when they have "familiarity with the complaint and the concept of a class action." *Enron*, 529 F. Supp. 2d at 725 (citations omitted).   Class representatives "are entitled to rely on, and be guided, by counsel."

27

*Prause,* 2020 WL 3549686, at *5 (quoting *Stoffels v. SBC Communs., Inc*., 238 F.R.D. 446, 455 (W.D. Tex. 2006)).   The adequacy of §10(b) Plaintiffs, both of whom declared that they are "willing to serve as a representative party on behalf of a class" (*see* Dkt. No. 24-2 (NSHEPP Certification), ¶4; Dkt. No. 105 at PDF pp. 270 (NSHEPP Second Certification), ¶2; Dkt. No. 21-3 (Pontiac Certification), ¶3), is beyond doubt.

§10(b) Lead Plaintiff NSHEPP is a well-managed, sophisticated institutional investor with billions of dollars in diversified investments, including ~40% in equities. Tuccillo Decl., ¶5; Declaration of Stefan Cowell ("Cowell Decl."), ¶2.   NSHEPP, along with its counsel, §10(b) Lead Counsel Pomerantz, successfully litigated and settled individual securities claims in *In re BP p.l.c. Sec. Litig.*, No. 4:10-md-2185 (S.D. Tex.), pertaining to BP's 2010 oil spill, over nine years of litigation, which included three motions to dismiss involving complex arguments under U.S. federal law and English law and extensive discovery.   Tuccillo Decl., ¶5.   NSHEPP has also pursued lead plaintiff positions in other lawsuits.   *See, e.g.*, Dkt. No. 105 at PDF pp. 270-271 (Certification), ¶6.   NSHEPP has demonstrated its attention, understanding, and oversight of the claims here at issue, the legal case theory and strategy, and the procedural stages, through regular updates from and communications with Pomerantz, whose efforts NSHEPP directs.   To date, NSHEPP has reviewed and approved drafts of pleadings and major briefing; oversaw §10(b) Lead Counsel's efforts to preserve class-wide interests in McDermott's bankruptcy; authorized pursuit of the proposed Supplement, including the additions of Pontiac and RGRD to further protect the §10(b) Class's interests; and participated in written discovery.   Cowell Decl. ¶5.   NSHEPP intends to continue to actively participate in further discovery, trial,

and any future resolution discussions. *Id.* at ¶¶6-7; *see also Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 502-03 (S.D. Tex. 2004) (adequacy established where plaintiffs were committed to the action, reviewed court papers, and understood complaint's allegations).

Additional non-lead Plaintiff Pontiac is also a sophisticated institutional investor, which has sought to serve and has been appointed to serve as a lead plaintiff in other federal securities lawsuits. *See, e.g.* Dkt. No. 21-3 (Certification), ¶5. Pontiac has demonstrated its attentiveness to the claims at issue in this lawsuit by, *inter alia*, timely filing a motion seeking to be appointed lead plaintiff in January 2019 (Dkt. No. 21), a fact that avoids any unique defenses arising under the PSLRA. Pontiac is willing to serve as an additional §10(b) Class representative, and upon the filing of the Supplement, will actively engage in discovery and trial. Declaration of Sheldon Albritton ("Albritton Decl."), ¶¶3-5.

*Third*, the adequacy inquiry "serves to uncover conflicts of interest between named parties and the class they seek to represent." *Feder*, 429 F.3d at 130 (quoting *Amchem*, 521 U.S. at 625). "Significantly, the existence of minor conflicts alone will not defeat a party's claim to class certification: the conflict must be a 'fundamental' one going to the specific issues in controversy." *In re Deepwater Horizon*, 739 F.3d 790, 813 & n.29 (5th Cir. 2014) (finding even "differently weighted interests" are not "fundamental conflicts"); *see EDS*, 226 F.R.D. at 569 (lead plaintiff was an adequate class representative for securities class because different causation theories created little conflict with class members having ERISA claims, as potential conflicts like differing measures of damages, preferred trial tactics, or settlement strategies under the securities laws versus ERISA are too speculative at class certification stage).

