# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MIRIAM EDWARDS, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:18-cv-04330 |
| McDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE, | § § § | |
| Defendants. | § § § | |

## DEFENDANTS' OPPOSITION TO THE SECTION 14(a) LEAD PLAINTIFF'S AMENDED MOTION FOR CLASS CERTIFICATION, APPOINTMENT OF CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

**Page**

Statement of Nature and Stage of Proceedings ................................................................. 1

Statement of the Issue ....................................................................................................... 1

Introduction and Summary of the Argument ..................................................................... 1

Argument ........................................................................................................................... 4

I.      Plaintiff faces a threshold barrier to class certification because its only theory of class-wide damages confirms the derivative nature of its claim and its concomitant lack of standing to recover for such derivative harm. ......................................................................................... 4

II.     Plaintiff fails to satisfy the requirements of Rule 23 ..................................... 8

      A.     Rule 23 establishes a demanding standard for class certification ................................................................................. 8

      B.     Plaintiff fails to provide a common, coherent damages methodology that fits its theory of liability ........................................ 9

            1.    *Comcast* makes clear that Rule 23(b)(3) requires that a proposed damages model align with the liability theory ......................................................................................... 9

            2.    Plaintiff runs afoul of *Comcast* by attempting to force the square peg of a Section 10(b) "inflation ribbon" damages methodology into the round hole of Plaintiff's Section 14(a) claim. ............................................................. 10

                    a.    Section 10(b) claims and Section 14(a) claims differ fundamentally in terms of injury and damages ................................................................. 11

                    b.    Even among Section 14(a) claims, key damages distinctions exist depending on whether plaintiffs are shareholders of the acquired company or the acquiring company .......................... 13

i

c.  Because Plaintiff's damages methodology ignores these important differences, it fails to line up with its Section 14(a) theory of liability. ....... 16

3.  Further demonstrating its poor fit, Plaintiff's inflation-ribbon damages methodology results in outcomes that make neither logical nor economic sense. ........................... 18

C.  MSPERS is an inadequate class representative because it was ineligible to vote on the Merger and thus lacks standing for a Section 14(a) claim. ............................................................... 20

D.  The class also fails on ascertainability, standing, and predominance grounds. ................................................ 22

Conclusion ....................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) ...................................................................... 21

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972) ................................................................................. 13

*Alexander v. Sandoval*,
  532 U.S. 275 (2001) ................................................................................... 5

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................... 8

*Anastasio v. Internap Network Servs. Corp.*,
  2010 WL 11459838 (N.D. Ga. Sept. 15, 2010) ........................................ 7

*Bell Atl. Corp. v. AT&T Corp.*,
  339 F.3d 294 (5th Cir. 2003) ................................................................... 25

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
  242 F.3d 290 (5th Cir. 2001) ..................................................................... 4

*Calamore v. Juniper Networks Inc.*,
  364 F. App'x 370 (9th Cir. 2010) .............................................................. 6

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) ..................................................................... 23

*Cherry v. Dometic Corp.*,
  986 F.3d 1296 (11th Cir. 2021) .......................................................... 22, 23

*Cramer v. Gen. Tel. & Elecs.*,
  443 F. Supp. 516 (E.D. Pa. 1977) ........................................................... 12

*Cruson v. Jackson Nat'l Life Ins. Co.*,
  954 F.3d 240 (5th Cir. 2020) ..................................................................... 9

*DaimlerChrysler AG Sec. Litig.*,
  294 F. Supp. 2d 616 (D. Del. 2003) ......................................................... 14

iii

*Dasho v. Susquehanna Corp.*,
  461 F.2d 11 (7th Cir. 1972) ...................................................................... 15

*DeBremaecker v. Short*,
  433 F.2d 733 (5th Cir. 1970) .................................................................... 22

*Denney v. Deutsche Bank AG*,
  443 F.3d 253 (2d Cir. 2006)...................................................................... 24

*EQT Prod. Co. v. Adair*,
  764 F.3d 347 (4th Cir. 2014) .................................................................... 23

*Flecha v. Medicredit, Inc.*,
  946 F.3d 762 (5th Cir. 2020) .................................................................... 24

*Flum Partners v. Child World Inc.*,
  557 F. Supp. 492 (S.D.N.Y. 1983)............................................................ 17

*Freedman v. magicJack Vocaltec Ltd.*,
  963 F.3d 1125 (11th Cir. 2020) .................................................................. 6

*Gabrielsen v. BancTexas Grp., Inc.*,
  675 F. Supp. 367 (N.D. Tex. 1987) ........................................................ 4, 5

*Goldkrantz v. Griffin*,
  1999 WL 191540 (S.D.N.Y. Apr. 6, 1999).............................................. 14

*Hurwitz v. LRR Energy L.P.*,
  2018 WL 6804481 (D. Del. Jan. 2, 2018)................................................ 10

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) ...................................................................... 25

*In re BP p.l.c. Sec. Litig.*,
  2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).................................... 9, 10, 17

*In re Deepwater Horizon*,
  739 F.3d 790 (5th Cir. 2014) .................................................................... 25

*In re Heckmann Corp. Sec. Litig.*,
  2013 WL 2456104 (D. Del. June 6, 2013)........................................... 14, 15

*In re Nexium Antitrust Litig.*,
  777 F.3d 9 (1st Cir. 2015) ........................................................................ 23

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*,
    725 F.3d 244 (D.C. Cir. 2013) ................................................................. 10

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    934 F.3d 619 (D.C. Cir. 2019) ................................................................. 25

*In re Real Est. Assocs. Ltd. P'ship Litig.*,
    223 F. Supp. 2d 1142 (C.D. Cal. 2002) .................................................. 14

*In re Romeo Power Inc. Sec. Litig.*,
    2022 WL 1806303 (S.D.N.Y. June 2, 2022) ........................................ 7, 15

*In re Willis Towers Watson PLC Proxy Litig.*,
    2020 WL 5361582 (E.D. Va. Sept. 4, 2020).............................................. 14

*J.I. Case Co. v. Borak*,
    377 U.S. 426 (1964) ......................................................................... 5, 12, 13

*James v. City of Dallas, Tex.*,
    254 F.3d 551 (5th Cir. 2001) .................................................................. 22

*John v. Nat'l Sec. Fire & Cas. Co.*,
    501 F.3d 443 (5th Cir. 2007) .................................................................. 22

*Kelley v. Rambus, Inc.*,
    2008 WL 5170598 (N.D. Cal. Dec. 9, 2008) .............................................. 5

*Lane v. Page*,
    727 F. Supp. 2d 1214 (D.N.M. 2012) ...................................................... 14

*Lewis v. Knutson*,
    699 F.2d 230 (5th Cir. 1983) .................................................................... 4

