# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MIRIAM EDWARDS, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 4:18-cv-04330 |
| McDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE, | § § § § | |
| Defendants. | § § | |

# DEFENDANTS' OPPOSITION TO § 10(b) LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF § 10(b) <u>CLASS REPRESENTATIVES AND § 10(b) CLASS COUNSEL</u>

# TABLE OF CONTENTS

Page

Table of Contents....................................................................................................i

Table of Authorities............................................................................................iii

Statement of Nature and Stage of Proceedings ................................................ 1

Statement of the Issue........................................................................................ 1

Introduction and Summary of the Argument.................................................... 1

Argument ............................................................................................................. 3

      I.      Rule 23 establishes a demanding standard for class certification. ............... 3

      II.     NSHEPP is an inadequate and atypical class representative because it suffered no economic injury as a result of the alleged securities fraud...................................................................................................... 5

      III.    Plaintiff's vague hand-waving on the damages methodology falls short of what *Comcast* requires. ....................................................... 9

             A.     *Comcast* makes clear that Rule 23(b)(3) requires a common, coherent damages methodology that aligns with the liability theory.................................................................................. 9

             B.     Plaintiff's damages methodology flunks the *Comcast* test, as it fails to account for various key matters and results in outcomes that make neither logical nor economic sense................................. 10

      IV.    Individual issues concerning each class member's reliance will predominate. .............................................................................................. 13

             A.     The rebuttable fraud-on-the-market presumption provides a class-wide basis for proving reliance. ............................................... 13

             B.     The substantial number of short sellers in the putative class that cannot invoke the fraud-on-the-market presumption creates a fatal predominance problem.......................................................... 15

             C.     Because the market for McDermott stock was no longer efficient after September 19, 2019 under Plaintiff's expert's own market efficiency test, the purchases and alleged

corrective disclosures past that date can play no role in any class. ................................................................................... 18

    D.    The *Affiliated Ute* presumption does not apply here. ....................... 20

V.    None of the last five alleged corrected disclosures demonstrates price impact. .............................................................................. 21

    A.    Only alleged corrective disclosures that actually correct earlier alleged misrepresentations can demonstrate price impact. ............. 21

    B.    The last five alleged corrective disclosures are not corrective of any earlier alleged misrepresentation. ......................................... 22

Certificate of Service .......................................................................... 27

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Abell v. Potomac Ins. Co.*,
    858 F.2d 1104 (5th Cir. 1988) ............................................................ 20, 21

*Affiliated Ute Citizens v. United States*,
    406 U.S. 128 (1972) ............................................................................ 20, 21

*Akin v. Q-L Invs., Inc.*,
    959 F.2d 521 (5th Cir. 1992) .................................................................... 20

*Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*,
    189 F.3d 1017 (9th Cir. 1999) ..................................................................... 5

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ...................................................................................... 4

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
    568 U.S. 455 (2013) .................................................................................... 13

*Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co. ("Halliburton I")*,
    597 F.3d 330 (5th Cir. 2010). ................................................................... 23

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) ......................................................... 14, 15, 16, 17

*Bertulli v. Indep. Ass'n of Cont'l Pilots*,
    242 F.3d 290 (5th Cir. 2001) ....................................................................... 8

*Cammer v. Bloom*,
    711 F. Supp. 1264 (D.N.J. 1989) .............................................................. 19

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ......................................................... 2, 3, 4, 9, 10, 13

*Cruson v. Jackson Nat'l Life Ins. Co.*,
    954 F.3d 240 (5th Cir. 2020) ....................................................................... 9

*Earl v. Boeing Co.*,
    53 F.4th 897 (5th Cir. 2022) .................................................................. 7, 8

*Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton II"),*
 563 U.S. 804 (2011) ................................................................. 14, 21

*Feder v. Elec. Data Sys. Corp.,*
 429 F.3d 125 (5th Cir. 2005) ...................................................... 9

*Ganesh, L.L.C. v. Comput. Learning Ctrs., Inc.,*
 183 F.R.D. 487 (E.D. Va. 1998) ...................................... 16, 17, 18

*Gene & Gene LLC v. BioPay LLC,*
 541 F.3d 318 (5th Cir. 2008) ...................................................... 4

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.,*
 141 S. Ct. 1951 (2021) ........................................ 14, 18, 21, 22, 23, 24, 25

*Greenberg v. Crossroads Sys., Inc.,*
 364 F.3d 657 (5th Cir. 2004) ...................................................... 24

*Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton III"),*
 573 U.S. 258 (2014) .......................................... 13, 14, 15, 17, 21

*In re BP p.l.c. Sec. Litig.,*
 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ........................ 10, 13

*In re Bristol Myers Squibb Co. Sec. Litig.,*
 586 F. Supp. 2d 148 (S.D.N.Y. 2008) ...................................... 25

*In re Critical Path, Inc., Sec. Litig.,*
 156 F. Supp. 2d 1102 (N.D. Cal. 2001) .................................... 16

*In re Dell Inc. Sec. Litig.,*
 591 F. Supp. 2d 877 (W.D. Tex. 2008) .................................... 25

*In re Omnicom Grp., Inc. Sec. Litig.,*
 597 F.3d 501 (2d Cir. 2010) ...................................................... 24

*In re PolyMedica Corp. Sec. Litig.,*
 224 F.R.D. 27 (D. Mass. 2004) ............................................ 16, 17

*In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869,*
 725 F.3d 244 (D.C. Cir. 2013) .................................................. 10

*James v. City of Dallas, Tex.,*
 254 F.3d 551 (5th Cir. 2001) ...................................................... 8

iv

*Kornman & Assocs., Inc. v. United States*,
   527 F.3d 443 (5th Cir. 2008) ................................................................. 15, 16

*Krogman v. Sterritt*,
   202 F.R.D. 467 (N.D. Tex. 2001) ................................................................. 19

*Lehocky v. Tidel Techs., Inc.*,
   220 F.R.D. 491 (S.D. Tex. 2004) ................................................................. 9

*Levy v. Gutierrez*,
   448 F. Supp. 3d 46 (D.N.H. 2019) ................................................................. 17

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015) ................................................................. 10

