**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>   v.<br><br>MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE,<br><br>                       Defendants. | Case No.: 4:18-cv-04330<br><br>**(Consolidated)**<br><br>**ORAL ARGUMENT REQUESTED** |

**PLAINTIFFS' REPLY IN FURTHER SUPPORT OF AMENDED MOTION FOR CLASS CERTIFICATION, APPOINTMENT AS CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL**

# TABLE OF CONTENTS

**Page(s)**

## CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     ARGUMENT ......................................................................................................2

        A.      Plaintiffs Assert a Direct Section 14(a) Claim.................................. 2

        B.      Plaintiffs' Proposed Damages Methodology Satisfies *Comcast* ................... 5

        C.      Defendants' *Comcast* Challenges Fail ................................................ 9

                1.      Defendants Improperly Reframe Plaintiffs' Allegations to
                        Manufacture a "Mismatch" Between Liability and Damages ........... 9

                2.      Defendants' Loss Causation Arguments Are Premature and
                        Prove That Plaintiffs' Methodology Can Be Commonly
                        Applied................................................................................... 13

        D.      MSPERS Is an Adequate Class Representative................................. 17

        E.      The Class Is Ascertainable and Predominance Is Satisfied........................ 23

III.    CONCLUSION..................................................................................................25

i

## TABLE OF AUTHORITIES

**Page(s)**

<u>**Cases**</u>

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
    38 F.3d 211 (5th Cir. 1994) .......................................................................................... 20

*A.A. v. Phillips*,
    No. 21-30580, 2023 WL 334010 (5th Cir. Jan. 20, 2023)
    ........................................................................................................................... 23, 24

*In re Acuity Brands, Inc. Sec. Litig.*,
    No. 1:18-CV-2140-MHC, 2020 WL 5088092 (N.D. Ga. Aug. 25, 2020) .............. 15

*In re Allstate Corp. Sec. Litig.*,
    No. 16 C 10510, 2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) ............................... 14

*In re Alta Mesa Resources, Inc. Sec. Litig.*,
    No. 4:19-cv-00957 (S.D. Tex. July 30, 2021) ....................................................... 11

*Amorosa v. AOL Time Warner Inc.*,
    409 F. App'x 412 (2d Cir. 2011) .............................................................................. 7

*In re Anadarko Petroleum Corp. Sec. Litig.*,
    No. 4:20-CV-00576, 2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) ....................... 9

*Anastasio v. Internap Network Svcs. Corp.*,
    No. 1:08-cv-03462-JOF,
    2010 WL 11459838 (N.D. Ga. Sept. 15, 2010) ....................................................... 4

*Audet v. Fraser*,
    332 F.R.D. 53 (D. Conn. 2019) .............................................................................. 17

*In re Bank of Amer. Corp. Sec., Derivative & ERISA Litig.*,
    281 F.R.D. 134 (S.D.N.Y. 2012) ............................................................. 4, 8, 12, 17

*In re Bank of Amer. Corp. Sec., Derivative, & ERISA Litig.*,
    757 F. Supp. 2d 260 (S.D.N.Y. 2010) ................................................................. 4, 8

*In re BP p.l.c Sec. Litig.*,
    No. 10–md–2185, 2014 WL 2112823 (S.D. Tex. 2014) ................................... 13, 16

*In re CenturyLink Sales Practices and Sec. Litig.*,
    337 F.R.D. 193 (D. Minn. 2020) ........................................................................... 16

*Cherry v. Dometic Corp.*,
    986 F.3d 1296 (11th Cir. 2021) .............................................................................. 24

*City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*,
No. 17-cv-00554-YGR, 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) .................16

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
No. 18-cv-04844-BLF, 2022 WL 1459567 (N.D. Cal. May 9, 2022) ...................16

*City P'ship Co. v. Jones Intercable, Inc.*,
213 F.R.D. 576 (D. Colo. 2002) .................................................................................20

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ..................................................................................................1, 6

*In re Daimlerchrysler AG Sec. Litig.*,
294 F. Supp. 2d 616 (D. Del. 2003) ......................................................................8, 11

*Dasho v. Susquehanna Corp.*,
461 F.2d 11 (7th Cir. 1972) ........................................................................................13

*Edwards v. McDermott Int'l, Inc.*,
No. 4:18-CV-4330, 2021 WL 1421603
(S.D. Tex. Apr. 13, 2021) .............................................................................2, 3, 7, 9

*In re EQT Corp. Sec. Litig.*,
No. 2:19-cv-00754-RJC, 2022 WL 3293518 (W.D. Pa. Aug. 11, 2022) .......6, 8, 12

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ....................................................................................................14

*Freedman v. magicJack VocalTec Ltd.*,
963 F.3d 1125 (11th Cir. 2020) ...................................................................................4

*Goldkrantz v. Griffin*,
No. 97 CIV. 9075(DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) .....................8

*Guenther v. BP Ret. Accumulation Plan*,
No. 4:16-CV-00995, 2021 WL 1216377 (S.D. Tex. Mar. 12, 2019).......................24

*In re Heckmann Corp. Sec. Litig.*, No. CA 10-378-LPS-MPT,
2013 WL 2456104 (D. Del. June 6, 2013) .............................................................8, 12

*J. I. Case Co. v. Borak*,
377 U.S. 426 (1964) .....................................................................................................20

*Kelly v. RealPage, Inc.*,
47 F.4th 202 (3rd Cir. 2022) .......................................................................................24

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015), *cert. denied* 578 U.S. 959, U.S. (2016)............. 6, 7, 8

*McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*,
52 F.3d 1330 (5th Cir. 1995) ......................................................................................16

*Mills v. Elec. Auto-Lite Co.*,
  396 U.S. 375 (1970) ................................................................................................7, 20

*Monroe Cty. Emps.' Ret. Sys. v. The Southern Co.*,
  332 F.R.D. 370 (N.D. Ga. 2019) ...............................................................................15

*Mullins v. Direct Dig., Ltd. Liab. Co.*,
  795 F.3d 654 (7th Cir. 2015)......................................................................................24

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  No. 08-CV-5310 (DAB), 2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016) ................16

*New Jersey and Its Div. of Inv. v. Sprint Corp.*,
  314 F. Supp. 2d 1119 (D. Kan. 2004) .........................................................................8

*Northstar Fin. Advisors Inc. v. Schwab Invs.*,
  779 F.3d 1036 (9th Cir. 2015) .....................................................................................5

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022)......................................................................................25

*Pirnik v. Fiat Chrysler Automobiles, N.V.*,
  327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................................16

*Randall v. Loftsgaarden*,
  478 U.S. 647 (1986) ..................................................................................................17

*In re Real Estate Assoc. Ltd. P'ship Litig.*,
  223 F. Supp. 2d 1142 (C.D. Cal. 2002) ......................................................................8

*In re Reliant Sec. Litig.*,
  No. H–02–1810, 2005 WL 8152605
  (S.D. Tex. Feb. 18, 2005); .................................................................................22, 25

*In re Romeo Power Inc. Sec. Litig.*,
  21 Civ. 3362 (LGS), 2022 WL 1806303 (S.D.N.Y. June 2, 2022).....................5, 13

*Roofer's Pension Fund v. Papa*,
  333 F.R.D. 66 (D.N.J. 2019).....................................................................................16

