# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated, <br><br><br> Plaintiff, <br><br> v. <br><br> MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, STUART SPENCE, <br><br><br> Defendants. | **Case No. 4:18-cv-4330** <br> **(Consolidated)** <br><br> **§10(b) LEAD PLAINTIFF'S REPLY IN FURTHER SUPPORT OF ITS MOTION FOR §10(b) CLASS CERTIFICATION, APPOINTMENT OF §10(b) CLASS REPRESENTATIVE, AND APPOINTMENT OF §10(b) CLASS COUNSEL** <br><br> **ORAL ARGUMENT REQUESTED** |

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 2

    I.     NSHEPP SATISFIES FED. R. CIV. P. 23 ..................................................... 2

    II.    NSHEPP'S DAMAGES METHODOLOGY SATISFIES *COMCAST* ...... 17

    III.   INDIVIDUAL RELIANCE ISSUES WILL NOT PREDOMINATE ........ 22

          A.    The Fraud-On-The-Market Presumption Applies ........................... 22

          B.    The Market For McDermott Stock Remained Efficient ................. 24

          C.    *Affiliated Ute* Applies ....................................................................... 27

    IV.   ALL ALLEGED CORRECTIVES PASS MUSTER ................................. 28

CONCLUSION ..................................................................................................... 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) ................................................................. 4, 20

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
  572 F.3d 221 (5th Cir. 2009) ................................................................. 30

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ................................................................. 16, 18, 28

*Barrie v. Intervoice-Brite, Inc.*, No. CIV.A. 3:01-CV-1071,
  2009 WL 3424614 (N.D. Tex. Oct. 26, 2009) ............................................. 27

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................. 22, 23

*Buettgen v. Harless*, No. 3:09-CV-1049-K,
  2011 WL 1938130 (N.D. Tex. May 19, 2011) ............................................. 26

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, No. 6:12-1609,
  2013 WL 1100819 (W.D. La. Mar. 15, 2013) ............................................. 29

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) ................................................................. 17, 21

*Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. CV H-21-2045,
  2022 WL 3227584 (S.D. Tex. Aug. 10, 2022) ............................................. 30

*Earl v. Boeing Co.*,
  53 F.4th 897 (5th Cir. 2022) ................................................................. 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  309 F.R.D. 251 (N.D. Tex. 2015) ............................................. 11, 28

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  563 U.S. 804 (2011) ................................................................. 16, 18

*Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA,
  2023 WL 2337364 (D. Nev. Mar. 1, 2023) ............................................. 20

*Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*,
　141 S. Ct. 1951 (2021) ................................................................ 28, 30

*Halliburton Co. v. Erica P. John Fund. Inc.*,
　573 U.S. 258 (2014) .................................................................... 22, 23

*Harvey M. Jasper Ret. Tr. v. Ivax Corp.*,
　920 F. Supp. 1260 (S.D. Fla. 1995) .................................................. 7

*In re Allstate Corp. Sec. Litig.*, No. 16 C 10510,
　2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) ........................... 13, 14, 15, 20

*In re Anadarko Petroleum Corp. Sec. Litig.*, No. 4:20-cv-00576,
　2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) ..................................... 3, 21

*In re: BP p.l.c. Sec. Litig.*, No. 10-md-2185,
　2013 WL 6388408 (S.D. Tex. Dec. 6, 2013) ...................................... 21, 22

*In re: BP p.l.c. Sec. Litig.*, No. 10-md-2185,
　2014 WL 2112823 (S.D. Tex. May 20, 2014) .......................................... 28

*In re Cobalt Int'l Energy, Inc.*, No. CV H-14-3428,
　2016 WL 215476 (S.D. Tex. Jan. 19, 2016) .......................................... 29

*In re Cooper Companies Inc. Sec. Litig.*,
　254 F.R.D. 628 (C.D. Cal. 2009) ................................................... 7, 24

*In re Dynegy, Inc. Sec. Litig.*,
　226 F.R.D. 263 (S.D. Tex. 2005) ..................................................... 16

*In re Enron Corp. Sec., Derivative & "ERISA" Litig.*,
　529 F. Supp. 2d 644 (S.D. Tex. 2006) ............................................. 24, 27

*In re First RepublicBank Sec. Litig.*, No. CIV. A. 3-88-0641-H,
　1989 WL 108795 (N.D. Tex. Aug. 1, 1989) ................................... 4, 7, 17, 18

*In re Parmalat Sec. Litig.*,
　2008 WL 3895539 (S.D.N.Y. 2008) .................................................... 28

*In re Verisign, Inc. Sec. Litig.*, No. C 02-02270 JW,
　2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ......................................... 15

*In re Williams Sec. Litig. – WCG Subclass.*,
　558 F.3d 1130 (10th Cir.2009) ....................................................... 30

*In re WorldCom, Inc. Sec. Litig.*,
    219 F.R.D. 267 (S.D.N.Y. 2003) ................................................................... 24

*KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS,
    2013 WL 2443217 (W.D. Tex. June 4, 2013) ........................................... 26

*Krogman v. Sterrill*,
    202 F.R.D. 467 (N.D. Tex. 2001) ...................................................... 25, 27

*Levy v. Guitierrez*,
    448 F. Supp. 3d 46 (D.N.H. 2019) ............................................................ 23

*Ludlow v. BP, p.l.c.*,
    800 F.3d 674 (5th Cir. 2015) .......................................................... 21, 28

*Oscar Priv. Equity Invs. v. Holland*, No. CIV. 3:03-CV-2761H,
    2005 WL 877936 (N.D. Tex. Apr. 15, 2005),
    *order vacated sub nom.*,
    *Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*,
    487 F.3d 261 (5th Cir. 2007) ............................................................ 27

*Parmelee v. Santander Consumer USA Holdings, Inc.*, No. 3:16-CV-783-K,
    2018 WL 276338 (N.D. Tex. Jan. 3, 2018) ............................................. 29, 30

*Patel v. Reala Pharms., Inc.*,
    549 F. Supp. 3d 559 (E.D. Tex. 2021) ...................................................... 16

*Prause v. TechnipFMC, PLC*, No. 4:17-cv-2368,
    2020 WL 3549686 (S.D. Tex. Mar. 11, 2020) ............................................. 3

*Pub. Emps.' Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*,
    769 F.3d 313 (5th Cir. 2014) ............................................................ 29, 30

*Realmonte v. Reeves*,
    169 F.3d 1280 (10th Cir. 1999) ............................................................ 16

*Rooney v. EZCORP, Inc.*,
    330 F.R.D. 439 (W.D. Tex. 2019) .................................................... 3, 16, 21

*Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-02399,
    2019 WL 6111303 (S.D. Tex. Nov. 13, 2019),
    *report and recommendation adopted*, No. 4:17-CV-2399,
    2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) .................................... 3, 21, 23

*Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB,
   2009 WL 761157 (S.D. Ind. Mar. 20, 2009),
   *aff'd*, 618 F.3d 679 (7th Cir. 2010) ........................................................ 23, 24

*Schott v. Nobilis Health Corp.*,
   211 F. Supp. 3d 936 (S.D. Tex. 2016) ........................................................ 30

*SEC v. Nat'l Sec., Inc.*,
   393 U.S. 453 (1969) .................................................................... 4, 15, 20

*Slade v. Progressive Sec. Ins. Co.*,
   856 F.3d 408 (5th Cir. 2017) ........................................................ 21

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ........................................................ 30

*Unger v. Amedisys Inc.*,
   401 F.3d 316 (5th Cir. 2005) ........................................................ 22

*Waggoner v. Barclays PLC*,
   875 F.3d 79 (2d Cir. 2017) ........................................................ 20

*Zlotnick v. TIE Commc'ns*,
   836 F.2d 818 (3d Cir. 1988) ........................................................ 23

## Statutes

Securities Exchange Act of 1934 §10(b) ................................................... *passim*

Securities Exchange Act of 1934 §20(a) ........................................................ 3

## Rules

Fed. R. Civ. P. 12(b)(6) ........................................................ 28

Fed. R. Civ. P. 15 ........................................................ 1

Fed. R. Civ. P. 23 ........................................................ *passim*

Fed. R. Civ. P. 30(b)(6) ........................................................ 3

Securities and Exchange Commission Rule 612 ........................................................ 27

Securities and Exchange Commission Rule 10b-5 ........................................................ 3, 10, 19, 21

§10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("NSHEPP") respectfully submits this Reply in support of its Motion (Dkt. No. 191, refiled as Dkt. No. 305)[1] requesting an Order: (i) certifying the §10(b) Action as a class action, (ii) certifying the §10(b) Class, (iii) appointing NSHEPP as §10(b) Class Representative, and (iv) appointing Pomerantz LLP and Briscoe Law Firm as §10(b) Lead and Liaison Counsel.[2]

## **INTRODUCTION**

The Court-upheld pleadings, boiled down, are that misstatements and omission by **McDermott, its CEO, and its CFO**, about **McDermott** lead to fraud-related inflation in **McDermott's** stock price, causing damages to all investors who purchased or acquired **McDermott's** stock, including acquisitions by conversion of CB&I stock via the Merger. §10(b) Lead Plaintiff NSHEPP has overseen four years of successful litigation and testified exceptionally well as to the details of the litigation and its intent to see it to conclusion. Class certification is a straightforward proposition and well-supported by Dr. Nye's work.

Faced with this landscape, Defendants brazenly rewrite the pleadings and rely on conclusory pronouncements by an "expert" who failed to conduct **any** *bona fide* supporting

---

[1]    After the Motion was filed in September 2021, the Court's Order (Dkt. No. 215) addressed NSHEPP's prior request under Fed. R. Civ. P. 15.  Though it did not address the instant request under Fed. R. Civ. P. 23, the parties thereafter agreed to complete streamlined briefing on this Motion by addressing only NSHEPP's request to be appointed as a §10(b) Class Representative, unaccompanied by other proposed representatives.  However, in so agreeing, NSHEPP expressly and in writing reserved all rights to seek to add additional class or sub-class representative(s) if the Court identifies any concern with NSHEPP's serving as the sole Class Representative in the §10(b) Action.

