United States District Court
Southern District of Texas
**ENTERED**
September 11, 2023
Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MIRIAM EDWARDS, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:18-cv-04330 |
| | § | |
| MCDERMOTT INTERNATIONAL, INC., *et al.*, | § | |
| | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before me in this putative securities class action is the Section 14(a) Lead Plaintiff's Amended Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel ("Motion for Class Certification"). Dkt. 303. On May 24, 2023, I held a hearing on the Motion for Class Certification during which both sides presented expert testimony and voluminous exhibits. At the hearing, I requested supplemental briefing, which the parties provided via letters to the Court. *See* Dkts. 369–70. Having considered the parties' briefing, oral arguments, the record, and the applicable law, I recommend that the Motion for Class Certification be **DENIED**.

## BACKGROUND

The Court has already summarized the "pertinent factual allegations" in this litigation. *See Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-4330, 2021 WL 1421603, at *1–5 (S.D. Tex. Apr. 13, 2021). So, for efficiency's sake, I will be brief. This litigation concerns the 2018 merger of McDermott International, Inc. ("McDermott") with Chicago Bridge & Iron Company, N.V. ("CB&I"). Lead Plaintiff Public Employees' Retirement System of Mississippi ("Plaintiff") alleges that Defendants[1] made material misrepresentations and omissions in the Proxy and

---

[1] The Defendants are McDermott, David Dickson (McDermott's former President and Chief Executive Officer), Stuart Spence (McDermott's former Executive Vice President

Proxy Solicitations that were provided to McDermott's shareholders, which "misled McDermott's shareholders and deprived them of an informed vote." Dkt. 303 at 7–8. These misrepresentations and omissions concern four of CB&I's construction projects known at the "Focus Projects." Specifically, Plaintiff alleges that "the Focus Projects were expected to incur substantially higher costs than publicly represented"; that "CB&I overstated the fair value of these projects, and McDermott improperly assumed that the fair value of the Focus Projects as of the Merger Date was equal to their respective carrying values"; and that "McDermott's representations that they had conducted substantial due diligence on CB&I prior to the date of the Proxy Statement were false or misleading because even minimal due diligence did, or should have, revealed the true risks posed by the Focus Projects." Dkt. 98 at 11 (internal quotation marks omitted).

Judge George C. Hanks, Jr. denied Defendants' motion to dismiss back in April 2021. *See* Dkts. 162, 167. Discovery is ongoing, having been underway for the past two years. Plaintiff timely filed its Motion for Class Certification, seeking certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons and entities that were McDermott shareholders (including beneficial owners) as of April 4, 2018, the record date for McDermott shareholders to be eligible to vote on the Merger of McDermott and CB&I, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants herein, the officers and directors of McDermott and CB&I at relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

Dkt. 303 at 8. Plaintiff seeks the appointment of itself and Teamsters Local 813 Insurance Trust Fund, Local 813 Pension Trust Fund, and Local 1034 Pension Trust Fund (the "Funds") as Class Representatives; and the appointment of Wolf Popper LLP and Bernstein Litowitz Berger & Grossmann LLP as Class Counsel. *See*

---

and Chief Financial Officer), CB&I, and Patrick Mullen (CB&I's former President and Chief Executive Officer).

*id.* at 7. Defendants oppose class certification, though several issues—numerosity, commonality, typicality, the adequacy of Local 813 as Class Representative, superiority, and the adequacy of co-class counsel—are uncontested by the parties.

## LEGAL STANDARD

Rule 23 governs the inquiry of whether a proposed class should be certified. "[T]he Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted).

Rule 23(a) requires that any purported class meet four "prerequisites": numerosity, commonality, typicality, and adequacy of representation. *See Madison v. Chalmette Refining L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011). These prerequisites are necessary but not sufficient conditions for class certification. *See id.*

Rule 23(b) specifies three class types and sets out requirements—beyond those articulated in Rule 23(a)—for each. The putative class here seeks certification under Rule 23(b)(3), which permits class certification where "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

In considering a motion for class certification, I must "must rigorously consider both Rule 23(a)'s prerequisites and the Rule 23(b) class type." *Chavez v. Plan Benefit Servs. Inc.*, 957 F.3d 542, 546 (5th Cir. 2020). This rigorous analysis requires me "to go beyond the pleadings to determine whether the requirements of Rule 23 have been met: a court must understand the claims, defenses, relevant facts, and applicable substantive law in order to make a meaningful determination of the certification issues." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir.

3

2007) (quotation omitted). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

As part of this "rigorous analysis," I must ask whether the proposed class's damages model "measure[s] only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35. "Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged effect of the violation." *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (cleaned up) (applying *Comcast*'s rationale to a putative securities class action); *see also Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410–11 (5th Cir. 2017) ("*Comcast* held that when plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs must put forward a damages methodology that maps onto plaintiffs' liability theory. Our cases interpreting *Comcast* confirm that what *Comcast* demands is fit between plaintiffs' class-wide liability theory and plaintiffs' class-wide damages theory."). "Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action." *Comcast*, 569 U.S. at 33–34 (quotations omitted).

