## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated, | Case No.: 4:18-cv-04330 |
| Plaintiff, | **(Consolidated)** |
| v. | |
| MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, and STUART SPENCE, | |
| Defendants. | |

## THE SECTION 14(a) PLAINTIFFS' REPLY IN FURTHER SUPPORT OF RENEWED MOTION FOR CLASS CERTIFICATION, APPOINTMENT AS CLASS REPRESENTATIVES, AND APPOINTMENT OF CLASS COUNSEL

# TABLE OF CONTENTS

**Page(s)**

## <u>CONTENTS</u>

I.     INTRODUCTION .................................................................................... 1

II.    ARGUMENT ......................................................................................... 3

    A.    This Court Rejected Defendants' Derivative Standing Argument ............... 4

    B.    This Court Rejected Defendants' *Comcast* Challenges, Which All Fail ...................................................................................................... 4

        1.    This Court Squarely Rejected Defendants' Derivative Standing and Acquiring Company Challenges to *Comcast* .............. 7

        2.    Defendants' Remaining *Comcast* Challenges Are Premature Loss Causation Defenses and Only Prove that Plaintiffs' Methodology Can Be Commonly Applied ........................................ 8

    C.    MissPERS Is an Adequate Class Representative ........................................ 14

    D.    The Class Is Ascertainable and Predominance Is Satisfied ........................ 23

III.    CONCLUSION .................................................................................... 25

# TABLE OF AUTHORITIES

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

*7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*,
  38 F.3d 211 (5th Cir. 1994) .................................................................. 19, 21

*A.A. v. Phillips*,
  No. 21-30580, 2023 WL 334010 (5th Cir. Jan. 20, 2023) .................................... 23, 24

*In re Acuity Brands, Inc. Sec. Litig.*,
  No. 1:18-CV-2140-MHC, 2020 WL 5088092 (N.D. Ga. Aug. 25, 2020)................... 10

*In re Allstate Corp. Sec. Litig.*,
  No. 16 C 10510, 2020 WL 7490280 (N.D. Ill. Dec. 21, 2020) .................................... 9

*In re Alta Mesa Res., Inc. Sec. Litig.*,
   No. 4:19-cv-00957, slip op. 241 (S.D. Tex. Jan. 24, 2022) ......................................... 7

*Amorosa v. AOL Time Warner Inc.*,
  409 F. App'x 412 (2d Cir. 2011) (Sotomayor, J.), *cert. denied sub nom*,
  *Amorosa v. Ernst & Young, LLP*, 564 U.S. 1013 (2011)................................................ 6

*In re Anadarko Petroleum Corp. Sec. Litig.*,
  No. 4:20-cv-00576, 2022 WL 4544235 (S.D. Tex. Sept. 28, 2022)............................ 7

*Audet v. Fraser*,
  332 F.R.D. 53 (D. Conn. 2019) .................................................................................. 12

*In re Bank of Am.*,
  281 F.R.D. 134 (S.D.N.Y. 2012) ......................................................................... 7, 12

*In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act
  (ERISA) Litig.*,
  757 F. Supp. 2d 260 (S.D.N.Y. 2010)........................................................................... 7

*In re BP p.l.c Sec. Litig.*,
  No. 10–md–2185, 2014 WL 2112823 (S.D. Tex. May 20, 2014) ........................... 8, 11

*In re CenturyLink Sales Prac. & Sec. Litig.*,
  337 F.R.D. 193 (D. Minn. 2020)................................................................................. 11

*Cherry v. Dometic Corp.*,
  986 F.3d 1296 (11th Cir. 2021) .................................................................................. 24

ii

*City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*,
No. 17-cv-00554-YGR, 2018 WL 4931543 (N.D. Cal. Oct. 11, 2018) ..................... 11

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
No. 18-cv-04844-BLF, 2022 WL 1459567 (N.D. Cal. May 9, 2022) ........................ 11

*City P'ship Co. v. Jones Intercable, Inc.*,
213 F.R.D. 576 (D. Colo. 2002) ................................................................ 19

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ............................................................................ passim

*In re Daimlerchrysler AG Sec. Litig.*,
294 F. Supp. 2d 616 (D. Del. 2003) .............................................................. 7

*Di Donato v. Insys Therapeutics, Inc.*,
333 F.R.D. 427 (D. Ariz. 2019) ................................................................ 11

*Edwards v. McDermott Int'l, Inc.*,
2021 WL 1421603 (S.D. Tex. Apr. 13, 2021) .................................... 4, 5, 8

*In re EQT Corp. Sec. Litig.*,
No. 2:19-cv-00754-RJC, 2022 WL 3293518 (S.D. Tex. Aug. 11, 2022) .................... 7

*Erica P. John Fund, Inc. v. Halliburton Co.*,
563 U.S. 804 (2011) ............................................................................. 9

*Goldkrantz v. Griffin*,
No. 97 CIV. 9075(DLC), 1999 WL 191540 (S.D.N.Y. Apr. 6, 1999) ........................ 7

*Guenther v. BP Ret. Accumulation Plan*,
No. 4:16-CV-00995, 2021 WL 1216377 (S.D. Tex. Mar. 12, 2019) ........................ 23

*In re Heckmann Corp. Sec. Litig.*,
No. 10–378–LPS–MPT, 2013 WL 2456104 at *8 (D. Del. June 6, 2013).................... 7

*J.I. Case Co. v. Borak*,
377 U.S. 426 (1964) ........................................................................ 6, 18

*Kelly v. RealPage, Inc.*,
47 F.4th 202 (3rd Cir. 2022) .................................................................. 24

*Levy v. Gutierrez*,
448 F. Supp. 3d 46 (D.N.H. 2019) ............................................................ 23

*Long Island Lighting Co. v. Barbash*,
   779 F.2d 793 (2d Cir. 1985)...................................................................... 21

*Ludlow v. BP, P.L.C.*,
   800 F.3d 674 (5th Cir. 2015), *cert. denied,* 578 U.S. 959 (2016)............................ 5, 7

*McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*,
   52 F.3d 1330 (5th Cir. 1995) ................................................................... 12

*Mills v. Elec. Auto-Lite Co.*,
   396 U.S 375 (1970)............................................................................. 6, 19

*Mullins v. Direct Digit., LLC.*,
   795 F.3d 654 (7th Cir. 2015) ................................................................... 24

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.*, *PLC*,
   2016 WL 7409840 (S.D.N.Y. Nov. 4, 2016) ..................................................... 11

*New Jersey and Its Div. of Inv. v. Sprint Corp.*,
   314 F. Supp. 2d 1119 (D. Kan. 2004) ........................................................... 7

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022), *cert. denied sub nom*, *Starkist Co. v. Olean
   Wholesale Coop., Inc.*, --U.S. --, 143 S. Ct. 424 (2022) ...................................... 25

*Pirnik v. Fiat Chrysler Autos., N.V.*,
   327 F.R.D. 38 (S.D.N.Y. 2018) ................................................................. 11

*Randall v. Loftsgaarden*,
   478 U.S. 647 (1986)............................................................................ 13

*In re Real Estate Assocs. Ltd. P'ship Litig.*,
   223 F. Supp. 2d 1142 (C.D. Cal. 2002) ......................................................... 7

*In re Reliant Sec. Litig.*,
   MASTER FILE NO. H–02–1810, 2005 WL 8152605 (S.D. Tex. Feb.
   18, 2005) ................................................................................. 21, 23, 24

