United States District Court
Southern District of Texas

**ENTERED**

April 24, 2024

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# HOUSTON DIVISION

| | | |
|---|---|---|
| MIRIAM EDWARDS, | § | |
| | § | |
| Plaintiff. | § | |
| | § | |
| V. | § | CIVIL ACTION NO. 4:18-cv-04330 |
| | § | |
| MCDERMOTT INTERNATIONAL, | § | |
| INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

## AMENDED MEMORANDUM AND RECOMMENDATION

Pending before me in this putative securities class action is the § 10(b) Plaintiffs' Motion for Class Certification and Appointment of § 10(b) Class Representatives and § 10(b) Class Counsel ("Motion for Class Certification"). Dkt. 305. On September 27, 2023, I held a hearing on the Motion for Class Certification during which both sides presented expert testimony and voluminous exhibits. *See* Dkt. 412. Following the hearing, I requested supplemental briefing, which the parties provided via letters to the Court. *See* Dkts. 425–429, 450, 460–61, 471.

On February 2, 2024, I issued a Memorandum and Recommendation on the Motion for Class Certification. *See* Dkt. 508. The crux of my analysis and recommendation was that Lead Plaintiff Nova Scotia Health Employees' Pension Plan ("Nova Scotia")—a shareholder in Chicago Bridge & Iron Company, N.V. ("CB&I") whose shares were converted into McDermott International, Inc. ("McDermott") stock as a result of the 2018 merger between CB&I and McDermott ("the Merger")—has a fundamental conflict with class members who purchased McDermott stock, which necessitates separate classes. I recommended the Motion for Class Certification be denied without prejudice to refiling a motion to certify two subclasses. *See id.* at 41. Judge George C. Hanks, Jr. adopted my recommendation on March 23, 2024. *See* Dkt. 526.

In subsequent status conferences with the parties, it has become clear to me that my recommendation could have been clearer about the next procedural steps, and that there is no need to delay certifying a class of CB&I shareholders when Nova Scotia and its counsel satisfy all the Rule 23 requirements for such a class. On April 24, 2024, Judge Hanks withdrew his Order Adopting Magistrate Judge's Memorandum and Recommendation and remanded the Motion for Class Certification to me for reconsideration. *See* Dkt. 544. I **WITHDRAW** my February 2, 2024 Memorandum and Recommendation. I now recommend that the Motion for Class Certification be **GRANTED IN PART**, and that the Court require two separate classes—one of CB&I shareholders, and one of purchasers of McDermott stock—due to a fundamental conflict, of which only one class may be certified at this juncture. I further recommend the Court permit lead plaintiff applications for the putative class of purchasers of McDermott stock.

## BACKGROUND

The Court has already summarized the "pertinent factual allegations" in this litigation. *See Edwards v. McDermott Int'l, Inc.*, No. 4:18-cv-4330, 2021 WL 1421609, at *1–6 (S.D. Tex. Apr. 13, 2021). For efficiency's sake, I will be brief. This litigation concerns the Merger of McDermott with CB&I. McDermott and CB&I announced their potential merger on December 18, 2017, "whereby CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity." Dkt. 105 at 30. McDermott shareholders approved the Merger on May 2, 2018, and the Merger closed on May 10, 2018.

Nova Scotia alleges Defendants[1] made pre- and post-Merger material misrepresentations and omissions regarding (1) "four large, challenging CB&I

---

[1] The Defendants are McDermott, David Dickson (McDermott's former President and Chief Executive Officer), Stuart Spence (McDermott's former Executive Vice President and Chief Financial Officer), CB&I, and Patrick Mullen (CB&I's former President and Chief Executive Officer).

projects" known as the "Focus Projects"; (2) "the importance of McDermott's acquisition of CB&I's technology business, Lummus . . . and McDermott's ability to integrate and operate that business as a post-Merger company despite the challenges posed by the Four Focus Projects"; and (3) "the strength and viability of McDermott's post-merger capital structure, balance sheet, liquidity, and financial health in light of its acquisition of CB&I, and specifically the Four Focus Projects." *Id.* at 5. The truth, according to Nova Scotia, was that the Focus Projects "carried undisclosed forecasted costs of well over $1 billion when the merger was announced and when it closed." *Id.* at 34. Moreover, Defendants continuously touted the importance of Lummus to the post-Merger company's long-term success, all the while "fail[ing] to disclose . . . that . . . the sale of Lummus Technology . . . was a necessary component of maintaining adequate cash flows and liquidity." *Id.* at 198.

Plaintiff Miriam Edwards filed the initial class action complaint on November 15, 2018, styled *Edwards v. McDermott, International, Inc.*, No. 4:18-cv-04330 (S.D. Tex.), alleging claims under § 10(b) and § 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"). On January 14, 2019, a related class action complaint—styled *Public Employees' Retirement System of Mississippi v. McDermott International, Inc.*, No. 4:19-cv-00135 (S.D. Tex.)—was filed alleging § 14(a) and § 20(a) Exchange Act claims. On June 4, 2019, both actions were consolidated. *See* Dkt. 84.

Six competing lead plaintiff motions were filed in the § 10(b) Action, including Nova Scotia's motion and the motion of City of Pontiac General Employees' Retirement System ("Pontiac"). Nova Scotia asserted that it expended $517,825 to purchase 25,052 shares of McDermott stock, and "incurred losses of $318,682 in connection with its transactions in McDermott stock during the Class Period." Dkt. 23 at 11. Pontiac asserted that it "purchased 22,442 shares of McDermott stock at artificially inflated prices and suffered over $373,000 in losses

as a result of the alleged wrongdoing." Dkt. 21 at 5. On June 4, 2019, the Court appointed Nova Scotia to serve as the § 10(b) Lead Plaintiff. *See* Dkt. 84.

On October 4, 2019, Nova Scotia filed the operative Consolidated Class Action Complaint (the "Complaint")

> on behalf of the 10(b) Class, consisting of all persons and entities, other than Defendants, their family members, and their subsidiaries, affiliates, and any entities in which they owned a controlling interest, who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and September 17, 2019, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5.

Dkt. 105 at 257. The Court denied Defendants' motion to dismiss in April 2021. *See* Dkts. 163, 168. Class discovery began in May 2021 and is ongoing.