29

Here, NSHEPP and Pontiac "possess the same interest and suffer[ed] the same injury as the class members," *Amchem*, 521 U.S. at 594, and no actual or potential conflicts exist.  §10(b) Plaintiffs and all §10(b) Class members suffered losses from purchasing McDermott securities at prices artificially inflated by the alleged fraud.  *See* ¶415; Supp. ¶37.  All were injured by Defendants' same underlying misrepresentations and omissions. Moreover, NSHEPP's and Pontiac's significant losses (*see* Dkt. No. 24-3 (NSHEPP loss chart); Dkt. No. 21-4 (Pontiac loss chart)), demonstrate that they have a sufficient interest in the outcome of this litigation.  *See Stott v. Cap. Fin. Servs.*, 277 F.R.D. 316, 326 (N.D. Tex. 2011) ("'class interests are not antagonistic for representation purposes'" where "'all class members are asserting [the] common right [of] achieving a maximum potential recovery for the class'") (alterations in original).

### B.    Rule 23(b)(3) Class Action Certification Is Appropriate

Class certification pursuant to Rule 23(b)(3) is appropriate where common questions of law or fact predominate over potential individual questions and the class action device is superior to other adjudication means.  *Prause*, 2020 WL 3549686, at *6.  Both requirements are readily satisfied and the §10(b) Class should be certified for the full, expanded §10(b) Class Period alleged in ¶4 of the proposed Supplement.[5]

### 1.    Common Questions Predominate

Predominance "is a test readily met in certain cases alleging…securities fraud,"

---

[5]    In the alternative, the Rule 23(b)(3) analysis also does not change assuming, *arguendo*, the Court were to reject the class period expansion urged by §10(b) in their motion to supplement and instead were to consider only whether the §10(b) Class should be certified for the unexpanded §10(b) Class Period pled in CCAC ¶1.  For both class

*Amchem*, 521 U.S. at 625, whereby "a plaintiff must show that those issues in the proposed action that are subject to generalized proof… [outweigh those] issues that are subject to individualized proof." *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 270 (S.D. Tex. 2005). "Predominance does not require all questions of law or fact to be common, but only that common questions predominate over individual questions." *EDS*, 226 F.R.D. at 570. "When one or more of the central issues in the action are common to the class and can be said to predominate, the action may be considered proper under Rule 23(b)(3) even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Torres v. S.G.E. Mgmt.*, L.L.C., 838 F.3d 629, 645-46 & n.74 (5th Cir. 2016) (internal quotation omitted). The elements of falsity, materiality, scienter, and loss causation all raise exclusively common questions of law and fact that predominate. *Amgen*, 568 U.S. at 467; *EDS*, 226 F.R.D. at 570 ("If Defendants are liable to [plaintiff] for these statements, they are liable to all other class members for the same statements, so common questions predominate"). "Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *Halliburton I*, 563 U.S. at 810. Predominance exists here, because Reliance is presumed on the alleged facts (¶¶408-410) and mechanical damage tabulations will not predominate over common issues at trial.

### a.   The Fraud-On-The-Market Doctrine Presumes Reliance

Individual proof of reliance will not undermine predominance, because reliance can

---

period iterations, Rule 23(b)(3) requirements (like those of Rule 23(a)) are met and the underpinnings, analysis, and conclusions of the Nye Report do not materially change.

be established class-wide via the fraud-on-the-market presumption, *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988),[6] which recognizes that in efficient markets, the price of a stock "reflects all public, material information--including material misstatements." *Halliburton Co. v. Erica P. John Fund. Inc.*, 573 U.S. 258, 263 (2014) ("*Halliburton II*"). Therefore, a security buyer in an efficient market may be presumed to have relied on public material information concerning that security.  *Amgen*, 568 U.S. at 465-70.  The fraud-on-the-market presumption considers informational efficiency, not the more rigorous academic strains of market efficiency.   *Halliburton II*, 573 U.S. at 271-73.   The presumption is based on the "fairly modest premise that 'market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id.* at 272.  Thus, "[d]ebates about the precise *degree* to which stock prices accurately reflect public information are thus largely beside the point."   *Id.* (emphasis original); *see also In re DVI, Inc. Sec. Litig.*, 639 F.3d 623, 635 (3d Cir. 2001), *abrogated on other grounds by Amgen*, 568 U.S. 455 (perfect efficiency is not required).