*Ludlow v. BP, P.L.C.*,
    800 F.3d 674 (5th Cir. 2015) .................................................................. 10

*Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*,
    389 F.3d 491 (5th Cir. 2004) .................................................................... 4

*Neale v. Volvo Cars of N. Am., LLC*,
    794 F.3d 353 (3d Cir. 2015)..................................................................... 10

*Potter v. Hughes*,
    546 F.3d 1051 (9th Cir. 2008) ................................................................... 4

*Roots P'ship v. Lands' End, Inc.*,
965 F.2d 1411 (7th Cir. 1992) ................................................................. 11

*Rudolph v. Cummins*,
2007 WL 1189632 (S.D. Tex. Apr. 19, 2007) ............................................ 5

*Sandberg v. Va. Bankshares, Inc.*,
891 F.2d 1112 (4th Cir. 1989) ................................................................ 14

*SEC v. Nat'l Secs., Inc.*,
393 U.S. 453 (1969) ................................................................................ 12

*Seeligson v. Devon Energy Prod. Co., L.P.*,
761 F. App'x 329 (5th Cir. 2019) ........................................................... 22

*United States v. Zangari*,
677 F.3d 86 (2d Cir. 2012) ............................................................... 20, 21

*Virginia Bankshares, Inc. v. Sandberg*,
501 U.S. 1083 (1991) .............................................................................. 17

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2016 WL 4138613 (E.D. Pa. Aug. 4, 2016) ............................................ 10

## STATUTES, RULES, AND REGULATIONS

Section 14(a) of the Exchange Act of 1934 ................................................*passim*

FED. R. CIV. P. 23 .......................................................................................*passim*

17 C.F.R. § 240.10b-5 ...................................................................................... 11

## OTHER AUTHORITIES

7A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE
§ 1760 (4th ed.) ..................................................................................... 22

*Your Vote: Proxy Choice and Securities Lending*, Columbia Law School
Blue Sky Blog (Oct. 11, 2021), available at
https://clsbluesky.law.columbia.edu/2021/10/11/the-price-of-your-vote-
proxy-choice-and-securities-lending/ ...................................................... 21

McDermott International, Inc. ("McDermott" or "MDR"), David Dickson, Stuart Spence, Chicago Bridge & Iron Company, N.V. ("CB&I"), and Patrick Mullen ("Defendants") file this opposition to Plaintiff's Amended Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel ("Motion").

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action under Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") on behalf of all shareholders (including beneficial owners) of McDermott stock as of April 4, 2018 who had a right to vote in connection with the proposed merger ("Merger") between McDermott and CB&I ("Section 14(a) Class").

## STATEMENT OF THE ISSUE

Plaintiff's Motion should be denied because (1) Plaintiff's lack of standing to pursue a derivative claim is a threshold barrier that requires dismissal, and (2) Plaintiff cannot meet Federal Rule of Civil Procedure 23's requirements for class certification.[1]

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff alleges that the Merger proxy misrepresented the prospects of four CB&I projects, and as a result, McDermott shareholders were deprived of making a fully informed vote on the Merger. The upshot of this, of course, is the notion that McDermott paid too much for CB&I; had the "true facts" been known, the Merger would have been renegotiated (in a way more favorable to McDermott), or it would have been voted down.

---

[1] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted and all emphases and alterations are as they appear in the original sources.

Plaintiff now moves to certify a class to recover for those injuries under Section 14(a).[2]

The Court should deny the Motion. Before even getting to the Rule 23 requirements, Plaintiff faces a threshold barrier to class certification because its only theory of class-wide damages confirms the derivative nature of its claim and its concomitant lack of standing to recover for such derivative harm. Although the Court denied Defendants' Motion to Dismiss that raised a similar direct-derivative issue, the circumstances have fundamentally changed. At that time, it was unclear whether Plaintiff would pursue a voter-suffrage theory of damages that could perhaps align with a direct claim. Now Plaintiff has made clear that its alleged damages consist solely of harm that flows from the alleged harm to McDermott itself from the merger. Accordingly, it is now undeniable that Plaintiff is pursuing a derivative Section 14(a) claim with no standing to do so.

Plaintiff's prospects do not improve if the Court looks past that threshold defect to measure the Motion against Rule 23's requirements. Perhaps most egregious is Plaintiff's damages methodology, which contravenes the Supreme Court's instruction in *Comcast Corp. v. Behrend* that a proposed damages model must fit the theory of liability. Plaintiff's model is a blatant attempt to force the square peg of a Section 10(b) "inflation ribbon" damages methodology into the round hole of its Section 14(a) claim. But it simply does not fit. Section 10(b) compensates investors who bought stock at inflated prices and

---

[2] In addition to this proposed Section 14(a) class, there is also a proposed Section 10(b) class that is the subject of a separate motion for class certification. It consists of "of all persons and entities who purchased or otherwise acquired common stock of McDermott International, Inc. … between December 18, 2017, and January 23, 2020, both dates inclusive." ECF 305 at 1. As such, there is a significant overlap between the two purported classes.

measures damages based upon the difference in inflation between the purchase and sale prices. But Section 14(a) addresses an entirely different issue—whether shareholders' voting rights were impaired. Yet instead of attempting to measure the damages from any violation of Section 14(a)—which, here, would consist of constructing a hypothetical world where the proxy did not contain the alleged false or misleading statements, such that the Merger either did not go through or closed on terms more favorable to McDermott— Plaintiff instead acts as if this were a Section 10(b) case and attempts to ascertain the artificial inflation in McDermott's stock price from the time of the Merger onwards. That ill-conceived damages model produces results that make neither logical nor economic sense, such as *negative* stock prices and *smaller* damages awards for class members who allegedly suffered *more* harm. For those reasons, Plaintiff's damages methodology does not even approach *Comcast*'s standard.

More class-certification defects remain. One of the putative class representatives, Public Employees' Retirement System of Mississippi ("MSPERS"), does not have standing to pursue any Section 14(a) claim—derivative or direct—because it was not eligible to vote on the Merger. Although MSPERS was a putative McDermott shareholder on the record date,[3] it had loaned out all of its shares, and it is black-letter law that the voting rights for those shares belonged to the borrowers (or a subsequent transferee). Because MSPERS could not vote on the Merger, it lacks standing to complain about the proxy. And it is axiomatic that a plaintiff without standing is an inadequate class

---

[3] To be entitled to vote on a merger, a shareholder must have owned the company's stock, including the associated voting rights, on the record date set by the company. *See infra* 21.

3

representative.