*Matrixx Initiatives, Inc. v. Siracusano*,
   563 U.S. 27 (2011) ................................................................. 13

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
   259 F.3d 154 (3d Cir. 2001) ................................................................. 5

*Patel v. Reata Pharms., Inc.*,
   549 F. Supp. 3d 559 (E.D. Tex. 2021) ................................................................. 9

*Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
   769 F.3d 313 (5th Cir. 2014) ................................................................. 25

*Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*,
   552 U.S. 148 (2008) ................................................................. 5

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ................................................................. 19

*Warren v. Reserve Fund, Inc.*,
   728 F.2d 741 (5th Cir. 1984) ................................................................. 9

*Weikel v. Tower Semiconductor Ltd.*,
   183 F.R.D. 377 (D.N.J. 1998) ................................................................. 17

*Zlotnick v. TIE Commc'ns*,
   836 F.2d 818 (3d Cir. 1988) ................................................................. 15, 16, 17

## STATUTES, RULES, AND REGULATIONS

Section 10(b) of the Exchange Act of 1934 ................................................................. *passim*

FED. R. CIV. P. 23 ................................................................................................... *passim*

17 C.F.R. § 240.10b-5 ........................................................................................... 1, 5, 14

McDermott International, Inc. ("McDermott" or "MDR"), David Dickson, and Stuart Spence ("Defendants") file this Opposition to § 10(b) Plaintiff's Motion for Class Certification and Appointment of § 10(b) Class Representatives and § 10(b) Class Counsel [ECF 305] ("Motion").

## STATEMENT OF NATURE AND STAGE OF PROCEEDINGS

This is a putative class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5 on behalf of all persons and entities who purchased or otherwise acquired McDermott common stock between December 18, 2017 and January 23, 2020, both dates inclusive ("Section 10(b) Class").[1]

## STATEMENT OF THE ISSUE

Plaintiff's Motion should be denied because Plaintiff cannot meet Federal Rule of Civil Procedure 23's requirements for class certification.[2]

## INTRODUCTION AND SUMMARY OF THE ARGUMENT

Plaintiff alleges that McDermott, its CEO David Dickson, and its CFO Stuart Spence knew that Chicago Bridge & Iron Company ("CB&I") was fatally hobbled by massive, undisclosed cost overruns on four "Focus Projects" but proceeded to merge McDermott with CB&I anyway (the "Merger"). These "Focus Projects" included the

---

[1] Earlier in this litigation, the Court denied Plaintiff's request to add City of Pontiac General Employees' Retirement System ("Pontiac") as an additional class representative and Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as additional class counsel. ECF 216 at 1-2. Nonetheless, Plaintiff includes Pontiac and Robbins Geller in its Motion. Mot. 1-2. Plaintiff apparently did so in an attempt to comply with the Court's request that Plaintiff refile its Motion, which predated the Court's ruling on Pontiac and Robbins Geller. Plaintiff and Defendants now agree that both will proceed through the rest of the briefing addressing only NSHEPP as a proposed representative, with both sides reserving all rights.

[2] Unless otherwise noted, all internal quotation marks, citations, and footnotes from quoted material have been omitted and all emphases and alterations are as they appear in the original sources.

1

engineering and construction of two LNG export facility projects and two gas turbine projects. Plaintiff claims that Defendants continued to conceal the calamitous reality of the Focus Projects after the Merger. Plaintiff now moves to certify a class to recover for shareholders' alleged injuries. Plaintiffs' Motion should be denied for the following reasons:

First, the proposed class representative, Nova Scotia Health Employees' Pension Plan ("NSHEPP"), *never bought even a single share of McDermott stock.* Instead, NSHEPP was a long-time *CB&I* shareholder that only acquired McDermott shares through the Merger—a fact that NSHEPP obscures in its Motion through its claim to have "purchased McDermott shares." If the Merger were not approved, CB&I faced almost certain bankruptcy. Like all other CB&I shareholders as of the Merger's close, NSHEPP received McDermott stock in exchange for its CB&I shares—shares that would have become worthless had a bankruptcy ensued instead of the Merger. Despite receiving this lifeline, NSHEPP now alleges that *McDermott* made material misstatements before the Merger that (somehow) harmed NSHEPP as a *CB&I* shareholder. NSHEPP is not an adequate and typical class representative because the alleged misrepresentations of which it complains unquestionably *benefitted* CB&I shareholders like NSHEPP. Nor should any similarly situated putative class member—*i.e.*, one who acquired McDermott shares only through the conversion of its CB&I shares—be part of any class.

Equally fatal to Plaintiff's Motion is that its damages methodology falls well short of the common, coherent model that is required under the Supreme Court's holding in *Comcast Corp. v. Behrend*. Unable or unwilling to present a proper damages methodology,

Plaintiff tries to take a shortcut with vague hand-waving about inflation and event studies. But that slapdash damages model produces results that make neither logical nor economic sense, such as *negative* stock prices and *smaller* damages awards for class members who allegedly suffered *more* harm. Needless to say, Plaintiff's damages methodology does not satisfy *Comcast*'s standard.

Yet another barrier to class certification is that individual issues of reliance defeat predominance. The fraud-on-the-market presumption provides a class-wide presumption of reliance that makes securities class actions possible. But none of the unusually high percentage of short sellers in the putative class may invoke that presumption due to their atypical motivations. The result is a putative class with a substantial number of members who must demonstrate their reliance on an individual basis, which defeats predominance.

Lastly, even if some class could be certified, it could not include any purchases or alleged corrective disclosures after September 19, 2019 or any of the last five alleged corrective disclosures. On the former, the market ceased to be efficient after that date, meaning that the fraud-on-the-market presumption could no longer apply and that the alleged corrective disclosure ceased to be a reliable aid in measuring damages. On the latter, none of the five alleged corrective disclosures actually corrected any alleged misrepresentation, and therefore none demonstrates the required price impact.

ARGUMENT

## I.  Rule 23 establishes a demanding standard for class certification.

"The class action is an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27,

3

33 (2013). It is available only if a party "affirmatively demonstrate[s] his compliance with Rule 23." *Id.* A party seeking to certify a class must "prove … *in fact*" that Rule 23's four prerequisites of numerosity, commonality, typicality, and adequacy are met. *Id.*; FED. R. CIV. P. 23(a). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim." *Comcast*, 569 U.S. at 33-34.