*Rooney v. EZCORP, Inc.*,
  330 F.R.D. 439 (W.D. Tex. 2019)...............................................................................9

*Rougier v. Applied Optoelectronics, Inc.*,
  No. 4:17-CV-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) .........4, 6, 9, 23

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
  335 F.R.D. 276 (N.D. Cal. 2020) ..............................................................................15

*Seeligson v. Devon Energy Prod. Co.*,
  761 F. App'x 329 (5th Cir. 2019)..............................................................................24

*In re Signet Jewelers Ltd. Sec. Litig.*,
    2019 WL 3001084 (S.D.N.Y. July 10, 2019) ........................................................16

*T.S.C. Industries, Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ...............................................................................................20

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*,
    845 A.2d 1031 (Del. 2004) ......................................................................................5

*Vrakas v. United States Steel Corp.*,
    No. 17-579, 2019 WL 7372041 (W.D. Pa. Dec. 31, 2019) ....................................16

*In re Willis Towers Watson PLC Proxy Litig.*,
    No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582 (E.D. Va. Sep. 4, 2020) ...........17

## Statutes

15 U.S.C. § 78n(a) ........................................................................................................20

Section 10(b) of the Exchange Act of 1934 ..........................................................10, 11

Section 14(a) of the Exchange Act of 1934 ...........................................................passim

## Other Authorities

Douglas Brown, The Arrival of Modern Securities Lending (Fidelity Institutional
    Insights), *available at*
    institutional.fidelity.com/app/proxy/content?literatureURL=/9904054.PDF
    (citing IHS Markit Data as of August 20, 2021) ...................................................18

SEC, Briefing Paper, Roundtable on Proxy Voting Mechanics,
    available at http://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm
    (last modified May 23, 2007) ..................................................................................22

## Rules

17 C.F.R. § 240.14a-9 ..................................................................................................20

64 Fed. Reg. 61408 ......................................................................................................19

64 Fed. Reg. 61411 ......................................................................................................19

Fed. R. Civ. P. 23(a) ....................................................................................................25

Fed. R. Civ. P. 23(b)(2) .................................................................................................3

Fed. R. Civ. P. 23(b)(3) .........................................................................................3, 6, 25

SEC Final Rule Release No. 33-11131, 2022 WL 16834029 (Nov. 2, 2022) .............20, 21

## I.     INTRODUCTION

Defendants' opposition brief ("D.Br.") concedes that 14(a) Lead Plaintiff MSPERS and putative class representative Local 813 (collectively, "Plaintiffs")[1] have satisfied Rule 23's elements of numerosity, commonality, typicality, and superiority, and that Local 813 and proposed Class Counsel are adequate to represent the Class. Defendants' few challenges to certification all have no merit.

Defendants first reprise their rejected argument that Plaintiffs' direct class claims are actually derivative, by contending that Plaintiffs' theory of the case has somehow changed. It has not. This Court has already held that the claims are direct, and Defendants provide no reason to reverse that holding. *Infra*, Sec. II.A. Defendants next mischaracterize the Complaint and make premature loss causation arguments claiming that Plaintiffs' standard damages methodology does not satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), thereby defeating predominance. However, as many courts have previously held, Plaintiffs' methodology is the standard approach for calculating damages in securities class actions, matches the theory of liability, and easily satisfies *Comcast's* modest requirements. *Infra*, Secs. II.B, II.C.

Last, Defendants raise an entirely unsupported argument that MSPERS lacks

---

[1]     Capitalized terms shall have the same meaning as in the Amended Motion for Class Certification ("Br."; Dkt. 303). References to "¶__" are to the Complaint. References to "Ex." are exhibits to the Declaration of Matthew Insley-Pruitt in Further Support of Class Certification. References to "Hartzmark ¶__" and "Hartzmark Reply ¶__" are to the Expert Report of Michael L. Hartzmark, Ph.D dated September 29, 2021 (Dkt. 303-7) and Expert Reply Report of Michael L. Hartzmark, Ph.D, dated March 3, 2023 (Ex. 7), respectively. References to "Allen ¶__" are to the Expert Report of Lucy Allen, dated December 15, 2022, submitted by Defendants (Dkt. 311-2). Unless otherwise indicated, emphasis is added and internal quotations and citations are omitted.

standing to bring a Section 14(a) and Rule 14a-9 claim because it engaged in securities lending, as do a vast number of institutional investors who lend securities as part of the multi-trillion dollar securities lending market. This argument also fails. MSPERS was a beneficial owner "entitled to vote" (as that term was defined in the Proxy Statement), had the undeniable right to recall the lent shares right up to the April 4, 2018 Record date, and was directly injured by Defendants' misrepresentations. Under established case law, false statements made by Defendants in the run-up to a proxy vote give rise to a claim under Rule 14a-9 regardless of whether and how MSPERS exercised, or did not exercise, its voting power. *Infra*, Sec. II.D. For similar reasons, Defendants' challenges to "ascertainability" also fail. *Infra,* Sec. II.E.

## II.   ARGUMENT

### A.   Plaintiffs Assert a Direct Section 14(a) Claim

Defendants once again argue that Plaintiffs are asserting a derivative claim rather than a direct claim—the identical argument the Court has already rejected in this case. D.Br. 4-7. Citing clear Supreme Court precedent, this Court held:

> Mississippi has pled that it "and other members of the proposed Class were denied the opportunity to make an informed decision when voting on the Merger" because Defendants made "false and misleading statements of material fact" that were designed to "encourage the Class to vote in favor of the Merger." . . . *Mills* and the Supreme Court's other cases discussing Section 14(a) allow Mississippi to plead a direct claim, and it has done so.

*Edwards v. McDermott Int'l, Inc.*, Civil Action No. 4:18-CV-4330, 2021 WL 1421603, at *6 (S.D. Tex. Apr. 13, 2021) ("§ 14(a) MTD Opp."). This Court further held that the Complaint alleged loss causation based on the drop in McDermott's stock price upon the

disclosure of the truth. *Id.* at *6.

There is nothing in the class motion that justifies revisiting, much less reversing, that holding. The only "change" Defendants point to is no change at all. Defendants first complain that Plaintiffs seek to certify a damages class pursuant to Rule 23(b)(3) instead of an injunctive relief class pursuant to Rule 23(b)(2). D.Br. 6. But the Complaint always sought certification under Rule 23(b)(3) and never sought injunctive relief. *See* ¶257. Defendants next suggest that the "out of pocket" ("OOP") damages methodology described in detail in the Reports of Plaintiffs' expert (and discussed fully below, *infra*), which measures the loss of value of McDermott shares based on stock price declines following corrective disclosures', is somehow new. D.Br. 6. Yet Plaintiffs have ***always*** asserted damages based on the decline in the stock price consistent with this methodology, as this Court already found. § 14(a) MTD Opp., *McDermott Int'l, Inc.*, 2021 WL 1421603, at *6.[2]

Finally, Defendants make perhaps their most baseless argument by attempting to reframe Plaintiffs' theory of the case as "one company ***overpaying*** for another" and calling it a "quintessential derivative claim." D.Br. 6-7. But the words "overpayment" or "overpaid" do not appear anywhere in the 99-page Amended Complaint, brief in support of certification, or accompanying expert report. Indeed, Lead Plaintiff specifically disclaimed this theory at the motion to dismiss stage. *See* Dkt. 142 at 24 ("Nowhere in the

---

[2]     The motion to dismiss briefing also confirms the consistency of Plaintiffs' theory of damages. Defendants acknowledged the damages theory based on economic loss due to stock price declines (Dkt. 124 at 22) and Plaintiff successfully argued that it "has adequately pled 'economic harm' through out-of-pocket losses measured by the decline in share price resulting from the misleading Proxy Solicitations." Dkt. 142 at 54; *see also id.* at 23.