[2]    Unless stated otherwise, all emphasis is added, all internal cites omitted, and all capitalized terms have the definitions assigned in the CCAC (cited as "C¶"), the Supplement (cited as "S¶"), or NSHEPP's opening brief (Dkt. No. 192, refiled as Dkt. No. 305-2) ("Memo").  This Reply is supported by Dr. Nye's Reply Report (Exhibit G), which addresses Ms. Allen's Report (Exhibit K) and Defendant's Opposition ("Opp.") arguments.  The Exhibits submitted herewith continue lettering from the set submitted with the Motion and include excerpts from NSHEPP's deposition ("NSTr.") (Exhibit J) and Ms. Allen's depositions in the §10(b) Action ("10BTr.") (Exhibit I) and the §14(a) Action ("14ATr.") (Exhibit H).

analysis to conjure an imaginary "benefit" to former CB&I shareholders – from having been defrauded – that would place ***100% of the inflation*** caused by McDermott Defendants ***only*** in the stock of *CB&I*, with not an iota of it in McDermott's stock.  There is ***no underlying expert analysis*** and ***no opinion expressed*** on the issue of price impact.  There is similarly ***no actual analysis or formal opinion*** concerning the efficiency of the market for McDermott's stock or the validity of the Court-upheld corrective disclosures.

NSHEPP respectfully submits that these tactics are deficient and should be rejected *See In re Allstate Corp. Sec. Litig.*, No. 16 C 10510, 2020 WL 7490280, at *4-*6 (N.D. Ill. Dec. 21, 2020) (discrediting Ms. Allen's opinions related to class certification after finding that she "fundamentally misunderstands plaintiffs' allegations and theory of the case," her "report is simply not responsive to the allegations," and her offering of "little explanation" after "not perform[ing] any empirical testing or disaggregation analysis" was a "failure [that] is fatal to defendants' attempt to defeat class certification").  It respectfully urges the Court to grant its Motion at the Court's earliest opportunity.

## **ARGUMENT**

### **I.  NSHEPP SATISFIES FED. R. CIV. P. 23**

Contrary to the Opp. at 5-9, NSHEPP satisfies Rule 23(a) typicality and adequacy standards.[3]  The §10(b) Class, with certain Defendant-related exclusions, is defined as:

> all persons and entities who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and January 23, 2020, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal

---

[3]     Defendants concede the Rule 23(a) prerequisites of numerosity and commonality.

securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5.

S¶4. Classes so defined, including those investors who "purchased" and those who "acquired" the stock at issue are commonly certified, even when the "acquisition" occurred as part of corporate mergers.[4] This case is no different, and certification is warranted.

The proposed §10(b) Class consists predominantly of investors who "purchased" or "acquired" their McDermott shares in one of two ways: (1) open market purchases during the Class Period and/or (2) conversion of their CB&I stock into McDermott stock as part of the Merger. When the Merger closed, these groups were evenly split, with converted CB&I shareholders owning roughly 47% of the post-Merger company. C179. As Defendants **concede**, NSHEPP is ***identically*** situated to CB&I shareholders who acquired McDermott shares via the Merger. *See* Opp. at 6 (NSHEPP is "like every other CB&I shareholder on the effective date of the Merger"); 10BTr 12:20-14:2. Moreover, NSHEPP has demonstrated its ability to adequately represent **all** investors in the §10(b) Class.

NSHEPP has been a model Lead Plaintiff, steering the §10(b) Action over four years through two motions to dismiss, extensive discovery, and into class certification. Its CEO gave an exemplary Fed. R. Civ. P. 30(b0(6) deposition, evidencing keen knowledge and oversight. He described spending ~15-20 business days on the litigation, described

---

[4]     *See, e.g.*, *In re Anadarko Petroleum Corp. Sec. Litig.*, No. 4:20-cv-00576, 2022 WL 4544235, at *1 (S.D. Tex. Sept. 28, 2022) (certifying class of investors that "purchased or acquired" stock); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 452 (W.D. Tex. 2019) (same); *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-02399, 2019 WL 6111303, at *1 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, No. 4:17-CV-2399, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019), (certifying class of investors that "purchased or acquired" the stock or call options or that sold put options); *Prause v. TechnipFMC, PLC*, No. 4:17-cv-2368, 2020 WL 3549686 at *7 (S.D. Tex. Mar. 11, 2020) (certifying class of investors who " purchased or acquired" shares, including via a corporate merger).

NSHEPP's staffing on the case, and summarized frequent communications with counsel. NSTr 47:14-49:19; 51:2-9.  He said NSHEPP discusses and approves all major litigation steps (*id.* 50:10-25) and confirmed he and NSHEPP would spend whatever time is necessary (*id.* 53:21-54:18).  He identified NSHEPP's lawyers (*id.* 17:24-19:13) and described the counsel contingency fee and the *pro rata* recovery for class members (*id.* 40:14-41:4).  He described how NSHEPP received McDermott shares via the Merger and knew its conversion ratio (*id.* 67:9-20; 73:14-23; 77:3-17).  He accurately stated the §10(b) Class Period (*id.* 62:20-63:2), described how the §10(b) Class includes investors who purchased shares on the open market or converted CB&I stock, and said why they should be treated the same (*id.* 81:3-10; 82:5-83:2).  He identified the Defendants and detailed the alleged three-prong fraud (*id.* 45:8-47:10).  He identified Dr. Nye as NSHEPP's expert on the topics of market efficiency and common allocation of damages (*id.* 23:14-24).

Defendants raise just four arguments against NSHEPP's serving as §10(b) Class Representative, which all lack merit and should be rejected.

***First***, they claim NSHEPP "never bought" a McDermott share (Opp. at 2, 5-6), *i.e.*, it had no open market purchase and instead acquired its shares through conversion of its CB&I stock "like every other CB&I shareholder on the effective date of the Merger." Under the federal securities laws, this is truly a distinction without a difference. *7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 227 (5th Cir. 1994) (merger in which shareholders were forced to exchange stock in a new and different corporation is covered within parameters of §10(b)) (citing *SEC v. Nat'l Sec., Inc.*, 393 U.S. 453, 467 (1969) (holding that for purposes of a §10(b) claim, "shareholders 'purchased' shares in the new

company by exchanging them for their old stock").

A Merger conversion ratio established that payment of one CB&I share secured 0.82407 McDermott shares.  C¶78; 10BTr 17:21-25.  As Ms. Allen conceded, the CB&I shares were paid as consideration for the McDermott shares.  *See* 10BTr 124:16-23, 134:8-14.  As she confirmed (*see* 10BTr 131:3-9), the cost of one full McDermott share in the Merger is calculable from the conversion ratio using basic algebra (show in Exhibit L).  *See* 10BTr 126:17-131:9.  That cost was 1.213489145338585 CB&I shares.  As Ms. Allen conceded (*see* 10BTr 135:11-25), the actual monetary price of that McDermott share can be set in a consistent manner across the CB&I shareholders, *e.g.*, by multiplying that cost-in-CB&I-shares by a market price at a set point in time, like CB&I's closing price on the Merger date.[5]  *See also* Exhibit G ¶15.  Alternatively, she conceded (*see* 10BTr 136:11-16), an investor's trading records may reflect the cost – ***as NSHEPP's records do***.[6]

NSHEPP's trading records (Exhibit M hereto) list the Merger transaction as a "***Purchase–Asset***" (cell F3) of "25051.728" shares (cell H3) of "McDermott International Inc Co" (cell J3) with a "Unit Price" of "20.67" dollars (cell I3), for a gross settlement amount of "-517819.22" dollars expended (cell S3), on the contract settlement date of "5/14/2018" (cell R3), with a book value of "517819.22" dollars (cell N3).[7]  *See* Exhibit

---

[5]     Multiplying CB&I's May 10, 2018 closing price of $16.39 by 1.213489145338585 CB&I shares per McDermott share yields a monetary price of $19.89 per McDermott share.

[6]     Ms. Allen also conceded that a stock acquisition by conversion could be compared against a later stock sale, *e.g.*, to identify out of pocket losses.  *See* 10BTr 142:15-16, 142:18-23.  Defendants describe that as the "usual measure of damages."  Opp. at 5.

[7]     The gross settlement amount is reflected as a negative, because it represents value being expended to acquire the McDermott stock, while the book value is positive, because it reflects the value received in the form of the McDermott stock.  The trading records also reflect a contemporaneous "Sale-Asset" transaction (cell F2) to dispose of a fractional 0.728 McDermott share (cell H2), which resulted from

M.   As NSHEPP's CEO testified, "[W]e purchased the shares of McDermott through conversion of our CBI into McDermott stock on May 14, 2018 with the merger date being May 10, 2018." *See* NSTr 67:13-16.[8]  He explained how it was a ***conscious*** decision, based on analysis by LSV, NSHEPP's investment manager (*see* NSTr 105:3-18), testimony corroborated by internal LSV emails produced in discovery (Exhibit N), showing that the LSV professionals overseeing NSHEPP's portfolio closely tracked and internally discussed pre-Merger factual developments, including the Merger announcement, the competing Subsea 7 deal, and related analysis.  *See* Exhibit N; NSTr 118:22-130-21.