With these principles in mind, I turn to Plaintiff's Motion for Class Certification.

## ANALYSIS

### A.   WHETHER PLAINTIFF HAS STANDING TO BRING ITS CLAIMS

Before I analyze Rule 23's requirements, I must confront the antecedent question of whether Plaintiff is bringing a direct or derivative claim. The nature of Plaintiff's claim is relevant because, if Plaintiff's claim is derivative, Plaintiff must satisfy certain requirements before it can "step into the corporation's shoes." *Lewis*

*v. Knutson*, 699 F.2d 230, 238 (5th Cir. 1983) (discussing Rule 23.1's shareholder derivative standing requirements as a prudential aspect of standing). Specifically, Rule 23.1 requires that shareholders to a derivative action "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." FED. R. CIV. P. 23.1(b)(3). It is undisputed that Plaintiff has not satisfied Rule 23.1's procedural hurdles and thus cannot bring a derivative claim. Indeed, Plaintiff has consistently maintained that it is bringing *only* a direct claim. *See* Dkt. 142 at 34 (acknowledging that although "Section 14(a) claims sometimes may be properly plead[ed] derivatively on behalf of the corporation, here, Plaintiff alleges direct claims"); Dkt. 329 at 8 ("Plaintiffs Assert a Direct Section 14(a) Claim").

When the Court denied Defendants' motion to dismiss, it held that Plaintiff "is entitled to bring, and has pled, a direct claim." *Edwards*, 2021 WL 1421603, at *6. Defendants ask me to revisit this standing issue, arguing that "Plaintiff faces a threshold barrier to class certification because its only theory of class-wide damages confirms the derivative nature of its claim and its concomitant lack of standing to recover for such derivative harm." Dkt. 311 at 11. Plaintiff responds that (1) the Court already rejected this argument in denying Defendants' motion to dismiss; (2) the Court's motion to dismiss ruling constitutes the law of the case and cannot be revisited at class certification unless it was clearly erroneous; and (3) even if the issue is revisited, the Court's motion to dismiss ruling "was absolutely correct." Dkt. 370 at 2.

Thus, I must first determine whether it is procedurally proper to even consider the nature of Plaintiff's claim and the issue of standing at this juncture.

### 1. *The Law-of-the-Case Doctrine Does Not Bar My Consideration of Defendants' Standing Argument*

In its supplemental letter to me on this issue, Plaintiff recites one of my own memorandums and recommendations in which I stated that the "law-of-the-case

5

doctrine posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." *Id.* (quoting *Guerrero v. Mambo Seafood*, No. 4:19-cv-03059, 2021 WL 4483509, at *2 (S.D. Tex. Sept. 3, 2021)). This is a true statement in the abstract, but Plaintiff omits the rest of what I said in *Guerrero*: "'The law-of-the-case doctrine does not . . . set a trial court's prior rulings in stone, especially if revisiting those rulings will prevent error.' This is true even where . . . a successor judge replaces another judge." *Guerrero*, 2021 WL 4483509, at *2 (quoting *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997)). The same is also true where a district judge refers a motion to a magistrate judge to handle.[2] In fact, in *Guerrero* I recommended overruling a prior discovery ruling issued by a different district judge in the context of a subsequent motion to dismiss and for summary judgment. *See id.* Notably, Judge Hanks adopted that recommendation. *See id.*, *report and recommendation adopted*, 2021 WL 4481091 (S.D. Tex. Sept. 30, 2021).

Yet, Plaintiff argues that under Fifth Circuit precedent, I may only "consider upending the law of the case" if "'(1) the evidence on a subsequent trial was substantially different, (2) controlling legal authority has since made a contrary decision of the law applicable to such issues, or (3) the earlier decision was clearly erroneous and would [cause] manifest injustice.'" Dkt. 370 at 2 (quoting *McKay v. Novartis Pharm. Corp.*, 751 F.3d 694, 703 (5th Cir. 2014); *In re Ford Motor Co.*, 591 F.3d 406, 411–12 (5th Cir. 2009)). But the tripartite test that Plaintiff quotes concerns when a transferor district court may overturn the decisions of a multidistrict litigation ("MDL") transferee court on remand—a procedurally unique situation. *See Ford*, 591 F.3d at 411 ("The law of the case doctrine requires

---

[2] In a footnote Plaintiff argues that "a magistrate judge has no authority to reverse the decision of a district court." Dkt. 370 at 2 n.1 (quoting *PCM Leasing, Inc. v. BelGioioso Cheese, Inc.*, No. 16-cv-50076, 2019 WL 4567576, at *3 (N.D. Ill. Jul. 11, 2019)). This is a generally true statement of law, but it has no bearing on whether I can or should make a *recommendation* regarding Plaintiff's standing. The Court "may accept, reject, or modify, in whole or in part" my memorandum and recommendation. 28 U.S.C. § 636(b)(1)(C).