*Ret. Sys. v. Southern Co.*,
   332 F.R.D. 370 (N.D. Ga. 2019)................................................................ 10

*Roofer's Pension Fund v. Papa*,
   333 F.R.D. 66 (D.N.J. 2019).................................................................... 11

*Rooney v. EZCORP, Inc.*,
   330 F.R.D. 439 (W.D. Tex. 2019) ............................................................... 7

*Rougier v. Applied Optoelectronics, Inc.*,
No. 4:17-cv-02399, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ...................... 5, 22

*SEB Inv. Mgmt. AB v. Symantec Corp.*,
335 F.R.D. 276 (N.D. Cal. 2020) ................................................................................ 10

*Seeligson v. Devon Energy Prod. Co.*,
761 F. App'x 329 (5th Cir. 2019) .............................................................................. 24

*Seeligson v. Devon Energy Prod. Co., L.P.*,
753 F. App'x 225 (5th Cir. 2018) (unpublished per curiam) ...................................... 23

*In re Signet Jewelers Ltd. Sec. Litig.*,
No. 16 Civ. 6728 (CM), 2019 WL 3001084 (S.D.N.Y. July 10, 2019) ..................... 11

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ............................................................................................... 5, 18

*Vrakas v. United States Steel Corp.*,
No. 17-579, 2019 WL 7372041 (W.D. Pa. Dec. 31, 2019) ........................................ 11

*In re Willis Towers Watson PLC Proxy Litig.*,
No. 1:17-cv-1338, 2020 WL 5361582 (E.D. Va. Sep. 4, 2020) ................................. 12

*Wilson v. LSB Indus.*,
15 Civ. 7614 (RA), 2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018) ........................... 11

STATUTES AND RULES

Fed. R. Civ. P.:

Rule 23 ...................................................................................... 1, 14, 23, 24, 25

Rule 23(B)(3) ................................................................................................. 8, 25

Rule 425 ............................................................................................................. 18

Securities and Exchange Act of 1934:

15 U.S.C. §78c ................................................................................................... 22

15 U.S.C. §78c(a)(10) ........................................................................................ 22

§14(a), 15 U.S.C. §78n(a) ......................................................................... passim

Securities and Exchange Commission Rule 10b-5,
17 C.F.R. §240.14a-9 ................................................................................. 5, 7, 18, 22, 23

**OTHER AUTHORITIES**

64 Fed. Reg. 61408 at 61411, 61415, 61434 (Nov. 10, 1999) ................................... 18, 20

No. 33-11131, 2022 WL 16834029, at *18 (Nov. 2, 2022) ........................................ 18, 19

SEC, Briefing Paper, Roundtable on Proxy Voting Mechanics, available at
http://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm (last
modified May 23, 2007) ................................................................................................. 21

## I.      INTRODUCTION

Defendants' opposition brief ("D.Br.") repeats arguments that are unrelated to Rule 23's requirements and have been rejected by this Court, concedes that 14(a) Plaintiffs[1] have satisfied Rule 23's elements of numerosity, commonality, typicality, and superiority; and that the Teamsters Funds and proposed Class Counsel are adequate to represent the Class. Defendants' few remaining challenges to certification all fail.

In their opposition to the Renewed Class Motion, Defendants chose to refile their prior briefing, leaving in arguments already rejected by this Court on September 29, 2023 (Dkt. 410). *Compare* D.Br. *with* Dkt. 311. Defendants' derivative standing arguments have already been twice rejected and are not properly raised as they are not "focuse[d]" on Rule 23's requirements, as ordered by this Court. Dkt. 410. *See infra* Sec. II.A. Defendants also repeat their argument that Plaintiffs' standard damages methodology does not satisfy *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) because the damages theory is supposedly derivative in nature and cannot be applied in circumstances where the Class is comprised of shareholders in an acquiring company. These arguments conflict with this Court's 14(a) MTD Opinion and prevailing law, were rejected by this Court's September 29, 2023 Order, and also are not focused on Rule 23's predominance requirement as set forth in *Comcast*.

---

[1] All defined terms and references to "¶__" and "Ex." shall have the same meaning as in the Renewed Motion for Class Certification ("Br."; Dkt. 472). Citations to "Reply Ex." are to exhibits to the Declaration of Matthew Insley-Pruitt in Further Support of The Section 14(a) Lead Plaintiffs' Renewed Motion for Class Certification, Appointment As Class Representatives, and Appointment of Class Counsel. References to "Allen ¶__" are to the Expert Report of Lucy Allen, dated December 15, 2022, submitted by Defendants (Dkt. 311-2). Unless otherwise indicated, all emphasis is added and internal quotations and citations are omitted.

*See infra* Section II.B.1.[2] As many courts have previously held, 14(a) Plaintiffs' methodology is the standard approach for calculating damages in securities class actions, matches the theory of liability, and easily satisfies *Comcast's* modest requirements.

Defendants raise only two interrelated arguments not already decided, both concerning MissPERS' securities lending practices. Both should be rejected, the 14(a) Class should be certified, and 14(a) Plaintiffs and their counsel should be appointed Class Representatives and Class Counsel.

Specifically, Defendants repeat their unsupported argument that 14(a) Lead Plaintiff MissPERS lacks standing to bring a Section 14(a) claim (and is therefore an inadequate Class Representative) because MissPERS, through a securities lending program operated by its custodial bank, lent out its McDermott shares as of the April 4, 2018 Record Date and did not vote its shares on the Merger Date. As an initial matter (and as described in 14(a) Plaintiffs' Renewed Class Motion, at 2, 13), this argument poses no barrier to certification because it does not apply to the Teamsters Funds, whose adequacy as a Class Representative is unchallenged.

More importantly, this argument fails on its merits. It is uncontested that MissPERS was a beneficial owner of 167,252 shares of McDermott common stock as of the Record and Merger Dates, held stock through a corrective disclosure, and suffered significant financial injury as a result. It is also uncontested that, because reliance is not an element of Section 14(a), courts are clear that a plaintiff need not have voted at all, or voted in a certain

---

[2] 14(a) Plaintiffs briefly address Defendants' resolved arguments herein and otherwise refer to their First 14(a) Class Reply (Dkt. 329) and Objection to the M&R (Dkt. 403) for fuller discussion.

way, in order to have standing to prosecute a Section 14(a) claim.

All that is relevant is whether a plaintiff's right to make an informed voting decision—which includes whether to vote at all, to vote in a specific manner, or whether to recall lent shares to vote them—was harmed as a result of misrepresentations made by Defendants in the Proxy Solicitations. MissPERS suffered a clear harm to its right to an informed vote on the Merger due to the multiple, sustained Proxy Solicitation misrepresentations that were made during the time that MissPERS could recall its shares to vote them. Defendants repeatedly made false and misleading Proxy Solicitation misrepresentations between December 18, 2017 and April 4, 2018, the window of time for MissPERS to recall its shares and vote them. These misrepresentations deprived MissPERS and all similarly situated Class Members of information necessary to make an informed voting decision, and that is all that Section 14(a) requires. *See infra* Section II.C. Finally, Defendants' challenges to "ascertainability" also fail. First, there is a simple way to identify Class members who engaged in securities lending by consulting documents maintained by their custodial bank. Second, in any event, there is simply no need to perform that exercise because such investors are properly part of the class. *See infra* Section II.DD.