On September 29, 2021, Nova Scotia moved to supplement the Complaint to (1) expand the Class Period by four months, through January 23, 2020; (2) add Pontiac as an additional, non-lead, named plaintiff; and (3) add Pontiac's counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"), as additional, non-lead plaintiffs' counsel in the § 10(b) action. *See* Dkt. 189. On November 2, 2021, I granted Nova Scotia's motion to supplement the Complaint but denied Nova Scotia's request to add Pontiac and its counsel. *See* Dkt. 216. On November 23, 2021, Defendants moved to dismiss the Supplemental Complaint (Dkt. 190-1). *See* Dkt. 222. On August 30, 2022, I recommended that Defendants' motion to dismiss the Supplemental Complaint be granted, but made clear that my recommendation was "not intended to impact the additional partial corrective disclosures set forth in ¶¶ 16–24 of the Supplement, or the extension of the class period to January 23, 2020 as described in ¶ 4 of the Supplement." Dkt. 265 at 13. The Court adopted my recommendation. *See* Dkt. 268.

On October 28, 2022, Nova Scotia timely filed its Motion for Class Certification, seeking certification of the following class pursuant to Federal Rule of Civil Procedure 23(b)(3):

> All persons and entities (the "§10(b) Class members") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. Excluded from the §10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

Dkt. 305-2 at 12. Nova Scotia seeks the appointment of itself as Class Representative, of Pomerantz LLP ("Pomerantz") as Lead Counsel, and of the Briscoe Law Firm ("Briscoe") as Liaison Counsel. *See id.* at 10. Defendants oppose class certification, though several issues—numerosity, commonality, superiority, and the adequacy of Lead and Liaison Counsel—are uncontested.

## LEGAL STANDARD

### A. CLASS CERTIFICATION STANDARD

Rule 23 governs the inquiry of whether a proposed class should be certified. "[T]he Rule 23 class-action device was designed to allow an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Califano v. Yamasaki*, 442 U.S. 682, 700–01 (1979). "To come within the exception, a party seeking to maintain a class action must affirmatively demonstrate [its] compliance with Rule 23." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quotation omitted). Rule 23(a) requires that any purported class meet four "prerequisites":

> (1) numerosity (a class so large that joinder of all members is impracticable); (2) commonality (questions of law or fact common to the class); (3) typicality (named parties' claims or defenses are typical

of the class); and (4) adequacy of representation (representatives will
fairly and adequately protect the interests of the class).

*Madison v. Chalmette Refin. L.L.C.*, 637 F.3d 551, 554 (5th Cir. 2011) (cleaned up).
These prerequisites—numerosity, commonality, typicality, and adequacy—are
necessary but not sufficient conditions for class certification.

Rule 23(b) specifies three class types and sets out requirements—beyond
those articulated in Rule 23(a)—for each. The putative class here seeks certification
under Rule 23(b)(3), which permits class certification where "questions of law or
fact common to class members predominate over any questions affecting only
individual members, and that a class action is superior to other available methods
for fairly and efficiently adjudicating the controversy." FED. R. CIV. P. 23(b)(3).

In considering a motion for class certification, I "must rigorously consider
both Rule 23(a)'s prerequisites and the Rule 23(b) class type." *Chavez v. Plan
Benefit Servs. Inc.*, 957 F.3d 542, 546 (5th Cir. 2020). This rigorous analysis
requires me "to go beyond the pleadings to determine whether the requirements
of Rule 23 have been met: a court must understand the claims, defenses, relevant
facts, and applicable substantive law in order to make a meaningful determination
of the certification issues." *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 724 (5th Cir.
2007) (quotation omitted). "Merits questions may be considered to the extent—
but only to the extent—that they are relevant to determining whether the Rule 23
prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans
& Tr. Funds*, 568 U.S. 455, 466 (2013). My "obligation . . . to conduct a rigorous
analysis of Rule 23's requirements . . . is not dispensed with by the parties'
stipulation to certification or failure to contest one or more of Rule 23's
requirements." *Ward v. Hellerstedt*, 753 F. App'x 236, 244 (5th Cir. 2018). "[T]he
court [is] bound to conduct its *own* thorough [R]ule 23(a) inquiry." *Stirman v.
Exxon Corp.*, 280 F.3d 554, 563 n.7 (5th Cir. 2002).

As part of this "rigorous analysis," I must ask whether the proposed class's
damages model "measure[s] only those damages attributable to [its] theory [of

liability].” *Comcast*, 569 U.S. at 35. “Calculations need not be exact, but at the class-certification stage (as at trial), any model supporting a plaintiff's damages case must be consistent with its liability case, particularly with respect to the alleged effect of the violation.” *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 683 (5th Cir. 2015) (cleaned up) (applying *Comcast*'s rationale to a putative securities class action); *see also Slade v. Progressive Sec. Ins. Co.*, 856 F.3d 408, 410–11 (5th Cir. 2017) (“*Comcast* held that when plaintiffs argue that damages can be decided on a class-wide basis, plaintiffs must put forward a damages methodology that maps onto plaintiffs’ liability theory. Our cases interpreting *Comcast* confirm that what *Comcast* demands is fit between plaintiffs’ class-wide liability theory and plaintiffs’ class-wide damages theory.”). “Such an analysis will frequently entail overlap with the merits of the plaintiff's underlying claim. That is so because the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action.” *Comcast*, 569 U.S. at 33–34 (quotations omitted).

Finally, I must also “consider how a trial on the merits would be conducted if the class were certified.” *Prantil v. Arkema Inc.*, 986 F.3d 570, 574 (5th Cir. 2021) (quotation omitted).

## B.    THE EXCHANGE ACT

Section 10(b) of the Exchange Act makes it

> unlawful for any person, directly or indirectly, . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 implements § 10(b) by prohibiting, among other things, the making of “any untrue statement of a material fact” or the omission of any “material fact necessary in order to make the statements . . . not misleading.” 17 C.F.R. § 240.10b–5(b). Plaintiffs may recover damages under § 10(b) by showing: “(1) a material misrepresentation or omission by the defendant;

(2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Erica P. John Fund, Inc. v. Halliburton Co. ("Halliburton I")*, 563 U.S. 804, 810 (2011) (quotations omitted).