For the presumption to apply, a plaintiff must show that "(1) the alleged misrepresentations were publicly known, (2) they were material, (3) the stock traded in an efficient market, and (4) the plaintiff traded the stock between when the misrepresentations were made and when the truth was revealed." *Halliburton II*, 573 U.S. at 277-78.  §10(b)

---

[6]      The Supreme Court in *Basic* explained why the presumption was adopted.  First, it furthered public interest in private enforcement of securities laws by preserving investors' ability to proceed on a class basis.  *Basic,* 485 U.S. at 242.  Second, it reflected how modern securities markets operated, because investors buy and sell anonymously via  exchanges rather than in individualized transactions.  *Id.* at 244-45.  Third, investors rely on market price integrity and assume that information incorporated into it is true.  *Id.* at 247.

Plaintiffs make this showing, for the reasons below and in the accompanying Nye Report. That Defendants' misrepresentations – made in McDermott's SEC filings, press releases, earnings teleconferences, presentations to analysts, and other public statements to investors – were publicly known is undisputable, and materiality need not be proved at class certification, because it is a common question to be determined at trial.  *See Amgen*, 568 U.S. at 467-68.   Further, §10(b) Plaintiffs already established that they purchased McDermott shares before the truth was fully disclosed.  *See* Dkt. No. 24-2 (NSHEPP Certification), Schedule A; Dkt. No. 105 at PDF p. 272 (NSHEPP Second Certification), Schedule A; Dkt. No. 21-3 (Pontiac Certification), Schedule A.  Finally, §10(b) Plaintiffs prove that McDermott shares, listed on the NYSE under the ticker "MDR," traded in an efficient market during the §10(b) Class Period.  *See* Nye Report at ¶¶14-59.   Thus, the fraud-on-the-market presumption of reliance applies.  *Halliburton II*, 573 U.S. at 277-78.

Generally, "market efficiency will not even be an issue" for "heavily-traded or well known stocks," *Unger v. Amedisys Inc.*, 401 F.3d 316, 322-23 (5th Cir. 2005), because for stocks traded on a national exchange, *e.g.*, McDermott's stock trading on the NYSE, the market automatically incorporates publicly known information into the price.  That said, to assess market efficiency, Fifth Circuit courts look to the exchange listing and five factors identified in *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989): "(1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 []; and (5) the existence of empirical facts showing a cause and effect

relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *See, e.g.*, *Enron*, 529 F. Supp. 2d 644, 692-93.  Courts also consider three factors identified in *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001), and *Unger*, 401 F.3d at 316: "(6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock." *See, e.g.*, *Bell v. Ascendant Solutions, Inc.*, 422 F.3d 307, 313 n.10 (5th Cir. 2005).  ***All*** *Cammer* factors and ***all*** *Krogman* / *Unger* factors demonstrate that McDermott shares traded in efficient markets.  *See* Nye Report at ¶¶14-59.

### i.    *Cammer* 1:  McDermott Actively Traded On NYSE

"The average trading volume is one of the most important factors in determining whether the market for a particular stock is efficient." *Enron*, 529 F. Supp. 2d at 694 n.69. Large weekly trading volume evidences market efficiency because it "implies significant investor interest in the company[,] . . . [implying] a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information." *Cammer*, 711 F. Supp. at 1286.  Weekly turnover equal to 2% or more of outstanding shares justifies a "strong presumption" of efficiency and of 1% or more justifies a "substantial presumption." *Id.* at 1293.