But MSPERS's lack of standing is only the tip of the iceberg. Due to the unusually high amount of securities lending and short selling on the record date, it is an established fact that more than a quarter of the shares purportedly included in the Section 14(a) Class also were loaned out, giving rise to the same standing problem. That precludes class certification—as a matter of ascertainability, standing, and predominance—because there is no administratively feasible way of identifying that significant portion of the putative class that lacks standing to bring a claim and, thus, is not properly part of the class.

In sum, the Motion fails for multiple reasons and should be denied.

**ARGUMENT**

I.    **Plaintiff faces a threshold barrier to class certification because its only theory of class-wide damages confirms the derivative nature of its claim and its concomitant lack of standing to recover for such derivative harm.**

"[B]efore the court considers the typicality of the claims or commonality of issues required for procedural reasons by Rule 23," certain threshold issues—including "[t]he issue of standing"—"must be overcome." *Gabrielsen v. BancTexas Grp., Inc.*, 675 F. Supp. 367, 371 n.3 (N.D. Tex. 1987); *see also Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry[.]"). Whether a shareholder must sue derivatively rather than directly because "the corporation and not the shareholder suffers the [complained of] injury" is one such question of prudential "standing." *Lewis v. Knutson*, 699 F.2d 230, 237-38 (5th Cir. 1983).[4] A court

---

[4] Like constitutional standing, "[t]he goal of the prudential standing requirements is to "determine whether the plaintiff is a proper party to invoke judicial resolution of the dispute and the exercise of the court's remedial powers." *Nat'l Solid Waste Mgmt. Ass'n v. Pine Belt Reg'l Solid Waste Mgmt. Auth.*, 389 F.3d

4

must therefore analyze whether a plaintiff has "standing to assert … claims [that] belong to the corporation" and "may only be asserted by a shareholder in a derivative action" before "reachin[g] the class certification question." *Gabrielsen*, 675 F. Supp. at 372, 374 (dismissing for lack of derivative standing in response to motion for class certification).[5]

Defendants' motion to dismiss (ECF 124 at 18-24) explained that the Class Action Complaint's ("CAC") only claimed economic harm—a "decline in the market value of the Company's stock price," CAC ¶ 23—is a "classical derivative" harm that Plaintiff lacked standing to assert. *Rudolph v. Cummins*, 2007 WL 1189632, at *2 (S.D. Tex. Apr. 19, 2007); *see J.I. Case Co. v. Borak*, 377 U.S. 426, 432 (1964) (recognizing, in the case that created the § 14(a) private right of action, "[t]he injury which a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation ordinarily flows from the damage done the corporation, rather than from the damage inflicted directly upon the stockholder").[6] The Court did not address whether that asserted stock-drop-loss theory was direct or derivative, but allowed the CAC to survive by characterizing the *separate*

---

491, 498 (5th Cir. 2004). In this context, whether a shareholder satisfies the demand pleading requirements of Rule 23.1 "is 'logically antecedent' to the issue of whether [a court] ha[s] jurisdiction over [a derivative] action" because "unless [the court] determine[s] that a proper demand was made, *there is no lawsuit over which to exercise jurisdiction.*" *Potter v. Hughes*, 546 F.3d 1051, 1055 (9th Cir. 2008) (emphasis added).

[5] Claims for "damages suffered by the corporation" qualify as "classical derivate action[s]." *Rudolph v. Cummins,* 2007 WL 1189632, at *2 (S.D. Tex. Apr. 19, 2007). Only when a plaintiff alleges personal harm *distinct* from that inflicted on the corporation can a § 14(a) claim qualify as direct, not derivative. *Id.*; *see also Kelley v. Rambus, Inc.,* 2008 WL 5170598, at *3 n.5 (N.D. Cal. Dec. 9, 2008) (concluding that a direct § 14(a) claim requires that "a stockholder … allege that he suffered an injury separate and distinct from any harm suffered by the corporation"), *aff'd*, 384 F. App'x 570 (9th Cir. 2010).

[6] Defendants preserve the argument that Section 14(a) does not create a private right of action. The Supreme Court has "abandoned" the free-wheeling approach to private rights of action it employed in *Borak*, 377 U.S. at 432, which first recognized an implied private right of action for certain Section 14(a) claims. *Alexander v. Sandoval*, 532 U.S. 275, 287-88 (2001) (specifically denouncing *Borak*'s methodology). The text and structure of Section 14(a) do not come close to satisfying the modern test for private rights of action, and *Borak* should be overruled.

allegation that "shareholders have been deprived of the right to cast an informed vote" as a "direct Section 14(a) claim[]" that Plaintiff had standing to assert. ECF 167 at 13.

Although the Court concluded that the disconnect between Plaintiff's derivative theory of economic loss and direct theory of voter-suffrage injury posed no obstacle at the motion to dismiss stage, the same cannot be said for class certification. This is because Plaintiff seeks certification of a Rule 23(b)(3) damages class—not a Rule 23(b)(2) injunctive-relief class of the sort that could conceivably cohere with a direct Section 14(a) claim predicated on abstract, voter-rights impairment. *See Calamore v. Juniper Networks Inc.*, 364 F. App'x 370, 372 (9th Cir. 2010) ("Direct proxy disclosure claims, if made promptly, may support equitable relief such as an order to amend a proxy solicitation and require a re-vote."). A movant for class certification under Rule 23(b)(3) must, under *Comcast Corp. v. Behrend*, propose a damages model that is both (1) class-wide and (2) consistent with its theory of liability. 569 U.S. 27, 35 (2013). Plaintiff proposes only one damages model—an "out of pocket" damages model based on "the diminution in the value of McDermott shares, as measured by the stock price declines following the alleged corrective disclosures." ECF 303 at 20. As explained below, that theory fails the *Comcast* test. *Infra* Part II.B. But it also raises the more fundamental, antecedent question that remains unanswered in this case: whether Plaintiff has standing to assert that theory of economic loss in the first place.

It does not, because a Section 14(a) claim seeking to recover damages for a stock-drop loss attributable to one company overpaying for another is a quintessential derivative claim. *See, e.g.*, *Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1137-38 (11th Cir.

2020) (purportedly direct § 14(a) claim was "[i]ndubitably … derivative in nature" when based on "a decline in the value of a company caused by misrepresentations and false statements made by officers of a company[,] [which] constitutes damage caused to the company and as a result … to all shareholders equally"); *In re Romeo Power Inc. Sec. Litig.*, 2022 WL 1806303, at *5 (S.D.N.Y. June 2, 2022) (dismissing purportedly direct § 14(a) claim for lack of derivative standing when "the essence of Plaintiffs' § 14(a) claim is that the proxy statements overstated the value of Romeo and as a result, RMG shareholders received less in value from the merger than they expected when they approved it"); *Anastasio v. Internap Network Servs. Corp.*, 2010 WL 11459838, at *13 (N.D. Ga. Sept. 15, 2010) (rejecting argument that § 14(a) claim was "direct because the overpayment 'resulted in a material decrease in [the company's] stock price,' which hurts shareholders" because "the damage [t]here flow[ed] from damage done to the corporation rather than damage inflicted directly on Plaintiffs"); *see also* ECF 124 at 18-24 (collecting additional cases); ECF 149 at 4-9 (same).