"[P]arties seeking class certification [also] must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997). Plaintiff asserts that class certification is appropriate only under Rule 23(b)(3), which allows for a class to be certified only if:

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

FED. R. CIV. P. 23(b)(3).

To decide whether Plaintiff has satisfied Rule 23(b)(3)'s predominance requirement, "the Court … consider[s] 'how a trial on the merits would be conducted if a class were certified.'" *Gene & Gene LLC v. BioPay LLC*, 541 F.3d 318, 326 (5th Cir. 2008). This "entails identifying the substantive issues that will control the outcome, assessing which issues will predominate, and then determining whether the issues are common to the class, a process that ultimately prevents the class from degenerating into a series of individual trials." *Id.* Notably, Rule 23(b)(3)'s predominance requirement, "though redolent of the commonality requirement of Rule 23(a), is 'far more demanding' because it 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by

4

representation.'" *Id.* (quoting *Amchem Prods.*, 521 U.S. at 623-24).

## II.   NSHEPP is an inadequate and atypical class representative because it suffered no economic injury as a result of the alleged securities fraud.

NSHEPP is the sole proposed class representative for the putative 10(b) class, and it is an inadequate class representative because it cannot satisfy the damages element of its claims. To state a claim under § 10(b) and Rule 10b-5, Plaintiff must plead: (1) a material misrepresentation or omission; (2) a defendant acting with scienter concerning the fraud; (3) reliance; (4) damages; and (5) loss causation. *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148, 157 (2008). The damages element is mandatory. Indeed, there is "no support in the case law for presuming economic injury for purposes of class certification in Rule 10b-5 claims absent indication that each plaintiff has suffered an economic loss." *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 180 (3d Cir. 2001). "The usual measure of damages for securities fraud claims under Rule 10b-5 is out-of-pocket loss; that is, the difference between the value of what the plaintiff gave up and the value of what the plaintiff received." *Ambassador Hotel Co., Ltd. v. Wei-Chuan Inv.*, 189 F.3d 1017, 1030 (9th Cir. 1999).

NSHEPP suffered no damages. NSHEPP never bought a single share of McDermott stock. Ex. 2, Deposition of Stefan Cowell ("Cowell Dep.") at 84:19-85:6 ("Q: And is it true that the only McDermott stock that NSHEPP has ever owned are the shares that it received through the conversion as part of the CB&I merger?" … A: Yes, within this time period, that is correct."); *id.* at 111:7-10 (similar). Instead, it owned CB&I shares that were converted to shares in the new McDermott entity following the Merger. *Id.* at 84:19-85:6,

108:11-13, 111:7-10; Ex. 3, LSV0000113, LSV Capital Change Detail (trading records documenting the share conversion); Corrected Class Action Complaint ("CCAC"), ECF 105, at 272 (same).[3] That "purchase"—the exchange of NSHEPP's pre-merger CB&I shares for post-merger McDermott shares—was NSHEPP's only acquisition of McDermott stock. Ex. 2, Cowell Dep. at 84:19-85:6. To be clear, NSHEPP never paid a penny for its McDermott stock; rather, it (like every other CB&I shareholder on the effective date of the Merger) *exchanged* its CB&I stock for its McDermott stock. *Id.* at 135:11-14 ("Q: And how was that payment measured? It wasn't made in cash, correct? A: We used our CB&I stock to purchase the McDermott stock.").

That creates a damages problem for NSHEPP because it actually *benefited* from that exchange. Plaintiff's theory of the case is that CB&I was artificially inflated before the Merger and conversion date. Ex. 1, Allen Rpt. ¶¶ 28-30. Then, through the Merger and conversion, CB&I's artificial inflation was diluted across the new McDermott entity. *Id.* CB&I's shareholders thus benefited from the conversion under NSHEPP's theory, for they exchanged purportedly more inflated shares of CB&I for less inflated shares of McDermott. *Id.* To put it in the parlance of the traditional out-of-pocket damages measure, NSHEPP gave up shares in CB&I, which were allegedly significantly inflated because of the undisclosed losses in CB&I's Focus Projects, and received shares of McDermott, which were untainted by any such issues before the Merger. *Id.*

---

[3] Although NSHEPP objected to answering questions regarding when it first acquired CB&I shares, its CB&I position dates back to at least March 31, 2017.  Ex. 2, Cowell Dep. at 93:12-94:20; Ex. 5, Q12017 Investment Report at 5.

Even putting aside the allegations of fraud and artificial inflation, Plaintiff's own Complaint admits that CB&I entered the Merger "to stave off bankruptcy." CCAC ¶ 5. The joint proxy for the Merger was equally clear that CB&I was headed to bankruptcy if it did not proceed with the Merger: "CB&I would have no choice but to seek bankruptcy protection if it did not enter into either an agreement with respect to the Technology Sale or the transaction with McDermott." Ex. 4, 3/23/18 MDR 2d Am. Proxy at 66. The Merger and conversion thereby provided CB&I shareholders a lifeline that, at the very least, was better than bankruptcy and the concomitant elimination of their equity interests. Ex. 1, Allen Rpt. ¶ 27. Accordingly, NSHEPP came out ahead on—and certainly was no worse off because of—the conversion of its CB&I shares to McDermott shares. *Id.* ¶ 31. And on that score, it is quite notable that NSHEPP's expert does not even attempt to explain how NSHEPP (unlike open-market purchasers of McDermott stock) was somehow harmed.