Complaint is Plaintiff seeking compensation on behalf of McDermott for overpaying for CB&I."). Courts regularly reject "attempts by defendants to reframe plaintiffs' theory of liability in order to prevent class certification." *See Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-CV-02399, 2019 WL 6111303, at \*18 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (citing cases).

Contrary to Defendants' "overpayment" argument, the alleged damages theory here focuses on the harm to **shareholders** due to the decline in **price of their shares**, which is distinct from the harm to the Company's balance sheet if it spends too much on an acquisition. This distinction was explained in *Bank of America*, which noted that if the value of the shareholder's shares decreases as a result of corrective disclosures, "that decrease is not necessarily co-extensive with injury to the corporation," and the shareholder has a direct claim. *In re Bank of Amer. Corp. Sec., Derivative, & ERISA Litig.*, 757 F. Supp. 2d 260, 291-92 (S.D.N.Y. 2010); *see also In re Bank of Amer. Corp. Sec., Derivative & ERISA Litig.*, 281 F.R.D. 134, 141 (S.D.N.Y. 2012) (certifying class of direct claims under § 14(a)). Defendants' cited cases, two of which were previously and unsuccessfully cited in their motion to dismiss, are entirely distinguishable as they alleged derivative overpayment claims not based on stock losses following corrective disclosures.[3]

---

[3]      *See Freedman v. magicJack VocalTec Ltd.*, 963 F.3d 1125, 1137-38 (11th Cir. 2020) (plaintiff's alleged damages were to "enjoin any payments" made in the acquisition or in the compensation plans); *Anastasio v. Internap Network Svcs. Corp.*, No. 1:08-cv-03462-JOF, 2010 WL 11459838, at \*13 (N.D. Ga. Sept. 15, 2010) (§ 14(a) claim was "clearly derivative" because the "injury, according to Plaintiffs themselves, is that Internap overpaid for Vitalstream"); *see also* Dkt. 142 at 22, 55 (distinguishing same cases). In *In re Romeo Power Inc. Sec. Litigation*, "[p]laintiffs provide[d] no explanation of the circumstances that make the § 14(a) claim in this

Fundamentally, the distinction between a direct and derivative claim hinges on the nature of the relief sought and whether it would flow to all affected shareholders equally. If there was a derivative recovery for the corporation, "all current shareholders would participate in the recovery…even if they were not shareholders during the relevant time period, and injured former shareholders would not necessarily participate in the recovery at all." *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1060 (9th Cir. 2015), *as amended on denial of reh'g and reh'g en banc* (Apr. 28, 2015); *see also Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1039 (Del. 2004) (in determining whether a claim is direct or derivative, "a court should look to the nature of the wrong and to whom the relief should go."). As explained in further detail *infra*, Plaintiffs' proposed damages methodology would calculate the OOP damages that are specific to each McDermott shareholder as of the Record Date, based in part on the disposition of each Class Member's shares relative to the price decreases following the Company's corrective disclosures. *See, e.g.*, Hartzmark ¶¶49-53.[4] These damages would not flow to all current shareholders; rather, they would be paid in varying amounts to historical shareholders as of the Record Date eligible to vote on the Merger. That is a quintessential direct claim.

## B.    Plaintiffs' Proposed Damages Methodology Satisfies *Comcast*

Defendants argue that Plaintiffs have not established predominance under Rule

---

case direct as opposed to derivative." 21 Civ. 3362 (LGS), 2022 WL 1806303, at *6 (S.D.N.Y. June 2, 2022), *reconsideration denied*, 2022 WL 3701095 (S.D.N.Y. Aug. 25, 2022)).

[4]    For example, MSPERS and Local 813 would be entitled to different amounts in damages based on the timing of their disposition of McDermott stock. While both Plaintiffs' shares had the same value per share on the Merger date, each Plaintiff sold shares at different times and at different prices, following different disclosures. Ex. 6.

23(b)(3) because they have failed to propose a damages methodology that satisfies *Comcast*. D.Br. 9-20. To the contrary, Plaintiffs' damages methodology satisfies *Comcast*, and Defendants' arguments fail for several reasons, explained below.

*Comcast* requires only that Plaintiffs provide a damages methodology that is "consistent" with their theory of liability. 569 U.S. 27, 35, 37 (2013) (rejecting damages model that focused on market distortions that no longer "remained in the case"); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015), *cert. denied* 578 U.S. 959 (2016) (holding *Comcast* only requires, "[a]s a conceptual matter," that "each plaintiff's theory of damages remains tied to a theory of liability common to all plaintiffs"). *Comcast* does not require that damages be calculated with "certainty," only that plaintiffs show the "ability" to calculate (but not the actual calculation of) class-wide damages. *See id.* at 683, 685, 689; *Optoelectronics*, 2019 WL 6111303, at *18 (rejecting *Comcast* arguments and holding that plaintiffs OOP damages model was "consistent" with the theory of liability).

Plaintiffs have proposed the universally accepted OOP damages methodology, which scores of courts have held satisfies the modest requirements of *Comcast*. *See, e.g.*, *In re EQT Corp. Sec. Litig.*, No. 2:19-cv-00754-RJC, 2022 WL 3293518, at *10 (W.D. Pa. Aug. 11, 2022); *see also* authorities *infra* at 8 and n.6. This methodology clearly aligns with Plaintiffs' theory of liability under § 14(a). Plaintiffs allege that (a) McDermott's common stock price was artificially inflated at the time of the Merger because the Proxy Solicitations contained material misrepresentations (¶¶136-97); and (b) subsequent corrective disclosures revealing the falsity of those representations caused McDermott stock price to drop drastically. *E.g.*, ¶¶16, 19-20, 200, 231, 235, 247, 251-52; *see* § 14(a)

MTD Opp., 2021 WL 1421603, at *6 (the § 14(a) class claims alleged a direct injury to McDermott shareholders that "led to drastic drops in McDermott's stock price as the truth about the Focus Projects became known"). Plaintiffs' expert, Dr. Michael Hartzmark, describes how the resulting damages to Class members can be calculated using a common OOP damages methodology. *See* Br. 19-23; Hartzmark ¶¶52-53. Plaintiffs broke no new ground in proposing a methodology that "would measure the difference between (a) the per share artificial inflation at the time of the Merger due to the false and misleading Proxy Solicitations; and (b) the per share artificial inflation when the Class member disposed of her McDermott shares." Br. 19-22; Hartzmark ¶¶52-53; Hartzmark Reply ¶¶3-7.[5]

This methodology easily satisfies *Comcast* because "the theory of liability is consistent with the theory of damages." *Ludlow*, 800 F.3d at 687. Indeed, the "standard" measure of damages for direct claims under § 14(a) is the decline in the price of the plaintiff's shares when the truth emerges, and the most commonly accepted manner of measuring that decline is through an OOP methodology. *See, e.g.*, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 389 (1970) (shareholders asserting direct § 14(a) claim may recover damages based on the "reduction of the earnings or earnings potential of their holdings"); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 415 (2d Cir. 2011) (Sotomayor, J.) (recognizing that, under § 14(a), a plaintiff may recover damages for "his stock['s] lost