NSHEPP purchased / acquired its McDermott stock, at a price set via a stock conversion ratio, at a time when ***McDermott's*** stock was allegedly trading at prices inflated by the fraud.  *See* C ¶¶27, 403-404.  The CCAC, as ***fully upheld*** by the Court, alleges that a three-prong fraud, including Defendants' pre-Merger misstatements concerning the *post-Merger* combined company, caused ***McDermott's*** stock to trade at inflated prices.[9]  Inflation in ***McDermott's*** stock was removed by post-Merger revelations up to and including its bankruptcy, thereby causing NSHEPP and the Class Members to suffer losses.  *See* C¶¶306-327; S¶¶16-24.  Contrary to the Opp. at 2, courts certify classes of investors

---

application of the Merger conversion ratio to NSHEPP's CB&I holdings, at a unit price of "21.964" dollars (cell I2), for a gross settlement amount of "15.99" dollars in proceeds (cell S2).  *Id.*

[8]       As a non-lawyer, he added that "purchase or acquire means you've obtained something of value for recognition of kind of other value," "if you acquire a share or purchase a share, it transfers the same ownership rights," and "a purchaser of a stock is one that trades value for the stock with value for something else."  *See* NSTr 72:3-10, 75:16-18.  He also explained that to acquire McDermott stock, "in our case, there was two options, sell CBI immediately and purchase McDermott immediately or engage in that transfer of value to purchase the stock through the conversion mechanism from the merger" and that, by doing the merger conversion, "the only difference is you would not pay brokerage fees."  *Id.* 75:19-76:13.

[9]       *See* pre-Merger CB&I / Focus Project Fraud (C¶¶136-178); Technology Business Fraud (C¶¶218-241); and Capital Structure / Liquidity Fraud (C¶¶276-282).

similarly bringing §10(b) claims against an acquiring company and its senior officers for alleged frauds that caused them to exchange their shares in the acquired company pursuant to a merger. *See, e.g.*, *In re First RepublicBank Sec. Litig.*, No. CIV. A. 3-88-0641-H, 1989 WL 108795, at *1-*2 (N.D. Tex. Aug. 1, 1989) (certifying class of investors suing acquiring company, which went bankrupt, its senior officers, and other defendants under §10(b) to recover losses flowing from their exchange of shares in the acquired company for allegedly inflated shares of the acquiring company pursuant to the merger).[10]

As Dr. Nye explains (Exhibit G ¶16), Ms. Allen's prior report in *Beckel v. Fagron Holdings USA, LLC*, No. 8:16-cv-02059-SDM-AAS (M.D. Fla.) contradicts her strained positions here.[11]  The *Beckel* plaintiff received $10.1 million in a post-merger company's stock (plus cash) in exchange for his shares in an acquired company (*id.*), which Ms. Allen testified was an "actual transaction." *See* 14ATr 171:10-13.  She used an event study to estimate inflation in the post-merger company's stock, by measuring stock price reaction to revelations, cumulating the stock's three-day percentage declines, and multiplying the $10.1 million by that figure to identify damages. *Id.* 160:2-10, 163:6-13, 164:9-165:7, 165:16-22, 167:24-168:5.[12]  She reconfirmed that approach today. *Id.* 190:18-22.

---

[10]    *See also In re Cooper Companies Inc. Sec. Litig.*, 254 F.R.D. 628, 632-633, 640-641 (C.D. Cal. 2009) (certifying class of investors who purchased an acquiring company's shares or acquired them via exchange of their shares in the acquired company pursuant to the merger and brought §10(b) claims for alleged misstatements, starting at the merger announcement, concerning acquiring company's revenue outlook and financial health, products and inventory, and integration of acquired company's operations, which inflated acquiring company's stock price until post-merger revelations including lowered guidance removed the inflation, after insiders had sold shares); *Harvey M. Jasper Ret. Tr. v. Ivax Corp.*, 920 F. Supp. 1260, 1264, 1268 (S.D. Fla. 1995) (certifying class of investors who purchased acquiring company's shares or acquired them pursuant to the merger and brought §10(b) claims for alleged misstatements, starting with the preliminary proxy, which inflated acquiring company's stock price until revelation of poor results).

[11]    The 14(a) Plaintiffs filed her *Beckel* report in this litigation as *Edwards* Dkt. No. 329-4.

[12]    As she testified, she alternatively could have added the dollar drops. *Id.* 165:13-15.

***Second***, Defendants' Opp. at 6-7 claims NSHEPP (and all CB&I shareholders) lack damages because they "benefitted" from the alleged fraud – which cratered their investments from ~$20.70/share on the Merger Date (C¶86) to $0.12/share by the Class Period end (S¶23), thereby gutting the $517,819.22 book value of NSHEPP's 25,051 McDermott shares.  As Dr. Nye explains, Ms. Allen's underlying report "is hardly expert 'economic analysis'" and is based on a misreading of NSHEPP's theory of liability.  *See* Exhibit G ¶¶8-16.  NSHEPP respectfully submits that this argument lacks merit, because:

• *CB&I could have avoided bankruptcy by selling Lummus*.  **McDermott's** S-4/A filed with the SEC on March 27, 2018 had a "Background" section (*see* Exhibit O excerpts) detailing CB&I's process leading to the Merger.  It said that to avoid bankruptcy, CB&I began to explore a sale of its Lummus technology business "with the intention and expectation of generating sufficient sales proceeds to pay off CB&I's outstanding indebtedness."  *See* Exhibit O at 56.  After quoting that sentence correctly, Ms. Allen's report ***falsely*** claimed – in an ***uncited*** sentence – "However, CB&I was ***unable to find a buyer*** for its technology business and ***thus*** started to look for other alternatives to avoid bankruptcy, including a merger."  *See* Exhibit K at 11 ¶27.  This false premise gives rise to Defendants' argument (Opp. at 2, 7) that "the Merger and conversion thereby provided CB&I shareholders a lifeline" so they "came out ahead" and were "no worse off."

To the contrary, consistent with C¶¶75-76, McDermott's S-4/A describes CB&I leadership's belief in July 2017 that selling Lummus would have enabled CB&I to gain "significant relief" by repaying or refinancing its existing debt, details how CB&I narrowed initial bids received from a pool of ***30+ strategic and financial buyers*** to ***three concrete***

*offers* valued between ***$2.25 billion*** and ***$2.5 billion*** by November 2017, and negotiated with two of those three bidders until CB&I's leadership voted to approve the Merger on December 17, 2017 – the day before it was publicly announced.    Exhibit O at 56-66.[13] Defendants' claim that CB&I had no options other than the Merger is simply fictional.[14]

- *CB&I shareholders were defrauded by McDermott, Dickson, and Spence.* Defendants' claims that CB&I shareholders, like NSHEPP, had no option but to exchange their CB&I shares for McDermott shares at the Merger's conversion ratio and that they "benefitted" from a fraud that lead to the evisceration of their McDermott investment in its bankruptcy ignore that they could have sold their CB&I shares[15] or exchanged them at a ratio unaffected by the alleged fraud.  The Court-upheld CCAC pleads that ***McDermott***, its CEO Dickson, and its CFO Spence made pre-Merger (and post-Merger) misstatements ***about McDermott*** that caused or maintained inflation in ***McDermott's*** stock price, which caused all investors, including former CB&I shareholders, to pay a higher price (whether cash or stock was the consideration being paid) for its shares.[16]

---

[13]    Notably, the S-4/A recounts CB&I leadership's view in December 2017 that CB&I would need to seek bankruptcy protection "if it did not enter into ***either*** an agreement with respect to the [Lummus] Technology Sale ***or*** the transaction with McDermott." *Id.* at 65.  Ms. Allen did not know that fact.  *See* 10BTr 75:9-13.  When read the highlighted portions of the S-4/A appended as Exhibit O, she did not dispute that McDermott (as the S-4/A filer) described those events in that way and had no reason to doubt the accuracy of those facts as McDermott stated them.  *See generally id.* 84:3-123:14.

[14]    Indeed, Ms. Allen did not analyze the three $2.25 - $2.5 billion bids and had no idea how they compared against CB&I's debt, and yet, said they would not have impacted her conclusions.  *See* 10BTr 106:14-107:5.  When given the chance to cite ***anything*** in support of her uncited report sentence, she failed to do so.  *Id.* 109:13-15, 110:3-8, 123:5-14.

[15]    Under Defendants' strained argument (Opp. at 7), if a CB&I shareholder sold its shares a second before the Merger and used the proceeds to buy the same number of McDermott shares on the open market as it would have gotten through the Merger exchange, then it would have suffered damages.

[16]    *See, e.g.*, ¶427 ("At the time of the purchases and/or acquisitions by §10(b) Lead Plaintiff NSHEPP and the §10(b) Class, the true value of McDermott stock was substantially lower than the prices paid" and "Had §10(b) Lead Plaintiff NSHEPP and the other §10(b) Class Members known the truth, they would not

These are typical §10(b) allegations, as described by Ms. Allen,[17] who conceded that her class certification analyses are supposed to take complaints as alleged. *See* 10BTr 22:12-16; 14ATr 70:13-15.  Indeed, she conceded, as she must, that the Court-upheld CCAC pleads that McDermott, Dickson, and Spence made the misstatements at issue, with scienter, after adequate due diligence on CB&I (C¶¶328-361) (*see* 10BTr 49:19-23, 83:8-12, 262:2-11, 262:19-263:2), and that, *inter alia*, they represented before the Merger how acquiring CB&I would impact **post-Merger McDermott**, *e.g.*, the post-Merger company's ability to fund its operations and to leverage Lummus to serve existing clients and attract new ones (*id.* 251:7-10, 267:8-12, 267:24-268:1, 269:4-8, 271:23-272:1).

Significantly, however, Ms. Allen admitted that she **did _not_ analyze** whether **any** pre-Merger misstatements impacted **McDermott's** pre-Merger stock price and, thus, **did _not_ opine** that they did _not_ impact it.[18]  Nor did she do **any** analysis of how the Merger's

---

have purchased or otherwise acquired [McDermott] shares or would not have purchased or otherwise acquired them at the inflated prices that were paid.")

[17] She testified:"the damages framework for a typical 10b-5 compares the difference between artificial inflation on the purchase date and artificial inflation on the sale date" (14ATr 38:15-19) and "you're saying that…the purchase price for example would have been different, so rather than paying this higher price, they would have paid a lower price and so they would have paid less" (14ATr 114:24-115:4).