6

attention to the special authority granted to the multidistrict transferee judge and ensures that transferor courts respect the transferee court's decisions." (quotation omitted)). In multidistrict litigation, "widespread overturning of transferee court decisions would frustrate the principle aims of the MDL process and lessen the system's effectiveness." *Id.* Such concerns simply are not present here.

Outside of the unique MDL context, the law-of-the-case doctrine is changeable:

> [T]he law-of-the-case doctrine does not operate to prevent a district court from reconsidering prior rulings. *A court has the power to revisit prior decisions of its own in any circumstance*. The doctrine directs a court's discretion, it does not limit the tribunal's power. The law-of-the-case doctrine is a rule of convenience designed to prevent unnecessary reconsideration of previously decided issues. It is equally clear, though, that the rule yields to adequate reason.
>
> . . . An order denying [a motion to dismiss] is interlocutory, and leaves the trial court free to reconsider and reverse its decision *for any reason it deems sufficient*, even in the absence of new evidence or an intervening change in or clarification of the substantive law.

*Zarnow v. City of Wichita Falls*, 614 F.3d 161, 171 (5th Cir. 2010) (emphasis added) (cleaned up). Thus, it is clear that the law-of-the-case doctrine does not bar my consideration of Defendants' standing arguments. *See Pérez-Ruiz v. Crespo-Guillén*, 25 F.3d 40, 42 (1st Cir. 1994) ("Interlocutory orders, including denials of motions to dismiss, remain open to trial court reconsideration, and do not constitute the law of the case."); FED. R. CIV. P. 60(b)(6) ("[T]he court may relieve a party or its legal representative from a final judgment, order, or proceeding for . . . any other reason that justifies relief.").

Still, there are three additional reasons I am certain it is proper to consider the nature of Plaintiff's claim and the issue of standing. First, it is within a federal court's "discretion" at all times to "consider whether prudential standing principles nonetheless counsel against hearing the plaintiff's claims." *Cibolo Waste, Inc. v. City of San Antonio*, 718 F.3d 469, 474 & n.4 (5th Cir. 2013). Second, Rule 23.1 standing "does not overlap with the merits of the claim." *Lewis*, 699 F.2d at 238;

*see also In re Facebook, Inc., Initial Pub. Offering Derivative Litig.*, 797 F.3d 148, 157 (2d Cir. 2015) ("[A] derivative plaintiff who has not satisfied [a Rule 23.1] requirement is no proper party, whatever the merits of the underlying claims."). Third, "[a]s [the Fifth Circuit has] recognized, class certification may be the backbreaking decision that places 'insurmountable pressure' on a defendant to settle, even where the defendant has a good chance of succeeding on the merits." *Regents of Univ. of Cal. v. Credit Suisse First Boston (USA), Inc.*, 482 F.3d 372, 379 (5th Cir. 2007) (quoting *Castano v. Am. Tobacco*, 84 F.3d 734, 746 (5th Cir. 1996)). Accordingly, to certify a class without standing would be a monumental waste of judicial resources. Thus, it is not only proper but prudent for me to consider whether Plaintiff's claim is direct or derivative.

### 2. The "Direct vs. Derivative" Analysis

#### a. Delaware Law Determines Whether Plaintiff's Claim Is Direct or Derivative

Before I can begin to answer the "direct vs. derivative" question, I must first decide what body of law supplies the rule of decision. Neither party offered a rigorous choice-of-law analysis in their motion to dismiss briefing, though Defendants clearly argued for the application of federal common law. *See* Dkt. 124 at 32. Plaintiff argued for the application of Delaware law, *see* Dkt. 142 at 33 n.7,[3] and Defendants replied that the outcome would be the same whether the Court applied Delaware law or federal common law. *See* Dkt. 149 at 12–13.

"The question whether a particular suit is derivative or direct is not always capable of easy resolution." 7C FED. PRAC. & PROC. CIV. § 1821 (3d ed.). "In a diversity action, the determination will be made under state law; in suits in which the rights being sued upon stem from federal law, federal law will control the issue whether the action is derivative." 7C FED. PRAC. & PROC. CIV. § 1821 (3d ed.). "Because [§ 14(a)] is a federal statute, any common law rule necessary to effectuate

---

[3] McDermott is incorporated in Panama and the parties agree "that Panamanian courts . . . look to Delaware law." *Id.* (citing Dkt. 124 at 32–33 n.5).