## II.   ARGUMENT

In their refiled brief, Defendants ignore this Court's rejection of the M&R and once again argue that Plaintiffs are asserting a derivative claim rather than a direct claim and that the damages methodology does not satisfy *Comcast*. D.Br. 4-8. For completeness, 14(a) Plaintiffs will briefly describe why these arguments should be rejected, and refer to

the prior briefs and orders filed over the past two years for a full response.[3]

### A.    This Court Rejected Defendants' Derivative Standing Argument

This Court properly held over two years ago that Plaintiffs' §14(a) claim is direct and not derivative. §14(a) MTD Opinion, 2021 WL 1421603, at *6 (allegations regarding the denial of an opportunity to cast an informed vote "allow Mississippi to plead a direct claim, and it has done so"). Defendants again argued in response to the First 14(a) Class Motion that 14(a) Plaintiffs asserted a derivative claim, and therefore lacked standing. Dkt. 311. While the M&R "recommend[ed] the Court change the law of the case" to find that 14(a) Plaintiffs did not have standing on this basis (Dkt. 387 at 15), this Court rejected the M&R (Dkt. 410). For all the reasons stated in the First 14(a) Class Reply, as well as in 14(a) Plaintiffs' supplemental briefing (Dkt. 370) and 14(a) Plaintiffs' Objection to the M&R (Dkt. 403 at 2-5), this Court's prior decisions should not be disturbed.

### B.    This Court Rejected Defendants' *Comcast* Challenges, Which All Fail

14(a) Plaintiffs' proposed damages methodology is consistent with its sustained theory of liability and satisfies the requirements of *Comcast*. The 14(a) MTD Opinion recognized that 14(a) Plaintiffs satisfied loss causation by alleging "facts sufficient to establish that the merger between McDermott and CB&I, and the misleading proxy materials that facilitated it, led to drastic drops in McDermott's stock price as the truth

---

[3] *See generally* 14(a) Plaintiffs' Opposition to Motion to Dismiss (Dkt. 142); *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421603, at *6 (S.D. Tex. Apr. 13, 2021); First §14(a) Class Reply (Dkt. 329); 14(a) Class Hearing (Dkt. 367); 14(a) Plaintiffs' Post-Hearing Submission Regarding Direct and Derivative Claims (Dkt. 370); 14(a) Plaintiffs' Objections to the Magistrate Judge's September 11, 2023 Memorandum and Recommendation (Dkt. 403); Order Rejecting Magistrate Judge's Memorandum and Recommendation (Dkt. 410).

about the Focus Projects became known." §14(a) MTD Opinion 2021 WL 1421603, at *6. In its First 14(a) Class Motion and Reply, the 14(a) Plaintiffs, through their expert, presented a primary damages methodology that matched the sustained theory of liability, which is all that *Comcast* requires. This Court thereafter rejected Defendants' *Comcast* challenges and the M&R's recommendation that Plaintiffs' "application of this stock-drop-loss theory to the facts of this case has no legal basis" (M&R at 17). Dkt. 410. In their Renewed Class Motion, the 14(a) Plaintiffs once again presented a class-wide damages model subject to a common methodology and tied directly to their theory of liability.

*Comcast* requires only that Plaintiffs provide a damages methodology that is "consistent" with their theory of liability. 569 U.S. at 35, 37 (rejecting damages model that focused on market distortions that no longer "remained in the case"); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015), *cert. denied*, 578 U.S. 959 (2016) (holding *Comcast* only requires, "[a]s a conceptual matter," that "each plaintiff's theory of damages remains tied to a theory of liability common to all plaintiffs"). *Comcast* does not require that damages be calculated with "certainty," only that plaintiffs show the "ability" to calculate (but not the actual calculation of) class-wide damages. *See id.* at 683, 685, 689; *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *18 (S.D. Tex. Nov. 13, 2019) (rejecting *Comcast* arguments and holding that plaintiffs OOP damages model was "consistent" with the theory of liability).

In this context, the calculation of damages for violations of Section 14(a) is flexible because Section 14(a) has no statutory damages formula; the Supreme Court has repeatedly recognized Rule 14a-9's "broad remedial" and "prophylactic" purposes. *TSC Indus., Inc.*

*v. Northway, Inc.*, 426 U.S. 438, 448 (1976); *see, e.g. Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 386 (1970) (courts should "exercise the 'sound discretion which guides the determinations of courts of equity" and "provide such remedies as are necessary to make effective the congressional purpose" of Section 14(a)); *J.I. Case Co. v. Borak*, 377 U.S. 426, 433-35 (1964) ("[I]t is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose . . . . [F]ederal courts have the power to grant all necessary remedial relief" under Section 14(a), and "[w]hatever remedy is necessary must await the trial on the merits.").

As described in the Renewed Class Motion, 14(a) Plaintiffs presented expert testimony setting forth a common methodology to measure "'out-of-pocket' loss" damages (also referred to as "stock price inflation" damages) that clearly aligns with 14(a) Plaintiffs' theory of liability under §14(a). *See* Renewed Class Motion, at 19-23; Ex. 5, ¶¶47-53; Ex. 6 at 2-8; Ex.7, ¶¶3-7.[4] *See also, e.g.*, *Mills*, 396 U.S. at 389 (shareholders asserting direct §14(a) claim may recover damages based on the "reduction of the earnings or earnings potential of their holdings"); *Amorosa v. AOL Time Warner Inc.*, 409 F. App'x 412, 415 (2d Cir. 2011) (Sotomayor, J.), *cert. denied sub nom*, *Amorosa v. Ernst & Young, LLP*, 564 U.S. 1013 (2011) (recognizing that, under §14(a), a plaintiff may recover damages for "his stock['s] lost value when [the company's] share prices fell as information concerning [the company's] accounting practices was gradually disseminated to the public") (affirming

---

[4] In addition, 14(a) Plaintiffs have also proposed an alternative methodology measuring rescissory damages, which Defendants have not directly challenged. *See* Renewed Class Motion, at 21, n.6; Ex. 5, ¶52 n.46; Ex.7, ¶22 n.26.

6

dismissal on unrelated basis); *In re EQT Corp. Sec. Litig.*, 2022 WL 3293518, at \*10 (S.D. Tex. Aug. 11, 2022) & Dkt. 141-4, ¶¶227-29 (Dkt. 329-5)) (certifying a class of acquiring company shareholders as of the proxy record date following submission of expert report opining that §14(a) damages could be calculated through an OOP analysis measuring "[s]hare price declines caused by corrective disclosures . . . using event study analysis").[5]

14(a) Plaintiffs' damages methodology is therefore "sound" and "produce[s] commonality of damages"—all that is required in this Circuit to satisfy *Comcast. See Ludlow*, 800 F.3d at 683, 685; *see also In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at \*6 (S.D. Tex. Sept. 28, 2022) ("damages at the class-certification stage needn't be exact"); *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 451 (W.D. Tex. 2019) (rejecting defendants' "extremely conclusory complaints" that plaintiff's expert failed to account for all variables that may arise).