At issue in every securities class action is the intersection between Rule 23(b)(3)'s predominance requirement and § 10(b)'s reliance requirement. Ordinarily, a plaintiff establishes reliance by showing "that he was aware of a defendant's misrepresentation and engaged in a transaction based on that misrepresentation." *Goldman Sachs Grp. Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 118 (2021). But this individualized inquiry is impractical in a class action. So, the Supreme Court has permitted presumptions of reliance in certain circumstances. "The two major doctrines that have evolved to provide such a presumption of classwide reliance are the *Affiliated Ute* presumption and the 'fraud on the market' theory" first articulated in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) (the "*Basic* presumption"). *In re Enron Corp. Sec.*, 529 F. Supp. 2d 644, 679 (S.D. Tex. 2006).

Under *Basic*, district courts presume that stock trading in an efficient market incorporates into its price all public, material information—including material misrepresentations—and that investors rely on the integrity of the market price when they choose to buy or sell that stock. *See Halliburton I*, 563 U.S. at 813. To establish the *Basic* presumption, plaintiffs must prove: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Halliburton Co. v. Erica P. John Fund, Inc. ("Halliburton II")*, 573 U.S. 258, 268 (2014).

* * *

With these principles in mind, I turn to Nova Scotia's Motion for Class Certification.

## ANALYSIS

The disputes here concern (1) Nova Scotia's adequacy and typicality as class representative; (2) the sufficiency of Nova Scotia's damages methodology under *Comcast*; (3) whether the large number of short sellers during the Class Period defeats predominance; (4) whether the market was efficient after September 17, 2019; (5) whether the *Affiliated Ute* presumption applies if the market was *not* efficient after September 17, 2019; and (6) whether the last five alleged corrective disclosures demonstrate price impact. Because I find that Nova Scotia has a fundamental conflict with purchasers of McDermott stock, I reach only the first three of these issues. But first, I must fulfill my obligation "to conduct [my] own thorough [R]ule 23(a) inquiry." *Stirman*, 280 F.3d at 563 n.7 (cleaned up).

### A.   THE UNCONTESTED ISSUES

Defendants concede that Nova Scotia has satisfied Rule 23(a)'s numerosity and commonality requirements, as well as Rule 23(b)'s superiority requirement. Defendants also concede that Pomerantz and Briscoe are adequate Class and Liaison Counsel. I also have no trouble finding that Nova Scotia satisfies the requirements of numerosity, commonality, adequacy (as to Class and Liaison Counsel), and superiority.

#### 1.   *Numerosity*

The putative class is numerous. "During the §10(b) Class Period, McDermott had an average of approximately 165.5 million shares outstanding and traded heavily, with an average weekly trading volume of 34.4 million shares." Dkt. 305-2 at 32. Numerosity "is generally assumed to have been met in class action suits involving nationally traded securities." *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. Unit A July 1981); *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (certifying a class where defendant corporation "had more than 50 million shares of Class A common stock outstanding during the class period, and the average weekly trading volume on the NASDAQ Stock Market during the class period was roughly 2.7 million shares").

###### 2.     *Commonality*

There are common questions of law and fact between Nova Scotia and the proposed class, including whether Defendants misrepresented or omitted material facts, scienter, materiality, economic loss, and loss causation. *See* Dkt. 305-2 at 33. These questions are "capable of classwide resolution—which means that determination of [their] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). Thus, the requirement of commonality is satisfied.

###### 3.     *Adequacy*

When assessing adequacy, I must consider "the zeal and competence of the representatives' counsel." *Slade*, 856 at 412 (cleaned up). Pomerantz has served as lead counsel in multiple securities class actions, has devoted substantial time and resources to this case, and has demonstrated a willingness to take this case to trial. *See* Dkts. 305-3, 305-4. Briscoe has served as counsel in numerous securities fraud cases. *See* Dkts. 305-3, 305-5. Accordingly, Lead Counsel and Liaison Counsel are adequate.

###### 4.     *Superiority*

Defendants do not contest "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

> [C]ourts readily agree that class actions are a superior method for resolving security fraud claims for publicly traded stocks. There is little interest in individual investors controlling their own claims, and a class action is more efficient than entertaining a multitude of suits. Finally, Defendants have presented no arguments suggesting the superiority requirement is not satisfied.

*Lumen v. Anderson*, 280 F.R.D. 451, 462 (W.D. Mo. 2012); *see also In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 676 (N.D. Ga. 2009) ("As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." (quotation omitted)).

## B.    NOVA SCOTIA HAS STANDING

When Nova Scotia moved to be appointed lead plaintiff, it represented to the Court that it "expended $517,825" when it "purchased 25,052 shares of McDermott stock." Dkt. 23 at 11. When Nova Scotia filed the Complaint, it again alleged that it "*purchased* McDermott's common stock at artificially inflated prices during the 10(b) Class Period and was damaged upon the revelation of Defendants' fraud." Dkt. 105 at 15 (emphasis added). Only after class discovery commenced did the parties realize that Nova Scotia *acquired* all of its McDermott stock by converting its CB&I shares at the time of the Merger. Yet, even when Nova Scotia moved to add Pontiac as an additional plaintiff, it failed to mention that Pontiac's "second perspective" would cover more than just "claims in the expanded period"—Pontiac would have been the only actual purchaser of McDermott stock representing the class, albeit in a non-lead role. Dkt. 190 at 24.[2]

Defendants argue Nova Scotia "is an inadequate and atypical class representative because it suffered no economic injury" and thus "cannot satisfy the damages element of its claims." Dkt. 318 at 12. Defendants contend that, under the unique facts that Nova Scotia alleges in this case, Nova Scotia "actually *benefited*" when it exchanged its CB&I shares, which "were allegedly significantly inflated because of the undisclosed losses in CB&I's Focus Projects, and received shares of McDermott, which were untainted by any such issues before the Merger." *Id.* at 13. Defendants highlight that Nova Scotia's "own Complaint admits that CB&I entered the Merger 'to stave off bankruptcy,'" meaning the "Merger and conversion thereby provided CB&I shareholders a lifeline that, at the very least, was better than bankruptcy and the concomitant elimination of their equity interests." *Id.* at 14 (quoting Dkt. 105 at 6).

---

[2] In considering the long procedural history of this case, it bears remembering that the lead plaintiff appointment process and the first motion to dismiss were briefed and decided without the benefit of this information.

Defendants argue that "[a]t minimum, [Nova Scotia] is subject to unique defenses" that render it an inadequate and atypical representative. Dkt. 318 at 15. Specifically, Defendants contend Nova Scotia "is subject to the unique defense that it never suffered a loss as a result of the conversion of its CB&I shares to McDermott shares." *Id.* at 16. Beyond the minimum, Defendants also contend the "lack of damages defeats [Nova Scotia]'s securities fraud claim and is a standing deficiency as well." *Id.* at 14.