McDermott had roughly 284,032,088 shares outstanding as of February 16, 2018, and post-Merger, 180,796,580 shares outstanding as of February 21, 2019, such that its stock was liquid.  ¶408(b).[7]  During the §10(b) Class Period, numerous McDermott shares

---

[7]    On a split-adjusted basis, accounting for the 3:1 reverse stock split effective May 9, 2018, this figure would be adjusted to 94.67 million shares.  *See* Nye Report ¶¶9, 10, 26.

traded daily, with moderate to heavy volume, demonstrating an active and broad market for McDermott stock. *Id.* McDermott's average weekly volume during the §10(b) Class Period was roughly 20.7% of its shares outstanding. Nye Report at ¶26. That McDermott's average weekly trading volume is approximately **ten times** the "strong presumption" of market efficiency described in *Cammer* provides strong evidence of market efficiency. *Id.* McDermott met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, open, developed, and automated market. ¶408(a). This provides further evidence of efficiency. "If . . . a security is listed on the NYSE, … the market for that security is presumed to be efficient." *Teamsters Local 445 Freight Div. Pension Fund v. Bombardier, Inc.*, No. 05-cv-1898 (SAS), 2006 WL 2161887, at *8 (S.D.N.Y. Aug. 1, 2006), *aff'd*, 546 F.3d 196 (2d Cir. 2008); *Unger*, 401 F.3d at 322-23.

### ii.        *Cammer* 2: Analysts Widely Covered McDermott

McDermott was followed by several securities analysts employed by major brokerage firms who wrote reports distributed to sales forces and customers of their firms during the §10(b) Class Period. ¶408(e). At least 10 investment and advisory firms covered McDermott during the §10(b) Class Period, issuing over 220 analyst reports. Nye Report at ¶30; *see Asarco LLC v. Ams. Mining Corp.*, 396 B.R. 278, 344 (S.D. Tex. 2008) (coverage by nine securities analysts favors market efficiency); *Rougier v. Applied Optoelectronics, Inc.*, No. 17-cv-02399, 2019 WL 6111303, at *11 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (citing *DVI*, 249 F.R.D. at 209) ("coverage by three securities analysts favored market efficiency). Such significant analyst coverage is "persuasive" evidence of market efficiency,

demonstrating that a company is closely followed by investment professionals who make buy and sell recommendations to investors. *Cammer*, 711 F. Supp. at 1286.

Investors also received information about McDermott from widespread media and from SEC filings, *see* Nye Report at ¶¶31-32, which provides further evidence of market efficiency. Additionally, because buy-side institutions often maintain their own analysts, broad institutional ownership further demonstrates market efficiency. "[L]arge investors, with more money at stake, may be more likely to inform themselves well before trading." *Todd v. STAAR Surgical Co.*, No. CV-14-05263-MWF-RZ, 2017 WL 821662, at *8 (C.D. Cal. Jan. 5, 2017) (ownership by 122 major institutions supported *Cammer* factor 2); *Wilson v. LSB Indus.*, *Inc.,* No. 15 Civ. 7614 (RA) (GWG), 2018 WL 3913115, at *12 (S.D.N.Y. Aug. 13, 2018) (ownership by 251 major institutions implies an efficient market). More than 290 institutional investors held McDermott stock during each §10(b) Class Period quarter, *see* Nye Report at ¶42, which further evidences efficiency.

### iii.     *Cammer* 3: Market Makers Facilitated Trading

Market makers ensure efficient trading of shares. Use of a designated market maker ("DMM"), especially where supplemented by other market makers, satisfies *Cammer* factor 3. *See, e.g.*, *Lehocky*, 220 F.R.D. at 508. McDermott was listed on the NYSE, whose rules enable investors to trade efficiently on new information by requiring the use of a single DMM to provide liquidity at the National Best Bid/Offer a specified percent of the time and to facilitate price discovery throughout the trading day. *See* Nye Report at ¶35. There were over 120 active market makers that traded McDermott stock, many of which handled a sizeable volume of shares. *See* Nye Report at ¶37 & Ex. 7; *see Lehocky*, 220

F.R.D. at 509 (twenty to twenty-five market makers "tips towards a finding of market efficiency"); *also Cammer*, 711 F. Supp. at 1283 n.30 (this factor satisfied where stock had eleven active market makers).  The substantial number of market makers for McDermott stock provides further evidence of market efficiency.