The Court is left with a Plaintiff that is pursuing an undisputedly derivative theory of economic harm with no standing to assert a derivative claim (because it has made no attempt to comply with Rule 23.1). The potential direct-derivative disconnect that the Court did not resolve at the motion-to-dismiss stage has now come to full fruition and is ripe for consideration. Because Plaintiff lacks derivative standing to assert its theory of class-wide damages, the Court must deny class certification and dismiss Plaintiff's claims before ever reaching the Rule 23 factors.

## II.     Plaintiff fails to satisfy the requirements of Rule 23.

Even if Plaintiff could overcome its lack of derivative standing, it would run headlong into a litany of Rule 23 problems that preclude class certification. Running the gamut from *Comcast* damages issues to serious adequacy and ascertainability concerns, these myriad defects doom Plaintiff's attempt to certify a class.

### A.     Rule 23 establishes a demanding standard for class certification.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast*, 569 U.S. at 33. It is available only if a party "affirmatively demonstrate[s] his compliance with Rule 23." *Id.* A party seeking to certify a class must "prove … *in fact*" that Rule 23's four prerequisites of numerosity, commonality, typicality, and adequacy are met. *Id.*; FED. R. CIV. P. 23(a). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 569 U.S. at 33-34.

"[P]arties seeking class certification [also] must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiff asserts that class certification is appropriate only under Rule 23(b)(3), which allows for a class to be certified only if

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b)(3).

**B.      Plaintiff fails to provide a common, coherent damages methodology that fits its theory of liability.**

Plaintiff's first fatal defect under Rule 23 is that irrespective of whether Plaintiff has standing to recover under its stock-drop-based damages theory, *supra* Part I, *Comcast* makes clear that Plaintiff's damages methodology must align with the theory of liability undergirding its claim. It does not. Instead, Plaintiff seeks to superimpose an inapposite, purchaser-centric Section 10(b) damages model onto a holder-based Section 14(a) claim—a fatal mismatch that requires the Court to deny class certification.

**1.      *Comcast* makes clear that Rule 23(b)(3) requires that a proposed damages model align with the liability theory.**

"Even where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a classwide basis.'" *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020) (quoting *Comcast*, 569 U.S. at 34). But, as the Supreme Court made clear in *Comcast*, not just any class-wide damages model will suffice. The Court explicitly rejected the proposition that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 35-36. Instead, there must be "consisten[cy]" between the proposed liability theory and the damages model, such that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id.* at 35.

It is that "second step" of the *Comcast* test—the one demanding that "the class-wide damages methodology proposed will track Plaintiffs' theories of liability"—that

9

"signal[ed] a significant shift in the scrutiny required for class certification." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).[7] Gone are the days when the mere "invocation of [an] event study methodology" that was "mathematical or formulaic" sufficed. *Id*. And it is no longer a valid response to an attack on a plaintiff's proposed damages model to "simply [say] those arguments would also be pertinent to the merits determination." *Comcast*, 569 U.S. at 33-34.

Lastly, while *Comcast* was an antitrust case, courts in the Fifth Circuit and beyond have had little trouble applying *Comcast*'s mandate to putative securities class actions.[8]

> **2.**   **Plaintiff runs afoul of *Comcast* by attempting to force the square peg of a Section 10(b) "inflation ribbon" damages methodology into the round hole of Plaintiff's Section 14(a) claim.**

Plaintiff aims to satisfy *Comcast* by proposing an "out of pocket" measure of damages. ECF 303 at 20-21. Relying on its expert, Dr. Hartzmark, Plaintiff contends that such out-of-pocket damages "may be calculated based on the diminution in the value of McDermott shares, as measured by the stock price declines following the alleged corrective

---

[7] *See also Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 n.68 (5th Cir. 2015) (discounting cases that "did not directly address class certification in a post-*Comcast* world"); *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Before [*Comcast*], the case law was far more accommodating to class certification under Rule 23(b)(3).").

[8] *See, e.g., Ludlow*, 800 F.3d at 689-90 (affirming denial of Section 10(b) sub-class when "materialization of the risk" damages theory was "not capable of class-wide determination" under the given liability theory); *BP*, 2013 WL 6388408, at *17 (denying class certification of Section 10(b) claim based on *Comcast*). One notable exception is that courts within the Third Circuit have limited *Comcast* to the antitrust context and refused to apply it in a meaningful way to securities class actions. *See Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374 (3d Cir. 2015) ("A close reading of [*Comcast*] makes it clear that the predominance analysis was specific to the antitrust claim at issue."); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *15 (E.D. Pa. Aug. 4, 2016) (refusing to apply *Comcast* to Section 10(b) claim); *Hurwitz v. LRR Energy L.P.*, 2018 WL 6804481, at *3 & n.3 (D. Del. Jan. 2, 2018) (refusing to scrutinize Section 14(a) claim under *Comcast*); *see infra* 14-15 (discussing another of these outlier decisions).

disclosures." *Id.* at 20 (citing Hartzmark Rpt. (ECF 303-7) ¶¶ 52-53). Dr. Hartzmark proposes to measure the "difference between [1] the per share artificial inflation when the alleged false and misleading statements in the Proxy Solicitations deprived the Class member of their right to cast a fully informed vote on the Merger," "and [2] the per share artificial inflation when the Class member disposed of their shares" at a later date. Hartzmark Rpt. ¶ 53. To do so, he plans to ascertain "the daily levels of artificial inflation"—the so-called "inflation ribbon" on any given day—by conducting an event study composed of "a widely-used market model" and evaluating "McDermott-specific price movements." *Id.* ¶¶ 54-70.

There is a fatal mismatch between that proposed damages methodology and Plaintiff's liability theory. Plaintiff (and Dr. Hartzmark) suggest that a Section 10(b) damages model works just as well for Section 14(a) claims, even when the Section 14(a) claim concerns a *holder* class that never purchased any stock based on alleged misrepresentations. That simply is not the case. The result is that Dr. Hartzmark's out-of-pocket "inflation ribbon" theory—lifted wholesale from the Section 10(b) context—does not cohere with the Section 14(a) claim Plaintiff presses.