That lack of damages defeats NSHEPP's securities fraud claim and is a standing deficiency as well, because it means that NSHEPP suffered no "injury in fact." *Earl v. Boeing Co*., 53 F.4th 897, 901 (5th Cir. 2022). *Boeing* is instructive on this point. In that case, the Fifth Circuit held that plaintiffs had no standing to bring a class action fraud claim where they "offered no plausible theory of economic harm." *Id.* The Court analyzed plaintiffs' "overcharge-by-fraud theory," in which plaintiffs claimed that they paid inflated prices for plane tickets because, "if the public had known about defendants' fraudulent scheme [to hide the safety risk of flying on MAX 8 planes], demand for tickets on routes flying the MAX 8 would have dropped, so the airlines would have been forced to lower fares and plaintiffs would have paid less for their tickets." *Id.* at 902. The Fifth Circuit

weighed the theory against more plausible inferences to the contrary—including that if the defendants' fraud had been known, two prominent airlines "would have offered *zero* MAX 8 flights until the defect could be fixed," which would have, if anything, *increased* ticket fares. *Id.* at 903. Because "the plaintiffs in [the] suit ha[d] not plausibly alleged that they're any worse off financially" as a result of the defendants' conduct, there was no injury-in-fact, and plaintiffs had no standing to sue. *Id.*

This case presents a different variation of that same standing problem. Unlike in *Boeing*, here there is no class-wide standing barrier that would prevent *any* plaintiff from bringing claims. Rather, the standing defect at issue is unique to NSHEPP and any other class members that acquired McDermott shares only by exchanging their CB&I shares. NSHEPP, and the rest of the class members that fall into that category, find themselves in the same position as the *Boeing* plaintiffs and lack standing because they cannot "plausibly allege[] that they're any worse off financially." *Id.*[4] This fatal lack of damages and standing renders NSHEPP an inadequate class representative. *See James v. City of Dallas, Tex.*, 254 F.3d 551, 563 (5th Cir. 2001) (holding that a party that "fails to establish standing … may not seek relief on behalf of himself or herself or any other member of the class"); *Bertulli v. Indep. Ass'n of Cont'l Pilots,* 242 F.3d 290, 294 (5th Cir. 2001) ("Standing is an inherent prerequisite to the class certification inquiry.").

At minimum, NSHEPP is subject to unique defenses on damages and standing that

---

[4] NSHEPP is far from the only putative class member that benefited from the Merger and conversion. Many more are similarly situated in that they only acquired McDermott shares through the conversion of their CB&I shares. Ex. 1, Allen Rpt. ¶ 35. For the reasons discussed above, these class members suffered no damages and therefore lack viable securities fraud claims. Indeed, they do not even have standing to bring such claims. Accordingly, this group of putative class members should be excluded from any class.

defeat adequacy and typicality. A class representative fails the typicality requirement if it "is subject to unique defenses that threaten to become the focus of the litigation." *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004). While "the presence of an arguable unique defense [does not] necessarily destroy[] typicality," "the key typicality inquiry is whether a class representative would be required to devote considerable time to rebut Defendants' claims." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 137-38 (5th Cir. 2005) (quoting *Lehocky*, 220 F.R.D. at 501-02); *see also Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir. 1984) (identifying relevant typicality concern as whether "representation of the class will suffer if the named plaintiff is preoccupied with a defense"). Because NSHEPP is subject to the unique defense that it never suffered a loss as a result of the conversion of its CB&I shares to McDermott shares, it is an inadequate and atypical class representative. *See Patel v. Reata Pharms., Inc.*, 549 F. Supp. 3d 559, 569 (E.D. Tex. 2021) ("Even if Massar's holding and trading Reata options and shares were typical of the class, Massar is potentially subject to unique defenses concerning damages that likewise render Massar ineligible to serve as lead plaintiff.").

III.   **Plaintiff's vague hand-waving on the damages methodology falls short of what *Comcast* requires.**

A.   *Comcast* **makes clear that Rule 23(b)(3) requires a common, coherent damages methodology that aligns with the liability theory.**

"Even where plaintiffs seeking class certification show that common issues predominate on questions of liability, they must also present a damages model 'establishing that damages are capable of measurement on a classwide basis.'" *Cruson v. Jackson Nat'l Life Ins. Co.*, 954 F.3d 240, 258 (5th Cir. 2020) (quoting *Comcast*, 569 U.S. at 34). But, as

the Supreme Court made clear in *Comcast*, not just any class-wide damages model will suffice. The Court explicitly rejected the proposition that "at the class-certification stage *any* method of measurement is acceptable so long as it can be applied classwide, no matter how arbitrary the measurements may be." *Comcast*, 569 U.S. at 35-36. Instead, there must be "consisten[cy]" between the proposed liability theory and the damages model, such that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to that theory." *Id.* at 35.

It is that "second step" of the *Comcast* test—the one demanding that "the class-wide damages methodology proposed will track Plaintiffs' theories of liability"—that "signal[ed] a significant shift in the scrutiny required for class certification." *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (S.D. Tex. Dec. 6, 2013).[5] Gone are the days when the mere "invocation of [an] event study methodology" that was "mathematical or formulaic" sufficed. *Id*. And it is no longer a valid response to an attack on a plaintiff's proposed damages model to "simply [say] those arguments would also be pertinent to the merits determination." *Comcast*, 569 U.S. at 33-34.

**B.    Plaintiff's damages methodology flunks the *Comcast* test, as it fails to account for various key matters and results in outcomes that make neither logical nor economic sense.**

Plaintiff's proffered damages methodology falls well short of the *Comcast* standard. For starters, it is hardly a "methodology" at all. Rather, it is a rote recitation of generic

---

[5] *See also Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 n.68 (5th Cir. 2015) (discounting cases that "did not directly address class certification in a post-*Comcast* world"); *In re Rail Freight Fuel Surcharge Antitrust Litig.-MDL No. 1869*, 725 F.3d 244, 255 (D.C. Cir. 2013) ("Before [*Comcast*], the case law was far more accommodating to class certification under Rule 23(b)(3).").

damages principles that could apply in any securities fraud case. *See* Nye Report, ECF 305-9 at ¶¶ 60-64. Dr. Nye made no attempt to describe the damages methodology with any specificity, much less explain how he will apply it to the unique facts of this case.

Perhaps most troublingly, Dr. Nye avoids discussing whether he will estimate inflation from the alleged corrective disclosures by using the dollar method or the percent method. Ex. 1, Allen Rpt. ¶ 57. The dollar method accounts for stock price drops on corrective disclosure dates on a dollar-for-dollar basis—*e.g.*, a $3 drop on a corrective disclosure date means that the stock price was inflated by $3 during earlier periods. *Id.* The percentage method accounts for stock price drops on corrective disclosure dates on a percentage basis—*e.g.*, a 15% dollar drop on a corrective disclosure date means that the stock price was inflated by 15% during earlier periods. *Id.* This is not a minor technicality. It reveals fundamental flaws in Dr. Nye's entire damages approach because both methods lead to nonsensical results.