---

[5]     Dr. Hartzmark expounded on this common OOP methodology to explain how, ***during the merits stage of this litigation***, an expert could calculate damages by, *inter alia*, using an event study, calculating daily abnormal returns, creating a regression model, determining which movements are outside the bounds of what would be expected by chance, and accounting for confounding information and changes over time, if necessary. Hartzmark ¶¶54-70.

value when [the company's] share prices fell as information concerning [the company's] accounting practices was gradually disseminated to the public") (affirming dismissal on unrelated basis); *EQT*, 2022 WL 3293518, at *10 & ECF No. 141-4, ¶¶227-29 (Ex. 9)) (certifying a class of acquiring company shareholders as of the proxy record date following submission of expert report opining that § 14(a) damages could be calculated through an OOP analysis measuring "[s]hare price declines caused by corrective disclosures . . . using event study analysis"); *In re Heckmann Corp. Sec. Litig.*, No. 10-378-LPS-MPT, 2013 WL 2456104, at *8 (D. Del. June 6, 2013) (certifying § 14(a) class based on an expert's "event study, which is a generally accepted practice in determining market efficiency in securities litigation," that included "a regression analysis, a proper control period, and selected relevant dates to demonstrate the requisite cause and effect").[6]

Plaintiffs' OOP damages methodology is therefore "sound" and "produce[s] commonality of damages"—all that is required in this Circuit to satisfy *Comcast*. *See Ludlow*, 800 F.3d at 683, 685; *see also In re Anadarko Petroleum Corp. Sec. Litig.*, No.

---

[6] *See also In re Bank of Am.*, 757 F. Supp. 2d at 292 (noting that § 14(a) plaintiffs bringing a direct claim "could show a diminution in the value of the shares that they held which was not due to an injury inflicted upon BofA") (later certifying § 14(a) class on behalf of acquiring company shareholders, 281 F.R.D. 134, 137 (S.D.N.Y. 2012)); *New Jersey and Its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1142 (D. Kan. 2004) (sustaining direct § 14(a) claim because there was "clearly a connection between the [corporate action voted upon] and plaintiff's injury in that the stock price declined after the conflict of interest was revealed"); *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 626 (D. Del. 2003) ("'Out-of-pocket' losses are the standard measure of damages for Rule 10b–5 and Section 14(a) claims."); *In re Real Estate Assoc. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152 (C.D. Cal. 2002) (for a direct § 14(a) claim, "generally, a plaintiff's injury will be the diminution in the value of his or her investment"); *Goldkrantz v. Griffin*, No. 97 CIV. 9075(DLC), 1999 WL 191540, at *8 (S.D.N.Y. Apr. 6, 1999) ("standard" measure of damages for a direct § 14(a) claim based on the "decrease in value" of the stock).

4:20-CV-00576, 2022 WL 4544235, at *6 (S.D. Tex. Sept. 28, 2022) ("damages at the class-certification stage needn't be exact"); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019) (rejecting defendants' "extremely conclusory complaints" that plaintiff's expert failed to account for all variables that may arise).[7]

### C.    Defendants' *Comcast* Challenges Fail

#### 1.    Defendants Improperly Reframe Plaintiffs' Allegations to Manufacture a "Mismatch" Between Liability and Damages

Defendants complain that "Dr. Hartzmark's out-of-pocket 'inflation ribbon' theory" purportedly "does not cohere with the Section 14(a) claim Plaintiff presses." D.Br. 11. Not so. Defendants' entire argument depends on their rejected premise that this is a derivative and not a direct action. *Supra*, Sec. II.A.  Again, Plaintiffs have consistently pled, and this Court has held, that Plaintiffs' § 14(a) class claims properly allege a direct injury to McDermott shareholders, which Dr. Hartzmark's OOP methodology measures. § 14(a) MTD Opp., 2021 WL 1421603, at *6. Defendants may not "reframe plaintiffs' theory of liability in order to prevent class certification" by mischaracterizing Plaintiffs' claims as derivative and then arguing that Plaintiffs' stock-drop damages methodology does not "match" the harm *to McDermott* rather than its shareholders, who were misled. *Optoelectronics*, 2019 WL 6111303, at *18 (citing cases and holding that defendants may not "reframe plaintiffs' theory of liability in order to prevent class certification").

---

[7]    Dr. Hartzmark describes that while OOP damages are the most common measure of damages, the similarly derived calculation of rescissory damages could also be appropriate at the merits stage. Hartzmark ¶52 n.46; Br. 20 n.4; Hartzmark Reply ¶22 n.26. Defendants challenge this on the same failed grounds as their challenge to the OOP methodology—that it is based on the "diminution-in-stock-value." D.Br. 17 n.12.

Defendants do not point to a single decision—in this district or any other—where a court rejected the application of an OOP damages methodology to the calculation of § 14(a) direct claims. Indeed, Defendants' expert Ms. Allen, in the ***only*** expert report she could recall ever opining on damages, calculated a plaintiff's Exchange Act damages from shares acquired in a corporate acquisition using a "virtually identical" methodology as the one proposed by Dr. Hartzmark. *See* Hartzmark Reply ¶9, n.17.[8]

Ignoring overwhelming precedent and this Court's own prior opinion, Defendants make a series of scattershot arguments that there is no common methodology that ***could*** measure the injury suffered by Class members because they are—***as they must be under § 14(a)***—holders of McDermott stock. D.Br. 10-16. These arguments fail. ***First***, Defendants start with the unremarkable observation that Section 14(a) has different elements than Section 10(b), but then make the illogical leap that the calculation of damages for both statutes cannot derive from a substantially similar underlying methodology. D.Br. 11-13.[9] This is wrong. Courts have repeatedly held that the OOP damages methodology is a foundational economic tool through which damages may be

---

[8]     As explained in detail in Dr. Hartzmark's Reply Report, Ms. Allen's unsworn expert report is rife with errors and she lacks any expertise in the area of the calculation of damages. She conceded that she could not identify by name a single instance where she previously opined on damages (save for the one instance that was consistent with Plaintiffs' methodology) (Ex. 10, Allen Dep. Tr. 104:2-105:25; 152:23-168:17; 170:10-174:21), conceded that she wrongly attributed quotes about MSPERS' securities lending to an agreement (*id.* at 212:1-217:3), and otherwise mischaracterized Plaintiffs' allegations in order to fit Defendants' theories.

[9]     Defendants' assertion that "Plaintiff and Dr. Hartzmark speak of the two [statutory provisions] interchangeably" (*id.* at 12) is false. Plaintiffs discuss Section 10(b) once in the opening brief, and only to note that "this case is ideally suited for class treatment because here, ***unlike in cases alleging violations of Section 10(b) of the Exchange Act***, reliance is not an element." Br. 3; *see also* Hartzmark ¶46, n.41.

calculated in **both** § 10(b) and § 14(a) claims. *See, e.g.*, *In re Daimlerchrysler*, 294 F. Supp. 2d at 626 ("'Out-of-pocket' losses are the standard measure of damages for Rule 10b–5 **and** Section 14(a) claims."); *see supra*, n.6. For § 14(a) damages, the OOP methodology would calculate "the difference between the level of inflation of the new McDermott stock price on the Merger Date in relation to the level of inflation on a date the Class members disposed of their shares," and this methodology would be common to all Class members. Hartzmark Reply ¶¶5-6; Hartzmark ¶¶51-53.