[18] She **did _not_ analyze** whether **McDermott's** pre-Merger stock price was impacted by Defendants' alleged pre-Merger misstatements calling the Focus Projects "de-risked" and "fixable" (C¶¶142, 143, 167, 176), describing their cost overruns as "well within the potential downside scenarios we contemplated as part of our due diligence," and saying their risks that had negatively impacted CB&I's results "could be managed" by post-Merger McDermott and "similar problems could be avoided in the future through improved project management" (C¶¶143, 145, 159); touting $350 million in annual cost synergies for post-Merger McDermott from the Merger (C¶¶138, 142, 148, 168); saying post-Merger McDermott could leverage Lummus's 3,000 patents and trademarks and 100 licensed technologies across its customer base to drive follow-on work, apply McDermott's "operational excellence" to CB&I's "strong technology" to offer "end-to-end solutions across the full lifecycle of a project" as "our customers are seeking," and achieve the Merger's "foundation" to support increased pull-through work via "CB&I's tier-one technology business" (C¶¶219, 222, 232); saying post-Merger McDermott would have a "strong capital structure to support growth" with sufficient cash and available credit to settle commitments and contingencies, reduce funded indebtedness, and address working capital needs "for the foreseeable future" (C¶¶277, 279, 281). *See* 10BTr 253:21-254:3, 259:3-10, 264:15-23, 269:9-14.

conversion ratio – which dictated the price NSHEPP paid for McDermott shares – would have been affected if the truth had been known pre-Merger.  *See* 10BTr 17-20.  She also ***did not opine*** that the ***post-Merger*** misstatements, *e.g.*, those repeatedly reaffirming McDermott's ability to settle commitments and contingencies and fund operations from cash and available credit and liquidity sources (C¶¶283, 286, 292, 296), did *not* impact McDermott's stock price.  *See* 10BTr 279:6-15.  Instead, she conceded that the CCAC could allege that they ***maintained*** stock price inflation (*see* 10BTr 277:8-11).[19] [20]  Indeed, Ms. Allen ***was not even asked*** to address the issue of price impact.  *Id.* 23:13-22 ("sometimes, in reports, I have been asked to specifically address the issue of price impact…but that was not my particular assignment here").  She also confirmed that she had no plan to file a second report to address price impact.  *Id.* 23:23-25, 24:9-13.[21]

Defendants bear the dual burdens of production and persuasion in any argument centered on lack of price impact from the alleged misstatements.  *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 258-260 (N.D. Tex. 2015) ("[T]he Court finds the burdens of production and persuasion to show lack of price impact are properly placed on Halliburton" and "Halliburton must ultimately persuade the Court that its expert's event

---

[19]  She even testified in the §14(a) Action that post-Merger misrepresentations could ***add*** inflation to McDermott's stock price (*see* 14ATr 189:20-190:1).

[20]  Ms. Allen's report at p. 11 n. 48 made the unsupportable claim: "Note Plaintiff is not alleging that there were new affirmative misstatements after the Merger."  To the contrary, the CCAC pleads extensive post-Merger misstatements in the CB&I / Focus Project Fraud (C¶¶179-217), the Technology Business Fraud (C¶¶242-275), and the Capital Structure / Liquidity Fraud (C¶¶283-305).  When asked to justify her footnote in light of these Court-upheld allegations, she said, "Those aren't affirmative misrepresentations that are alleged misrepresentations where you would expect the stock price to increase because of the misrepresentations there -- alleged misrepresentations of failing to say bad news, not saying surprising good news" (*see* 10BTr 276:7-21) but conceded that they could maintain stock inflation (*id.* 277:8-11).

[21]  Had she testified otherwise, §10(b) Lead Counsel would have objected, reserved rights to reconvene her deposition, and potentially sought Court assistance.

studies are more probative of price impact than the [plaintiff's] expert's event studies.").[22]

They have utterly failed to meet this burden, and indeed, never tried.[23]   Their argument's

premise that McDermott's pre-Merger stock was "untainted" (Opp. at 6) lacks any basis.

• *NSHEPP and CB&I shareholders did not "benefit" from the Merger.*   By

brazenly rewriting the pleadings, Defendants' Opp. at 2, 6 claims that **CB&I's stock** – and

***only*** CB&I's stock – was inflated, by some unquantified amount, by the Court-upheld pre-

Merger misstatements by **McDermott, its CEO, and its CFO** that are about **McDermott**.

In support, they cite ***only*** Ms. Allen's report (Exhibit K) ¶¶28-30, which make a conclusory

assertion that "to the extent there was inflation in McDermott's stock during the alleged

Class Period,[24] **all of that inflation came from CB&I**; therefore there had to be more

inflation in CB&I's stock than the inflation in McDermott's stock after the Merger."   She,

in turn, cites only C¶135, a mere preamble paragraph defining the three prongs of alleged

fraud.   Her report (Exhibit K) ¶29 includes a graphic placing 100% of a ***hypothetical***

inflation amount into CB&I's stock and 0% into pre-Merger McDermott's stock.   The

graphic ***directly contradicts*** the Court-upheld pleadings and is fatally undermined by her

own stock chart (Exhibit K at 9), which shows ***both*** CB&I's stock price and McDermott's

stock price moving in lockstep between the Merger announcement on December 18, 2017

and its closing on May 10, 2018.   As Dr. Nye explains, this implies that "investors were

---

[22]     Indeed, this burden was Defendants' reason for requesting a sur-reply brief.  *See, e.g.*, 9/27/2022 Hearing Tr. at 12 ("we have the burden of proof on price impact").

[23]     It is unclear what Defendants can say in a sur-reply brief – which the Court ***limited*** to the issue of price impact – when they made no opening proffer on that issue and did not seek its analysis from Ms. Allen, who confirmed she will not try to submit a second report.

[24]     Apparently, Ms. Allen is referring to *both* pre-Merger and post-Merger inflation.

already expecting the Merger to be completed" and "Defendants' alleged misstatements and omissions were clearly incorporated in McDermott's stock price prior to the Merger." *See* Exhibit G ¶13.  Courts have rejected similar, recent attempts by Ms. Allen to disregard a plaintiff's allegations and case theory as a basis to oppose class certification.  *See In re Allstate,* 2020 WL 7490280 at *4-*6 (discrediting Ms. Allen's opinions related to class certification and finding that she "fundamentally misunderstands plaintiffs' allegations and theory of the case" and that "Allen's report is simply not responsive to the allegations in the complaint").  NSHEPP respectfully submits that this Court should follow suit.

Incredibly, when questioned under oath, Ms. Allen conceded that (contrary to her report) it was ***not*** her position that the Court-upheld pre-Merger misstatements had zero impact on McDermott's pre-Merger stock price.  *See* 10BTr 165:19-22.  Yet, she failed to ***quantify*** that price impact.  *Id.* 165:23-166:1, 196:11-18, 198:25-199:7.  Remarkably, she also failed to quantify how much, if any, inflation existed in CB&I's stock.  *Id.* 198:25-199:7. She knew almost nothing about CB&I and made no effort to analyze it.[25]  Absent ***any*** analysis, comparing inflation in the two companies' stock prices (or reasons therefor) is speculation.  *See In re Allstate*, 2020 WL 7490280 at *5 (finding Ms. Allen's offering of "little explanation" after "not perform[ing] any empirical testing or disaggregation

---

[25]     Ms. Allen did not do a valuation of CB&I.  *See* 10BTr 78:14-19, 82:11-13.  She did not know if all its assets were acquired in the Merger (*id.*  29:23-30:2); how much the Focus Projects were ultimately written down (*id.* 39:1-3), how much debt CB&I carried (*id.* 57:5-8); or whether any CB&I creditors required payoff in a bankruptcy (*id.* 57:9-14).  She did not do a valuation of Lummus (*id.* 30:6-9, 30:15-17, 82:14-16); did not know (despite the S-4/A stating it) how CB&I would have used Lummus sale proceeds if the Merger did not happen (*id.* 57:16-20); and did not know (despite the S-4/A stating it) if those proceeds could have reduced or eliminated CB&I's debt (*id.* 58:20-24) or kept CB&I out of bankruptcy (*id.* 61:2-5).  Her ignorance appears willful, particularly given that Defendants had ***16 months*** between the original filing of NSHEPP's opening brief and the filing of their opposition and Ms. Allen's report.

analysis" was a "failure [that] is fatal to defendants' attempt to defeat class certification").

Defendants' related argument that CB&I's purported "inflation" (if any) "diluted" across post-Merger McDermott also fails.  As Dr. Nye explains, Defendants and Ms. Allen implicitly and baselessly assume that some unquantified "benefit" CB&I investors received from this "dilution" of inflation outweighs the actual economic losses suffered when partial corrective disclosures wiped out most of McDermott's share value.  *See* Exhibit G ¶11. However, this assumption does not make sense, given Ms. Allen's acknowledgement of "inflation in McDermott's stock after the Merger," which is precisely the amount of inflation measured by the event study used in connection with the "out-of-pocket" damages estimation methodology described in the Nye Report.  *See* Exhibit G ¶12; Exhibit K at 11 ¶28.  Thus, as Dr. Nye explains, by Ms. Allen's "logic," it is impossible for CB&I investors who acquired McDermott shares in the Merger to lack damages.  *See* Exhibit G ¶12.