8

a private cause of action under that statute is necessarily federal in character." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97 (1991). "It does not follow, however, that the content of such a rule must be wholly the product of a federal court's own devising." *Id.* at 98. To the contrary, there is a "presumption" that "federal courts should incorporate state law as the federal rule of decision, unless application of the particular state law in question would frustrate specific objectives of the federal programs." *Id.* (cleaned up). With this presumption in mind, it is clear that I must look to the law of the state of incorporation to determine whether Plaintiff's claim is direct or derivative.

Indeed, the Fifth Circuit has held that "[s]tate law determines whether a shareholder may maintain a nonderivative action." *Crocker v. Fed. Deposit Ins. Corp.*, 826 F.2d 347, 349 (5th Cir. 1987) (looking to Mississippi state law to determine whether a class of minority shareholders could maintain a direct RICO action against a bank's controlling shareholders). Although the *Crocker* panel was not dealing with a securities class action, later decisions from other federal circuits have reached the same conclusion regarding § 14(a) claims specifically. *See Freedman v. magicJack Vocaltec Ltd.*, 963 F.3d 1125, 1134 (11th Cir. 2020) (collecting cases and holding, in the context of a § 14(a) claim, "that federal courts should look to state law to decide the issue of whether a claim brought under a federal statute is direct or derivative"); *N.Y.C. Emps.' Ret. Sys. v. Jobs*, 593 F.3d 1018, 1022 (9th Cir. 2010) ("The characterization of a claim as direct or derivative is governed by the law of the state of incorporation.").

Defendants cite a trial court opinion from this district for the proposition "that federal common law governs the analysis of whether a shareholder is asserting a direct or derivative claim under Section 14(a)." *Rudolph v. Cummins*, No. H-06-02671, 2007 WL 1189632, at *2 n.4 (S.D. Tex. Apr. 19, 2007) (Harmon, J.). But *Rudolph* is at odds with the presumption articulated in *Kamen*, the Fifth Circuit's holding in *Crocker*, and the persuasive authority from other federal circuits issued after *Rudolph* was decided. *Rudolph* is also at odds with another

9

opinion issued by the same district court one month prior, in which the court held that "[w]hether a claim is derivative or direct is a matter of state law." *In re Enron Corp. Sec., Derivative & "ERISA" Litig.*, No. G-02-0299, 2007 WL 789141, at *2 (S.D. Tex. Mar. 12, 2007) (Harmon, J.) (citing *Crocker*, 826 F.2d at 349).[4]

I am persuaded by the Eleventh Circuit's reasoning in *Freedman*, which makes clear that the law of the state of incorporation should apply either way:

> It follows, therefore, that the rule directing a court to look to the law of the state or place of incorporation to answer the "direct vs. derivative" question is a logical one. After all, the law of the state or place where a company is incorporated establishes the requirements that a shareholder must meet before bringing either a direct or derivative claim against a corporation. For instance, if a shareholder wishes to bring a derivative claim, he must first make a demand on the corporation. . . . This is a prime example of why a court should look to the state or place of incorporation to fill in the gaps of federal law in assessing the parties' rights in corporate litigation.

*Freedman*, 963 F.3d at 1133. Thus, I will look to Delaware law to determine whether Plaintiff's claim is direct or derivative.[5]

### b. Plaintiff's Liability Theory Is Direct, but Its Claimed Damages Are Not

When looking to Delaware law to determine whether Plaintiff's claim is direct or derivative, I must begin with the Delaware Supreme Court's opinion in *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004).

> In *Tooley*, the Delaware Supreme Court . . . articulated the following test for determining whether a claim is derivative or direct: "The analysis must be based solely on the following questions: Who suffered the alleged harm—the corporation or the suing stockholder individually—and who would receive the benefit of the recovery or other remedy?" *Tooley*, 845 A.2d at 1035. According to the Delaware

---

[4] The difference is perhaps explained by the fact that *Enron* dealt with purely state law claims whereas *Rudolph*'s holding was addressed to a federal claim under § 14(a).

[5] To the extent Panamanian law might differ from Delaware law in the "direct vs. derivative" analysis, the parties have waived any such argument by arguing for the application only of Delaware law, should state law be applied. *See Fruge v. Amerisure Mut. Ins. Co.*, 663 F.3d 743, 747 (5th Cir. 2011) ("Failure to raise an argument before the district court waives that argument, including an argument for choice-of-law analysis.").

10

> Supreme Court, this approach is "to be applied henceforth in determining whether a stockholder's claim is derivative or direct." *Id.* at 1033. The court then clarified this test, stating:
>
>> The proper analysis has been and should remain that . . . a court should look to the nature of the wrong and to whom the relief should go. The stockholder's claimed direct injury *must be independent of any alleged injury to the corporation*. The stockholder must demonstrate that the duty breached was owed to the stockholder and that he or she can prevail *without showing an injury to the corporation*.
>
> *Id.* at 1039 (emphasis added).