### 1. This Court Squarely Rejected Defendants' Derivative Standing and Acquiring Company Challenges to *Comcast*

By rejecting the M&R, this Court rejected Defendants' arguments that 14(a)

---

[5] *See also In re Bank of Am. Corp. Sec., Derivative, & Emp. Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 292 (S.D.N.Y. 2010) (noting that §14(a) plaintiffs bringing a direct claim "could show a diminution in the value of the shares that they held which was not due to an injury inflicted upon BofA") (later certifying §14(a) class on behalf of acquiring company shareholders, 281 F.R.D. 134, 137 (S.D.N.Y. 2012)); *New Jersey and Its Div. of Inv. v. Sprint Corp.*, 314 F. Supp. 2d 1119, 1142 (D. Kan. 2004) (sustaining direct §14(a) claim because there was "clearly a connection between the [corporate action voted upon] and plaintiff's injury in that the stock price declined after the conflict of interest was revealed"); *In re Daimlerchrysler AG Sec. Litig.*, 294 F. Supp. 2d 616, 626 (D. Del. 2003) ("'Out-of-pocket' losses are the standard measure of damages for Rule 10b–5 and Section 14(a) claims."); *In re Real Estate Assocs. Ltd. P'ship Litig.*, 223 F. Supp. 2d 1142, 1152 (C.D. Cal. 2002) (for a direct §14(a) claim, "generally, a plaintiff's injury will be the diminution in the value of his or her investment"); *Goldkrantz v. Griffin*, 1999 WL 191540, at \*8 (S.D.N.Y. Apr. 6, 1999) ("standard" measure of damages for a direct §14(a) claim based on the "decrease in value" of the stock).

Plaintiffs' damages methodology does not satisfy *Comcast* because Plaintiffs' theory of liability was derivative in nature. This argument was also grounded in the related assertion that there could be no direct remedy for a Class of shareholders of McDermott on the grounds that McDermott acquired CB&I in the Merger. §14(a) MTD Opinion, 2023 WL 5916598, at *9-11.[6] This Court rejected the M&R in its entirety, and those arguments, restated verbatim in Defendants' opposition brief (D.Br. 9-16) should be disregarded as moot. *See* First 14(a) Class Reply at 9-13 (explaining why Defendants' arguments fail); 14(a) Class Hearing at 63:12-92:6; 105:20-122:20; 194:17-195:5, 198:23-199:20; 201:2-15; 203:10-204:6; 205:1-8 (same).

> ## 2. Defendants' Remaining *Comcast* Challenges Are Premature Loss Causation Defenses and Only Prove that Plaintiffs' Methodology Can Be Commonly Applied

"[T]he focus of the 23(b)(3) class certification inquiry—predominance—is not whether the plaintiffs will fail or succeed, but whether they will fail or succeed together." *In re BP p.l.c Sec. Litig.*, 2014 WL 2112823, at *7 (S.D. Tex. May 20, 2014). At the merits stage of this litigation, when the parties will exchange expert opinions on damages and causation in 2024 (*see* Dkt. 453), the parties' experts will address the specific application

---

[6] Defendants' argument that this methodology cannot apply to classes of acquiring company shareholders under Section 14(a) had no legal basis.  Not only does the language of the statute not make any such distinction, but no court has ever made such a finding, where, in contrast, several courts—including this Court—certified and sustained classes of such shareholders and have not carved those claims out or made any distinction like the one suggested by Defendants. *See, e.g., In re Heckmann Corp. Sec. Litig.*, 2013 WL 2456104 at *8 (D. Del. June 6, 2013) (certifying § 14(a) class of shareholders in acquiring company); *EQT*, 2022 WL 3293518, at *10 (same); *Bank of Am.*, 281 F.R.D. at 140-42, 148-49 (same); *In re Alta Mesa Res., Inc. Sec. Litig.*, No. 4:19-cv-00957, Dkt. 241 (S.D. Tex. Jan. 24, 2022).

of 14(a) Plaintiffs' damages methodology. In their opposition, Defendants and their expert witness raise several premature and hypothetical critiques of potential approaches 14(a) Plaintiffs' expert may (or may not) adopt at the merits stage. Specifically, Defendants and Ms. Allen pose questions concerning whether and how 14(a) Plaintiffs' expert would (a) apply dollar or percent inflation; (b) apply "LIFO" or "FIFO" accounting to Class member shares; and (c) offset recoverable Class damages against any pre-Merger CB&I shares held by Class members. D.Br. 18-20.

Ms. Allen's critiques misconstrue the calculation of damages and 14(a) Plaintiffs' theory of the case (Hartzmark Reply ¶¶28-29), something she is known to have done before. *See In re Allstate Corp. Sec. Litig.*, 2020 WL 7490280, at *4-6 (N.D. Ill. Dec. 21, 2020) (discrediting Allen's opinions related to certification, finding that she "fundamentally misunderstands plaintiffs' allegations and theory of the case," and that "Allen's report is simply not responsive to the allegations in the complaint").[7]

Ms. Allen's critiques fail for two primary reasons. First, they all raise premature attacks on the issue of loss causation, which the Supreme Court has squarely held need not be shown to obtain class certification. *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 815 (2011). Second, as 14(a) Plaintiffs' expert explains, regardless of which

---

[7] As explained in detail in Dr. Hartzmark's Reply Report, Ms. Allen's unsworn expert report is rife with errors and she lacks any expertise in the area of the calculation of damages. She conceded that she could not identify by name a single instance where she previously opined on damages (save for the one instance that was consistent with Plaintiffs' methodology) (Reply Ex. 12, Allen Dep. Tr. 104:2-105:25; 152:23-168:17; 170:10-174:21), conceded that she wrongly attributed quotes about MissPERS' securities lending to an agreement (*id.* at 212:1-217:3), and otherwise mischaracterized Plaintiffs' allegations in order to fit Defendants' theories.

inflation, accounting method, or offset determination (if any) is ultimately applied, the 14(a) Plaintiffs' methodology is sufficiently flexible such that the inputs will be applied Class-wide, posing no impediment to class certification here. Hartzmark Reply Secs. V & VI; Ex. 6 at 1-12.[8]

*Plaintiffs' ultimate inflation or accounting methods will be applied Class-wide at the appropriate time*. 14(a) Plaintiffs' damages methodology will use inputs consisting of the daily level of inflation of McDermott stock, the selection and calculation of which requires an analysis of loss causation. Hartzmark ¶¶54-55; Hartzmark Reply ¶¶15, 30-31. As Dr. Hartzmark explained, there are multiple ways of calculating the inflation inputs (*see* Hartzmark Dep. Tr. at 111:3-18, 131:22-23, 134:14-15) and at this juncture, 14(a) Plaintiffs have not committed to a method (*id.* at 135:17-19; Hartzmark Reply ¶31). *See also* Ex. 6 at 17-21 (Class Hearing slides). Similarly, choosing either a "LIFO" or "FIFO" accounting method at this stage (D.Br. 19; Allen ¶¶41-42) is entirely premature. Hartzmark Dep. Tr. at 177:14-178:16; *see also* Hartzmark Reply ¶¶35, 38, 49; Ex. 6 at 22-26. This is because "[c]alculating the actual inputs into the out-of-pocket method [] requires an analysis of *loss causation*." *SEB Inv. Mgmt. AB v. Symantec Corp.*, 335 F.R.D. 276, 288 (N.D. Cal. 2020); *see also, e.g.*, *In re Acuity Brands, Inc. Sec. Litig.*, 2020 WL 5088092, at *10 (N.D. Ga. Aug. 25, 2020) ("[I]t is not appropriate at the class certification stage, before fact discovery

---

[8] To the extent Ms. Allen points out hypothetical disparities in how different potential Class members' damages would be calculated (Allen ¶¶36-49), "[i]t is axiomatic that individualized damages calculations are generally insufficient to foreclose class certification, and particularly so where the central liability question is common to each class member." *Monroe Cty. Emps.' Ret. Sys. v. The Southern Co.*, 332 F.R.D. 370, 397 (N.D. Ga. 2019).

has concluded, to require Plaintiffs' expert to commit to the particular method he intends to use to measure inflation in this case."); *Southern Co.*, 332 F.R.D. at 399. Defendants cite to no decision that would require the level of detail that they would have this Court impose.