Before I address Defendants' arguments, I want to establish what Defendants are *not* arguing. Defendants *concede* that shareholders who acquire shares through conversion during a merger *may* be injured, *may* participate in a § 10(b) class, and *may* be adequate and typical class representatives. Defendants' counsel has admitted that "if the shoe were on the other foot [and] the undisclosed problems were on the McDermott side, not the CB&I side[,] and after the merger closed, the McDermott problems became manifest [and] the stock price went down[, we] would agree that the CB&I shareholders are part of the class." Dkt. 412 at 24. Thus, Defendants' arguments turn on Nova Scotia's own theory of the case and the unique manner in which the alleged misrepresentations were reflected in CB&I's stock price prior to the Merger.

I will cut to the chase: Defendants overreach with their attack on Nova Scotia's standing. Defendants' standing argument assumes CB&I's stock was inflated and McDermott's stock was not inflated at all. If true, Nova Scotia (and all other CB&I shareholders) would have only benefitted from the exchange of their shares and could not have suffered any economic injury. But—and this is a big "but"—this argument is based on nothing more than the conclusory assertion of Defendants' expert, Lucy Allen ("Allen"). *See* Dkt. 318 at 13 (citing Dkt. 318-2 at 15–17). The only support Allen offers for that conclusory assertion is a single cite to a general description of Nova Scotia's case in the Complaint. *See* Dkt. 318-2 at 15 n.49 (citing Dkt. 105 at 58). This is far from sufficient.

Defendants' authorities on this point are of no help.[3] Defendants compare Nova Scotia to the plaintiffs in *Earl v. Boeing Co.*, who were found to lack standing because they "offered no plausible theory of economic harm." 53 F.4th 897, 903 (5th Cir. 2022). But that is not the case here. Nova Scotia has alleged that McDermott stock was inflated as a result of Defendants' misrepresentations when Nova Scotia acquired it through conversion. If CB&I's stock was inflated *less* than McDermott's stock, Nova Scotia may indeed have been injured, despite benefitting from McDermott's alleged misrepresentations about the inherent value of the Focus Projects inflating CB&I's stock. Nor is *In re McKesson HBOC, Inc. Securities Litigation* the powerful medicine that Defendants made it out to be at the hearing. Despite the *McKesson* court's "unease with the notion that holders of [the target company] stock are entitled to damages"—given that "[t]heir shares were inflated due to fraud after they had purchased them, and they acquired [the merged company's shares] at a discount because of that fraud"—the court nevertheless acknowledged "one possible way in which [target company] shares acquired before the class period may have sustained a loss as a result of the alleged fraud." 97 F. Supp. 2d 993, 998 & n.6 (N.D. Cal. 1999). Moreover, the court's passing observation, in a footnote, that such shareholders "are thus ineligible to recover under Section 10(b)" because their "shares were sold into an inflated market," is *ipse dixit. Id.* at 999 n.7.[4]

---

[3] Nova Scotia vehemently objects to me considering these "decades old" cases that Defendants submitted only the night before the hearing, contending that any argument Defendants make based on these cases is waived. Dkt. 412 at 243. I do question why Defendants did not cite these cases earlier, but Nova Scotia's objection is moot because I find that Nova Scotia *has* standing and I do not rely on Defendants' authorities or their arguments based on those authorities. *See Gonzales v. AutoZoners, LLC*, 860 F. Supp. 2d 333, 337 (S.D. Tex. 2012) ("Many objections raised by Plaintiff's counsel are immaterial because they pertain to statements or evidence upon which the Court does not rely for any rulings.").

[4] In the other two cases that Defendants provided at the hearing—*In re Bank of America Corp. Securities, Derivative, & Employee Retirement Income Security Act (ERISA) Litigation*, 281 F.R.D. 134 (S.D.N.Y. 2012), and *In re Heckmann Corp. Securities Litigation*, No. 1:10-cv-378 (D. Del. Oct. 19, 2012), ECF No. 185—the class definitions

I am not going to knock out an entire group of plaintiffs based on Allen's conclusory assertion that Defendants' alleged misrepresentations inflated *only* CB&I's stock and not McDermott's stock. Nova Scotia's expert, Dr. Zachary Nye ("Dr. Nye"), reasons the "contention that McDermott's stock price was free of inflation prior to the Merger, while CB&I's stock was full of inflation, is easily demonstrated to be false by examining the contemporaneous stock prices of CB&I and McDermott during that period," which "traded in lockstep" between the announcement and closing of the Merger. Dkt. 342-2 at 11. But herein lies the rub: in offering this opinion, Dr. Nye *admits* that "Defendants' alleged misstatements and omissions were clearly incorporated *in CB&I's* and McDermott's stock price prior to the Merger." *Id.* at 12 (emphasis added). Accordingly, even Nova Scotia's expert concedes that CB&I's stock was *also* inflated *as a result of the alleged fraud*. This inflation may not present a standing problem, but it calls into question Nova Scotia's adequacy as a class representative.

## C.   NOVA SCOTIA IS AN INADEQUATE CLASS REPRESENTATIVE OF THE PROPOSED CLASS

Nova Scotia has repeatedly stressed—through its expert, its counsel, and its briefing—that, just like open-market purchasers, CB&I shareholders "took money out of their pocket to acquire new McDermott shares." Dkt. 342-2 at 16–17; *see also id.* at 16 ("Thus, rather than use currency, CB&I investors paid for their new McDermott shares using the value of their CB&I shares."). In its reply brief, Nova Scotia takes issue with the fact that

> Defendants fail to explain why CB&I investor A who converted its stock directly into McDermott shares via the Merger lacks damages and standing, whereas CB&I investor B who sold its shares just before the Merger and used the proceeds to buy McDermott shares are differently situated for purposes of damages and standing.

Dkt. 342 at 21 n.27. But there is no explanation because there is no difference.

---

sought by plaintiffs did not include target company shareholders. Without either court confronting this issue, these cases have no bearing on my standing analysis here.