### iv.       *Cammer* 4: McDermott Filed Forms S-3

Companies meeting the SEC's criteria for raising capital through an abridged Form S-3 registration statement are "presumed to be actively traded and widely followed. … [A] company's ability to file an S-3 Registration Statement points to market efficiency." *Krogman v. Sterritt*, 202 F.R.D. 467, 476 (N.D. Tex. 2001).  This *Cammer* factor demonstrates market efficiency, as McDermott filed a Form S-3 before and during the §10(b) Class Period.  *See* Nye Report at ¶48.

### v.       *Cammer* 5: A Cause-and-Effect Relationship Existed

"As the *Cammer* court noted, 'one of the most convincing ways to demonstrate efficiency would be to illustrate, over time, a cause-and-effect relationship between company disclosures and resulting movements in stock price." *KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *8 (W.D. Tex. June 3, 2013) (citing *Cammer*, 711 F. Supp. at 1291); *Unger*, 401 F.3d at 325 (the causal connection factor "goes to the heart of the 'fraud on the market theory'").  However, market efficiency does not require that this—or any other single *Cammer* factor—be satisfied.  *Unger,* 401 F.3d at 323 ("[T]his list [of eight factors, including the five *Cammer* factors] does not represent an exhaustive list, and in some cases one of the above factors may be unnecessary."); *Strougo v. Barclays PLC*, 312 F.R.D. 307, 320-21 (S.D.N.Y. 2016) ("there would be no need for a

five factor test [] if one factor were dispositive in every context" and "no court has adopted a per se rule that any one *Cammer* factor is dispositive").

To assess the cause-and-effect factor, Dr. Nye conducted an event study on daily stock prices.  *See* Nye Report at ¶¶49-55 and Ex. 12.  An event study provides "a statistical regression analysis that examines the effect of an event on a dependent variable, such as a corporation's stock price."  *Enron*, 529 F. Supp. 2d at 720.  "Event studies are commonly used in securities fraud class actions." *Rougier*, 2019 WL 6111303, at *15; *see also City of Sterling Heights Gen. Emps. Ret. Sys. v. Prudential Fin., Inc.*, No. 12-5275, 2015 WL 5097883, at *6 (D.N.J. Aug. 31, 2015) ("[T]here is no dispute that [an event study] is widely accepted in the academic community and in the courts" to prove the cause-and-effect relationship contemplated by *Cammer*).

Dr. Nye's event study here strongly demonstrates "a cause-and-effect relationship between new, material, Company-specific disclosures and resulting movements in McDermott's stock price during the §10(b) Class Period."  *See* Nye Report at ¶51. Specifically, of the ten dates examined, nine (*i.e.*, 90%) are associated with company-specific returns that are statistically significant at or above the 95% confidence level.  *Id.* at ¶53.  This outcome is *18 times* the amount of statistically significant dates that should be expected from a randomly selected ten-day sample, confirming the strength of McDermott's Company-specific stock price reaction on event dates.  *Id.*

### vi.     *Krogman / Unger* Factors Show Market Efficiency

In addition to the five *Cammer* factors, courts often consider a company's market capitalization, bid-ask spread, and float – the so-called *Krogman / Unger* factors – to

determine market efficiency. *See Unger*, 401 F.3d at 323; *Krogman*, 202 F.R.D. at 478; *KB Partners*, 2013 WL 2443217, at *5. Each *Krogman/Unger* factor further demonstrates that McDermott's stock traded on an efficient market. McDermott's market capitalization was as high as $4.10 billion during the §10(b) Class Period and was greater than ***37%*** of the companies listed on the NYSE at the start of the §10(b) Class Period. *See* Nye Report at ¶¶56-57. The public float of McDermott stock was very large – on average, it was 99.1% of shares outstanding during the §10(b) Class Period. *See* Nye Report at ¶59. Finally, McDermott's bid-ask spreads were comparable to those of other stocks listed on the NYSE, further demonstrating that McDermott shares traded in an efficient market during the §10(b) Class Period. *See* Nye Report at ¶¶43-44, 58.

### b. Reliance Is Also Presumed Under *Affiliated Ute*

The CCAC pleads (¶410) that, alternatively, reliance can also presumed under *Affiliated Ute Citizens v. U.S.*, 406 U.S. 128 (1972), because the claims involve "primarily a failure to disclose," rather than affirmative misrepresentation. *Id.* at 153-54; *see also Finkel v. Docutel/Olivetti Corp.*, 817 F.2d 356, 359 (5th Cir. 1987). In such cases, "positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material[.]" *Affiliated Ute*, 406 U.S. at 153.