> **a.  Section 10(b) claims and Section 14(a) claims differ fundamentally in terms of injury and damages.**

Section 10(b) and Rule 10b-5 prohibit the use of certain misleading or deceptive statements or devices "in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. Given this focus on the purchase or sale of securities, a typical Section 10(b) claim seeks to redress an "injury" caused by plaintiff's reliance on false or misleading

statements in "purchasing … stock at … an inflated price." *Roots P'ship v. Lands' End, Inc.*, 965 F.2d 1411, 1416 (7th Cir. 1992). Dr. Hartzmark's damages methodology borrows from that Section 10(b) inflation paradigm—he describes his "out of pocket … method for calculating losses" as the "widely-accepted methodology in claims for violations of Section 10(b)." Hartzmark Rpt. ¶ 52. Proving that point, every instance of a court's accepting Dr. Hartzmark's inflation-ribbon methodology is a Section 10(b) case. *See* ECF 303 at 22-23 (citing *In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 212 (D. Minn. 2020); *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019), *R&R adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *19 (S.D.N.Y. July 10, 2019)); Hartzmark Rpt. ¶ 7 n.5 (citing *Christakis Vrakas, et al. v. U.S. Steel Corp., et al.*, 2019 WL 7372041, at *9-*10 (W.D. Pa., Dec. 31, 2019)).

But this is a Section 14(a) case, and although Plaintiff and Dr. Hartzmark speak of the two interchangeably, "[i]t is not true … that § 10(b) and § 14(a) are identical causes of action." *Cramer v. Gen. Tel. & Elecs.*, 443 F. Supp. 516, 521-22 (E.D. Pa. 1977), *aff'd*, 582 F.2d 259 (3d Cir. 1978). While Section 10(b) focuses on fraud "in connection with the purchase or sale of any security, … Section 14(a), on the other hand, speaks not to the purchase or sale of a security, but to the solicitation of proxies." *Id.*; *see also SEC v. Nat'l Secs., Inc.*, 393 U. S. 453, 468 (1969) ("Section 10(b) applies to all proscribed conduct in connection with a purchase or sale of any security; § 14 applies to all proxy solicitations *whether or not* in connection with a purchase or sale.") (emphasis added). Because Section 14(a) is agnostic to the purchase or sale of a security, the "injury" it seeks to redress is

12

instead one the "stockholder suffers from [the] corporate action pursuant to a deceptive proxy solicitation." *Borak*, 377 U.S. at 432. In other words, whereas Section 10(b) provides a claim for losses stemming from misrepresentations related to the purchase or sale of a security, Section 14(a) provides a claim for losses stemming from a corporate action taken pursuant to a false or misleading proxy solicitation.

> **b.** **Even among Section 14(a) claims, key damages distinctions exist depending on whether plaintiffs are shareholders of the acquired company or the acquiring company.**

Plaintiff's error goes beyond just conflating Section 10(b) and Section 14(a) damages. Because, as the Supreme Court noted in *Borak,* the harm to shareholders from a defective proxy "ordinarily" flows from the harm to the company and hence such claims are derivative, 377 U.S. at 432, direct Section 14(a) cases seeking damages are few and far between. In the context of a merger vote, a Section 14(a) damages action may be brought on behalf of a class of shareholders of the *acquired* company (seller), in which the challenged merger resulted in an exchange of the proposed class members' stock for either cash or stock of the acquiring company (buyer). In that context, an "out of pocket" damages methodology may align with the liability theory, insofar as it seeks to compensate the cashed-out shareholder for receiving consideration that allegedly undervalued her shares, or the stock-for-stock shareholder for receiving allegedly artificially inflated stock. *See Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128, 155 (1972) (out-of-pocket losses are usually difference between what investors received and what they "would have received" without the violation). And in that context, the class of shareholders suffered an injury completely independent of harm to the company—they received less in the merger

than was represented, while the company itself suffered no harm at all. This type of Section 14(a) claim resembles a Section 10(b) claim with only a single exchange.

Given the poor analogy between the injury alleged in such Section 14(a) cases and the inflation-based injury in the Section 10(b) cases from which Dr. Hartzmark derives his methodology, it is no surprise that nearly every Section 14(a) case cited in Plaintiff's Motion (at 19-20, 22) or Dr. Hartzmark's report (at ¶ 48 n.45) in support of the out-of-pocket damages model involves claims by shareholders of the *acquired* company. *See In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *9 (E.D. Va. Sept. 4, 2020) (acquired-company shareholder class in stock-for-cash deal; damages "measured by the difference between the Merger consideration and the true value of [acquired company] stock on the Merger close date"); *DaimlerChrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 626 (D. Del. 2003) (acquired-company shareholder class in stock-for-stock merger; damages "measured by the difference between the fair value of all that the seller received and the fair value of what he would have received had there been no fraudulent conduct").[9] The only case that does not, *In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104 (D. Del. June 6, 2013), is triply unpersuasive, as it (1) applied the Third Circuit's outlier position that excludes *Comcast* from the securities context, (2) cited only to *acquired*-company

---

[9] *See also Lane v. Page*, 727 F. Supp. 2d 1214, 1232 (D.N.M. 2012) (acquired-company shareholder class in stock-for-cash merger; damages measured by "the difference between the true value of the shares and the price the class was induced into accepting"); *Sandberg v. Va. Bankshares, Inc.*, 891 F.2d 1112, 1117-19 (4th Cir. 1989) (cashed-out minority shareholder class; damages measured by difference between "the value of a share of stock" and the price per share paid in the transaction), *rev'd on other grounds*, 501 U.S. 1083 (1991); *Goldkrantz v. Griffin*, 1999 WL 191540, at *7, 8 (S.D.N.Y. Apr. 6, 1999) (acquired-company shareholder class in stock-for-stock merger; discussing damages measured by "decrease in value" of acquired stock), *aff'd*, 201 F.3d 431 (2d Cir. 1999); *In re Real Est. Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152-53 & n.9 (C.D. Cal. 2002) (acquired limited-partnership interest holder class).

shareholder cases[10] for the proposition that "diminution in the value of the[] shares" was the proper damages model, and (3) never analyzed whether that damages model also makes sense for *acquiring*-company shareholder cases. *Id.* at *14.