Applying the dollar method to the model results in total alleged inflation—*i.e.*, the sum of the dollar drops corresponding to the alleged corrective disclosures—that is *greater* than the stock price during more than a third of the Class Period. *Id.* ¶ 58. In other words, Dr. Nye's damages methodology would yield a *negative* value for McDermott's stock price across those various time periods once the artificial inflation is removed. *Id.* That is economically impossible because a stock cannot have negative value. *Id.*

Applying the percent method (or a dollar method that caps inflation at the stock price, so as to avoid the negative-value issue) to Dr. Nye's model would also yield economically nonsensical results. Specifically, there are periods during which a class

member who held its shares through *more* alleged corrective disclosures would be awarded *less* damages per share than an investor who held its shares through fewer alleged corrective disclosures. *Id.* ¶¶ 59-61. That makes neither logical nor economic sense because those class members necessarily were harmed *more*, not *less*, by holding their stock through additional corrective disclosures. *Id.*

Accordingly, what at first may appear to be a technical oversight actually reveals the fundamental irrationality of Dr. Nye's approach. After all, if both methods of estimating inflation yield economically nonsensical results, then the problem lies with the damages methodology itself.

An additional logical flaw in Dr. Nye's model is that it does not account whatsoever for the offsetting economic gains that accrued to class members who also owned CB&I shares. *See id.* ¶¶ 62-64. Many proposed class members owned CB&I shares that were converted into McDermott shares through the Merger. *Id.* ¶ 63. Those class members benefited from the alleged fraud under Plaintiff's theory because they exchanged their allegedly significantly inflated CB&I shares for less inflated shares in the new combined enterprise, given that CB&I's inflation was diluted across McDermott through the Merger. *See supra* Part II. Dr. Nye ignores these complications that arise from the ownership of CB&I shares. That simply is not a rational way to compute damages.

Dr. Nye glosses over other thorny matters. How will he calculate the alleged inflation during the the almost six-month period between the beginning of the alleged Class Period and when the Merger was completed? That is a tricky question with no obvious answer. *Id.* ¶ 56. Perhaps that is why Dr. Nye declines to comment on it. *Id.* What about

how the damages methodology will match purchases and sales together? The large number of proposed class members who acquired McDermott shares through the conversion of their CB&I shares and also purchased McDermott shares during the alleged Class Period makes that an important question with vast damages implications. *Id.* Yet, again, Dr. Nye entirely ignores this key issue. *Id.*

Perhaps before *Comcast*, Dr. Nye's vague "invocation of [an] event study methodology" that is "mathematical or formulaic" could suffice, but not after that watershed decision. *In re BP p.l.c. Sec. Litig.*, 2013 WL 6388408, at *17 (emphasizing the "rigorous[]" nature of the damages inquiry after *Comcast*). More than hand-waving about the damages methodology is required in the post-*Comcast* world. Dr. Nye's boilerplate damages platitudes simply do not meet that rigorous standard.

## IV.   Individual issues concerning each class member's reliance will predominate.

### A.   The rebuttable fraud-on-the-market presumption provides a class-wide basis for proving reliance.

To prevail on a 10b-5 claim, a plaintiff must prove, *inter alia*, "reliance upon the misrepresentation or omission." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460-61 (2013) (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011)). "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—*e.g.*, purchasing common stock—based on that specific misrepresentation." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton III")*, 573 U.S. 258, 267 (2014) (quoting *Amgen*, 568 U.S. at 461). The Supreme Court has recognized, however, that

"'[r]equiring proof of individualized reliance' from every securities fraud plaintiff 'effectively would … prevent … [plaintiffs] from proceeding with a class action' in Rule 10b-5 suits" because "'individual [reliance] issues then would … overwhelm[] the common ones,' making certification under Rule 23(b)(3) inappropriate." *Id.* at 268 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 242 (1988)).

In *Basic*, the Supreme Court created a way around this otherwise fatal class-certification problem in the form of a rebuttable presumption of reliance. *Id.* Relying on the "'fraud-on-the-market' theory, which holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations,'" the Court held that in certain circumstances "'reliance on any public material misrepresentations … may be presumed for purposes of a Rule 10b-5 action.'" *Id.* (ellipsis in original) (quoting *Basic*, 485 U.S. at 246-47). "To invoke the *Basic* presumption, a plaintiff must prove: (1) that the alleged misrepresentation was publicly known; (2) that it was material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentation was made and when the truth was revealed." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1958 (2021).

Importantly, "*Basic* itself 'made clear that the presumption was just that, and could be rebutted by appropriate evidence.'" *Halliburton III*, 573 U.S. at 279 (quoting *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton II")*, 563 U.S. 804, 811 (2011)). Accordingly, "'[a]ny showing that severs the link between the alleged misrepresentation and … the price received (or paid) by the plaintiff … will be sufficient to rebut the

presumption of reliance' because 'the basis for finding that the fraud had been transmitted through market price would be gone.'" *Id.* at 281 (quoting *Basic*, 485 U.S. at 248).

> **B.** **The substantial number of short sellers in the putative class that cannot invoke the fraud-on-the-market presumption creates a fatal predominance problem.**

On average, McDermott's short interest represented 25% of the shares outstanding during the Class Period. Ex. 1, Allen Rpt. ¶ 51. That unusually high amount of short selling creates a reliance problem because short sellers' atypical motivations prevent them from invoking the fraud-on-the-market presumption. And that reliance problem devolves into a predominance issue due to the need for individualized reliance inquiries.

"A short sale is a sale of securities that are not owned by the seller." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 450-51 (5th Cir. 2008). The Fifth Circuit explained the basic concept of short selling in *Kornman*:

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk.

*Id.* at 450 (quoting *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988)). Accordingly, "[w]here the traditional investor seeks to profit by trading a stock the value

15

of which he expects to rise, the short seller seeks to profit by trading stocks which he expects to decline in value." *Id.* (quoting *Zlotnick*, 836 F.2d at 820).