**Second**, Defendants incorrectly state that "every instance of a court's accepting Dr. Hartzmark's inflation-ribbon methodology is a Section 10(b) case." D.Br. 12 & 16 n.11. Even if true, courts' uniform embrace of Dr. Hartzmark's expertise and application of the proposed methodology only supports commensurate action here. *See* Br. 22-23 (collecting cases). However, this statement is untrue. Since Dr. Hartzmark's initial report, this very Court certified a § 14(a) class of shareholders where Dr. Hartzmark opined that damages could be calculated on a common classwide basis using an OOP methodology.[10] Moreover, many courts have accepted (and none have rejected) that "[t]he standard measure of recovery under § 14(a) is out-of-pocket damages." *Supra* n.6.

---

[10] *See In re Alta Mesa Resources, Inc. Sec. Litig.*, No. 4:19-cv-00957, Dkt. 188-1, ¶153 (S.D. Tex. July 30, 2021) (Ex. 11); Dkt. 237-1, ¶¶33-35 (supplemental Hartzmark Report) (Ex. 12); Dkt. 241 (granting unopposed certification of § 14(a) class) (Jan. 20, 2022 S.D. Tex.) (Hanks, J.) (Ex. 13). Defendants knew of Dr.' Hartzmark's *Alta Mesa* report because Dr. Hartzmark specifically (and repeatedly) testified that he submitted an expert opinion in *Alta Mesa* providing that damages for a § 14(a) claim "may be computed on a class-wide basis using broadly accepted methodologies that would be common to all class members." Ex. 14, Hartzmark Dep. Tr. at 27:22-28:20; *see also id.* at 16:16-16:24, 21:3-21:15. Yet, Defendants represented that Dr. Hartzmark had not previously opined on a § 14(a) damages methodology.

**Third**, after Defendants begrudgingly concede that "an 'out of pocket' damages methodology may align with the liability theory" of a § 14(a) class on behalf of holders of the **acquired** company (i.e., CB&I here), Defendants contend that this does not fit for a class of holders of the **acquiring** company (i.e., McDermott). D.Br. 13-16. This theoretical proposition has no legal or economic support; indeed, no court faced with direct claims on behalf of shareholders of an acquiring company has carved those claims out or made any distinction like the one suggested by Defendants. *See, e.g., Heckmann*, 2013 WL 2456104 at *8 (certifying § 14(a) class of shareholders in acquiring company); *EQT*, 2022 WL 3293518, at *10 (same); *Bank of America*, 281 F.R.D. at 140-42, 148-49 (same); *Alta Mesa*, *supra* n.10. Defendants' attempt to paint *Heckmann* as both an outlier and "triply unpersuasive" because it "exclude[d]" *Comcast* from its analysis and did not analyze Defendants' entirely novel acquiror/acquired company dichotomy (D.Br. 14) is meritless. Citing *Comcast*, *Heckmann* held that "plaintiff's damage theory is consistent with Section 14(a) precedent," while rejecting defendants' insistence that *Comcast* required that plaintiff **prove** damages at certification. 2013 WL 2456104, at *14.

Defendants' argument in this respect is based on the erroneous premise that shareholders of the acquiring company "receive nothing" and "merely hold" the acquiring company stock. D.Br. 15. This argument ignores that McDermott transformed on May 10, 2018 into a materially different company as a result of the Merger. *See* Hartzmark Reply ¶4, n.7. As a matter of economics, McDermott shareholders are not merely holding shares in the same company that existed before the Merger. *See id.* Defendants' argument ignores this economic reality and represents just another shot at their failed argument that

McDermott shareholders have no direct claims—despite losing at least $1 billion in shareholder stock value when the falsity of Defendants' representations were revealed.[11]

*Finally*, Defendants argue that McDermott shareholders could only seek damages if Plaintiffs can prove "what would have happened to existing McDermott shareholders in that hypothetical, no-Merger world where McDermott proceeded on an uncombined basis (or perhaps renegotiated the merger on more favorable terms)"—a burden that Defendants conveniently say "would be a tall order" and is "inherently speculative." D.Br. 16-17; Allen ¶¶25-27. While Defendants argue that McDermott shareholders simply have no recourse, this is not the case, as decades of precedent have shown. Defendants' imaginary "but for" world is simply not relevant to the measurement of direct damages that Plaintiffs have alleged in the Complaint and proposed in their class motion. Hartzmark Reply ¶¶11-14, 19-22. Plaintiffs are proposing something far more certain and well-established: measuring damages based on the actual decline in McDermott's share price when the truth emerged.

### 2. Defendants' Loss Causation Arguments Are Premature and Prove That Plaintiffs' Methodology Can Be Commonly Applied

"[T]he focus of the 23(b)(3) class certification inquiry—predominance—is not whether the plaintiffs will fail or succeed, but whether they will fail or succeed together." *In re BP p.l.c Sec. Litig.*, No. 10–md–2185, 2014 WL 2112823, *7 (S.D. Tex. 2014). At

---

[11]     A look at Defendants' only two cited cases make clear that this is just a repeat of their failed derivative argument. *See Romeo Power*, 2022 WL 1806303, at *5 (*derivative* claims based on allegation that "shareholders 'did not receive their fair share of the value of the assets and business of the combined entity'"); *Dasho v. Susquehanna Corp.*, 461 F.2d 11, 31 (7th Cir. 1972) (discussing damages to the acquiring company, and not its shareholders, in assessing *derivative* claim damages).

the merits stage of this litigation, when the parties will exchange expert opinions on damages and causation in 2024 (*see* Dkt. 323), the parties' experts will address the specific application of Plaintiffs' damages method. Defendants jump the gun and raise hypothetical critiques of potential approaches Dr. Hartzmark may (or may not) adopt at the merits stage. Specifically, Defendants and Ms. Allen pose questions concerning whether and how Dr. Hartzmark would (a) apply dollar or percent inflation; (b) apply "LIFO" or "FIFO" accounting to Class member shares; and (c) offset recoverable Class damages against any pre-Merger CB&I shares held by Class members. D.Br. 18-20.

Ms. Allen's critiques of Dr. Hartzmark and Plaintiffs' allegations betray a fatal misunderstanding of the calculation of damages and Plaintiffs' theory of the case (Hartzmark Reply ¶¶28-29), something she is known to have done before. *See In re Allstate Corp. Sec. Litig.*, No. 16 C 10510, 2020 WL 7490280, at *4-*6 (N.D. Ill. Dec. 21, 2020) (discrediting Allen's opinions related to certification, finding that she "fundamentally misunderstands plaintiffs' allegations and theory of the case," and that "Allen's report is simply not responsive to the allegations in the complaint").