The argument also fails to acknowledge that CB&I's valuable assets were ***likewise*** "diluted."  McDermott paid $1.75 billion to acquire CB&I, based on the market value on May 10, 2018 of the 84.5 million shares it issued.  *See* C¶86; Exhibit K at 4 ¶9; 10BTr 26:1-7, 29:17-21.  Yet, Lummus ***alone*** was worth more – based not only on the ***three*** bids from ***$2.25 - $2.5 billion*** CB&I received for it in November 2017, but also its ***$2.725 billion*** price when ***McDermott*** sold Lummus in ***McDermott's*** bankruptcy to pay off ***McDermott's*** creditors, while eviscerating McDermott shareholder equity, including the former CB&I stockholders.  *See* S¶19.[26]  Ms. Allen conceded that absent the Merger, McDermott lacked

---

[26]    Incredibly, Ms. Allen did not view McDermott's Lummus sale as relevant (*see* 10BTr 39:25-40:9), did not recall analyzing its bankruptcy filings (*id.* 34:20-35:2), and did not know the bankruptcy wiped out

*any* entitlement to sale proceeds of CB&I assets like Lummus or the tank storage business (*see* 10BTr 65:15-20, 66:1-5, 69:15-19) and, because of it, their asset values were spread across post-Merger McDermott rather than staying at CB&I alone (*id.* 77:12-15).

**_Third_**, Defendants' standing argument (Opp. at 7-8) – **_52 months_** into this litigation after two motions to dismiss that failed to raise **_any_** loss causation or damages arguments – fails.[27]  Defendants cite no authority holding that defrauded investors who acquired a company's shares by giving up stock in an acquired company need to have also purchased even more of the acquiring company's shares on the open market to have standing to pursue claims for losses when the fraud was revealed.  To the contrary, courts find investors who acquire shares via merger conversions have claims typical of open market purchasers, without any such requirement.  *See, e.g.*, *In re Verisign, Inc. Sec. Litig.*, No. C 02-02270 JW, 2005 WL 7877645, at *6-7 (N.D. Cal. Jan. 13, 2005) (lead plaintiffs who acquired stock of merged company via conversion of shares in acquired company were typical of a "purchased or acquired" class and appointed as class representatives for both investor types) (citing *SEC v. Nat'l Sec., Inc*., Sec, 393 U.S. at 466)).  *See also* cases cited in ns. 4

---

its shareholders (*id.* 55:11-20).  Calling Lummus CB&I's "only thing of value," she did not know that CB&I's tank storage business had high value (C¶307(e)) and McDermott sought to sell it to reduce *McDermott's* debt (*see* 10BTr 58:4-14), and she did not do a valuation of it (*id.* 82:17-20).

[27]     Defendants' sole citation, *Earl v. Boeing Co.*, 53 F.4th 897, 901 (5th Cir. 2022), a non-securities fraud case, is distinguishable, as its lack of harm (a flight defect reducing the number of flights, thus increasing flight costs) was straightforward and credible.  Here, Defendants fail to explain why CB&I investor A who converted its stock directly into McDermott shares via the Merger lacks damages and standing, whereas CB&I investor B who sold its shares just before the Merger and used the proceeds to buy McDermott shares are differently situated for purposes of damages and standing.  When asked, Ms. Allen offered no coherent explanation.  *See* 10BTr 147:2-152:12.  Yet, that unexplained divergence in proposed treatment lies at the heart of Defendants' breathtaking suggestion – in a footnote! – that CB&I shareholders who acquired McDermott shares through the Merger (who, immediately thereafter, represented 47% of the post-Merger equity holders) should be excluded from the Class altogether.  *See* Opp. at 8 n.4.

and 10, *supra*. *Cf. also Realmonte v. Reeves*, 169 F.3d 1280, 1286 (10th Cir. 1999) (investors who acquired company stock through merger relied to their detriment on misrepresentations as to its financial condition and future, have claims typical of open market purchasers, and thus benefitted from class action tolling for their opt out lawsuit).[28]

*__Last__*, Defendants' "unique defenses" argument (Opp. at 8-9) fails.  Their affirmative defenses regarding damages and loss causation (*see* Dkt. No. 177, "Additional Defenses" 12, 16, and 17) are not properly adjudicated at the class certification stage.  *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 475 (2013); *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 807 (2011) ("*Halliburton I*").  Moreover, these defenses are not "unique" to NSHEPP and, instead, apply to ***all*** former CB&I shareholders who did not also purchase McDermott on the open market.  *See* Opp. at 2, 8 n.4.[29]  NSHEPP disputes that "considerable time" (Opp. at 9) is needed to resist that argument, but whatever time is spent will be necessary, for the benefit of the Class Members facing the defense.[30]  It bears noting that Fifth Circuit courts are loathe to reject otherwise qualified and attentive lead plaintiffs like NSHEPP from serving as class representatives, even where *bona fide* unique

---

[28]     Ms. Allen's attempts (Exhibit K ¶¶32-42) to divide the Class based purchases or acquisition of CB&I versus McDermott stock, beyond being irrelevant, rest on unsound analysis. *See, e.g.*, 10BTr 171:23-173:5 (Form 13-F data she reviewed omits institutional investors with under $100 million in assets and all non-institutional investors); 10BTr 177:12-14 (no idea how the stock of those investors fits into the class); 10BTr 235:14-236:6, 237:11-14, 238:8-10 (Form 13-F data does not state reasons for purchases); 10BTr 178:1-11 and 180:1-12 (McDermott-only investors are not subject to any purported "offset").

[29]     Defendants' cited case, *Patel v. Reala Pharms., Inc.*, 549 F. Supp. 3d 559, 569 (E.D. Tex. 2021), is inapposite, as it denied a lead plaintiff motion by an investor whose atypical trading patterns, involving losses only from options and actual *profits* from common stock, subjected him to unique defenses.

[30]     *See Rooney*, 330 F.R.D. at 446 (typicality requirement met where "Plaintiff has presented a classwide legal theory and does not appear to be subject to any unique defense inapplicable to the class as a whole"); *In re Dynegy, Inc. Sec. Litig.*, 226 F.R.D. 263, 269 (S.D. Tex. 2005) (typicality test is "not demanding" and aims to protect class members from representation by a party "who is preoccupied with a defense that is applicable only to himself").

defenses exist.  *See, e.g.*, *In re First RepublicBank*, 1989 WL 108795, at *12 (representatives of the Merger and Note classes not rendered atypical because of potential unique defenses where they sought "to recover damages caused by the same allegedly unlawful conduct which affected all members of their respective classes").  That is particularly the case here, as Defendants' true aim, transparently, is not the conservation of time or resources on behalf of the Class, but rather decapitation of its representation.

## II.    NSHEPP'S DAMAGES METHODOLOGY SATISFIES *COMCAST*

As stated in NSHEPP's opening Memo, Dr. Nye's damages methodology (Dkt. No. 305-9 ¶¶60-64) employs the widely-accepted "out-of-pocket measure of damages" and satisfies *Comcast Corp. v. Behrend*, 569 U.S. 27, 34-35 (2013).  *See* Dkt. No. 305-2 at 40-41 (collecting cases).  As Dr. Nye again explains, an event study can be used to isolate the price changes of McDermott's stock due to release of company-specific information on every day of the §10(b) Class Period, including the corrective disclosure dates, which permits class-wide measurement of price inflation consistent with NSHEPP's theory of liability that Defendants' fraud caused or maintained artificial inflation in McDermott's stock price until it was incrementally removed by the correctives.  *See* Exhibit G ¶¶30-32.

Ms. Allen *agrees* that event studies are used in this way,[31] and, as discussed *supra*, her *Beckel* litigation report used an event study to calculate §10(b) damages for a plaintiff who received fraud-inflated stock in a post-merger company in exchange for his shares in

---

[31]    *See, e.g.*, 14ATr 162:13-15 ("An event study is - - is a common method of looking at how a price reacts to information."); *id.* 103:8-13 ("[A]n event study looks at the reaction in a stock price to information and news that's being announced at the time.  And one of the things that you could do is say that the reaction at some later time tells you about what would have happened at some earlier point in time.").

an acquired company.  Here, she was not asked to calculate damages or identify a common damages methodology.  *See* 10BTr 198:13-15.[32]  She does _**not**_ opine that an event study damages estimation cannot be done.  *Id.* 185:19-186:12. She instead offers only critiques of Dr. Nye's report, all of which he addresses and refutes.  *See* Exhibit G §VII.

One macro criticism is that a "well-specified" or detailed damages methodology is required at this stage.  *See* Opp. at 11; Exhibit K §VII.[33]  Dr. Nye explains how doing so would require an analysis of loss causation (Exhibit G §VII.A.), which is not required at this stage of the litigation.  *Amgen*, 568 U.S. at 475; *Halliburton I*, 563 U.S. at 807.

Defendants' other arguments (Opp. at 2-3, 10-13) lack merit, for these reasons.

_**First**_, citing Ms. Allen's report ¶¶57-61, they claim that the "dollar method" and the "dollar method that caps inflation at the stock price" (which they also call a "percent method") "yield economically nonsensical results" that preclude class-wide damages (Opp. at 11-12) – an argument that, if credited, would leave McDermott's shareholders _**wiped out**_ by its bankruptcy and unable to recover.  Dr. Nye explains why these arguments are wrong. *See* Exhibit G §VII.B.   Under the widely accepted out-of-pocket method, "artificial inflation on any given day is, by definition, limited to the purchase price an investor actually paid for McDermott stock" or, in the case of former CB&I stockholders, "artificial inflation is limited to the per-share value of CB&I stock exchanged for new McDermott

---

[32]     Ms. Allen has never authored a publication regarding damages methodologies or determination of damages in a securities class action.  *See* 14ATr 58:21-59:9.

[33]     Yet, Ms. Allen testified that "well-specified" does not mean all inputs need to be decided at this stage (14ATr 98:13-17) and conceded the difference between calculating damages and articulating a methodology (or "recipe") (*id.* 97:10-16) that in the §10(b) context need only be "well enough defined that someone could understand how it would work and that it would actually work" (*id.* 99:22-100:4).

stock upon the closing of the Merger.  *Id.* ¶45.  Ms. Allen's testimony is in harmony.[34]

Thus, a "negative value" for McDermott's stock (Opp. at 11) would not occur.