*Smith v. Waste Mgmt., Inc.*, 407 F.3d 381, 384 (5th Cir. 2005) (citing *Tooley*). With the Fifth Circuit's explanation of *Tooley* in mind, I turn to the analysis of whether Plaintiff's claim is direct or derivative.

Plaintiff alleges that it "and other members of the proposed Class were denied the opportunity to make an informed decision when voting on the Merger." Dkt. 98 at 99. "Th[e Delaware Supreme] Court has recognized, as did the Court of Chancery, that *where it is claimed that a duty of disclosure violation impaired the stockholders' right to cast an informed vote, that claim is direct.*" *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 772 (Del. 2006) (emphasis added). That definitive statement seems to begin and end the "direct vs. derivative" inquiry. Of course, if it were that easy, I would have written a lot less leading up to this point.

Despite the Delaware Supreme Court's express acknowledgment in *J.P. Morgan* that a proxy disclosure claim is direct, the court upheld *dismissal* of such a claim because "plaintiffs cite[d] no authority that validate[d] conflating their individual direct claim of liability for a duty of disclosure violation with the compensatory damages flowing from the corporation's separate and underlying derivative claim." *Id.* at 773. Under Delaware law, "to plead a direct (non-derivative injury), a stockholder must demonstrate that the duty breached was owed to the stockholder *and* that she or she can prevail *without showing an injury to the*

11

*corporation.*" *Id.* at 769–70 (emphasis added) (quotation omitted). Stated differently, under Delaware law, a securities plaintiff has standing to assert a direct claim against a corporation only when the plaintiff's theory of liability *and* damages are *both* direct.

As the Court of Chancery has explained:

> It is possible for a claim to be both derivative and direct. To the extent that the Plaintiffs complain about the alleged impact on their ability to exercise their shareholder voting rights knowledgably, they present a direct claim. When, however, they assert that bad things happened to [the company] (i.e., financial disaster) because they were induced into voting for [the challenged action], the Plaintiffs have done nothing more than painted derivative claims with a disclosure coating. *To the extent that the Plaintiffs seek to recover for losses suffered by [the company], those claims are derivative in nature because any recovery would benefit the entity as a whole.*

*Thornton v. Bernard Techs., Inc.*, No. CIV.A 962-VCN, 2009 WL 426179, at *3 n.28 (Del. Ch. Feb. 20, 2009) (emphasis added) (citation omitted).[7] Plaintiff does not contest this legal landscape. Rather, Plaintiff seeks to distinguish its damages theory from all the cases cited by Defendant in which an admittedly direct voting rights claim was nevertheless dismissed for seeking derivative economic harm.

Plaintiff asserts that "[c]ontrary to Defendants' 'overpayment' argument, the alleged damages theory here focuses on the harm to **shareholders** due to the decline in **price of their shares**." Dkt. 329 at 10. But the problem with this argument is that a drop in Plaintiff's shares' price is "'an injury suffered by all [McDermott] shareholders in proportion to their pro rata share ownership.'" *Smith*, 407 F.3d at 385 (quoting *Manzo v. Rite Aid*, No. Civ. A. 18451–NC, 2002 WL 31926606, at *5 (Del. Ch. 2002), *aff'd*, 825 A.2d 239 (Del. 2003)). As the Fifth Circuit has explained in applying Delaware law:

> [W]hen a corporation, through its officers, [makes a material misstatement], thereby causing a decline in the company's share price

---

[7] *Thornton* was a shareholder suit against a company's directors following the company's Chapter 7 liquidation in bankruptcy court, but is nevertheless relevant insofar as Delaware law guides the "direct vs. derivative" analysis.

> when the truth is revealed, the corporation itself has been injured. Here, the harm that befell [Plaintiff]—the drop in share price caused by the untimely disclosure of unfavorable financial data—was a harm that befell all of [McDermott]'s stockholders equally. Stated differently, the misconduct alleged by [Plaintiff] did not injure [Plaintiff] or any other shareholders directly, but instead only injured them indirectly as a result of their ownership of [McDermott] shares. As such, [Plaintiff] cannot prove [its] injury without also simultaneously proving an injury to the corporation. Accordingly, in light of *Tooley*, . . . [Plaintiff]'s claims are derivative under Delaware law.

*Id.* (citing *Tooley*, 845 A.2d at 1033, 1035, 1039).