A plethora of cases have held that the determination of these and similar "inputs" involves an analysis of loss causation that is not required at the class certification stage. *See, e.g.*, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, 2022 WL 1459567, at *8 (N.D. Cal. May 9, 2022); *In re CenturyLink Sales Prac. & Sec. Litig.*, 337 F.R.D. 193, 212-13 (D. Minn. 2020); *Vrakas v. United States Steel Corp.*, 2019 WL 7372041, at *9 (W.D. Pa. Dec. 31, 2019); *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *20 (S.D.N.Y. July 10, 2019); *Di Donato v. Insys Therapeutics, Inc.*, 333 F.R.D. 427, 448 (D. Ariz. 2019); *Pirnik v. Fiat Chrysler Autos., N.V.*, 327 F.R.D. 38 (S.D.N.Y. 2018).

Courts reliably find that issues related to "quantification and allocation of damages" are "not appropriately raised at the class certification stage." *City of Miami Gen. Emps' & Sanitation Emps' Ret. Tr. v. RH, Inc.*, 2018 WL 4931543, at *4 (N.D. Cal. Oct. 11, 2018); *see also Roofer's Pension Fund v. Papa*, 333 F.R.D. 66, 88 (D.N.J. 2019) (same); *Wilson v. LSB Indus.*, 2018 WL 3913115, at *17 (S.D.N.Y. Aug. 13, 2018) (same); *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 2016 WL 7409840, at *10 (S.D.N.Y. Nov. 4, 2016) (same); *In re BP*, 2014 WL 2112823 at *10 (same).

Finally, once a loss causation analysis is complete and a determination of inflation and accounting inputs are made, those inputs will be applied uniformly to the Class, thus confirming the propriety of certification here. *See* Hartzmark Reply Report ¶¶33, 53; *see also* Ex. 6, at 17-26; *see In re CenturyLink Sales Pracs. & Sec. Litig.*, 337 F.R.D. 193, 212

(D. Minn. 2020) ("Plaintiffs need merely show, as Hartzmark has done, that the techniques used to estimate the true price (and thus calculate artificial inflation) will be common to all putative class members and will be applied on a class-wide basis.").

**The success or failure of Defendants' CB&I "offset" defense can also be formulaically applied class-wide**. Defendants argue that 14(a) Plaintiffs' expert's damages model must account for an affirmative defense they have not yet raised: that "there are "offsetting economic gains" purportedly enjoyed by McDermott shareholders who also owned CB&I stock at the time of the Merger. D.Br. 19-20; Allen ¶¶32-35.[9] As an initial matter, to the extent that CB&I shareholders at the time of the Merger experienced any purported "economic gains" from the Merger (despite also being deceived), those CB&I shares are represented in the §10(b) Action, and any offset defense is more properly litigated there. *See* Hartzmark Reply ¶¶44 n.56. This damages argument is not properly raised at class certification because "the ultimate issue of whether certain plaintiffs' losses are to be offset by any purported inflation of [the acquired company's] share prices need not be resolved at [the class certification stage]." *In re Bank of Am.*, 281 F.R.D. at 148-49; *see also In re Willis Towers Watson PLC Proxy Litig.*, 2020 WL 5361582, at *13 (E.D. Va. Sep. 4, 2020) (finding that whether damages should be offset by class members' other holdings "can, if necessary, be adequately addressed within the context of a certified class"); *Audet v. Fraser*, 332 F.R.D. 53, 73-74 (D. Conn. 2019) (finding that the existence

---

[9] Defendants did not assert an offset affirmative defense in their Answer. If raised, Defendants bear the burden of proof. *See, e.g.*, *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1340 (5th Cir. 1995) ("The burden of proof is on the party claiming the credit 'to show that the damages assessed against it have 'in fact and in actuality' been previously covered.'").

of "chargebacks" or other transactions by which class members reduced their losses or achieved net gains does not defeat predominance).[10] In any event, as Dr. Hartzmark explains, the OOP methodology incorporates offsets in a Class-wide, formulaic manner at the appropriate time, thus raising no individualized issues. Hartzmark Reply ¶¶43-45; *see also* Ex. 6 at 27.

> ***Defendants' invocation of a speculative "but for" world is inconsistent with 14(a) Plaintiffs' sustained theory of liability.*** Defendants also argue that McDermott shareholders could only seek damages if Plaintiffs can prove "what would have happened to existing McDermott shareholders in that hypothetical, no-Merger world where McDermott proceeded on an uncombined basis (or perhaps renegotiated the merger on more favorable terms)"—a burden that Defendants conveniently say "would be a tall order" and is "inherently speculative." D.Br. 16-17; Allen ¶¶25-27. While Defendants argue that McDermott shareholders simply have no recourse, this is not the case, as decades of precedent have shown. Defendants' imaginary "but for" world is not relevant to the measurement of direct damages that Plaintiffs have alleged in the Complaint and proposed in their class motion. Hartzmark Reply ¶¶11-14, 19-22; *see also* Ex. 6 at 15-16. Plaintiffs are proposing something far more certain and well-established: measuring damages based on the actual decline in McDermott's share price when the truth emerged.

---

[10] Defendants' offset defense also undermines the "deterrent purpose" of the Exchange Act, which was enacted "to deter fraud and manipulative practices in the securities markets, and to ensure full disclosure of information material to investment decisions." *Randall v. Loftsgaarden*, 478 U.S. 647, 664 (1986) (rejecting attempt to offset tax benefits in Exchange Act claim).

### C.     MissPERS Is an Adequate Class Representative

The Renewed Class Motion defines the Class as all "McDermott shareholders (including beneficial owners) as of April 4, 2018 (the record date for McDermott shareholders to be eligible to vote on the Merger of McDermott and CB&I [. . .]), and who were damaged thereby." Br. 1. MissPERS is a member of the Class because it was a McDermott "shareholder" as of April 4, 2018 whose voting rights were impaired by Defendants' Proxy Solicitation misrepresentations, and who suffered damages.

Importantly, Defendants' adequacy argument as to MissPERS is not a barrier to class certification in any event. The Teamsters Funds did not lend any shares and Defendants do not challenge their adequacy. D.Br. 20.

Defendants nevertheless argue that MissPERS cannot have standing because its McDermott shares were "lent" out on April 4, 2018 through a securities lending agreement managed by its custodial bank (Bank of New York Mellon, or "BNY"). *See* D.Br. 20-22. Defendants again attempt to argue standing instead of focusing on Rule 23, contrary to this Court's prior order. Dkt. 410. Regardless, securities lending is no bar to standing, and MissPERS, in addition to the Teamsters Funds, is an adequate Class Representative.