No one is disputing that "CB&I investors could have easily sold their shares for $16.39 apiece, and then promptly purchased approximately the same number of new McDermott shares the next day." Dkt. 342-2 at 16. Rather, Defendants' point is that, had CB&I investors sold their shares, they would only have received $16.39 apiece *because of the fraud that Nova Scotia is alleging*. In other words, but for the fraud that Nova Scotia is alleging, according to Nova Scotia's own allegations, CB&I's stock would have been worth *less*. *See* Dkt. 105 at 6 (alleging that the Merger was bad for McDermott, but "may have been prudent for CB&I, to stave off bankruptcy"). Nova Scotia's own expert has conceded that "Defendants' alleged misstatements and omissions were clearly incorporated in CB&I's . . . stock price prior to the Merger." Dkt. 342-2 at 12. But unlike the inflation in McDermott's stock, which unquestionably harmed all class members, the acknowledged inflation in CB&I's stock prior to the Merger was a *benefit* to CB&I shareholders. When CB&I shareholders "took money out of their pocket to acquire new McDermott shares" (Dkt. 342-2 at 16–17), they had more money to take because the alleged fraud had inflated CB&I's stock. This benefit renders Nova Scotia an unsuitable class representative for anyone other than CB&I shareholders.

Following the hearing, I gave Nova Scotia an opportunity to direct me to "any cases in which the shareholders of a target company were allowed to participate in a 10(b) class *when the alleged fraud stemmed in part from misrepresentations regarding the health of the target company*." Dkt. 405 at 1–2. Nova Scotia directed me to three cases, each of which merit discussion.

The first case Nova Scotia cites is *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142 (S.D. Cal. 2008). Nova Scotia argues "[t]he *Atlas* case makes clear that . . . not only can shareholders of a target company participate in a §10(b) class when the fraud stemmed in part from misrepresentations regarding the health of the target company, they can clearly **_represent_** the class." Dkt. 429 at 1 (quotation omitted). But the *Atlas* case never even made it to class certification, settling before class certification briefing was complete. *See* Joint Motion to Vacate

Class Certification Hearing, Vacate Scheduling Orders, and Adopt Proposed Schedule of Settlement Procedures, *Atlas*, No. 3:07-cv-00488 (S.D. Cal. Apr. 21, 2019), ECF No. 196.

Moreover, the target company shareholder in *Atlas* advanced claims under §§ 11, 12, and 15 of the Securities Act of 1933 ("Securities Act"), but **_not_** § 10(b). *See* 556 F. Supp. 2d at 1147, 1159–61. "Unlike under § 10(b), under § 11 the plaintiff generally does not have to establish scienter, causation (materiality) or reliance." *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 258 F. Supp. 2d 576, 595 (S.D. Tex. 2003). Moreover, § 11 damages are calculated using a statutorily mandated formula. *See* 15 U.S.C. § 77k(e). The most any § 11 plaintiff could ever recover under this formula is "the price at which the security was offered to the public." *Id.* In other words, inflation in the target company's stock price at the time of merger— i.e., the benefit that Defendants argue Nova Scotia received here according to Nova Scotia's own allegations—is irrelevant in a § 11 case. Nor is inflation in the target company's stock price at the time of merger relevant to any plaintiff in a § 12 case where the remedy is rescission or, if the plaintiff has sold their stock, rescissionary damages. *See* 15 U.S.C. § 77l(a); *see also Hoxworth v. Blinder, Robinson & Co.*, 903 F.2d 186, 203 (3d Cir. 1990) ("[S]ection 12(2) liability would be calculated according to different, potentially more pro-plaintiff, measures of damages than would . . . liability under rule 10b–5.").

The second § 11 case cited by Nova Scotia is *Freedman v. Value Health, Inc.*, 190 F.R.D. 33 (D. Conn. 1999). In that case, the district court observed that "the question of whether or not the value of the stock used to acquire stock of another company in a merger is artificially inflated is irrelevant to the damages calculus *under § 11.*" *Id.* at 35 (emphasis added). Because inflation is simply not a consideration in §§ 11 and 12 cases, it is unsurprising that the *Freedman* court found "no adversity of interests" between open market purchasers of the security at issue and shareholders of the target company who acquired their shares via

merger.[5] Dkt. 429 at 2 (quoting *Freedman*, 190 F.R.D. at 35). But *Freedman*'s holding is specific to "the way that damages are calculated under § 11 of the Securities Act of 1933." *Freedman*, 190 F.R.D. at 35 (citing 15 U.S.C. § 77k(e)). *Freedman* says nothing about whether the same is true in § 10(b) cases where inflation is *the* measure of damages.

Nova Scotia's final case—*In re Vivendi Universal, S.A., Securities Litigation*, 242 F.R.D. 76 (S.D.N.Y. 2007), *aff'd sub nom. In re Vivendi, S.A. Securities Litigation*, 838 F.3d 223 (2d Cir. 2016)—is seemingly on all fours with this case, but is short on details that would make clear its applicability or persuasiveness. In *Vivendi*, Defendants challenged the adequacy of a class representative, Gerard, who "exchanged Vivendi, S.A. shares for Vivendi Universal shares pursuant to the three-way merger with Seagram and Canal Plus." *Id.* at 85. As here, the *Vivendi* defendants argued "that persons such as Gerard who obtained Vivendi Universal shares and/or ADSs only in the one-to-one exchange of Vivendi, S.A. securities may not be properly included in the putative class, because such persons did not suffer economic damage and cannot prove materiality." *Id.* The defendants also argued that "preexisting Vivendi shareholders[] cannot show that the alleged misstatement inflating the value of shares or ADSs that they already owned was material to them or caused them any economic damage." *Id.* (quotation omitted).

The *Vivendi* court rejected this argument:

> [I]t is not inappropriate to consider either damages or materiality in assessing the typicality of the individual plaintiffs' claims, even though some assessment of the merits of their claims is required. However, the Court is not persuaded that either issue precludes a finding that the typicality requirement is satisfied here. ***Materiality for all class members will turn on the nature and accuracy of all defendants public statements*** including, obviously, those made in connection with the three-way merger of Vivendi, Seagram and Canal Plus in December, 2000. ***That Vivendi S.A. shareholders received Vivendi Universal shares as a result***

---

[5] Section 15 is a "derivative" claim, meaning the measure of damages is determined by the underlying claim. *Atlas*, 556 F. Supp. 2d at 1159; *see also* 15 U.S.C. § 77o. Thus, inflation is also irrelevant to § 15 claims based on §§ 11 and 12 claims.