The Court need not reach this issue if it finds, as §10(b) Plaintiffs believe it should, that reliance is presumed under the fraud-on-the-market doctrine. However, to the extent necessary, reliance can also be presumed because, under *Affiliated Ute*, §10(b) Plaintiffs' allegations regarding the CB&I/Focus Project Fraud, the Technology Business Fraud, and the Capital Structure/Liquidity Fraud, both as pled in the CCAC and in the Supplement,

center on statements that were misleading because of what they *omitted*.  Specifically, Defendants' public statements concealed material, negative information, partly revealed by CW statements and internal company documents, about the undisclosed risks of the Merger and the Focus Projects and the true scope of their deleterious impacts on McDermott, about McDermott's inability to integrate and leverage Lummus or timely sell it to short up McDermott's financial health, and about the true extent of McDermott's capital structure and liquidity crises and the inability to solve them outside of a Chapter 11 bankruptcy and reorganization.  *See* ¶¶87-134, 135-327; Supp. ¶16.

### c.      Individual Calculations Will Not Defeat Predominance

Damages can be measured on a class-wide basis and in a manner consistent with §10(b) Plaintiffs' theory of liability, as required by *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013).  "The *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier*, 2019 WL 6111303, at *15.  While *Comcast* holds that the damages theory must be consistent with the liability theory, it does not require that damages be calculated with certainty at the class certification stage.  *See Ludlow v. BP, p.l.c.*, 800 F.3d 674, 685 (5th Cir. 2015) ("*Comcast* requires a 'sound' methodology, not certainty").  The question at the class certification stage is not whether §10(b) Plaintiffs' damages methodology is correct, but rather, solely, that they have proposed a sound methodology that is consistent with their liability theory.  *See Marcus*, 2016 WL 8604331, at *10 ("Defendants may disagree with the methodology or feel that another methodology is correct, but that does

not make this methodology inconsistent with the Fund's theory of liability.")

While Dr. Nye does not provide a full damages model at this time, he demonstrates that per-share damages can be determined class-wide for the §10(b) Class through the traditionally accepted "out-of-pocket measure of damages." *See* Nye Report at ¶¶60-64. The use of this methodology is widespread in securities fraud class actions and is specifically endorsed by the Fifth Circuit. *See In re BP p.l.c. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *9 (S.D. Tex. May 10, 2014) , *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015) ("out-of-pocket" measure of damages is a "long-standing and widespread practice" in §10(b) cases) (collecting cases); *Rougier,* 2019 WL 6111303, at *15 (finding out-of-pocket measure of damages is "an accepted method for calculating Class members' out-of-pocket damages that are consistent with a fraud on the market theory of liability.").  Therefore, §10(b) damages can be calculated on a class-wide basis consistent with the *Comcast* requirements.

### 2.    Class Adjudication Is Superior To Other Available Methods

"In general, securities suits such as this easily satisfy the superiority requirement of Rule 23." *In re JPMorgan Chase & Co. Sec. Litig.*, No. 12-cv-03852 (GBD), 2015 WL 10433433, at *8 (S.D.N.Y. Sept. 29, 2015) (quoting *In re Blech Sec. Litig.,* 187 F.R.D. 97, 107 (S.D.N.Y. 1999)).   Under Rule 23(b)(3), four factors are to be considered as "pertinent" to the "superiority" evaluation: "(A) the class members' interests in individually controlling the prosecution . . . of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; (C) the desirability . . . of concentrating the litigation of the claims in the particular forum; and (D)

the likely difficulties in managing a class action."