Unlike shareholders who exchange their shares for stock in the acquiring company or cash them out—and thus are allegedly induced into receiving inadequate consideration—shareholders of the acquiring company receive nothing. Rather, those shareholders merely *hold*, on a record date, stock in one company that allegedly overpaid for another, which purportedly leads to an injury to the corporation and a downstream (albeit derivative, *supra* Part I) injury to shareholders who "received less in value from the merger than they expected when they approved it." *Romeo Power*, 2022 WL 1806303, at *5. Remedying the relevant transactional injury in such cases, therefore, has nothing to do with removing an artificial "inflation-ribbon" from stock that the acquiring company's shareholders purchased *before* that fraudulent inflation was introduced. Indeed, that would make no sense even in the Section 10(b) context, as the purchase would have occurred at an uninflated price. Computing the damages for this type of Section 14(a) claim requires measuring something fundamentally different: the injury from the *merger itself*. Specifically, the relevant damages questions are whether and to what extent "[the acquiring company] would have been better off with no merger at all" or "a more favorable exchange ratio would have been available if there had been full disclosure." *See Dasho v. Susquehanna Corp.*, 461 F.2d 11, 31 (7th Cir. 1972) (Stevens, J.) (predicating "monetary

---

[10] *Heckmann*, 2013 WL 2456104, at *14 (citing *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) (acquired-company shareholder class); *Gould v. Am.-Hawaiian S.S. Co.*, 535 F.2d 761, 781 (3d Cir. 1976) (same)).

injury" from stock-for-stock merger on acquiring company's ability to demonstrate such).

### c. Because Plaintiff's damages methodology ignores these important differences, it fails to line up with its Section 14(a) theory of liability.

Applying those principles here reveals the mismatch between Plaintiff's Section 14(a) acquiring-company claim and Dr. Hartzmark's Section 10(b) inflation-based damages methodology. Dr. Hartzmark's report acknowledges the merger-centric nature of Plaintiff's Section 14(a) liability theory—namely, that "[h]ad the truth been revealed at the time of the Proxy Solicitations, Class members could have avoided voting for the Merger." Hartzmark Rpt. ¶ 51. But Dr. Hartzmark's proposed "inflation-ribbon" methodology—which he has previously applied *only* to Section 10(b) cases, *supra* 12, and *never* to a Section 14(a) claim[11]—manifestly does not seek to quantify what would have happened to existing McDermott shareholders in that hypothetical, no-merger world where McDermott proceeded on an uncombined basis (or, perhaps, renegotiated the merger on more favorable terms). Instead, he proceeds as if the proposed Section 14(a) *holder* class of McDermott shareholders were a Section 10(b) class of *purchasers*—all of whom made a fictitious purchase of McDermott stock on April 4, 2018 and thereby incurred an identical inflationary injury, later realized when they sold their stock. Hartzmark Rpt. ¶ 53 & n.47.

Why did Dr. Hartzmark go this route? Because he knew full well that it would be a tall order to propose a damages methodology consistent with Plaintiff's Section 14(a) claim. To his credit, Dr. Hartzmark agreed that hypothesizing what would have happened

---

[11] In fact, Dr. Hartzmark has never "calculated damages in a matter where the claims were [Section] 14(a) only." Ex. 2, Hartzmark Dep. 31:21-23.

vis-à-vis the merger if the alleged truth had been revealed would be inherently speculative. Ex. 2, Hartzmark Dep. 113:14-15 ("I'm not going to speculate on that issue."). And for good reason. Courts, too, have identified weighty causation concerns with such attenuated theories. *See, e.g.*, *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1105-06 (1991) (rejecting Section 14(a) causation theory based on "speculative claims … about what the corporate directors would have thought and done without … minority shareholder approval"); *Flum Partners v. Child World Inc.*, 557 F. Supp. 492, 498 (S.D.N.Y. 1983) (rejecting, in § 14(a) context, a series of "conjectural assumptions" that additional disclosures would have given shareholders an opportunity to press acquiror for increase in merger price as "an exercise in sophistry"). But the difficulty of preparing a consistent class-wide damages model—or the fact that such a theory ultimately may fail on the merits—is hardly a valid excuse to forgo proposing such a methodology in the first place. *See BP*, 2013 WL 6388408, at *17 ("If in fact … damages could be measured class-wide, Plaintiffs had an obligation to come forward with evidence thereof. They did not, and *Comcast* does not allow them the luxury of waiting until trial.") (citing *In re Montano*, 493 B.R. 852, 860 (Bankr. D.N.M. 2013)).[12]

---

[12] The Court can reject out of hand the fallback reference to "rescission"-based damages—a methodology relegated to a footnote in Dr. Hartzmark's report and appearing nowhere in Plaintiff's Motion. *See* Hartzmark Rpt. ¶ 52 n.46. As Dr. Hartzmark describes it, it is simply another metric for gauging the inapposite diminution-in-stock-value methodology that has no application to Plaintiff's Section 14(a) claim. Hartzmark Rpt. ¶ 52 n.46 (describing rescissionary damages as "calculated in whole or in part based on: a) the value of the common stock at the time the alleged false and misleading statements in the Proxy Solicitations deprived the Class member of their right to cast a fully informed vote; and b) the value of the common stock at the time of the disposition of the holding"). Nor does Dr. Hartzmark provide necessary specifics of this alternative methodology. *See BP*, 2013 WL 6388408, at *17 ("Plaintiffs cannot avoid [*Comcast*'s] hard look by refusing to provide the specifics of their proposed methodology.").

>    **3.    Further demonstrating its poor fit, Plaintiff's inflation-ribbon damages methodology results in outcomes that make neither logical nor economic sense.**

The mismatch between Plaintiff's Section 14(a) claim and Dr. Hartzmark's Section 10(b) damages methodology becomes clearer still when one digs into the details of his model, for it results in outcomes that make neither logical nor economic sense. To measure the inflation-based damages under that model, Plaintiff must choose between the two commonly used methods to estimate inflation based on the alleged corrective disclosures: dollar inflation or percent inflation. Ex. 1, Allen Rpt. ¶¶ 37-38. The dollar method accounts for stock price drops on corrective disclosure dates on a dollar-for-dollar basis—*e.g.*, a $3 dollar drop on a corrective disclosure date means that the stock price was inflated by $3 dollars during earlier periods. *Id.* ¶ 38. The percentage method accounts for stock price drops on corrective disclosure dates on a percentage basis—*e.g.*, a 15% dollar drop on a corrective disclosure date means that the stock price was inflated by 15% dollars during earlier periods. *Id.* Dr. Hartzmark fails to specify which method he plans to use, but both lead to nonsensical results.

Applying the dollar method to the model results in total alleged inflation—*i.e.*, the sum of the dollar drops corresponding to the alleged corrective disclosures—that is *greater* than the stock price at various points in time. *Id.* ¶ 47. In other words, Dr. Hartzmark's damages methodology would yield a *negative* value for McDermott's stock price across various periods once the artificial inflation is removed. That is economically impossible because a stock cannot have negative value. *See* Ex. 2, Hartzmark Dep. 161:10-162:3.