Short sellers cannot invoke the fraud-on-the-market presumption due to the very nature of their transactions. Whereas "[t]he 'fraud on the market' presumption is based on the idea that individuals relied on 'the integrity of the market price[,]' [s]hort sellers … sell short because they believe that the market price is somehow mistaken." *In re PolyMedica Corp. Sec. Litig.*, 224 F.R.D. 27, 44 (D. Mass. 2004) (quoting *Basic*, 485 U.S. at 247), *vacated on other grounds*, 432 F.3d 1 (1st Cir. 2005). Short sellers' entire strategy is based on a belief that the "price of a stock overestimates its true value," such that they will profit when the price later falls to reflect that accurate true value. *Zlotnick*, 836 F.2d at 823. That is fundamentally incompatible with the fraud-on-the-market presumption, which rests on the opposing premise that a "stock purchaser does not ordinarily seek to purchase a loss in the form of artificially inflated stock." *Ganesh, L.L.C. v. Comput. Learning Ctrs., Inc.*, 183 F.R.D. 487, 491 (E.D. Va. 1998) (quoting *Basic*, 485 U.S. at 245). "Accordingly, short sellers are not entitled to the 'fraud on the market' presumption of reliance." *PolyMedica*, 224 F.R.D. at 44; *see also Zlotnick*, 826 F.2d at 823 ("A presumption that Zlotnick relied on the price of the stock in making his investment decision is also unwarranted. An investor like Zlotnick sells short because he believes the price of a stock overestimates its true value."); *Ganesh*, 183 F.R.D. at 491 ("[Short sellers] cannot logically use a fraud on the market theory to obviate the need for positive proof of individual reliance.").[6]

---

[6] Notably, courts have also refused to appoint short sellers as lead plaintiffs because of their inability to rely on the fraud-on-the-market presumption. *See, e.g.*, *In re Critical Path, Inc., Sec. Litig.*, 156 F. Supp. 2d

To be sure, not all courts agree on this point. There is a competing line of authority that would permit short sellers to invoke the fraud-on-the-market presumption despite their atypical beliefs and motivations. *See, e.g.*, *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 61 (D.N.H. 2019). But *Zlotnick*, *Ganesh*, and *PolyMedica* have the better view and more faithfully honor *Basic* and its fraud-on-the-market presumption.

If the Court agrees that short sellers cannot invoke the fraud-on-the-market presumption, then individual issues of reliance will predominate as each short seller attempts to prove its actual reliance. *Halliburton III*, 573 U.S. at 268 (without the presumption, "'individual [reliance] issues … w[ill] … overwhelm[] the common ones,' making certification under Rule 23(b)(3) inappropriate"). Perhaps if the number of short sellers were small, some minimal amount of individualized reliance inquiries could be tolerated. But here, 25% of the shares were sold short during the Class Period. Ex. 1, Allen Rpt. ¶ 51. The individualized reliance inquiries necessary for each and every one of those many short sellers defeat predominance.

Indeed, as the *Ganesh* court reasoned on similar facts where "[a]s many as one-third of the Proposed Class consists of … short sellers," "each of them would have to present positive proof of individual reliance and damages in order to recover. The managerial burden of conducting thousands of mini-trials on these two issues would overwhelm any common questions of law or fact and eviscerate the efficiencies that classwide adjudication

---

1102, 1109-10 (N.D. Cal. 2001) (denying request to appoint short seller as lead plaintiff and noting "short sales raise the question of whether the seller was actually relying on the market price, and the class is not served by its representative coming under such scrutiny"); *Weikel v. Tower Semiconductor Ltd.*, 183 F.R.D. 377, 392 (D.N.J. 1998) (finding short seller "inadequate" to serve as lead plaintiff because he would not be able to benefit from the fraud-on-the-market theory and instead would have to prove "actual reliance").

might otherwise afford." 183 F.R.D. at 491. Here, as there, the proposed class therefore "fails to satisfy the predominance … requirement[] in Rule 23(b)(3)." *Id.*

**C.  Because the market for McDermott stock was no longer efficient after September 19, 2019 under Plaintiff's expert's own market efficiency test, the purchases and alleged corrective disclosures past that date can play no role in any class.**

Any class cannot include purchases made during the post-September 17, 2019 period covered by the Supplemental Class Action Complaint ("Supplement") because this Court granted Defendants' motion to dismiss the Supplement. ECF 265. Nevertheless, to the extent those purchases somehow are still part of the class, putative class members cannot rely on the fraud-on-the-market presumption for purchases of McDermott stock that occurred after the September 18-19, 2019 news events. The market for McDermott ceased to be efficient after that point, which means that the fraud-on-the-market presumption could no longer apply. *See Goldman Sachs*, 141 S. Ct. at 1958 (listing among requirements for the fraud-on-the-market presumption "that the stock traded in an efficient market").

In evaluating whether the market for an individual stock is efficient, courts apply a set of eight factors, known as the *Cammer/Krogman* factors:

(1) the average weekly trading volume expressed as a percentage of total outstanding shares;

(2) the number of securities analysts following and reporting on the stock;

(3) the extent to which market makers and arbitrageurs trade in the stock;

(4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2);

(5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price";

18

(6)  the company's market capitalization;

(7)  the bid-ask spread for stock sales; and

(8)  float, the stock's trading volume without counting insider-owned stock.

*Unger v. Amedisys Inc.*, 401 F.3d 316, 322 (5th Cir. 2005) (citing *Cammer v. Bloom*, 711

F. Supp. 1264, 1286-87 (D.N.J. 1989), for the first five factors and *Krogman v. Sterritt*,

202 F.R.D. 467, 473 (N.D. Tex. 2001), for the last three factors).

Based on NSHEPP's expert's own analysis, half of these market-efficiency factors

radically shifted following the September 18-19, 2019 news:

- ***Number of securities analysts.*** Most analysts stopped covering McDermott after the September 18-19, 2019 news broke. Ex. 1, Allen Rpt. ¶¶ 66-69. Analyst coverage ceased completely in November 2019. *Id.* ¶ 67.