Ms. Allen's critiques fail for two reasons. First, they all raise premature attacks on the issue of loss causation, which the Supreme Court has squarely held need not be shown to obtain class certification. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 815 (2011). Second, as Dr. Hartzmark repeatedly explains, regardless of which inflation, accounting method, or offset determination (if any) is ultimately applied, the OOP methodology is sufficiently flexible such that the inputs will be applied class-wide, posing

14

no impediment to class certification here. Hartzmark Reply Secs. V & VI.[12]

  ***Plaintiffs' ultimate inflation or accounting methods will be applied class-wide at the appropriate time***. Dr. Hartzmark's OOP methodology will use inputs consisting of the daily level of inflation of McDermott stock, the selection and calculation of which requires an analysis of loss causation. Hartzmark ¶¶54-55; Hartzmark Reply ¶¶15, 30-31. As Dr. Hartzmark explained, there are multiple ways of calculating the inflation inputs (*see* Hartzmark Dep. Tr. at 111:3-18, 131:22-23, 134:14-15) and at this juncture he has not committed to a method (*id.* at 135:17-19; Hartzmark Reply ¶31). Similarly, choosing either a "LIFO" or "FIFO" accounting method at this stage (D.Br. 19; Allen ¶¶41-42) is entirely premature. Hartzmark Dep. Tr. at 177:14-178:16; *see also* Hartzmark Reply ¶¶35, 38, 49. This is because "[c]alculating the actual inputs into the out-of-pocket method [] requires an analysis of ***loss causation***." *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020); *see also, e.g.*, *In re Acuity Brands, Inc. Sec. Litig.*, No. 1:18-CV-2140-MHC, 2020 WL 5088092, at *10 (N.D. Ga. Aug. 25, 2020) ("[I]t is not appropriate at the class certification stage, before fact discovery has concluded, to require Plaintiffs' expert to commit to the particular method he intends to use to measure inflation in this case."); *The Southern Co.*, 332 F.R.D. at 399. Defendants cite to no decision that would require the

---

[12]   To the extent Allen points out hypothetical disparities in how different potential Class members' damages would be calculated (Allen ¶¶36-49), "[i]t is axiomatic that individualized damages calculations are generally insufficient to foreclose class certification, and particularly so where the central liability question is common to each class member." *Monroe Cty. Emps.' Ret. Sys. v. The Southern Co.*, 332 F.R.D. 370, 397 (N.D. Ga. 2019).

level of detail that they would have this Court impose.[13]

In any event, what is clear is that once a loss causation analysis is complete and a determination of inflation and accounting inputs are made, those inputs will be applied uniformly to the Class, thus confirming the propriety of certification here. *See* Hartzmark Reply Report ¶¶33, 53.

***The success or failure of Defendants' CB&I "offset" defense can also be formulaically applied class-wide***. Defendants argue that Dr. Hartzmark's damages model must account for an affirmative defense they have not yet raised: that "there are "offsetting economic gains" purportedly enjoyed by McDermott shareholders who also owned CB&I stock at the time of the Merger. D.Br. 19-20; Allen ¶¶32-35.[14] As an initial matter, to the extent that CB&I shareholders at the time of the Merger experienced any positive "benefit"

---

[13]     A plethora of cases have held that the determination of these and similar "inputs" involves an analysis of loss causation that is not required at the class certification stage. *See, e.g., City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, No. 18-cv-04844-BLF, 2022 WL 1459567, *8 (N.D. Cal. May 9, 2022); *In re CenturyLink Sales Practices and Sec. Litig.*, 337 F.R.D. 193, 212-213 (D. Minn. 2020); *Vrakas v. United States Steel Corp.*, No. 17-579, 2019 WL 7372041, *9 (W.D. Pa. Dec. 31, 2019); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, *20 (S.D.N.Y. July 10, 2019); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 448 (D. Ariz. 2019); *Pirnik v. Fiat Chrysler Automobiles, N.V.*, 327 F.R.D. 38 (S.D.N.Y. 2018). Moreover, courts consistently find that issues related to "quantification and allocation of damages" are "not appropriately raised at the class certification stage." *City of Miami Gen. Employees' & Sanitation Employees' Ret. Tr. v. RH, Inc.*, No. 17-cv-00554-YGR, 2018 WL 4931543, *3 (N.D. Cal. Oct. 11, 2018); *see also Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 88 (D.N.J. 2019) (same); *Wilson v. LSB Indus.*, 2018 WL 3913115, *17 (S.D.N.Y. Aug. 13, 2018) (same); *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, No. 08-CV-5310 (DAB), 2016 WL 7409840, *10 (S.D.N.Y. Nov. 4, 2016) (same); *In re BP*, 2014 WL 2112823, at *10 (same).

[14]     Defendants did not assert an offset affirmative defense in their Answer. If raised, Defendants bear the burden of proof. *See, e.g., McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1340 (5th Cir. 1995) ("The burden of proof is on the party claiming the credit 'to show that the damages assessed against it have 'in fact and in actuality' been previously covered.'").

from the Merger (despite also being deceived), those CB&I shares are represented in the § 10(b) Action, and any offset defense is more properly litigated there. *See* Hartzmark Reply ¶¶44 n.56. Moreover, this damages argument is not properly raised at class certification because "the ultimate issue of whether certain plaintiffs' losses are to be offset by any purported inflation of [the acquired company's] share prices need not be resolved at [the class certification stage]." *In re Bank of Am.*, 281 F.R.D. at 148-49; *see also In re Willis Towers Watson PLC Proxy Litig.*, No. 1:17-cv-1338 (AJT/JFA), 2020 WL 5361582, at *13 (E.D. Va. Sep. 4, 2020) (finding that whether damages should be offset by class members' other holdings "can, if necessary, be adequately addressed within the context of a certified class"); *Audet v. Fraser*, 332 F.R.D. 53, 73-74 (D. Conn. 2019) (finding that the existence of "chargebacks" or other transactions by which class members reduced their losses or achieved net gains does not defeat predominance).[15] In any event, as Dr. Hartzmark explains, the OOP methodology incorporates offsets in a Class-wide, formulaic manner at the appropriate time, thus raising no individualized issues. Hartzmark Reply ¶¶43-45.

### D.    MSPERS Is an Adequate Class Representative

The class motion defines the Class as all "McDermott shareholders (including beneficial owners) as of April 4, 2018, the record date for McDermott shareholders to be eligible to vote on the Merger of McDermott and CB&I, and who were damaged thereby."

---

[15]    Defendants' offset defense also undermines the "deterrent purpose" of the Exchange Act, which was enacted "to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions." *Randall v. Loftsgaarden*, 478 U.S. 647, 664 (1986) (rejecting attempt to offset tax benefits in Exchange Act claim).

Br. 2. MSPERS is a member of the Class because it was unquestionably a McDermott "shareholder" as of April 4, 2018. Defendants, however, argue that MSPERS cannot have standing because its McDermott shares were "lent" out on April 4, 2018 through a securities lending agreement managed by its custodial bank (Bank of New York Mellon, or "BNY"). *See* D.Br. 20-22. This is no bar to standing, and MSPERS is an adequate Class Representative.[16]

Securities lending is a decades-old practice through which institutional investors support the securities markets. Over $3 trillion of securities were lent out by investors in 2021.[17] No court has ever concluded that a plaintiff's or class members' participation in a securities lending program stripped them of the protection of § 14(a) or any other claim.