Moreover, the "capped-dollar method" is not "economically nonsensical" (Opp. at

11-12; Exhibit K ¶¶59-61.  As Dr. Nye explains, when a stock is sold, the price inflation at

that moment is "capped" at the sale price (*i.e.*, the remaining fraud-related inflation in the

stock cannot exceed its price).  *See* Exhibit G ¶¶47-48.  For both of Ms. Allen's sample

investors, the remaining (capped) inflation figure plus the damages figure add up to the

original inflation at purchase (if remaining inflation is higher, damages are lower, and vice

versa), which is economically *sensical* and allows for the fact that a company's stock price

will rise and fall throughout an alleged period of fraud.  Otherwise, class-wide damages

could only be articulated where a stock chart showed day-over-day declines the entire Class

Period.  Defendants cite no authority mandating such a chart for class-wide damages.

**<u>Second</u>**, Defendants claim Dr. Nye needs to account for a purported "benefit" to

CB&I shareholders defrauded by McDermott, its CEO, and its CFO – the privilege of

having their CB&I shares converted into McDermott shares eviscerated in McDermott's

bankruptcy.  *See* Opp. at 12 (citing Exhibit K ¶¶62-64).  As discussed *supra*, and as Dr.

Nye explains (Exhibit G §V.), this "benefit" argument lacks merit and is Ms. Allen's latest

attempt at rewriting court-upheld pleadings and offering speculation in lieu of actual

"expert" analysis – despite ***16 months*** to do a proper analysis after NSHEPP's motion was

---

[34]    *See, e.g.*, 14ATr 123:1-12 ("out-of-pocket would be a measure of what you lost relative to what
you paid"); 122:13-19 (""out-of-pocket in a 10b-5 cases… is you purchase a stock…on a given date and so
you're out-of-pocket that amount of money when you purchase it and then you sell it at a later date.  And
the difference between those is a measure - - can be a measure of damages").

filed.  *See In re Allstate*, 2020 WL 7490280 at *5 (finding that Ms. Allen's offering of "little explanation" after "not perform[ing] any empirical testing or disaggregation analysis" was a "failure [that] is fatal to defendants' attempt to defeat class certification").

NSHEPP's theory of the case, as pled in the Court-upheld Complaint and Supplement, is that the alleged misstatements by **McDermott** and its officers concerned **McDermott** and inflated **McDermott's** stock price, for investors who "purchased" or "acquired" their shares during the Class Period.  As Dr. Nye explains, *how* that transaction occurred, *e.g.*, by converting CB&I shares directly into McDermott shares or by selling CB&I shares and taking the cash to buy McDermott shares, is of no consequence from an economics perspective.  *See* Exhibit G ¶¶18.  The same is true from a legal one.  *See, e.g.*, *7547 Corp.*, 38 F.3d at 227; *SEC v. Nat'l Sec., Inc.*, 393 U.S. at 467.

<u>*Last*</u>, Defendants raise "thorny matters" (Opp. at 12-13), claiming Dr. Nye fails to explain how to calculate pre-Merger inflation, citing Ms. Allen's report, Exhibit K ¶56 (subpart (3)), which falsely asserts that "Plaintiff claims that the alleged inflation came from the Merger, which was completed in May 2018" and cites C¶135, which, as discussed *supra*, is a mere preamble paragraph.  As Dr. Nye explains (*see* Exhibit G ¶139 n.143), the alleged inflation arose not "from the Merger" but from the **Court-upheld misstatements**, which began on December 18, 2017.  Moreover, "defendants' argument that Nye's method fails to account for the possibility that inflation is not necessarily constant over the entire class period is premature at this stage." *Ferris v. Wynn Resorts Limited*, No. 18-cv-00479-APG-DJA, 2023 WL 2337364 at *12 (D. Nev. Mar. 1, 2023) (citing *Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017) (rejecting argument that class certification was

improper where "[p]laintiffs' damages model failed to account for variations in inflation over time" because damage calculations need not be "so precise" at class certification stage)). Defendants otherwise ask how the damages methodology will "match purchases and sales together," which they claim is "an important question with vast damages implications," citing Ms. Allen's report, Exhibit K ¶56 (subpart (5)). Yet, she testified *exactly opposite*, disavowing *any* need "to match one share to another," which even at the time of judgment or settlement "doesn't matter."[35]

Dr. Nye's damages methodology satisfies *Comcast*. *See Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408 (5th Cir. 2017) (*Comcast* requires fit between class-wide liability theory and class-wide damages theory) (collecting cases); *Ludlow v. BP, p.l.c.*, 800 F.3d 674, 683, 685 (5th Cir. 2015) (granting class certification where Plaintiffs' expert calculated damages by using an "out-of-pocket losses measure" and noting that "*Comcast* requires a 'sound' methodology, not certainty").[36] [37]

---

[35]   After stating that both LIFO (last in, first out) and FIFO (first in, first out) are common methods to account for the order of stock sales (*see* 14ATr 191:16-20), Ms. Allen testified that "in a 10b-5 case, you can take account of the damages and the full effect of inflation on an individual plaintiff without having to match up and make a determination of which share went to which other share. You can look at all the shares that were purchased during the class period at inflated prices and compare that for all the shares for the individual plaintiffs that were sold at inflated prices and calculate the effect of the inflation and there isn't a need to do LIFO or FIFO at all and figure that out." *Id.* 192:4-14. *See also id.* 192:19-25 (in a 10b-5 case, no choice needs to be made about using the LIFO or FIFO methodology at the time that damages are ultimately calculated); *id.* 194:16-21 (at the time of judgment or settlement, "if you think the shares are inflated, you can see how much you benefited from the inflation and you can see how much you were harmed by the inflation. And you don't need to match one share to another. It doesn't matter.")

[36]   *See also In re Anadarko*, 2022 WL 4544235, at *7 (granting class certification where plaintiff expert measured damages via out-of-pocket method tied to a theory of liability common to all class members); *Rooney*, 330 F.R.D. at 451 (granting class certification where plaintiff expert's out-of-pocket method could calculate class-wide damages); *Rougier*, 2019 WL 6111303 at *18 (granting class certification because out-of-pocket loss measure of damages showed class-wide damages consistent with plaintiffs' theory of liability).

[37]   Defendants' lone cite, *In re: BP p.l.c. Sec. Litig.*, No. 10-md-2185, 2013 WL 6388408 (S.D. Tex.

## III.    INDIVIDUAL RELIANCE ISSUES WILL NOT PREDOMINATE

### A.  The Fraud-On-The-Market Presumption Applies

As discussed in NSHEPP's opening Memo (Dkt. No. 305-2 at 31-39), reliance in this litigation can be established class-wide via the fraud-on-the-market presumption, *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988), which recognizes that in efficient markets, the price of a stock "reflects all public, material information--including material misstatements." *Halliburton Co. v. Erica P. John Fund. Inc.*, 573 U.S. 258, 263 (2014) ("*Halliburton II*"). Generally, "market efficiency will not even be an issue" for "heavily-traded or well-known stocks." *Unger v. Amedisys Inc.*, 401 F.3d 316, 322-23 (5th Cir. 2005). McDermott fits the bill, and Defendants' counter-arguments (Opp. at 3, 15-20) fail.

Defendants claim "unusually high" short selling creates a "reliance problem" (for short sellers) and "predominance issue" (for the Class). *See* Opp. at 15-18. They cite to Ms. Allen's report ¶51, which, based on Bloomberg data "only available every two to three weeks" (*id.* n.64), says the "average" short interest represented 25% of shares outstanding, with a low of 8% in December 2017 and highest levels just before McDermott's bankruptcy. As Dr. Nye explains, "virtually all" U.S.-traded stocks have a short interest and "*any* level" "will result in so-called 'artificial shares.'" *See* Exhibit G ¶28. Ms. Allen **agrees** (*see* 10BTr 228:7-9), adding that "artificial shares" (when two investors think they own the same share due to short interest) are "not literally artificial" because "It's creating additional shares" (*see* 14ATr 221:14-20, 222:12-19), consistent both with literature Dr.

---

Dec. 6, 2013) did not involve a merger or a merger-related exchange of shares.  It is informative, however, in that in initially rejecting class certification (*id.* at *18), Judge Ellison permitted plaintiffs to try again, with the epilogue being later certification of the post-spill class and a substantial class-wide settlement.

Nye cites indicating that short sales effectively "increase the float" and Ms. Allen cites

showing that stock owners can vote shares purchased from short sellers. *See* Exhibit G ¶28.

The only divergence is Defendants' claim that short sellers cannot invoke *Basic*'s

fraud on the market presumption, due to the "nature of their transactions."  However, on

this issue, Defendants cite ***no*** authority from within the Fifth Circuit, ***no*** decision entered

after 2004, and ***no*** appellate decision handed down after *Zlotnick v. TIE Commc'ns*, 836

F.2d 818 (3d Cir. 1988), their seminal case, which ***predated*** *Basic*.  *See* Opp. at 16-17.

As Defendants note (Opp. at 17), there is a split of authority, and the ***clear trend*** is

toward including short sellers in §10(b) classes.  Indeed, *Levy v. Guitierrez*, 448 F. Supp.

3d 46, 62 (D.N.H. 2019), highlights that their cited cases all flow from *Zlotnick*, an oft-

questioned decision whose underlying rationale was ***rejected*** by the Supreme Court in

*Halliburton II*.  *See id.* at 62 (citing *Halliburton II*, 573 U.S. at 273 ("But to indirectly rely

on a misstatement in the sense relevant for the *Basic* presumption, he need only trade stock

based on the belief that the market price will incorporate public information within a

reasonable period.")).  As the Seventh Circuit stated in *Schleicher v. Wendt*:

> Defendants' insistence that short sellers don't rely on the market price
> suggest that they misunderstand the efficient capital market hypothesis,
> which underlies the fraud-on-the-market doctrine. …  Short sellers play a
> role in aligning prices with information under any version of the efficient
> capital market hypothesis.  That the resulting price may be inaccurate does
> not detract from the fact that false statements affect it, and cause loss,
> whether or not any given investor read and relies on the false statement.
> That's all that *Basic* requires.