Plaintiff tries to avoid this inevitable result by relying on *Northstar Financial Advisors Inc. v. Schwab Investments* for the proposition that, in a derivative action, "'all current shareholders would participate in the recovery . . . even if they were not shareholders during the relevant time period, and injured former shareholders would not necessarily participate in the recovery at all." Dkt. 329 at 11 (quoting *Northstar Fin. Advisors Inc. v. Schwab Invs.*, 779 F.3d 1036, 1060 (9th Cir. 2015)). Plaintiff contrasts this scenario with its alleged damages—which would flow "to historical shareholders as of the Record Date eligible to vote on the Merger" as opposed to "all current shareholders"—in an attempt to demonstrate that its damages claim is direct. *Id.*

But *Northstar* dealt with whether investors could sue a mutual fund trustee directly under Massachusetts law for "failing to ensure that the Fund was managed in accordance with fundamental investment objectives and [for] changing the Fund's fundamental investment objectives without obtaining required shareholder authorization." 779 F.3d at 1056. *Northstar* has little to no applicability to this case. To the extent that *Northstar* discussed *Tooley* and Delaware law, it reaffirmed that "a corporate stockholder who brings a direct action 'must demonstrate that . . . [it] can prevail without showing an injury to the corporation." *Id.* at 1058–59 (quoting *Tooley*, 845 A.2d at 1039). In *Northstar*, "[t]he claim support[ed] a direct action because the impact [wa]s directly on the investors in

13

the Fund and a recovery would not be dependent on demonstrating an injury to the Schwab Trust." *Id.* at 1058. That is not the case here. That Plaintiff would restrict—via the class definition—the shareholders that can recover for the drop in stock prices does not change the fact that the stock price drops affected all shareholders equally and flows from harm done to McDermott.

Plaintiff offers only one case that addressed the issue at hand: *In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260 (S.D.N.Y. 2010). Plaintiff relies on *Bank of America* for the proposition that "if the value of the shareholder's shares decreases as a result of corrective disclosures, 'that decrease is not necessarily co-extensive with injury to the corporation,' and the shareholder has a direct claim." Dkt. 329 at 10 (quoting 757 F. Supp. 2d at 291–92). Plaintiff's reliance of *Bank of America* is misplaced. In denying Defendants' motion to dismiss the § 14(a) claims, the *Bank of America* court refused to certify the following question to the Delaware Supreme Court:

> Where a Delaware corporation issues its own shares in a stock-for-stock merger in exchange for shares held by the acquired company's shareholders, do acquiring company shareholders who were allegedly deprived of their right to cast an informed vote on the merger as a result of a materially false or misleading proxy solicitation—but who did not themselves buy, sell or exchange their shares in the merger—have a direct claim under Delaware law against the acquiring corporation and/or its officers or directors to recover damages for the post-merger decline in the market price of the acquiring company's shares when the allegedly misstated or omitted material facts were publicly disclosed?

757 F. Supp. 2d at 292. That is the *exact* question in this case.

Yet, the *Bank of America* court avoided answering it—concluding that it was "unnecessary" and allowing *both* direct and derivative § 14(a) claims to proceed based on the conclusory assertion that a "decrease [in the acquiring company's shares] is not necessarily co-extensive with injury to the corporation." *Id.* at 292. The court went on to certify a § 14(a) class of direct and derivative claims, refusing to revisit the issue of plaintiffs' damages model. *See In re Bank of Am. Corp. Sec.,*

14

*Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 281 F.R.D. 134, 140–42 (S.D.N.Y. 2012). The parties then settled (as parties are wont to do following class certification), thus ending any meaningful discussion of this novel theory before it could begin. *See In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, No. 09-md-2058, 2012 WL 13070626 (S.D.N.Y. Dec. 4, 2012). Thus, if anything, *Bank of America* stands as the non-answer to the standing question in this case.

### 3. *Plaintiff Lacks Standing Under Rule 23.1*

Defendants would have me find that Plaintiff's "only theory of class-wide damages confirms the derivative nature of its claim and its concomitant lack of standing to recover for such derivative harm." Dkt. 311 at 11. Persuasive as that argument is, it overlooks the fact that "Plaintiffs have ***always*** asserted damages based on the decline in the stock price," Dkt. 329 at 9, a theory this Court upheld in denying Defendants' Motion to Dismiss. Thus, the current law of the case compels a finding that the proposed class's damages model "measure[s] only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35.

But the law of the case is not the immovable mountain Plaintiff makes it out to be. The law of the case "yields to adequate reason." *Zarnow*, 614 F.3d at 171 (quotation omitted). This Court is "free to reconsider and reverse its [motion to dismiss] decision for any reason it deems sufficient." *Id.* (quotation omitted). Here, refusing to certify a class without standing strikes me as an adequate reason. So, I recommend the Court change the law of the case.

Plaintiff's theory of liability may be direct, but its damages claim is derivative. Delaware law does not permit Plaintiff to paint its derivative damages claim with a disclosure coating. There is no dispute that Plaintiff has not satisfied Rule 23.1's procedural requirements for bringing a derivative claim against McDermott. Accordingly, Plaintiff lacks standing under Rule 23.1 and its proposed class should not be certified.