Securities lending is a decades-old practice through which institutional investors support the securities markets. Over $3 trillion of securities were lent out by investors in 2021.[11] No court has ever concluded that a plaintiff's or class members' participation in a

---

[11] *See* Douglas Brown, The Arrival of Modern Securities Lending (Fidelity Institutional Insights), *available at* institutional.fidelity.com/app/proxy/content?literatureURL=/9904054.PDF (citing IHS Markit Data as of August 20, 2021).

securities lending program stripped them of the protection of §14(a) or any other statutory or common law claim.

   ***First***, contrary to what Defendants contend, MissPERS' participation in securities lending did not strip it of its entitlement to vote in the Merger—and those rights were indeed harmed. MissPERS lent its McDermott shares to third parties through a stock lending program managed by BNY, retaining beneficial ownership of those shares—which remained in MissPERS' holdings without break.[12] Up to the Record Date of April 4, 2018, MissPERS, through its investment manager DFA and custodial bank BNY, also ***had the right to recall its shares and exercise its entitlement to vote those lent shares***—as MissPERS, its custodial bank, its investment manager, the SEC, and the Federal Reserve all attest. *See, e.g.*, Supp. DFA Decl. ¶6 (Ex. 8) ("[I]f the shares were recalled prior to the record date, such shares would normally appear in [DFA's] proxy voting system as shares for which Dimensional could instruct a vote."); Dkt. 311-4 at 26, 28, 30 (BNY "Securities Finance" presentation noting that a "Client" who lends securities is a "Beneficial Owner" who "retains the benefits of ownership" and "can recall the security at anytime [sic]" and "for any reason"). As MissPERS' Chief Investment Officer testified, lent shares "can always be recalled at a moment's notice and those shares can be voted." Ex. 9 at 85:8-10; *see also id.* at 54:13-15; *see infra* at 21 (SEC guidance).[13] Defendants' expert, Ms. Allen,

---

[12] *See* Reply Ex. 13 (compilation of monthly holdings reports reflecting MissPERS' constant McDermott stock holdings from December 2017—May 2018).

[13] Reply Ex. 14 at 26 (Federal Reserve Bank Reference Guide to U.S. Repo and Securities Lending Markets, stating "securities lenders" [are] referred to as 'beneficial owners,'" and "[a] security may be recalled when its beneficial owner would like to sell it or exercise its voting rights").

conceded that MissPERS could have recalled the securities on loan. 14(a) Class Hearing

(Dkt. 367 and also attached as Ex.6 to Declaration of Amy Pharr Hefley, Dkt. 474-7) at

179:5-8 ("Q. And you would agree that MissPERS had the right to recall its securities, its

McDermott securities that were on loan, to vote them, right? A. I think that's correct.").

MissPERS was entitled to truthful statements by Defendants—not only in the final

March 27, 2018 Proxy Statement, declared effective on March 29, 2018, but in each of the

numerous Proxy Solicitations made between December 17, 2017 and the April 4, 2018

Record Date – the window during which it could have recalled its shares and voted. Those

misrepresentations informed MissPERS' determination whether to recall MissPERS'

shares to vote. Indeed, DFA, MissPERS' investment manager, described how it based its

decision whether to recall and vote lent shares on the information in its possession and

whether "voting the securities is likely to materially affect the value of a client's investment

and it is in the client's best interests to do so."[14]

The Complaint details Defendants' misrepresentations, ¶¶78-79, 143-61, which

provided the market with materially misleading information concerning McDermott's

diligence of the Focus Projects and the risks posed by the Focus Projects to the combined

Company. For example:

- On December 17, 2017, Defendant Spence emphasized that McDermott had
  "***dedicated a significant amount of time performing joint due diligence***

---

[14] *See* Reply Ex. 15 at 32 (DFA's March 29, 2018 "Brochure" filed with the SEC and describing process for voting lent securities, stating that DFA "will balance the revenue-producing value of loans against the difficult-to-assess value of casting votes," and that DFA "does intend to recall securities on loan if, based upon information in [DFA's] possession, [DFA] determines that voting the securities is likely to materially affect the value of a client's investment and it is in the client's best interests to do so").

together with CB&I's team [and had] gotten to know one others['] *operations very well*." Spence continued, stating that McDermott had "*performed a great deal of due diligence on CB&I's IPL Eagle Valley, Calpine, Freeport and Cameron projects.*" Spence emphasized again, later in the call, that "*we have done a significant amount of diligence around not only the four projects*, but the overall portfolio." ¶76.[15]

- On December 18, 2017, Defendant Dickson stated that "*[W]e have worked extensively with CB&I on due diligence* . . . a lot of effort has been put into that." ¶¶77-78.

- Dickson assured investors that "*an extensive amount of work has been done on these projects and obviously with a lot of focus with the work that's left or the balance of the work that's left on what has been four critical projects for CB&I*." ¶¶79.

- In a January 8, 2018 investor presentation widely disseminated on McDermott's website, Defendants assured investors that "We have performed *thorough due diligence* and believe we have a *strong understanding of the key drivers* and are *comfortable with what needs to be done with these projects going forward."* ¶143.

- In that same presentation, Defendants told investors that the "Four focus projects *have been significantly de-risked* with respect to engineering, quantities and procurement; *remaining risk is assessed as mostly related to labor performance*." ¶144.

- Defendants also highlighted on January 8, 2018, that a "strong team of highly experienced E&C risk managers," "supported by independent consultants," conducted the due diligence over a period of months, which included "*site visits at key projects to supplement and confirm analysis*." ¶145.

- On January 24, 2018, Defendants filed a Preliminary Proxy with the SEC that contained false and misleading statements reinforced Defendants' earlier statements concerning its "thorough due diligence," and also announced the Record Date – the vote by which any lent shares would need to be recalled in order to exercise voting rights. ¶¶157-161.

---

[15] Analysts took comfort in Defendants' misrepresentations and communicated that comfort to shareholders. For example, analysts from MKM Partners noted on December 19, 2017 that while "[t]he news [of the Merger] comes as a surprise to investors," "MDR management said on the call that they had done exhaustive due diligence on CBI's backlog and are comfortable with the risks there regarding further charges." ¶82.

- On February 21, 2018, Defendant Dickson—despite CB&I's announced poor fourth quarter and full-year results—assured investors that "*the potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence.*" He explained that with "integration planning now well under way, *we're even more confident in our synergy expectations and looking forward to a timely closing.*" ¶154.

The SEC recognizes that Proxy Solicitation statements like those at issue here are clearly intended to provide information for security holders to make voting rights decisions including whether or not to lend or recall lent securities. Regulation of Takeovers and Security Holder Communications, 64 Fed. Reg. 61408 at 61411, 61415, 61434 (Nov. 10, 1999) (emphasizing that Rule 425 filings are subject to liability under Rule 14a-9); SEC Final Rule Release No. 33-11131, 2022 WL 16834029, at *18 (Nov. 2, 2022) (recognizing that investors make informed voting rights decisions based on proxy solicitation materials).

In sum, MissPERS had its right to a fully informed voting decision harmed by the alleged misrepresentations in this case, and it has standing to asset a Section 14(a) claim.