> ***of the merger does not alter the materiality of defendants***
> ***alleged misstatements to plaintiff-shareholders' decision***
> ***to approve the merger and accept shares in a new entity.***
> And to the extent that, as alleged, defendants were constructing an
> ever-expanding house of cards, old Vivendi S.A. shareholders who
> accepted shares in Vivendi Universal were likely damaged thereby.
> Therefore, the Court declines to exclude members of the class who
> acquired their shares in the one-to-one exchange, including Gerard as
> class representative, on the basis of defendants' arguments regarding
> damages or materiality.

*Id.* at 86 (emphasis added).

I obviously agree with *Vivendi*'s reasoning insofar as standing is concerned. Now is not the time to determine whether Nova Scotia suffered economic damage. But that is really all the *Vivendi* court addressed. The *Vivendi* court certified a single class of plaintiffs advancing claims under §§ 10(b) and 20(a) of the Exchange Act, and §§ 11, 12(a), and 15 of the Securities Act. *See* 242 F.R.D. at 79. The *Vivendi* court appointed *five* plaintiffs as class representatives, including Gerard, without commenting on which class representative was lead plaintiff, and without specifying which plaintiffs were advancing which claims, or if all plaintiffs were pursuing all claims. The *Vivendi* court did not discuss whether Gerard was subject to unique defenses[6] or had a fundamental conflict with open market purchasers. Thus, *Vivendi* has limited relevance here.

### 1.    *Nova Scotia Is Not Subject to Unique Defenses*

Defendants argue:

> A class representative fails the typicality requirement if it "is subject
> to unique defenses that threaten to become the focus of the litigation."
> *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 500 (S.D. Tex. 2004).
> While "the presence of an arguable unique defense [does not]
> necessarily destroy[] typicality," "the key typicality inquiry is whether
> a class representative would be required to devote considerable time
> to rebut Defendants' claims." *Feder v. Elec. Data Sys. Corp.*, 429 F.3d

---

[6] As discussed above, the defense contemplated here—that the fraud benefited CB&I shareholders—is irrelevant to and unavailable under §§ 11 and 12 claims, where inflation is simply not a consideration. It is impossible to tell from the *Vivendi* class certification order which claims Gerard was advancing.

> 125, 137-38 (5th Cir. 2005) (quoting *Lehocky*, 220 F.R.D. at 501-02);
> *see also Warren v. Reserve Fund, Inc.*, 728 F.2d 741, 747 (5th Cir.
> 1984) (identifying relevant typicality concern as whether
> "representation of the class will suffer if the named plaintiff is
> preoccupied with a defense"). Because [Nova Scotia] is subject to the
> unique defense that it never suffered a loss as a result of the
> conversion of its CB&I shares to McDermott shares, it is an
> inadequate and atypical class representative.

Dkt. 318 at 16. The first two sentences are true statements of law. And Nova Scotia may yet spend "considerable time" rebutting the argument that it benefitted from the alleged fraud. But as Nova Scotia notes, "whatever time is spent will be necessary[] for the benefit of the Class Members facing the defense." Dkt. 342 at 22. Given that CB&I shareholders owned 47 percent of post-Merger McDermott, that is likely a considerable portion of the class. *See* Dkt. 105 at 30 ("McDermott shareholders would own approximately 53% of the combined entity."); *see also* Dkt. 412 at 176 ("CB&I exchangers actually held a large number of shares. So they make up 62 percent.").

"Unique defense" means unique *to Nova Scotia*—not to half (or more) of the class. *See, e.g.*, *Plymouth Cnty. Ret. Sys. v. Apache Corp.*, 566 F. Supp. 3d 712, 719 (S.D. Tex. 2021) (potential plaintiff subject to unique defense that he is a net seller and net gainer); *Patel v. Reata Pharms., Inc.*, 549 F. Supp. 3d 559, 567 (E.D. Tex. 2021) (investor subject to unique defense where his "material gain in common stocks [made his] trading practices during the Class Period functionally the same as an investor who traded only in options and materially different from the putative class consisting largely of common stockholders"); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 455 (S.D. Tex. 2002) (plaintiff subject to unique defense that it did not buy in reliance either on the market or on statements by defendants, or on Registration Statements and Prospectuses). Accordingly, Nova Scotia is not subject to a unique defense that renders it an atypical representative. But that does not end the inquiry. Nova Scotia may yet devote considerable time to a defense that

is of no benefit whatsoever to actual purchasers of McDermott stock. That suggests a fundamental conflict.[7]

### 2. Nova Scotia, and All Former CB&I Shareholders, Have a Fundamental Conflict with the Rest of the Class

"For a conflict of interest to defeat the adequacy requirement, that conflict must be fundamental." *In re Deepwater Horizon*, 739 F.3d 790, 813 n.99 (5th Cir. 2014) (quoting *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 180 (4th Cir. 2010), and citing *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 186 (3d Cir. 2012); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003)). "A fundamental conflict exists where some party members claim to have been harmed by the same conduct that benefitted other members of the class." *Valley Drug*, 350 F.3d at 1189. "A conflict concerning the allocation of remedies amongst class members with competing interests can be fundamental and can thus render a representative plaintiff inadequate." *Dewey*, 681 F.3d at 184. "[N]o circuit has approved of class certification where some class members derive a net economic benefit from the very same conduct alleged to be wrongful by the named representatives of the class." *Valley Drug*, 350 F.3d at 1190.

It is too early to say whether former CB&I shareholders derived a *net* economic benefit from the alleged fraud.[8] "Nobody has quantified the inflationary effect . . . on CB&I stock." Dkt. 412 at 53. If CB&I's stock was less inflated than McDermott's stock, then former CB&I shareholders may prove an economic injury. This possibility is why Nova Scotia has standing. But it is also possible that CB&I's stock was more inflated than McDermott's stock, and that former CB&I shareholders derived a net economic benefit from exchanging their shares.[9] This

---

[7] While neither side has raised the issue of a fundamental conflict, as discussed above, I must conduct my own thorough inquiry. *See Stirman*, 280 F.3d at 563 n.7.

[8] It is too early to say whether the alleged fraud was, in fact, fraudulent.

[9] It is also possible the Merger was a zero-sum game for CB&I shareholders—that their shares were either going to be eviscerated in a CB&I bankruptcy, or McDermott's bankruptcy.

possibility represents a fundamental conflict. This is not a "merely speculative or hypothetical" conflict. 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed.). Nova Scotia's own expert has already conceded that "Defendants' alleged misstatements and omissions were clearly incorporated in CB&I's . . . stock price prior to the Merger." Dkt. 342-2 at 12. While this fact will ultimately be decided by the trier of fact, it is not a hypothetical or speculative conflict.