Each of these factors demonstrates the superiority of class action adjudication here. *First*, for most of the hundreds or thousands of §10(b) Class members, the cost of individual litigation would be prohibitively expensive and forcing them to file individual actions would be a waste of judicial and private resources. *See e.g.*, *Marcus*, 2016 WL 8604331, at *10.  *Second*, §10(b) Plaintiffs are aware of only one active opt-out case, the *Kingstown* Action, despite there being hundreds or thousands of §10(b) Class Members, which does not indicate "an interest by members of the proposed class in proceeding individually." *See Buettgen v. Harless*, No. 09-cv-791-K, 2011 WL 1938130, at *9 (N.D. Tex. May 19, 2011) (superiority requirement still met despite existence of one other pending case). *Third*, concentration of this litigation in one forum – this Court – will avoid inconsistent adjudications,[8] a particularly important consideration given that the Court has already rendered several important rulings, including its twin Orders denying Defendants' motions to dismiss the §10(b) Action and the §14(a) Action.  *Lehocky*, 220 F.R.D. at 510-11.[9] Moreover, §10(b) Lead Plaintiff has moved to consolidate related, tag-along litigation, as noted in the Procedural History section, *supra*.  *Fourth*, §10(b) Plaintiffs expect no unusual difficulties in management, such as notice procedures, choice-of-law issues, or the need for extensive subclassing. *See In re Reliant*, 2005 WL 2000707, at *4; *Lehocky*, 220 F.R.D.

---

[8]    Indeed, if a lawsuit related to the claims at issue was filed in a different federal court, it would be subject to transfer to this Court by the Judicial Panel on Multidistrict Litigation.
[9]    There is an unopposed motion to transfer the *Kingstown* opt out action from Judge Hittner to this Court, which §10(b) Lead Plaintiff supports and respectfully submits should be granted as soon as practicable to avoid inconsistent rulings or uncoordinated discovery.

at 511.  §10(b) Lead Counsel and additional §10(b) Plaintiffs' counsel have substantial experience in securities class action litigation and will manage the case efficiently, and there is no reason to believe that counsel or the Court will experience any unusual management difficulties.  *EDS*, 226 F.R.D. at 571; *Lehocky*, 220 F.R.D. at 511.  Moreover, the flexibility provided to the Court under Rules 23(c) and (d) will enable it to address and resolve any unexpected management issues.

### 3.       §10(b) Plaintiffs Should Be Approved As Class Representatives

All the Fed. R. Civ. P. 23 requirements are met, including typicality, adequacy of representation, and predominance of common questions.  §10(b) Plaintiffs will adequately protect the §10(b) Class.  To date, §10(b) Lead Plaintiff and §10(b) Lead Counsel have actively overseen the successful prosecution and navigation of the §10(b) Action, often in collaboration with the §14(a) Lead Plaintiff and its counsel, through an investigatory phase, past McDermott's bankruptcy and Defendants' motion to dismiss, and into active discovery.  Additional §10(b) Plaintiff Pontiac and its counsel, RGRD, have monitored the progress of this litigation since filing a timely lead plaintiff motion and now stand ready to help advance the litigation and protect the §10(b) Class members' interests.  §10(b) Plaintiffs have no conflicts of interest with the §10(b) Class members, since they are litigating the same legal theories and factual allegations, seeking recovery from the same Defendants.  For all the foregoing reasons, §10(b) Plaintiffs respectfully urge the Court to appoint them as §10(b) Class Representatives.

## III. §10(B) LEAD AND ADDITIONAL §10(B) COUNSEL WILL ADEQUATELY PROTECT THE §10(B) CLASS AND SHOULD BE APPOINTED

Beyond Rule 23(a)'s adequacy of representation prong (*see* §II.A.4., *supra*), factors considered in appointing class counsel are "(i) the work counsel has done in identifying or investigating [claims]; (ii) counsel's experience in handling class actions [] and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit [.]" Rule 23(g)(1)(A). These considerations all weigh in favor of appointing §10(b) Lead Counsel Pomerantz as §10(b) Lead Class Counsel, RGRD as additional non-lead §10(b) class counsel, and §10(b) Liaison Counsel Briscoe as liaison class counsel. §10(b) Lead Counsel Pomerantz, in successful coordination with §14(a) Lead Plaintiff's counsel, has identified and prosecuted the claims, investigated their legal and factual bases, drafted the CCAC, successfully opposed Defendants' motion to dismiss in its entirety, successfully protected the §10(b) Class's rights in McDermott's bankruptcy proceedings, successfully consolidated a tag-along lawsuit, and advanced the §10(b) Action into discovery. §10(b) Liaison Counsel Briscoe has assisted, as requested, on matters related to practice before this Court. Additional proposed §10(b) class counsel RGRD, after pursuing Pontiac's lead plaintiff motion, has followed the progress of this lawsuit, and is prepared to actively join the litigation effort at this juncture. All the foregoing work has been performed on a wholly contingent basis.