Applying the percent method (or a dollar method that caps inflation at the stock

price, so as to avoid the negative-value issue) to Dr. Hartzmark's model also would yield economically nonsensical results. Specifically, some class members who sold *after* the second alleged corrective disclosure would get less damages than class members who sold *before* the second alleged corrective disclosure. Ex. 1, Allen Rpt. ¶ 48. That makes neither logical nor economic sense because those class members necessarily were harmed *more*, not *less*, by holding their stock through an additional corrective disclosure. *Id.*

That is but one example of the irrationality inherent in Dr. Hartzmark's model. Another concerns the nonsensical results that flow from whether Dr. Hartzmark adopts a last-in, first-out ("LIFO") or first-in, first-out ("FIFO") accounting method. *Id.* ¶¶ 39-45. PNC Wealth Management ("PNC") and Citi Investment Research (US) ("Citi") provide an illustrative example. *Id.* ¶¶ 44-45, Allen Rpt. Both proposed class members owned MDR and CB&I shares on the record date, with the key difference that Citi purchased its MDR shares before its CB&I shares, whereas PNC purchased its CB&I shares before its MDR shares. *Id.* Yet under Dr. Hartzmark's model, the choice between LIFO and FIFO will result in either PNC's or Citi's receiving no damages whatsoever. *Id.* That makes no sense under Plaintiff's theory because—as Dr. Hartzmark agrees, *see* Hartzmark Rpt. ¶ 50—the date of the purchases should not matter for such a holder class.

An additional logical flaw in Dr. Hartzmark's model is that it does not account whatsoever for the offsetting economic gains that class members who also owned CB&I shares necessarily made under Plaintiff's theory. *See* Ex. 1, Allen Rpt. ¶¶ 33-35, 50-53. Many proposed class members owned vastly more CB&I shares than MDR shares on the record date. *Id.* ¶¶ 51-52. Those class members benefited from the Merger under

19

Plaintiff's theory because they exchanged their allegedly significantly inflated CB&I shares for shares in the new combined enterprise. *Id.* ¶¶ 33-35, 50-53. For example, Magnetar Capital Partners LP ("Magnetar") benefited from the Merger (under Plaintiff's theory) to the tune of $42 million due to its extensive CB&I holdings. *Id.* ¶ 53. Dr. Hartzmark ignores all of these complications from the ownership of CB&I shares. That simply is not a rational way to compute damages.

Those irrationalities underscore just how poor a fit Plaintiff's proposed damages methodology is for its Section 14(a) claim.

## C.   MSPERS is an inadequate class representative because it was ineligible to vote on the Merger and thus lacks standing for a Section 14(a) claim.

Another class-certification defect—albeit not a fatal one due the presence of other proposed class representatives—is that MSPERS is an inadequate class representative. MSPERS fails the basic test that a class representative must have standing to pursue its claim. Because MSPERS had loaned out its MDR shares on the record date for the Merger, it was not eligible to vote on the Merger and thus lacks standing to bring any Section 14(a) claim at all, much less on behalf of a class.

MSPERS engaged in the practice of securities lending. In such arrangements, "securities are temporarily transferred by one party (the lender) to another (the borrower)," and "[t]he borrower is obliged to return the securities to the lender, either on demand, or at the end of any agreed term." *United States v. Zangari*, 677 F.3d 86, 88 (2d Cir. 2012). "The borrower of securities may be motivated by any number of factors, including the desire to cover a short position, to sell the borrowed securities in hopes of buying them back at a

lower price before returning them to the lender, or to gain tax advantages associated with the temporary transfer of ownership of the securities." *Id.*

Shareholders whose shares are on loan on the record date do not have the right to vote those shares. Such a loan "transfers incidents of ownership, including proxy voting rights, for the duration of the loan," and the shareholder "loses its ability to vote the proxies of such securities, unless the securities are recalled, the loan is terminated, and the securities are returned … before the record date for the vote." SEC Final Rule, Release No. 33-11131 (Nov. 2, 2022). Securities lending thus presents a "lending-voting tradeoff,"[13] where lenders have elected to sell their right to vote in exchange for lending revenues.

MSPERS accepted that tradeoff, forfeiting its right to vote on the Merger in exchange for the economic benefits of lending its MDR shares,[14] which were on loan on the record date (April 4, 2018) pursuant to a Securities Lending Agreement with the Bank of New York Mellon. Ex. 3, MSPERS Dep. 58:11-13, 65:9-12; Ex. 4, Dimensional Fund Advisors Decl. ¶¶ 5-6; Ex. 5, BNYM Decl. ¶ 7. Accordingly, MSPERS had no right to vote any proxies in connection with the Merger. Because only persons who had the right to vote a challenged proxy have standing to bring a Section 14(a) claim, *see, e.g.*, *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994) ("[W]e are unwilling to expand standing under section 14(a) of the Exchange Act to interest-holders

---

[13] *See* Joshua Mitts, *The Price of Your Vote: Proxy Choice and Securities Lending*, Columbia Law School Blue Sky Blog (Oct. 11, 2021), available at https://clsbluesky.law.columbia.edu/2021/10/11/the-price-of-your-vote-proxy-choice-and-securities-lending/ (identifying problems created by index and mutual funds' trading of proxy voting rights for lending revenues).

[14] At the time, MSPERS earned over a million dollars a month from its securities lending. Ex. 1, Allen Rpt. ¶ 61.

who are not qualified to vote."), MSPERS "fails to establish standing [and] … may not

seek relief on behalf of himself or herself or any other member of the class," *James v. City

of Dallas, Tex.*, 254 F.3d 551, 563 (5th Cir. 2001).[15]

### D.    The class also fails on ascertainability, standing, and predominance grounds.

The proposed class also cannot satisfy the "ascertainability" requirement. "The

existence of an ascertainable class of persons to be represented by the proposed class

representative is an implied prerequisite of [Rule] 23." *John v. Nat'l Sec. Fire & Cas. Co.*,

501 F.3d 443, 445 (5th Cir. 2007). To satisfy the "ascertainability" requirement, the class

description must be "sufficiently definite so that it is administratively feasible for the court

to determine whether a particular individual is a member." 7A CHARLES ALAN WRIGHT ET

AL., FEDERAL PRACTICE & PROCEDURE § 1760 (4th ed.).

The "circuits have split over the proper role of administrative feasibility" in the

ascertainability inquiry, and it remains an open question in the Fifth Circuit. *See Cherry v.

Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021).[16] The First, Third, and Fourth

Circuits "require proof of administrative feasibility as a prerequisite for certification." *Id.*

That is the better view, as the ascertainability requirement otherwise loses its function. *See

---

[15] MSPERS may claim that the potential to recall its shares from loan and vote suffices to confer standing, but that would result in the nonsensical consequence that both the lender (MSPERS) and the borrower (or a subsequent transferee) would have § 14(a) standing based on the same share even though only one of them (here, the borrower or a subsequent transferee) had the right to vote that share. That would lead to a class containing more shares than the total number of MDR shares outstanding, since shares on loan would be double counted, and any damages awarded would be artificially inflated by that double counting.