- ***Cause and effect relationship between news and stock price.*** Dr. Nye found that during the Class Period as a whole, McDermott stock appropriately reacted more strongly on event dates (*i.e.*, on dates with news of "unexpected corporate events or financial releases," *Unger*, 401 F.3d at 322) than on non-event dates (*i.e.*, on dates when no such events occurred). Ex. 1, Allen Rpt. ¶ 72. But from September 20, 2019 through January 23, 2020, Dr. Nye's own event study shows that McDermott's stock price reacted *similarly* on both event dates and non-event dates. *Id.* ¶ 73.

- ***Market capitalization.*** Dr. Nye found that McDermott's market capitalization was greater than 37.4% of NYSE-listed stocks. *Id.* ¶ 74. But its market capitalization declined precipitously towards the end of the Class Period, such that as of December 31, 2019, it was greater than only 2.0% of NYSE-listed stocks. *Id.*

- ***Bid-ask spread.*** Dr. Nye found McDermott's average and median bid-ask spreads during the Class Period (average 0.16%, median 0.12%) were comparable to the bid-ask spreads of a sample of other NYSE stocks (average 0.09%, median 0.08%). *Id.* ¶ 70. But looking only at the period from September 20, 2019 through January 23, 2020 reveals that McDermott's bid-ask spread had ceased to be comparable by that point (average 0.39%, median 0.43%). *Id.*

Accordingly, McDermott stock fails Dr. Nye's own market-efficiency test for the

period after September 19, 2019. Because the market for McDermott stock was not efficient at that point, purchases of McDermott stock after that point do not benefit from the fraud-on-the-market presumption and must be individually analyzed for reliance purposes. As a result, those purchases cannot be included in any class, or else the individualized reliance inquiries would defeat predominance.

For these same reasons, the alleged corrective disclosures after September 19, 2019 cannot be the basis for any damages. The market's inefficiency during this period hampers any effort to ascertain what, if any, portion of a price drop in response to an alleged corrective disclosure is attributable to the dissipation of earlier inflation. Ex. 1, Allen Rpt. ¶ 56. Accordingly, those alleged corrective disclosures cannot serve a proper legal basis for calculating damages for any purchases during the Class Period. *See infra* Part V.A (discussing the relationship between corrective disclosures and front-end inflation).

### D.    The *Affiliated Ute* presumption does not apply here.

Plaintiff also argues that even if it cannot rely on the fraud-on-the-market presumption to prove reliance class-wide, the separate presumption of reliance from *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), offers a ready alternative. Mot. 39-40. Not so. "The *Ute* presumption … operates only in omissions cases, not where plaintiffs assert positive misrepresentations of material information." *Akin v. Q-L Invs., Inc.*, 959 F.2d 521, 529 (5th Cir. 1992). To be clear, "[i]t is not enough that a claim has aspects of omission … at a sufficiently high level of generality." *Id.* Rather, "the *Ute* presumption is limited to cases, like *Ute* itself, in which the plaintiffs have based their complaint *primarily* upon alleged omissions." *Abell v. Potomac Ins. Co.*, 858 F.2d 1104,

1119 (5th Cir. 1988), *judgment vacated on other grounds sub nom. Fryar v. Abell*, 492

U.S. 914 (1989). "Such non-disclosure suits are those in which the complaint is grounded

primarily in allegations that the defendant has failed to disclose any information

whatsoever relating to material facts about which the defendant has a duty to the plaintiff

to disclose." *Id.* Conversely, the presumption does not apply "in cases where the plaintiffs

allege either that the defendant has made false statements or has distorted the truth by

making true but misleading incomplete statements." *Id.* As this case falls squarely in the

latter category, Plaintiff cannot invoke the *Ute* presumption.

**V.     None of the last five alleged corrected disclosures demonstrates price impact.**

**A.     Only alleged corrective disclosures that actually correct earlier alleged misrepresentations can demonstrate price impact.**

"[A] defendant [may] rebut th[e] [fraud-on-the-market] presumption in a number of

ways, including by showing that the alleged misrepresentation did not actually affect the

stock's price—that is, that the misrepresentation had no 'price impact.'" *Halliburton III*,

573 U.S. at 263-64. Price impact refers to the price distortion at the time of the alleged

misrepresentation, not at the time of a later corrective disclosure. *See id.* at 278; *see also*

*Halliburton II*, 563 U.S. at 814 (noting that the "price impact" inquiry asks "whether the

alleged misrepresentations affected the market price in the first place"). But "[p]laintiffs

typically try to prove the amount of inflation indirectly: They point to a negative disclosure

about a company and an associated drop in its stock price; allege that the disclosure

corrected an earlier misrepresentation; and then claim that the price drop is equal to the

amount of inflation maintained by the earlier misrepresentation." *Goldman Sachs*, 141 S.

Ct. at 1961. NSHEPP follows that typical approach here. Mot. 18-19.

"But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure." *Goldman Sachs*, 141 S. Ct. at 1961. In other words, price impact is "front-end price inflation"—the notion that statements caused stock-price inflation at the time they were made. *Id.* A back-end decline *may* imply front-end price inflation, but for it to do so, the contents of the alleged misrepresentation and the alleged corrective disclosure must match. Accordingly, courts must scrutinize the "contents" of the alleged misrepresentations and alleged corrective disclosures for a "mismatch" at the class certification stage. *Id.*

### B.  The last five alleged corrective disclosures are not corrective of any earlier alleged misrepresentation.

To demonstrate price impact, NSHEPP cites eight alleged corrective disclosures. Mot. 18-20; CCAC ¶¶ 306-325. The alleged corrective disclosures chronicle news of McDermott's new challenges: (1) October 30, 2018 disclosure of changed Focus Project estimates, increased Merger goodwill of $782 million, and intent to sell its tank storage and U.S. pipe fabrication businesses; (2) February 13, 2019 disclosure of $168 million in changed Q4 2018 estimates for one of the Focus Projects, the Cameron LNG Project; (3) July 29, 2019 disclosure of $205 million in cash used by operating activities in Q2 2019, net loss of $146 million, and lowered guidance; (4) September 18-19, 2019 reports of hiring a turnaround firm and a potential sale of McDermott's Lummus technology business; (5) September 24, 2019 reports of seeking a $1.7 billion bridge loan; (6) September 27, 2019

reports of a challenging credit situation relating to obtaining a bridge loan; (7) November 4, 2019 disclosure of an SEC investigation relating to the Cameron LNG Project; and (8) January 21, 2020 bankruptcy filing.