*First*, contrary to what Defendants contend, MSPERS' participation in securities lending did not strip it of its entitlement to vote in the Merger. MSPERS lent its McDermott shares to third parties through a stock lending program managed by BNY, retaining a beneficial interest in those shares—which remained in MSPERS' holdings without break.[18] Up to the Record Date of April 4, 2018, MSPERS, through its investment manager DFA and custodial bank BNY, *had the right to recall its shares and exercise its entitlement to vote those lent shares*—as MSPERS, its custodial bank, its investment manager, the SEC,

---

[16]    Defendants' adequacy argument as to MSPERS is not fatal to class certification. Local 813 did not lend any shares and Defendants do not challenge Local 813's adequacy. D.Br. 20.

[17]    *See* Douglas Brown, The Arrival of Modern Securities Lending (Fidelity Institutional Insights), *available at* institutional.fidelity.com/app/proxy/content?literatureURL=/9904054.PDF (citing IHS Markit Data as of August 20, 2021).

[18]    *See* Ex. 15 (compilation of monthly holdings reports reflecting MSPERS' constant McDermott stock holdings from December 2017—May 2018).

and the Federal Reserve all attest. *See, e.g.*, Supp. DFA Decl. ¶6 (Ex. 16) ("[I]f the shares were successfully recalled prior to the record date, such shares would normally appear in [DFA's] proxy voting system as shares for which Dimensional could instruct a vote."); Dkt. 311-4 at 26, 28, 30 (BNY "Securities Finance" presentation noting that a "Client" who lends securities is a "Beneficial Owner" who "retains the benefits of ownership" and "can recall the security at anytime [sic]" and "for any reason"). As MSPERS' Chief Investment Officer testified, lent shares "can always be recalled at a moment's notice and those shares can be voted." Ex. 17 at 85:8-10; *see also id.* at 54:13-5; *see infra*, at 21 (SEC guidance).[19]

MSPERS was entitled to truthful statements by Defendants in the March 27, 2018 Proxy Statement, declared effective on March 29, 2018, and the numerous other Proxy Solicitations made between December 17, 2017 and the Record Date, in making its determination whether to recall MSPERS' shares to vote.[20] In fact, the SEC recognizes that these proxy solicitation statements are clearly intended to provide information for security holders to make voting rights decisions including whether or not to lend or recall lent securities. 64 Fed. Reg. 61408 at 61411, 61415, 61434 (emphasizing that Rule 425 filings are subject to liability under Rule 14a-9); SEC Final Rule Release No. 33-11131, 2022 WL

---

[19]    Ex. 18 at 26 (Federal Reserve Bank Reference Guide to U.S. Repo and Securities Lending Markets, stating "securities lenders" [are] referred to as 'beneficial owners,'" and "[a] security may be recalled when its beneficial owner would like to sell it or exercise its voting rights").

[20]    *See, e.g.*, Ex. 19 at 32 (DFA's March 29, 2018 "Brochure" filed with the SEC and describing process for voting lent securities, stating that DFA "will balance the revenue-producing value of loans against the difficult-to-assess value of casting votes," and that DFA "does intend to recall securities on loan if, based upon information in [DFA's] possession, [DFA] determines that voting the securities is likely to materially affect the value of a client's investment and it is in the client's best interests to do so").

16834029, at *18 (Nov. 2, 2022) (recognizing that investors make informed voting rights decisions based on proxy solicitation materials).

While MSPERS did not elect to vote, this does not render it atypical or inadequate. Section 14(a) was enacted to protect the entire class of stockholders by preventing "management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitations." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964); *see also T.S.C. Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976); 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a-9. In keeping with this broad and protective purpose, reliance is not an element of § 14(a) (*see Mills*, 396 U.S. at 383; Br. 18), and courts have held that "whether any particular member of the class relied on the proxy information; voted for or against the challenged transaction; ***or voted at all in connection with the challenged transaction*** . . . does not raise a unique defense that disqualifies them from acting as class representatives." *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 587 (D. Colo. 2002) (citing, *e.g.*, *Mills*, 396 U.S. 375), *report and recommendation adopted*, 213 F.R.D. 576, 577 (D. Colo. 2002); *cf. 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994) ("the rationale for permitting a stockholder to assert a cause of action under Section 14(a) … is to protect the voting process ***as a whole*** from misinformation; it is simply a recognition that the stockholder is bound by the collective action of his other stockholders who may have been misled by the statement.").[21]

---

[21]     Defendants' reliance on *7547 Corp.* for a contrary result is misplaced. That case addressed the lack of standing of ***non-shareholders***, who never had the right to vote and made no voting rights decisions with respect to their securities.

Imposing liability against Defendants on behalf of shareholders who participate in stock lending programs is no different that imposing liability on Defendants on behalf of shareholders who do not vote their proxy. MSPERS' decision whether to recall its lent shares and to vote those shares *is itself a voting decision*.

Notably, the SEC recently confirmed that shareholders who engage in securities lending are still "entitled" to vote their shares, even though they would have to recall them from loan to do so. *See generally* SEC Final Rule, Release No. 33-11131, 2022 WL 16834029 (Nov. 2, 2022) (also cited by Defendants (D.Br. 21, 23-24)). This SEC guidance pertains specifically to the disclosure of proxy voting activities, and states, "*a fund would be entitled to vote on a matter if its portfolio securities are on loan as of the record date for the meeting … [b]ecause the reporting fund could recall and vote these loaned securities*." *Id.* at *8.[22] MSPERS, and other Class members who engaged in securities lending, had "voting power" within the SEC's definition of the term, which is exercised by recalling loaned shares if necessary. *Id.* at *172-73 ("Voting power means the ability . . . to vote a security or direct the voting of a security, including the ability to determine whether to vote a security *or to recall a loaned security*.").

*Second*, in addition to the fact that MSPERS had the unfettered right to recall shares, the definitive Proxy Statement defines shareholders "entitled to vote" on the Merger as

---

[22]     The SEC's guidance and the Proxy Statement use the term "entitled to vote," while the proposed Class definition uses the term "eligible to vote." *See* Br. 2, Dkt. 303-1. § 14(a) Lead Plaintiff does not believe—and did not intend to argue—that there is a relevant difference between these terms. However, if the Court believes that it is appropriate, Lead Plaintiff would amend the class definition to "entitled to vote" to harmonize with SEC regulations and the Proxy Statement.

shareholders whose shares "were held by a bank, broker, trust company or other nominee (that is, in street name)" on April 4, 2018. Ex. 20 (March 27, 2018 Proxy Statement at vii).[23] MSPERS' ownership of the lent shares continued unbroken throughout this period, and its inclusion in those "entitled to vote" defeats Defendants' adequacy challenge. *See 7547 Corp.*, 38 F.3d at 230 ("we look to the relevant documents [the Proxy Statement] to determine whether the plaintiffs had [voting] rights"). The fact that MSPERS' McDermott shares were on loan did not impact MSPERS' ownership or voting rights decisions of or these shares. *See, e.g.*, Ex. 21, Supp. BNY Decl. ¶¶5-6;[24] *supra*, n.18 & Ex. 15.