*Id.*, 618 F.3d 679, 684-85 (7th Cir. 2010) (affirming grant of class certification).[38]  Indeed,

---

[38]   *See also, e.g., Rougier*, 2019 WL 6111303 at *1 (certifying class of investors that "purchased or

courts overseeing merger-related §10(b) class actions reject defense attempts to exclude short sellers from the class or the fraud-on-the-market presumption at class certification – instead of at summary judgment or trial. *See, e.g.*, *In re Cooper*, 254 F.R.D. at 641.

Moreover, as Dr. Nye explains, virtually all settlement plans of allocation, including as approved by Fifth Circuit courts (as he cites), recognize that shares purchased to cover a short position are promptly returned to the investor who originally lent the shares to the short seller, which would lead to zero damages for the short seller under the out-of-pocket damages methodology. *See* Exhibit G ¶42. During the claims administration process, mechanical damages calculations match the earliest subsequent purchases and acquisitions of stock to fulfill the short position and do not permit such purchases / acquisitions to support damages recovery until the short position is fully covered. *Id.*[39] There is thus no need to exclude short sellers or their trading counter-parties from a class.[40] [41]

### B. The Market For McDermott Stock Remained Efficient

As upheld by multiple Court Orders, the §10(b) Class Period extends through

---

acquired" the stock or call options or that sold put options); *Schleicher v. Wendt*, No. 1:02-CV-1332-DFH-TAB, 2009 WL 761157, at *9 (S.D. Ind. Mar. 20, 2009), *aff'd*, 618 F.3d 679 (7th Cir. 2010) (certifying class after finding short sellers could still rely on the fraud on the market presumption to the extent harmed by the misconduct); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 296–97 (S.D.N.Y. 2003) (rejecting argument that fraud on the market presumption could not apply where an unusually large proportion of investors had more short positions than long positions). *Cf. also In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, 529 F. Supp. 2d 644 (S.D. Tex. 2006) (unconstrained short selling at rising rates during the class period evidenced market efficiency and helped trigger the fraud-on-the-market presumption).

[39] Ms. Allen **did not know what a plan of allocation was**, let alone whether one could address short positions. *See* 10BTr 223:3-12 (Q: "Have you ever seen a plan of allocation that accounts for short sellers?" A: "What's a plan of allocation?"). Her ignorance of this exceedingly common method of addressing short positions likely fueled her draconian market efficiency conclusion that short sellers had to be excluded from the §10(b) Class.

[40] If the Court disagrees and wants short *positions* expressly excluded, the §10(b) Class definition could be modified to do so. It would be an over-reaction to exclude "short sellers" themselves (as versus their short positions), as they may also have long positions.

[41] Ms. Allen claims investors might have speculated on the Merger's likelihood (Exhibit K §VI. B.), but conceded that they would have looked to the pre-Merger statements of company leadership to do so (*se*

January 23, 2020 (S¶4), with correctives pled through McDermott's bankruptcy filing and the resulting trading halt (*id.* ¶¶16-24).[42]  Defendants' latest attempt at blocking recovery by late-period §10(b) Class Members is to claim the market for McDermott stock was inefficient after September 18-19, 2019, by challenging "half" of the eight *Cammer /* *Krogman* factors (Opp. at 3, 19-20) and citing to Ms. Allen's report (Exhibit K ¶¶66-74).  Yet, she has **_never_** done a market efficiency analysis (*see* 14ATr 61:4-6) and **_does not opine_** that the market was *inefficient* after September 19, 2019 (*see* 10BTr 203:17-22).  She merely pokes at Dr. Nye's work, claiming certain factors are not consistent with market efficiency.  *Id.*  She did not state any set number of *Cammer / Krogman* factors had to be met (*id.* 206:6-12) and conceded that her report did not challenge four factors (*id.*207:18-24).[43]  On this slim foundation, without any case citation (Opp. at 20), Defendants declare the market was inefficient after September 19, 2019 and that *five* correctives, including McDermott's bankruptcy that wiped out shareholders, are comfortably off-limits.  Not so.

- *Analysts (Factor 2)*:    As Dr. Nye explains, equity analysts, business commentators, fixed-income analysts, and all three major credit rating agencies published on McDermott between September 18, 2019 and its bankruptcy.  *See* Exhibit G §VIII.A.[44]

---

10BTr 241:25-242:11).  She also claimed investors after September 18-19, 2019 were "on notice" that McDermott's bankruptcy was "potentially likely" – a rudimentary truth on the market defense – but could not define "potentially likely," conceded it was not definite, and conceded the corrective that day did not mention "bankruptcy" (*see* 10BTr 213:4-215:20, 222:17-23).  Defendants do not advance these positions.

[42]    *See* Dkt. Nos. 265 at 13; 268 at 2; 313 at 1.  Attempts to relitigate (Opp. at 18) should be rejected.

[43]    Defendants **do not contest** these other four factors: weekly volume (factor 1), market makers / arbitrageurs (factor 2), eligibility to file Form S-3 (factor 4), and float (factor 8).

[44]    Specifically: (i) Citi, UBS, and Credit Suisse issued four analyst reports and news commentators including *Bloomberg News* published about McDermott in late September 2019; (ii) Citi, Credit Suisse, and Deutsche Bank issued three analyst reports and news commentators including *Bloomberg* and *Dow Jones Institutional News* published about McDermott in early November 2019; (iii) fixed-income and other equity analysts, including Bloomberg Intelligence, Zacks Investment Research, Independent Credit

*See also* Exhibit P (list of analyst reports appended to Dr. Nye's report).  The argument in the Opp. at 19 and Ms. Allen's report, Exhibit K ¶¶66-69, is simply wrong.[45]

- *Cause & Effect (Factor 5)*:  As discussed *supra* and in NSHEPP's opening Memo (Dkt. No. 305-2 at 37-38), Dr. Nye used an event study (as Ms. Allen did in the *Beckel* case) to show a cause-and-effect relationship between McDermott-specific disclosures and resulting stock price movements.  Consistent with his methodology, he examined McDermott's lone post-September 19, 2019 earnings announcement and found the statistically significant price decline on November 5, 2019 aligns with expectations in an efficient market.  As he explains, Defendants' claim that the stock reacted similarly on event and non-event dates post-September 19, 2019, flows from faulty inclusion of nearly *any* day with *any* news on McDermott, regardless of subject, time of release, economic significance, or repetition. He gives examples of how Ms. Allen's methodology results in misclassification of event dates, rendering her conclusion unreliable. *See* Exhibit G §VIII.C.  The arguments in Opp. at 19 and Ms. Allen's report, Exhibit K ¶¶72-73, fail.

- *Market Capitalization (Factor 6)*: As Dr. Nye explains, McDermott's market capitalization was $287.1 million at the September 19, 2019 close; its later declines evidenced efficient market digestion of negative news; its market capitalization at 2019

---

Research, Egan Jones, and Bernstein published on McDermott between early November 2019 and late January 2020; (iv) S&P, Moody's, and Fitch reported on McDermott at least seven times and updated its credit rating several times between September 18, 2019 and January 23, 2020.  *Id.* ¶¶52-58.

[45]     *See KB Partners I, L.P. v. Barbier*, No. A-11-CA-1034-SS, 2013 WL 2443217, at *7–8 (W.D. Tex. June 4, 2013) (granting class certification and finding plaintiff's expert's opinion reliable where he stated that one to three analysts covered company along with additional media coverage which altogether supported market efficiency); *Buettgen v. Harless*, No. 3:09-CV-1049-K, 2011 WL 1938130, at *7 (N.D. Tex. May 19, 2011) (company followed by UBS, Credit Suisse, J.P. Morgan, and Merrill Lynch, others).

year-end was larger than 30% of NASDAQ-listed companies; and all relevant times, it exceeded the SEC minimum for Form S-3 eligibility.  Exhibit G §VIII.D.  Contrary to the Opp. at 19 and Ms. Allen's report, Exhibit K ¶74, the facts support market efficiency.[46] [47]

- *Bid / Ask Spread (Factor 7)*:  As Dr. Nye explains, McDermott's bid/ask spread was the smallest allowed for nearly all Class Period trading days, even after September 19, 2019, given constraints imposed by SEC Rule 612 under Regulation NMS (a/k/a the "Sub-Penny Rule"),[48] which Ms. Allen fails to address.  *See* Exhibit G §VIII.B.  Accounting for the rule, McDermott's average and median bid/ask spreads after September 19, 2019 were comparable to its spreads throughout the §10(b) Class Period and to those of randomly-sampled NYSE stocks.  Thus, contrary to the Opp. at 19 and Ms. Allen's report, Exhibit K ¶70, these facts support market efficiency.[49]

### C.  *Affiliated Ute* Applies

Contrary to the Opp. at 20-21, as per NSHEPP's opening Memo (Dkt. No. 305-2 at 39-40), *Affiliated Ute*'s presumption of reliance (pled in C¶410) applies.  *See, e.g.*, *Enron*, 529 F. Supp. 2d at 683 (a mix of misstatements and omissions does not *per se* preclude *Ute*

---

[46]    *See Barrie v. Intervoice-Brite, Inc.*, No. CIV.A. 3:01-CV-1071-, 2009 WL 3424614, at *12 (N.D. Tex. Oct. 26, 2009) (market capitalization of $300 million to $1.2 billion supported efficient market); *Oscar Priv. Equity Invs. v. Holland*, No. CIV. 3:03-CV-2761H, 2005 WL 877936, at *11 (N.D. Tex. Apr. 15, 2005), *order vacated sub nom. Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261 (5th Cir. 2007) (eligibility to file Form S-3 suffices for market capitalization factor to support an efficient market).