B. **THE MISMATCH BETWEEN PLAINTIFF'S DIRECT LIABILITY THEORY AND DERIVATIVE CLAIM ALSO RUNS AFOUL OF THE PRIVATE SECURITIES LITIGATION REFORM ACT ("PSLRA") AND *COMCAST***

There is another reason the Court should change the law of this case. Defendants ask me to find that "Plaintiff runs afoul of *Comcast* by attempting to force the square peg of a Section 10(b) 'inflation ribbon' damages methodology into the round hole of Plaintiff's Section 14(a) claim." Dkt. 311 at 17. This, too, is a persuasive argument.[9] But as with Defendants' argument regarding Plaintiff's (lack of) standing, it overlooks that "Plaintiffs have ***always*** asserted damages based on the decline in the stock price," Dkt. 329 at 9, and this Court upheld that theory in denying Defendants' Motion to Dismiss. In doing so, this Court reasoned that

> "a plaintiff satisfies [Section] 14(a)'s loss causation requirement by demonstrating that [the] defendant's misrepresentations induced a disparity between the transaction price and the true investment quality of the securities at the time of the transaction." *In re AOL Time Warner, Inc. Secs. and ERISA Litig.*, 381 F. Supp. 2d 192, 231 (S.D.N.Y. 2004) (quotation marks omitted); *see also Mills*, 396 U.S. at 388–89 ("[M]onetary relief might be afforded to the shareholders [in a direct Section 14(a) action] if the merger resulted in a reduction of the earnings or earnings potential of their holdings."). Mississippi has pled facts sufficient to establish that the merger between McDermott and CB&I, and the misleading proxy materials that facilitated it, led to drastic drops in McDermott's stock price as the truth about the Focus Projects became known. (Dkt. 98 at pp. 86–94) These allegations are sufficient to plead loss causation.

*Edwards*, 2021 WL 1421603, at *6. I respectfully disagree.

---

[9] That Delaware law does not allow securities plaintiffs to graft a direct disclosure violation onto a derivative damages claim mirrors the requirement of the PSLRA that plaintiffs bringing private actions under the Securities Exchange Act of 1934 ["the '34 Act"] allege economic harm and "'*loss causation*,' *i.e.*, a causal connection between the material misrepresentation and the [economic harm]." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005) (quoting 15 U.S.C. § 87u-4(b)(4)). This requirement to plead loss causation bleeds into the Supreme Court's requirement that a proposed class's damages model at class certification "measure only those damages attributable to [its] theory [of liability]." *Comcast*, 569 U.S. at 35. Thus, the mismatch between Plaintiff's liability and damages theory not only reveals the derivative nature of Plaintiff's claim—it also highlights Plaintiff's failure to adequately allege loss causation, or to proffer a suitable damages model.

*Mills* and *AOL Time Warner* both dealt with § 14(a) claims by shareholders of the *acquired* company—a completely different posture than Plaintiff in this case. For example, in *AOL Time Warner*, the district court found that the plaintiff "adequately pled loss causation by alleging that during the Class Period, defendants' actions artificially propped up the price of [their] securities when they were *purchased, exchanged or otherwise acquired* by [the plaintiff] class members, causing [the plaintiff] and the Class to lose billions of dollars." 381 F. Supp. 2d at 231–32 (emphasis added).

But unlike *Mills* and *AOL Time Warner*, the proposed class here is based solely on share ownership *in the acquiring company*, and the proposed class definition is divorced from any transaction price. Specifically,

> Lead Plaintiff's expert, Dr. Michael Hartzmark, has detailed a common methodology through which each Class member's damages may be calculated based on the diminution in the value of McDermott shares, as measured by the stock price declines following the alleged corrective disclosures. As Dr. Hartzmark explains, damages based on the artificial inflation in McDermott's common stock prices can be determined for any member of the Class by applying the widely accepted "out-of-pocket" measure of damages. As set forth in the Hartzmark Report, damages can be calculated through an event study methodology that first determines the inflation in McDermott common stock based on the alleged corrective disclosures, and then estimates the share price inflation on each day during the period of April 4, 2018 through the announcement of McDermott's bankruptcy on January 21, 2020.

Dkt. 303 at 26–27 (citations omitted). The application of this stock-drop-loss theory to the facts of this case has no legal basis—no court has ever awarded damages under § 14(a) to the shareholders of an *acquiring* company based on a drop in their share prices. It is true, as Plaintiffs repeatedly note, that the *Bank of America* court certified a § 14(a) class of shareholders of an *acquiring* company. *See* 281 F.R.D. at 140–42. But, as discussed above, the *Bank of America* court certified a direct *and* derivative § 14(a) class, punting (twice) the opportunity to

17

address the very issue that Defendants raise here. The case settled before the court ever tackled the issue, so *Bank of America* offers no support to Plaintiff here.