While MissPERS did not elect to vote, this does not render it atypical or inadequate. Section 14(a) was enacted to protect the entire class of stockholders by preventing "management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation[s]." *J. I. Case Co. v. Borak*, 377 U.S. 426, 431 (1964); *see also T.S.C. Indus.,* 426 U.S. at 448-50; 15 U.S.C. §78n(a); 17 C.F.R. §240.14a-9. In keeping with this broad and protective purpose, reliance is not an element of §14(a) (*see Mills*, 396 U.S. at 383; Br. 17-18), and courts have held that "whether any particular member of the class relied on the proxy information; voted for or against the challenged transaction; *or voted at all in connection with the challenged*

*transaction* . . . does not raise a unique defense that disqualifies them from acting as class representatives." *City P'ship Co. v. Jones Intercable, Inc.*, 213 F.R.D. 576, 587 (D. Colo. 2002) (citing, *e.g.*, *Mills*, 396 U.S. 375); *cf. 7547 Corp. v. Parker & Parsley Dev. Partners, L.P.*, 38 F.3d 211, 230 (5th Cir. 1994) ("the rationale for permitting a stockholder to assert a cause of action under Section 14(a) . . . is to protect the voting process *as a whole* from misinformation; it is simply a recognition that the stockholder is bound by the collective action of his other stockholders who may have been misled by the statement.").[16]

Imposing liability against Defendants on behalf of shareholders who participate in stock lending programs is no different that imposing liability on Defendants on behalf of shareholders who do not vote their proxy, which is irrelevant to a plaintiff's standing. MissPERS' decision whether to recall its lent shares and to vote those shares *is itself a voting decision*.

Notably, the SEC recently confirmed that shareholders who engage in securities lending are still "entitled" to vote their shares, even though they would have to recall them from loan to do so. *See generally* SEC Final Rule, Release No. 33-11131, 2022 WL 16834029 (Nov. 2, 2022) (also cited by Defendants (D.Br. 21, 23-24)). This SEC guidance pertains specifically to the disclosure of proxy voting activities, and states, "*a fund would be entitled to vote on a matter if its portfolio securities are on loan as of the record date for the meeting . . . [b]ecause the reporting fund could recall and vote these loaned*

---

[16] Defendants' reliance on *7547 Corp.* for a contrary result is misplaced. That case addressed the lack of standing of ***non-shareholders***, who never had the right to vote and made no voting rights decisions with respect to their securities.

*securities*." *Id.* at \*4.[17] MissPERS, and other Class members who engaged in securities lending, had "voting power" within the SEC's definition of the term, which is exercised by recalling loaned shares if necessary. *Id.* at \*66 ("Voting power means the ability . . . to vote a security or direct the voting of a security, including the ability to determine whether to vote a security *or to recall a loaned security*.").

The definition of the Class is simple and encompassing: it only requires the Class Members to be beneficial owners of shares on April 4, 2023, and who were damaged thereby.[18] As 14(a) Plaintiffs clarified at the 14(a) Class Hearing, this means that beneficial owners who lent their shares (i.e., MissPERS) as well as the borrowers of the shares (or the third party who purchased them as the counterparty to a short sale) could be Class Members, so long as they held these shares on April 4, 2018, and through a corrective disclosure. 14(a) Class Hearing at 234:2-237:20. This is a perfectly reasonable result, given the broad protective intent of the statute and the fact that choosing not to vote, and not to recall shares, is itself a voting decision that needs to be properly informed. and is protected under the law. *See Long Island Lighting Co. v. Barbash*, 779 F.2d 793, 796 (2d Cir. 1985) ("The question in every case is whether the challenged communication, seen in the totality of circumstances, is reasonably calculated to influence the shareholders' votes.") (cited at

---

[17] The SEC's guidance and the Proxy Statement use the term "entitled to vote," while the proposed Class definition uses the term "eligible to vote." *See* Br. 14-15, Dkt. 303-1. §14(a) Lead Plaintiff does not believe—and did not intend to argue—that there is a relevant difference between these terms. However, if the Court believes that it is appropriate, Lead Plaintiff would amend the class definition to "entitled to vote" to harmonize with SEC regulations and the Proxy Statement.

[18] Defendants' re-filed brief ignores the Class definition that is clarified in the Renewed Motion. *See* Br. 1; *see also* 14(a) Class Hearing 228:13-23 (clarifying the definition).

14(a) Class Hearing at 223). Furthermore, as Dr. Hartzmark confirmed, Class Members who loaned their shares and those who did not loan their shares had identical economic harm. *Id.* at 55:11-17.

**Second**, in addition to the fact that MissPERS had the unfettered right to recall shares, the definitive Proxy Statement defines shareholders "entitled to vote" on the Merger as shareholders whose shares "were held by a bank, broker, trust company or other nominee (that is, in street name)" on April 4, 2018. Ex. 10 (March 27, 2018 Proxy Statement at vii).[19] MissPERS' ownership of the lent shares continued unbroken throughout this period, and its inclusion in those "entitled to vote" defeats Defendants' adequacy challenge. *See 7547 Corp.*, 38 F.3d at 230 ("we look to the relevant documents [the Proxy Statement] to determine whether the plaintiffs had [voting] rights"). That MissPERS' McDermott shares were on loan did not impact MissPERS' ownership or voting rights decisions of or these shares. *See, e.g.*, Reply Ex. 11, Supp. BNY Decl. ¶¶5-6;[20] *supra* at n.12, Reply Ex. 13.

Defendants argued at the Class Hearing that the "the statute is what dictates who can recover damages, who can be in this kind of class" and that "14(a) is about harm to the voting rights." 14(a) Class Hearing at 216:21-23. However, the statute is not limited to only those who have exercised their voting power; instead, it prohibits untrue statements to

---

[19] Beneficial owners like MissPERS typically own their shares as an interest in a fungible bulk of shares that are deposited with the Depository Trust Company ("DTC"). *See In re Reliant Sec. Litig.,* 2005 WL 8152605, at *6 (S.D. Tex. Feb. 18, 2005); SEC, Briefing Paper, Roundtable on Proxy Voting Mechanics, http://www.sec.gov/spotlight/proxyprocess/proxyvotingbrief.htm  (last modified May 23, 2007).

[20] The declaration from BNY Mellon submitted herewith also corrects an error in the prior BNY Mellon declaration submitted by Defendants, clarifying that the MissPERS Securities Lending Agreement nowhere discussed the forfeiture of any right to vote when lending securities.

"security holders." *See, e.g.*, 15 U.S.C. §78n(a); 17 C.F.R. §240.14a-9(a); *see also* 15 U.S.C. §78(c) (instructing issuers to provide proxies for meeting for "holders of record"); 14(a) Class Hearing at 241:1-7. It says nothing about voting rights. As a beneficial holder, MissPERS is undoubtedly a security holder.

*Finally*, Defendants' other arguments with respect to securities lending also fail. Defendants provide no legal support for their position that allowing MissPERS and other lenders to proceed here is "nonsensical" because the voting class would then "contain[] more shares than the total number of . . . shares outstanding, since shares on loan would be double counted." D.Br. 22 n.15. As noted above, both the statutory text and the SEC's guidance seek to protect all shareholders with voting power without limitation. And Defendants' argument is also speculative; trading volume data shows that a large percentage of the shares that comprise the Class were sold between the Record Date and the first corrective disclosure on October 30, 2018, and thus were not damaged shares, meaning that, even if such a fact could be relevant, there is little danger that the number of damaged shares would outweigh the number of outstanding shares at the time of the Merger. *See* Hartzmark Reply ¶59 n.74.[21]

MissPERS was a McDermott shareholder at all relevant times; is a member of the

---

[21] In any event, an issuer such as McDermott can be liable for false statements that impact the market in "securities" such as stocks sold short or stock options, notwithstanding that they did not "issue" those securities. *See, e.g.*, 15 U.S.C. §78c(a)(10) (defining a security); *Optoelectronics*, 2019 WL 6111303, at *5 (certifying 10(b) class including options traders); *Levy v. Gutierrez*, 448 F. Supp. 3d 46, 64 (D.N.H. 2019) (certifying an Exchange Act class including short sellers, arbitrageurs and options traders); *Reliant*, 2005 WL 8152605 (shares purchased pursuant to a Registration Statement and then lent to third parties are both included within the Class pursuant to Section 11).