Now is not the time to litigate these issues, but I must "consider how a trial on the merits would be conducted if the class was certified." *Prantil*, 986 F.3d at 574 (quotation omitted). The inflationary effect of the alleged fraud on CB&I's stock simply does not concern purchasers of McDermott stock. To the extent it does concern them, purchasers of McDermott stock only benefit if former CB&I shareholders are excluded, or if former CB&I shareholders must accept an offset to their damages. *See, e.g.*, Dkt. 412 at 177 ("[W]ith a company that's in—has gone through bankruptcy, the pie cannot always get bigger, sort of by definition."). It is fundamentally unfair for absent class members who actually purchased McDermott stock to be represented by Nova Scotia and its counsel, who may yet expend considerable time—as they did during the class certification hearing—on this issue. *See, e.g.*, Dkt. 412 at 74–78, 102–119, 138–151, 217–242.

Having determined that Nova Scotia has a fundamental conflict with purchasers of McDermott stock, I must decide how to manage this conflict. Recognizing that subclassing is not always preferred, I have considered whether this fundamental conflict can be resolved without designating subclasses, such as "bifurcating liability and damage trials with the same or different juries" or "decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages." 3 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS § 7:31 (6th ed.). Because the possible lack of damages or benefit to Nova Scotia goes to Defendants' liability—an affirmative defense that need not be addressed by purchasers of McDermott stock—the creation of two classes is the best approach. Accordingly, I recommend: one class of CB&I shareholders who

converted their CB&I stock into McDermott stock via the Merger, and one class of purchasers of McDermott stock. *See* FED. R. CIV. P. 23(c)(5) ("When appropriate, a class may be divided into subclasses that are each treated as a class under this rule."). If certified, class members who both converted CB&I stock into McDermott stock *and* purchased McDermott stock would hold claims in both classes.

The things that make Nova Scotia an inadequate representative of those class members who purchased McDermott stock are inapplicable to a class of former CB&I shareholders. But Nova Scotia cannot represent a class of purchasers of McDermott stock. Accordingly, the Court should appoint a lead plaintiff for a putative class of purchasers of McDermott stock.

At the outset of this litigation, five movants timely filed motions seeking appointment as the § 10(b) Lead Plaintiff: Wah Kee Ho, Donald Piliero, Alfred Rodrigues, University of Puerto Rico Retirement System, and City of Pontiac General Employees' Retirement System. *See* Dkts. 10, 14, 18, 20, 21. I recommend the Court permit these five plaintiffs to move to be appointed lead plaintiff of a class of purchasers of McDermott stock. Whichever plaintiff is appointed can then move for certification of a class of purchasers of McDermott stock.

* * *

Having determined that Nova Scotia is an adequate and typical representative of a class of CB&I shareholders, I turn to the remaining certification challenges.

## D.   NOVA SCOTIA'S DAMAGES METHODOLOGY IS SUFFICIENT

Defendants attack Nova Scotia's damages methodology on four fronts, arguing that (1) Dr. Nye's methodology leads to economically nonsensical results whether he estimates inflation using the dollar method or the percent method; (2) Dr. Nye's model "does not account whatsoever for the offsetting economic gains that accrued to class members who also owned CB&I shares"; (3) "Dr. Nye glosses over . . . [how he will] calculate the alleged inflation during the [] almost six-month period between the beginning of the alleged Class Period and when the Merger was

completed"; and (4) Dr. Nye does not identify "how the damages methodology will match purchases and sales together." Dkt. 318 at 18–20. None of these arguments is persuasive.

First, courts in this district routinely find that "[t]he *Comcast* requirement is easily satisfied in securities fraud cases invoking the *Basic* presumption and seeking out-of-pocket damages because fraud on the market presumes a causal connection between the misrepresentations and the price of the stock." *Rougier v. Applied Optoelectronics, Inc.*, No. 4:17-cv-02399, 2019 WL 6111303, at \*15 (S.D. Tex. Nov. 13, 2019). Furthermore, Dr. Nye has explained that the economically nonsensical results Defendants warn of are simply not possible under the "capped-dollar method" in which "the price inflation at that moment is 'capped' at the sale price (*i.e.*, the remaining fraud-related inflation in the stock cannot exceed its price)." Dkt. 342 at 25; *see also* Dkt. 342-2 at 48–50.

Second, Dr. Nye testified that "upon analysis of the actual level of price inflation of damages if there was a reason to have an offset, it could be modeled and applied on a class-wide basis." Dkt. 412 at 78. Nova Scotia's counsel asked Allen: "Let's say the jury accepts your view [that CB&I exchangers had to have received a benefit]. Let's say the jury believes that a \$2 offset, a \$3 offset, a \$4 offset should be applied. Is there any reason that couldn't be applied for each share that was exchanged?" *Id.* at 237. Rather than answer this question and rebut Dr. Nye's testimony, Allen merely reiterated Defendants' position that "the proposed lead plaintiffs and substantial members of the class are benefiting rather than having a damage, [and] they shouldn't be in the class." *Id.* Thus, I have no reason to think that Dr. Nye's methodology cannot account for any offsetting economic gains that may have accrued to CB&I shareholders.

Third, "[Dr.] Nye's methodology of determining damages is consistent with the plaintiffs' theory that the class's losses come from the inflated stock price caused by the defendants' misstatements and later price drop when the truth was revealed." *Ferris v. Wynn Resorts Ltd.*, No. 2:18-cv-00479, 2023 WL 2337364, at

*12 (D. Nev. Mar. 1, 2023). "[D]efendants' argument that [Dr.] Nye's method fails to account for the possibility that inflation is not necessarily constant over the entire class period is premature at this stage." *Id.* The Second Circuit has addressed this exact argument head-on:

> [W]e are not persuaded by the Defendants' argument that class certification was improper under *Comcast* because the Plaintiffs' damages model failed to account for variations in inflation over time. *Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that "[c]alculations need not be exact." 569 U.S. at 35, 133 S.Ct. 1426. Thus, even accepting the Defendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the Defendants' argument fails.
>
> Dr. Nye explained that damages for individual class members could be calculated by applying a method across the entire class that focused on the decline in stock price following the disclosure of the New York Attorney General's lawsuit and then isolating company–specific events from market and industry events. His model also accounted for calculating the damages for individual class members based on their investment history.
>
> Therefore, we conclude that the district court did not abuse its discretion when it certified the Plaintiffs' class over the Defendants' damages–related objections.