Each of these firms has impeccable credentials as leaders of the bar. §10(b) Lead Counsel Pomerantz has extensive experience prosecuting securities and achieving substantial recoveries, including among the largest-ever recoveries for investors. *See*

Tuccillo Decl., Ex. A (Pomerantz Firm Resume). Additional non-lead §10(b) Class Counsel RGRD has likewise obtained many of the largest securities class action recoveries in history. *Id.*, Ex. C (RGRD Firm Resume). §10(b) Liaison Counsel Briscoe is highly experienced and has provided valuable insights regarding matters of local law and procedure. *Id.*, Ex. B (Briscoe Firm Resume). These firms are prepared to devote talented staff and substantial resources to the prosecution of the §10(b) Action and the advancement of the §10(b) Class's interests through discovery, summary judgment, and trial.

For these reasons, §10(b) Plaintiffs respectfully urge the Court to appoint their choice of counsel, Pomerantz as §10(b) Lead Class Counsel, RGRD as additional §10(b) class counsel, and §10(b) Liaison Counsel Briscoe as liaison class counsel.

## CONCLUSION

For these reasons, Plaintiffs respectfully request that the Court issue an Order: (i) certifying the §10(b) Action as a class action, (ii) certifying the §10(b) Class as defined in ¶4 of the proposed Supplement,[10] (iii) appointing §10(b) Plaintiffs as §10(b) Class Representatives, (iv) appointing §10(b) Lead Counsel Pomerantz as §10(b) Lead Class Counsel, RGRD as additional §10(b) class counsel, and §10(b) Liaison Counsel Briscoe as §10(b) liaison class counsel, and (5) granting such other and further relief as the Court may deem just and proper.

---

[10]   If the Court rejects the expansion of the §10(b) Class Period as pled in the Supplement, then §10(b) Lead Plaintiff requests, in the alternative, that the Court certify the §10(b) Class as defined in CCAC ¶1.

Dated:    September 29, 2021                  Respectfully submitted,


**POMERANTZ LLP**

*/s/Matthew L. Tuccillo*
Matthew L. Tuccillo
(S.D. Tex. Federal Bar # 1467939)
Jeremy A. Lieberman
(S.D. Tex. Federal Bar # 1466757)
Jennifer Banner Sobers
(*Admitted Pro Hac Vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: jbsobers@pomlaw.com

*Counsel for §10(b) Lead Plaintiff Nova
Scotia Health Employees' Pension Plan,
Lead Counsel for the §10(b) Class, and
Proposed §10(b) Lead Class Counsel*

**THE BRISCOE LAW FIRM, PLLC**

*/s/Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
1980 Park Oak Blvd.
Houston, TX  77056
Telephone: 713-752-2600
Facsimile: 832-201-9950
wbriscoe@thebriscoelawfirm.com

*Attorney-In-Charge, Counsel for §10(b)
Lead Plaintiff Nova Scotia Health
Employees' Pension Plan, Liaison Counsel
for the §10(b) Class, and Proposed §10(b)
Liaison Class Counsel*

**ROBBINS GELLER RUDMAN & DOWD LLP**

<u>*/s/ Eric I. Niehaus*</u>
Eric I. Niehaus (*Pending Pro Hac Vice*)
Arthur C. Leahy (*Pending Pro Hac Vice*)
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: (619) 231-1058
Facsimile: (619) 231-7423
Email: artl@rgrdlaw.com
Email: ericn@rgrdlaw.com

*Counsel for Additional Plaintiff City of Pontiac General Employees' Retirement System*

47

## CERTIFICATE OF SERVICE

I hereby certify that on this 29th day of September 2021, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo

48