[16] In an unpublished case, the Fifth Circuit noted that it has not adopted the Third Circuit's standard that the class must be "*currently* and readily ascertainable" at the certification stage. *Seeligson v. Devon Energy Prod. Co., L.P.*, 761 F. App'x 329, 334 (5th Cir. 2019). "Instead, a party need only demonstrate [ascertainability] … 'at some stage of the proceeding'" *Id.* But the timing of the inquiry is not relevant here because ascertaining this class is not administratively feasible now or ever.

*EQT Prod. Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) ("However phrased, the requirement is the same. A class cannot be certified unless a court can readily identify the class members in reference to objective criteria."); *Carrera v. Bayer Corp.*, 727 F.3d 300, 307 (3d Cir. 2013) ("Ascertainability mandates a rigorous approach at the outset because of the key roles it plays as part of a Rule 23(b)(3) class action lawsuit."); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 19 (1st Cir. 2015) ("At the class certification stage, the court must be satisfied that, prior to judgment, it will be possible to establish a mechanism for distinguishing the injured from the uninjured class members.").

Applying the administrative-feasibility requirement here, the problem is that any potential class member could be like MSPERS and lack standing due to its MDR shares being on loan on the record date. That is more than a theoretical concern. Due to the unusually high amount of securities lending and short selling occurring on the record date, *around a quarter or more* of the MDR shares on the record date fall into that category and do not confer standing. Ex. 1, Allen Rpt. ¶ 62.

In addition to its volume, there is no easy way of separating this chaff from the wheat. The Court need look no further than the fact that MSPERS sought appointment as Lead Plaintiff apparently without knowing that its MDR shares were on loan on the record date to see that ascertaining whether a shareholder's shares were on loan at a given time is no straightforward process. The only way to separate the shareholders whose shares were on loan on the record date from those whose shares were not is to repeat the process of obtaining and reviewing securities lending records for each and every potential class member who engaged in that practice. *Id.*; *see also* SEC Release No. 33-11131

(establishing final rule for certain funds, effective July 1, 2024, requiring "disclosure of the number of shares the reporting person loaned and did not recall" to "provide transparency on a specific, security-by-security basis" because "[a]bsent this disclosure, investors would not have quantified information showing how securities lending may have impacted the degree of proxy voting by the reporting person"). Because that simply is not administratively feasible, the proposed class fails the ascertainability requirement.

Importantly, Plaintiff cannot solve this ascertainability problem by altering the class definition to avoid it, such as by including all McDermott shareholders, whether or not they had a right to vote on the Merger.[17] That would merely shift the problem from ascertainability to standing and predominance. A class that explicitly sweeps in shareholders who lack standing to pursue this Section 14(a) claim would fail due to those shareholders' lack of standing. *See Flecha v. Medicredit, Inc.*, 946 F.3d 762, 770 (5th Cir. 2020) (Oldham, J., concurring) ("I also agree with the Court's conclusion that '[c]ountless unnamed class members lack standing.' In my view, that lack of standing is sufficient to decide the case."); *Denney v. Deutsche Bank AG*, 443 F.3d 253, 264 (2d Cir. 2006). (holding "no class may be certified that contains members lacking Article III standing" and requiring the class "be defined in such a way that anyone within it would have standing").[18]

---

[17] Plaintiff may be trying this route, as the Motion goes back and forth between one class definition that includes only those MDR shareholders "as of April 4, 2018 *who had the right to vote*" and another that includes all MDR "shareholders (including beneficial owners) as of April 4, 2018" full stop. *See* ECF 303 at 1, 2 (emphasis added).

[18] The Fifth Circuit has observed that "the possibility that some [absent class members] may fail to prevail on their individual claims will not defeat class membership." *In re Deepwater Horizon*, 739 F.3d 790, 813 (5th Cir. 2014). But this case does not involve a "possibility" relating to "some" class members; it involves the *fact* that a significant number of putative class members lack standing and therefore have no claim.

It would also give rise to a predominance defect because, as discussed above, there is no way to winnow out the class members without standing other than to undertake the laborious task of carefully analyzing their securities lending records. Ex. 1, Allen Rpt. ¶ 62; *see Bell Atl. Corp. v. AT&T Corp.*, 339 F.3d 294, 302 (5th Cir. 2003) ("[W]here fact of damage cannot be established for every class member through proof common to the class, the need to establish antitrust liability for individual class members defeats Rule 23(b)(3) predominance."). It may be debatable whether having to individually find and exclude a small number of class members without standing poses a fatal predominance problem, but where, as here, around a quarter or more of the shares fall into that category, it cannot be certified. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 625 (D.C. Cir. 2019) (denying class certification on predominance grounds, explaining that whereas "the 'few reported decisions' involving uninjured class members 'suggest that 5% to 6% constitutes the outer limits of a *de minimis* number[,]' [t]he 12.7 percent figure in this case is more than twice that approximate upper bound reflected in analogous caselaw"); *In re Asacol Antitrust Litig.*, 907 F.3d 42, 56-57 (1st Cir. 2018) (collecting similar cases).

In sum, whether framed in terms of ascertainability, standing, or predominance, the large number of McDermott shareholders that lack standing precludes class certification.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiff's Motion.

25

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*
 David D. Sterling
  *Attorney-In-Charge*
 State Bar No. 19170000
 Federal I.D. No. 07079
 Amy Pharr Hefley
 State Bar No. 24046046
 J. Mark Little
 State Bar No. 24078869
 Federal I.D. No. 1487508
 Anthony J. Lucisano
 State Bar No. 24102118
 Federal I.D. No. 3369146
 Elizabeth P. Furlow
 State Bar. No. 24109899
 Federal I.D. No. 3402815
 910 Louisiana Street
 Houston, Texas 77002
 Telephone: (713) 229-1234
 Fax: (713) 229-1522
 david.sterling@bakerbotts.com
 amy.hefley@bakerbotts.com
 mark.little@bakerbotts.com
 anthony.lucisano@bakerbotts.com
 elizabeth.furlow@bakerbotts.com

 ***Attorneys for Defendants***

SIDLEY AUSTIN LLP
Angela C. Zambrano
State Bar No. 24003157
Mason Parham
State Bar No. 24088182
Fabricio Archanjo
State Bar No. 24110983
2021 McKinney Ave., Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3300
Fax: (214) 981-3400
angela.zambrano@sidley.com
mparham@sidley.com
farchanjo@sidley.com

**_Attorneys for Defendant Stuart Spence_**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via email on all counsel of record on this 15th day of December, 2022.

_/s/ Amy Pharr Hefley_
Amy Pharr Hefley