Perhaps an argument could be made that the first three of those corrected the "content" of one or more of the alleged misrepresentations, which consist of statements of optimism about the planned Merger and updates on McDermott's wrestling with the Focus Projects and greater-than-expected challenges following the Merger. CCAC ¶¶ 137-304. But not so for the last five alleged corrective disclosures. The "mismatch" between them and the alleged misrepresentations defeats price impact and precludes application of the fraud-on-the-market presumption, for unless the price declined "because of *the correction* to a prior misleading statement … there would be no inference raised that the original, allegedly false statement caused an inflation in the price to begin with." *Archdiocese of Milwaukee Supporting Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 597 F.3d 330, 336 (5th Cir. 2010), *vacated on other grounds*, *Halliburton II*, 563 U.S. at 815.

The various "mismatch[es] between the contents of the misrepresentation[s] and the corrective disclosure[s]," *Goldman Sachs*, 141 S. Ct. at 1961, are chronicled below.

**Negative new developments that McDermott never stated would not occur.** The negative news that began on September 18, 2019 was not corrective of any earlier statement. McDermott never claimed, for example, that it would not hire a turnaround firm (*contra* the September 18-19, 2019 alleged corrective disclosure) or declare bankruptcy (*contra* the January 21, 2020 alleged corrective disclosure).  Indeed, this Court has already expressly held that Defendants "never once promised investors that a bankruptcy filing was

off the table." ECF 265, 8/30/22 Order at 8.

While these five disclosures doubtlessly represented bad news, "none of these matters even purported to reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint." *In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010). "[P]laintiffs cannot trigger the presumption of reliance by simply offering evidence of any decrease in price following the release of negative information." *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 665 (5th Cir. 2004).

***Specificity mismatch.*** The last five alleged corrective disclosures also have a striking contrast in level of specificity with the alleged misrepresentations. This matters, as the Supreme Court has explained, because "when the earlier misrepresentation is generic (*e.g.*, 'we have faith in our business model') and the later corrective disclosure is specific (*e.g.*, 'our fourth quarter earnings did not meet expectations')[,] … it is less likely that the specific disclosure actually corrected the generic misrepresentation." *Goldman Sachs*, 141 S. Ct. at 1961. Here, whereas the alleged misrepresentations are broad and generic (*e.g.*, CCAC ¶ 137(a) ("McDermott and CB&I's combined experience in delivering customer centric solutions and fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects for customers.")), the alleged corrective disclosures concern very specific items (*e.g.*, September 24, 2019 reports of seeking a $1.7 billion bridge loan). That further establishes the lack of correctiveness.

***Announcement of a government investigation.*** The November 4, 2019 announcement of an SEC investigation is not a corrective disclosure because it is well established that the announcement of a government investigation, standing alone, does not

constitute a corrective disclosure. *See, e.g.*, *Pub. Emps.' Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) ("[G]enerally, commencement of government investigations on suspected fraud do not, standing alone, amount to a corrective disclosure."); *In re Dell Inc. Sec. Litig.*, 591 F. Supp. 2d 877, 910 (W.D. Tex. 2008) (holding that if unaccompanied by "a revelation of prior misrepresentations," "the disclosure of an investigation . . . [does not] constitute a corrective disclosure"). Only if the disclosure of the investigation is "the 'tip of the iceberg'—the first in a series of revelations which would ultimately expose the Company's entire fraudulent scheme," may it qualify as a corrective disclosure. *In re Bristol Myers Squibb Co. Sec. Litig.*, 586 F. Supp. 2d 148, 165 (S.D.N.Y. 2008); *see Amedisys*, 769 F.3d at 323-24 (announcement of government investigation can be corrective disclosure when "viewed together with the totality of the other alleged partial disclosures").

The general rule applies here because the disclosure of the SEC investigation is, if anything, the tail-end of the iceberg rather than its tip, coming as it did as one of the last alleged corrective disclosures. Nor, to be clear, did the announcement contain any "revelation of prior misrepresentations." *In re Dell*, 591 F. Supp. 2d at 910.

\*     \*     \*

In sum, an analysis of the last five alleged corrective disclosures reveals a fatal "mismatch" in "contents" when compared with the alleged misrepresentations. *Goldman Sachs*, 141 S. Ct. at 1961. That decouples those alleged corrective disclosures from the alleged misrepresentations and renders them unfit to be part of any class claims.

Respectfully submitted,

BAKER BOTTS L.L.P.

By: */s/ David D. Sterling*
    David D. Sterling
      *Attorney-In-Charge*
    State Bar No. 19170000
    Federal I.D. No. 07079
    Amy Pharr Hefley
    State Bar No. 24046046
    J. Mark Little
    State Bar No. 24078869
    Federal I.D. No. 1487508
    Anthony J. Lucisano
    State Bar No. 24102118
    Federal I.D. No. 3369146
    Elizabeth Furlow Malpass
    State Bar. No. 24109899
    Federal I.D. No. 3402815
    910 Louisiana Street
    Houston, Texas 77002
    Telephone: (713) 229-1234
    Fax: (713) 229-1522
    david.sterling@bakerbotts.com
    amy.hefley@bakerbotts.com
    mark.little@bakerbotts.com
    anthony.lucisano@bakerbotts.com
    elizabeth.malpass@bakerbotts.com

    ***Attorneys for Defendants***

SIDLEY AUSTIN LLP
Angela C. Zambrano
State Bar No. 24003157
Mason Parham
State Bar No. 24088182
Fabricio Archanjo
State Bar No. 24110983
2021 McKinney Ave., Suite 2000
Dallas, TX 75201
Telephone: (214) 981-3300
Fax: (214) 981-3400
angela.zambrano@sidley.com
mparham@sidley.com
farchanjo@sidley.com

**_Attorneys for Defendant Stuart Spence_**

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via email on all counsel of record on this 23rd day of January, 2023.

_/s/ Amy Pharr Hefley_
Amy Pharr Hefley

27