 *Finally*, Defendants' other arguments with respect to securities lending also fail. Defendants provide no support for their position that allowing MSPERS and other lenders to proceed here is "nonsensical" because the voting class would then "contain[] more shares than the total number of . . . shares outstanding, since shares on loan would be double counted." D.Br. 22 n.15. In reality, there is little danger that the number of damaged shares would outweigh the number of outstanding shares at the time of the Merger because trading volume data shows that a large percentage of the shares that comprise the Class were sold between the Record Date and the first corrective disclosure on October 30, 2018, and thus

---

[23] Beneficial owners like MSPERS typically own their shares as an interest in a fungible bulk of shares that are deposited with the Depository Trust Company ("DTC"). *See In re Reliant Sec. Litig.,* MASTER FILE NO. H–02–1810, 2005 WL 8152605, at *6 (S.D. Tex. Feb. 18, 2005); SEC, Briefing Paper, Roundtable on Proxy Voting Mechanics, available at http://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm (last modified May 23, 2007).

[24] The declaration from BNY Mellon submitted herewith also corrects an error in the prior BNY Mellon declaration submitted by Defendants, clarifying that the MSPERS Securities Lending Agreement nowhere discussed the forfeiture of any right to vote when lending securities.

were not damaged shares. *See* Hartzmark Reply ¶59 n.74.[25]

MSPERS was a McDermott shareholder at all relevant times, and is a member of the Class and an adequate Class Representative who was damaged by Defendants' misrepresentations regardless of whether and how it exercised its right to vote. No more is required to establish standing under Section 14(a) and Rule 14a-9.

### E.    The Class Is Ascertainable and Predominance Is Satisfied

The Class here easily meets Rule 23's ascertainability requirement. The Class definition clearly defines Class members as McDermott shareholders as of April 4, 2018 who were "eligible" or "entitled" to vote their shares on the Merger. Notably, the Class was essentially defined by Defendants themselves in the Proxy Statement. *Supra* Sec. II.D. Moreover, Defendants, their proxy solicitors, and major banks who held the bulk of these securities on behalf of beneficial owners, clearly have the means to identify Class members.

This satisfies the Fifth Circuit's ascertainability standard, which "is less burdensome in this circuit than in others," including the Third Circuit's ascertainability standard relied on by Defendants. *A.A. v. Phillips*, No. 21-30580, 2023 WL 334010, at *2 n.12 (5th Cir. Jan. 20, 2023) (unpublished per curiam); *accord Seeligson v. Devon Energy Prod. Co., L.P.*, 753 F. App'x 225, 230 (5th Cir. 2018) (unpublished per curiam); *see also Guenther*

---

[25]    In any event, an issuer such as McDermott can be liable for false statements that impact the market in "securities" such as stocks sold short or stock options, notwithstanding that they did not "issue" those securities. *See, e.g.*, 15 U.S.C. § 78c(a)(10) (defining a security); *Optoelectronics*, 2019 WL 6111303, at *5 (certifying 10(b) class including options traders); *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 64 (D.N.H. 2019) (certifying an Exchange Act class including short sellers, arbitrageurs and options traders); *Reliant*, 2005 WL 8152605 (shares purchased pursuant to a Registration Statement and then lent to third parties are both included within the Class pursuant to Section 11).

*v. BP Ret. Accumulation Plan*, CA NO. 4:16-CV-00995, 2021 WL 1216377, at *3 (S.D. Tex. Mar. 12, 2019) ("At the certification stage, it is not necessary that the class be so clearly ascertainable that every potential member can be readily identified."). The Fifth Circuit recently confirmed the relatively low burden that must be met: "[t]o be ascertainable, the class must be susceptible to a precise definition to properly identify those entitled to relief, those bound by the judgment, and those entitled to notice. The district court need not know the identity of each class member before certification, but it needs to be able to identify class members at some stage of the proceeding." *Phillips*, 2023 WL 334010, at *2. Defendants' claim of a heightened ascertainability standard fails.[26]

As explained above, shareholders who engaged in securities lending are members of the Class. There is therefore no need to segregate loaned shares from non-loaned shares. Even if this Court were to determine that securities lending was relevant, this would not defeat ascertainability. Although securities lending is a common practice, Defendants do not cite any cases holding that securities lending or short selling would defeat predominance. In fact, this Court has ***rejected*** a substantially similar argument. *Reliant*,

---

[26]     Defendants' suggestion that this Court should adopt the "heightened" standard of ascertainability from the Third Circuit is without support in the Fifth Circuit or its district courts. In fact, the momentum is moving away from this additional burden nationwide. *See, e.g.*, *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (citing to *Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 334 (5th Cir. 2019)); *Mullins v. Direct Dig., Ltd. Liab. Co.*, 795 F.3d 654, 658 (7th Cir. 2015) (recognizing that a heightened ascertainability standard would upset the balance established by Rule 23). Even the Third Circuit has clarified its ascertainability standard. *Kelly v. RealPage, Inc.*, 47 F.4th 202, 222-25 (3rd Cir. 2022) (ascertainability requirement met since "a straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources").

2005 WL 8152605, at *9 (rejecting argument that short selling creates individualized questions: "[T]his case involves no unexpected phenomenon but just the commonplace series of events that occur in nearly every [relevant transaction] and its aftermath.").[27]

Defendants' only support for why it could be difficult to identify Class members is the fact that MSPERS did not consider whether its shares were on loan when it sought lead plaintiff appointment here. D.Br. 23. But MSPERS had no reason to inquire about the stock lending program because it is irrelevant to standing and MSPERS' holdings reflected its ownerships of McDermott shares at all relevant times. Yet, MSPERS was readily able to provide documentation of its lending in response to Defendants' discovery requests. Furthermore, any judgment or settlement will require a claims process, where a claims administrator can assess whether the documentation submitted by Class members complies with the claims process and plan of allocation. Far from being an unknowable fact, determining whether shares were on loan was done by MSPERS in this case and could be determined for any class member through coordination with securities lending agents.

## III. CONCLUSION

Plaintiffs respectfully request that the Court (i) certify the Action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint MSPERS and Local 813 as Class Representatives; and (iii) appoint Wolf Popper and Bernstein Litowitz as Co-Class Counsel.

---

[27]    *See also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 & n.14 (9th Cir. 2022) (rejecting the argument "that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members. . . . [U]ltimately, the problem of a potentially over-inclusive class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.").

Dated: March 3, 2023

**WOLF POPPER LLP**

By:  */s/ Chet B. Waldman*

Chet B. Waldman
(admitted *pro hac vice*)
Robert C. Finkel
(admitted *pro hac vice*)
Matthew Insley-Pruitt
(admitted *pro hac vice*)
Philip M. Black
(*pro hac vice* pending)
845 Third Avenue, 12th Floor
New York, New York 10022
(212) 759-4600
cwaldman@wolfpopper.com
rfinkel@wolfpopper.com
minsley-pruitt@wolfpopper.com
pblack@wolfpopper.com

Jeffrey W. Chambers
913 Dunleigh Meadows Lane
Houston, TX 77055
(713) 438-5244
jchambers@wolfpopper.com

***Lead Counsel for the 14(a) Lead Plaintiff and the Proposed Class***

**BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP**

John Rizio-Hamilton
(admitted *pro hac vice*)
Lauren McMillen Ormsbee
(admitted *pro hac vice*)
Veronica Montenegro
(*pro hac vice* pending)
Jonathan D'Errico
(*pro hac vice* pending)

26

1251 Avenue of the Americas,
44th Floor
New York, NY 10020
(212) 554-1400
johnr@blbglaw.com
lauren@blbglaw.com
veronica.montenegro@blbglaw.com
jonathan.derrico@blbglaw.com

***Additional Counsel for the 14(a)
Lead Plaintiff and Proposed Class
Counsel***