[47]    It bears noting that Defendants seek to capitalize on the market capitalization destruction caused by corrective disclosures revealing *their* alleged fraud, by circularly citing that decline as a basis to exclude those very correctives from the certified class of harmed investors – an argument intended *only* to discard five of the eight alleged correctives to shield *Defendants* from the huge litigation liability *they* caused.

[48]    Under this rule, McDermott's minimum bid/ask spread was $0.01/share from September 18, 2019 – November 7, 2019, and $0.0001/share thereafter.

[49]    *See Barrie*, 2009 WL 3424614 at *12 (0.5% bid/ask spread supported efficient market).  *Contra Krogman v. Sterrill*, 202 F.R.D. 467, 478 (N.D. Tex. 2001) (5.6% bid/ask spread suggested inefficiency).

presumption if allegations "primarily" concern omissions).[50]   That conclusion is even clearer if the Court were to credit (which it should not) Defendants' arguments seeking to cut the majority of correctives and correlating stock declines from the certified class.[51]

## IV.   ALL ALLEGED CORRECTIVES PASS MUSTER

Defendants claim *five* of eight Court-upheld correctives – two pled in the CCAC *41 months* ago and three pled in the Supplement *16 months* ago – must be excised from the certified class (Opp. at 20, 22-25).[52]   These arguments are inappropriately presented now.

> [I]n Amgen, the Court made clear that questions "common to the class" need not be proved at the class certification stage, so long as they are capable of common resolution. Here, the question of whether certain corrective disclosures are linked to the alleged misrepresentations in question is undeniably common to the class and is "susceptible of a class-wide answer."

*Ludlow*, 800 F.3d at 688 (citing *Amgen*, 568 U.S. at 469).[53]   If, *arguendo*, the Court considers them, *Defendants* bear the burdens of production and persuasion to prove lack of price impact by a preponderance of evidence.   *Halliburton*, 309 F.R.D. at 258-260; *Goldman Sachs Grp. v. Ark. Tchr. Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021).   As discussed

---

[50]   *See also In re Parmalat Sec. Litig.*, 2008 WL 3895539, at *8 (S.D.N.Y. 2008) (defendants "overstate" limitations on *Ute*, which applies where omissions "played an independent, or at least interdependent, role in the alleged fraud").

[51]   Having twice failed to challenge loss causation or damages at the Rule 12(b)(6) stage, Defendants transparently seek to use class certification to neuter investors in the Supplement's expanded Class Period. They seek to eliminate *five* disclosure / event dates – *see* §IV. *infra* – and if successful, the litigation would narrow to the Merger-tethered dispute they (falsely) claim was pled.   In that case, the $1 billion in *undisclosed* cost overruns and write-downs on the Cameron project – which prompted an ongoing SEC investigation (¶17) – would take on even greater prominence and the modified case contours would satisfy the standards for *Affiliated Ute*'s presumption of reliance even more clearly.

[52]   The pleadings of the eight corrective dates and correlating stock declines (C¶¶306-327; S¶¶16-24) speak for themselves, and Defendants' deficient summaries thereof (Opp. at 22-25) should be rejected.

[53]   *See also In re: BP p.l.c. Sec. Litig.*, No. 10-md-2185, 2014 WL 2112823, at *13 (S.D. Tex. May 20, 2014) ("fit between an alleged corrective event and an alleged fraudulent statement" is a loss causation argument, the failure of which to prove "is not, at present, an impediment to class certification," where plaintiffs are "to present a legally viable, internally consistent, and truly classwide *approach* to calculating damages" but whether they "properly execute[ ] under the approach is a question for a different day.").

*supra*, Ms. Allen rendered ***no opinion*** on price impact.  Defendants offer ***no evidence*** on that issue and thus ***fail*** to carry their burden.  Their arguments otherwise fail.

• *SEC Investigation*. The November 5, 2019 stock decline resulted ***both*** from McDermott's ***belated*** disclosure on November 4, 2019 of SEC's July 26, 2019 letter – received ***before*** their last misstatements (C¶¶213-216, 271-274, 301-304) – disclosing its investigation into their statements on the Cameron project ***and*** from Defendant Spence's abrupt resignation the next day.  *See* S¶¶17-18.[54]  Soon after, the U.S. Attorney sent a letter – which Defendants also concealed – stating that a Federal Grand Jury investigation was underway concerning Cameron.  *Id.* ¶35.  The SEC letter is an easy "match," *e.g.*, to Defendants' misstatements that Cameron was "de-risked" – including on July 31, 2019, ***five days after receipt of the SEC letter***, which ***concealed its existence*** (C¶216).  *See* Exhibit Q (citing C¶¶3-4, 11, 142(c)-(d), 148(c)-(d), 176, 216).  These allegations alone adequately plead a corrective under *Defendants'* authority.  *See Pub. Emps.' Ret. Sys. of Miss., P.R. Tchrs. Ret. Sys. v. Amedisys, Inc.*, 769 F.3d 313, 323 (5th Cir. 2014) (SEC and DOJ investigations, C-suite resignation, and other facts are a sufficient corrective).[55]

• *"Matched" / Mirror Image Correctives*.  Defendants otherwise claim (Opp.

---

[54]     In denying Defendants motion to dismiss the CCAC, Judge Hanks held that Defendants' scienter was evidenced, in part, by their failure to timely disclose the SEC's July 26, 2019 letter in their alleged misstatements in McDermott's July 29, 2019 SEC filings and earnings call or in any other public statements before November 3, 2019.  *See* Dk. No. 168 at 11, 22.  Defendants' attempt to now point to the *late timing* of the disclosure that ***they suspiciously delayed*** as a basis for discrediting it (Opp. at 25) should be rejected.

[55]     *See also In re Cobalt Int'l Energy, Inc.*, No. CV H-14-3428, 2016 WL 215476, at *6 (S.D. Tex. Jan. 19, 2016) (more probable than not that corrective disclosures regarding elevation of SEC and DOJ investigations caused at least a large part of price decline); *Parmelee v. Santander Consumer USA Holdings, Inc.*, No. 3:16-CV-783-K, 2018 WL 276338, at *6 (N.D. Tex. Jan. 3, 2018) (announcement that the SEC had an open comment letter on a fiscal report was partial corrective disclosure); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp., Inc.*, No. 6:12-1609, 2013 WL 1100819, at *5 (W.D. La. Mar. 15, 2013) (announcement of SEC investigation, along with other investigations, was a sufficient corrective).

at 23-24) the last five correctives are "unfit" and "decoupled" from the fraud due to a "fatal mismatch" in contents and "striking contrast" in specificity, as compared to the misstatements.  Their transparent goal is to eviscerate, with a penstroke, most of the stock declines at issue to insulate themselves as a matter of law against recovery by many thousands of McDermott shareholders.  They argue that correctives must be a *mirror image* of misstatements, *e.g.*, that McDermott's bankruptcy could ***only*** correct a statement saying it would not declare bankruptcy.  That is ***not*** the standard.  *See Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 230 (5th Cir. 2009) (vacating denial of class certification after emphasizing a corrective disclosure "need not precisely mirror an earlier misrepresentation").[56]  Even a non-exhaustive comparison-by-sampling of Court-upheld misstatements against the correctives reveals that they are sufficiently specified and aligned with one another as to pass muster at this stage. *See* Exhibit Q (chart prepared by counsel).[57]

## CONCLUSION

For these further reasons, NSHEPP respectfully asks the Court to grant its Motion.

---

[56]    *See also Amedisys*, 769 F.3d at 321-22 (corrective disclosure "must make the existence of the actionable fraud more probable than it would be without that alleged fact, taken as true") (citing *In re Williams Sec. Litig. – WCG Subclass.*, 558 F.3d 1130, 1140 (10th Cir.2009) (to be corrective, a disclosure need only relate back rather than precisely mirror earlier misrepresentation)); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 688 (5th Cir. 2014) (corrective disclosures "'make the existence of the actionable fraud more probable than it would be without that alleged fact (taken as true)'"); *Schott v. Nobilis Health Corp.*, 211 F. Supp. 3d 936, 950 (S.D. Tex. 2016) (correctives must be related to or relevant to alleged misrepresentations but need not precisely mirror them); *Parmelee*, 2018 WL 276338, at *6 (same); *Delaware Cnty. Emps. Ret. Sys. v. Cabot Oil & Gas Corp.*, No. CV H-21-2045, 2022 WL 3227584, at *10 (S.D. Tex. Aug. 10, 2022) (same).

[57]    Moreover, to "sever the link' with correctives, defendants must do more than point to the generic nature of misstatements and must instead submit expert evidence, lest plaintiff shoulder the burden of proving price impact.  *Goldman*, 141 S. Ct. at 1961-1963 (adding that "we have faith in our business model" versus "our fourth quarter earnings did not meet expectations" illustrate a mismatch making it "less likely that the specific disclosure actually corrected the generic misrepresentation").

Dated:    March 20, 2023             Respectfully submitted,

**POMERANTZ LLP**

*/s/Matthew L. Tuccillo*
Matthew L. Tuccillo
(S.D. Tex. Federal Bar # 1467939)
Jeremy A. Lieberman
(S.D. Tex. Federal Bar # 1466757)
Jennifer Banner Sobers
(*Admitted Pro Hac Vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: jbsobers@pomlaw.com

*Counsel for §10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan, Lead Counsel for the §10(b) Class, and Proposed §10(b) Lead Class Counsel*

**THE BRISCOE LAW FIRM, PLLC**

*/s/Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
1980 Park Oak Blvd.
Houston, TX  77056
Telephone: 713-752-2600
Facsimile: 832-201-9950
wbriscoe@thebriscoelawfirm.com

*Attorney-In-Charge, Counsel for §10(b) Lead Plaintiff Nova Scotia Health Employees' Pension Plan, Liaison Counsel for the §10(b) Class, and Proposed §10(b) Liaison Class Counsel*

31

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of March 2023, a true and correct copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing, as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Matthew L. Tuccillo*
Matthew L. Tuccillo