Plaintiff argues that this dichotomy between acquiror/acquired company shareholders is "entirely novel." Dkt. 329 at 18. Yet Plaintiff has no support for the proposition that an out-of-pocket damages methodology can be superimposed onto a claim unconnected to a transaction. For example, in its reply brief, Plaintiff states: "'Out-of-pocket' losses are the standard measure of damages for Rule 10b–5 and Section 14(a) claims." Dkt. 329 at 14 n.6 (quoting *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 626 (D. Del. 2003)). The *Daimlerchrysler* court was quoting *Tse v. Ventana Medical Systems, Inc.*, which offered this definition: "Out-of-pocket losses are the standard measure of damages for a 10b–5 claim, and are defined as: 'the difference between the fair value of *all that the seller received* and the fair value of what he would have received had there been no fraudulent conduct.'" *Tse v. Ventana Med. Sys., Inc.*, 123 F. Supp. 2d 213, 222 (D. Del. 2000) (emphasis added) (quoting *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128, 155 (1972), *aff'd*, 297 F.3d 210 (3d Cir. 2002)). But here, no one *received* anything. Thus, the damages methodology Plaintiff proposes, regardless of how labeled, is *not* what courts mean when approving "out-of-pocket" loss methodologies.[10]

Plaintiff tries to avoid this conclusion by arguing that the "premise that shareholders of the acquiring company 'receive nothing' and 'merely hold' the acquiring company stock" is "erroneous." Dkt. 329 at 18. But this assertion is made without any legal support. Moreover, it is in stark contrast to one of the primary cases on which Plaintiff relies for support.

Plaintiff contends its loss causation theory was upheld in *In re Heckmann Corp. Securities Litigation*, No. 10-378, 2013 WL 2456104, at *8 (D. Del. June 6,

---

[10] The notion that plaintiffs must point to a transaction in order to bring a direct action is hardly novel. For example, § 10(b) plaintiffs' claims are considered direct because their alleged harm—*purchasing* their shares at artificially inflated prices—is "separate and distinct from any harm to [the company]." *City of Pontiac Gen. Emps.' Ret. Sys. v. Wal-Mart Stores, Inc.*, 278 F. Supp. 3d 1128, 1131 (W.D. Ark. 2017).

18

2013). Plaintiff cites *Heckmann* for the elementary proposition that an event study is "a generally accepted practice in determining market efficiency." *See* Dkt. 329 at 14; *see also* Dkt. 367 at 201–02 (citing *Heckmann* as one of "four cases . . . [where] the class of Section 14(a) shareholders were of the acquiring company in a merger"). Yet, the loss causation theory upheld in *Heckmann* derived from the plaintiffs' allegation "that the eligible Company shareholders were denied the IPO proceeds they would have received once the Company failed to complete a qualifying business transaction within the required twenty-four months." *In re Heckmann Corp. Sec. Litig.*, 869 F. Supp. 2d 519, 542 (D. Del. 2012). Loss of proceeds is a distinct harm that flowed directly to shareholders—it is easily distinguished from the "ordinarily" derivative harm that "a stockholder suffers from corporate action pursuant to a deceptive proxy solicitation." *J.I. Case v. Borak*, 377 U.S. 426, 432 (1964). Thus, *Heckmann* is unavailing to Plaintiff.

Plaintiff's reliance on *In re Alta Mesa Resources, Inc. Securities Litigation*, No. 4:19-cv-957 (S.D. Tex.), is similarly unavailing. In *Alta Mesa*, the § 14(a) plaintiffs alleged that the misleading proxy prevented them "from the fully informed opportunity to redeem their shares . . . valued in the Proxy at approximately $10 per share." *See id.* ECF No. 69 at 96 (Apr. 6, 2020). As in *Heckmann*, this is a quintessentially *direct* claim because the $10 per share subject to redemption is independent of any harm to the company's stock price.

Equally futile is Plaintiff's reliance on *In re EQT Corp. Securities Litigation*, No. 2:19-cv-754, 2022 WL 3293518 (W.D. Pa. Aug. 11, 2022). In *EQT*, the nature of plaintiffs' claims does not appear to have been challenged at either the motion to dismiss or the class certification stage. *See id.* (class certification); *In re EQT Corp. Sec. Litig.*, 504 F. Supp. 3d 474 (W.D. Pa. 2020) (motion to dismiss). Moreover, at the class certification stage, the *EQT* court declined to "assess the validity of Plaintiffs' damages model." 2022 WL 3293518, at *28. Thus, as with *Bank of America*, the refusal of a district court in another circuit to engage with

the challenges presented by Defendants here cannot stand for any proposition of relevance.

For all these reasons, Plaintiff's Motion for Class Certification should be denied.

## CONCLUSION

For the reasons explained above, I recommend that Plaintiff's Motion for Class Certification (Dkt. 303) be **DENIED**.[11]

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 11th of September 2023.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

---

[11] I think my recommendation on class certification, if adopted, means that Plaintiff's claims must be dismissed for lack of standing; but the parties can further brief that issue at the appropriate time.