Class; was deprived of the right to make a fully informed decision on whether to recall and vote; and was damaged by Defendants' misrepresentations regardless of whether and how it exercised its right to vote. No more is required to establish standing under Section 14(a) and Rule 14a-9.

### D. The Class Is Ascertainable and Predominance Is Satisfied

The Class here easily meets Rule 23's ascertainability requirement. The Class definition clearly defines Class members as McDermott shareholders as of April 4, 2018 who were "eligible" or "entitled" to vote their shares on the Merger. Notably, the Class was essentially defined by Defendants themselves in the Proxy Statement. *Supra* Sec. II.C. Moreover, Defendants, their proxy solicitors, and major banks who held the bulk of these securities on behalf of beneficial owners, clearly have the means to identify Class members.

As discussed in the Renewed Class Motion, the Class definition here satisfies the Fifth Circuit's ascertainability standard, which "is less burdensome in this circuit than in others," including the Third Circuit's ascertainability standard relied on by Defendants. *A.A. v. Phillips*, 2023 WL 334010, at *2 n.12 (5th Cir. Jan. 20, 2023) (unpublished per curiam); *accord Seeligson v. Devon Energy Prod. Co., L.P.*, 753 F. App'x 225, 230 (5th Cir. 2018) (unpublished per curiam); *see also Guenther v. BP Ret. Accumulation Plan*, 2021 WL 1216377, at *3 (S.D. Tex. Mar. 12, 2019) ("At the certification stage, it is not necessary that the class be so clearly ascertainable that every potential member can be readily identified."). The Fifth Circuit recently confirmed the relatively low burden that must be met: "[t]o be ascertainable, the class must be susceptible to a precise definition to properly identify those entitled to relief, those bound by the judgment, and those entitled

to notice. The district court need not know the identity of each class member before certification, but it needs to be able to identify class members at some stage of the proceeding." *Phillips*, 2023 WL 334010, at *2. Defendants' claim of a heightened ascertainability standard fails.[22]

As explained above, shareholders who engaged in securities lending are members of the Class. There is therefore no need to segregate loaned shares from non-loaned shares. Even if this Court were to determine that securities lending was relevant, this would not defeat ascertainability. Although securities lending is a common practice, Defendants do not cite any cases holding that securities lending or short selling would defeat predominance. In fact, this Court has ***rejected*** a substantially similar argument. *Reliant*, 2005 WL 8152605, at *9 (rejecting argument that short selling creates individualized questions: "[T]his case involves no unexpected phenomenon but just the commonplace series of events that occur in nearly every [relevant transaction] and its aftermath.").[23]

---

[22] Defendants' suggestion that this Court should adopt the "heightened" standard of ascertainability from the Third Circuit is without support in the Fifth Circuit or its district courts. In fact, the momentum is moving away from this additional burden nationwide. *See, e.g.*, *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1302 (11th Cir. 2021) (citing to *Seeligson v. Devon Energy Prod. Co.*, 761 F. App'x 329, 334 (5th Cir. 2019)); *Mullins v. Direct Dig., Ltd. Liab. Co.*, 795 F.3d 654, 658 (7th Cir. 2015) (recognizing that a heightened ascertainability standard would upset the balance established by Rule 23). Even the Third Circuit has clarified its ascertainability standard. *Kelly v. RealPage, Inc.*, 47 F.4th 202, 222-25 (3rd Cir. 2022) (ascertainability requirement met since "a straightforward 'yes-or-no' review of existing records to identify class members is administratively feasible even if it requires review of individual records with cross-referencing of voluminous data from multiple sources").

[23] *See also Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 669 & n.14 (9th Cir. 2022), *cert. denied sub nom*, *Starkist Co. v. Olean Wholesale Coop., Inc.*, --U.S. --, 143 S. Ct. 424 (2022) (rejecting the argument "that Rule 23 does not permit the certification of a class that potentially includes more than a de minimis number of uninjured class members. . . .

Defendants' only support for why it could not identify Class members is the fact that MissPERS did not consider whether its shares were on loan when it sought lead plaintiff appointment. D.Br. 23. But MissPERS had no reason to inquire about the stock lending program because it is irrelevant to standing and MissPERS' holdings reflected its ownerships of McDermott shares at all relevant times. Yet, MissPERS was readily able to provide documentation of its lending in response to Defendants' discovery requests. Furthermore, any judgment or settlement will require a claims process, where a claims administrator can assess whether documentation submitted by Class members complies with the claims process and plan of allocation. Far from being an unknowable fact, determining whether shares were on loan was done by MissPERS in this case and could be determined for any Class member through coordination with securities lending agents.

## III.   CONCLUSION

The 14(a) Plaintiffs respectfully request that the Court (i) certify the Action pursuant to Rules 23(a) and 23(b)(3); (ii) appoint MissPERS and the Teamsters Funds as Class Representatives; and (iii) appoint Wolf Popper and Bernstein Litowitz as Co-Class Counsel.

---

[U]ltimately, the problem of a potentially over-inclusive class can and often should be solved by refining the class definition rather than by flatly denying class certification on that basis.").

Dated: November 17, 2023

**WOLF POPPER LLP**

*By:*  */s/ Chet B. Waldman*

    Chet B. Waldman
    (admitted *pro hac vice*)
    Robert C. Finkel
    (admitted *pro hac vice*)
    Matthew Insley-Pruitt
    (admitted *pro hac vice*)
    Philip M. Black
    (*pro hac vice* pending)
    845 Third Avenue, 12th Floor
    New York, New York 10022
    (212) 759-4600
    cwaldman@wolfpopper.com
    rfinkel@wolfpopper.com
    minsley-pruitt@wolfpopper.com
    pblack@wolfpopper.com

    Jeffrey W. Chambers
    913 Dunleigh Meadows Lane
    Houston, TX 77055
    (713) 438-5244
    jchambers@wolfpopper.com

    ***Lead Counsel for the 14(a) Lead***
    ***Plaintiff and the Proposed Class***

    **BERNSTEIN LITOWITZ**
    **BERGER & GROSSMANN LLP**

    John Rizio-Hamilton
    (admitted *pro hac vice*)
    Lauren McMillen Ormsbee
    (admitted *pro hac vice*)
    Veronica Montenegro
    (*pro hac vice* pending)
    Jonathan D'Errico
    (*pro hac vice* pending)

1251 Avenue of the Americas,
44th Floor
New York, NY 10020
(212) 554-1400
johnr@blbglaw.com
lauren@blbglaw.com
veronica.montenegro@blbglaw.com
jonathan.derrico@blbglaw.com

***Additional Counsel for the 14(a) Lead
Plaintiff and Proposed Class Counsel***