*Waggoner v. Barclays PLC*, 875 F.3d 79, 106 (2d Cir. 2017). I see no reason to depart from this analysis.

Fourth, Defendants' own expert disavowed the need to match shares to one another in a 10(b) case, stating that "if you think the shares are inflated, you can see how much you benefited from the inflation and you can see how much you were harmed by the inflation. And you don't need to match one share to another. ***It doesn't matter***." Dkt. 342-3 at 37 (emphasis added).

* * *

For these reasons, Nova Scotia's damages methodology satisfies *Comcast*.

## E.   SHORT SELLERS DO NOT CREATE A PREDOMINANCE PROBLEM

Lastly, Defendants argue that the "unusually high amount of short selling creates a reliance problem because short sellers' atypical motivations prevent them

from invoking the fraud-on-the-market presumption." Dkt. 318 at 22. Defendants contend "that reliance problem devolves into a predominance issue due to the need for individualized reliance inquiries." *Id*. The Fifth Circuit has explained the basics of short selling:

> Short selling is accomplished by selling stock which the investor does not yet own; normally this is done by borrowing shares from a broker at an agreed upon fee or rate of interest. At this point the investor's commitment to the buyer of the stock is complete; the buyer has his shares and the short seller his purchase price. The short seller is obligated, however, to buy an equivalent number of shares in order to return the borrowed shares. In theory, the short seller makes this covering purchase using the funds he received from selling the borrowed stock. Herein lies the short seller's potential for profit: if the price of the stock declines after the short sale, he does not need all the funds to make his covering purchase; the short seller then pockets the difference. On the other hand, there is no limit to the short seller's potential loss: if the price of the stock rises, so too does the short seller's loss, and since there is no cap to a stock's price, there is no limitation on the short seller's risk.

*Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 450 (5th Cir. 2008) (quoting *Zlotnick v. TIE Commc'ns*, 836 F.2d 818, 820 (3d Cir. 1988)).

Defendants' argument that short sellers cannot invoke the *Basic* presumption is the minority rule. I greatly appreciate and commend the candor of Defendants' counsel in acknowledging the "competing line of authority that would permit short sellers to invoke the fraud-on-the-market presumption despite their atypical beliefs and motivations." Dkt. 318 at 24. But I agree with the Seventh Circuit and the reasoning of the erudite then-Chief Judge Easterbrook:

> That the class includes short sellers (many investors were long at some times and short at others) also is irrelevant. A person buys stock (goes long) because he thinks the current price too low and expects it to rise; a person sells short (sells today and promises to cover in the market and deliver the shares in the future) because he thinks the price too high and expects it to fall. These positions are mirror images. If a long can participate in a class, so can a short. Both the long and the short are affected by news that influences the price they pay or receive. It may turn out that the shorts do not suffer compensable losses—that, indeed, the shorts' gains should be

subtracted from the longs' losses, and only the net treated as damages—but this does not imply that the class definition is defective. *See Kohen v. Pac. Inv. Mgmt. Co.*, 571 F.3d 672 (7th Cir. 2009); *Fry v. UAL Corp.*, 84 F.3d 936, 938–39 (7th Cir. 1996).

> Defendants' insistence that short sellers don't rely on the market price suggests that they misunderstand the efficient capital market hypothesis, which underlies the fraud-on-the-market doctrine. . . .

> Short sellers play a role in aligning prices with information under any version of the efficient capital market hypothesis. That the resulting price may be inaccurate does not detract from the fact that false statements affect it, and cause loss, whether or not any given investor reads and relies on the false statement. That's all that *Basic* requires.

*Schleicher v. Wendt*, 618 F.3d 679, 684–85 (7th Cir. 2010). Thus, I disagree that the large short position defeats predominance.

* * *

Defendants' remaining arguments against class certification regarding market efficiency after September 19, 2019, and the correctiveness of the last five alleged corrective disclosures, pertain to a period in time that is relevant only to actual purchasers of McDermott stock. Those arguments are best addressed by a lead plaintiff who has, in fact, purchased McDermott stock. Thus, I recommend the Court defer consideration of these arguments until a lead plaintiff for a putative class of purchasers of McDermott stock is appointed and moves for class certification.

## CONCLUSION

For the reasons discussed above, I recommend the Motion for Class Certification (Dkt. 305) be **GRANTED** in part.

Specifically, I recommend the Court hold:

1. Nova Scotia—a former CB&I shareholder—has standing to pursue its claims, and is an adequate representative of a class of CB&I shareholders.

2. Nova Scotia's counsel, Pomerantz and Briscoe, are adequate Lead and Local Counsel, respectively, for a class of CB&I shareholders.

3.    Nova Scotia's damages methodology satisfies *Comcast* and can account for any inflation in CB&I's stock as a result of the alleged fraud, and the corresponding economic benefit to CB&I Shareholders.

4.    The large number of short sellers does not defeat predominance.

5.    Nova Scotia and its counsel have a fundamental conflict with and cannot represent purchasers of McDermott stock. This conflict necessitates two classes and two lead plaintiffs.

6.    Nova Scotia and its counsel satisfy all Rule 23 requirements for the following class, which should be certified now:

All persons and entities (the "§ 10(b) CBI Subclass") who converted stock in Chicago Bridge & Iron Company, N.V. (NYSE: CBI) into stock of McDermott International, Inc. (NYSE: MDR) via the merger of CBI and MDR, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

7.    The Court will permit motions from the five plaintiffs—Wah Kee Ho, Donald Piliero, Alfred Rodrigues, University of Puerto Rico Retirement System, and City of Pontiac General Employees' Retirement System—who timely filed to be the § 10(b) Lead Plaintiff at the outset of this litigation to be lead plaintiff for the following class:

All persons and entities (the "§ 10(b) MDR Subclass") who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017, and January 23, 2020, both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§ 10(b) and 20(a) and SEC Rule 10b-5.

8.    Class members who both converted CB&I stock into McDermott stock and purchased McDermott stock will hold claims in both classes.

9.    Arguments regarding market efficiency after the Merger and the price impact of the last five alleged corrective disclosures are best addressed by the Lead Plaintiff of the putative § 10(b) MDR Class once appointed.

The parties have 14 days from service of this Memorandum and Recommendation to file written objections. *See* 28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b)(2). Failure to file timely objections will preclude appellate review of factual findings and legal conclusions, except for plain error.

SIGNED this 24th of April 2024.

_____
ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE