**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| MIRIAM EDWARDS, Individually and On Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MCDERMOTT INTERNATIONAL, INC., DAVID DICKSON, STUART SPENCE,<br><br>Defendants, | **Case No. 4:18-cv-4330**<br>**(Consolidated)**<br><br>**CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS ON BEHALF OF THE EXCHANGE ACT §10(B) CLASS**<br><br>**JURY TRIAL DEMANDED** |

# TABLE OF CONTENTS

PART 1: CONSOLIDATED CLASS ACTION COMPLAINT (ECF 105) ...................... 1

I. NATURE OF THE ACTION ........................................................................ 2

II. JURISDICTION AND VENUE .................................................................. 13

III. PARTIES ................................................................................................ 14

IV. NON-PARTY CONFIDENTIAL WITNESSES ............................................. 16

V. SUBSTANTIVE ALLEGATIONS ................................................................ 25

A. McDermott's Business & Operations ........................................................ 25

B. CB&I's Business & Operations ................................................................ 26

C. McDermott & CB&I Announce Their Potential Merger ............................ 32

D. Post-Announcement Scrutiny Focused On The Four Focus Projects ......... 33

E. The Four Focus Projects Carried Undisclosed Forecasted Costs Of Well Over $1 Billion When The Merger Was Announced And When It Closed......... 36

1. *Undisclosed Facts and Risks Concerning The Cameron Project* ......... 37

2. *Undisclosed Facts and Risks Concerning The Calpine Project* ........... 50

3. *Undisclosed Facts and Risks Concerning The Freeport Project* .......... 53

4. *Undisclosed Facts and Risks Concerning The IPL Project* .................. 55

5. *The Four Focus Projects' Undisclosed Catastrophic Financial Impacts* ........................................................................................ 55

F. Materially False and Misleading Statements Issued During the Period ..... 62

1. *The CB&I / Focus Project Fraud* ........................................................ 63

a. *Pre-Merger Misstatements & Omissions* .............................. 63

b. *Post-Merger Misstatements & Omissions* ........................... 109

2. *The Technology Business Fraud* ....................................................... 140

3. *The Capital Structure / Liquidity Fraud* .......... 191

4. *Partial Corrective Disclosures Incrementally Revealed The Frauds* .......... 224

G. Additional Facts Probative Of Scienter .......... 239

1. *Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter* .......... 239

a. McDermott's Extensive Pre-Announcement Due Diligence .......... 239

b. McDermott's Extensive Post-Announcement / Pre-Merger Due Diligence .......... 249

c. Additional Red Flags Around The Time Of The Merger .......... 258

d. With Defendants Dickson And Spence At The Helm, McDermott Knowingly Continued Improprieties After The Merger .......... 259

2. *Defendants Dickson & Spence Were Financially Motivated To Commit Fraud* .......... 261

3. *McDermott Raised Funds During The Class Period* .......... 269

4. *The Fraud Implicated Core Operations* .......... 270

5. *Defendants Signed, Were Quoted In, Or SOX Certified The Alleged Misstatements* .......... 273

6. *The Fraud Violated McDermott's Corporate Code of Conduct* .......... 274

VI. NO SAFE HARBOR .......... 276

VII. THE CLAIMS ARE TIMELY .......... 277

VIII. LOSS CAUSATION/ECONOMIC LOSS .......... 278

IX. PRESUMPTION OF RELIANCE .......... 280

X. PLAINTIFFS' CLASS ACTION ALLEGATIONS .......... 281

XI. CLAIMS FOR RELIEF .......... 285

COUNT I ........................................................................................................ 285

COUNT II ....................................................................................................... 289

XII. PRAYER FOR RELIEF ............................................................................ 291

XIII. DEMAND FOR TRIAL BY JURY ........................................................... 292

PART 2: SUPPLEMENT UNDER FED. R. CIV. P. 15(d) TO THE CORRECTED CLASS ACTION COMPLAINT (ECF 220) ON BEHALF OF THE §10(B) CBI SUBCLASS ........................................................................................................ 298

I. EXPANDED INTRODUCTION ................................................................. 298

II. MODIFIED CLASS PERIOD & CLASS DEFINITION ................................... 299

III. SUPPLEMENTED PARTY DESCRIPTION ................................................ 300

IV. ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ....................................... 300

V. ADDITIONAL PARTIAL CORRECTIVE DISCLOSURES ............................. 315

VI. ADDITIONAL SCIENTER ALLEGATIONS ................................................ 320

A. Defendants Dickson & Spence Were Further Financially Motivated To Continue Committing Fraud ........................................................ 321

*Defendants Dickson & Spence Were Motivated To Commit Fraud By Compensation Increases Tied To The Bankruptcy* ..................................... 321

*Defendant Dickson Was Motivated To Commit Fraud By Gaining An Equity Stake In The Reorganized Company* .................................................. 322

B. Defendants Dickson And Spence Belatedly Disclosed An SEC Investigation While Engaging In Insider Trading ............................................ 323

C. Defendant Spence's Suspicious Resignation And Lavish Severance Package Evidence Scienter ................................................................... 324

D. Delayed Disclosure Of A Criminal Investigation Evidences Scienter ...... 325

VII. ADDITIONAL LOSS CAUSATION / ECONOMIC LOSS ALLEGATIONS .. 325

VIII. EXPANDED CLAIMS FOR RELIEF ......................................................... 325

PART 3: AMENDMENT ON BEHALF OF THE §10(B) MDR SUBCLASS TO COMBINED PLEADINGS AT ECF 105 (CLASS ACTION COMPLAINT) AND ECF 220 (SUPPLEMENT) ........ 328

I. ADDITIONAL NATURE OF THE ACTION ALLEGATIONS (CCAC §I) ........ 328

II. ADDITIONAL PARTIES ALLEGATIONS (CCAC §III) ........ 330

III. ADDITIONAL SUBSTANTIVE ALLEGATIONS (CCAC §V.A.-V.E.) ........ 331

IV. ADDITIONAL POST-10(b) CLASS PERIOD ALLEGATIONS (CCAC §V) ........ 356

V. ADDITIONAL MATERIALLY FALSE OR MISLEADING STATEMENTS OR OMISSIONS DURING THE 10(b) CLASS PERIOD (CCAC §V.F) ........ 357

VI. ADDITIONAL PARTIAL CORRECTIVE DISCLOSURES ........ 364

VII. ADDITIONAL SCIENTER ALLEGATIONS (CCAC §V.G) ........ 369

VIII. EXPANDED LOSS CAUSATION / ECONOMIC LOSS ALLEGATIONS (CCAC §VIII) ........ 381

IX. EXPANDED CLAIMS FOR RELIEF (CCAC §XI) ........ 381

**PART 1: CONSOLIDATED CLASS ACTION COMPLAINT (ECF 105)**

The Nova Scotia Health Employees' Pension Plan ("NSHEPP"), Lead Plaintiff overseeing all claims arising under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Rule 10b-5 thereunder from June 4, 2019 (ECF 84) through May 17, 2026 and Lead Plaintiff of the Court-certified §10(b) CBI Subclass (defined below) since June 21, 2024 (ECFs 546, 579), and Christopher Coligado ("Coligado"), Lead Plaintiff of the §10(b) MDR Subclass since May 18, 2026 (ECFs 689, 696) (together, the "10(b) Lead Plaintiffs"), individually and on behalf of all other persons similarly situated, by their undersigned attorneys, for their complaint against Defendants, allege the following based upon personal knowledge as to themselves and their own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included a review of Defendants' public statements and publicly available documents, conference calls and announcements, SEC filings, wire and press releases published by and regarding McDermott International, Inc. ("McDermott"), analysts' reports and advisories and other press coverage about McDermott, McDermott's stock chart, McDermott's corporate website, data obtained through news services such as Bloomberg and Yahoo! Finance, interviews with certain confidential witnesses ("CWs") who were former employees of McDermott and/or Chicago Bridge & Iron Company, N.V. ("CB&I") or its joint venture

partners, and information readily obtainable on the Internet.[1] 10(b) Lead Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I. NATURE OF THE ACTION

1. This is a federal securities class action brought on behalf of a class ("10(b) Class") consisting of all persons and entities who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017 and January 23, 2020,[2] both dates inclusive ("10(b) Class Period"), seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. Excluded from the 10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

2. During the 10(b) Class Period, in press releases, SEC filings, and teleconferences with analysts and investors, Defendants made extensive public statements

---

[1] The allegations in this Introduction, as well as §§I. – XIII. and Figures 1-2 *supra*, are replicated, with only minor conforming revisions that can be presented to the Court in redline form upon request, from NSHEPP's Corrected Class Action Complaint for Violations of the Federal Securities Laws on Behalf of the Exchange Act §10(b) Class (ECF 105) ("CCAC"), filed on October 4, 2019. Challenges to the CCAC under Fed. R. Civ. P. 12(b)(6) were already litigated, with the CCAC fully upheld by the Court by its Order entered on March 21, 2021 (ECF 163) and its Memorandum Opinion and Order entered on April 13, 2021 (ECF 168).

[2] The 10(b) Class Period was expanded by NSHEPP's Supplement (ECF 220), defined and discussed below, with that expanded period upheld by the Court's rulings set forth in the Memorandum and Recommendation entered on August 30, 2022 (ECF 265) and the Order entered on September 22, 2022 (ECF 268).

about four large, challenging CB&I projects in the U.S. (“Four Focus Projects” or “Focus Projects”) that McDermott acquired as part of its May 2018 acquisition of CB&I, two gas turbine projects known as the Calpine Gas Turbine Power Project (“Calpine”) and the IPL Project (“IPL”), and two liquefied natural gas (“LNG”) export facility projects known as the Freeport LNG Project (“Freeport”) and the Cameron LNG Project (“Cameron”); (b) the importance of McDermott’s acquisition of CB&I’s technology business, Lummus (“Technology Business” or “Lummus”), and McDermott’s ability to integrate and operate that business as a post-Merger company despite the challenges posed by the Four Focus Projects; and (c) the strength and viability of McDermott’s post-merger capital structure, balance sheet, liquidity, and financial health in light of its acquisition of CB&I, and specifically the Four Focus Projects. The picture painted for analysts and investors was one of a strong company, capitalizing on a discounted acquisition of a complementary peer and seamlessly integrating its most significant projects and assets, for which it had appropriately accounted.

3. For instance, Defendants stated in their January 1, 2018 presentation and March 22, 2018 presentation, that the “Four focus projects have been ***significantly de-risked*** with respect to engineering, quantities and procurement.” They went on to say, in the same two presentations, “We believe the four focus projects are not representative of the entire portfolio and have unique characteristics that will continue to be ***de-risked*** significantly in 2018.” During a February 21, 2018 Earnings Call, referencing CB&I’s having disclosed over $100 million of Q4 2017 operating charges related to the Four Focus

Projects, Defendant Dickson reassured investors that the situation was expected and under control, and said:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence***.

4. Also, during an April 24, 2018 conference call, Defendant Dickson assured investors that McDermott, through its due diligence, had mitigated the risk to McDermott of CB&I's Focus Project contacts, and stated:

> These projects respectively reached 84%, 82% and 84% completion and incurred ***no material project charges*** during the quarter. Through our integration planning process, ***we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three [sic] projects and to continue to execute successfully on the broader portfolio***.

5. Defendants also deceived investors about CB&I's Technology Business in propping up the value of the Merger as a whole, including CB&I's entire business and the Four Focus Projects, while concealing that the Technology Business was the key valuable asset of CB&I, that McDermott had contemplated acquiring just the Technology Business for a comparable price as it paid for the whole company, and that the Four Focus Projects were so far removed from forecasts that they were an albatross on the Technology Business and, if acquired, McDermott's entire operations. While the deal may have been prudent for CB&I, to stave off bankruptcy, the same was not true for McDermott, and Defendants concealed the true risks of merging with CB&I rather than merely acquiring the Technology Business. In a December 18, 2017 press release McDermott filed with the SEC

as an exhibit to a Form 8-K signed by Defendant Spence, Defendant Dickson was quoted as stating, *inter alia*:

> This transaction combines ***two highly complementary businesses*** to create a leading onshore-offshore EPCI company ***driven by technology and innovation***, with the scale and diversification to better capitalize on global growth opportunities

6. McDermott concealed that the Technology Business was being saddled with CB&I projects that made the transaction far less desirable than the way in which it was being presented, with the Technology Business front and center, and the downside elements explained away in a misleading manner, underestimating the true risks and costs involved.

7. Defendants' insistence that McDermott's post-Merger balance sheet would be stable and have enough working capital to prevent liquidity issues and maintain a sustainable capital structure, even while McDermott barreled towards an undisclosed liquidity crisis due to the immensely under-estimated costs of the Four Focus Projects, also constituted fraudulent conduct. From before the merger closed, the Proxy Statement said, "***After the Combination, McDermott expects to have a strong capital structure.***" After the merger, Defendants represented throughout the Class Period that McDermott's capital structure met its needs and that its cash and cash equivalents, cash flows, credit facilities, lines of credit, and non-core assets sales would be enough to finance capital expenditures, settle commitments and contingencies, and address working capital needs. These representations were false, as McDermott routinely underestimated costs on the Four Focus

Projects and was on a path to crisis, leading to the need to unload core assets and seek emergency loans just five operating quarters after acquiring CB&I.

8. Unbeknownst to investors, as detailed by numerous confidential witnesses (CW) statements of former company employees, many of whom held high-level positions, and the objective evidence set forth in CB&I's internal documents including risk assessments, set forth in §V.E. herein, CB&I had been misrepresenting the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." As a result, during the period when McDermott conducted extensive pre-Merger due diligence, it was already internally apparent that the Four Focus Projects were gravely behind schedule and over budget and, as such, would vastly underperform their contracts. For instance, CW6 said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted

risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron.

9. These undisclosed, material, adverse facts were known to Defendants before the Merger closed, through the extensive due diligence that McDermott stated it performed in advance of the Merger's closing, both before the Merger had even been announced in December 2017 and during the period between the Merger announcement and its closing in May 2018. Before the Merger was even announced, in 2017 and early 2018, McDermott undertook an exhaustive due diligence review that included, *inter* alia, examination of detailed data and reporting on the Four Focus Projects, such as project forecasts, actuals to date, quantities, accurate performance factors, project controls-type information, and indicators of project success and cost to date. Defendants also devoted significant time and energy to meetings about the potential CB&I acquisition and McDermott had a dedicated, five-person special accounting team vet the acquisition. CWs with extensive knowledge of McDermott's due diligence efforts corroborated this due diligence. After the Merger was announced, McDermott continued to undertake extensive due diligence efforts in the form of integration planning using teams from both companies, multi-day site visits at CB&I project sites, including the Focus Projects, and integrating functional groups like sales and engineering. This post-announcement diligence was also corroborated by CWs with detailed knowledge.

10. On October 30, 2018, after hours, McDermott issued a press release announcing its Q3 2018 financial results, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence. In it, McDermott disclosed that it was recording ***$744 million*** total in changed estimates to the Calpine LNG project, the Freeport LNG Project, and the Calpine gas power project; that it was taking "significant steps" to address the performance issues on those projects, including installation of a new Chief Operating Officer ("COO"); and that McDermott had completed a strategic review, determined the tank storage business and U.S. pipe fabrication business to be "not core to our vertical integration," and developed plans to exit those markets and to seek buyers for those segments. On this news, amidst shock and panic by analysts, McDermott's stock price fell $5.14, an astounding ***40% single-day decline***, on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.

11. Yet, Defendants continued to mislead analysts and investors. Indeed, the October 30, 2018 press release itself stated, "***We expect no further material changes in the cost estimates on these projects***." Defendant Dickson said "***[W]e expect no further material changes in the cost estimates on the legacy Focus Projects, which we believe have been significantly and incrementally de-risked*** as compared to where we were in Q2 [2018]" in an earnings call that same day. McDermott Form 10-Q for Q3 2018, filed with the SEC the same day, touted the success of the acquired technology segment, while failing to disclose the full brunt of the downside created by other acquired CB&I assets. The 10-Q filing also contained a false and misleading statement from McDermott about their balance sheet situation:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit, together with the expected proceeds for the Private Placement, ***will be sufficient to finance our capital expenditures… settle our commitments and contingencies… and address our normal, anticipated working capital needs for the foreseeable future.***

12. However, on February 13, 2019, McDermott issued a press release, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, "commenting on its assessment of the financial position of the Cameron LNG project as of December 31, 2018." It stated that for the fourth quarter of 2018, McDermott was recording another ***$168 million*** in adverse changed estimates, purportedly due to unfavorable labor productivity and increases in subcontract, commissioning and construction management costs, which impacted McDermott's reported financials for the three months and year ended December 31, 2018. On this news, which again caught analysts and the market off-guard, McDermott's stock price fell $2.48, a massive ***26.7% single-day decline***, on extremely high volume, from its February 12, 2019 closing price of $9.30 to close at $6.82 on February 13, 2019.

13. On July 29, 2019, McDermott issued an after-hours press release, which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence. In it, McDermott disclosed a ***$205 million cash burn*** for operating activities in the second quarter of 2019, reflecting both a $146 million net loss and the cash used on Cameron. McDermott also lowered 2019 guidance due, *inter alia*, to changed assumptions about the performance of the Four Focus Projects and a shift from 2019 to 2020 in the timing of remaining incentives on the Cameron project. On this news, which again surprised

analysts, McDermott's stock price fell $3.56, another huge ***35.3% single-day decline***, on very high volume, from its July 29, 2019 closing price of $10.08 to close at $6.52 on July 30, 2019.

14. On September 18, 2019, McDermott's stock plummeted a ***whopping 49%*** in morning trading, on high volume, amid leaks and rumors that it had hired a turnaround firm. The *Wall Street Journal* published an article reporting that McDermott "has engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses." Trading was halted for several hours, followed by multiple attempts to restart trading that had to be aborted due to volatility. Finally, McDermott issued a cryptic statement that failed to deny an impending bankruptcy filing, effectively confirming its severe financial distress. The single-day decline of $3.72, from $5.88 to $2.16, represented an unprecedented ***63.3%*** decline. Due to the multiple trading halts imposed during that day, the stock had not yet bottomed out. According to a Citi analyst report from after-hours on September 18, 2019, McDermott needed cash fast to counteract its negative working capital issues, and its Lummus Technology Business was among the assets that could get it that cash, even if that meant the price "in an urgent sale situation could be under pressure." Citi analysts went on to say that prior to the Merger, CB&I had received "significant interest for its Technology asset." Declines continued, both in after-market trading that day and pre-market trading the next day.

15. On September 19, 2019, McDermott's stock fell another ***22.7%***, on even higher volume, to close at $1.67. The two-day decline of $4.21 represented ***a wipeout of 71.6% of McDermott's stock price***.

16. Incredibly, the evisceration of McDermott's shareholders was not yet over. A UBS analyst report from September 23, 2019 stated that McDermott confirmed multiple bidders were involved in the Lummus Technology sale process. Shortly thereafter, on September 24, 2019, reports came out indicating McDermott was seeking a bridge loan to the tune of around $1.7 billion. This news revealed to the market that the asset sale process would not finish soon enough to resolve McDermott's short term woes. *Bloomberg* reported that the bridge loan was to cover McDermott's working capital deficit "until it can sell an asset such as its Lummus Technology unit…." Upon this news of continued balance sheet turmoil, McDermott stock fell $0.20 on September 24, 2019 to a closing price of $2.15, an ***8.5%*** drop from its September 23, 2019 close of $2.35.

17. A few days later, on September 27, 2019, analysis came out detailing McDermott's credit situation as it pertained to obtaining a bridge loan. McDermott, according to an Xtract Research report, would find it "virtually impossible" to obtain super-senior debt that had seniority status over existing creditors because existing creditors were unlikely to accept changes that moved them back in the priority line. Given McDermott's dire cash flow situation, and inability to unload major assets quickly, the bridge loan was a necessity to keep operations afloat. As these difficulties emerged, McDermott stock fell $0.20 on September 27, 2019 to a closing price of $2.00, a ***9.1%*** drop from its previous day close of $2.20.

18. McDermott's shareholders have been devastated. Since the day McDermott announced its proposed Merger with CB&I, December 18, 2017, when its stock closed at

$22.77, its share price has declined $21.07, ***an evisceration of 92.5% of its market capitalization!***

19. Defendants had significant financial motives both to close the acquisition of CB&I, notwithstanding the undisclosed problems with the Four Focus Projects, McDermott's inability to absorb those projects along with CB&I's desirable Technology Business, and the severe and unmanageable strain on McDermott's capital structure and balance sheet posed by these projects, and to mislead investors both before and after the Merger's close.

20. Incentive compensation and insider transactions support a strong scienter inference for Defendants that is at least as cogent and compelling as any alternative inference. Both Defendants Dickson and Spence were motivated by incentive compensation to close the Merger, despite the findings of McDermott's due diligence, and to commit the securities fraud alleged herein. Attributable to their work on the Merger, Defendants Dickson and Spence received "Recognition Bonuses" of ***$1,125,000*** and ***$637,500***, respectively. Despite the financial difficulties of fiscal year 2018, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger and post-Merger time periods to immunize Defendants Dickson and Spence from the impact of charges taken post-merger on the Focus Projects. Further, the Merger elevated McDermott into a different peer group of companies, leading to Defendants Dickson and Spence receiving increases in their base and incentive compensation.

21. Defendants Dickson and Spence also netted a combined ***$9,984,700***, along with 727,464 additional shares acquired at no expense in net ill-gotten gains from

transactions during the 10(b) Class Period, while the fraud was raging, the true facts remained hidden from investors, and McDermott's stock price was inflated by the fraud. These transactions were highly suspicious in amount, a fact that further supports the scienter inference. Dickson's ***$8,015,187*** in net insider transaction gains compare suspiciously against his 2018 salary of $1,125,000. Spence's ***$1,969,513*** in net insider transaction gains compare suspiciously against his 2018 salary of $650,000. Additionally, the Individual Defendants' sale/exercise of certain stock units – PSUs and RSUs – during the 20-month 10(b) Class Period compares suspiciously against their far lower sale/exercise of PSUs and RSUs in the preceding 20-month period. These transactions were also highly suspicious in timing vis-à-vis the alleged fraudulent misstatements and the alleged partial corrective disclosures, a fact that further supports the scienter inference.

22. As a result of Defendants' wrongful acts and omissions as alleged herein, and the precipitous decline in the market value of McDermott's securities, 10(b) Lead Plaintiffs and the other 10(b) Class members have suffered significant losses and damages. This action represents their only opportunity to seek recovery.

## II. JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

24. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

25. Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) as McDermott's U.S. headquarters are located within this District and a significant portion of the Defendants' actions, and the subsequent damages, took place within this District.

26. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## III. PARTIES

27. 10(b) Lead Plaintiffs bringing this action, individually and on behalf of the 10(b) Class members, are as follows:

(a) §10(b) CBI Subclass Lead Plaintiff Nova Scotia Health Employee's Pension Plan, as set forth in its accompanying Supplemental Certification, which is incorporated by reference herein, acquired McDermott's common stock at artificially inflated prices during the 10(b) Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

(b) §10(b) MDR Subclass Lead Plaintiff Christopher Coligado, as set forth in his accompanying Supplemental Certification, which is incorporated by reference herein, purchased McDermott's common stock at artificially inflated prices during the 10(b) Class Period and was damaged upon the revelation of Defendants' fraud, as alleged herein.

28. Defendant McDermott is incorporated under the laws of the country of Panama, with its principal executive offices located at 757 North Eldridge Parkway,

Houston, Texas 77079. McDermott's common stock trades on the New York Stock Exchange under the ticker symbol "MDR." At relevant times, the McDermott website has listed at least eight different analysts who follow it, and millions of McDermott common shares typically trade daily.

29. Defendant David Dickson ("Dickson") has served as President and Chief Executive Officer ("CEO") of McDermott since December 2013. According to McDermott's SEC filings, at the time of the Merger, Dickson had "more than 25 years of industry experience, including 11 years with Technip S.A. and its subsidiaries." Prior to McDermott, from September 2008 to October 2013, he served as President of Technip U.S.A. Inc., overseeing Technip's entire North American operations.

30. Defendant Stuart Spence ("Spence") has served as Executive Vice President and Chief Financial Officer ("CFO") of McDermott since August 2014. According to McDermott's SEC filings, at the time of the Merger, Spence had "more than 25 years of financial and operation management experience with companies in oilfield products and services, and engineering and construction businesses."

31. Defendants Dickson and Spence are sometimes referred to herein, collectively, as the "Individual Defendants." The Individual Defendants, because of their positions with McDermott, possessed the power and authority to control the contents of McDermott's SEC filings, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The Individual Defendants were provided with copies of McDermott's filings and press releases alleged herein to have been false or misleading prior to, or shortly after, their issuance and had the

ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations that were being made were then materially false and/or misleading. The Individual Defendants are liable for the false and misleading statements alleged herein.

32. Defendant McDermott and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## IV. NON-PARTY CONFIDENTIAL WITNESSES

33. CW1 worked at CB&I starting in May 2012, having come to CB&I as part of CB&I's 2013 acquisition of the Shaw Group, Inc. ("Shaw"), and most recently worked as Director of Project Controls at Cameron from June 2016 to June 2018 and as Director of Project Controls at Calpine from spring 2015 until mid-June 2016. CW1 worked in CB&I's headquarters for about a year before going to the Calpine project in Delta, PA. In June 2016, CW1 went to work on-site at the Cameron project, where CW1 was in charge of change management and risk, reporting to Senior Director of Project Controls Syed Kakakhel, until CW1 left the company in June 2018, just after McDermott closed the Merger. CW1 also had black line reporting to the corporate office, reporting for some of that time to Jerry Burns.

34. CW2 worked at CB&I from March 2008 until November 2017, for the final three years as the Financial Operations Controller for the USA Oil and Gas Division. CW2 was responsible for the full financial reporting of CB&I for the Americas segment, which

encompassed every oil and gas project in Canada, the U.S., Central America, and South America. CW2 was based out of CB&I's Woodland offices for the first seven or eight years and then its Westchase office, which was headquarters for the Americas segment. For the Americas segment, CW2 reported directly to Dane Osborne, SVP of Operations for the Americas who was over the Cameron and Freeport projects. Through the financial rollup, CW2 reported first to Travis Stricker and then to Adam Harwell. CW2's divisional reporting went to Stricker or Harwell, who combined the Power, Oil & Gas, and Fabrication segments into a single report given to senior management. CW2 said that Tom McCormick was President of the Americas segment until about a year before CW2 left, and was replaced in that role. CW2 left the company in November 2017, when CB&I was in the process of merging with McDermott, which was a reason CW2 departed.

35. CW3 worked at CB&I and, post-Merger, McDermott from April 2015 through February 2019, as the Cost Manager on the Cameron project, initially based in Houston during project engineering and then on-site during the construction phase starting in roughly July 2016. CW3 oversaw a group that managed costs and provided forecast information and reported to the Project Controls Manager, who was initially Tom Fuller, then Mike Samick, then Syed Kakakhel.

36. CW4 worked at CB&I from July 2005 through May 10, 2018, leaving just as the Merger closed. As Senior Vice President for Construction from 2009 onward, CW4 ran CB&I's global construction operations out of CB&I's Woodlands, Texas headquarters. At the high point, CW4 oversaw over 27,000 people in the field for CB&I and was responsible for staffing the jobs and providing the necessary personnel, processes,

procedures, and equipment to all of CB&I's ongoing projects, including the Four Focus Projects. CW4 ran CB&I's global operations in the field for over ten years, with Vice Presidents from around the world reporting to CW4. CW4 managed the construction for all four of the Four Focus Projects: Cameron, Freeport, Calpine, and IPL. CW4 self-described as "the most senior guy in the field" knowledgeable about the status of construction at CB&I's projects worldwide, including the Four Focus Projects. CW4 reported directly to the CB&I Chief Operating Officer, first Lasse Pettersen and then, Patrick Mullen from September 2016 through June 2017, when Mullen become CB&I's CEO. From July 2017 onward, CB&I operated without a COO, so CW4 reported directly to Duncan Wigney, Executive Vice President of Operations at CB&I, who in turn reported directly to Mullen.

37. CW5 worked at CB&I and, after the Merger, McDermott, from 2011 through November 2018, most recently as Vice President of Construction at the Woodlands, Texas headquarters. CW5 worked on Power projects, including Calpine and IPL. CW5 reported to CW4. CW5 was the corporate sponsor for the construction side of the projects, ensuring that they were manned with people having the right skills set, helping to manage the schedule, and managing tools for construction equipment. CW5 served as Construction Director and Project Manager at Calpine from May 2017 through December 2017.

38. CW6 worked at CB&I and, after the Merger, McDermott, from December 2013 through June 2018. CW6, an electrical engineer, was a Project Procurement Manager II, working on the Cameron project while based in the Houston office for 2.5 years until February or March 2017, before shifting to another project. CW6 reported, at various

times, to Regional Director Jack Brown, Global Procurement Director Gene Nikstad, and Ramit Bajaj, Clay Coffee, and Andrew Hollywood. CW6 was considered executive management and, therefore, received information to which most employees were not privy. CW6 was supposed to transfer to the Freeport project toward the end of CW6's tenure, and a lot of the people who worked for CW6 did go to Freeport, so CW6 also knew about the issues that CB&I had created at Freeport.

39. CW7, a mechanical engineer, worked for CB&I and, post-Merger, for McDermott in a variety of capacities from April 2011 through November 2018, most recently as Senior Commissioning Superintendent at Cameron (in 2016) and at Freeport (from 2016-2018), having worked on four total LNG jobs for the company. Commissioning oversees pre-start and start-up work at a unit.

40. CW8 worked at CB&I and, post-Merger, McDermott as the Lead Cost/Change Management Engineer for Cameron from November 2015 until the Merger, and thereafter, as a PPL Engineer and Cost Specialist on Cameron from the Merger through August 2018. As an Engineer and Cost Specialist, CW8 reported to Director of Project Controls John Thomas and Director of Project Controls Syed Kakakhel, who CW8 described as the "top guy" on the project. CW8 was responsible for overseeing cost and change management, both construction change management and construction engineering change management, for the construction portion of the Cameron project. CW8 assisted the Director of Project Controls with cost and change management and helped deliver new information to the client for review and approval. As a Lead Cost/Change Management

Engineer, CW8 was responsible for change and risk management, assisting field engineers, and facilitating their proper workflow.

41. CW9 worked for CB&I from April 2014 through January 2018, most recently as a Project Controls Cost Specialist from 2015 onward. From November 2015 until leaving the company, CW9 focused on the Freeport project, working in the Pipe business unit. CW9 worked at corporate headquarters and reported to Maan Hamdan.

42. CW10 worked for CB&I's joint venture partner, Chiyoda International Corporation, from October 2014 through January 2017, during which time CW10 worked as a civil engineer on the Cameron project from the spring of 2015 through June or July 2016, and thereafter, as a Project Engineer through January 2017.

43. CW11 worked for CB&I as a civil structural engineer from late 2014 until June 2017, based initially out of the Baton Rouge office and, later, the Houston office, where CW11 worked as a design engineer on LNG projects, including Cameron and Freeport.

44. CW12 worked for CB&I from August 2014 through December 2017 as the Project Controls Director for the Cameron project. CW12 reported to the Lead Project Controls Manager of the project, who was based in Houston. CW12 was based in the Houston office, oversaw six people, and came onto the Cameron project just before construction began, during a process of schedule development, which CW12 saw through the engineering and procurement side.

45. CW13 worked for CB&I as a Principle Scheduling Specialist from April 2016 to December 2017. CW13 was the senior scheduler onsite at the Calpine project.

CW13 reported to Gary Neal, the Project Controls Manager on Calpine. CW13 was responsible for managing and maintaining the entire construction schedule on Calpine.

46. CW14 worked at CB&I headquarters from June 2014 through September 2017 as a Lead Expediter assigned to the Cameron project. CW14 managed 15-20 expediters, monitored suppliers' documentation and material, and ensured that suppliers delivered equipment and materials on time to the job site. CW14 managed the team that put together progress for the client so as to issue the client monthly invoices, backed by supporting documentation and evidence. CW14 reported to Arles Melet.

47. CW15 worked for CB&I and, post-Merger, McDermott from February 2012 through May 2019, as a Regional Sourcing & Expediting Manager for the Americas from 2012-2015 and then as a Project Procurement Director from 2015 onward. CW15 was based out of the corporate office and reported to Tenny Way. CW15 worked on a single project at a time and served as its lead for all supply chain activities, such as purchasing, expediting, logistics, and materials management all the way through the project.

48. CW16 worked for Shaw and CB&I from 2008 through January 3, 2018, when CW16's position was eliminated in conjunction with the Merger. CW16 worked in a variety of positions, including as Cost Analyst II from July 2010 to March 2017 and Senior Construction Tech Support II from March 2017 onward. In that latter capacity, CW16 supported the Senior Vice President of Construction, Stan Kukulka, and several of the senior engineering managers and some construction managers. CW16 worked in the Charlotte office and reported to Kukulka and James Brobeck. As a Senior Construction Tech Support II, CW16's responsibilities included preliminary work and tech support on

new projects, including making construction work packages by linking drawings and procedures together and inputting them into the software, and CW16 worked on Calpine. As a Cost Analyst II, CW16's responsibilities included running financial reports for warranty projects, which was necessary once construction and commissioning on a power plant was completed. CW16 kept up with the construction on both Calpine and IPL, as any issues would affect warranty down the line, staying informed through meetings and the monthly executive review that reviewed the financials of every project. CW16 also accessed these projects on the Intranet, to which any employee had access.

49. CW17 was a Project Accountant at McDermott from April 2012 through May 2017, based at the company headquarters in Houston, TX. CW17 was one of six Project Accountants, responsible for monitoring revenue, job expenses, cash management, financial reporting, and forecasting and for managing the budgets on assigned projects. CW17 assisted finance management personnel with analysis and performed occasional research of variances from prior forecasts. CW17 prepared weekly cashflow forecasts and monthly forecast financial packages with supplemental schedules. CW17 maintained a variety of documentation and approvals to comply with company internal record keeping and reporting requirements and also prepared monthly general ledger account reconciliations. CW17 reported to Project Accounting Manager Paul Jose, who still leads McDermott's project accounting team.

50. CW18 worked at CB&I from 2004 to 2016 as a Scheduler (2004-2010) and in Global Project Controls – Compliance, Processes & Training (2010-2016). After a gap, CW18 returned and worked at CB&I, and post-Merger, at McDermott, for about a year as

a Senior Scheduling Specialist from 2017 to August 2018. In that capacity, CW18 reported to Abdullah Al Masry, who in turn reported to Amir Hadzic. CW18 spent half of that time working in the corporate office and the rest on-site at projects.

51. CW19 worked for CB&I, and post-Merger, at McDermott from May 2008 through September 2018, most recently as a Senior Labor Pricing Specialist. CW19 reported to Lunetta "Sissy" Simpson, who in turn, reported to Susan Lafleur. CW19 dealt with billing on the Calpine and IPL projects.

52. CW20 worked at Shaw, CB&I, and post-Merger, McDermott as a Project Administrator from April 2008 to December 2012, as a Warehouse Manager in the TES department from August 2015 to July 2018, and as an Executive Assistant January 2018 to July 2018. As a Warehouse Manager and Project Administrator, CW20 worked with project management on various sites and assisted with reporting, managing, and closing out projects. CW20 managed equipment and handled HR, timekeeping, accruals, expediting, and requisitions. CW20 also assisted sub-contractors in the field by approving invoices, reconciling discrepancies, and working with vendors and suppliers. As an Executive Assistant at CB&I and then McDermott, CW20 worked to support Construction Director Erwin Reyes Rodriguez, Contracts / Commercial Director – LNG Project Ivan Van Der Walt, Sit Project Director Tom Ram, and Don Hall – to all of whom CW20 reported. CW20 and CW20's supervisors all worked on the Cameron project.

53. CW21 worked at CB&I and, post-Merger, McDermott as a Project Control Engineer from January 2014 through June 2018, departing the company three weeks after the Merger closed. CW21 functioned as a quality surveyor and cost specialist. CW21

reported to Directors within the organization, who in turn reported to corporate executives, such that CW21 had straight-line reporting to the CEO. CW21 started on the Cameron project just a few months after it began. CW21 worked on estimate conforming, meaning taking an estimate, aligning it with the work breakdown structure, and importing that data into the management tool. CW21 also did field walkdowns to validate the progress that was submitted by Cameron's construction management, which was used to invoice the client, so as to ensure that the reported progress was accurate. CW21 also managed progressable subcontracts, working with subcontractors whose work was directly tied to client payments. If their scope impacted the overall project progress, CW21 worked with them more directly to track their progress and forecast work.

54. CW22 was McDermott's VP of Finance and Chief Accounting Officer from December 2014 through August 2016, based at the company's Houston headquarters. CW22 worked directly with Defendants Dickson and Spence during CW22's tenure.

55. CW23 worked at CB&I and, post-Merger, at McDermott from 2007 through November 2018 as a Senior Reformer & Civil / Structural Designer, working on plans, design drawings, engineering design, and fabrication design details for the structural steel for the steam methane reformer.

56. CW24 worked at CB&I and, post-Merger, McDermott, from June 2016 until June 2018, one month after the Merger, when CW24 was laid off. CW24 was the Global Sales Director – Engineered Products. CW24 was involved in due diligence related to potential deals.

## V. SUBSTANTIVE ALLEGATIONS

### A. McDermott's Business & Operations

57. Headquartered in Houston, Texas, McDermott describes itself as a "premier, fully-integrated provider of technology, engineering and construction solutions to the energy industry" that has designed and built "end-to-end infrastructure and technology solutions to transport and transform oil and gas into the products the world needs today." Its corporate website states, "Customers rely on McDermott to deliver certainty to the most complex projects, from concept to commissioning. We call it the One McDermott Way.'"

58. McDermott's website states that it operates in 54 countries, employees 32,000 people, and uses a "diversified fleet of specialty marine construction vessels and fabrication facilities around the world." It divides corporate operations into four geographic regions and six global product lines, of which the "North, Central and South America" region (a/k/a the "Americas") and the "LNG" (liquified natural gas) and "Power" segments are pertinent to the claims at issue.

59. Traditionally, McDermott had focused on upstream field development, with projects such as production facilities, pipeline installations, and subsea systems, and particularly offshore oil platforms for clients who are exploration and production companies.

60. McDermott was a healthy, profitable company, and it reported 2017 revenue of almost $3 billion and net income of more than $178 million.

61. However, by 2017, McDermott had grown concerned about its lack of diversification. For instance, almost two-thirds of its 2017 revenue came from a single

client, Saudi Aramco, which also accounted for almost half of its contractual backlog. Its second largest client contributed 11% of revenues that year. Given its concentration of oil and gas production clients, McDermott remained sensitive to the cyclical nature of this industry and the changes in commodity prices. It also had an established upstream offshore presence in South and Central America and the Middle East, but little presence in the stable market of the United States. At the same time, McDermott was viewed as a potential takeover target by its rivals. CW22 confirmed that during 2014 to August 2016, Defendants Dickson and Spence were discussing what steps to take next, whether to sell itself or acquire another company, and a major merger was on the table. However, CW22 said that, to that point, no one had brought up a potential acquisition of CB&I.

**B. CB&I's Business & Operations**

62. CB&I was also an engineering and construction company that focused on the oil and gas industry, but unlike McDermott, CB&I focused its downstream onshore operations in the United States, Europe, and the Middle East, and had a diverse client base. CB&I was known for constructing petrochemical plants.

63. In the years leading up to the Merger, CB&I's performance increasingly depended on the Four Focus Projects, which represented a massive part of its backlog.

64. CB&I first announced in December 2013 that its joint venture with Zachry Industrial, Inc. was awarded two contracts valued at $2.5 billion to construct two trains at the Freeport Liquefaction Project in Freeport, Texas. In March 2015, CB&I announced that the Freeport project had expanded to include construction of a third train in a contract valued at over $2 billion.

65. On March 17, 2014, CB&I and Chiyoda Corp. issued a joint press release stating that the two companies had entered into a joint venture and had been awarded a contract by Cameron LNG, LLC to construct the Cameron Liquefaction Project in Hackberry, La. The Cameron project was valued at approximately $6 billion ($3 billion each to CB&I and Chiyoda).

66. On June 19, 2014, CB&I issued a press release about the IPL project, announcing that it had been awarded a contract, valued at over $500 million, by AES Corporation subsidiary Indianapolis Power & Light Company for the engineering, procurement and construction ("EPC") of a 671-megawatt, combined-cycle gas turbine power station near Martinsville, Indiana.

67. On November 11, 2014, CB&I issued a press release about the Calpine project, announcing that it has been awarded a contract by Calpine Mid-Merit, LLC for the initial development phase of a combined-cycle gas turbine station in Peach Bottom Township, Pennsylvania. CB&I later disclosed the contract's value at roughly $300 million.

68. By 2017, CB&I's performance on these Four Focus Projects was declining. On May 8, 2017, prior to the trading open, CB&I issued a press release reporting Q1 2017 operating results, reporting, *inter alia*, that "solid earnings for the quarter" were "negatively impacted by underperformance on two union construction projects." On the accompanying earnings call, CB&I quantified the charges at $167 million "due primarily to union construction projects." CB&I later identified, during its Q2 2017 earnings call, that the two projects as Calpine and IPL.

69. Several analysts revised their opinions of CB&I in light of these and similar revelations about the Four Focus Projects. For example, on May 18, 2017, a Bank of America Merrill Lynch analyst slashed her price target on CB&I to $20 from $31, citing more risks to the company from incremental project charges, among other things. On June 9, 2017, a Goldman Sachs analyst cut his price target on CB&I to $15 from $33, citing higher cost overrun estimates on the Cameron Project in the second half of 2017 and 2018. On June 21, 2017, a Macquarie analyst cut his price target on CB&I from $11.50 to $10 a share, citing delays at the Freeport Project that could lead to a possible cost overrun at CB&I.

70. Thereafter, CB&I faced financial difficulties and an uncertain future, burdened by execution of the Four Focus Projects. CB&I's Q2 2017 earnings release on August 9, 2017, announced suspension of its dividend and pursuit of a sale of its valuable, highly-regarded Technology Business to eliminate debt and to reinvest in its Engineering & Construction (E&C) and Fabrication Services businesses. CB&I's E&C business reported an operating loss of $525.7 million "due to forecasted increases in costs on [the Four Focus Projects] amounting to $548.0 million, as well as an additional $50 million from the current-quarter impact of a lower margin percentage recognized on work performed during the period on the projects." CB&I reported that "[a]s of June 30, 2017, [it] would not have been in compliance with certain covenants required under CB&I's credit agreement without amending the agreements. Effective August 9, the company amended its credit agreements . . . to waive its current non-compliance and to revise future covenants." On the Q2 2017 earning call, CB&I acknowledged taking $367 million in

charges on Cameron (primarily) and Freeport and $181 million in charges on Calpine and IPL, which its CEO said reflected "a more conservative view of assumptions going forward," adding that "we've got enough experience in the field right now with where we are in construction, and applying that to the future and taking the loss that we talked about today is what we've decided to do."

71. Following these disclosures, a September 11, 2017 analyst report issued by Credit Suisse contained "takeaways" from "meetings with CBI including the new President and CEO Pat Mullen, EVO & CFO Mike Taff, and VP of IR, Scott Lamb." During those meetings, CB&I management provided an "update on problem projects" (i.e., the Focus Projects) and stated that "the charges taken in Q2'17 more accurately reflect the cost to complete the projects along with lower productivity levels vs prior estimates."

72. In announcing Q3 2017 results, CB&I reported that it had revised its loan covenants, effective August 9, 2017, to address CB&I's difficulties on the Four Focus Projects, e.g., by requiring that it maintain decreasing trailing 12-month EBITDA levels while excluding from the EBITDA calculation certain unspecified "charges on certain projects which occurred" during the first half of 2017, and "an agreed amount for potential future charges for the same projects if they were to be incurred during the third and fourth quarters of 2017." On the October 20, 2017 earnings call, CB&I's CEO acknowledged that it had "moderat[ed]" its cost forecasts for the IPL and Calpine projects and had taken $38 million in extra charges on them during the quarter. He also said that IPL was "99% complete on construction and is in the commissioning phase" and Calpine was "approximately 75% complete." He added that CB&I was at "full site staff levels" and

"continue to make good progress" on the Cameron and Freeport projects and that it was "continuing our discussions with Cameron LNG regarding claims for extension of time and recovery of certain costs on that project. We are meeting with our customer regularly, and senior management at both companies have targeted a resolution before year's end."

73. Thus, heading into the 10(b) Class Period, CB&I struggled to stay afloat, amidst its prior difficulties successfully executing the Four Focus Projects, even while signaling that the worse had passed on those projects. Despite 2017 revenue over $6.6 billion, CB&I reported a net loss of more than $1.4 billion, struggled to comply with its recently amended debt covenants, and explored strategic options to prevent bankruptcy. CB&I had approximately $2.5 billion of debt and an over $1 billion impairment to goodwill, stemming from a $3.3 billion acquisition in February 2013.

74. According to CW2, CB&I's former Financial Operations Controller who was responsible for the financial reporting of CB&I for all oil and gas projects in the Americas until departing the company in November 2017, CB&I was "basically bankrupt" by the end of 2017. From December 3, 2016 through December 18, 2017, CB&I's common shares declined in value by 43.56% - a period during which McDermott's shares appreciated by 2.71%.

75. Desperate, CB&I was looking to sell business units, including its coveted Technology Business, to raise badly needed capital. CW2 said that the Technology Business held extremely valuable patents and was likely worth about $2 billion, calling it the "gemstone in the rusty crown." CW14 said that the most attractive part of CB&I was

the Technology Business and corroborated that employees had been told that CB&I could get at least $2 billion for it.

76. The CWs tell a consistent story – that McDermott was initially only interested in that valuable Technology Business, but at some point, pivoted to taking on the entirety of CB&I, including the distressed Focus Project. CW6 said that originally, McDermott was only looking at CB&I's Technology Business, and the potential deal was only about McDermott acquiring just that one piece, rather than taking over the whole company. CW24, the Global Sales Leader for a $500 million piece of the Technology Business called Engineering Products, also called the Technology Business the "crown jewel," noting that it had a very high profit margin, as well as intellectual property and proprietary technology, some of which was very lucrative. CW24 said that in early 2017, CW24's boss informed CW24 that CB&I was going to sell the Technology Business. CW24 said it was later in 2017 that employees were told that McDermott was the buyer and had made an offer for the whole company, not just the Tech Business. CW23 provided a rank-and-file perspective, stating that the original intent was to simply sell the Technology Business, which included the office in which CW23 was based, and that CB&I had several bidders, but then McDermott bought all of CB&I for a price comparable to what CB&I wanted to sell just the Technology Business, which employees found odd because a lot of CB&I seemed to be dead weight that should have been cut out from the deal.

**C. <u>McDermott & CB&I Announce Their Potential Merger</u>**

77. In this context, McDermott and CB&I discussed a potential merger (the "Merger") in the fall of 2017.

78. On December 18, 2017, the two companies entered into a business combination agreement to effectuate the Merger (the "Merger Agreement"), whereby CB&I would merge into McDermott and CB&I shareholders would receive 0.82407 shares of McDermott stock for each share of CB&I stock, and McDermott shareholders would own approximately 53% of the combined entity. McDermott was acquiring its distressed peer, and purportedly solving both their problems by creating a "premier fully vertically integrated onshore-offshore company with a broad engineering, procurement, construction and installation service offering and market leading technologies portfolio." The announcement quoted Defendant Dickson as stating, "By applying McDermott's operational excellence across the combined portfolio, we will be a best-in-class solutions provider driven by consistency in systems, processes, execution and culture."

79. The next day, CB&I issued a press release announcing that it had reached a settlement with Cameron LNG, the client on the Cameron project (the "Cameron Settlement Agreement"), which CB&I's CEO called "an important milestone in resolving all past commercial issues and aligning all parties toward the successful completion of the project." He added, "We appreciate the collaboration of Cameron LNG and look forward to their continued support as we move forward with the safe and on-time completion of this significant energy infrastructure project." Significantly, the Cameron Settlement

Agreement seemed to clear up any prior claims and potential future impacts from past difficulties on the Cameron project, as stated in the press release:

> The settlement resolves all known and unknown claims to date (including impacts from Hurricane Harvey) and includes the following key components:
>
> - Resolves all past commercial issues and increases the certainty of the project schedule, which has all three liquefaction trains producing LNG in 2019
> - Provides incentive bonus payments related to expedited project completion
> - Waiver of any schedule-related liquidated damages related to the original contract and reestablishment of liquidated damage start dates according to the settlement.

### D. Post-Announcement Scrutiny Focused On The Four Focus Projects

80. From the beginning, analysts and investors focused on how McDermott would value the Four Focus Projects. Indeed, the first question from an analyst on the conference call announcing the Merger dealt with "the level [of] due diligence" around the transaction, particularly with respect to these projects. Defendant Dickson confirmed that McDermott had "worked extensively with CB&I on due diligence," while Defendant Spence assured the analysts that the due diligence was "significant." These comments were among the first of an extensive, consistent thread touting the sufficiency of McDermott's due diligence, as discussed more fully in §V.G.1.a.-b., *infra*. Nonetheless, several analysts' first reports on the proposed Merger transaction focused on the need to properly evaluate the Four Focus Projects.

81. Thereafter, Defendants consistently reassured analysts and investors that they did indeed properly evaluate those projects. Between the Merger announcement and

the shareholder vote on May 2, 2018, Defendants continued to reassure analysts and investors that they had conducted and were continuing to conduct extensive due diligence into CB&I in general, and specifically the Four Focus Projects, so that there was little risk for which they had not already accounted.

82. For example, during the post-announcement / pre-Merger time period, on February 20, 2018, CB&I announced its Q4 2017 operating results, which disclosed $101 million in operating charges on the Four Focus Projects, as follows:

- Cameron LNG project: $39.0 million, resulting in part from the recognition of incremental costs resulting from Hurricane Harvey, which the company agreed to absorb in connection with the December 2017 settlement agreement with the project sponsor. The settlement considerably de-risks the project for CB&I, as it resolves all past commercial issues, provides significant cost coverage for certain past and current cost increases, includes an incentive bonus payment related to expedited project completion and, importantly, resets the trigger dates for any potential liquidated damages. As of December 31, 2017, the project was approximately 77 percent complete and is forecasted to be completed in the fourth quarter of 2019.

- Freeport LNG project: $20.0 million, due in part to the adjustment of contingency provisions in the existing contract. The company is continuing to evaluate and estimate the indirect impacts of Hurricane Harvey, including potential impacts to productivity and schedule-related prolongation costs. The company believes any costs incurred as a result of the hurricane are recoverable under contractual force majeure provisions. The pace of incremental progress on the project increased substantially during the fourth quarter as compared to prior quarters. As of December 31, 2017, the project was approximately 73 percent complete and is forecasted to be completed in the third quarter of 2019.

- Calpine combined-cycle gas turbine power project: $35.0 million, primarily resulting from disruption of construction activities caused by severe winter weather during the fourth quarter. The charge includes the benefit of a claims settlement (subject to final documentation) with the project owner, which resulted in a net

> increase in project price during the fourth quarter for schedule incentives (based on a revised schedule) and the resolution of schedule liquidated damages. As of December 31, 2017, the project was approximately 79 percent complete and is forecasted to be completed in the fourth quarter of 2018.
>
> - IPL/Eagle Valley combined cycle gas turbine power project: $7.0 million associated with the close-out of the project, which is expected to be essentially completed by the end of this month.

83. CB&I's Form 10-K filed with the SEC on February 21, 2018, also reassured investors that forecasts on the Four Focus Projects were under control. For example, when discussing the gas projects, CB&I recognized the recent setbacks but stated that current forecasts "anticipate[ ] productivity levels that are consistent with our overall historical experience on the project and improved progress (due in part to anticipated improvement in weather conditions as the project moves out of the winter months), and actions to reduce our schedule related indirect costs." It added that the Cameron forecast "anticipates improvement in productivity from our overall historical experience on the project (as we anticipate improved construction performance for each subsequent LNG train) and actions to significantly reduce our schedule related indirect costs." CB&I also included similar reassurances in its Form 10-Q filed on April 24, 2018, just before the Merger closed.

84. These CB&I disclosures were made during early 2018, after McDermott completed its pre-announcement due diligence and while it was undertaking its post-announcement / pre-Merger due diligence. In response, Defendants repeatedly reassured investors that the situation was under control – that they had thoroughly assessed CB&I's business, particularly the Focus Projects, that they understood the risks of those Focus Projects, and that they had appropriately valued the Merger and accounted for the Focus

Projects. For instance, during the February 22, 2018 earnings call, Defendant Dickson gave reassurances, which were repeated by analysts in their reports thereafter:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional project charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence***.

85. Lingering concerns about the risks of McDermott taking over CB&I and the Four Focus Projects were enough that one member of McDermott's Board of Directors took the unusual step of voting against the Merger, based on his lengthy experience in the engineering and construction industry. However, Defendants argued that they had sufficiently mitigated the risks that this Director identified through McDermott's extensive due diligence of CB&I.

86. After receiving Defendants' repeated reassurances that McDermott had controlled for the risk, the Merger was approved by a majority of McDermott shareholders and closed on May 10, 2018 (the "Merger Date"). McDermott issued approximately 84.5 million shares to former CB&I Shareholders with a market value (based on the $20.70 per share closing price on the Merger Date) of approximately $1.75 billion.

### E. The Four Focus Projects Carried Undisclosed Forecasted Costs Of Well Over $1 Billion When The Merger Was Announced And When It Closed

87. Contrary to Defendants' alleged misstatements, as discussed herein, former CB&I and McDermott employees, including those at senior or executive levels, and internal CB&I documents demonstrate that Defendants knew of or recklessly disregarded

significant, material, undisclosed facts and financial risks to investors from the Four Focus Projects, which undermined Defendants' public justifications for McDermott to acquire all of CB&I, rather than only its Technology Business. Moreover, these former employees, whose statements are set forth in the CW allegations herein, describe how information related to these risks was available and was provided to McDermott throughout its extensive due diligence efforts, which are discussed more fully in §V.G.1.a.-b. *infra*.

### 1. *Undisclosed Facts and Risks Concerning The Cameron Project*

88. The extensive CW statements herein put critical, adverse, undisclosed information directly into the hands of Defendants Dickson and Spence, as well as the top leadership of CB&I with whom Dickson and Spence closely worked during due diligence efforts that started even before the Merger was announced and that continued until it closed.

89. CW3, the Cost Manager on Cameron from April 2015 through February 2019, stated that CB&I grossly underbid Cameron, as CB&I wanted domestic LNG experience, but had never done a lump sum LNG and had only done LNG internationally. CW7 corroborated that assessment, stating that Pete Rano, the SVP of LNG at CB&I, wanted the Cameron job badly due to its size and underbid it by roughly $2.5 - $3 billion. CW4, CB&I's Senior Vice President for Construction, also said that the company underbid Cameron by way too much.

90. CW1 was the Director of Project Controls at Cameron from June 2016 through the closing of the Merger into June 2018. The Project Controls team was responsible for understanding the cost of the Cameron project job site, to forecast the cost of future events, and to report those forecasted costs to senior management. The Project

Controls team had 25-30 people encompassing schedule, cost, earned value, and change management. Work crews completed project impact notification forms to identify anything out of scope, incorrect, or fabricated incorrectly, which were reported up through foremen, general foremen, superintendents, and project managers to CW1. CW1's group verified, *inter alia*, whether these costs were ones that the Cameron job site would have to absorb.

91. CW3 described a similar process. CW3 oversaw a group whose main task was managing the project cost and providing forecast information upward, by analyzing the schedule, contractor information, and performance metrics on labor to determine how much was left to spend and what the total cost / spend would be on the project to finish the job. CW3 stated forecast reports were given to executives, including those close to Defendants Dickson and Spence, if not to them directly.

92. CW1 explained that the Project Controls team was responsible for understanding the cost of the Cameron project job site, forecasting the cost of future events, and reporting those forecasted costs to management. To do so, every month, the Project Controls team did their own due diligence and, based on actual projected impacts to the Project's costs, Senior Director of Project Controls at Cameron Syed Kakakhel's team created a forecast of what they thought the true change in costs would be for Cameron LNG in addition to those already reported, based on input from CW1 and CW3.

93. According to CW1, Risk factors were documented in "Risk Registers." Each month, CW1 had a review of the risk register with the cost owners on that page to make sure that they agreed on the areas of risk and with the risks as presented. CW1 described

how, at that point, those "Risk Registers" were sent to the Project Controls Cost Manager for the Cameron LNG project, CW3. CW3, together with Kakakhel, who was CW1's supervisor, discussed CW1's forecasted costs with the on-site Project Managers and Project Directors. CW1 described how the Cameron Project Manager sent the forecasted numbers to management located at CB&I's Woodlands, Texas headquarters. CW2 corroborated that statement, confirming that CW2 received the Risk Registers for the Focus Projects, including Cameron. CW3 corroborated that monthly forecasting was standard at CB&I when the Cameron project began, though said that it changed to quarterly reporting at some point. CW1 said that final copies of all Risk Registers for every single month were stored on an iDocs system, along with a distribution list of the persons to whom each was sent and a PDF of a copy signed by the Project Director.

94. CW1 stated that, by the end of 2017, forecasted costs on Cameron had escalated well beyond what CB&I was budgeting and forecasting publicly. CW1 reported how the forecasted costs were a "political hot potato" and, without fail, CW1's and Project Controls' forecasted costs for the Cameron Project were largely acknowledged internally and then ignored publicly by CB&I management such that the true costs were not accurately reported to in public disclosures. CW1 said that CB&I's home office would issue "ridiculous" challenges to the monthly Project Controls forecast, and thereafter CB&I would recognize only a "little bit of loss" while telling the team to find ways to mitigate the rest, even when Project Controls increased the monthly forecast by $200 million. CW1 said that the inaccuracy of publicly reported forecasts got worse as the Cameron project went on. CW1 stated that it was "as clear as the nose on your face that the [existing]

forecast was not adequate." CW1 explained that this approach resulted in, at times, the Cameron Project having already spent more than what the entire pertinent piece of the Project was forecasted to cost.

95. CW2 stated that Cameron had slippage every month as far as additional costs over what had been forecast, related to the performance factor, due to poor management and poor handling of materials. CW2 said that performance never improved as the project went on, as it had been projected to do. CW2 said that Project Controls was very accurate with the forecast, so to see continuous monthly changes to the project costs meant that the company was trying to string out the forecast costs. CW2 said that Cameron and Freeport were two big projects and were watched very closely by everybody, and everyone in the management chain all the way up to Phil Asherman knew what the performance factor was. CW2 said that field performance could simply not keep track with what was required to keep Cameron on track.

96. CW3 confirmed CW1's account that the Project Controls group was often instructed to change the numbers in their reports, as late as one day before they were due in the system. Significantly, CW3 confirmed that this ***practice continued after McDermott completed the Merger***, and CW3 recalled a Q3 2018 email from a regional VP overseeing the North, Central, and South America financials instructing employees to change the numbers. CW3 said that with ***both CB&I and McDermott***, top executives, including the CEO and CFO received both the real forecasted numbers in initial reports and later revised forecasts with "better" numbers, which would be published. CW3 explained that Defendants Dickson and Spence "knew the numbers" because they came on site to

Cameron, and ***CW3 went over the true cost estimates with Spence***. CW3 also said that there were emails where ***Defendants Spence and Dickson received the complete package of Project Control's unaltered forecasts***, including low-level details and their basis. CW3 stated that the Project Controls Group had begun tracking how far off the revised numbers in the reports were from the initial internal numbers three reporting quarters before the Merger and ***continued to do so after McDermott took over***. CW3 believes the executives were very well aware of difference in the numbers and that there is no way they could claim they did not know. Indeed, CW3 recalled employees openly calling CB&I "Enron II." CW3 stated that a very experienced Project Director, Tom Rabb, was brought in to handle Cameron, but after the first update with McDermott, saw that things were not going to change and resigned.

97. CW4 confirmed that the highest levels of CB&I were aware of the undisclosed facts regarding the Four Focus Projects. CW4 was confident that the CB&I CEO and CFO were updated "constantly" on the status of the Four Focus Projects. CW4's "main focus" was on Cameron and Calpine, so CW4 had meetings "constantly" about those two projects, including meetings about fabrication, execution, and financial issues. CW4 attended monthly meetings through April 2018, which covered all the projects in the division, with CB&I's executive board, including Duncan Wigney, Executive Vice President of Operations at CB&I, and Jim Sabin, Executive Vice President of Global Operations Services at CB&I (who was announced as the CB&I Integration Team Leader via an SEC rule 425 filing on December 19, 2017), and typically, Project Controls people such as CW3, CW1, Tom Rabb, and Syed Kakakhel. The project director; the project

senior team, including the construction manager, project manager, and the engineering manager from the home office; and employees responsible for financial reporting on project trending or for project controls also sometimes attended. CW4 also attended focus meetings once or twice a month, which included executives up to the COO, about Cameron, Freeport, Calpine, and IPL. Beyond that, every division (EPC, Tank, Fabrication) had formal monthly meetings covering the total health of projects in the division, including personnel, safety, finance, change orders, and client relations, for which CW4's division compiled information into a Powerpoint presentation, with results that went up to the entire C-suite, including the CEO, CFO, and CAO, who would have their own meetings into which CW4 sometimes called. Every quarter until roughly six months before CW4 left the company, CW4 also presented to the Board of Directors in meetings of 50-60 people, where each group had 30 minutes to present their business unit and CW4 would present head count, safety issues, schedule opportunities, focus activities.

98. At both formalized monthly meetings and breakout meetings, CW4 discussed construction operations and provided CW4's view on how to improve negative construction and operations trends at the Four Focus Projects. CW4 said that Project Controls for each Focus Project presented all the costs for each Focus Project and calculated a productivity factor based on progress to date for completion. Based on that, Project Controls representatives analyzed trends, forecast what completion of the balance of the Focus Project would cost the company, and presented this information in the monthly meetings. CW4 confirmed that the Project Controls forecasted numbers were "way above" what CB&I formally added in as a contingency due to circumstances like having to drive

23,000 piles for the Cameron project instead of the 18,000 piles that had been originally calculated, which corresponding increases in concrete, structural steel, and related materials. CW4 stated that CB&I was "absolutely horrendous at getting their arms around the quantities" of such materials necessary to complete Cameron.

99. CW2 corroborated CW4's statements about the monthly presentations. CW2 said that during the course of projects, there were extensive monthly project controls reviews and financial reviews, with enormous Powerpoint presentations, called Project Status Reports, that were 20-40 pages long and contained all the detailed data. CW2 said that the SVP of Operations for the Americas, Dane Osborne, would present the Project Status Reports to Mike Taff, CB&I President Phill Asherman, and CB&I's CEO and CFO. CW2 described how monthly "strategy meetings," attended by the SVPs of the Americas (Operations, Construction, Project Controls), involving department heads for each leg (Engineering, Construction, Finance), Project Controls, and the next tier down would discuss the projects that were underwater like Cameron, including what was causing the poor performance factor and would could be done about it. CW2 said that the finance director and project director for each project would present a 40-70 page packet for the projects. CW2 said that additional meetings would focus on each project.

100. CW16 also described monthly presentations with the executive team on every project, which CW16 either attended or had access to the covered information via Intranet, where the senior cost person for each project gave a Powerpoint presentation, akin to a webinar, that included the financials and pictures of issues they were having. CW16 said that CB&I's CEO and CFO participated in these presentations, if not in person, then

at least by phone about 90% of the time. CW16 stated that the monthly presentation went through all major power projects and used to take two full days and, more recently, took up a full day, with supplemental one-off meetings only attended by certain individuals. CW16 stated that the Power Division, which included Calpine and IPL, had its monthly meeting on a different day than the Oil & Gas Division, which included Cameron and Freeport, until late in CW16's tenure when they were consolidated into a single day.

101. CW14 said that CB&I had to provide weekly reports on its suppliers and progress reports on how they were performing to the Project Controls group for Cameron. CW14 said that CB&I had a system called iDocs, which held the weekly supplier reports, the reports that went to the client, and the monthly reports generated for the client. CW14 said that anyone in management had access to iDocs and assumed the CEO did as well. As CW14 said, "Nothing was hidden, and it was not a secret."

102. CW10, a civil engineer and Project Engineer with CB&I's joint venture partner, Chiyoda, on the Cameron project, stated that the additional costs on Cameron resulted from the engineering and that there was a lot of rework needed on the foundations and structures. CW10 stated that there was no quality to the designs. For instance, when CW10's team lead had to present the foundation designs to go into construction, CW10 was asked to check the foundation design alone, a task that would typically require 2-3 people supplied with significant information. CW10 requested information like what the foundations would be carrying, what equipment would be on top of them, the weights, and the quantities, but was told to review the designs without it. CW10 did so but refused to sign off. CW10 said that CW10 saw a lot of mistakes and that the design "was a mess."

103. CW8, a PPL Engineer and Cost Specialist for CB&I / McDermott on Cameron, tracked rework on the project, applied the proper rates and crunched numbers when changes were sought by field engineers, and sought necessary written approvals from superiors including John Thomas, Project Director Ivan Van der Walt, Mike Hutton, and the Cameron Project Director. CW8 said that CW8's construction, engineering, and back charge paperwork reflected Cameron overruns, from both an hours and a dollars standpoint. CW8 also provided forecast numbers for trends that needed to be put into place. CW8 confirmed that Cameron had both engineering rework and construction rework and that ongoing demands for rework in the millions of dollars. CW8 said that, over three years, CW8 interacted with management to address issues related to back-charges and to suggest changes to the Cameron project where CW8 saw things being done incorrectly. However, CW8 said that upper management and Director-level employees did not take CW8's suggestions, which led to CW8's decision to leave the company in August 2018.

104. The problems started at Cameron from the beginning. CW11, a CB&I civil structural engineer who worked on the LNG projects, including Cameron and Freeport, corroborated these statements. CW11 called both projects a mess and said that the front-end engineering design (FEED) was lacking, management for Cameron and Freeport were awful, and employees did not have the information and drawings to support construction. CW7, Senior Commissioning Superintendent at Cameron, was a senior project engineer when the FEED was done with regards to Cameron. CW7 called it a "light FEED," and it was done by the client's engineering company, S&G, which did very light weight engineering design, which they handed over to CB&I to verify and complete where

processes were omitted. CW7 said that the civil engineering was the Cameron project weakness, as load tests and test bores determined that the design was insufficient and that additional pilings needed to be installed. CW7 said that changing the pilings meant that all the steel had to be redesigned, the steel in fabrication had to be cut up and redone, and the existing steel needed to be spread out to meet load requirements. CW7 said that these steps were a big deal as far as cost overruns. CW7 believes that Cameron was underbid by $2.5 - $3 billion.

105. CW12, the Project Controls Director at Cameron, similarly characterized the Cameron project. CW12 said that the schedule was developed front to back in the home office, with construction personnel intended to fill in details once out in the field. CW12 said that the pile driving was a fiasco, because the company scheduled it just 4-5 months after the contract was awarded, when they did not know the weight or dimensions of equipment and, therefore, how to pile drive to support the equipment. CW12 said that CB&I lacked enough batch plants to pour the concrete necessary to support the piles and, rather than procure more batch plants, halted construction for a couple of months around September 2014, a delay that cascaded down the schedule. CW12 observed that pipe and equipment thereafter accumulated, requiring the company to truck it on and off-site, to rent over 500 “C-cans” (large containers that go on trucks and ships) for storage, and to buy up available warehouse space at the ports of Houston and New Orleans, thereby driving up costs beyond the budget. CW12 said that CB&I needed to drive around 25,000 piles due to the bog-like soil. CW12 also stated that CB&I was unable to meet the client’s specifications for pulling a single, continuous cable from one termination to the other, due

to Cameron's large plot size exceeding the length of available cable spools, likely necessitating installation of a marshalling panel, an interim termination point, and double the number of cable terminations (four instead of two), thereby increasing manhours and equipment needed. When CW12 left in December 2016, Cameron was behind schedule and CB&I was in the "what the hell do we do now stage."

106. CW6, who was considered executive management, was responsible for maintaining the budget on Cameron, making sure that there was clear accountability for every penny spent in the office and on the field, reporting to higher-level executive management the project budget and project spend, managing all employees on the project throughout the entire supply chain and workers in the field, and dealing with suppliers. CW6's direct superiors would take CW6's report, refine it, and report it to their bosses, and the information would make it to the company CEO. CW6 ran reports and compiled project-level comparisons of actual versus budgeted numbers, based on accurate data in a JD Edwards system, which the finance team double checked and which CW6 verified line by line. CW6 used the JD Edwards data to create spreadsheets used in monthly meetings with CW6's direct supervisor, his supervisor's superior, and executives, including at times the Global Director of Procurement, who reported on the project to the CEO. CW6 was asked at times to alter the reports, but refused to do so. CW6 confirmed that the JD Edwards system was the primary data system for recording project-level costs versus budget/estimates and that executives including the CEO received reports generated from information in that system.

107. CW21 said that Cameron was significantly underbid, selling for $6.8 billion when an industry standard bid would have been roughly $3 billion per train for a three-train project like Cameron. CW21 identified execution issues that led to Cameron's further overruns during construction. CW21 stated that the construction team consisted largely of foreign workers from Australia and elsewhere, which affected productivity. CW21 also identified CB&I's use of its own piping division, which CW21 said could not handle the demand and caused productivity loss. CW21 said that Cameron was about two years behind schedule from what that type of project should take and does not think that the charges that have been announced by McDermott will be the last ones.

108. The CWs indicated that the budget overages prompted CB&I to manipulate the timing of revenues and expenses related to the Cameron project. According to CW1, the company improperly recognized change order revenue and engaged in accounting gimmicks. Once, when the client at Cameron entered a change order in February or March 2018, there was a $200 million bonus structure for the completion of Train 1, a milestone in the project. CW1 knows for sure that CB&I immediately recognized at least $50 million of that bonus right off the bat, without meeting any of the milestones for receipt, and that it went straight to the bottom-line as margin because it was reflected in the project cost report. CW1 said that the instruction to recognize $50 million early would have come from CB&I's Woodlands home office.

109. CW1 also stated that the company delayed payment to vendors for 60-90 days. CW6 corroborated this claim, stating that personnel at the Woodlands headquarters had instructed the Cameron project not to pay suppliers for 30 days, a scheme that project

employees referred to as "cooking the books." CW6 said this occurred approximately once per quarter the whole time CW6 oversaw Cameron, which CW6 described as a "nightmare," since CW6 dealt directly with suppliers. CW14 also said that CB&I held off paying invoicing on the Cameron project.

110. CW15 discussed the "huge" impacts on other projects of these manipulations, which CW15 also called "cooking the books" by retaining more money in the bank and said occurred in the weeks leading up to every quarter end. CW15 said that the company would push vendors to expediate product shipping so as to meet project milestones, then delay payment to their suppliers. CW15 said that by not paying suppliers on successful projects, the company was "robbing Peter to pay Paul" and using the money instead to fund Cameron and Freeport to keep those projects going. However, CW15 said that this conduct caused vendors to shut down, refuse new purchase orders, and/or to refuse to ship materials for money-making projects because they had not been paid on Cameron or Freeport. CW15 said that the project on which CW15 was working received its first big payment in October 2018, but the funds quickly went to Cameron and Freeport to get them back to a reasonable place with suppliers. CW15 specifically recalled one supplier, Lockwood International, that at any given time, had 200-300 invoices 90+ days overdue, out of 1200 invoices from CW15's project. CW15 also stated that CB&I was not paying contractors, which fell under CW15's responsibility as well. CW15 said that Project Procurement Managers did weekly reports to identify the most critical vendor payments, based on which vendors were going to refuse further purchase orders, after which point, senior management, the accounting group, and the finance group would decide which

invoices got paid. CW15 said that high-dollar invoices required CFO approval (if over $1 million) or CEO approval (if over $50 million) and were definitely delayed until quarter end – every single quarter. Significantly, CW15 confirmed that these practices, which had been ongoing since 2016, ***continued during the first year after the Merger under McDermott*** and that any payments over $50 million ***first went to Defendant Spence***, who would decide whether to act on it or go for ***higher approval from Defendant Dickson***.

**2. *Undisclosed Facts and Risks Concerning The Calpine Project***

111. CW5, who was VP of Construction at the Woodlands corporate office and who worked on Calpine in 2017, confirmed that CB&I underbid Calpine by probably 40-50% in the context of union labor. CW5 called Calpine a "catastrophe."

112. CW1 also worked as Director of Project Controls on the Calpine job site and said that Calpine was "upside down from the beginning." CW1 said that rank-and-file employees on Calpine "knew a long time ago that they were in trouble and losing money." When CW1 left Calpine site in June 2016, CW1 told CB&I that it would lose $30 million on the project, but the company told him he was "nuts" and transferred him to Cameron. CW1 said that labor at the Calpine job had a performance factor (PF) of 0.3 or 0.2, meaning that it was missing budget on the project by 70%.

113. The underlying data to verify this performance factor was available and accurate. For instance, CW19, a Senior Labor Checking Specialist, worked to ensure that aspects of the labor data at Calpine was accurate. CW19 took the piping and welding labor to be performed on each piece of equipment – going through the cut, the weld, and the labor for each piece of pipe – then price it out and ensure that it was input properly, so that

the company could accurately charge and bill it. CW19 had to ensure that the information was detailed and to check it with a fine-tooth comb. Thereafter, CW19 said that the information went through a second group of checkers located in Baton Rouge, who ensured that CW19's group did not make any errors.

114. CW4 relayed that the Calpine Project "was woefully late," dating back to the pre-CB&I days when the project was run by Shaw Group, because of bad engineering and the decision to mobilize the job too early. Despite engineering that was "extremely late," CW4 stated that [Shaw] tried to mobilize the job on time and "cripple through." CW4 stated this was a "horrific" thing to do because it sets the stage for "sloppy productivity," and once that went on for a year, "it was almost like a terminal disease for the project." CW4 said that by early- to mid-2016 Calpine was only 30% through engineering, rather than being done, and that 85% of the indirect and running costs had been spent before work ever got going in the field. CW4 said that these long-term problems would have been ***obvious to McDermott*** or anybody thinking about taking over this project. CW4 changed senior leadership at Calpine but the project continued to be "plagued by delays" by the end of 2017 and through 2018, delays that were "no secret to senior leadership at CB&I," because CW4 met with Wigney, Executive Vice President of Operations at CB&I, every week about Calpine to try and address the "calamity of errors" regarding engineering, material, and construction.

115. CW18 stated that at the Calpine project, the company had two schedules, one to show the client and the other from which they were working. CW18 said that CW18

did not see any post-Merger changes implemented by McDermott while CW18 was still at the company.

116. CW16 called Calpine a "disaster from the get-go." CW16 received monthly cost reports on Calpine, which reflected lots of additional costs on the project, which was significantly over-estimate and significantly behind schedule. CW16 said that the cost reports were posted on the Intranet and that all executives had access to the cost reports. CW16 stated that monthly overviews and financial reports on Calpine included progress reports and timelines, risk mitigation, pending issues, and related documentation as to things affecting the project timing.

117. CW13, who was responsible for managing and maintaining the entire construction schedule at Calpine before leaving CB&I in December 2017, described "horrible, horrible delays" and observed that the project went over by more than 100% in terms of both schedule and cost. CW13 said the overages were the result of poor engineering and poor execution. CW13 said that usually, they only got half of the hours of work that they had planned for in any given week done at twice the cost. CW13 said that the schedule changed at least half a dozen times. CW13 said that Calpine was already six or seven months behind when CW13 joined the project in April 2016. CW13 worked in Project Controls and prepared all the data on Calpine, updating the schedule every week, which would also update cost estimates. CW13's group prepared monthly reporting of the data on Calpine, which CW13 described as relaying 'this is where the project is, and this is the date it is going to finish.' CW13 said that the client and CB&I executives got monthly reporting on Calpine, which went "all the way to the top," meaning most people in the

Charlotte office and everyone within the Power Division at the Woodlands office. CW13 was not aware of the reports being altered. CW13 described full-day quarterly project reviews, attended by CB&I's EVP over Project Controls, CB&I management, and client representatives, at which CW13 usually gave a 20-minute presentation.

### 3. *Undisclosed Facts and Risks Concerning The Freeport Project*

118. CW7 stated that the biggest issue with Freeport was that CB&I underbid the job.

119. CW3 was told that ***CB&I and McDermott*** also changed the forecasts provided by CW3's team and the Project Controls group for the Freeport project, as was done on the Cameron project. This statement is corroborated by CW9.

120. CW9 worked on a $220 million pipe project for Freeport, which was running probably six months behind, and said that the company's forecast was 10-20% different than CW9's forecast. CW9 said that the executive over Fabrication Services, Luke Scorsone, attended monthly forecast review meetings, one of which CW9 attended, that included reports showing the forecasted costs versus the actual costs. CW9 stated that the cost per performance factor (a/k/a an FDI) at Freeport was trending at a much higher dollar value than the level at which they were forecasting the project to end, that those forecasts were reported to upper management in every single report and in monthly meetings, and that upper management at the VP level would thereafter give in-person instructions, on hand-written paper, to lower the forecast. CW9 assumed the instruction came down from a higher level than the VPs and that it was tied to short-term compensation concerns. CW9 said that VPs came directly to CW9 or to CW9's boss with the instruction to lower the

forecast. CW9 cited this practice as CW9's reason for leaving the company - CW9 wanted nothing to do with it.

121. CW4 attended the same monthly meetings with CB&I executives for the Freeport project as CW4 attended for the Cameron project, as discussed *supra*. For these meetings as well, Project Controls would state accumulated costs within a time period and then forecast, based on those costs and progress to date, the productivity on the project. CW4 confirmed that the Project Controls forecasted numbers were "way above" what CB&I formally added in as a contingency. In the same meetings, CW4 discussed operations and how to improve the negative trends.

122. CW6 said that some of the overruns were due to poor materials management occurring in the field and that there was also overage on the logistics side because of engineering issues creating a time crunch and requiring different, more costly measures, like shipping items air freight instead of by truck. Indeed, CW6 said that, across the board at CB&I, engineering did just enough to get documentation out for companies to quote and a supplier to be secured, and only then did CB&I start validating specifics. CW6 said that this practice was not typical in the industry. CW6 said that by the time CW6 left the company in June 2018, Freeport was close to $100 million over budget.

123. CW11 called the Freeport project "a mess," said the front-end engineering design was lacking, management was awful, and employees lacked information and drawings to support construction. CW11 added that, at Freeport, engineers were rushed to issue drawings because the piling contractor was already on-site.

124. CW7 worked a lot on the schedule at Freeport and said that they did new schedules and evaluations to remediate schedule slippages. However, CW7 said that CB&I kept two schedules, one that was real and one that they showed to the client. CW7 confirmed that this practice ***continued after McDermott closed the Merger***.

125. CW6 confirmed that personnel at the Woodlands headquarters had instructed the Freeport project, like Cameron, not to pay suppliers for 30 days, which employees referred to as "cooking the books."

#### 4. *Undisclosed Facts and Risks Concerning The IPL Project*

126. CW13, who was responsible for managing and maintaining the entire construction schedule at Calpine before leaving CB&I in December 2017, described IPL as the "twin sister" project to Calpine. CW13 said that, upon learning that Calpine had a twin project, CW13 did a lot of schedule comparisons between the two projects and would fly to the IPL site to compare. CW13 said that it was "obvious" that IPL was behind schedule. CW13 said that IPL was 6-8 months behind and 50% over cost estimates.

#### 5. *The Four Focus Projects' Undisclosed Catastrophic Financial Impacts*

127. The CWs were clear that the Four Focus Projects were hugely behind schedule and massively over-budget before the Merger had even closed, such that to accurately account for them, McDermott needed to take ***$1 billion*** or more in charges at the Merger closing and to clearly state that the Four Focus Projects would create an ongoing cash burn in the hundreds of millions of dollars each quarter.

128. CW1, an individual with over twenty years' experience in the industry, who served as the Director of Project Controls - Risks at the Cameron Project from June 2016 to June 2018 (and who previously served in the same capacity at the Calpine Project from Spring 2015 until June 2016)), said there was such rampant "corporate override of the [Cameron] project['s]" costs at the end of 2017 and throughout the first quarter of 2018, "that it [was] just a deception to stakeholders of the company."

129. CW6 said that by the time CW6 left the Cameron project around February or March 2017, Cameron was already ***$300 million over budget***, meaning the amount of actual capital spend over what had been budgeted for the project, due to issues in the field, such as damaged equipment. CW6 also recalled a company-wide presentation, scheduled at different times to accommodate work schedules, indicating that Focus Projects were up to $500 - $600 million over budget and that Cameron and Freeport had specifically led to that number. CW6 stated that on Cameron, the overage was driven by material management in the field not being prepared to handle incoming materials, leading to CB&I's incurring a lot of additional costs on things like shipping, storage, and leased land. CW6 also confirmed that CW6 saw ***no evidence that the Four Focus Projects had been de-risked*** while CW6 was at CB&I / McDermott. CW6 said that McDermott's claim that even the troubled "focus projects have been significantly de-risked with respect to engineering, quantities and procurement, remaining risk is assessed as mostly related to labor performance" did not seem to be true, because McDermott relied upon legacy CB&I executive management and employees.

130. CW2 said that Cameron was about ***$1 billion over budget***, if not more, and significantly behind the delivery date, by the time CW2 left the company in November 2017. CW2 said that the number they were using in their then-current trending was showing the project end costs to end up being $1 billion over project budget. CW2 thinks that the ***actuals were even worse***. CW2 also said that Jerry Burns, who was in charge of Project Controls for the Americas segment, was demoted and then fired in 2017 after he raised a stink all the way up to the President, Phil Asherman, in December 2016 by saying that the cost overruns for Cameron were going to be a heck of a lot more than what the company was reporting because management was ignoring Burns's forecast and using a more optimistic forecast. CW2 also said that Freeport was ***darn close to being $1 billion over budget*** (though not yet over the project cost) when CW2 left the company in November 2017.

131. By the end of December 2017, when the Merger was first announced, CW1's forecasted costs had escalated well beyond what was reported in CB&I's financial statements, ***rising to well over $1 billion*** above then-currently reported costs. Internal CB&I documents, which were shown to counsel for 10(b) CBI Subclass Lead Plaintiff NSHEPP and, on information and belief based on the due diligence allegations set forth in ¶¶V.G.1.a.-b. *infra*, which were part of the extensive pre-Merger due diligence that McDermott conducted, confirm CW1's account that charges between $700 million and $1 billion would be incurred at Cameron before completion. Specifically:

(a) CW1 drafted and compiled, with the help of others in the Cameron Project Controls group, documents titled "Risk Registers" that set out each itemized threat to the

Cameron Project and assigned each risk a dollar value. The December 31, 2017 "Cameron Liquefaction Project Execution CCJV Risk Register," which was signed off on by Thomas Rabb, the Cameron Project Director, on January 25, 2018 (the "December 2017 Risk Register") identified ***$1,200,552,343 of itemized, forecasted risks***, 39% of which, totaling $468,740,165, carried a medium, high, or extreme severity level and a probability score of 4 or 5, which indicated that these risks carried a greater than 40% or greater than 60% probability of occurring. CW1 stated that any risk with a probability score of 4 or 5 should be charged to the project in CB&I's statements. One risk—"Direct Craft Performance Factor" in the amount of $107,049,208—was rated "Extreme." Among the *fifteen* risks rated "High" were "Cumulative Impact of Unplanned Work" in the amount of $35,550,376 with a probability score of "5" (the highest possible score, indicting the highest likelihood of occurrence) and "Craft Per Diem Cost," which indicated that the "per diem forecast for the project is insufficient to sustain the project through to completion" due to the "monthly burn rate of per diem cost," recorded at $52,747,296 with a probability score of "4" (a high level, likely to occur, that should be included in the forecast). The largest single category of potential charges was $507,599,177 in potential liquidated damages.

(b) CW1 also drafted and compiled, with the help of others on the Cameron Project Controls team, the First Quarter March 31, 2018 "Cameron Liquefaction Project Execution CCJV Risk Register," which was signed off on by Rabb on April 23, 2018 (the "March 2018 Risk Register"). The March 2018 Risk Register identified escalating risks at Cameron, reporting over $1.34 billion of itemized forecasted risks, 38% of which, totaling $513,198,182, carried a medium or high severity level and a probability score or 4 or 5.

(c) These two Risk Registers confirm that risks at Cameron were escalating between the fourth quarter of 2017 and the first quarter of 2018, contrary to Defendants' repeated statements touting a de-escalation of risk at the Four Focus Projects. For example, the forecasted risk line item in the December 2017 Risk Register projecting an additional $35.5 million of at risk costs to reflect the "Cumulative Impact of Unplanned Work" clearly indicated that: "The cumulative impact of many changes over time has only been accounted for on an incremental basis. Unplanned work continues to mount as engineering changes, construction re-work, back charges, etc. causes scheduled creep/slip and increased cost. The full scope of unplanned work should be identified and a response plan developed."

(d) This risk line item (just one of 55 line items in the December 2017 Risk Register) was assigned the highest severity level and a probability rating of "5" out of 5, meaning, that it should have been incorporated into CB&I's reported financials. That same line item concerning unplanned work was repeated in the March 2018 Risk Register (which now contained 65 line items), just as the Proxy was released to investors touting the "de-risking" of the Focus Projects, except by that time period, the cumulative impact of unplanned work had risen to $38.1 million.

(e) Another forecasted risk line item in the December 2017 and March 2018 Risk Registers was unreported costs related to "Indirect Craft Labor Increases." The December 2017 Risk Register identified $19.1 million in unreported costs, reporting that "[t]he current spend rate for indirect labor is higher than the current forecast" and that "[i]f this trend continues, it will impact indirect labor EAC forecast." This line item was also

assigned "High" severity level and was assigned a probability rating of "4" out of 5, a level that CW1 stated should also have been incorporated into CB&I's reported financials. The trend of indirect labor not only continued, but it skyrocketed, such that the March 2018 Risk Register reported unreported forecasted costs of $76.8 million the next quarter.

(f) An April 2018 Project Controls "Cameron LNG 1st Quarter 2018 Forecast" PowerPoint presentation, that was delivered to CB&I management in early April 2018, openly detailed CW1's and the Project Control team's serious concerns (the "April 2018 Cameron Forecast Presentation"). In this document, Project Controls described how much work and analysis went into its project risks assessments, writing that "[i]n February, four weeks of detailed review meetings were held for every aspect of the cost forecast, first at the budget owner level, and then at a project management level," followed by "additional reviews . . . held with LNG operations and functional Corporate Management." These reviews were done during the period of McDermott's extensive post-announcement / pre-Merger due diligence, as set forth in §V.G.b., *infra*. The April 2018 Cameron Forecast Presentation made clear that the forecasted costs in the March 2018 Risk Register were all costs after taking into account the charges associated with the Cameron Settlement Agreement and any impact from Hurricane Harvey.

(g) The April 2018 Cameron Forecast Presentation concluded that, at a ***minimum***, CB&I should report an overall cost impact of ***$194.1 million*** of the projected $1.34 billion in costs reflected in the March 2018 Risk Register. Project Controls emphasized that this figure was insufficient, writing in the April 2018 Cameron Forecast Presentation that the "Project team considers [the $194.1 million overall cost impact]

aggressive in nature, mainly PF's [productivity factors], and represents the best possible outcome." Project Controls noted that this figure contained "No provision for Client LD's [liquidated damages]" and "No provision for delays and limited allowances." CW1 explained that the purpose of the above warning language was to make clear that Project Controls did not believe that the $194.1 million was at all sufficient to capture the known risks to the Cameron project's costs. As regards PFs, CW1 explained that when an item or activity on a large project like Cameron is 20-35% done, it is unlikely to be fixed thereafter if not fixed already, and at 40-50% done, the PF flatlines, such that it is unrealistic to expect a future PF of 2.0 (indicating a task was done in half the budgeted time), a level which had never before occurred, to balance out earlier PFs well below 1.0. Ultimately, however, even Project Control's minimum recommendation was rejected and CB&I, working with McDermott at this time to secure shareholder approval of the Merger, reported ***no*** operational charges to Cameron in its Q1 2018 financials.

132. Despite forecasted increased charges of $1.2 billion as of December 31, 2017 and then $1.34 billion as of March 31, 2018, CB&I reported in its quarterly press releases and Forms 10-K and 10-Q, both filed with the SEC, only $39 million of operating charges to the Cameron project for Q4 2017 (largely attributed to costs related to the purported "force majeure" event caused by Hurricane Harvey), and not a penny of operating charges in Q1 2018.

133. CW1's concerns over CB&I's reporting of costs was one reason that prompted CW1 to leave the company on June 12, 2018, after giving notice one week after the merger closed. CW1 resigned after believing that the company misreported its costs.

CW1 provided an exit interview survey in connection with noisily resigning from the post-Merger company, in which CW1 informed management that "***Project cost forecast on the [Cameron] project is being overridden by corporate***," and that these actions were "***deceptive to our stakeholders***." CW1 continued with a stark, and prescient, warning: "***Cameron is going to lose an additional 700MM to 1.2B before this project is completed,***" "yet Project Controls is forced to report untruthful cost forecasts month after month," noting that the "last [cost forecast] (Q1 2018), didn't even make it to April before we had negative to complete items in the forecast." This report, which CW1 based on his work on the Risk Registers, was sent to McDermott Human Resources, with copies to Syed Kakakhel, the VP of Project Controls at the home office, Amir Hadzic, Karla Ochoa, and the Senior Director of Project Controls at the home office to whom 500 employees reported.

134. Thereafter, CW1 sent an email indicating that CW1 thought ***$700 million to $1 billion*** more in cost should be reported on Cameron to Syed Kakakhel, his superior at the Woodlands headquarters, Amir Hadzic, and Hadzic's superior at the Woodlands headquarters, VP of Project Controls Clay Briscoe.

## F. Materially False and Misleading Statements Issued During the Period

135. During the Class Period, Defendants made materially false and misleading statements that can be organized into three primary, overlapping threads of the alleged fraud, each of which was incrementally revealed through a series of partial corrective disclosures: (i) the CB&I / Focus Project Fraud, (ii) the Technology Business Fraud, and (iii) the Capital Structure / Liquidity Fraud.

### 1. *The CB&I / Focus Project Fraud*

136. The CB&I / Focus Project Fraud involved Defendants' misstating the benefits of the Merger by concealing the substantially higher undisclosed costs that the Focus Projects were internally forecast to incur and by overstating the fair value of those projects in that Defendants improperly "assumed that the fair value" of those projects as of the Merger Date was "equal to their carrying values," while simultaneously misrepresenting the true and ongoing costs of these delayed and over-budget projects, the risks they posed, and the benefits and synergies to McDermott of the Merger with CB&I, as versus alternative potential deals with CB&I (such as a purchase of only its Technology Business) or with other entities (such as Subsea 7).

#### a. *Pre-Merger Misstatements & Omissions*

137. On December 18, 2017, McDermott issued a press release (the "12/18/2017 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K (the "12/18/2017 Form 8-K") signed by Defendant Spence, announcing that McDermott was acquiring CB&I through a proposed merger that would result in McDermott shareholders owning 53% of the combined company. Several materially false and misleading misstatements and omissions of material information were made in the 12/18/2017 Press Release, and in a subsequent McDermott filing with the SEC the same day pursuant to Rule 425 ("Rule 425") under the Securities Act of 1933 (the "Securities Act") deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, as follows:

(a) The 12/18/2017 Press Release touted the combined company's ability to deliver and execute on "fixed price lump-sum contracts" like the ones in place for the

Cameron, Freeport, and Calpine projects, stating, "***McDermott and CB&I's combined experience in delivering*** customer centric solutions and ***fixed price lump-sum contracts will form the basis for the combined company to deliver a consistent approach to executing projects*** for customers."

(b) The 12/18/2017 Press Release touted the merger as enhancing the ability to respond to customer needs while maximizing asset value in LNG and power projects:

> Greater ability to respond to evolving customer needs. ***The combined company will offer customers engineered and constructed facility solutions and fabrication services across the full lifecycle, executed to maximize asset value***. ***Customers will also benefit from enhanced exposure across diverse end markets, including*** refining, petrochemicals, ***LNG and power***.

(c) The 12/18/2017 Press Release touted the size of the post-merger company's backlog, without disclosing the extent to which it would be weighed down by the Cameron, Freeport, and Calpine projects, stating (with footnotes omitted), "On a pro forma combined basis, McDermott and CB&I would have combined revenues of approximately $10 billion and ***a backlog of approximately $14.5 billion***."

(d) The 12/18/2017 Press Release also touted the merger's extensive purported opportunities for "synergies" and revenue impacts, after purportedly "one-time" costs:

> Cash accretive with opportunities for cost and revenue synergies. The transaction is expected to be cash accretive, ***excluding <u>one-time</u> costs***, within the first year after closing. It is also expected to generate annualized cost synergies of $250 million in 2019. ***This is in addition to the $100 million cost reduction program that CB&I expects to have fully implemented by the end of 2017 previously implemented*** [sic]. The cost synergies are expected to come from operations optimization, G&A savings, supply chain optimization and other related cost savings. Further, McDermott and CB&I expect that the transaction will lead to substantial revenue synergies due to the enhanced capabilities of the combined company.

(e) The 12/18/2017 Press Release also quoted Defendant Dickson as stating, *inter alia*:

> Customers worldwide increasingly seek a single company that can offer end-to-end solutions, and the combination of McDermott and CB&I responds to these evolving customer needs ***by creating a leading vertically integrated company***. This transaction combines ***two highly complementary businesses*** to create a leading onshore-offshore EPCI company driven by technology and innovation, with the scale and diversification to better capitalize on global growth opportunities

138. Also on December 18, 2017, McDermott published a 30-page slide presentation (the "12/18/2017 Presentation"), which was attributed to Defendants Dickson and Spence therein and which was posted on McDermott's corporate website and filed with the SEC as an attachment to the 12/18/2017 Form 8-K signed by Defendant Spence. The 12/18/2017 Presentation made several materially false and misleading misstatements, and omitted material information from the statements made, as follows. It touted the combined company's attributes, by stating (footnotes omitted) that the merger was purportedly "creating a premier $10 billion global, ***fully vertically integrated*** onshore-offshore EPCI provider" and "***combining complementary and diversified capabilities***." It highlighted the combined company's backlog and purported cost-saving synergies, stating that it would have "combined revenues of approximately $9.9Bn and a ***backlog of $14.5Bn***" – of which $12.1 billion was CB&I backlog – and was "expected ***$250 million annual cost synergies***," which it explained as "[e]xpected to generate ***annualized cost synergies of $250m in 2019*** (***in addition to the $100m cost reduction program that CB&I expects to have fully implemented by the end of 2017***)." It highlighted that a common "***focus***[ ] ***on*** safety, ***fixed***

***lump-sum contracting*** and customer engagement will ensure seamless transition for partners and employees." Last, it reported these CB&I Non-GAAP Reconciliations:

## CB&I NON-GAAP RECONCILIATIONS

| | Three Months Ended Dec 31, 2016 | Nine Months Ended Sept 30, 2017 | Last Twelve Months Sept 30, 2017 |
|---|---|---|---|
| (Dollars in millions) | | | |
| GAAP Net Income (Loss) Attributable to CB&I[1] | $(21) | $(284) | $(305) |
| Plus: Non-GAAP Adjustments | | | |
| Receivable Reserve from Sale of Nuclear Operations[2] | 148 | - | 148 |
| Significant Project Charges[3] | 205 | 641 | 846 |
| Restructuring Costs[4] | - | 31 | 31 |
| Accelerated DIC Amortization[5] | - | 22 | 22 |
| Total Non-GAAP Adjustments | 353 | 694 | 1,047 |
| Tax Effect of Non-GAAP Changes[6] | (124) | (243) | (367) |
| Total Non-GAAP Adjustments (After Tax) | 229 | 451 | 680 |
| Non-GAAP Adjusted Net Income Attributable to CB&I | $208 | $167 | $375 |
| GAAP Net Income (Loss) Attributable to CB&I[1] | $(21) | $(284) | $(305) |
| Add: | | | |
| Depreciation & Amortization | 22 | 62 | 84 |
| Interest Expense, Net | 16 | 117 | 133 |
| Provision for Income Taxes | (137) | (158) | (295) |
| EBITDA[7] | $(120) | $(263) | $(383) |
| EBITDA | $(120) | $(263) | $(383) |
| Plus: Non-GAAP Adjustments | 353 | 672 | 1,025 |
| Non-GAAP Adjusted EBITDA[7] | $233 | $409 | $642 |

139. Also on December 18, 2017, McDermott held an investor call (the "12/18/2017 Investor Call") regarding the proposed merger, on which Defendants Dickson and Spence spoke, a transcript of which was filed with the SEC by McDermott via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. During it, Defendants Dickson and Spence made several materially false and misleading misstatements, and omitted material information from the statements made, as follows.

(a) In discussing the proposed merger, Defendant Dickson stated in prepared remarks, "***Our operations and capabilities are highly complementary***," and "***[o]ur companies share…a similar approach to conducting business***…and ***we both primarily***

***operate on fixed price lump-sum contracts***." He added, "***We also expect the combination will generate substantial cost and revenue synergies***."

(b) Defendant Spence stated in prepared remarks, regarding potential cost synergies:

> ***We expect to generate annualized cost synergies of $250 million in 2019. This is in addition to the $100 million cost reduction program that CB&I expects to be fully implemented by the end of 2017. We expect to incur a <u>onetime cost</u> of $210 million to realize these synergies*** of which $170 million will be in 2018 and the remaining $40 million in 2019.

(c) During Q&A, Defendant Dickson had this exchange with an analyst concerning the Cameron LNG product and the Freeport LNG Project:

> [*Analyst*]: David, when you came on to McDermott, obviously, it had its share of issues with fixed price projects, and again I think you've done a good job of cleaning them up. But CBI, as you mentioned, you guys have done a lot of due diligence on these projects, and people have covered these companies for a long time, we do hear that. And then ultimately, some companies still have issues.
>
> So, these are sort of big – a couple of these are really big projects, so how much experience have you had with the customers themselves? ***How much due diligence have you done in terms of really getting your arms around the couple – the bigger LNG projects so that you can sort of give us some comfortability factor that you've really sort of priced in the potential risk on these projects***?
>
> [*Defendant Dickson*]: [W]e obviously, as said earlier, we have spent a significant amount of time and resources on this. As you know, with my past background, it gives me some better insight on how these projects evolve. And these projects are all at different stages of completion, and ***all four of them are fairly well progressed, so that takes out a lot of the risk that you would expect at the start-up***. So we're very happy with the work that we've done in the work to go.
>
> In terms of dialogue with the customer of those projects, obviously, I haven't been able to start any dialogue as we're being through a very confidential process. But what I can say is ***historically I've had experience***

> ***with both working with the customer on the Cameron LNG and with the customer on the Freeport LNG***. So now that we have announced, that allows me to join with Pat and obviously get a bit closer with the customer on these things. But going back to what I said earlier on the call and the prepared remarks in which Stuart said is, ***an extensive amount of work has been done on these projects and obviously with a lot of focus with the work that's left or the balance of the work that's left on what has been four critical projects for CB&I***.

140. The foregoing misstatements on December 18, 2017 were materially false and misleading, *inter alia* for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had misrepresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as

demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to

suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

141. Analysts reacted immediately to news of the Merger, expressing surprise and some caution about the risks being undertaken by McDermott. In a December 19, 2017 analyst report titled "Heading Onshore: MDR Acquires CBI," Deutsche Bank noted that "The key swing factor will be execution post the close, which remains uncertain" because, among other things, "MDR [is] taking on 3 large scale projects with execution issues." The analyst report minimized this "swing factor," however, noting that McDermott "[b]egan the due diligence process in the summer (>3mos)," and "Mgmt feels very comfortable with 3 remaining problem projects (LPL nearly complete, Calpine, Cameron LNG, and Freeport LNG remain), ran a sensitivity analysis on productivity factors to get more comfortable." Similarly, analysts from MKM Partners noted on December 19, 2017 that while "[t]he news comes as a surprise to investors," "MDR management said on the call that they had done exhaustive due diligence on CBI's backlog and are comfortable with the risks there

regarding further charges." These concerns were further allayed the next day when CB&I announced a settlement concerning certain outstanding liabilities relating to the Cameron Project. Deutsche Bank, also on December 19, 2017, adds that "From a MDR perspective, deal price appears attractive, especially after factoring in the $250M in cost synergies…." Their report also states that McDermott's management has a good track record of "turning around challenged EPC companies with high mix of fixed price work and large projects" and the deal is expected to be cash EPS accretive for McDermott. The report, speaking about CB&I's "problem projects" says that McDermott management "believes it can apply its overall project execution culture to move forward."

142. On January 8, 2018, McDermott filed a Form 8-K with the SEC (the "1/8/2018 Form 8-K"), signed by Defendant Spence, attaching as exhibits a press release (the "1/8/2018 Press Release" and an updated 48-page slide presentation (the "1/8/2018 Presentation") regarding the proposed CB&I acquisition that once again was attributed to Defendants Dickson and Spence, who were highlighted in "Management Profiles" in the presentation. While the 1/8/2018 Presentation overlapped with the 12/18/2017 Presentation and repeated some of the misstatements first made therein, it differed in several ways, including that it expressly discussed the so-called "Four Focus Projects" being acquired with CB&I (the Cameron LNG Project, Freeport LNG Project, and Calpine Gas Turbine Power Project, along with another project, the IPL Project), it included accounting adjustments specific to the "Four Focus Projects," and it emphasized the "thorough due diligence" that McDermott had undertaken into CB&I's overall business and specifically into the "Four Focus Projects," which was described as giving Defendants

"a strong understanding of the key drivers and [such that we] are comfortable with what needs to be done with these projects going forward." The 1/8/2018 Presentation made several materially false and misleading misstatements, and omitted material information from the statements made, as follows:

(a) The 1/8/2018 Presentation, like the 12/18/2017 Presentation before it, touted the purported attributes of the combined, post-merger company, by stating (footnotes omitted) that the merger purportedly "[c]reates a premier $10 billion global, ***fully vertically integrated*** onshore-offshore EPCI provider" and "***combines complementary and diversified capabilities***." It highlighted the combined company's backlog and the purported cost-saving synergies to be achieved, stating that the post-merger company would have "combined revenues of approximately $9.9Bn and a ***backlog of $14.5Bn***" – of which $12.1 billion was CB&I backlog – and would be "[e]xpected to generate ***annualized cost synergies of $250m in 2019*** (***in addition to the $100m cost reduction program that CB&I has <u>already implemented</u>***)." Significantly, this revised language told investors that the CB&I "cost reduction program" referenced earlier in the 12/18/2017 Presentation had by this point been "*already implemented*."

(b) The 1/8/2018 Presentation stated that, since the 12/18/2017 Presentation, McDermott had made the accounting and financial reporting adjustments necessary to address the "Four Focus Projects" and that, significantly, these adjustments were "non-recurring." Specifically, it stated, "This deck includes certain non-GAAP financial metrics and ***adjustments that we believe to be <u>non-recurring</u>***, as we believe this provides a better understanding of the underlying business. These adjustments are consistent with those

used in McDermott's adjusted financial metrics. ***The adjustments included primarily relate to*** the Four Focus Projects: IPL, ***Calpine, Freeport, and Cameron***." It then reported adjusted CB&I Non-GAAP Reconciliations, both for CB&I as a whole and as separately reported by its four business segments (Engineering & Construction (E&C), Fabrication Services (FS), Technology (Tech), and Capital Services (CS)):

## CB&I NON-GAAP RECONCILIATION FOR LTM 9/30/17[11]

| | Three Months Ended Dec 31, 2016 | Nine Months Ended Sept 30, 2017 | Last Twelve Months Sept 30, 2017 |
|---|---|---|---|
| (Dollars in millions) | | | |
| GAAP Net Income (Loss) Attributable to CB&I, as reported[1] | $(666) | $(391) | $(1,056) |
| Less: Net Income (Loss) Attributable to Capital Services[2] | 645 | 107 | 752 |
| GAAP Net Income (Loss) Attributable to CB&I, on a continuing operations basis | (21) | (284) | (305) |
| Plus: Non-GAAP Adjustments | | | |
| Loss on Sale of Nuclear Operations[3] | 148 | - | 148 |
| Significant Project Charges[4] | 128 | 769 | 897 |
| Restructuring Costs[5] | - | 31 | 31 |
| Accelerated DIC Amortization[6] | - | 22 | 22 |
| Total Non-GAAP Adjustments | 276 | 822 | 1,098 |
| Tax Effect of Non-GAAP Changes[7] | (97) | (288) | (384) |
| Total Non-GAAP Adjustments (After Tax) | 179 | 534 | 714 |
| **Non-GAAP Adjusted Net Income Attributable to CB&I** | **$159** | **$251** | **$409** |
| GAAP Diluted EPS, as reported[1] | (6.65) | (3.87) | (10.52) |
| Non-GAAP Adjustments | 8.22 | 6.34 | 14.56 |
| **Non-GAAP Diluted EPS** | **$1.57** | **$2.47** | **$4.04** |
| Shares | | | |
| Basic | 100 | 101 | 101 |
| Diluted | 101 | 102 | 101 |
| GAAP Net Income (Loss) Attributable to CB&I | $(21) | $(284) | $(304) |
| Add: | | | |
| Depreciation & Amortization, as reported | 29 | 66 | 95 |
| Interest Expense, Net, as reported | 22 | 6 | 28 |
| Provision for Income Taxes, as reported | (130) | (177) | (307) |
| Reclassification of Discontinued Operations and Adjustments[8] | (20) | 125 | 105 |
| **EBITDA[10]** | **$(119)** | **$(263)** | **$(383)** |
| EBITDA | $(119) | $(263) | $(383) |
| Plus: Non-GAAP Adjustments | 276 | 800 | 1,076 |
| **Non-GAAP Adjusted EBITDA[9,10]** | **$157** | **$537** | **$694** |

(c) The 1/8/2018 Presentation also included specific "Observations" regarding each of the Four Focus Projects, including certain "***Unique Characteristics that will continue to be de-risked significantly in 2018***."

(i) For the Calpine Gas Turbine Power Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being "Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party product." However, these were tempered by the "Assessment" that "***Additional two turbines recently turned over for commissioning***" and a "Status as of 9/30/2017" as being "***76% complete***."

(ii) For the Freeport LNG Project, with "Original Booking Value" of $2 billion, it listed just one "Unique Characteristic," that being "Higher level of indirect labor (limiting control)." Significantly, it ***did <u>not</u> list*** "Aggressive bidding by predecessor" – as was done for Calpine. The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs still being assessed as technical solutions are being determined," but that "***Train 1 steel erection milestone achieved***" and "***Zachery (JV Partner) is managing and performing project construction phase and has a demonstrated track record***." The "Status as of 9/30/2017" was "***Engineering complete, Procurement substantially complete, Construction remaining, project remains profitable***."

(iii) For the Cameron LNG Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "Significant quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays." Significantly, as with Freeport, it ***did <u>not</u> list*** "Aggressive bidding by predecessor" – as was done for Calpine. The "Assessment" stated that "Majority of remaining risk related to labor and schedule,"

but that "***Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the trigger for any potential liquidated damage claims, increasing certainty of project schedule resulting in a de-risking of the project***." The "Status as of 9/30/2017" was "***Engineering complete, Procurement substantially complete, Construction remaining; targeting 2019 for all 3 trains***."

(d) In this context, the 1/8/2018 Presentation also summarized the purported findings of McDermott's extensive due diligence over a "period of months" into CB&I's overall business and the "Four Focus Projects" in particular. Using then-present or then-past tense language, it articulated as a "Key Assessment" that the "***Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement***." It stated that "remaining risk is assessed as mostly related to labor *performance*." It added, however, "***We believe the four focus projects*** are not representative of the entire portfolio and ***have unique characteristics that will continue to be de-risked significantly in 2018***."

143. On January 9, 2018, Defendant Dickson gave an interview with *Bloomberg Markets*, a transcript of which was filed by McDermott with the SEC via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. The *Bloomberg* piece referenced the proposed Merger and the "four projects dragging down profit" for CB&I, as well as McDermott's track record under Dickson in turning eight out of nine of McDermott's unprofitable projects into profitable ones. It said that Dickson vows to do at CB&I what he did at McDermott and quoted him

as describing CB&I as follows: "***It has all the hallmarks of the McDermott of three or four years ago***. ***Everything is fixable***."

144. The foregoing misstatements on January 8-9, 2018, were materially false and misleading, *inter alia*, for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and

to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable

Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

145. On February 21, 2018, McDermott held a conference call with analysts (the "2/21/2018 Earnings Call") regarding its Q4 2017 earnings release, on which Defendants Dickson and Spence discussed the Merger and the Four Focus Projects. McDermott filed a copy of the 2/21/2018 Earnings Call transcript with the SEC on February 22, 2018, via a Securities Act Rule 425 filing deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. During the 2/21/2018 Earnings Call, Defendants made several materially false and misleading misstatements, and omitted material information from the statements made, as follows:

(a) In prepared remarks, Defendant Dickson expressed "even more confiden(ce)" in the Merger after telling analysts, *inter alia*, that IPL was essentially complete, such that the Four Focus Projects were "now down to three," and that Freeport was "stabilized and profitable," all leading to the impression that 50% of those projects were of no concern, as follows:

> ***[A]s IPL Eagle Valley is in its very final stages of delivery, we are pleased that the focused four projects are now down to three***. In addition, ***Freeport is currently stabilized and profitable***. ***We remain confident that our***

> ***combination with CB&I will generate significant benefits for our shareholders by*** better positioning us to meet evolving customer needs, diversifying our portfolio of capabilities, as well as our geographic footprint ***providing a strong capital structure*** and by delivering significant synergies. In fact, ***the integration planning now well under way, we're even more confident in our synergy expectations*** and looking forward to a timely closing.

(b) In the context of CB&I's having disclosed over $100 million of Q4 2017 operating charges related to the Four Focus Projects, Defendant Dickson reassured investors that the situation was expected and under control, specifically referencing McDermott's robust due diligence into CB&I and the Four Focus Projects (discussed in §V.G.1.a.-b. *infra*), in the following remark, which was repeated by analysts following McDermott in their ensuing reports:

> We note that CB&I in its earnings results released yesterday reported a number of non-operating charges and specifically, some additional charges attributable to the Four Focused Projects. ***The potential for incremental overruns on these projects was considered during our due diligence and these charges are well within the potential downside scenarios we contemplated as part of our due diligence***.

(c) During Q&A, Defendants were again asked about the charges CB&I took regarding the Four Focus Projects, and again they referenced their due diligence as a basis for their informed remarks the charges were expected and not a cause for alarm, for instance in this exchange involving Defendant Dickson:

> [Analyst]: I understand the comments you made about CBI's print and that they were contemplated within your downside risk scenario. But just to be clear, I mean does this imply that we're already starting off below where we wanted to or in line? And could you put that in sort of context with how we should think about CBI's guidance that they provided in their S-4 at least for 2018?

[Defendant Dickson]: So, ***on the disclosure given by CB&I yesterday***, as I said in my prepared remarks, ***all of it is within our evaluation that we did during this due diligence period***. Obviously, today, we're operating in separate companies, but credit to the CB&I management team they kept us posted as developments have occurred. So we're obviously monitoring the situation, but ***what I could say today is that it's in line with what we've been looking at and well within the work that we did during the due diligence***.

(d) Defendant Spence made similar remarks during Q&A, as follows:

[Analyst]: And turning to CB&I, how was your expected pro forma funding post the deal changed over the last few months? Obviously, they had the [ph] December (52:00) settlement, which should drive some additional expected cash flows. Not sure if that was already fully in your expectation for the $3.3 billion of pro forma funding, but maybe if you could just talk a little bit about how that's developing.

[Defendant Spence]: As David highlighted before, ***the Q4 results for CB&I were all within the parameters of our diligence and our understanding and the models that we built***. And ***as such, we're still looking at the same funding levels that we highlighted in December to fund the combination, which is the approximate $3.3 billion of funded debt***.

146. The foregoing misstatements were materially false and misleading, *inter alia*, for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the

Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and

extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

147. Analysts focused and relied on Defendants' assurances concerning CB&I's $101 million in charges to the Focus Projects, and McDermott's representation that these overruns were within the ranges contemplated as part of due diligence. For example, in a February 21, 2018 analyst report, Credit Suisse analysts noted that market reaction to McDermott's own earning release "had more to do with CBI's earnings print versus its

own, reflecting the pending merger" because "CBI reported another $101M in charges on the four known problem projects including Cameron," before noting: "Even with the charges, MDR maintained the company is well within the ranges contemplated as part of due diligence. CB&I had, in fact, under-accrued for the costs to complete the Focus Projects." Similarly, the next day, an analyst from Scotia Howard Weil reported that "management was tested regarding its conviction regarding projections offered in the merger related filings given that a noisy 4Q17 CBI report invited some degree of skepticism," but passed the test because "MDR offered that it has been kept apprised of any and all issues encountered by its other half and believes that the numbers it has offered remain in the range of outcomes contemplated by MDR during due diligence and it continues to gather optimism around greater synergy and cost savings figures."

148. On March 22, 2018, McDermott filed a Form 8-K with the SEC (the "3/22/2018 Form 8-K"), signed by Defendant Spence, attaching as an exhibit an updated, 51-page version (the "3/22/2018 Presentation") of the earlier-filed 1/8/2018 Presentation regarding the proposed CB&I acquisition that once again was attributed to Defendants Dickson and Spence, who were highlighted in "Management Profiles" in the presentation. It against specifically discussed the Four Focus Projects, included accounting adjustments specific to the Four Focus Projects, and emphasized the "thorough due diligence" that McDermott had undertaken into CB&I's overall business and specifically into the Four Focus Projects, which was described as giving Defendants "a strong understanding of the key drivers and [such that we] are comfortable with what needs to be done with these projects going forward." The 3/22/2018 Presentation made several materially false and

misleading misstatements, and omitted material information from the statements made, as follows:

(a) The 3/22/2018 Presentation, like the 1/8/2018 Presentation and 12/18/2017 Presentation before it, touted the purported attributes of the combined, post-merger company, by stating (footnotes omitted) that the merger purportedly "[c]reates a premier $10 billion global, ***fully vertically integrated*** onshore-offshore EPCI provider" and "***combines complementary and diversified capabilities***." It highlighted the combined company's backlog and the purported cost-saving synergies to be achieved, stating that the post-merger company would have "combined revenues of approximately $9.7Bn and a ***backlog of $15.3Bn***" – of which $11.4 billion was CB&I backlog – and would be "[e]xpected to generate ***annualized cost synergies of $250m in 2019*** (***in addition to the $100m cost reduction program that CB&I has <u>already implemented</u>***)." Significantly, this revised language told investors that the CB&I "cost reduction program" referenced earlier in the 12/18/2017 Presentation had by this point been "*already implemented*."

(b) The 3/22/2018 Presentation stated that McDermott had made the accounting and financial reporting adjustments necessary to address the "Four Focus Projects" and that, significantly, these adjustments were "non-recurring." Specifically, it stated, "This deck includes certain non-GAAP financial metrics and ***adjustments that we believe to be <u>non-recurring</u>***, as we believe this provides a better understanding of the underlying business. These adjustments are consistent with those used in McDermott's adjusted financial metrics. ***The adjustments included primarily relate to*** the Four Focus Projects: IPL, ***Calpine, Freeport, and Cameron***." It then reported adjusted CB&I Non-GAAP

Reconciliations, both for CB&I as a whole and as separately reported by its four business segments (Engineering & Construction (E&C), Fabrication Services (FS), Technology (Tech), and Capital Services (CS)):

## CB&I NON-GAAP EBITDA RECONCILIATIONS FOR HISTORICAL RESULTS 2013 – 2017[1]

| | For the year ended | | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 |
| (Dollars in millions) | | | | | |
| | | | | | |
| GAAP Net Income (Loss) Attributable to CB&I, as reported[2] | $454 | $544 | ($504) | ($313) | ($1,458) |
| Add: Losses (Income) From Discontinued Operations | | | | | |
| Capital Services[3] | (9) | (37) | (43) | 621 | 105 |
| Nuclear Operations[4] | (37) | (93) | (131) | - | - |
| **GAAP Net Income (Loss) from Continuing Operations Attributable to CB&I** | **$408** | **$414** | **$(679)** | **$308** | **$(1,353)** |
| | | | | | |
| Add: Non-GAAP Adjustments | | | | | |
| Charges Related to Nuclear Operations Sale[5] | - | - | 1,506 | 148 | - |
| Long-Term Incentive Change in Control Expense[6] | - | - | - | - | 12 |
| Significant Project Charges[7] | - | - | - | 197 | 870 |
| Restructuring, Acquisition and Integration Costs[8] | 81 | 31 | - | - | 115 |
| Net Gain from Insurance Proceeds[9] | - | - | - | - | (63) |
| Tax Law and Deferred Tax Valuation Impacts[10] | - | - | - | - | 1,002 |
| Normalized Interest Expense[11] | - | - | - | - | 97 |
| Total Non-GAAP Adjustments | 81 | 31 | 1,506 | 345 | 2,033 |
| Tax Effect of Non-GAAP Changes[12] | (28) | (11) | (371) | (121) | (353) |
| Total Non-GAAP Adjustments (After Tax) | 53 | 20 | 1,135 | 224 | 1,680 |
| **Non-GAAP Adjusted Net Income Attributable to CB&I** | **$460** | **$434** | **$456** | **$532** | **$327** |
| | | | | | |
| GAAP Net Income (Loss) from Continuing Operations Attributable to CB&I | $408 | $414 | ($679) | $308 | ($1,353) |
| Add: | | | | | |
| Depreciation & Amortization, as reported | 180 | 181 | 161 | 123 | 88 |
| Interest Expense, Net, as reported | 81 | 75 | 86 | 92 | 226 |
| Provision for Income Taxes, as reported | 91 | 271 | (81) | 3 | 799 |
| Reclassification of Discontinued Operations and Adjustments[14] | (115) | (177) | (186) | (73) | - |
| **EBITDA[13]** | **$644** | **$765** | **$(699)** | **$453** | **$(240)** |
| | | | | | |
| EBITDA | 644 | 765 | (699) | 452 | (240) |
| Plus: Adjustments | 81 | 31 | 1,506 | 345 | 934 |
| **Non-GAAP Adjusted EBITDA[13]** | **$725** | **$797** | **$807** | **$798** | **$694** |

(c) The 3/22/2018 Presentation also included specific "Observations" regarding each of the Four Focus Projects, including certain "***Unique Characteristics that will continue to be de-risked significantly in 2018***."

(i) For the Calpine Gas Turbine Power Project, with an "Original Booking Value" of $300 million, it listed just three "Unique Characteristics," those being

"Union labor and absenteeism," "Aggressive bidding by predecessor," and "On-site assembly of third-party product." However, these were tempered by the "Assessment" that "***Additional two turbines recently turned over for commissioning***" and a "Status…as of year-end 2017" as being "~79% complete."

(ii) For the Freeport LNG Project, with "Original Booking Value" of $2 billion, it listed three "Unique Characteristics," that being "Higher level of indirect labor (limiting control), impacted by Hurricane Harvey, and significant quantity growth." Significantly, it ***did <u>not</u> list*** "Aggressive bidding by predecessor" – as was done for Calpine. The "Assessment" stated "Majority of remaining risk related to labor and schedule" and "Harvey costs still being assessed as technical solutions are being determined," but that "***Train 1 steel erection milestone achieved***" and "***Zachery (JV Partner) is managing and performing project construction phase and has a demonstrated track record***." The "Status…as of year-end 2017" was "~73% complete" and "Project remains profitable."

(iii) For the Cameron LNG Project, with "Original Booking Value" of $3.2 billion, it listed just five "Unique Characteristics," those being "FEED by Third Party," "Significant quantity growth," "Site reclamation (e.g. soil quality)," "Lower than anticipated productivity," and "Adverse weather-related delays." Significantly, as with Freeport, it ***did <u>not</u> list*** "Aggressive bidding by predecessor" – as was done for Calpine. The "Assessment" stated that "Majority of remaining risk related to labor and schedule," but that "***Announced settlement December 19th, 2017, resolving all past commercial issues, resetting the schedule for any potential liquidated damages, increasing certainty***

***of project schedule resulting in a de-risking of the project***." The "Status…as of year-end 2017" was "~77% complete."

(d) In this context, the 3/22/2018 Presentation also summarized the purported findings of McDermott's extensive due diligence over a "period of months" into CB&I's overall business and the "Four Focus Projects" in particular. Using then-present or then-past tense language, it articulated as a "Key Assessment" that the "*Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement*." It stated that "remaining risk is assessed as mostly related to labor *performance*." It added, however, "*We believe the four focus projects* are not representative of the entire portfolio and *have unique characteristics that will continue to be de-risked significantly in 2018*."

149. The foregoing misstatements were materially false and misleading, *inter alia*, for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery

date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns,

blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

150. On January 24, 2018, McDermott and a wholly-owned subsidiary of CB&I filed a preliminary version of the Proxy with the SEC on Form S-4, and later filed three amendments on Forms S-4/A on March 2, March 23 and March 27, 2018. The March 27, 2018 Form S-4/A contained the definitive Proxy Statement (the "Proxy Statement"), including the attached Merger Agreement. On March 29, 2018, McDermott filed a Form 8-K pursuant to Rule 425 under the Securities Act announcing that the March 27, 2018 registration statement had been declared effective as of 2:00 pm Eastern Daylight Time on

March 29, 2018, and, further, that McDermott and CB&I had established record dates of April 4, 2018 and meeting dates of May 2, 2018 for the special meetings of their respective shareholders to seek approvals related to the proposed combination. On March 29, McDermott and CB&I filed a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3) and McDermott mailed it to McDermott's shareholders. On April 2, 2018, McDermott filed additional materials related to the Merger on Form DEFM14A.

151. The Proxy Statement explained the terms and conditions of the Merger to shareholders, informed them about the background of the Merger, and set forth the reasons why the McDermott and CB&I boards of directors recommended that shareholders vote in favor of the Merger. The Proxy Statement specifically incorporated by reference documents into the Proxy Statement that "contain important information about McDermott and CB&I and their respective financial performance." These documents, discussed below, included Forms 10-Q filed by CB&I and McDermott as well as Forms 8--K filed by McDermott and CB&I on January 8, 2018 and March 22, 2018, all filed pursuant to Rule 425.

152. On March 27, 2018, McDermott filed with the SEC Amendment No. 3 to a Form S-4 Registration Statement. The Explanatory Note to the amendment (page *i*) stated that it contained, among other things, a joint proxy statement that would be used in connection with the special meeting of McDermott shareholders being held on May 2, 2018, and the special meeting of CB&I shareholders being held on May 2, 2018.

153. The Amendment No. 3 and Proxy/Statement Prospectus (*i.e.* the Proxy Statement) were declared effective by the SEC on March 29, 2018, and was mailed to

McDermott shareholders of record as of April 4, 2018. The Merger was subject to a vote of both McDermott and CB&I shareholders, voting separately, pursuant to the Proxy Statement. The record date for the vote was April 4, 2018. On March 29, 2018, CB&I filed that same Proxy Statement with the SEC as an exhibit to a Schedule 14A.

154. The Proxy Statement described ten days of meetings that took place between September 2017 and December 2017 during which representatives from McDermott met with representatives from CB&I and engaged in "due diligence." The description of these meetings served to reinforce Defendants' earlier statements that the Company "performed thorough due diligence" such that it was "comfortable with what needs to be done with these projects going forward." For example, Defendants state in the Proxy Statement that "Mr. Freeman, other representatives of McDermott, Ms. David and respective advisors of McDermott and CB&I met in person or spoke by telephone on multiple occasions to conduct due diligence." McDermott noted that its Board had "considered the challenges and potential costs of combining and integrating the businesses" when considering the Merger.

155. Because McDermott's Board did not unanimously vote in approval of the Merger, McDermott was forced to provide additional information about its due diligence and risks to the Company and its shareholders presented by the Focus Projects.

156. The Proxy Statement described that one member of McDermott's Board of Directors (the "Board"), Stephen Hanks, voted against the Merger. According to McDermott's last Form 10-K before the merger with CB&I, filed on March 8, 2018, Mr. Hanks "held various roles with Washington Group International, Inc. (and its predecessor,

Morrison Knudsen Corporation) ("Washington Group"), an integrated engineering, construction, and management solutions company for businesses and governments worldwide." The 2018 10-K continues, "The Board of Directors believes Mr. Hanks is qualified to serve as a director in consideration of his extensive experience in the international engineering and construction business and his broad knowledge in accounting, auditing and financial reporting, and his legal background."

157. McDermott reported that "Stephen G. Hanks, the dissenting director, did not vote in favor of the transaction due in large part to his stated belief that the business operated by CB&I is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods." The Proxy Statement continued, noting that:

> At each of the meetings of the McDermott Board at which the potential business combination was discussed, Mr. Hanks consistently stated that he believes, based on his prior experience in the engineering and construction (E&C) industry, that the E&C business operated by CB&I (and historically operated by certain of its predecessors) is inherently subject to the types of problems that CB&I has been experiencing recently in connection with its four significant contracts that have negatively impacted CB&I's results of operations in recent periods, that ***these problems may be difficult for McDermott's management to remedy (at least in the near term) and, therefore, that the Combination is too risky for McDermott***, taking into account the combined balance sheet of the two companies.

158. Notably, Mr. Hanks based his concerns "on his experience as President and Chief Executive Officer of Washington Group [], during which time that company acquired a business with two significant, fixed-price, lump-sum, combined-cycle gas power plant projects in the northeastern region of the United States that Mr. Hanks described as having

generated over $2.0 billion in losses that led to Washington Group's filing for protection from creditors under Chapter 11 of the U.S. Bankruptcy Code." Dissenting Director Hanks was particularly well-positioned to offer an opinion on risks of the Merger.

159. The Proxy Statement described McDermott management's response to Dissenting Director Hanks and the views of the other members of McDermott's Board, which ultimately prevailed in approving the Merger:

> Mr. Hanks also asked detailed questions of McDermott's management team, and McDermott's management, in turn, provided detailed responses and, ultimately, expressed the belief that, ***based on McDermott's due diligence and the experience and capabilities of the McDermott management team, the risks related to CB&I's four significant contracts that have negatively impacted CB&I's results of operations in recent periods could be managed and that similar problems could be avoided in the future through improved project management***.

160. The foregoing misstatements made in the Proxy Statement were materially false and misleading, *inter alia*, for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said

that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants

cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

161. The Proxy Statement contained an unaudited pro forma balance sheet. Column 3 of this balance sheet has "Preliminary Purchase Price Allocation." On page 173 of the Proxy Statement are the pro forma adjustments which reveal that other than intangible assets, no fair value adjustments had been provided. The following language appears under the table on that page:

> Other than the items listed above, ***we have assumed that the fair value of all assets and liabilities equal their respective carrying values***. Until the Combination is complete, we will not have full access to all relevant information and will not have completed our evaluation. As a result, fair value estimates are preliminary and subject to change.
>
> The final allocation of Combination consideration will be determined when we have completed the detailed valuations and necessary calculations. The final allocation could differ materially from the preliminary allocation used in the pro forma adjustments. The final allocation may include: (1) change for the fair value of CB&I's contracts in process, net of advance billings on contracts . . . .

162. McDermott's fair value adjustments to the Focus Projects above were false and misleading because McDermott either recklessly disregarded information from readily available core documents, such as Risk Registers, that were widely-disseminated and discussed in monthly meetings, despite representing to shareholders the performance of due diligence sufficient to assess the risks and costs of the Focus Projects or, alternatively, did review this readily-available information and knowingly omitted over one billion dollars in necessary change in cost estimates. Furthermore:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the

Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and

extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

163. Moreover, the SEC's guidance for purchase accounting requires that, if an acquirer is waiting for additional information, the acquirer must "Furnish other available information which will enable a reader to understand the ***magnitude*** of any potential adjustment." 3250.1-h. However, as detailed herein, given the material fair value impact and higher costs recorded on CB&I's Focus Projects, as contemporaneously detailed in

risk registers and other reports, that were revealed by McDermott within a short timeframe subsequent to the Merger, the Company did not comply with the SEC Guidance. For example, as detailed below, McDermott made fair value adjustments to acknowledge loss contracts in their "preliminary purchase price allocations" which they disclosed in both the McDermott second and third quarter 2018 10-Qs. These fair value adjustments were made to the fair value as of the acquisition date (May 10, 2018) thereby establishing that the relevant facts and circumstances regarding the fair value of the Focus Projects existed at that time.

164. Defendants were under a continuing duty to update and correct the Proxy Statement to disclose the material adverse facts set forth above. As discussed below, as CB&I reported false financial statements for the first quarter of 2018 and CB&I's own Project Controls group estimated up to an additional $1.3 billion in costs to the Cameron Project alone, a marked increase in risk from the prior quarter, McDermott and CB&I filed several SEC Form 425 filings concerning the proposed Merger between April 2, 2018 and May 2, 2018 (the "Proxy Supplements"). By failing to correct or update any of Defendants' false and misleading statements in the Proxy Statement and incorporated documents, these supplemental Proxy Solicitations falsely affirmed that nothing in the earlier proxy solicitations was, or had become, materially false or misleading.

165. On April 12, 2018, prior to the open of trading on the NYSE, as part of the proxy solicitation process, CB&I issued a press release reporting preliminary first quarter 2018 financial results. The press release reported a range of operating results that CB&I "expect[ed] to report." The press release reported that CB&I did not incur any material

project changes to the Focus Projects in the first quarter 2018 and stated that "CB&I's preliminary results reflect:"

> ***Excellent operating performance across the company's portfolio of projects, including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project***, which respectively reached 84%, 82% and 84% completion and incurred no material project changes during the quarter.

166. On April 12, 2018, as part of the proxy solicitation process, McDermott provided its shareholders with an operational update for the quarter ended March 31, 2018, and reaffirmed its 2018 guidance originally issued on January 24, 2018, as previously reaffirmed on February 21, 2018. McDermott and the Individual Defendants, as part of their due diligence, would have reviewed CB&I's April 12, 2018 press release and CB&I's underlying analyses and either knew or recklessly disregarded that CB&I had under-accrued for losses on the Focus Projects.

167. Analysts viewed CB&I's quarterly results reflecting no charges to the Focus Projects positively and as supportive of the Merger. Credit Suisse wrote in an April 12, 2018 analyst report titled "MDR-CBI Preannounce: Working Miracles," that "A clean quarter from CBI and a beat from MDR is a positive surprise and certainly timely given concerns the deal was at risk." In another analyst report issued on April 12, 2018, Deutsche Bank stated: "we are encouraged that the MDR/CBI merger story has somewhat de-risked" and noted that the Focus Projects were now "under control." Similarly, in an April 17, 2018 analyst report, Pareto stated that: "CB&I also released a PW on April 12th, which included no one-off charges on its four focus projects, which is a positive indicator for ongoing execution risk."

168. On April 16, 2018, Defendants issued a further letter to shareholders that was filed with the SEC pursuant to Rule 425 and was part of the proxy solicitation process. Defendants assured investors as to their ongoing due diligence and the benefits of the Merger:

> We believe that, together, McDermott and CB&I will span the entire value chain from concept to commissioning, ***deliver compelling value***, be more competitive and ***deliver more consistent, predictable performance*** through market cycles.
>
> In addition to being underpinned by a compelling strategic rationale, ***the combination is also expected to deliver substantial financial benefits for stockholders***. Together, McDermott and CB&I will have significantly enhanced backlog and pro forma combined revenues, adjusted EBITDA and adjusted net income. The companies have reaffirmed the anticipated $250 million in annualized cost synergies with concrete plans to achieve them by the second quarter of 2019, and have identified potential incremental savings of $100 million.

169. The foregoing misstatements as part of the proxy solicitation process were materially false and misleading, *inter alia*, for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said

that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants

cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

170. On April 23, 2018, prior to the opening of trading, CB&I issued a press release announcing financial results for the first quarter of 2018. CB&I reported a 78 percent increase in net income versus the year-ago quarter, including "[s]olid operating performance in Fabrication Services, Technology, and E&C Groups, including no material charges on Cameron LNG, Freeport LNG and Calpine power projects." CB&I did not hold

a first quarter earnings conference call, it stated, "due to [the] pending combination with McDermott."

171. The Form 10-Q filed by CB&I on April 24, 2018, included a discussion of the Cameron Project, which noted that "[t]he project was approximately 84% complete and had a reserve for estimated losses of approximately [$13 million] at March 31, 2018."

172. On April 24, 2018, as part of the proxy solicitation process, McDermott issued a press release reporting first quarter 2018 operating results attached to a form 8-K signed by Spence and filed with the SEC. The headline of the press release read: "Strong Start to 2018 Driven by One McDermott Way." With respect to the proposed acquisition of CB&I, the press release added that the parties had identified an additional $100 million of synergies anticipated from the Merger.

173. That same day, McDermott attached a presentation titled "Q1 2018 Supplemental Information" to the same Form 8-K. On a slide titled "Post-Combination Synergies Identified," McDermott states that there are $350 million in total synergies, with $153 million in the supply chain, $93 million in G&A, $77 million in operations, and $27 million in other cost-cutting measures.




174. Also on April 24, 2018, McDermott conducted a conference call with investors as part of the proxy solicitation process to discuss the first quarter operating results. On the call, Defendant Dickson emphasized that McDermott's Board had rejected Subsea 7's "highly contingent" offer because the CB&I Merger presented a more "attractive alternative":

> This highly conditional proposal was subject to amongst other things, the termination of our combination with CB&I. McDermott's board carefully reviewed and considered the proposal in consultation with its outside financial advisors and legal counsel. The board concluded that the proposal was not in the best interest of the company or its stockholders as it significantly undervalued McDermott and was not an attractive alternative to our pending combination with CB&I.
>
> * * *
>
> ***We're very confident of the combination*** and we're going to continue on the same path.

175. Dickson also stated on the conference call that since the December 2017 announcement of the Merger, the parties had worked closely together and that "[t]ogether, we can provide certainty, innovation and added-value to energy projects around the world."

> ***We have spent a great deal of time with CB&I since we initiated this effort last summer and are more enthusiastic than ever about the opportunities this combination will offer to our customers.*** Together, we can provide certainty, innovation and added-value to energy projects around the world. And together, our complementary market positions and geographical footprint will create new opportunities for revenue growth and we will be more competitive and better able to deliver consistent predictable performance through market cycles.
>
> ***As we've gotten to know CB&I better over the last 10 months***, we've seen first-hand, how this company values quality, innovation, safety and its employees, and more importantly, we have witnessed how it puts customers first. That is why coming together makes sense, and we are really excited about what's next.

176. With respect to CB&I's long-term construction contracts, Dickson assured shareholders that McDermott, through its due diligence, had mitigated the risk to McDermott:

> We also note that CB&I reported results for Q1 2018 yesterday. CB&I reported excellent operating performance across its portfolio of projects ***including the Cameron and Freeport LNG projects and the Calpine combined-cycle natural gas power project.***
>
> These projects respectively reached 84%, 82% and 84% completion and incurred no material project charges during the quarter. Through our integration planning process, ***we have spent considerable time with CB&I reviewing the project portfolio and feel very comfortable with the progress they've made to de-risk the focus three projects and to continue to execute successfully on the broader portfolio***.

These statements indicated Defendants' familiarity and comfort with the degree of completion on the Focus Projects and, therefore, the costs incurred and to be incurred in completing the Focus Projects.

177. When asked about the Freeport Project, Dickson gave assurances to investors: "That was all known as we went through the due diligence and it's all subject to insurance, it is a force majeure situation and CB&I are working with the customer getting through that, but all in all, I would again emphasize that in our view, ***Freeport is a good project***."

178. The foregoing misstatements on April 24, 2018 were materially false and misleading, *inter alia*, for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as

demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to

suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

b. *Post-Merger Misstatements & Omissions*

179. On May 10, 2018, the Company announced that on May 2, 2018, McDermott shareholders had overwhelmingly approved the Merger with CB&I. Of the approximately 285.9 million shares eligible to vote, 219.3 million shares participated in the vote, of which 209.2 million shares voted in favor of the Merger (approximately 95.4% of the shares participating in the vote), 9.8 million shares voted against the Merger, and 227,000 shares abstained. As a result of the Merger, McDermott stockholders owned approximately 53% of the combined business on a fully diluted basis, and CB&I shareholders owned approximately 47%.

180. On July 31, 2018, McDermott issued a press release with Q2 2018 financial results, and filed it as an exhibit in a Form 8-K with the SEC that was signed by Defendant Spence. McDermott reported a $221 million change to the estimated costs associated with

three projects it had acquired from CB&I: Cameron, IPL and Calpine. McDermott, in relevant part, stated:

> In accounting for the acquisition of CB&I on May 10, 2018, McDermott recorded the fair value of the CB&I balance sheet, including identified intangible assets and updated cost estimates on the acquired backlog. The vast majority of the acquired portfolio did not require material changes to cost estimates. However, McDermott did record changes in estimated costs on three projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on the Company's net income for the second quarter.
>
> "We are clearly disappointed with the increased cost estimates for three of the legacy CB&I projects," said Dickson. "***The increases are within the bounds of the scenarios we contemplated during our due diligence***, and ***we believe that by applying our disciplined One McDermott Way to these projects, we can bring them to successful completion***. We have already made significant changes to personnel, reporting structures, stakeholder relationships and execution plans on Cameron, for example, since the combination closed, and there are encouraging signs that these changes have made a difference. More importantly, we have moved forward to further strengthen our relationships with stakeholders. Going forward, we plan to continue to aggressively apply our McDermott approach to ensure appropriate risk evaluation and mitigation across the combined Company's portfolio—from bidding to execution."

181. In that press release, Defendant Dickson is also quoted as saying:

> We remain confident in the fundamental soundness of the acquired backlog**.** ***Our project portfolio as a whole is being executed efficiently and progressing well, specifically through implementation*** of the One McDermott Way, which has been a proven contributor to our success in recent years. Today we also announced our initial guidance as a combined Company for the second half of 2018, which we believe demonstrates the strategic rationale of the combination[.]

182. The foregoing misstatements were materially false and misleading due to McDermott's failure to fully and accurately account for the Focus Projects, by continuing to underreport the cost estimates for the projects.

183. Moreover, Defendants had failed to disclose in the Proxy Statement that McDermott had contemplated as much as $200 million in negative changes in estimated costs for these three legacy CB&I Focus Projects during due diligence. Indeed, the second quarter 2018 charges beg the question why no fair value adjustments had been made in the Proxy Statement pro forma financial statements. Defendants' July 31, 2018 statements establish that Defendants knew but failed to disclose the need for additional charges to CB&I's financial statements as of March 27, 2018, and certainly no later than the May 2, 2018 shareholder vote.

184. That same day, McDermott filed with the SEC their 10-Q for the second quarter of 2018 (the "2Q 2018 10-Q"), SOX certified by Defendants Dickson and Spence. McDermott stated that the Cameron LNG project, as of June 30, 2018, "was approximately 23% complete on a post-Combination basis (approximately 88% on a pre-Combination basis) and had a reserve for estimated losses of approximately $32 million" and that the Calpine Power Project, as of June 30, 2018, "was approximately 28% complete on a post-Combination basis (approximately 89% on a pre-Combination basis) and had a reserve for estimated losses of approximately $42 million." McDermott went on to say "[t]here were no other material active projects as of June 30, 2018 in a substantial loss position." Also, Page 16 of the 2Q 2018 10-Q disclosed a purchase price adjustment: "Note (2) Advance billings on contracts includes provisions for estimated losses on projects of $112 million."

185. Page 19 of the 2Q 2018 10-Q, under the heading "Loss Projects" stated as follows:

> Included in the Combination were three projects in a substantial loss position at the Combination Date. The loss positions include our changes in cost estimates of $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. These changes in cost estimates did not have a direct impact on our net income for the three months ended June 30, 2018 as the impact of their changes in estimates were included as adjustments to the fair value of the ***acquired balance sheet date.***

186. In the 2Q 2018 10-Q, McDermott also said:

> In accounting for the acquisition of CB&I on May 10, 2018, we recorded the fair value of the CB&I balance sheet, including updated estimates on the acquired RPOs. The vast majority of the acquired portfolio did not require material changes to cost estimates. However, we did record changes in estimated costs on three loss projects, including $165 million on the Cameron LNG project, $23 million on the Calpine project and $33 million on the now-completed IPL gas power project. ***These changes in cost estimates did not have a direct impact on our net income for the three months ended June 30, 2018.***

187. McDermott's July 31, 2018 earnings call with analysts (the "7/31/2018 Earnings Call"), to discuss 2Q 2018 results, contained the following false and misleading statement from Defendant Spence: "We believe that the vast majority of the acquired portfolio is fundamentally sound, is being executed well and as such ***did not require a material change in cost estimates***."

188. All the foregoing misstatements on July 31, 2018 were materially false and misleading, *inter alia,* for the following reasons:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by

engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-

Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

189. McDermott admitted that the facts and circumstances which led to these new purchase price adjustments existed at the time the Proxy Statement was disseminated to McDermott shareholders. Analysts, however, responded with some hope that these negative results were one-time charges. A UBS analyst report on July 31, 2018 noted that "some may see it as 'kitchen sinking' of the projects for MDR management to clear the deck going forward." Deutsche Bank echoed these sentiments in a July 31, 2018 analyst report titled "Tossing Out the Kitchen Sink," noting that "Mgmt struck a confident tone as they laid out a detailed risk mitigation framework for managing the existing problem projects and bidding new onshore prospects. . . ."

190. McDermott participated in the Barclays Energy Power CEO Conference on September 6, 2018. During the conference Defendant Dickson stated:

> ***So regards to the integration, what I'd say today is that the integration process is probably ahead of where I would have anticipated when we closed the deal***. So we have invested time, effort, money in really looking at how we bring together these 2 companies. And we did that because we felt that there have been a number of M&A transaction over a number of years where culture was not developed or really approached by both organizations. So we really have spent a lot of time and effort on this.

191. On September 12, 2018 at the Pareto Securities 25th Annual Oil & Offshore Conference, McDermott presented a slide that stated there were no "Changes In Estimate ("Project Charges") Recorded in Q2 2018" for the Freeport and Cameron projects.

192. The foregoing misstatements in September 2018 were materially false and misleading because McDermott was continuing to understate the true costs of the Focus Projects. Moreover:

(a) As demonstrated by the statements of the CWs, many of them high-level

former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital

structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

193. As alleged in §V.F.4., *infra*, a partial corrective disclosure on October 30, 2018 served to reveal aspects of Defendants' fraud and to remove a portion of the inflation from McDermott's stock price. However, Defendants' fraud continued unabated. Starting with additional statements made on October 30, 2018, they continued to mislead analysts and investors up to the point where McDermott was on the brink of bankruptcy and its stock suffered a near-complete collapse, so severe that trading was repeatedly halted as the markets struggled to digest its downfall.

194. Defendants muted the corrective effects of the 10/30/2018 Press Release by making additional false and misleading statements the same day to falsely reassure investors and buoy McDermott's stock price in the face of the negative revelations. But for these contemporaneous false and misleading statements and omissions, the corrective decline in McDermott's stock price would have been even greater.

195. On October 30, 2018, McDermott released a press release with Q3 2018 earnings results that was attached as an exhibit in a Form 8-K filed with the SEC and signed by Defendant Spence, in which, McDermott states:

> For the third quarter of 2018, McDermott recorded $744 million of changes in estimates on three projects, including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project and $68 million on the Calpine gas power project. Under the provisions of purchase accounting applicable to the Combination, these changes in estimates were reflected as a change in intangible assets, including goodwill, and, as a result, ***did not have a direct impact on the Company's net income for the third quarter.***

> "After five months of ownership, we now believe ***we have a thorough and definitive understanding of the schedule and cost position on each of the projects – and clear visibility into the operational and financial path to completion***," said Dickson. "We have taken significant steps to address performance issues on the three projects. Specifically, we have installed a new executive leadership team – including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination – and made improvements in reporting structures, execution plans, forecast cost-base methodology and the flow of communication with our consortium members and customers. ***We expect no further material changes in the cost estimates on these projects.***

196. On October 30, 2018, McDermott filed their Form 10-Q with the SEC for the third quarter of 2018 (the "3Q 2018 10-Q"), SOX certified by Defendants Dickson and Spence, which stated that the Cameron LNG project, as of September 30, 2018, "was approximately 37% complete on a post-Combination basis (approximately 83% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $127 million." and that the Calpine Power Project, as of September 30, 2018, "was approximately 43% complete on a post-Combination basis (approximately 86% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $28 million."

197. The following false and misleading statements also appeared in the 3Q 2018 10-Q:

> Based on our assessment at September 30, 2018, included in the preliminary purchase price allocation for the Combination (see Note 3, Business Combination, to the Financial Statements) were four projects determined to be in substantial loss positions, which included the Cameron LNG, Freeport LNG Trains 1 & 2, Calpine and the now-completed IPL gas power projects. Based on our assessment at June 30, 2018, our Freeport LNG Trains 1 & 2 project was not estimated to be in a loss position; however, as a result of changes in estimates during the third quarter of 2018, the project is now estimated to be in a loss position at completion. Our Freeport LNG Train 3

> project is not anticipated to be in a loss position. Changes since our initial preliminary assessments during the second quarter of 2018 reflect unfavorable changes in estimates of $482 million on the Cameron LNG project, $194 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $68 million on the Calpine project. ***These changes in estimates did not have a significant direct impact on our net income for the three or nine months ended September 30, 2018, as the impact of the changes in estimates were included as adjustments to the fair values reflected in the acquired balance sheet.***

198. On the after-hours earnings call on October 30, 2018 (the "10/30/2018 Earnings Call"),, after reiterating statements from the 10/30/2018 Press Release regarding the changed leadership team and purported operational improvements for the CB&I projects at issue, Defendants made additional false and misleading statements, as follows.

(a) Defendant Dickson addressed the Cameron LNG Project in prepared remarks:

> We have now completed our first full quarter of ownership of CB&I, which has given us the ability to ***fully grasp*** the magnitude of the challenges associated with our legacy Focus Projects and to complete a comprehensive portfolio review.
>
> * * *
>
> First to address concerns about Cameron and the other two Focus Projects, including the feedback from investors that these projects represent an overhang in our stock price, ***we have taken steps to significantly improve the way we are managing the projects and the way we are interacting with our customers and our consortium partners***.
>
> * * *
>
> ***[W]e expect no further material changes in the cost estimates on the legacy Focus Projects, which we believe have been significantly and incrementally de-risked*** as compared to where we were in Q2 [2018].
>
> * * *

> Specifically on Cameron, our confidence in the path forward is now bolstered by three things. First is a productivity improvement initiative set out to identify ways to improve the execution plan. Second is a costs reduction plan that aims to review and improve the economics of our subcontractor and service relationships. Third is a revenue recovery plan through which we expect to obtain meaningful reimbursements from the customer for certain incremental costs.

(b) During Q&A, analysts pressed Defendant Dickson on why they should put faith in McDermott's going-forward assessment of the CB&I projects. For instance, this exchange:

> [Analyst]: David, when you came to McDermott from Technip, you were able to get your arms around I think nine brown projects that McDermott had reasonably quickly. Why do you think that you haven't been able to get on top of Cameron and Freeport in particular? And why should the market – I mean, it's tough to ask this question, but ***why should the market believe you now*** that you have your arms around the project because in E&C we've tended to learn that once projects are bad, they tend to be bad until after the first fire, so. And I know you've said all this stuff that you've done differently, but maybe help us understand why this really is it?
>
> [Dickson]: [L]et me go back to the McDermott story. The nine loss-making projects I think I first disclosed it to the Street about four months after I joined, here obviously we're getting close to six months. But obviously the scale and the size of these projects are considerably larger than what we've seen. I think in particular in Cameron the challenge we've had is, having to unwind what was a pure execution and strategy by CB&I and so that's taken a bit more time. And then obviously mobilize the stronger teams and the stronger executive oversight has just taken a little bit longer. The additional item here which you can't blame the past is the situation around the availability and quality of construction labor, specifically to the Lake Charles area, and that's resulted in this significant increase in cost.
>
> Now come back to answer your question, what would give confidence in these projects? So if we look at the work that we have done. On the estimate, and I'm going to specifically talk about Cameron, because that's the bigger one. ***So on Cameron, we've done the cost estimate based on a number of methodologies from top down, bottom up, having the teams, let's say, invest – really spending time and building up the cost and schedule***. We also today, and I won't disclose where they are but are using productivity factors

> in certain trades, which are numbers which sometimes are difficult to understand because they're so low. So ***we've taken a very, what I'd call, prudent position with regards to productivity***.
>
> Now we've been spending a lot of time on building up the cost estimate to go and what I was trying to make clear on my opening remarks is now we've shifted away from containing the cost to say, hey, how do we reduce these losses, so in Cameron, we had $1.5 billion of loss, that loss does not include any productivity improvement that we're looking to see, where we can make changes, does not include any cost improvements that we could make and a significant part of what's happening in Cameron today is subcontract. And we also haven't included any cost recovery from our customer, and we're starting to engage discussions with our customer. And in particular, Cameron to get to the $1.5 billion loss, we actually unwind some incentives that had been included in the estimate.
>
> So whilst we talk about the cost, the losses today in Cameron, we haven't included for any upside, resulting from those three initiatives. Secondly, I tried to indicate in my remarks is that, as we look to Cameron, we also benchmarked it against Freeport, and as we look at those two projects today with the estimated cost of completion, these are benchmarking very closely together, so that gives us even further confidence is that, we're getting to the end of where these projects would go. But today, our more focus is on to recover the cost, reduce the cost rather than contain the cost.

199. The foregoing misstatements on October 30, 2018, which muted the effect of the corrective disclosure that day, were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity. These issues were long known to Defendants, because:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk

assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing

millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

200. McDermott International Inc Investor Day was held on November 5, 2018, and contained the following false and misleading statements:

> The only thing I'd draw to your attention is if you look at the targeted completion of Freeport and Cameron. And today, ***I'm not going to spend a lot of time talking about Calpine. There's nothing much that we can do today that really changes the outcome of Calpine. It has 2 or 3 months to go***. It's well into its commissioning phase. There's nothing significant that we can do as a company to materially change the outcome. So our focus today will really be on the 2 LNG projects.

201. Like the October 30, 2019 misstatements, the foregoing misstatements on November 5, 2018 were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity.

202. McDermott filed their Form 10-K for the year 2018 with the SEC on February 25, 2019 (the "2018 10-K"), and it was signed, and SOX certified by Defendants Dickson and Spence. The following statements about completion rates appeared:

> *Cameron LNG*—At December 31, 2018, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) ***was approximately 50% complete on a post-Combination basis (approximately 85% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $185 million.***
>
> ****
>
> *Freeport LNG*—At December 31, 2018, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) ***were approximately 64% complete on a post-Combination basis (approximately 91% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $26 million.***
>
> ****

*Calpine Power Project*—At December 31, 2018, our U.S. gas turbine power project in the Northeast for Calpine (within our NCSA operating group) ***was approximately 80% complete on a post-Combination basis (approximately 95% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $25 million.***

203. The 2018 10-K also had the following false and misleading statements:

We have had unfavorable changes in estimates of $815 million on the Cameron LNG project, $296 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $122 million on the Calpine project since the Combination Date, of which approximately $647 million, $296 million and $91 million, respectively, were included as adjustments to the fair values reflected in the acquired balance sheet for the Combination. ***The changes in estimates reflected in the acquired balance sheet did not result in a significant direct impact on our net income during 2018***. The changes in estimates for the Freeport Trains 1 & 2 and Train 3 projects totaled approximately $102 million during the fourth quarter of 2018. The changes in estimates for the Cameron LNG and Calpine projects that were not reflected in the acquired balance sheet were recognized during the fourth quarter of 2018, and resulted in charges of approximately $168 million and $31 million, respectively, to loss from operations during 2018.

204. Also on February 25, 2019, McDermott released a press release with Q4 2018 and full year 2018 earnings results that was attached as an exhibit in a Form 8-K filed with the SEC and signed by Defendant Spence, in which, McDermott states:

**Update on Estimated Costs on Selected Projects**

For the fourth quarter of 2018, McDermott recorded a total of $199 million of changes in estimates on the Cameron LNG and Calpine Gas Turbine Power projects. The changes directly impacted McDermott's income statement for the fourth quarter. ***Expected completion dates for the projects are unchanged.***

- Cameron LNG Project – ***Operationally, the project continues to progress well and in line with the schedule presented in the third quarter of 2018***. The gas turbine solo run was completed ahead of schedule, cold circulation of hot oil in Train 1 was completed during the fourth quarter and flare ignition testing was successfully completed on all flares. All of these events are crucial steps in the commissioning of Train 1, and we expect to

achieve a major milestone with feed gas into the facility in the first quarter of 2019. ***As of the end of the fourth quarter of 2018, the project was 85% complete and had approximately $445 million of McDermott's portion of expected revenues remaining until expected completion.*** During the quarter, the project contributed $116 million to revenues and used $39 million of cash flows from operations. ***Phase 1 of the Cameron LNG project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.*** The $168 million change in estimate resulted from unfavorable labor productivity and subcontract, commissioning and construction management costs.

- Calpine Gas Turbine Power Project – First fire was achieved in December 2018, the steam blows have been completed successfully and systems have been turned over to commissioning. During the fourth quarter of 2018, the project contributed $3 million to revenues and used $28 million of cash flows from operations. As of the end of the fourth quarter of 2018, ***the project was 95% complete, and substantial completion is expected in March 2019.*** *T*he $31 million change in estimate resulted from increased labor construction costs associated with achieving first fire and substantial completion.

Separately, McDermott recorded a change in estimate of $102 million on the Freeport LNG project in the fourth quarter of 2018. The change in estimate related primarily to McDermott's view of a reduction in the assumed recovery of the claim and liquidated damages estimates that were filed with the customer relating to damages sustained as a result of Hurricane Harvey. That claim was outstanding at the time of the Combination and, as a result, the reduction in the claim has been recorded under the provisions of purchase accounting as a change in intangible assets. ***As such, the change in estimate did not directly impact McDermott's statements of operations. Expected completion dates for the project are unchanged.***

Operationally, the project continues to perform well, with the completion of lube oil flushing of the propane compressors on Train 1 and beginning of the lube oil flushing on Train 2. As of December 31, 2018, Freeport LNG was approximately 88% complete and had approximately $411 million of McDermott's portion of expected revenues remaining until completion. During the fourth quarter of 2018, the project contributed $175 million to revenues and used $186 million of cash flows from operations. ***Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.***

205. McDermott held its earnings call with analysts to discuss 4Q 2018 and full year 2018 results on February 25, 2019 (the "2/25/2019 Earnings Call"). During the call, Defendant Spence made the following false and misleading statements:

> As for the cadence of our earnings in 2019, we expect that Q1 is likely to be the softest quarter of the year and that the second half is likely to be stronger than the first half. This is in part due to three factors. First, ***the cumulative benefit of cost synergies will grow increasingly evident as the year progresses***. Second, we will also expect to see diminishing revenues from the zero-margin focus projects as the year progresses. And third, the contribution from new awards that we booked earlier this quarter.
>
> ***Operating cash flow is similarly expected to be stronger in the second half, as we begin to see reduced outflows on the focus projects***. Other assumptions embedded in our guidance include an assumption of no material project charges, sound execution on the project portfolio, and a healthy pace of new orders, as supported by our revenue opportunity pipeline.

206. The foregoing misstatements on February 25, 2019 were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity. These issues were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron

was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses;

presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

207. On April 29, 2019 McDermott filed their Form 10-Q with the SEC for the first quarter of 2019 (the "1Q 2019 10-Q"), SOX certified by Defendants Dickson and Spence, which contained the following statements:

> *Cameron LNG*—At March 31, 2019, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) ***was approximately 65% complete on a post-Combination basis (approximately 90% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $128 million.*** For these purposes (and for purposes of the discussion below), when we refer to a percentage of completion on a pre-Combination basis, we are referring to the cumulative percentage of completion, which includes progress made prior to the Combination Date. In accordance with U.S. GAAP, as of the Combination Date, we reset the progress to completion for all of CB&I's projects then in progress to 0% for accounting purposes based on the remaining costs to be incurred as of that date.
>
> *Freeport LNG*—At March 31, 2019, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) ***were approximately 80% complete on a post-Combination basis (approximately 95% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $19 million.*** During the three months ended March 31, 2019, the project was negatively impacted by $27 million due to changes in cost estimates resulting from increases in construction and subcontractor costs. These cost estimate increases were partially offset by the recording of approximately $11 million of incentive revenues. Additionally, Freeport LNG Train 3 was positively impacted by $16 million of changes in cost estimates at completion due to increased productivity and savings in indirect costs, resulting in an overall net immaterial impact on operating margin at completion for the Freeport LNG project taken as a whole.
>
> ****
>
> *Calpine Power Project*—At March 31, 2019, our U.S. gas turbine power project for Calpine (within our NCSA operating group) ***was approximately 95% complete on a post-Combination basis (approximately 99% on a pre-Combination basis), and the remaining accrued provision for estimated losses was not significant.***

208. Also on April 29, 2019, McDermott released a press release with 1Q 2019 earnings results which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, in which the following false and misleading statements were made:

> "With our steady progress on both Cameron and Freeport during the first quarter of 2019, ***McDermott has taken important steps to demonstrate disciplined execution on these projects***," said David Dickson, President and

> Chief Executive Officer of McDermott. "The recent introduction of feed gas at Cameron was a major milestone in the commissioning of Train 1 and is the precursor for the production of liquefied natural gas. With the imminent completion of Train 1, as well as the initial work to commission Freeport Train 1, ***we are increasingly confident that the two facilities will come fully on line in 2020 as world-class LNG producers***. ***Further, we were pleased to report that we had no material increase in cost estimates on either project in the first quarter***, and we continue to progress our commercial discussions relating to Cameron."

209. McDermott's analyst earnings call that same day, to discuss 1Q 2019 results (the "4/29/2019 Earnings Call"), contained the following false and misleading statements from Defendant Dickson:

> Our performance in the first quarter of 2019 sets the stage for McDermott to fulfill the long-term promise of potential of our combination with CB&I As we anticipated and conveyed to you at the year end, we are benefiting from strong market positioning, favorable sector dynamics and a robust pipeline, all of which contributed to solid top line performance and will foster continued realization of the strategic rationale for the combination. These factors manifested in a number of positive trends that we expect, will continue to accelerate our growth trajectory into the year. The pace of new orders more than quadrupled as compared to Q4; backlog grew 41% sequentially to a level that exceeds the total of the two companies prior to the combination; ***we completed our integration efforts and the full auctioning of the $475 million CPI program; and of course, delivered on our commitment to deliver disciplined execution of the Cameron and Freeport projects with no material increases in cost estimates.***
>
> ****
>
> [W]e expect to have a more attractive backlog profile on a go forward basis. We're doing essentially the same thing today, using a Playbook ***to successfully complete the execution of the focus projects, while at the same time steadily building a book of new business at more predictable margins that will provide the foundation for our future earnings and cash flows. We are improving organizational efficiency and have established a capital structure that serves our needs over the intermediate term.***

210. During that same call, Defendant Spence stated that:

> As we said in our earnings release, the Cameron and Freeport projects incurred no material changes in estimates during the quarter. As of quarter

> end, the Cameron project was about 90% complete with Phase 1, achieving mechanical completion during the period. Cameron Train 1 is scheduled for initial production of LNG this quarter.
>
> Initial production of LNG from Trains 2 and 3 at Cameron is set for Q1 of 2020 and Q2 of 2020, respectively. Our expectation of cash usage by Cameron for the full year 2019 is essentially in line with previous guidance of about $450 million. The Freeport project progressed during the quarter reaching 93% completion. The project achieved a milestone earlier this month with FERC approval to bring in fuel gas for pre-commissioning of the pretreatment facility.
>
> Freeport is scheduled for initial production of LNG as follows: Trains 1, 2 and 3 in Q3 2019; Q4, 2019, and Q1, 2020 respectively. ***Our expectation of cash usage by the Freeport project in 2019 is $33 million, which is modestly less favorable than previous guidance and is due largely to revised estimates of the timing of milestone payments. Said another way, the cash usage in Q1 was higher than expected, but we are forecasting the project to generate cash over the remaining nine months of this year.***

211. Later in the 4/29/2019 Earnings Call, in response to an analyst question about Freeport charges, Defendant Dickson said:

> Yes, so if you look at the details in the Q, as you know, on the Freeport project, we are in a different consortium on Train 1 and 2 to Train 3, as we refined our estimates in the quarter, we increased marginally some cost on Train 1 and Trains 2, but given the productivity that we're seeing and the progress that we're seeing, we reduced our estimates on Train 3. ***So overall as a project there was no change in cost*** -- total cost to complete for the entire project albeit with some POC accounting, with Trains 1 and 2, and a loss you take that amount and Train 3 gets kind of percentage of completion. ***So there was just a very-very minor immaterial net change for the quarter and the P&L, albeit for the entire project, we did not change our cost estimate for the project.***

212. The foregoing misstatements on April 29, 2019 were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects

were having on McDermott's capital structure balance sheet, and liquidity. These issues were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on

Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants

wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

213. On July 29, 2019 McDermott filed their Form 10-Q with the SEC for the second quarter of 2019 (the "2Q 2019 10-Q"), SOX certified by Defendants Dickson and Spence, in which the following false and misleading statements were made:

> *Cameron LNG*—At June 30, 2019, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (being performed by our NCSA operating group) ***was approximately 78% complete on a post-Combination basis (approximately 93% on a cumulative basis) and had an accrued provision for estimated losses of approximately $58 million.*** In the second quarter of 2019, NCSA project operating margin was positively impacted by recognition of approximately $110 million of incentives related to the projected achievement of progress milestones.
>
> *Freeport LNG*—At June 30, 2019, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (being performed by our NCSA operating group) ***were approximately 87% complete on a post-Combination basis (approximately 96% on a cumulative basis) and had an accrued provision for estimated losses of approximately $19 million***. During the three and six months ended June 30, 2019, the project was negatively impacted by $27 million and $54 million, respectively, due to changes in cost estimates resulting from increases in construction and subcontractor costs. These cost estimate increases were partially offset by the recording of approximately $11 million of incentive revenues in the first quarter of 2019.
>
> ****
>
> *Calpine Power Project*—At June 30, 2019, our U.S. gas turbine power project for Calpine (being performed by our NCSA operating group) ***was approximately 99% complete on a post-Combination basis***

> ***(approximately 99.7% on a pre-Combination basis), and the remaining accrued provision for estimated losses was not significant.***

214. Also on July 29, McDermott held an earnings call to discuss 2Q 2019 earnings (the "4/29/2019 Earnings Call"). Defendant Dickson made the following false and misleading statements:

> let me emphasize once again that the long-term outlook for McDermott is exceptionally positive. ***We are optimizing the benefits of our combination with CB&I and steadily advancing toward completion of the Cameron and Freeport LNG projects.*** We remain confident in the earnings power of the company, and the adjustment in our current year guidance is largely a reflection of Q2 actions and subsequent timing related issues. ***We are confident now that the challenges we have confronted since the combination with CB&I, will be largely behind us by the end of the year*** and we look forward to a significantly improved 2020. Although we are not prepared to give specific earnings guidance for next year, let me cite the specific factors that support our optimistic view of 2020.
>
> First, we should capture, not only the revenues and earnings that we previously expected to see in Q4 of this year, but we should see a much higher revenue run rate based on the growth in backlog and a corresponding reduction in unallocated operating expense.
>
> Second, we would expect to see a sharp reduction and eventual elimination on zero margin revenues from our existing project portfolio, as we complete the Cameron and Freeport LNG projects.
>
> Third, we believe our backlog is sound and profitable ***and we would not expect to incur material changes in project estimates across our portfolio.***

215. On July 30, 2019, McDermott released a press release with their 2Q 2019 earnings results which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, and which had the following statements from Defendant Dickson:

> "This is a year of transition as we position McDermott to ***fully optimize the benefits of our combination with CB&I and as we steadily advance toward completion of the Cameron and Freeport projects,*** " added Dickson. "Nevertheless, the company today has updated its guidance for 2019. The

> reduction in our guidance is due to four main factors: 1) the weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA operating segment; and 4) a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives on the Cameron LNG project. Even so***, we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020.***

216. On July 31, 2019, McDermott hosted a breakfast meeting with analysts, during which Defendants stated that McDermott remained confident that the CB&I backlog will be significantly de-risked by the end of next year as Cameron and Freeport's Train 1 are commissioned, and Train 2 / 3 (of both projects) remain on schedule.

217. The foregoing misstatements on July 29-30, 2019 were materially false and misleading because Defendants continued to understate the true costs and necessary cash expenditures on the Focus Projects, as well as the materially negative effect those projects were having on McDermott's capital structure balance sheet, and liquidity. These issues were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron

was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses;

presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

### 2. *The Technology Business Fraud*

218. Defendants deceived investors about the Technology Business of CB&I in propping up the value of the merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, and the rest

of their portfolio dragged the whole of the business down. As stated in an analyst report by Citi on December 19, 2017, when the merger was announced, "the deal provides CB[&]I shareholders the opportunity to participate in the upside of the new combined company while still retaining the valuable Technology business." While the deal may have been prudent for CB&I, the same was not true for McDermott, and Defendants concealed the true risks of merging with CB&I rather than merely acquiring the Technology Business.

219. On December 18, 2017, McDermott issued a press release (the "12/18/2017 Press Release"), which it filed with the SEC as an exhibit to a Form 8-K (the "12/18/2017 Form 8-K") signed by Defendant Spence, touting the significance of the acquisition of CB&I's ***"strong technology capabilities"*** stating:

> ***By retaining CT&I's Technology business, with its 3,000 patents and patent application trademarks and more than 100 licensed technologies, the combined company will be one of the world's largest providers of licensed process technologies.*** McDermott and CB&I anticipate ***leveraging these capabilities across their customer base to drive follow-on work.***

220. The 12/18/2017 Press Release also quoted Defendant Dickson as stating, *inter alia*:

> This transaction combines ***two highly complementary businesses*** to create a leading onshore-offshore EPCI company ***driven by technology and innovation***, with the scale and diversification to better capitalize on global growth opportunities

221. Also on December 18, 2017, McDermott published a 30-page slide presentation (the "12/18/2017 Presentation"), which was attributed to Defendants Dickson and Spence therein and which was posted McDermott's corporate website and filed with the SEC as an attachment to the 12/18/2017 Form 8-K signed by Defendant Spence. The

12/18/2017 Presentation, like other statements issued by the Company that day, touted the combined company's attributes with its "***market-leading technology portfolio***" playing a key role, by stating that the merger was purportedly "create[ing] a premier $10 billion global, ***fully vertically integrated*** onshore-offshore EPCI provider" that was "***driven by technology and innovation.***"

222. In yet another statement on December 18, 2017, Defendant Dickson recorded a video, the transcript of which, McDermott filed with the SEC on December 19, 2017, pursuant to Rule 425 ("Rule 425") under the Securities Act of 1933 (the "Securities Act") deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, stating that the merger was about ***"growth," "diversification," and "scale"*** and explaining that CB&I's technology will provide McDermott with "the platform to drive growth and expand into new regions" and further stating:

> With a ***focus on technology*** and innovation, we plan ***to combine the best of both companies to provide increased value to our clients.*** For example, by applying ***McDermott's operational excellence with CB&I's strong technology capabilities, we will offer end-to-end solutions across the full lifecycle of a project***. This is what our customers are seeking.

223. On December 18, 2017, Defendant Dickson issued another statement, which McDermott filed with the SEC on December 19, 2017, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, again stating that the acquisition of ***"CB&I's strong technology"*** will give McDermott the ***"scale and diversification to continue our transformation and drive growth*** in new territories and sectors of the energy industry."

224. Also on December 18, 2017, McDermott held an investor call (the "12/18/2017 Investor Call") regarding the proposed merger, on which Defendants Dickson and Spence spoke, a transcript of which McDermott filed with the SEC on December 19, 2017, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, continuing the Company's campaign of emphasizing that technology was one of the main considerations for choosing to merge with CB&I, stating:

> As you know, my past obviously come from the world of both onshore and offshore, I look at the future, ***I consider things such as technology, a diversification and scale. And when this opportunity came up, I was able to satisfy in all 3 areas*** and I just think this is a fantastic opportunity for both companies to really create what is going to be a Tier-1 first class organization.

225. Continuing the Company's campaign on December 18, 2017 to tout how instrumental Scott Munro, the Vice President, Americas, Europe and Africa, issued a statement that McDermott filed with the SEC on December 19, 2017, pursuant to Rule 425 ("Rule 425") under the Securities Act of 1933 (the "Securities Act") deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, reiterating Defendant Dickson's earlier statements about how critical to McDermott's growth and success it was to retain CB&I's technology, stating:

> ***This combination is good news for McDermott.*** As David said in his note to you earlier today, ***CB&I's strong technology offering and capabilities in the onshore and LNG markets will give us the scale and diversification to compete in new areas.*** This is particularly true in our part of the world. McDermott will be able to leverage CB&I's existing relationships in these regions and aim to deliver customers FEED, installation, MMO services and end-to-end engineered and constructed facility solutions across the full

project lifecycle. ***This combination is about growth and it sets the stage for future success, while creating exciting new opportunities for McDermott.***

226. The foregoing misstatements on December 19, 2017 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said

that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants

cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

227. On January 8, 2018, McDermott published a 48-page slide presentation (the "1/8/2018 Presentation"), updating the 12/18/2017 Presentation, which was attributed to Defendants Dickson and Spence therein and which was posted McDermott's corporate website and filed with the SEC as an attachment to the 1/8/2018 Form 8-K signed by Defendant Spence. McDermott filed the 1/8/18 Presentation with the SEC on January 8, 2018, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-

2(b) and Rule 14a-12 under the Exchange Act. The 1/8/2018 Presentation continued to tout the key role of its "***market-leading technology portfolio***" on the merger making statements substantially similar to those alleged above.

228. On January 24, 2018, McDermott and a wholly-owned subsidiary of CB&I filed a Registration Statement with the SEC on Form S-4, and later filed three amendments on Forms S-4/A on March 2, March 23, and March 27, 2018. The preliminary Proxy Statement stated the "Strategic Considerations" the McDermott Board considered for entering into the Business Agreement, including:

> By retaining ***CB&I's technology business***, with its 3,000 patents and patent applications, trademarks and more than 100 licensed technologies, the combined business will be one of ***the world's largest providers of licensed process technologies***. McDermott anticipates ***leveraging these capabilities across the combined customer base to drive follow-on work***.

229. On January 30, 2018, Defendant Dickson issued a statement to CB&I employees discussing the "complementary nature" of McDermott and CB&I, which McDermott filed with the SEC on January 30, 2018, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, stating"

> ***McDermott's offshore capabilities combined with CB&I's onshore expertise and technology gives us a platform to drive growth and expand into new regions.***
>
> With a ***renewed focus on technology and innovation***, we plan to combine the best of both companies to provide increased value to our customers. ***With the combination of our capabilities, technology, the diversification of our offering and the scale of our new organization, I'm confident we will be the leader in providing world-class end-to-end solutions to our customers in this highly competitive market.***

230. The foregoing misstatements in January 2018 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the

Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects,

even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

231. On February 21, 2018, McDermott held a conference call with analysts (the "2/21/2018 Earnings Call") regarding its Q4 2017 earnings release, on which Defendants Dickson and Spence discussed the merger. McDermott filed a copy of the 2/21/2018 Earnings Call transcript with the SEC on February 22, 2018, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. During the 2/21/2018 Earnings Call, Defendant Dickson not only reaffirmed previous statements that the ***"market-leading technology"*** was part of the ***"compelling strategic rationale"*** of the proposed combination with CB&I, but also

reassured investors that technology would remain a focus of the combined company for 2018 stating that the among the ***"strategic priorities"*** for the year was ***"to build upon strengthened customer alignment and relationships with a new technology focus."***

232. In a letter to employees, which was filed by McDermott with the SEC on February 27, 2018, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Defendant Dickson stated that the "***foundation*** [of the merger is] to support ***increased pull-through work, but this will not be possible without CB&I's tier-one technology business."***

233. McDermott's Form 10-K for the year ended December 31, 2017, which was filed with the SEC on February 21, 2018 and was signed and SOX certified by Defendants Dickson and Spence (the "2018 10-K"), was amended on March 7, 2018 and filed with the SEC on March 8, 2018 (the "2018 10-K/A"). The 2018 10-K/A was signed and SOX certified by Defendants Dickson and Spence and stated:

> Notwithstanding this continued challenging macro environment, in 2017 McDermott remained focused on growing its leadership position in the Middle East, ***building upon strengthened customer alignment and relationships with a new technology focus***, proactively seeking ways to improve its cost structure and managing its cost base, deepening integration to build efficiencies and further enhance capabilities and building backlog in markets where capital is available for investment.

234. The foregoing misstatements in February 2018 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key

valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2

billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

235. On March 22, 2018, McDermott published a 51-page slide presentation (the "3/22/2018 Presentation"), updating the 12/18/2017 Presentation, which was attributed to Defendants Dickson and Spence therein and which was posted McDermott's corporate website and filed with the SEC as an attachment to the 3/22/2018 Form 8-K signed by Defendant Spence. McDermott filed the 3/22/18 Presentation with the SEC on March 22, 2018, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act. The 3/22/2018 Presentation continued to tout the key role of its "***market-leading technology portfolio***" on the merger making statements substantially similar to those above.

236. The March 27, 2018 Form S-4/A contained the definitive Proxy Statement, including the attached Merger Agreement. On March 29, 2018, McDermott filed a Form 8-K pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, announcing that the March 27, 2018 registration

statement had been declared effective as of 2:00 pm Eastern Daylight Time on March 29, 2018, and, further, that McDermott and CB&I had established record dates of April 4, 2018 and meeting dates of May 2, 2018 for the special meetings of their respective shareholders to seek approvals related to the proposed combination. On March 29, McDermott and CB&I filed a prospectus supplement to the Proxy Registration Statement on Form 424(b)(3) and McDermott mailed it to McDermott's shareholders. On April 2, 2018, McDermott filed additional material related to the Merger on Form DEFM14A.

237. The Proxy Statement encouraged investors to vote "FOR" each of the proposals relating to the merger, stating numerous times the "Compelling Strategic Rationale" that the merger "would combine two highly complementary businesses to create a leading onshore-offshore EPCI company ***driven by technology and innovation***, with the scale and diversification to better capitalize on global growth opportunities."

238. The Proxy Statement also reiterated prior statements in the preliminary Proxy Statement regarding the "Strategic Considerations" the McDermott Board took into account in entering into the Business Agreement, including:

> By retaining ***CB&I's technology business***, with its 3,000 patents and patent applications, trademarks and more than 100 licensed technologies, the combined business will be one of ***the world's largest providers of licensed process technologies***. McDermott anticipates ***leveraging these capabilities across the combined customer base to drive follow-on work***.

239. The foregoing misstatements in the Proxy Statement were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with

CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as

demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to

suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

240. In a letter to employees dated April 23, 2018, which McDermott filed with the SEC on April 23, 2018, pursuant to Rule 425 under the Securities Act deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Defendant Dickson announced that CB&I's "industry-leading technology portfolio" would use the Lummus brand name and that all of the combined company's technology initiatives would be housed under the umbrella of McDermott Technology, and reiterated the oft-cited strategic rationale stating, ***"technology is critical to our success going forward as a combined company."***

241. The foregoing misstatements in April 2018 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with

CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as

demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to

suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

242. After the closing of the merger, McDermott continued to tout the technology portfolio as an instrumental part of its growth and success strategies both pre- and post-merger, particularly as to pull-through opportunities provided by the Technology Business.

243. On July 31, 2018, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on second quarter 2018 financial and operational results, stating:

> McDermott's operating income and operating income margin for the second quarter of 2018 were $49 million and 2.8%, reflecting the net impact of transaction-related items. Adjusted operating income for the second quarter of 2018 was $172 million, primarily driven by offshore and downstream projects. The ***adjusted operating income margin was 9.9***%, aided by ***strong margin performance*** in the APAC, MENA and ***Technology segments.***
>
> ****
>
> Revenue of $105 million and operating income and margin of $25 million and 23.8%, respectively, in the Technology segment for the second quarter

> of 2018 were driven by balanced activity across the portfolio of refining and petrochemical licensing and heat transfer equipment, aided by several large catalyst shipments.

244. McDermott filed with the SEC its Form 10-Q for Q2 2018 (the "Q2 2018 10-Q") on July 31, 2018 and was signed and SOX certified by Defendants Dickson and Spence, discussing an overview of the combination completed on May 10, 2018, the reorganization of operations into business segments and the results of operations, stating:

> We are now a fully integrated provider of EPCI and technology solutions to the energy industry and design and build end-to-end infrastructure and technology solutions, from the wellhead to the storage tank, to transport and transform oil and gas into a variety of products.
>
> ****
>
> Technology—***Our Technology segment is a leading technology licensor of proprietary gas processing, refining, petrochemical and coal gasification technologies*** as well as a supplier of proprietary catalysts, equipment and related engineering services. ***These technologies are critical in the refining of crude oil into gasoline, diesel, jet fuel and lubes, the manufacturing of petrochemicals and polymers, as well as the gasification of coal into syngas.*** Technology also has a 50% owned unconsolidated joint venture that provides proprietary process technology licenses and associated engineering services and catalysts, primarily for the refining industry.

245. The Q2 2018 10-Q also disclosed the significant impact the technology segment had on revenues and operating income for the three months ended June 30, 2018 as follows:

> Technology – Revenues in the second quarter of 2018 were $105 million (all of which resulted from the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and the sale of catalyst.
>
> ****
>
> ***Our second quarter 2018 operating income benefited by $74 million from the impact of the Combination (including $22 million of project related and***

> ***other intangible assets amortization), primarily within our NCSA and Technology segments.***
>
> ****
>
> Technology – Segment operating income in the second quarter of 2018 was $25 million, net of $13 million of project related and other intangible assets amortization. The results were primarily associated with licensing and proprietary equipment activity, as well as the supply of catalyst and included $3 million of income from our CLG unconsolidated joint venture.

246. The Q2 2018 10-Q also disclosed the significant impact the technology segment had on revenues and operating income for the six months ended June 30, 2018 as follows:

> Our revenues for the 2018 period benefited by $1.1 billion from the impact of the Combination, primarily within our NCSA, MENA and Technology segments.
>
> ****
>
> Technology – Revenues during the six months ended June 30, 2018 were $105 million (all of which resulted from the impact of the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining market and the sale of catalyst.
>
> ****
>
> Technology – Segment operating income during the six months ended June 30, 2018 was $25 million, net of $13 million of project related and other intangible assets amortization. The results were primarily associated with licensing and proprietary equipment activities, as well as the supply of catalyst, and included $3 million of income from our CLG unconsolidated affiliate.

247. On July 31, 2018, McDermott held a conference call with analysts (the "7/31/2018 Earnings Call") regarding its Q2 2018 earnings release, on which Defendants Dickson and Spence discussed the first quarterly report for the combined organization. In prepared remarks, Defendant Dickson stated:

> We believe our integrated end-to-end offering enables us to deliver a more robust value proposition to our customers and in turn generates the opportunities for revenue synergies across all global density markets and ***incremental pull-through revenue from Lummus Technology***.
>
> ****
>
> ***In our Technology business, we have a leading position among the world's licensors of petrochemical and refining technology.*** In fact, around ***40% of the world's ethylene capacity is produced under licenses that were sold by our Technology business.*** The market for petrochemical and refining Licensing continues to be strong.

248. Also, on the 7/31/2018 Earnings Call, in his prepared remarks, Defendant Spence attributed the strong results of the operating income to the Technology Business, stating:

> Operating income for the quarter was $49 million or $172 million, excluding the $123 million of transaction costs, CPI costs, and intangibles amortization. The ***adjusted operating income margin*** was just under 10%, ***driven largely*** by solid execution across our portfolio and the ***strong margin performance*** in our APAC, MENA and ***Technology segments.***

249. The foregoing misstatements in April 2018 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and

balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on

Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants

wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

250. In McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule A, on August 10, 2018, McDermott stated that strategic objectives included "***grow[ing] revenue and earnings by***…steadily expanding our EPC portfolio in petrochemical and refining by capitalizing on ***pull-through opportunities provided by our technology business,***" and ***"expand[ing] our leadership position*** in served markets and ***technology***."

251. On September 6, 2018, Defendant Dickson spoke at the Barclays CEO Energy-Power Conference and McDermott published a 30-page slide deck in conjunction with this event touting the Company's "tier 1" "market-leading technology portfolio" stating that it "***Generates steady and attractive returns*** selling licenses/catalysts and ***significant pull-through for downstream projects***," "***Longer term, this business segment will house all of the technology that underpins McDermott's business***" and that a 2018 Focus Area was to "Complete integration successfully to establish top tier, vertically integrated EPC company, ***competitively differentiated in technology,*** customer relationships, culture and geographic footprint."

252. On September 12, 2018, Defendant Dickson spoke at Pareto's Securities' 25th Annual Oil & Offshore Conference and McDermott published a 30-page slide deck in

conjunction with this event, stating, "***Lummus Technology provides competitive differentiation and uniquely positions us for pull-through EPC work.***"

253. The foregoing misstatements in September 2018 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said

that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants

cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

254. McDermott filed with the SEC its Form 10-Q for Q3 2018 (the "Q3 2018 10-Q") on October 30, 2018 and was signed and SOX certified by Defendants Dickson and Spence, which disclosed the significant impact the technology segment had on revenues and operating income for the three months ended September 30, 2018 as follows:

> Technology – Revenues in the third quarter of 2018 were $148 million (all of which resulted from the Combination) and were primarily associated with

> licensing and proprietary equipment activities in the petrochemical and refining markets.
>
> ****
>
> Our third quarter 2018 operating income benefited by $121 million from the impact of the Combination (including $68 million of project related and other intangible assets and investment in unconsolidated affiliates related amortization), primarily within our Technology and NCSA segments.

255. The Q3 2018 10-Q also disclosed the significant impact the technology segment had on revenues and operating income for the nine months ended September 30, 2018 as follows:

> Our revenues for the 2018 period benefited by $2.8 billion from the impact of the Combination, primarily within our NCSA, EARC, MENA, and Technology segments.
>
> ****
>
> Technology – Revenues during the nine months ended September 20, 2018 were $253 million (all of which resulted from the impact of the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and the sale of catalyst.
>
> ****
>
> The first nine months of 2018 operating income benefited by $194 million (including $90 million of project related and other intangible assets and investment in unconsolidated affiliates related amortization) from the impact of the Combination, primarily within our NCSA, MENA and Technology segments.

256. On October 30, 2018, McDermott held a conference call with analysts (the "10/30/2018 Earnings Call") regarding its Q3 2018 earnings release, on which Defendants Dickson and Spence discussed the third quarterly report for the combined organization. In prepared remarks, Defendant Dickson discussed how integral the Technology Business was to McDermott's success stating:

> I'd like to offer a few comments on our ***Technology business***, which ***continues to generate terrific value*** for us. ***The segment posted very strong results with sequential quarter gains in all key metrics.*** In particular, new orders quadrupled, backlog was up 26%, revenues increased by 41%, and adjusted operating income was up 66%.
> The technology license awards announced in the third quarter provided McDermott with an opportunity for the sale of additional products and services. On this point in particular, ***we continue to view the Technology business as providing McDermott with a huge competitive edge and winning EPC contracts in the petrochemical and refining markets.*** In the past five years alone, the company has won about ***$8 billion of pull-through EPC work that resulted from the initial sale of technology licenses.***

257. During the 10/30/2018 Earnings Call, in prepared remarks, Defendant Spence discussed reported results of the Technology segment stating:

> ***The adjusted operating income margin*** was 10.2% ***aided by strong performance*** in the MENA and ***Technology segments***."
>
> ****
>
> In our Technology segment, revenues of $148 million and operating income of $20 million for the third quarter of 2018 were primarily driven by licensing and proprietary supply in the petrochemical and refining markets. Approximately, half of the revenue was attributable to proprietary supply, including catalysts. ***Operating income was positively impacted by strong execution progress, earned fees and process performance.*** Excluding the impact of intangibles amortization, adjusted operating income for the third quarter of 2018 was $63 million, representing an adjusted operating income margin of 42.8%.

258. During the Q&A portion of the 10/30/2018 Earnings Call, as a follow-up question to the reasoning behind the announced sale of the pipe fabrication and tank storage business, an analyst asked whether McDermott was considering selling the Technology Business. In response, Defendant Dickson reassured the analyst that the technology segment was a core part of McDermott's business strategy going forward stating:

> [L]et me just address the question on the technology and I tried to highlight it very strong on my opening remarks. ***The technology business is very core***

> ***or very much core for our future.*** We've already seen a ***number of opportunities that have came up with the pull through of the technology through to the E&C and EPC business***. And through our combination of both McDermott and CB&I, we're seeing excellent opportunities with regards to the capabilities of both companies and I refer to things such as modularization. ***So technology is very much part of our strategy moving forward.*** And as you heard on the call of business which today in the current market where we see increasing activity in petrochemical, less so in refining but will remain very core to our future.

259. Amidst partial corrective disclosures that day related to the cost estimates of the Focus Projects, the foregoing misstatements on October 30, 2018 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent

that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before

the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

260. McDermott's Form 10-K for the year ended December 31, 2018, which was filed with the SEC on February 25, 2019 (the "2018 10-K") and was signed and SOX certified by Defendants Dickson and Spence disclosed:

> Technology—***Our Technology segment is a leading technology licensor of proprietary gas processing, refining, petrochemical and coal gasification technologies*** as well as a supplier of proprietary catalysts, equipment and related engineering services. ***These technologies are critical in the refining of crude oil into gasoline, diesel, jet fuel and lubes, the manufacturing of petrochemicals and polymers, as well as the gasification of coal into syngas.*** Technology also has a 50% owned unconsolidated joint venture that provides proprietary process technology licenses and associated engineering services and catalysts, primarily for the refining industry.
>
> ****
>
> Technology—Revenues during 2018 were $391 million (all of which was due to the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and the sale of catalyst.

261. On February 25, 2019, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on fourth quarter and full year 201 financial and operational results, and particularly regarding the technology segment stating, "Revenues of $137 million were primarily driven by licensing, heater, and catalyst sales in the petrochemical and refining markets" and "Adjusted operating income was positively impacted by strong execution progress, earned fees and process performance."

262. On February 25, 2019, McDermott held a conference call with analysts (the "2/25/2019 Earnings Call") regarding its Q4 2018 earnings release, on which Defendants Dickson and Spence discussed the financial and operational results for the quarter, which

included reported losses in several segments. In response to an analyst's question about the growth outlook for the technology segment, Defendant Dickson stated:

> What I would say today is that ***the technology business is in very, very good shape***. I mentioned in my prepared remarks that we're seeing an emerging petrochemical market and a big part of the technology company really is in the petchem space. And as you know ***one of the strategic reasons for this combination is to have our EPC part of the business benefit from pull-through from the technology***. And the ***technology group has had a very good 2018, 2019 has started off in the same trend, and so we're seeing more and more of this type of work coming. So again, the whole strategic rationale of getting the pull-through is still solid and obviously we see that as a strong part of the company moving forward.***

263. The foregoing misstatements in February 2019 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk

assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already \$300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to \$500-\$600 million over budget combined. CW2 said that Cameron was \$1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being \$1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over \$1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified \$1.2 billion of itemized forecasted risks in January 2018 and \$1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that \$700 million to \$1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing

millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

264. In McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule A, on March 22, 2019, McDermott stated that the result of the merger "create[d] a top-tier, technology-led" integrated company and reiterated that its technology portfolio is a focus of its business strategy, stating:

> We also have one of the industry's ***most robust technology portfolios*** and continue to develop cutting edge technology to achieve our customers' objectives. This approach to sustainability and ***focus on technology*** helps us create ***shared value for our company and stakeholders and supports our overall business strategy.***

265. On March 25, 2019, Defendant Spence spoke at Scotia Howard Weil Energy Conference and McDermott published a 26-page slide deck in conjunction with this event touting the continued success of the technology segment and that technology would remain a focus for the Company. For example, on the slide titled, "Strategic Review of Business Portfolio: Sale of U.S. Pipe Fabrication and Tank Business," a bullet stated, ***"Focus remains on technology pull through with differentiated vertical integration capabilities."*** The presentation also noted, "2018 revenues were driven by NCSA and MENA and ***key contributors to operating results were*** MENA and ***Tech,***" and that ***"Tech continues to produce strong and steady results."*** The presentation further reiterated prior statements regarding Lummus Technology, including, "***Longer term, this business segment is expected to house all of the technology that underpins McDermott's business***."

266. The foregoing misstatements in March 2019 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with

CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as

demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to

suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

267. McDermott filed with the SEC its Form 10-Q for Q1 2019 (the "Q1 2019 10-Q") on April 29, 2019 and was signed and SOX certified by Defendants Dickson and Spence, which disclosed the significant impact the technology segment had on revenues and operating income for the three months ended March 31, 2019 as follows:

> *Technology*—Revenues during the first quarter of 2019 were $148 million (all of which was due to the Combination) and were primarily associated with licensing and proprietary equipment activities in the petrochemical and refining markets and also the sale of catalyst materials.
>
> ****
>
> *Technology*—Segment operating income during the first quarter of 2019 was $35 million (including $17 million of project-related and other intangible assets and investment in unconsolidated affiliate-related amortization).

268. On April 29, 2019, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on first quarter 2019 financial and operational results, stating:

> McDermott's operating income for the first quarter of 2019 was $13 million and adjusted operating income was $86 million, excluding the previously described restructuring, integration and transaction costs. ***Operating income for the first quarter of 2019 was favorably impacted by*** the execution of various projects in MENA and NCSA, as well as ***strong performance in the Technology segment.***

269. On April 29, 2019, McDermott held a conference call with analysts (the "4/29/2019 Earnings Call") regarding its Q1 2019 earnings release, on which Defendants Dickson and Spence discussed the Q1 2019 earnings and guidance for the rest of the year and 2020. During the call, Defendant Dickson stated:

> Having completed the integration and now clearly witnessing the combined market power of the two companies, ***we have continued to validate and strengthen the strategic rationale for putting McDermott and CB&I together.***
>
> As a reminder, that ***rationale*** was built upon three drivers, firstly, ***adding a technology capability that would enable us to tap into a significant pull-through opportunity;*** secondly, diversifying beyond offshore and subsea and more specifically establishing an onshore presence in the growing LNG and petrochemical markets; and thirdly, gaining significant scale to enhance and broaden our competitive position.

270. The foregoing misstatements in April 2019 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key

valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2

billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

271. On July 29, 2019, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on second quarter 2019 financial and operational results and full year guidance, stating:

> [I]n our ***Technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018***. One of the recent highlights was our selection as the Master Licensor by S-OIL, an affiliate of Saudi Aramco, in support of its ethylene cracker and downstream petrochemicals complex, being developed as a major expansion of S-OIL's existing refinery in South Korea. ***Our Technology business gives us unparalleled insight into upcoming EPC opportunities***, and we see roughly $40 billion of potential EPC pull-through opportunities in the refining and petrochemical markets over the next five years.

272. On July 29, 2019, McDermott held a conference call with analysts (the "7/29/2019 Earnings Call") regarding its Q2 2019 earnings release, on which Defendants Dickson and Spence discussed the Q2 2019 financial and operating results. In prepared remarks during the call, Defendant Dickson reiterated statements in the July 29, 2019 press release regarding the success of the Technology Business stating:

> ***[I]n our technology business, we are forecasting the number of license sales to increase by 25% this year versus 2018. Beyond that, as a result of recent or pending technology license sales, we continue to see roughly $40 billion of potential EPC pull-through opportunities in refining and petrochemical.***

273. During the 7/29/2019 Earnings Call, Defendant Spence provided the financial results of the technology segment, stating:

> We reported revenues of $154 million and operating income and margin of $35 million and 22.7% respectively, primarily driven by catalyst shipments, execution progress, earned fees and process performance.

274. In response to an analyst's question during the 7/29/2019 Earnings Call about the structural changes made in the technology segment and the outlook for the technology segment, Defendant Dickson noted that change in leadership in the beginning of the year in the Technology Business would strengthen the segment, stating:

> [T]he changes was we had retirement of the Head of Technology. Dan has agreed to stay on for approximately 12 months as he knew that we'll be busy and the management team is busy fixing some other things and also, got a lot of confidence in the technology business. What we've done since beginning of this year is we have put a new person in charge for that business, Dan has retired. And ***we have also challenged the new team to really re-energize the technology business***. And the reason we say that is that, ***one has a strong position already in the marketplace. There was feedback from our customers we feel that Lummus has an even stronger position in the marketplace.***
>
> So we are doing a review of the whole business, looking at whole portfolio of the technologies. And the big things that we really are driving though and really taken opportunity to buy, sell license, also takes us into FEED, the sale of critical equipment and then ultimately, the EPC. So what we've noticed is just in the last three and six months is those number of opportunities have significantly increased.
>
> In addition, what we've done is, although, we operate the technology businesses in the segment, we've also integrated it more with regards to our business development efforts. ***And so when we are sitting across from a***

> ***customer, we're not just talking about down a license, we were actually talking about how we can support a customer through the various stages of developing the project, so starting to see some positives on that.*** And with S-OIL award, in South Korea was a major award, although, it's only a master license at this stage. But it's an example of a project which can lead to the award of the various next stages and including some high margin activity.

275. The foregoing misstatements in April 2019 were materially false and misleading. Defendants were aware of the true costs and risks of the Merger and the Focus Projects through McDermott's extensive due diligence and deceived investors about the Technology Business of CB&I in propping up the value of the Merger as a whole, with CB&I's entire business, while concealing that the Technology Business was the key valuable asset of CB&I, while the Four Focus Projects dragged the whole of the business down. Defendants concealed the true risks of choosing to merge with CB&I rather than merely acquiring the Technology Business alone, including the significant risk that McDermott would need to sell the Technology Business to buoy its capital structure and balance sheet under the weight of the Four Focus Projects. These risks were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron

was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses;

presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

### 3. *The Capital Structure / Liquidity Fraud*

276. Defendants' insistence that the balance sheet of McDermott post-merger would be stable and have enough working capital to prevent liquidity issues and maintain a sustainable capital structure, while McDermott was heading towards a liquidity crisis due

to the immensely under-estimated costs of the Four Focus Projects, constituted fraudulent conduct.

277. The 3/22/2018 Presentation contained false and misleading statements about McDermott's liquidity and capital structure. McDermott stated, on a slide titled "A Transformational Combination" that the merger "Provides capital structure with liquidity to fund growth and manage downside scenarios." A later slide titled "Financing" said that "Sufficient funded debt being raised to strengthen balance sheet and provide liquidity to manage working capital needs, timing and focus projects."

278. The foregoing misstatements were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials

and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the

combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

279. The Proxy Statement contained the following false and misleading statements:

> ***After the Combination, McDermott expects to have a strong capital structure*** to support growth. The combined business is expected to generate EBITDA growth and strong free cash flow, enabling a reduction in funded indebtedness over the next few years.

280. The foregoing misstatements in the Proxy Statement were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash

burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on

Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants

wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

281. On April 24, 2018, McDermott filed a Form 10-Q with the SEC for the first quarter of 2018 (the "Q1 2018 10-Q"), SOX certified by Defendants Dickson and Spence, which the following statement about liquidity: "We believe our anticipated future operating cash flow, capacity under our credit facilities and uncommitted bilateral lines of credit, along with access to surety bonds, will be sufficient to finance our capital expenditures, settle our commitments and contingencies and address our normal, anticipated working capital needs for the foreseeable future."

282. The foregoing misstatements in the 10-Q were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and

maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already \$300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to \$500-\$600 million over budget combined. CW2 said that Cameron was \$1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being \$1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over \$1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified \$1.2 billion of itemized forecasted risks in January 2018 and \$1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and

to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable

Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

283. McDermott filed with the SEC its Form 10-Q for Q2 2018 (the "Q2 2018 10-Q") on July 31, 2018, which was SOX certified by Defendants Dickson and Spence, stating:

> We believe our cash on hand, cash generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and other external sources of liquidity, such as the issuance of debt and equity instruments, ***will be sufficient to finance our capital expenditures… settle our commitments and contingencies…and address our normal, anticipated working capital needs for the foreseeable future.***

284. In an earnings call with analysts that same day (the "7/31/2018 Earnings Call") regarding its Q2 2018 earnings release, in response to analyst question about McDermott's liquidity and working capital, Defendant Spence stated

> Just on our liquidity targets, they remain unchanged. So, we're still targeting as you mentioned to get below 2 times leverage in 2020. That in part is driven by our CPI program. You see we are accelerating our cost savings. It's about execution in the current portfolio and as you know, it's about booking new orders. We have a significant revenue pipeline that could bring along with it significant advances at the beginning of new projects."
>
> ****
>
> [W]e always expected that the combined business would operate on somewhere between $800 million to $900 million of negative working

> capital. We always expected some volatility quarter-to-quarter and you see that really with Q2. We did get a negative spike, which is good for cash flow, but as expected that is going to unwind in the second half. And that's mainly driven by the outsized advances that we have received earlier on both Cameron and Freeport. So that $900 million negative level by year-end, we see that as a somewhat stable level going into 2019.

285. The foregoing misstatements on July 31, 2018 were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by

engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-

Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

286. On October 30, 2018, McDermott filed with the SEC its Form 10-Q for Q3 2018 (The "Q3 2018 10-Q), SOX certified by Defendants Dickson and Spence. Within this filing, McDermott stated:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit, together with the expected proceeds for the Private Placement, ***will be sufficient to finance our capital expenditures… settle our commitments and contingencies… and address our normal, anticipated working capital needs for the foreseeable future.***

287. On October 30, 2018 as well, McDermott filed a Form 8-K with the SEC, signed by Defendant Spence, attaching a press release which reported on third quarter 2018 financial and operational results, stating, in relevant part:

> We have also entered into definitive agreements…providing for the private placement of $300 million of redeemable preferred stock, together with warrants to purchase 3.75% of our common stock, subject to customary closing conditions. In addition, we have separately received commitments for a $230 million increase in letter of credit capacity, subject to closing conditions. ***Proceeds from the private placement are expected to provide liquidity to fund working capital needs***, and the increase in letter of credit capacity will enhance the Company's readiness to book anticipated very strong order intake.

288. The foregoing misstatements were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable.

Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as

demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to

suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

289. McDermott held its earnings call with analysts for Q3 2018 that same day (the "10/30/2018 Earnings Call'). During the call, Defendant Dickson said:

> Now let me summarize the key points I'd like each of you to take away from today's call. Firstly, outside of the legacy Focus Projects, the company reported solid operating performance, strong bookings, and healthy liquidity in a rebounding market.
>
> ****
>
> [W]e have entered into definitive agreements with the investment funds managed by the Merchant Banking Division of Goldman Sachs, providing for the private placement of $300 million of redeemable preferred stock. ***We have also separately received commitments for a $230 million increase in our letter of credit capacity. Proceeds from the private placement are expected to fund working capital needs***, and the increase in the letter of credit capacity will enhance the company's readiness to book anticipated very strong order intake.

290. During that same call, Defendant Spence stated, "Our net working capital position is expected to be approximately $1.5 billion at the end of the year. The

supplemental steps we have taken to strengthen our balance sheet are not included in the figures I just spoke to." Also during the 10/30/2018 Earnings Call, Defendant Spence was asked an analyst question about McDermott's balance sheet and reasoning behind raising expensive equity and stated:

> [W]e're wanting to provide certainty to our company, our employees and our customers, as we work through the period between now and when we achieve the exit of the tank and the pipe business. And additionally we need the additional capital to support our growing business. So as David mentioned we've got an $80 billion opportunity pipeline, all of our end markets are in growth, and we are looking at an increased order intake pace. ***So it's all about kind of providing some working capital, providing support for our growing business and just ensuring that we've got a very kind of prudent balance sheet to manage through 2019***.

291. The foregoing misstatements on October 30, 2018 were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash

burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on

Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants

wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

292. McDermott filed its SEC Form 10-K for the year 2018 on February 25, 2019 (the "2018 10-K). The 2018 10-K was signed, and SOX certified, by Defendants Dickson and Spence. Within the 2018-K, McDermott stated:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit ***will be sufficient to finance our capital expenditures….settle our commitments and contingencies…and address our normal, anticipated working capital needs for the foreseeable future.***

293. On February 25, 2019, McDermott also held its Q4 2018 Earnings Call with analysts (the "2/25/2019" Earnings Call), and Defendant Spence stated the following in response to an analyst's question pertaining to cash flows:

> [O]n your question about free cash flow, similar to the main comments on our earnings – on our results overall. We expect free cash flow to be negative in the first half, and then turn in the second half. Our business models remain unchanged. So that means in our onshore business we are still getting customer advances and ***we still build up negative working capital and our new awards, and that is fundamentally part of our plan. Overall with our free cash flow being nagged in the first half, we're still very comfortable with our overall cash position***.

294. During that call, Spence also said, "Operating cash flow is similarly expected to be stronger in the second half, as we begin to see reduced outflows on the focus projects. Other assumptions embedded in our guidance include an assumption of no material project

charges, sound execution on the project portfolio, and a healthy pace of new orders, as supported by our revenue opportunity pipeline."

295. The foregoing misstatements on February 25, 2019 were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence

that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts

versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

296. In their Q1 2019 Form 10-Q filed with the SEC on April 29, 2019 (the "Q1 2019 10-Q"), SOX certified by Defendants Dickson and Spence, McDermott had the following to say about their liquidity situation:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and ***proceeds from previously announced non-core asset sales will be sufficient to finance our capital expenditures, settle our commitments and contingencies…and address our normal, anticipated working capital needs for the foreseeable future***

297. In the Earnings Call with analysts also held on April 29, 2019 (the "4/29/2019 Earnings Call"), Defendant Dickson stated:

> We are improving organizational efficiency and ***have established a capital structure that serves our needs over the intermediate term***. In this regard, I see 2019 as a year of stabilization and transition with 2020 as a year in which we will begin to demonstrate our full potential.

298. During the 4/29/2019 Earnings Call, Defendant Spence, remarking on liquidity said:

> ***We are comfortable with the company's liquidity profile over the course of 2019***, supported by the $1.1 billion of cash and revolver availability that we had as of the end of Q1. Again as a reminder, the proceeds from the ***anticipated sales of the pipe fabrication and storage tank businesses are not reflected in the guidance***. As far as the cadence of our earnings in 2019, we expect that the second half is likely to be much stronger than the first half, with expected earnings ramping up sharply in the fourth quarter. This is in part due to higher revenues driven by the execution of recently booked backlog, which in turn will drive higher utilization.

299. During the same call, Defendant Dickson said the following about capital structure:

> [W]e expect to have a more attractive backlog profile on a go forward basis. We're doing essentially the same thing today, using a Playbook ***to successfully complete the execution of the focus projects, while at the same time steadily building a book of new business at more predictable margins that will provide the foundation for our future earnings and cash flows. We are improving organizational efficiency and have established a capital structure that serves our needs over the intermediate term.***

300. The foregoing misstatements were materially false and misleading. McDermott's mention of non-core asset sales as part of their plan to maintain adequate cash flows and liquidity fails to disclose the fact that those sales would be inadequate, and the sale of Lummus Technology, a core asset, was a necessary component of maintaining adequate cash flows and liquidity. The foregoing misstatements were materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by

engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-

Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

301. On July 29, 2019, McDermott filed on SEC Form 10-Q its quarterly report for Q2 2019 (the "Q2 2019 10-Q"), SOX certified by Defendants Dickson and Spence. In the Q2 2019 10-Q, McDermott stated:

> We believe our cash and cash equivalents on hand, cash flows generated from operations, amounts available under our credit facilities and uncommitted bilateral lines of credit and ***proceeds from previously announced non-core asset sales will be sufficient to finance our capital expenditures, settle our commitments and contingencies…and address our normal, anticipated working capital needs for the foreseeable future.***

302. McDermott held its earnings call with analysts for Q2 2019 the same day (the "7/29/2019 Earnings Call"), in which Defendant Spence said, "I'd also like to note that we continue to believe that the company's liquidity profile is adequate, and I would remind you that the guidance we are providing today is based on our current portfolio." Later in the call, responding to an analyst question about liquidity, Spence said:

> So just as a reminder…our guidance for the full year, does not include ***the divestiture of our tank storage business or the remaining pipe fabrication assets.*** So, our guidance includes the benefit of those businesses, all the way to the end of the year. We are comfortable with the liquidity at the end of Q2, which is $1 billion. ***We are guiding – giving guidance for the back half of the year, and given our credit facilities and bilateral facilities, we are comfortable with the overall liquidity profile of the company. If you look at the asset sales, just in general, our tank business is a global business. It has a high level of interest, it was the foundation entity of CB&I. So it has taken us a little bit longer to prepare it for sale. It's taken a little bit longer for our buyers to understand the global scale and growth opportunities of that business. But we would hope to drive that process to conclusion relatively soon.***

303. On July 30, 2019, McDermott released a press release with their 2Q 2019 earnings results that was filed with the SEC as an exhibit on a Form 8-K/A signed by Defendant Spence, and that had the following statements about asset sales from McDermott

> Asset Sales
>
> During the second quarter of 2019, McDermott completed the sale of the APP business, the distribution and manufacturing arm of its pipe fabrication business. ***McDermott continues to pursue a sale of the remaining portion of its pipe fabrication business.***
>
> ***We have identified potential buyers for our industrial storage tank business, and sales efforts with respect to that business remain ongoing***. In connection with that contemplated sale, we may retain a continuing minority ownership or other economic interest in the business. Our anticipated aggregate net cash proceeds from the pipe fabrication and storage tank transactions are now expected to be lower than the approximately $1 billion we previously estimated. Our ongoing competitive sale process is now expected to result in a closing of the sale of the storage tank business in the fourth quarter of 2019.

304. The press release also had the following statements from Defendant Dickson:

> "This is a year of transition as we position McDermott to fully optimize the benefits of our combination with CB&I and as we steadily advance toward completion of the Cameron and Freeport projects," added Dickson. "Nevertheless, the company today has updated its guidance for 2019. The reduction in our guidance is due to four main factors: 1) the weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA operating segment; and 4) a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives on the Cameron LNG project. Even so***, we expect to see a sharp improvement in the company's operating income by the fourth quarter of this year, as we build momentum heading into 2020.***

305. The foregoing misstatements on July 29-30, 2019 were materially false and misleading. McDermott's mention of non-core asset sales as part of their plan to maintain adequate cash flows and liquidity fails to disclose the fact that those sales would be inadequate, and the sale of Lummus Technology, a core asset, was a necessary component of maintaining adequate cash flows and liquidity. The foregoing misstatements were

materially false and misleading. McDermott was not sufficiently strong financially to withstand the weight of the Four Focus Projects, which had brought CB&I to the brink of bankruptcy. Touting McDermott's diligence into CB&I and the Focus Projects, Defendants deceived investors into believing that McDermott could manage those projects to successful conclusion and that the cost estimate increases and ongoing burn rate of those projects, which they were understating, had been within the scope of their diligence and expectations and, thus, were manageable. Defendants' insistence that McDermott's post-Merger capital structure and balance sheet would be, and as events unfolded, was, sufficiently stable, with enough working capital to prevent liquidity issues, fund ongoing operations and debt service, and maintain a sustainable capital structure, even as McDermott was heading towards an undisclosed liquidity crisis due to the immensely under-estimated costs and rising cash burn of the Four Focus Projects about which Defendants knew well in advance, constituted fraudulent conduct. All the underlying circumstances were long known to Defendants:

(a) As demonstrated by the statements of the CWs, many of them high-level former employees, and the evidence set forth in CB&I's internal documents shown to 10(b) Lead Plaintiffs' counsel and described in §V.E. herein, including Risk Registers and risk assessments, CB&I had mispresented the true costs of and risks to the Focus Projects by engaging in "rampant corporate override" of the Focus Projects' costs to such an extent that it was "just a deception to stakeholders of the company." CW6, who saw no evidence that the Focus Projects had been de-risked, said that by February or March 2017, Cameron was already $300 million over budget and that company-wide presentations pegged the

Four Focus Projects as being up to $500-$600 million over budget combined. CW2 said that Cameron was $1 billion over budget, if not more, and significantly behind the delivery date, by November 2017, and that the individual in charge of Project Controls for the Americas segment was demoted then fired in 2017 after raising the issue all the way up to the company President in 2016. CW2 said that Freeport was close to being $1 billion over budget (though not yet over project costs) by November 2017. By December 2017, CW1's forecasted costs had escalated to well over $1 billion over then-currently reported costs, as demonstrated by internal CB&I documents discussed herein, that, *e.g.*, identified $1.2 billion of itemized forecasted risks in January 2018 and $1.34 billion of itemized forecasted risks in March 2018. CW1's concerns over unreported costs prompted CW1 to resign and to transmit an exit interview survey and internal email to senior executives at the corporate home office indicating that $700 million to $1 billion more in cost should be reported on Cameron. According to the CWs, these overages were due to long-standing, widespread, well-known, well-documented problems with underbidding, poor engineering, materials and procurement problems, and shoddy performance factors.

(b) As detailed in §V.G.1., Defendants' admissions, coupled with CW statements, also reveal that McDermott engaged in extensive due diligence, costing millions of dollars, both pre-Merger-announcement and post-announcement but pre-Merger closing, which revealed the true state of the Focus Projects to Defendants before the Merger had ever closed. McDermott was provided forecasts; comparisons of forecasts versus actual results; historical performance and productivity factors; scheduling analyses; presentations on scheduling, costs, and construction; risk analyses and risk registers; and

extensive on-site diligence at the Focus Projects. Based on the foregoing, Defendants cannot credibly deny understanding the scope and extent of the delays, cost overruns, blown budgets, negative forecasts, and significant risk factors of the Four Focus Projects, even before the Merger closed.

(c) Beyond the foregoing, the company, both as CB&I and then McDermott engaged in manipulations to "cook the books" and try to optically improve the depiction of the Four Focus Projects, including by consciously withholding overdue payments to suppliers and vendors to such an extent that it impaired work on the projects.

(d) As later revealed to investors, *see* §V.F.4., due to its acquisition of CB&I in the Merger and its taking on the Four Focus Projects in addition to CB&I's valuable Technology Business, McDermott needed to take massive additional charges to the Four Focus Projects, based on information available as of the Merger date, which Defendants wrongfully delayed past the Merger date; it needed to incur significant, ongoing costs and cash burn associated with the execution of the distressed Focus Projects; and the combination of these circumstances caused adverse impacts to McDermott's capital structure so severe as to drive it to the brink of bankruptcy, desperate to sell valuable assets like the Technology Business or to secure additional debt financing.

### 4. *Partial Corrective Disclosures Incrementally Revealed The Frauds*

306. Interspersed with the foregoing misstatements were a series of partial corrective disclosures that incrementally revealed aspects of the three threads of Defendants' fraud and wiped out most of the company's share value.

307. On October 30, 2018, McDermott reported its Q3 2018 results in an after-hours press release (the "10/30/2018 Press Release"), which was filed with the SEC after the market close as an exhibit to a Form 8-K (the "10/30/2018 Form 8-K") signed by Defendant Spence. The 10/30/2018 Press Release revealed the following previously undisclosed facts to investors.

(a) The 10/30/2018 Press Release revealed significant "purchase accounting adjustments" related to CB&I acquisition (referred to as the 'Combination'), which "were reflected as a change in intangible assets, including goodwill." Specifically, it disclosed that, "[f]or the third quarter of 2018, McDermott recorded ***$744 million*** of changes in estimates on three projects, including $482 million on the Cameron LNG project, $194 million on the Freeport LNG project, and $68 million on the Calpine gas power project." It quoted Defendant Dickson as stating:

> ***After five months of ownership***, ***we now believe*** we have a thorough and definitive understanding of the schedule and cost position on each of the projects – and clear visibility into the operational and financial path to completion. We have taken ***significant steps*** to address performance issues on the three projects. Specifically, we have installed a ***new executive leadership team*** – including our new Chief Operating Officer and the Area Senior Vice President announced with the Combination and made ***improvements in the reporting structures, execution plans, forecast cost-base methodology and the flow of communication*** with our consortium members and customers. ***We expect no further material changes in the cost estimates on these projects***.

(b) The 10/30/2018 Press Release revealed to investors previously undisclosed details as to the extensive, costly problems that had been plaguing the Cameron LNG Project, leading to ***$482 million*** in changed estimates, stating:

> Cameron LNG Project – ***the changes in estimates followed a detailed reassessment of the schedule and cost base***. The analysis included a comprehensive review of the work to go, ***including work for which we may not be compensated – such as rework*** – and a ***reduction in productivity estimates***. The reassessed schedule and estimates reflect ***regional limitations on labor availability and quality***, the ***elimination of an incentive opportunity*** and the ***addition of liquidated damages*** associated with the completion schedule. Operationally, the project continues to progress well, with commencement of commissioning expected in the fourth quarter and first LNG expected in the first quarter of 2019. As of the end of the third quarter of 2018, the project was 83% complete and had approximately $557 million of McDermott's portion of expected revenues to go until expected completion. During the quarter, the Cameron LNG project contributed $191 million to revenues and ($34) million to cash flows from operations. Phase 1 of the Cameron project is scheduled for completion in Q2 2019; Trains 2 and 3 are expected to be completed in Q4 2019 and Q1 2020, respectively.

Significantly, unbeknownst to investors, the $482 million on Cameron, when added to the $165 million in changed estimates previously taken on the project in Q2 2018, meant that McDermott had belatedly recognized ***$647 million*** total – very near to the $700 million in necessary minimum charges that CW1 had, noisily, internally documented to senior management back in June 2018.

(c) The 10/30/2018 Press Release also revealed undisclosed details of the problems afflicting the Freeport LNG Project, leading to ***$194 million*** in changed estimates, stating:

> Freeport LNG Project – ***the changes in estimates followed a detailed reassessment of the schedule and cost base and a reduction in forecasted labor productivity resulting from regional limitations on labor availability and quality***. The change in estimates was also impacted by the Company's decision, reached in conjunction with ongoing customer discussions, ***to include liquidated damages*** associated with the pre-Hurricane Harvey schedule. The updated forecast is based on rigorous reassessments and views by project teams and site management, including the area supervisor's assessment of work to go. At the end of the third quarter of 2018, the project was approximately 82% complete and had approximately $622

> million of McDermott's portion of expected revenues to go until completion. During the quarter, the Freeport LNG project contributed $220 million to revenues and ($115) million to cash flows from operations. Trains 1, 2 and 3 are expected to be completed in Q3 2019, Q1 2020 and Q2 2020, respectively.

(d) The 10/30/2018 Press Release also revealed undisclosed details as to the issues affecting the Calpine Gas Turbine Project, leading to ***$68 million*** in changed estimates, stating:

> Calpine Gas Turbine Power Project – ***the changes in estimates resulted from our decision to decrease the productivity factor on the future work by 20%***. ***The major driver of increased costs on Calpine has been labor productivity involving both direct-hire and sub-contract employees***. The newly assumed productivity factor also considered lessons learned on the closeout experience on the recently completed IPL project and we believe is realistic and achievable. First fire is anticipated during the fourth quarter of 2018. During the quarter, the Calpine Gas Turbine Power project contributed $29 million to revenues and ($14) million to cash flows from operations. As of the end of the third quarter of 2018, the project was 91% complete and had approximately $27 million of expected revenues to go until expected completion in Q1 2019.

(e) Finally, the 10/30/2018 Press Release also revealed that McDermott had ***already decided to exit*** both the tank storage and the U.S. pipe fabrication businesses, stating:

> [W]e have completed a strategic review of our business portfolio and have determined that the tank storage business and the U.S. pipe fabrication business are not core to our vertical integration. As such, we have developed plans to seek buyers for each of the two businesses, which together had 2017 revenues of approximately $1.5 billion. We anticipate receiving proceeds in excess of $1 billion upon the sale of those assets and expect to use a majority of the proceeds to reduce debt under our term loan.

308. The same day, McDermott filed with the SEC its Form 10-Q for Q3 2018 (the "Q3 2018 10-Q"), which disclosed additional previously undisclosed facts to investors, as follows:

(a) The Q3 2018 10-Q increased the goodwill associated with the CB&I merger by $782 million, driven by the $744 million in adjustments to the Cameron, Freeport and Calpine projects calculated as of the merger date. Specifically, it stated:

> ***Significant changes in our preliminary purchase price allocations*** since our initial estimates reported in the second quarter of 2018 primarily ***related to fair value adjustments to three of our acquired loss contracts***. ***Adjustments to the Cameron LNG, Freeport LNG and Calpine projects were approximately $744 million combined and primarily impacted Advance billings on contracts*** as further discussed in Note 4, *Revenue Recognition*. ***As a result*** of these and other adjustments to the initial purchase price allocation, ***goodwill increased by approximately $782 million*** since the second quarter of 2018. ***Adjustments to the purchase price allocation are recognized in the period in which the adjustments are determined and calculated as if the accounting had been completed as of the Combination Date***.

(b) The Q3 2018 10-further Q quantified the impacts project by project:

> Based on our assessment at September 30, 2018, ***included in the preliminary purchase price allocation for the Combination*** (see Note 3, *Business Combination*) ***were four projects determined to be in substantial loss positions,*** which included the ***Cameron LNG, Freeport LNG Trains 1 & 2, Calpine*** and the now-completed IPL gas power projects. Based on our assessment at June 30, 2018, our ***Freeport LNG Trains 1 & 2*** project was not estimated to be in a loss position; however, ***as a result of changes in estimates during the third quarter of 2018, the project is now estimated to be in a loss position at completion***. Our Freeport LNG Train 3 project is not anticipated to be in a loss position. ***Changes since our initial preliminary assessments during the second quarter of 2018 reflect unfavorable changes in estimates of $482 million on the Cameron LNG project, $194 million on the Freeport LNG Trains 1 & 2 and Train 3 projects and $68 million on the Calpine project***. These changes in estimates did not have a significant direct impact on our net income for the three or nine months ended September 30, 2018, as the ***impact of the changes in estimates were***

> ***included as adjustments to the fair values reflected in the acquired balance sheet***.
>
> ***Our accrual of provisions for estimated losses on active uncompleted contracts at September 30, 2018 was $215 million and primarily related to the Cameron LNG, Freeport LNG Trains 1 & 2 and Calpine loss projects***. Our accrual of provisions for estimated losses on active uncompleted contracts at December 31, 2017 was not material.

(c) Discussing the Cameron LNG project, the Q3 2018 10-Q blamed a purported "reassessment" of schedule and underlying cost, related to conditions at the time of the merger:

> *Cameron LNG*—At September 30, 2018, our U.S. LNG export facility project in Hackberry, Louisiana for Cameron LNG (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 37% complete on a post-Combination basis (approximately 83% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $127 million.
>
> ***The increase in our cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily due to changes in estimates resulting from a detailed reassessment of schedule and underlying cost base***. ***The schedule analysis included a reassessment of the work to go, including re-work for which we may not be fully compensated, and took into account revisions to the estimation of productivity based on historical efforts and the quality and availability of labor resources throughout the revised project schedule***. The revised schedule also results in loss of incentive revenue (approximately $40 million) and the application of contractual liquidated damages (approximately $17 million). These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, as ***they resulted from refinements of estimates of conditions that existed as of the Combination Date***, and primarily impacted Advance billings on contracts.

(c) The Q3 2018 10-Q contained similar revelations about the Freeport LNG project:

*Freeport LNG*—At September 30, 2018, Trains 1 & 2 of our U.S. LNG export facility project in Freeport, Texas for Freeport LNG (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 43% complete on a post-Combination basis (approximately 86% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $28 million.

***The increase in the cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily due to changes in estimates resulting from a detailed reassessment of schedule and underlying cost base. The schedule analysis included a reassessment of the work to go, including re-work for which we may not be fully compensated, and took into account revisions to the estimation of productivity based on historical efforts and the quality and availability of labor resources throughout the revised project schedule***. Our changes in estimates for the project also reflect our decision, reached in conjunction with ongoing customer discussions, to include liquidated damages (approximately $53 million) associated with the pre-Hurricane Harvey schedule. These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, as ***they resulted from refinements of estimates of conditions that existed as of the Combination Date***, and primarily impacted Advance billings on contracts.

(d) The Q3 2018 10-Q similarly discussed the Freeport LNG project:

*Calpine Power Project*—At September 30, 2018, our U.S. gas turbine power project in the Northeast for Calpine (within our NCSA operating group) was in a loss position. As of September 30, 2018, the project was approximately 53% complete on a post-Combination basis (approximately 91% on a pre-Combination basis) and had an accrued provision for estimated losses of approximately $43 million. ***The increase in the cost estimates recorded as adjustments to the fair value of the acquired balance sheet during the third quarter of 2018 were primarily associated with revisions to the estimation of productivity based on historical performance***. These changes in estimates were reflected as adjustments to the fair values of various assets and liabilities reflected in the acquired balance sheet, ***as they resulted from refinements of estimates of conditions that existed as of the Combination Date***, and primarily impacted Advance billings on contracts.

(e) In describing McDermott's operating results, the Q3 2018 10-Q also stated, "The legacy CB&I operations included approximately $2.4 billion of negative working

capital at the Combination Date, including approximately $1.2 billion of negative Project Working Capital associated with our Calpine power project and our proportionate shares of the Cameron LNG and Freeport LNG consortium projects (our "Focus Projects"). Negative Project Working Capital for the Focus Projects was approximately negative $760 million at September 30, 2018." After describing components of working capital that had provided cash during the quarter, the Q3 2018 10-Q stated that they were offset by "Contracts in progress/Advance billings on contracts—a net increase of $318 million, primarily due to the impact of progress on projects within our NCSA segment (including approximately $585 million from our Focus Projects), partially offset by projects within our MENA and APAC segments."

309. By characterizing the $744 million in charges related to the Four Focus Projects as a change in estimate as of the Merger Date, rather than a current third quarter change, Defendants acknowledged that the facts warranting the charges existed at the time of the Merger.

310. Following these disclosures, an analyst from UBS wrote in a report that the "additional cost overruns are surprisingly large, and we presume that MDR will now have a different business than what it envisioned when it agreed to acquire CB&I." Jamie Cook, the Credit Suisse analyst following McDermott, stated in an October 30, 2018 research report that "the magnitude" of the charges on the three projects "was larger and will create additional uncertainty on management's handle on the risk associated with the CBI deal. . . . We believe that quarter will drive more questions and uncertainty. As such, we believe the stock is in the penalty box until MDR can provide confidence to the market that the

problem projects are under control." He soon thereafter lowered his price target on McDermott's stock by over 56%. According to a Deutsche Bank analyst report on October 31, 2018, "[w]hile the market was expecting a capital raise, a second consecutive round of charges was not priced in." The report indicated that the value of McDermott's stock took a hit due to those unexpected charges, because the risk of additional charges is now higher due to management credibility taking a hit, because McDermott's ability to sell the pipes/tanks business at a fair price was low given their need to sell quickly, and due to the fact that McDermott's ability to win new business contracts was lowered because the problems with existing projects would scare off customers.

311. On this news, amidst shock and panic by analysts, McDermott's stock price fell $5.14, an astounding ***40% single-day decline***, on extremely high volume, from its October 30, 2018 closing price of $12.87 to close at $7.73 on October 31, 2018.

312. On February 13, 2019, McDermott issued a press release (the "2/13/2019 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K (the "2/13/2019 Form 8-K") signed by Defendant Spence, "commenting on its assessment of the financial position of the Cameron LNG project as of December 31, 2018." The 2/13/2019 Press Release shocked the market, by directly contradicting the 10/30/2018 Press Release's statement, as regards the Cameron LNG Project, that "We expect no further material changes in the cost estimates on these projects." Specifically, the 2/13/2019 Press Release stated, "For the fourth quarter of 2018, McDermott expects to report ***an adverse change in estimate of approximately $168 million***, ***due to unfavorable labor productivity, and increases in subcontract, commissioning and construction management costs***." It added,

"***The change in estimate is expected to impact McDermott's statements of operations for the three months and year ended December 31, 2018***."

313. A February 13, 2019 analyst report from Credit Suisse mentions the Cameron LNG adverse change of $168 million for Q4 2018 as "disappointing given the magnitude of the charge in the third quarter," showing the market's reaction to continual adverse changes in cost estimates on the project.

314. On this news, which caught analysts off-guard, McDermott's stock price fell $2.48, a massive ***26.7% single-day decline***, on extremely high volume, from its February 12, 2019 closing price of $9.30 to close at $6.82 on February 13, 2019.

315. On July 29, 2019, McDermott issued an after-hours press release (the "7/29/2019 Press Release"), which was filed with the SEC as an exhibit to a Form 8-K (the "7/29/2019 Form 8-K") signed by Defendant Spence, disclosing additional negative impacts from the CB&I projects at issue and adverse new information regarding McDermott's exit from the industrial storage tank and pipe fabrication businesses, as follows.

(a) The 7/29/2019 Press Release disclosed an ongoing, substantial cash burn caused by the Cameron LNG Project, stating, "Cash used by operating activities in the second quarter of 2019 was $(205) million. This primarily reflected the company's net loss and the ***usage of cash on the Cameron LNG project***." This contributed to a reported net loss of $146 million, or $0.80 per diluted shares, and an operating loss of $61 million in the second quarter of 2019.

(b) Defendant Dickson noted that the "legacy CB&I projects," which were not "booked under McDermott's stringent risk management protocols," still represented 14% of McDermott's then-current backlog. Dickson added:

> [T]he company today has updated its guidance for 2019. The reduction in our guidance is due to four main factors: 1) weaker than expected operating results for the second quarter of 2019; 2) the impact of reduced revenues and higher unallocated operating expenses due to slippage in certain new awards and customer changes to schedule on several projects; 3) ***changes in our assumptions about the expected performance of legacy CB&I projects in our NCSA*** [North, Central and South America] ***operating segment***; and 4) ***a shift from the fourth quarter of 2019 to 2020 in the assumed timing of remaining incentives in the Cameron LNG project***.

(c) Finally, the 7/29/2019 Press Release disclosed that the 10/30/2018 Press Release's articulation of the purported upside of McDermott's exiting the industrial storage tank and pipe fabrication businesses was overstated. Specifically, the 7/29/2019 Press Release disclosed: "Our anticipated aggregate net cash proceeds from the pipe fabrication and storage tank transactions are now expected to be lower than the approximately $1 billion we previously estimated."

316. During the earnings call that morning, these topics were further discussed, with Defendants reiterating the foregoing points and providing additional details to analysts. During Q&A, the following exchange concerned the Cameron and Freeport projects:

> [Analyst]: … [A]s you guys know, it's been over a year since B&I closed. So in general, when do you think that investors could get comfortable that the vast majority of your backlog at risk will get better? And I know you mentioned that CB&I and NCSA backlog would be under $1 billion by the end of this year and $20[0] million by the end of '20. But what's the risk that we have to wait until the end of 2020 for you to reduce the noise in the backlog?

> [Dickson]: ***If you look at also the majority of this backlog still relates to Cameron and Freeport***. And as you can see in the supplemental deck, the completion dates for those projects haven't changed since Q1. So once we have those two, obviously, those two projects ongoing and we'll obviously continue to -- ***these are zero margin revenue projects***. But the balance of the portfolio, I would say today that and I said in prepared remarks is obviously of our confidence level is growing as we've gone through with each and every one of them.
>
> And as you're seeing once we get through to the back end of 2020, we're essentially through that, we only $200 million of the backlog left. So I think that after 12 months -- and obviously, ***a lot of our focus*** as you know ***has been on Cameron and Freeport, because of the quantum -- the charges we'll have to take on both of those projects***. And what we'd say today is, obviously, we've made a lot of good progress. The incentive discussion with the customer -- the customer has been very fair with us. But unfortunately, a large part of those incentives won't be realized until 2020. But generally over the portfolio, I think we're as times progress, we're getting our arms around it more and more. But ***I think the two big remaining initiatives will always be Cameron and Freeport until we've got them completely done***.

317. Analysts once again expressed disappointment. On July 30, 2019, Deutsche Bank issued a research report titled "One Step Forward, Three Steps Back," rating an investment in McDermott a "Hold." In the report, Deutsche Bank noted the following:

> Our Thoughts
>
> MDR's 2Q results fell short of expectations. Not only did core numbers miss street estimates, but the company took charges on 2 projects (Freeport and Pemex) and cut guidance due to project delays (Marjan and Mozambique LNG got booked later than expected). ***It also lowered performance expectations on legacy CB&I projects and recalibrated its asset sale proceeds outlook downward*** . . . . We lower our EPS estimates and cut our PT to $7 due to revenue slippage on several projects, changes in assumptions regarding legacy CB&I projects in the NCSA segment, and a shift in timing of Cameron incentives from 4Q19 to 2020.
>
> * * *
>
> Key Takeaways

> Updated 2019 guidance – lowered revenue to $9.5B (vs. $10.0B previously), adj EBITDA revised to $725M (vs. $1.1B previously), and adj EPS-$0.32 (vs. $1.65 previously); 2) cut FCF guidance to -$640M (vs. -470M previously) and raised gross debt to $3.8B from $3.7B. . . . $110M of progress incentives recognized for Cameron LNG project ($75M in cash expected to be received in 2H19 of which $38M was received in July and $35M expected to be received in 2020), $38M project change for Freeport LNG….

318. A Credit Suisse report from the same day states that McDermott "results were weighed down by" by charges across multiple projects, and that the Company cut its FY 2019 EBIDTA by around 50%, partly due to a "pushout on timing of incentives from Q4'2019 to 2020 on Cameron LNG."

319. On this news, which again surprised analysts, McDermott's stock price fell $3.56, another huge ***35.3% single-day decline***, on very high volume, from its July 29, 2019 closing price of $10.08 to close at $6.52 on July 30, 2019.

320. On September 18, 2019, McDermott's stock price plummeted 49% in morning trading, on volume nearing 18 million shares (compared to its full-day average of 7.5 million shares), amid leaks and rumors that it had hired a turnaround firm, according to *Briefing.com*. *MarketWatch* reported that McDermott was the NYSE's "leading loser" and "headed for the biggest one-day decline since the company went public in 1982 prior to the trading halt for news." Trading was halted for several hours, followed by multiple attempts to restart trading that had to be aborted due to volatility. In a section covering companies under "Pro Bankruptcy Distress," *The Wall Street Journal* published an article reporting that McDermott "has engaged turnaround consulting firm AlixPartners LLP to advise on efforts to improve cash flow and stem a recent spate of net losses." AlixPartners

is one of the global leaders in turnaround and restructuring services. Thereafter, speaking publicly for the first time that day, McDermott issued a cryptic statement that failed to deny an impending bankruptcy filing and effectively confirming its hiring of a turnaround firm, stating that McDermott "routinely hires external advisors to evaluate opportunities for the Company. The Company is taking positive and proactive measures, as we have done in the past, intended to improve its capital structure and the long-term health of its balance sheet."

321. On this news, which utterly shocked the market and prompted numerous interim halts of trading, McDermott's stock price fell $3.72, an unprecedented 63.3% single-day decline, on volume of 77.95 million shares (10x the prior day's volume), from its September 17, 2019 closing price of $5.88 to close at $2.16 on September 18, 2019.

322. Due to the multiple trading halts imposed during that day, the stock had not yet bottomed out. According to a Citi analyst report from after-hours on September 18, 2019, McDermott needed cash fast to counteract its negative working capital issues, and its Lummus Technology Business was among the assets that could get it that cash, even if that meant the price "in an urgent sale situation could be under pressure." Citi analysts went on to say that prior to the Merger, CB&I had received "significant interest for its Technology asset." Declines continued, both in after-market trading that day and pre-market trading the next day.

323. On September 19, 2019, McDermott's stock fell another ***22.7%***, on even higher volume of 81.35 million shares, to close at $1.67. The two-day decline of $4.21 represented a wipeout of 71.6% of McDermott's stock price. These declines were fueled

by the balance sheet issues, and likely need to sell off assets such as Lummus Technology to resolve these issues, at potentially below-market prices, as indicated by Citi. A September 20, 2019 analyst report from Credit Suisse noted that 'This technology business was known as the crown jewel of the company and considered a last resort…but unfortunately needed [to be sold] to improve the balance sheet."

324. A UBS analyst report from September 23, 2019 stated that McDermott confirmed multiple bidders were involved in the Lummus Technology sale process. Shortly thereafter, on September 24, 2019, reports came out indicating McDermott was seeking a bridge loan to the tune of around $1.7 billion. This news revealed to the market that the sale process would not finish soon enough to resolve McDermott's short term woes. *Bloomberg* reported that the bridge loan was to cover McDermott's working capital deficit "until it can sell an asset such as its Lummus Technology unit…." This, according to reporting from *Bloomberg*, indicated that asset sales could not be consummated quickly enough to resolve the balance sheet issues, and the bridge loan was necessary as an emergency measure. Upon this news of continued balance sheet turmoil, McDermott stock fell $0.20 on September 24, 2019 to a closing price of $2.15, an 8.5% drop from its September 23, 2019 close of $2.35.

325. A few days later, on September 27, 2019, analysis came out detailing McDermott's credit situation as it pertained to obtaining a bridge loan. McDermott, according to an Xtract Research report, would find it "virtually impossible" to obtain super-senior debt that had seniority status over existing creditors under their May 2018 credit agreement. According to the report, existing creditors were unlikely to accept amendments

to existing debt rules that moved them back in the priority line. Given McDermott's dire cash flow situation, and inability to unload major assets quickly, the bridge loan was a necessity to keep operations afloat, and these emerging difficulties made a tough situation worse. As these difficulties emerged, McDermott stock fell $0.20 on September 27, 2019 to a closing price of $2.00 a 9.1% drop from its previous day close of $2.20.

326. McDermott's shareholders have been devastated. Since the day McDermott announced its proposed Merger with CB&I, December 18, 2017, when its stock closed at $22.77, its share price has declined $21.07, ***an evisceration of 92.5% of its market capitalization!***

327. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of McDermott's securities, 10(b) Lead Plaintiffs and other 10(b) Class members have suffered significant losses and damages.

## G. Additional Facts Probative Of Scienter

### 1. *Defendants' Knowledge or Reckless Disregard of Red Flags Demonstrates Scienter*

328. Defendants repeatedly touted the extensive due diligence they had done on CB&I, diligence that ***focused*** on the Cameron LNG Project, the Freeport LNG Project, and the Calpine Gas Turbine Power Project.

#### a. McDermott's Extensive Pre-Announcement Due Diligence

329. During the 12/18/2017 Investor Call, held the day the proposed merger was announced, Defendant Spence told analysts, in prepared remarks:

> Over the course of this process we have dedicated a significant amount of time performing joint due diligence together with CB&I's team. We've

> gotten to know one another's operations very well. In particular, ***McDermott has performed a great deal of due diligence on CB&I's*** IPL Eagle Valley, ***Calpine, Freeport, and Cameron projects***.
>
> ***We feel confident that we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects***.

330. The first question posed by an analyst during Q&A on the 12/18/2017 Investor Call asked about the due diligence done. In response, Defendant Dickson stated, in relevant part, "I'll tell you that we have worked extensively with CB&I on due diligence…and obviously had a number of our team working with passing through what Stuart referred to as core projects." Defendant Spence added, "[W]e have done a significant amount of diligence around not only the four projects, but the overall portfolio." Later, Defendant Dickson, when expressly asked by an analyst about labor and productivity issues at the Cameron LNG Project and the Freeport LNG Project, stated, *inter alia*, "[W]e've had a large number of people from our side working very closely with [CB&I CEO] Pat [Mullen] and his team through the due diligence process, including looking at the productivity on each of the projects at the sites" and "a lot of good work has been done and I would emphasize that a lot of good transparency from Pat and his team as we have gone through this process." Defendant Spence added, in response to follow up questions, "[L]ike David said on the project side, we've done extensive due diligence. We really understand the balance sheet in the position of the contracts, and we wouldn't add any further color at this time."

331. The 1/8/2018 Presentation repeatedly emphasized the extensive due diligence that McDermott had undertaken into CB&I's overall business and the Four Focus

Projects in particular. Its graphics detailed the "months" of diligence done by "highly experienced E&C [Engineering & Construction] risk managers" and "independent consultants performing parallel analysis," with a "particular focus" on a limited set of projects including the Cameron LNG Project, the Freeport LNG Project, and the Calpine Gas Turbine Power Project. Specifically, it stated:




**DUE DILIGENCE CONDUCTED OVER PERIOD OF MONTHS**

**OVERVIEW AND KEY FINDINGS**

- Strong team of highly experienced E&C risk managers led project due diligence efforts, supported by independent consultants performing parallel analysis
- Site visits at key projects to supplement and confirm analysis
- Focus on 33 projects based on risk and revenue exposure
  - Particular focus on 14 E&C projects representing approximately 65% of the E&C and Fabrication backlog
- **Key Assessment**
  - Four focus projects have been significantly de-risked with respect to engineering, quantities and procurement; **remaining risk is assessed as mostly related to labor performance**
  - Remaining 29 projects deemed low risk
  - **1500+ contracts are profitable and low risk**

332. Based on this extensive due diligence, the 1/8/2018 Presentation stated: "***Due diligence supports underlying strength and profitability of CB&I***." As regards the Four Focus Projects specifically, it stated, "***We have performed <u>thorough due diligence</u> and believe we have a strong understanding of the key drivers and are comfortable with what needs to be done with these projects going forward***."

333. McDermott's Proxy Statement, which was declared effective by the SEC on March 29, 2018, contained extensive discussion as to particulars of McDermott's extensive pre-announcement due diligence of CB&I's business, both independently and with the assistance of McDermott's investment bankers, including, *inter alia*, the following:

(a) "Mr. Freeman, other representatives of McDermott, Ms. David and respective advisors of McDermott and CB&I met in person or spoke by telephone on multiple occasions to conduct due diligence."

(b) "On September 13, 2017, members of management of McDermott met with members of management of CB&I in Houston, Texas to conduct mutual due diligence, and to discuss the scale and nature of potential synergies a business combination between the two companies could generate. The parties each preliminarily estimated that a combination of the two companies could result in annualized cost synergies in the range of in excess of $200 million, but agreed that further analysis and information was needed in order to refine the parties' estimate."

(c) "On October 10, 2017, Messrs. Spence and Taff spoke by telephone to discuss transaction structure, considerations regarding possible financing structure and due diligence. Following this conversation, Messrs. Spence and Taff maintained direct communications and spoke by telephone on several occasions during October and November 2017."

(d) "On October 24-26 and October 30, 2017, members of McDermott and CB&I management met in Houston, Texas in order to discuss their respective businesses and outlook and detailed business, financial and legal due diligence matters, as well as to discuss the scale and nature of potential synergies related to costs and revenues that could result from a business combination between the two companies."

(e) "On November 11, 2017, the McDermott Board held a telephonic special meeting attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts. Members of McDermott management provided an overview of the potential business combination to date and discussed the proposed transaction structure, the negotiation of the

draft Business Combination Agreement, due diligence and next steps. Representatives of Goldman Sachs and Greenhill reviewed financial information on McDermott and CB&I."

(f) "On November 29, 2017, the McDermott Board held a telephonic special meeting attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts. Members of McDermott management provided an update on the status of the proposed business combination, including financial analyses with respect of the two companies, and information about due diligence, transaction structure, the negotiation of the draft Business Combination Agreement and financing."

(g) "On December 17, 2017, the McDermott Board held a special meeting in Houston, Texas, attended by representatives of Goldman Sachs, Greenhill, Moelis and Baker Botts. Members of McDermott management provided an update on the status of the proposed business combination, including financial analysis of the two companies, due diligence, transaction structure, the negotiation of the draft Business Combination Agreement and financing. Representatives of Goldman Sachs and Greenhill reviewed their respective preliminary financial analyses of the Exchange Offer Ratio." The same day, analysts were noting that management's representations concerning McDermott's due diligence and analysis of the Focus Projects had offset concerns, such as MKM Partners, which noted on December 19, 2017 that while "news [of the merger] comes as a surprise to investors," "MDR management said on the call that they had done exhaustive due diligence on CBI's backlog and are comfortable with the risks there regarding further charges."

334. The CWs also gave detailed descriptions of the extensive due diligence done by McDermott as to CB&I generally and the Four Focus Projects specifically.

335. CW22, McDermott's Chief Accounting Officer until August 2016, said that important financial and strategic decisions were made by a small, core senior management group that included Defendant Dickson, Defendant Spence, and CW22. During that period, they relied heavily on Goldman Sachs to evaluate data and vet potential corporate transactions and ensured that Goldman Sachs had the necessary resources to spend to do so. The senior management team then carefully evaluated the information Goldman Sachs provided. This approach was taken as regards a potential deal with Aramco that was considered at that time.

336. CW2, the Financial Operations Controller for the USA Oil & Gas Division responsible for the full financial reporting of the Americas segment that included the Cameron and Freeport projects, became aware of talks with McDermott around April/May 2017 or maybe a little earlier. CW2 provided information for the due diligence, including standard project forecasts, actuals to date, quantities, accurate performance factors, Project Controls-type information, and indicators of project success and cost to date. CW2 said that forecasts are often understated, but that McDermott had access to the historical performance factors and should have been professional enough to recognize the issue. While CW2 questioned the time and resources available for McDermott's due diligence, CW2 said that McDermott should have seen the forecast trend and anybody worth their weight in Finance in this industry would have immediately raised a red flag. CW2 added that if people doing the due diligence knew what they were doing and were seasoned

professionals, they would have known that performance factor declines and does not improve at the end of a project. CW2 could not imagine McDermott's diligence would not have included the Risk Registers, which CW2 saw, as they are common industry tools and documents possessed by all EPC companies that will highlight specific points in a project and what the mitigation plan was for a particular risk.

337. CW17 corroborated that McDermott had done diligence well before the proposed Merger was announced in December 2017. CW17 stated that when CW17 was laid off in May 2017, McDermott was in the process of vetting CB&I for acquisition. In early 2017, CW17 was personally required to produce to an outside law firm financial reports and copies of invoices regarding an ongoing McDermott project in Brazil that was in a large loss position, due to labor and equipment costs. CW17 said that a number of high-level McDermott people devoted significant time and energy to meetings about the potential CB&I acquisition, many of which took place at the company's Houston headquarters. Significantly, CW17 stated that in May 2017 – a year before the Merger closed – McDermott was assembling a dedicated, five-person special accounting team to help vet the CB&I acquisition.

338. CW15 also corroborated that McDermott was doing due diligence in early- to mid-2017. CW15 stated that VP-level McDermott employees were paired up with CB&I counterparts at the same level – CW15 specifically recalls CB&I's VP of Engineering, VP of Finance, and VP of Construction – would come in for a week, and conducted on-site due diligence at multiple nearby job sites for a couple of days each, to meet with different management groups, review the job site, and talk about the plan. CW15 recalls the

McDermott diligence team and their CB&I counterparts from corporate coming to CW15's job site, the LACC Project, twice during 2017, once in the middle of the year and again a quarter or two later. CW15 met with the McDermott and CB&I diligence team both times and also contributed data used in Powerpoint presentations given to the diligence teams, which CW15 watched and which covered project overviews, progress updates, safety records, and discussion of where the project was and how it was doing. CW15 stated that the same people went to the Cameron and Freeport projects to conduct due diligence, having been so informed by people on those projects with whom CW15 spoke.

339. CW15 confirmed that project forecasts versus actual results, including those related to budget and performance factor, were "definitely" part of the due diligence that was provided to the McDermott due diligence team. CW15 provided that information for supply chain management as part of the diligence on the LACC Project and said that the company had SOPs in place so that all the projects were treated the same. While CW15 did not always get input on the final presentations to McDermott, CW15 expressed confidence that the McDermott VP-level personnel received this information during the due diligence period.

340. CW15 described monthly meetings, for which the Projects team took information provided by CW15 and combined it with information provided by Scheduling, Costs, and Construction into one big presentation for senior management. CW15 recalled that the McDermott and CB&I diligence teams attended two such monthly meetings at CW15's project site, one likely during mid-year 2017 and one likely in Q3 or Q4 2017.

341. CW15 learned that the due diligence done at Cameron and Freeport was comparable to the diligence done at CW15's project. CW15 stated that in monthly meetings, Project Procurement Managers would go through each project, where everyone in attendance, including CW15 would listen to an hour of what was happening at Cameron, then an hour of what was happening at Freeport, what was happening at CW15's project, and so on. CW15 said that, once the due diligence started, the due diligence at each project was discussed in those meetings as well. Also, the company had CMS and certain SOPs (standard operating procedures) that were followed, and all projects faced the same requirements.

342. CW24 was involved with the due diligence on the Engineering Products business, a $500 million piece of the Technology Business. For most of 2017, CW24 was mining and collaborating with peers to mine responses to requests for historical data for sales, which CW24 gave to CW24's bosses, who aggregated and presented the information to McDermott.

343. A February 21, 2018 McDermott press release, filed with the SEC as an attachment to a Form 8-K signed by Defendant Spence, disclosed that McDermott had already spent ***$8.9 million*** on transaction-related costs as of December 31, 2017 – just two weeks after the Merger was first announced. On information and belief, based on the foregoing facts and circumstances regarding the scope of pre-announcement due diligence, the majority of these disclosed expenditures were devoted to pre-announcement due diligence and related activities vetting CB&I's business operations, including the Four Focus Projects.

#### b. McDermott's Extensive Post-Announcement / Pre-Merger Due Diligence

344. Defendants also made clear that the diligence, scrutiny, and planning did not end with the announcement of the proposed merger. During the 12/18/2017 Investor Call, Defendant Dickson stated:

> [W]e know that the success of this combination will ultimately rest on our ability to integrate our two companies effectively. Let me state upfront that we are confident in our ability to do so. ***We are beginning the integration planning phase immediately***. Our respective integration team leads have been identified, and in the coming weeks, they will build ***a cross-functional team comprised of representatives from both companies***. This team ***will develop a detailed plan so that we are ready to begin integrating our two companies immediately after close***.

345. Indeed, in a Securities Act Rule 425 filing with the SEC on December 19, 2017, deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, McDermott announced the leaders of the Integration Team for the Merger: McDermott VP of Corporate Strategy Tony Brown, who served as McDermott's Chief Integration Officer, and CB&I Executive VP of Global Operations Services James Sabin. A week later, in a Securities Act Rule 425 filing with the SEC on December 26, 2017, deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Brown disclosed that a team had been assembled to lead the integration planning process and that a combined Integration Planning kick-off meeting had already been held with leaders from both the McDermott and CB&I planning teams.

346. In a January 16, 2018 communication to McDermott employees, which was filed by McDermott with the SEC pursuant to Rule 425 under the Securities Act of 1933 (the "Securities Act") and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under

the Exchange Act, the McDermott "Integration Planning Team" described the "Integration Management Office" as "responsible for being the enterprise wide driver or change and coordination" for the Merger and described its structure, team, and work streams, as follows:

| | |
|---|---|
| **Engineering:** | John Ashcroft, Director, Engineering, Dubai |
| **Fabrication:** | George Stapleton, Director, Fabrication |
| **Project Management & Controls:** | Frank Johnson, Senior Director, Global Project Controls |
| **QHSES:** | John Macpherson, Senior Director, QHSES |
| **Supply Chain:** | Albert Jeria, Director, SCM, Marine Assets & Operations |




347. A February 5, 2018 communication to McDermott employees, which was filed by McDermott with the SEC pursuant to Securities Act Rule 425 and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, referenced a recent "full-day planning meeting" involving "senior leaders from both McDermott and CB&I" at McDermott's headquarters and stated, "This week, the integration planning teams from both companies will meet again for three days of detailed planning sessions."

348. In a letter to employees, which was filed by McDermott with the SEC on February 27, 2018 pursuant to Securities Act Rule 425 and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Defendant Dickson disclosed the high level of personal involvement he was engaging in as part of the diligence and integration process, stating, "As we continue the planning process for the future integration of our combined company, I've had the pleasure of meeting many of you during my visits to CB&I and McDermott offices and sites over the past few weeks. The town halls and smaller discussion groups were very productive, and your feedback has been extremely valuable as we design the combined company."

349. In a letter to employees, which was filed by McDermott with the SEC on March 13, 2018 pursuant to Securities Act Rule 425 and deemed filed pursuant to Rule 14d-2(b) and Rule 14a-12 under the Exchange Act, Defendant Dickson outlined the leadership team, which would consist of both McDermott and legacy CB&I personnel, the latter being even more knowledgeable about the CB&I portion of the post-merger company. His correspondence presented these charts:


President and Chief Executive Officer
David Dickson
Integration
Tony Brown
Corporate Development
Scott Munro
Commercial
Brian McLaughlin
Chief Financial Officer
Stuart Spence
Chief Operating Officer
TBD
Technology
Daniel McCarthy
Human Resources
Steve Allen
Legal
John Freeman
Communications
Gentry Brann
Project Delivery
Jonathan Kennefick
Americas
Richard Heo
Europe, Africa, Russia & Caspian
Tareq Kawash
Middle East / North Africa
Linh Austin
Asia Pacific
Ian Prescott
Product Lines

# A Look Inside Our Future Together:

## Building a leadership team to drive near-term value and long-term growth

### THE EXECUTIVE LEADERSHIP TEAM

Comprised of extraordinary talent from both McDermott and CB&I, as well as the wider energy industry, the global leadership team will include:



**DAVID DICKSON**
President & Chief Executive Officer
- Nearly 30 years' experience in the oilfield engineering and construction industry, holding management positions in market development, project management, engineering and construction
- Oversees the strategic direction of McDermott, including responsibility for the company's international growth
- Previously spent 11 years with Technip S.A. and its subsidiaries, including as President of Technip U.S.A., Inc., with oversight for the company's North American operations



**STUART SPENCE**
Chief Financial Officer
- 20+ years of financial and operational management experience
- Responsible for financial and accounting operations, focused on sustainable, profitable growth and shareholder returns
- Previously served in senior management roles at Halliburton and other oilfield services companies



**RICHARD HEO**
North, Central & South America
- Seasoned executive with extensive sales and operations experience
- Led CB&I's Fabrication Services business
- Previous leadership roles and responsibilities include technology sales and operational oversight for project and construction management, fabrication shops and specialty engineered products



**TAREQ KAWASH**
Europe, Africa, Russia & Caspian
- Nearly 30 years of experience in the engineering and construction industry
- Previously led international operations for CB&I's Engineering & Construction business
- Career includes business development, operational and project management roles in Europe, the Middle East and Africa



**IAN PRESCOTT**
Asia Pacific
- 28+ years of experience of extensive operational, marketing and business unit responsibilities
- Previously VP, Asia at McDermott and member of the company's Executive Committee
- Previously held top leadership positions at SNC-Lavalin and Global Process Systems



**LINH AUSTIN**
Middle East & North Africa
- 20+ years of progressive experience in directing oil and gas projects, strategy, P&L and change management
- Previously VP, Middle East and Caspian for McDermott after joining the company in 2013
- Prior to joining McDermott, served as Senior Advisor to the leadership of ADMA-OPCO in Abu Dhabi



**DANIEL MCCARTHY**
Technology
- 40+ years of experience in the energy industry
- Previously led CB&I's Technology business
- Leadership roles and responsibilities include process engineering and design, process licensing, global product marketing and management



**BRIAN MCLAUGHLIN**
Commercial
- Experienced executive with international expertise in the oil and gas industry
- Previously served as McDermott's SVP, Commercial, and held multiple leadership roles since joining the company in 2006
- Before joining McDermott, held roles with several companies throughout the Middle East and other countries



**JONATHAN KENNEFICK**
Project Execution & Delivery
- 20+ years of experience in offshore construction projects
- Joined McDermott in 1992 and most recently served as SVP, Project Execution and Delivery
- Experience leading projects both in deepwater and shallow water infrastructure



**SCOTT MUNRO**
Corporate Development
- Extensive international management experience in the oil and gas industry
- Previously responsible for the growth and development of McDermott's business across the Americas, Europe and Africa
- Experience at oil and gas companies in the UK, U.S., Canada, Brazil and France



**STEVE ALLEN**
Human Resources
- 25+ years of human resources experience
- Leadership roles in compensation, benefits, talent acquisition, talent management and real estate management
- Previously led HR functions at both Technip USA and Duke Energy



**JOHN FREEMAN**
Legal
- 30+ years of legal experience both in the private and public sector
- Before joining McDermott, served as Special Advisor for the integration of Technip and FMC
- Previously responsible for worldwide leadership of all legal and compliance matters at Technip, based in Paris



**GENTRY BRANN**
Communications
- 25+ years' experience in strategic communications, marketing, public affairs and investor relations
- Led global internal and external communications at CB&I
- Previously held communications and marketing leadership roles in engineering and construction, government, and advertising and public relations firms



**TONY BROWN**
Integration
- Accomplished executive who has served in senior legal, sales and strategy roles
- Previously led Strategy for McDermott and is currently integration planning lead for McDermott's combination with CB&I
- Career with McDermott includes leading global initiatives and strengthening relationships with customers

**We are Driving Energy Forward with Integrated End-to-End Solutions**



350. In a Form 8-K filed with the SEC on March 22, 2018 and signed by Defendant Spence, McDermott provided an updated joint venture presentation, attached as an exhibit, which reiterated the due diligence statements previously made in the 1/8/2018 Presentation, discussed *supra*.

351. Confidential witnesses corroborated McDermott's statements as to the extent of its post-announcement / pre-merger due diligence.

352. CW1 reported that, after the merger was announced in December 2017, McDermott representatives started visiting CB&I job sites and talking to management. CW1 recalled that McDermott representatives conducted due diligence meetings on-site at the Cameron project, for a couple of days in March or April 2018, in the project management complex, one of the three trailer complexes of offices located there. CW1 did not meet with the McDermott personnel, but stated that they spoke with other management-level employees and assumed that they met with the Project Director, the lead cost manager on-site, and the Senior Director of Project Controls. CW1 said that competent due diligence would have included specific requests for Risk Registers and similar documents created by Project Controls that forecasted future cost changes to an immense project like Cameron, as those documents are commonly used in the industry to internally project the likelihood and value of current risks to the future costs of a project.

353. CW3 knew that McDermott was provided with the schedule analysis on the Cameron project and, therefore, could see that the project was consistently not achieving the stated milestones. CW3 believes that McDermott was given access to performance factors, the metrics that indicate, *e.g.*, whether workers are performing 10 hours of work in

10 hours (a performance factor of 1.0) or if they are deviating up (12 hours would be a performance factor of 0.8) or down (8 hours would be a performance factor of 1.2). CW3 said that McDermott should have been able to see that CB&I had been estimating a 0.7 - 0.8 performance factor, but had realized a 0.4 - 0.5 performance factor. As alleged *supra*, CW3 also stated that project forecast reports were given to executives, including those close to Defendants Dickson and Spence, if not directly to them personally.

354. CW4 observed a tremendous amount of McDermott activity prior to the closing of the Merger. CW4 stated that, during this time period, McDermott started placing McDermott and CB&I employees together to figure out how best to set up the company permanently and that McDermott was integrating functional groups like sales and engineering for the planning of "D-Day" in order to have a smooth transition. As the "most senior" person in the field, CW4 had no reason to believe that McDermott did not have access to documents and reports, including Project Controls reports, informing them of the problems and anticipated forecasted costs of each of the Four Focus Projects. Indeed, as alleged *supra*, CW4 also said that the long-term problems on Calpine, *e.g.*, its being only 30% through engineering by mid-2016 and that 85% of indirect and running costs having been spent before field work began, would have been obvious to McDermott or anybody thinking of taking over the project.

355. CW6 began receiving requests for information related to McDermott's due diligence as of the first of the year 2018. For instance, CW6 was asked for information regarding what was on project reports or even regarding specific items such as air coolers that had been damaged at the port leading to a $300,000 cost and insurance claim. CW6

also said that McDermott came for a tour of his project in April 2018, during which time a legacy CB&I executive manager spoke with CW6 about the Cameron project. That manager told CW6 that the two CEOs had taken a day to have meetings onsite at Cameron during March or April 2018 to meet with people on the project and figure out what was going on.

356. CW5 was involved with the due diligence on the Calpine project. According to CW5, Jonathan Parks and Jonathan Kennefick, the global Senior Vice Presidents for the Calpine project, were given the Project Management Report and project cost reporting. CW5 said that Perks and Kennefick were aware of what was going on with the project, and asked questions about what was going on, what it would take to finish the project, and how much it would cost. CW5's team gave them the best knowledge they could. CW5 stated that McDermott had access to every report on what the productivity factor was and what the history of the productivity factor for that project was – "they had all of that information." CW5 also said that CB&I never instructed employees to mislead McDermott.

357. CW18 was involved in McDermott's due diligence and met with McDermott personnel before the Merger closed. CW18 described these meetings as ones with corporate groups to ensure that they were aligned with coding.

358. CW8 said that prior to the acquisition, McDermott sent a team of high-level executives to talk with CB&I management at Cameron's Hackberry, LA site. CW8 believes that executives were on site a week or more, which was considered big news among CB&I employees, and that auditors were there one or two weeks. CW8 said, "The

executives who visited talk to upper management; they didn't talk to me or my peers." Management instructed CW8 to provide reports on Cameron to CW8's boss, John Thomas, who in turn provided them as part of the diligence for review by McDermott's auditors. CW8 provided weekly and monthly change management reports, describing how many rework items were done, how much those rework items cost, how much time those rework items required, and related information. These change management reports were to be part of the cost reports overseen by CW3, John Thomas, John Clark, and Syed Kakakhel. Regarding McDermott's diligence, CW8 said, "They did audits on our paperwork. They had to be real ignorant not to know how much over-budget we were" on the Cameron project.

359. CW20, who worked on the Cameron project, corroborated CW8 by stating, "The top executives from McDermott visited – eight to ten of them." CW20 saw the McDermott executives from McDermott come by the Cameron site while CW20 was working with the directors of the Cameron project. CW20 added, "So many people [from McDermott were in and out." CW20 said that four or five of the McDermott executives came from Houston, and others from Australia and other overseas locations also visited. CW20 added that Cameron was experiencing serious cost-overruns at the time when McDermott was vetting CB&I for acquisition.

360. CW21 said that McDermott representatives came to the Cameron site and met with CB&I's project management team – Directors at a Project Director Level, Project Managers, Construction Manager – to review CB&I's project reports. CW21 said that McDermott was on-site reviewing project documentation for about two weeks total and

knew that McDermott looked at cash flow and progress and reviewed the schedule. CW21 stated that McDermott personnel also came and did walkthroughs of the Cameron site to see where everything was at and the productivity of the teams. Based on the foregoing, CW21 believes that McDermott should have had a sense of Cameron's project status and that it was pretty evident that the schedule had flipped from the original date. CW21 knew that McDermott spent time in the field at all Four Focus Projects.

361. Given the foregoing, it would have been impossible for CB&I to hide issues of the magnitude of what the CWs described as occurring on the Four Focus Projects, and doing so would have opened CB&I up to liability twice – once with its own shareholders and then again to McDermott if it lied or withheld information during the due diligence phase. On information and belief, McDermott has not filed any action or otherwise sought legal recourse due to any actions by CB&I or its management team during the pre-Merger due diligence that McDermott conducted.

**c. Additional Red Flags Around The Time Of The Merger**

362. On May 24, 2018, a motion by CB&I and certain of its executives to dismiss a securities class action complaint against them was denied in full. *See In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 Civ. 1580 (LGS), 2018 WL 2382600 (S.D.N.Y. May 24, 2018). This lawsuit, filed in early 2017, alleges that, between October 2013 and June 2015, CB&I had failed to fully apprise investors regarding delays and loss of profitability of other large-scale projects and instead: (a) recorded unapproved change orders as assets and revenues, in violation of GAAP, in financial statements in Forms 10-K and 10-Q filed with the SEC; (2) overstated goodwill in financial statements in Forms

10-K and 10-Q resulting in part from CB&I's improper recording of purchase price adjustments following a 2013 corporate acquisition, thereby overstating those assets on CB&I's balance sheet and understating expenses on its income statement; and (b) made materially false and misleading statements regarding the progress of those projects and falsely stated that construction delays would have no effect on CB&I's profitability.

363. Given the similarity of underlying misconduct, this decision put Defendants on renewed notice as to red flags in CB&I's business and operations that gave rise to an additional duty to investigate the Four Focus Projects, a duty to speak the truth about them, and a duty to correct their prior false and misleading statements about them.

#### d. With Defendants Dickson And Spence At The Helm, McDermott Knowingly Continued Improprieties After The Merger

364. CW8, who tracked and reported on engineering and construction rework and associated costs in time and money at Cameron and sought necessary approvals for such rework, verified that at both CB&I and McDermott, the Cost Manager, Project Controls Manager, Scheduling Manager, Program Director, and Construction Manager at each project site, including the Focus Projects, reported to corporate and rolled up reports for the corporate office.

365. As discussed in greater detail in §V.E. *supra*, the CWs also put the undisclosed, material, adverse information into the hands of Defendants after the Merger closed, given McDermott's post-Merger perpetuation of certain CB&I improprieties.

366. For instance, CW3 stated that the practice of upper management altering cost forecasts downward before publicly reporting them continued unabated after McDermott

closed the Merger. CW3 said that with both CB&I and McDermott, top executives, ***including the CEO and CFO***, received both the real forecasted numbers in initial reports and later revised forecasts with better numbers, which would be publicly published. CW3 explained that Defendants Dickson and Spence knew the numbers because they came on site to Cameron, and CW3 went over the true cost estimates with Spence. CW3 also described emails where Defendants Spence and Dickson received the complete package of Project Control's undoctored forecasts, including low-level details and their basis. CW3 believed they were very well aware of difference in the numbers and that there is no way they could claim they did not know.

367. Other CWs corroborate these statements, as regards multiple Focus Projects. CW5 said that CB&I and McDermott changed internal forecasts on both Cameron and Freeport. Likewise, CW7 said that post-Merger, McDermott continued CB&I's practice of keeping two schedules on the Freeport project – one that was real and one that was shown to the client.

368. CW15 confirmed that during the first year after the Merger, McDermott continued CB&I's practice of delaying payment to vendors at quarter end, which dated back to 2016. CW15 said that payment decisions over $50 million required review and approval by Defendant Spence, and sometimes also Defendant Dickson.

### 2. *Defendants Dickson & Spence Were Financially Motivated To Commit Fraud*

369. Defendants Dickson and Spence had significant personal financial motivations, unique to them, to disregard the findings of McDermott's due diligence, to proceed with the Merger, and to engage in the securities fraud alleged herein.

*Defendants Dickson & Spence Were Motivated By Compensation Increases Tied To The Merger*

370. Defendants Dickson and Spence were motivated by their increased compensation packages to close the Merger, despite the findings of McDermott's due diligence, and to commit the securities fraud alleged herein. First, as disclosed in a Form 8-K filed with the SEC on March 7, 2018, Defendants Dickson and Spence were awarded on March 1, 2018, by McDermott's Compensation Committee, "Recognition Bonuses" attributable to their work on the Merger. Defendant Dickson was awarded a Recognition Bonus of $1,125,000, and Defendant Spence was awarded a Recognition Bonus of $637,500. One-half of each Recognition Bonus was paid in March 2018, immediately upon the award – during McDermott's post-announcement/pre-merger due diligence – and the other half of the Recognition Bonus was deferred until May 2020, the first-year anniversary of the Merger, based on certain performance criteria.

371. Moreover, although fiscal 2018 was a bad year for McDermott and legacy CBI shareholders, McDermott's Compensation Committee bifurcated 2018 into the pre-Merger and post-Merger time periods to immunize Defendants Dickson and Spence from the impact of charges taken post-merger on the Focus Projects. Although the Merger closed on the tenth day of the fifth month of 2018, they were paid 50% (rather than one-

third) of their full year 2018 incentive compensation for their four plus months' work. Thus, for 2018, Defendant Dickson was paid – primarily for his four plus months' work prior to the Merger – total executive compensation of $11,294,007, and Defendant Spence was paid total executive compensation of $7,530,641.

372. Further, according to the Proxy Statement, because the Merger elevated McDermott into a different peer group of companies, Defendants Dickson and Spence received increases in their base and incentive compensation. For example, Defendant Dickson received a 25% increase in his 2018 annual base salary of $1,125,000.

*Suspicious, Widespread Insider Trading During the 10(b) Class Period Evidences Scienter*

373. Defendants' scienter is further evidenced by the 10(b) Class Period transactions in McDermott stock, options, and stock-related units by the Individual Defendants, suspicious in timing and amount, accumulating millions of dollars in ill-gotten gains during the fraud alleged herein. Specifically, such sales included the following:

(a) Defendant Dickson's 10(b) Class Period Transactions

Defendant Dickson entered the 10(b) Class Period with balances of 924,327 McDermott shares, 0 PSUs,[3] and 642,925 RSUs.[4] Defendant Dickson's transactions during the 10(b) Class Period were as follows:

| Stock Transactions | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | | **Shares** | **Price** | **Funds Spent / Gained** |
| 11/6/2018 | Purchase | | 39,800 | $ 9.9581 | ($396,332) |
| | | | | | |
| **Sub-Total Stock Purchases** | | | 39,800 | **Cost** | ($396,332) |
| **Performance Unit and Restricted Stock Unit Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/16/2018 | Award of PSUs | 739,762 | 3/5/2018 | n/a | $0 |
| 2/26/2018 | RSUs converted to shares | (120,040) | 2/26/2018 | n/a | $0 (120,040 shares) |
| 2/26/2018 | RSUs converted to shares and sold | (77,783) | 2/26/2018 | $7.62 | $592,706 |
| 2/28/2018 | RSUs converted to shares | (65,923) | 2/28/2018 | n/a | $0 (65,923 shares) |

3 As noted in Figures 1 and 2 appended hereto, the definition of PSUs was set forth in McDermott's proxy statements and changed as regards PSUs awarded in 2017 or earlier versus those awarded in 2018 or later.

4 As defined in McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule 14A, on August 10, 2018, and consistently in McDermott's other proxy statements, Restricted Stock Units (RSUs) were defined as follows: "Restricted stock units, or RSUs, are intended to promote the retention of employees, including the NEOs. The RSUs granted in 2017 generally vest in one-third increments on the first, second and third anniversaries of the grant date. The RSUs may be paid out in shares of McDermott common stock, cash equal to the fair market value of the shares otherwise deliverable, or any combination thereof, at the sole discretion of the Compensation Committee."

| | | | | | |
|---|---|---|---|---|---|
| 2/28/2018 | RSUs converted to shares and sold | (42,771) | 2/28/2018 | $7.30 | $312,228 |
| 3/1/2018 | RSUs awarded | 331,491 | (three equal installments beginning 3/1/2019) | n/a | $0 |
| 3/5/2018 | RSUs converted to shares | (149,975) | 3/5/2018 | n/a | $0 (149,975 shares) |
| 3/5/2018 | RSUs converted to shares and sold | (97,304) | 3/5/2018 | $7.51 | $730,753 |
| 3/5/2018 | PSUs converted to shares and sold | (739,762) | 3/5/2018 | $7.51 | $5,555,613 |
| 5/10/2018 | RSUs awarded | 197,824 | 2/26/2019 | n/a | $0 |
| 5/10/2018 | RSUs awarded | 108,696 | 2/28/2020 | n/a | $0 |
| 6/6/2018 | RSUs awarded | 82,584 | (three equal installments beginning 6/6/2019) | n/a | $0 |
| 2/26/2019 | RSUs converted to shares | (94,097) | 2/26/2019 | | $0 (94,097 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (77,780) | 2/26/2019 | $8.61 | $669,686 |
| 2/26/2019 | RSUs converted to shares | (65,941) | 2/26/2019 | n/a | $0 (65,941 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (25,947) | 2/26/2019 | $8.61 | $223,404 |
| 2/27/2019 | RSUs awarded | 468,396 | (three equal installments beginning 2/27/2020) | n/a | $0 |
| 2/28/2019 | RSUs converted to shares | (21,975) | 2/28/2019 | n/a | $0 (21,975 shares) |

| | | | | | |
|---|---|---|---|---|---|
| 2/28/2019 | RSUs converted to shares and sold | (14,257) | 2/28/2019 | $8.48 | $120,899 |
| 3/1/2019 | RSUs converted to shares | (22,339) | 3/1/2019 | n/a | $0 (22,339 shares) |
| 3/1/2019 | RSUs converted to shares and sold | (14,493) | 3/1/2019 | $9.11 | $132,031 |
| 6/6/2019 | RSUs converted to shares | (16,696) | 6/6/2019 | n/a | $0 (16,696 shares) |
| 6/6/2019 | RSUs converted to shares and sold | (10,832) | 6/6/2019 | $6.85 | $74,199 |
| | | | | | |
| **Sub-Total Awards of PSUs** | | 739,762 | | **Cost** | $0 |
| **Sub-Total Conversions/Sales of PSUs** | | (739,762) | | **Proceeds** | $5,555,613 |
| **Sub-Total Awards of RSUs** | | 1,188,991 | | **Costs** | $0 |
| **Sub-Total Conversions/Sales of RSUs** | | (361,167) | | **Proceeds** | $2,855,906 |
| **Sub-Total Conversions of RSUs** | | (556,986) | | **Proceeds** | $0 (556,986 shares) |
| | | **270,838** | | **Proceeds** | **$8,411,519** |
| | | | | | |
| **Totals** | **Shares Purchased** | 39,800 | **Transaction Costs** | | **($396,332)** |
| | **Awards of PSUs** | 739,762 | **Transaction Costs** | | **$0** |
| | **Conversions/Sales of PSUs** | (739,762) | **Transaction Proceeds** | | $5,555,613 |
| | **Awards of RSUs** | 1,188,991 | **Transaction Costs** | | **$0** |
| | **Conversions/Sales of RSUs** | (361,167) | **Transaction Proceeds** | | $2,855,906 |
| | **Conversions of RSUs** | (556,986) | **Transaction Proceeds** | | $0 (556,986 shares) |
| | | **Net Gain to Defendant Dickson** | | | **$8,015,187** |

(b) Defendant Spence's 10(b) Class Period Transactions

Defendant Spence entered the 10(b) Class Period with balances of 252,520 McDermott shares, 0 PSUs, and 197,823 RSUs. Defendant Spence's transactions during the 10(b) Class Period were as follows:

| **Stock Transactions** | | | | | |
|---|---|---|---|---|---|
| **Transaction Date** | **Purchases / Sales** | **Shares** | | **Price** | **Funds Spent / Gained** |
| 11/6/2018 | Purchase | 25,000 | | $9.9783 | ($249,458) |
| | | | | | |
| **Sub-Total Stock Purchases** | | 25,000 | | **Cost** | ($249,458) |
| **Performance Unit and Restricted Stock Unit Transactions** | | | | | |
| **Transaction Date** | **Unit Grants / Exercises** | **Units** | **Vesting Date** | **Price** | **Funds Spent / Gained** |
| 2/16/2018 | Award of PSUs | 177,543 | 3/5/2018 | n/a | $0 |
| 2/26/2018 | RSUs converted to shares | (41,768) | 2/26/2018 | n/a | $0 (41,768 shares) |
| 2/26/2018 | RSUs converted to shares and sold | (27,470) | 2/26/2018 | $7.62 | 209,321 |
| 2/28/2018 | RSUs converted to shares | (20,601) | 2/28/2018 | n/a | $0 (20,601 shares) |
| 2/28/2018 | RSUs converted to shares and sold | (13,365) | 2/28/2018 | $7.30 | $97,565 |
| 3/1/2018 | RSUs awarded | 103,590 | (three equal installments beginning 3/1/2019) | n/a | $0 |
| 3/5/2018 | RSUs converted to shares | (35,994) | 3/5/2018 | n/a | $0 (35,994 shares) |
| 3/5/2018 | RSUs converted to shares and sold | (23,353) | 3/5/2018 | $7.51 | $175,381 |

| | | | | | |
|---|---|---|---|---|---|
| 3/5/2018 | PSUs converted to shares and sold | (177,543) | 3/5/2018 | $7.51 | $1,333,348 |
| 5/10/2018 | RSUs awarded | 69,239 | 2/26/2019 | n/a | $0 |
| 5/10/2018 | RSUs awarded | 33,968 | 2/28/2020 | n/a | $0 |
| 6/6/2018 | RSUs awarded | 11,796 | (three equal installments beginning 6/6/2019) | n/a | $0 |
| 2/26/2019 | RSUs converted to shares | (41,883) | 2/26/2019 | n/a | $0 (41,883 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (27,356) | 2/26/2019 | $8.61 | $235,535 |
| 2/26/2019 | RSUs converted to shares | (13,999) | 2/26/2019 | $8.61 | $0 (13,999 shares) |
| 2/26/2019 | RSUs converted to shares and sold | (9,081) | 2/26/2019 | n/a | $78,187 |
| 2/27/2019 | RSUs awarded | 112,866 | (three equal installments beginning 2/27/2020) | n/a | $0 |
| 2/28/2019 | RSUs converted to shares | (6,867) | 2/28/2019 | n/a | $0 (6,867 shares) |
| 2/28/2019 | RSUs converted to shares and sold | (4,455) | 2/28/2019 | $8.48 | $37,778 |
| 3/1/2019 | RSUs converted to shares | (6,981) | 3/1/2019 | n/a | $0 (6,981 shares) |
| 3/1/2019 | RSUs converted to shares and sold | (4,529) | 3/1/2019 | $9.11 | $41,259 |
| 6/6/2019 | RSUs converted to shares | (2,385) | 6/6/2019 | n/a | $0 (2,385 shares) |
| 6/6/2019 | RSUs converted to shares and sold | (1,547) | 6/6/2019 | $6.85 | $10,597 |

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| **Sub-Total Awards of PSUs** | | 177,543 | | **Cost** | $0 |
| **Sub-Total Conversions/Sales of PSUs** | | (177,543) | | **Proceeds** | $1,333,348 |
| **Sub-Total Awards of RSUs** | | 331,459 | | **Costs** | $0 |
| **Sub-Total Conversions/Sales of RSUs** | | (111,156) | | **Proceeds** | $885,623 |
| **Sub-Total Conversions of RSUs** | | 170,478 | | **Proceeds** | $0 (170,478 shares) |
| | | **405,256** | | **Proceeds** | **$2,218,971** |
| | | | | | |
| **Totals** | **Shares Purchased** | 25,000 | **Transaction Costs** | | ($249,458) |
| | **Awards of PSUs** | 177,543 | **Transaction Costs** | | $0 |
| | **Conversions/Sales of PSUs** | (177,543) | **Transaction Proceeds** | | $1,333,348 |
| | **Awards of RSUs** | 331,459 | **Transaction Costs** | | $0 |
| | **Conversions/Sales of RSUs** | (111,156) | **Transaction Proceeds** | | $885,623 |
| | **Conversions of RSUs** | (170,478) | **Transaction Proceeds** | | $0 (170,478 shares) |
| | | | **Net Gain to Defendant Spence** | | **$1,969,513** |

374. These transactions during the 10(b) Class Period, while the fraud was raging and the true facts regarding McDermott's business and operations, in particular those regarding the Merger and the Four Focus Projects, as alleged herein, remained hidden from investors, yielded the Individual Defendants a combined ***$9,984,700*** ($8,015,187 for Dickson, $1,969,513 for Spence), along with 727,464 additional shares acquired at no expense (556,986 for Dickson, 170,478 for Spence) in net ill-gotten gains from prices

inflated by the fraud alleged herein. These transactions and proceeds constitute strong evidence of scienter.

375. These transactions were suspicious in amount, a fact that further supports the scienter inference. Dickson's $8,015,187 in insider transaction gains compare suspiciously against his 2018 salary of $1,125,000. Moreover, the fact that Defendant Dickson sold/exercised 739,762 PSUs and 918,153 RSUs during the 20-month 10(b) Class Period compares suspiciously against his sale/exercise of just 0 PSUs and 547,142 RSUs in the 20-month period before the 10(b) Class Period. Spence's $1,969,513 in insider transaction gains compare suspiciously against his 2018 salary of $650,000. Moreover, the fact that Defendant Dickson sold/exercised 177,543 PSUs and 281,634 RSUs during the 20-month 10(b) Class Period compares suspiciously against his sale/exercise of just 0 PSUs and 299,756 RSUs in the 20-month period before the 10(b) Class Period.

376. These transactions were also suspicious in timing vis-à-vis the alleged fraudulent misstatements and the alleged partial corrective disclosures, a fact that further supports the scienter inference.

### 3. *McDermott Raised Funds During The Class Period*

377. During the Class Period, McDermott announced its intention to raise hundreds of millions of dollars in funds while its stock was trading at prices elevated by the fraud alleged herein. In an October 30, 2018 Form 8-K and press release, and an October 31, 2018 Form 8-K filed with the SEC, McDermott announced that it entered into a Securities Purchase Agreement to issue and sell in a Private Placement, 300,000 shares of 12% Redeemable Preferred Stock, par value $1.00 per share, and a number of Series A

warrants equal to the product of 3.75% times the total number of shares of its common stock, par value $1.00 per share, outstanding as of the closing date, with an initial exercise price of $0.01, for a total purchase price of $289.5 million. Also, in the same press release and Forms 8-K, McDermott announced a Letter of Credit Facility for extensions of credit in the form of performance letters of credit in the aggregate face amount of up to $230 million. On November 29, 2018, in a press release and Form 8-K, McDermott announced the closing of this $289.5 million Private Placement offering, and the availability of the $230 million Letter of Credit Facility. These transactions, which took place during the fraud alleged herein, are evidence of McDermott's corporate scienter.

### 4. *The Fraud Implicated Core Operations*

378. The fraud alleged herein implicates the core operations of McDermott. The Merger with CB&I was McDermott's largest and most important strategic transaction, both in size and timing, and, upon its closing, the CB&I's backlog represented a massive 74.5% of McDermott's post-Merger multi-billion-dollar backlog.

379. As regards timing, when the Merger was announced, McDermott had been a potential takeover target by its rivals. Indeed, on April 23, 2018, Subsea 7 S.A. ("Subsea 7"), a competitor to McDermott, confirmed that it had earlier made an unsolicited offer to acquire McDermott for $7.00 per share (pre-split) in cash or up to 50% in Subsea 7 stock and the balance in cash. This represented a premium of 16% to McDermott's common stock closing price on April 20, 2018 at $6.05 per share. The value of Subsea's offer was approximately $2 billion. The Subsea 7 offer was not subject to any financing conditions or Subsea 7 shareholder approval. The Subsea 7 shareholder offer, however, was subject

to McDermott ending its proposed Merger with CB&I. Subsea 7's offer said it would also consider increasing its proposed price upon further assessment of McDermott's business through discussions with McDermott management.

380. However, McDermott's Board of Directors swiftly rejected Subsea 7's proposal, as confirmed in a McDermott press release on April 23, 2018, which stated, "We remain fully committed to completing the transformational transaction [with CB&I] and our Board has reaffirmed its recommendation that our stockholders should support it."

381. Once the rejected bid was public, press coverage on April 25, 2018, indicated that Subsea 7 was willing to offer more. A *Business Guide* article quoted Jean Cahuzac, Subsea 7's CEO, as stating: "Given the attributes of the proposed transaction and our stated ability to further enhance our proposed terms, we encourage the McDermott board of directors to reconsider this compelling opportunity to combine two complementary businesses." He added: "Our proposal provides equity upside in a company with a robust financial position, as well as a meaningful premium. We see significant merit in such a transaction for all shareholders, and with our financial and legal advisors continue to be open to discussions." A Law360 article reported that Subsea 7 had said it would be open to adjusting its $2 billion bid for McDermott, but that a new offer was possible "only if the Houston-based firm agrees to come to the negotiating table." It quoted Cahuzac as saying, "We would welcome the opportunity to engage with McDermott's board of directors and management to discuss our proposal and the substantial upside opportunity represented by ongoing participation in the equity, with a view to a combination that would be in the best interests of our respective shareholders."

382. At this time, analysts also stated their optimism that Subsea 7's original bid was just a first offer and that even if Subsea 7 increased its bid, the deal would still be accretive. For example, UBS published an analyst report on April 24, 2018, noting, *inter alia*, that Subsea 7 could still have a value accretive deal at an increased bid of $4/share more. Similarly, Arctic Securities published and analyst report on April 25, 2018 estimating that a bid of just about $2/share more would still result in an accretive deal and that the original $7/share bid was just a first move to initiate a dialog.

383. Notwithstanding Subsea 7's invitation for further discussions and its willingness to increase its offer, McDermott never engaged Subsea 7 in any negotiations regarding a potential deal choosing, instead, to continue with the proposed Merger with CB&I. On May 2, 2018, in light of McDermott's opposition to its proposal and the shareholder vote approving the Merger, Subsea 7 withdrew its $7.00 (pre-split) offer.

384. As regards size, the Merger was McDermott's largest M&A transaction in a decade, if not its entire history, and would augment McDermott's own $3.9 billion backlog with CB&I's $11.4 billion backlog (as of December 31, 2017).

385. The Merger also represented a massive expenditure of corporate resources, at the cost of turning down the higher premium offered by Subsea 7.

386. Immediately prior to the Merger on May 10, 2018, McDermott shares split one-for-three. Thus, for example, a holder of 300 McDermott shares with a closing market price of $6.64 per share on May 9, 2018, exchanged those shares for 100 shares of McDermott common stock (post-split), which closed on May 10, 2018 at $20.70 per share.

The Subsea 7 initial offer post-split would have been worth $21 per share in cash to McDermott shareholders.

387. CB&I shares closed on May 10, 2018, immediately prior to the Merger, at $16.39 per share. CB&I shareholders received 0.82407 McDermott shares in the Merger. According to the Proxy Statement (at *xiii*), approximately 102.5 million shares of CB&I common stock were outstanding as of March 26, 2018. Thus, the market value of the shares issued to CB&I shareholders on May 10, 2018, approximated $1.75 billion (a 0.82407 conversion ratio multiplied by a $20.70 per share market price multiplied by 102.5 million shares).

388. In light of these facts, it is inconceivable that the Individual Defendants, McDermott's CEO and CFO, and its Board did not know the facts and circumstances of the fraud as alleged herein. Moreover, such knowledge is imputable to Defendants, given the implication of core operations, the Defendants' roles and status within McDermott, both generally and as specifically regards the Merger and the Four Focus Projects, and the litany of facts alleged herein regarding the funneling of information to them and their personal involvement in the key events and circumstances at issue, as alleged herein, including by the CW statements.

#### 5. *Defendants Signed, Were Quoted In, Or SOX Certified The Alleged Misstatements*

389. As the individuals who signed, were quoted in, or orally made the alleged false and misleading statements described herein, the Individual Defendants were under an

obligation to familiarize themselves with the subject matter of those public statements and to speak truthfully. As alleged herein, they violated such duties.

390. As the individuals who SOX certified SEC filings as described above, the Individual Defendants were obligated to inquire and investigate, familiarize themselves with the subject matter of their SOX certifications, and reassure themselves that the certifications were accurate and that they were speaking truthfully in making them. As alleged herein, they violated such duties.

### 6. *The Fraud Violated McDermott's Corporate Code of Conduct*

391. McDermott's Code of Conduct, published on its website throughout the Class Period, barred all of the misconduct detailed by the extensive CW statements set forth above.

392. In a section captioned "Integrity of Records and Accounting Procedures," the Code of Business Conduct ***required*** accurate reporting of the company's operations, expressly including accurate measurements of progress to date and forecasts of cost on large construction projects like the Four Focus Projects. For instance:

> We create documents and records in the normal course of business to assist in our decision-making process and to document our compliance with laws, regulations and Company policies and procedures. ***All entries in the Company's books, records and accounts must be complete, accurate and fairly reflect our business transactions conforming to applicable accounting standards and legal requirements***.
>
> Whatever your part in this process, you are required to be honest and forthcoming – if a transaction or payment cannot be accurately documented without raising legal questions or embarrassing the Company, the transaction should not be consummated and the payment should not be made.

> All of the Company's records, from your expense account forms to the Company's annual report must accurately reflect the facts. ***In most of our construction operations we report financial results and are compensated on a percent-of-completion basis and may be paid by our customers on a milestone basis. This requires an accurate measurement of progress to date and an accurate forecast of cost to complete, as that has a direct impact on the earnings reports filed by the Company and reported to the SEC and the Company's shareholders.*** Corporate funds and assets must be recorded according to Company procedures. False or misleading entries are unlawful and will not be tolerated. No one may establish undisclosed or unrecorded funds or assets for any purpose. Except for normal and customary petty cash funds, which are strictly controlled, cash transactions are not allowed.
>
> * * * *
>
> ***All Company records and documents must be accurately and honestly created and maintained, and all accounts and reports must fully reflect all relevant facts. This is Company policy and it is the law.*** In following these requirements, activities such as embezzlement, money laundering and ***holding "off the books" cash or slush funds are prohibited.***

393. McDermott's 10-K filings during the Class Period, which directed investors to where the Code of Business Conduct was posted on the Company's website, stated, "We have adopted a Code of Business Conduct for our employees and directors, including, specifically, our chief executive officer, our chief financial officer and our other executive officers. Our code satisfies the requirements for a 'code of ethics' within the meaning of SEC rules. A copy of the code is posted on our Web site, www.mcdermott.com/ under 'Ethics-Code of Business Conduct.'" This language made clear that, throughout the Class Period, the Code of Business Conduct governed the Individual Defendants' conduct at issue, which they knew and understood, inasmuch as they signed and SOX-certified those Form 10-K filings.

394. Defendants' flagrant violation of express corporate policy further buttresses the inference of Defendants' scienter, whether based on their knowledge or their recklessness.

## VI. NO SAFE HARBOR

395. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Most, if not all, of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent any statements were labelled as forward-looking, they included statements of then-historical or then-present fact and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Any purported cautionary language warned only of theoretical future risks at times when those risks had already ripened due to CB&I's and McDermott's then-ongoing misconduct as alleged herein, including without limitation as regards the Merger and the Four Focus Projects. Moreover, the purported cautionary language failed to adjust over time, using the same theoretical tone even after concrete changes of circumstance.

396. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable, because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by one or both of the Individual Defendants or an executive officer of McDermott who knew that those statements were false when made.

397. For all these same reasons, the bespeaks caution doctrine likewise does not apply to shield Defendants from liability.

398. In addition, to the extent Defendants' statements are determined to be ones of opinion, they were materially false and misleading because (i) they were either not believed by the Defendants and were objectively false and (ii) because McDermott's shareholders expected not just that Defendants believed the opinion (however irrationally), but that it fairly aligned with the information in their possession at the time. However, Defendants' statements did not fairly align with the information in their possession at the time such statements were made, and they omitted material facts about Defendants' knowledge of the true state of the facts, including, *inter alia*, the true facts concerning the Focus Projects, their valuation and necessary accounting, and their true financial impacts on McDermott. Specifically, it was known or knowable at the time of Defendants' statements outlined herein that the Focus Projects had not been de-risked and that CB&I and McDermott senior personnel internally were anticipating in excess of $1 billion in potential additional charges on Cameron alone, including charges for liquidated damages. Those true facts were known to Defendants or recklessly disregarded by them and conflicted with what a reasonable investor would take from Defendants' statements.

## VII. THE CLAIMS ARE TIMELY

399. The claims set forth herein were timely filed.

400. The market was not even arguably aware until October 30, 2018, at the earliest, that credible allegations existed to the effect that McDermott had misrepresented

and/or failed to disclose material facts about its business and operations, particularly including without limitation as regarded the Merger and the Four Focus Projects.

401. It was also not until October 30, 2018, at the earliest, that Plaintiffs were first presented with any credible evidence that Defendants had made materially false and misleading statements to investors during the 10(b) Class Period. In the absence of publicly available information prior to then suggesting that McDermott's pronouncements in its SEC filings and other public statements during the 10(b) Class Period were materially false and/or misleading, 10(b) Lead Plaintiffs were not under any duty to inquire as to the truthfulness of McDermott's public statements. Therefore, 10(b) Lead Plaintiffs' duty in that regard arose no earlier than October 30, 2018.

402. Prior to October 30, 2018, 10(b) Lead Plaintiffs and 10(b) Class Members could not have been on any inquiry notice of possible claims under the Securities Exchange Act. Even assuming this early date for inquiry notice, Plaintiffs' Securities Exchange Act claims against Defendants were brought within two years. Therefore, Plaintiffs have complied with the requirements of 28 U.S.C. § 1658(b).

## VIII. LOSS CAUSATION/ECONOMIC LOSS

403. The market for McDermott shares was open, well-developed, and efficient at all relevant times. During the 10(b) Class Period, as detailed herein, Defendants engaged in a course of conduct and a scheme to deceive the market that artificially inflated McDermott's share price and operated as a fraud or deceit on 10(b) Class Period purchasers and acquirors of McDermott shares by misrepresenting the material facts as detailed herein. As detailed above, at the end of the 10(b) Class Period, when Defendants' prior

misrepresentations became known to the public, through a series of corrective disclosures, the price of McDermott shares fell precipitously, as the prior artificial inflation came out. As a result of their purchases or acquisitions of McDermott shares during the 10(b) Class Period, 10(b) Lead Plaintiffs and the other 10(b) Class members suffered economic loss, *i.e.*, damages, under the U.S. federal securities laws.

404. During the 10(b) Class Period, Defendants presented a misleading picture of McDermott's financial condition, revenues, performance, and business prospects, including without limitation as regarded the Merger and the Four Focus Projects. Defendants' false and misleading statements had the intended effect and caused McDermott shares to trade at artificially inflated prices throughout the 10(b) Class Period and until the truth was fully revealed to the market.

405. In response to the issuance of partially corrective disclosures on October 30, 2018, February 13, 2019, and July 29, 2019, and September 18, 2019, the price of McDermott shares sharply dropped, on high volume, as detailed herein, thereby removing inflation from the price of McDermott shares, causing real economic loss to 10(b) Lead Plaintiffs and the 10(b) Class Members, investors who had purchased or acquired McDermott shares during the 10(b) Class Period.

406. The decline was a direct and proximate result of the nature and extent of Defendants' fraud being revealed to investors and the market. The timing and magnitude of the price decline in McDermott shares negates any inference that the loss suffered by 10(b) Lead Plaintiffs and the other 10(b) Class members was caused by changed market

conditions, macroeconomic factors or McDermott-specific facts unrelated to Defendants' fraudulent conduct.

407. The economic loss, *i.e.*, damages, suffered by 10(b) Lead Plaintiffs and other 10(b) Class members was a direct and proximate result of Defendants' fraudulent scheme to artificially inflate McDermott's share price and the subsequent significant decline in the value of McDermott shares when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

## IX. PRESUMPTION OF RELIANCE

408. At all relevant times, the market for McDermott shares was an efficient market, supporting a presumption of reliance under the fraud-on-the-market doctrine, for the following reasons, among others:

(a) McDermott met the requirements for listing, and was listed and actively traded on the NYSE under ticker symbol "MDR", a highly efficient and automated market;

(b) McDermott had approximately 284,032,088 million shares outstanding as of February 16, 2018, and, post-Merger, 180,796,580 shares outstanding as of February 21, 2019, such that its stock was liquid. During the 10(b) Class Period, numerous shares of McDermott stock were traded on a daily basis, with moderate to heavy volume, demonstrating an active and broad market for McDermott stock and permitting a strong presumption of an efficient market;

(c) As a regulated issuer, McDermott filed periodic public reports with the SEC;

(d) McDermott regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on

the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e) McDermott was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the 10(b) Class Period; and

(f) Unexpected material news about McDermott was rapidly reflected and incorporated into McDermott's stock price during the 10(b) Class Period.

409. As a result of the foregoing, the market for McDermott shares promptly digested current information regarding McDermott from all publicly available sources and reflected such information in the price of its stock. Under these circumstances, all purchasers and acquirors of McDermott stock during the 10(b) Class Period suffered similar injury through their purchase or acquisition of McDermott stock at artificially inflated prices and a presumption of reliance applies.

410. Alternatively, 10(b) Lead Plaintiffs and the 10(b) Class members are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their 10(b) Class Period statements in violation of a duty to disclose such information, as detailed above.

## X. PLAINTIFFS' CLASS ACTION ALLEGATIONS

411. Plaintiffs bring this federal securities action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the 10(b) Class, consisting of all persons and entities, other than Defendants, their family members, and their subsidiaries, affiliates, and

any entities in which they owned a controlling interest, who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and January 23, 2020,[5] both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. Pursuant to Orders of the Court, the 10(b) Class comprises two subclasses, as follows.

(a) A Court-certified §10(b) CBI Subclass consisting of all persons and entities who converted stock in Chicago Bridge & Iron Company, N.V. (NYSE: CBI) into stock of McDermott International, Inc. (NYSE: MDR) via the merger of CBI and MDR, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. *See* ECFs 546, 579.

(b) A §10(b) MDR Subclass consisting of all persons and entities who purchased or otherwise acquired common stock of McDermott International, Inc. (NYSE: MDR) between December 18, 2017 and January 23, 2020, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. *See* ECFs 546, 579, 689, 696.

---

[5] The 10(b) Class Period was expanded by NSHEPP's Supplement (ECF 220), defined and discussed below.

412. Excluded from the 10(b) Class are Defendants herein, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants, McDermott, or CB&I have or had a controlling interest.

413. The 10(b) Class members are so numerous that joinder of all of them is impracticable. Throughout the 10(b) Class Period, McDermott stock was actively traded on the NYSE. While the exact number of 10(b) Class members is unknown to 10(b) Lead Plaintiffs at this time and can be ascertained only through appropriate discovery, 10(b) Lead Plaintiffs believe that there are hundreds or thousands of them. Record owners and other 10(b) Class members may be identified from records maintained by McDermott or its transfer agent and may be notified of this action's pendency by mail, with 10(b) Class members not so identified being notified through publication notice, using forms of notice similar to those customarily used in securities class actions.

414. 10(b) Lead Plaintiffs claims are typical of the claims of the 10(b) Class members, as all 10(b) Class members are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

415. 10(b) Lead Plaintiffs will fairly and adequately protect the interests of the 10(b) Class members and have retained counsel competent and experienced in class and securities litigation. 10(b) Lead Plaintiffs have no interests antagonistic to or in conflict with those of the 10(b) Class.

416. Common questions of law and fact exist as to all 10(b) Class members and predominate over any questions solely affecting individual 10(b) Class members. Among the questions of law and fact common to the 10(b) Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;
- whether statements made by Defendants to the investing public during the 10(b) Class Period misrepresented material facts about the business, operations and management of McDermott, including without limitation as regarded the Merger and the Four Focus Projects;
- whether the Individual Defendants caused McDermott to issue false and misleading financial statements during the 10(b) Class Period;
- whether Defendants acted knowingly or recklessly in issuing the false and misleading statements alleged herein;
- whether the prices of McDermott common stock during the 10(b) Class Period were artificially inflated because of the Defendants' conduct complained of herein; and,
- whether the 10(b) Class members have sustained damages and, if so, what is the proper measure of damages.

417. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all 10(b) Class members is impracticable. Furthermore, as the damages suffered by individual 10(b) Class members may be relatively small, the expense and burden of individual litigation make it impossible for 10(b) Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

418. As alleged herein, 10(b) Lead Plaintiffs will rely, in part, on the presumption of reliance established by the fraud-on-the-market doctrine, inasmuch as Defendants made public misrepresentations or failed to disclose material facts during the 10(b) Class Period; the misrepresentations and omissions were material and would tend to induce a reasonable investor to misjudge the value of McDermott's securities; and 10(b) Lead Plaintiffs and the 10(b) Class members purchased or otherwise acquired McDermott common stock between the time the Defendants misrepresented or failed to disclose material facts and the time the true facts were fully disclosed, without knowledge of the omitted or misrepresented facts.

## XI. CLAIMS FOR RELIEF

### COUNT I

**(Against All Defendants For Violations Of**
**Exchange Act Section 10(b) And Rule 10b-5 Promulgated Thereunder)**

419. 10(b) Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

420. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

421. During the 10(b) Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon 10(b) Lead Plaintiffs and the other members of the 10(b) Class; made various untrue

statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the 10(b) Class Period, did: (i) deceive the investing public, including 10(b) Lead Plaintiffs and other 10(b) Class members, as alleged herein; (ii) artificially inflate and maintain the market price of McDermott securities; and (iii) cause Plaintiffs and other members of the 10(b) Class to purchase or otherwise acquire McDermott common stock and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

422. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases, teleconferences with analysts and investors, and other documents and statements described above, including statements made to securities analysts and the media that were designed to influence the market for McDermott securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about McDermott's operations, finances and business prospects, including without limitation as regards the Merger and the Four Focus Projects.

423. Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein, including by virtue of their positions at McDermott, and intended thereby to deceive Plaintiffs and the other members of the 10(b)

Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

424. Defendants were personally motivated to make false statements and omit material information necessary to make the statements not misleading in order to personally benefit from the consummation of the Merger and the sale of McDermott securities.

425. Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. Defendants' first-hand knowledge is alleged herein. Moreover, as the senior managers and/or directors of McDermott, who among other things oversaw the due diligence into the Merger, the Merger, and the post-Merger operations of the Four Focus Projects, the Individual Defendants had knowledge of the details of McDermott's operations, business, and internal affairs, including without limitation those regarding the Merger and the Four Focus Projects.

426. The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of McDermott. As officers and/or directors of a publicly-held company, the

Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to McDermott's businesses, operations, financial condition and prospects, including without limitation as regarded the Merger and the Four Focus Projects. As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of McDermott securities was artificially inflated throughout the 10(b) Class Period. In ignorance of the adverse facts concerning McDermott's business, operations and financial condition concealed by Defendants, including without limitation those regarding the Merger and the Four Focus Projects, 10(b) Lead Plaintiffs and the other 10(b) Class members purchased or otherwise acquired McDermott common stock at artificially inflated prices and relied upon the price of McDermott's securities, the integrity of the market for those securities and/or upon statements disseminated by Defendants, and were damaged thereby.

427. During the 10(b) Class Period, McDermott common stock was traded on an active and efficient market. 10(b) Lead Plaintiffs and the other 10(b) Class members, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of McDermott at prices artificially inflated by Defendants' wrongful conduct. Had 10(b) Lead Plaintiffs and the other 10(b) Class members known the truth, they would not have purchased or otherwise acquired said shares or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by 10(b) Lead Plaintiffs and the 10(b) Class, the true value of McDermott stock was substantially lower than the prices paid

by Plaintiffs and the other 10(b) Class members. The market price of McDermott stock declined sharply upon public disclosure of the fraud alleged herein, to the injury of 10(b) Lead Plaintiffs and 10(b) Class members.

428. By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

429. As a direct and proximate result of Defendants' wrongful conduct, 10(b) Lead Plaintiffs and the other 10(b) Class members suffered damages in connection with their respective purchases, acquisitions and sales of McDermott's common stock during the 10(b) Class Period, upon the disclosures that McDermott had been disseminating materially misstatements and omissions to the investing public.

**COUNT II**

**(Against The Individual Defendants For Violations Of Section 20(a) Of The Exchange Act)**

430. 10(b) Lead Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

431. During the 10(b) Class Period, the Individual Defendants participated in the operation and management of McDermott, and conducted and participated, directly and indirectly, in the conduct of McDermott's business affairs. Because of their senior positions, they knew the adverse non-public information about McDermott's business, operations, finances, and prospects, and through their pre-Merger due diligence and post-

Merger oversight, that knowledge extended to and included without limitation the adverse non-public information about CB&I's business and the Four Focus Projects.

432. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to McDermott's business, operations, financial condition, results of operations, and prospects, including without limitation those related to the Merger and the Four Focus Projects, and to correct promptly any public statements issued by McDermott which had become materially false or misleading.

433. Because of their positions of control and authority as senior officers and directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which McDermott disseminated in the marketplace during the 10(b) Class Period concerning McDermott's business, operations, financial condition, results of operations, and prospects, including without limitation those related to the Merger and the Four Focus Projects. Throughout the 10(b) Class Period, the Individual Defendants exercised their power and authority to cause McDermott to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of McDermott within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of McDermott stock.

434. Each of the Individual Defendants, therefore, acted as a controlling person of McDermott. By reason of their senior management positions and/or being directors of McDermott, each of the Individual Defendants had the power to direct the actions of, and

exercised the same to cause, McDermott to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations and business of McDermott and possessed the power to control the specific activities that comprise the primary violations about which the 10(b) Lead Plaintiff and the other members of the 10(b) Class complain.

435. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by McDermott.

## XII. PRAYER FOR RELIEF

**WHEREFORE**, 10(b) Lead Plaintiffs hereby demand judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Fed. R. Civ. P. 23 and certifying the 10(b) CBI Subclass Lead Plaintiff NSHEPP as the class representative for the §10(b) CBI Subclass and 10(b) MDR Subclass Lead Plaintiff Coligado as the class representative for the §10(b) MDR Subclass;

B. Requiring Defendants to pay damages sustained by the 10(b) Lead Plaintiffs and the 10(b) Class by reason of the acts and transactions alleged herein;

C. Awarding the 10(b) Lead Plaintiffs and the other members of the 10(b) Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## XIII. DEMAND FOR TRIAL BY JURY

10(b) Lead Plaintiffs hereby demand a trial by jury.

Dated: July 15, 2026

Respectfully submitted,
**POMERANTZ LLP**

*/s/Matthew L. Tuccillo*
Matthew L. Tuccillo, Attorney In Charge
(S.D. Tex. Federal Bar Number 1467939)
Jeremy A. Lieberman
(S.D. Tex. Federal Bar Number 1466757)
J. Alexander Hood II
(S.D. Tex. Federal Bar Number 3086579)
Jennifer Banner Sobers (*pro hac vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: ahood@pomlaw.com
Email: jbsobers@pomlaw.com

*Counsel for §10(b) CBI Subclass Lead Plaintiff Nova Scotia Health Employees' Pension Plan and Lead Counsel for the §10(b) CBI Subclass*

**THE BRISCOE LAW FIRM, PLLC**

*/s/Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
1980 Park Oak Blvd.
Houston, TX 77056
Telephone: 713-752-2600
Facsimile: 832-201-9950
Email: wbriscoe@thebriscoelawfirm.com

*Additional and Local Counsel for §10(b) CBI Subclass Lead Plaintiff Nova Scotia Health Employees' Pension Plan, and Liaison Counsel for the §10(b) CBI Subclass*

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

/s/Malcolm T. Brown
Malcolm T. Brown, Attorney In Charge
(NY State Bar No. 2918498)
Thomas H. Burt
(NY State Bar No. 2869550)
Patrick Donovan
(NY State Bar No. 5040688)
270 Madison Avenue
New York, NY 10016
Telephone: 212-545-4600
Facsimile: 212-686-0114
Email: brown@whafh.com
Email: burt@whafh.com
Email: donovan@whafh.com

*Counsel for §10(b) MDR Subclass Lead Plaintiff Christopher Coligado and Lead Counsel for the §10(b) MDR Subclass*

**REYNOLDS FRIZZELL LLP**

/s/ Michael K. Oldham
Michael K. Oldham
Texas Bar No.: 00798405
Southern District No.: 21486
Jean C. Frizzell
Texas Bar No.: 07484650
Southern District No.: 14529
1100 Louisiana, Suite 3500
Houston, TX 77002
Telephone: 713-485-7200
Facsimile: 713-485-7250
Email: oldham@reynoldsfrizzell.com
Email: jfrizzell@reynoldsfrizzell.com

*Additional Counsel for §10(b) MDR Subclass Lead Plaintiff Christopher Coligado and Liaison Counsel for the §10(b) MDR Subclass*

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS ON BEHALF OF THE EXCHANGE ACT §10(B) CLASS**

**FIGURE 1**

As defined in McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule 14A, on August 10, 2018, Performance Units (PSUs) awarded in 2017 or earlier were defined and illustrated as follows:

> Performance Units. Performance units are intended to align the NEOs' interests with those of our stockholders, with a focus on long-term results. The performance units awarded in 2017 are structured to be paid out, if at all, in shares of McDermott common stock, cash equal to the fair market value of the shares otherwise deliverable, or any combination thereof, at the sole discretion of the Compensation Committee, at the end of a three-year performance period, to the extent the applicable performance goals are met. Relative return on average invested capital, or ROAIC, was used as the performance metric for the performance units granted in 2017, as the Compensation Committee believed that this metric tied specifically to our strategy of appropriately investing capital to grow the business. The number of performance units earned is determined based on both (1) our average ROAIC, and (2) our relative ROAIC improvement as compared to a competitor peer group comprised of both domestic and international peers, in each case over the three-year performance period. Based on this performance, up to 200% of a participant's target award may be earned, with earned awards between the amounts shown calculated by linear interpolation. We compute McDermott's ROAIC improvement by subtracting McDermott's 2016 ROAIC from the three-year performance period average ROAIC. Similar calculations are done for each member of the competitor peer group, following which the median competitor peer group ROAIC improvement is calculated. The amount by which McDermott's ROAIC improvement exceeds the competitor peer group median ROAIC improvement determines whether the threshold, target or maximum earned award is achieved.

| | MDR 3-Year Average ROAIC | < 6% | ≥ 6% and < 10% | ≥ 10% |
|---|---|---|---|---|
| Performance Level | Amount by which MDR ROAIC Improvement Exceeds Competitor Peer Group Median ROAIC Improvement | Earned Award | Earned Award | Earned Award |
| Maximum | ≥ 6% | 50% | 200% | 200% |
| Target | 2% | 50% | 100% | 100% |
| Threshold | 0% | 50% | 50% | 50% |
| | < 0% | 0% | 0% | 50% |

**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS ON BEHALF OF THE EXCHANGE ACT §10(B) CLASS**

**FIGURE 2**

As defined in McDermott's Definitive Proxy Statement filed with the SEC on Form DEF 14A, Schedule 14A, on March 22, 2019, Performance Units (PSUs) awarded in 2018 or later were defined and illustrated as follows:

> Performance Units. Performance units are intended to align the NEOs' interests with those of our stockholders, with a focus on long-term results. The number of performance units awarded in 2018 which will ultimately be earned and vest, if any, will be determined with (1) 50% based on aggregate consolidated order intake for the performance period from July 1, 2018 through December 31, 2020, and (2) 50% based on McDermott's relative total shareholder return as compared to the Performance Peer Group (as defined on page 53 of this CD&A) for the performance period from May 10, 2018 through December 31, 2020.
>
> The Compensation Committee identified order intake as a performance metric for 50% of the 2018 performance unit awards based on its belief that this metric ties specifically to McDermott's strategy of positioning itself for future growth by capitalizing on its robust revenue opportunity pipeline and growing end markets. The Compensation Committee also believes the performance units should remain highly sensitive to McDermott's stock price, in order to further align management's interests with those of our stockholders, and, accordingly, identified relative total shareholder return as the performance metric for the remaining 50% of the 2018 performance unit awards. For the 50% portion of the 2018 performance units based on aggregate consolidated order intake, up to 150% of a participant's target award may be earned, and for the 50% portion of the 2018 performance units based on relative total shareholder return, up to 200% of a participant's target award may be earned, to further the alignment of management's interests with those of our stockholders. If earned, 2018 performance units are structured to be paid out in shares of McDermott common stock, cash equal to the fair market value of the shares otherwise deliverable, or any combination thereof, at the sole discretion of the Compensation Committee.
>
> The earned award with respect to the aggregate consolidated order intake metric over the performance period from July 1, 2018 through December 31, 2020 will be determined as follows:

| Performance Level* | Earned Award |
|---|---|
| Maximum | 150% |
| Target | 100% |
| Threshold | 50% |
| | 0% |

* Due to the nature of our business, order intake goals are competitively sensitive and therefore are not disclosed. The performance goals were established based on McDermott's internal forecast.

The earned award with respect to the relative total shareholder return metric over the performance period from May 10, 2018 through December 31, 2020 will be determined as follows:

| Total Shareholder Return Percentile Rank | Earned Award |
|---|---|
| 90th Percentile | 200% |
| 50th Percentile | 100% |
| 25th Percentile | 50% |
| <25th Percentile | 0% |

**PART 2: SUPPLEMENT UNDER FED. R. CIV. P. 15(d)**
**TO THE CORRECTED CLASS ACTION COMPLAINT (ECF 220) ON BEHALF OF THE §10(B) CBI SUBCLASS**

The Nova Scotia Health Employees' Pension Plan ("NSHEPP"), Lead Plaintiff overseeing all claims arising under Exchange Act §10(b) and SEC Rule 10b-5 thereunder from June 4, 2019 (ECF 84) through May 17, 2026 and Lead Plaintiff of the Court-certified §10(b) CBI Subclass since June 21, 2024 (ECFs 546, 579), individually and on behalf of all other persons similarly situated, by its undersigned attorneys, hereby restates the allegations of its prior-filed Supplement Under Fed. R. Civ. P. 15(d) to the Corrected Class Action Complaint for Violations of The Federal Securities Laws on Behalf of the Exchange Act §10(b) Class (Dkt. No. 105) (ECF 220) (the "Supplement"), filed November 4, 2021 with leave of Court (ECF 216). As stated therein, pursuant to Fed. R. Civ. P. 15(d), NSHEPP hereby respectfully supplements its Corrected Class Action Complaint (Dkt. No. 105) ("CCAC")[6] as follows, including specific references to the Court's Memorandum Opinion and Order fully denying Defendants' motion to dismiss the CCAC (Dkt. No. 168; *Edwards v. McDermott Int'l, Inc.*, 2021 WL 1421609 (S.D. Tex.) (Apr. 13, 2021)).[7]

## I. EXPANDED INTRODUCTION

436. The Nature of The Action allegations in CCAC §1. are hereby supplemented as follows. The Defendants' fraud continued, unabated, from late September 2019 through

---

[6] All terms herein have the definitions ascribed in the CCAC unless otherwise noted.

[7] The allegations in this Part 2 are replicated, with only minor conforming revisions that can be presented to the Court in redline form upon request, from NSHEPP's Supplement filed on November 4, 2021, ¶¶436-474 herein replicating Supplement ¶¶1-39. Challenges to the Supplement under Fed. R. Civ. P. 12(b)(6) were already litigated, with the Court's rulings set forth in the Memorandum and Recommendation entered on August 30, 2022 (ECF 265) and the Order entered on September 22, 2022 (ECF 268).

McDermott's abrupt filing of a prepackaged bankruptcy on January 23. 2020. Their public statements created the false and misleading impression that McDermott was successfully negotiating with lenders, gaining access to the capital and liquidity to fund its operations and generate long-term balance sheet viability, and preparing to sell its "crown jewel" Lummus technology business to generate billions more in funds – without the need for a bankruptcy.

437. In reality, however, the funds to which McDermott gained access were nothing more than bridge lending to permit Defendants to prepare a prepackaged bankruptcy, which would enrich themselves, protect McDermott's lenders with equity in the reorganized company, and wipe out common stockholders, and their pursuit of a Lummus sale focused on completing one within a bankruptcy proceeding.

438. Defendants' fraud was further revealed by a partial corrective disclosure on November 4, 2019, when McDermott belatedly disclosed that the ***SEC had launched an investigation*** back in July 2019 into "disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project," which caused McDermott's stock price to drop, and by McDermott's announcement on January 21, 2020 that it had filed a prepackaged bankruptcy that would eviscerate common stockholder equity, which caused a trading halt (the second one in a matter of months) followed by another stock drop.

## II. MODIFIED CLASS PERIOD & CLASS DEFINITION

439. The Class Action Allegations in CCAC §§I. and X. are hereby supplemented as follows. The §10(b) Class Period is adjusted and expanded to include the time period

between September 17, 2019, and January 23, 2020, so as to extend between December 18, 2017, and January 23, 2020, both dates inclusive. Consequently, the §10(b) Class definition is adjusted to encompass the following §10(b) Class members:

> Plaintiffs bring this federal securities action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b)(3) on behalf of the 10(b) Class, consisting of all persons and entities who purchased or otherwise acquired the common stock of McDermott International, Inc. (NYSE: MDR) during the 10(b) Class Period of December 18, 2017 and January 23, 2020, both dates inclusive, seeking to pursue remedies against McDermott and certain of its officers and/or directors named as Defendants herein for violations of the federal securities laws under Exchange Act §§10(b) and 20(a) and SEC Rule 10b-5. Excluded from the §10(b) Class are Defendants, the officers and directors of McDermott and CB&I at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants, McDermott, or CB&I have or had owned a controlling interest.

## III. SUPPLEMENTED PARTY DESCRIPTION

440. The Parties section in CCAC §III. is hereby supplemented as follows. NSHEPP, as set forth in its accompanying Supplemental Certification, which is incorporated by reference herein, acquired McDermott's common stock at artificially inflated prices during the §10(b) Class Period, as defined and expanded herein, and was damaged upon the revelation of Defendants' fraud, as alleged in the CCAC and herein.

## IV. ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

441. The CCAC's allegations of materially false and misleading statements comprising the Technology Business Fraud (CCAC §V.F.2.) and the Capital Structure / Liquidity Fraud (CCAC §V.F.3.) are hereby supplemented as follows.

442. Defendants continued both the Technology Business Fraud and the Capital Structure / Liquidity Fraud after rumors of McDermott's bankruptcy began circulating, by falsely reassuring analysts and investors that McDermott continued to be stable and that the Lummus technology business could be sold to generate sufficient capital to correct liquidity issues and avoid bankruptcy – even as McDermott was barreling towards a prepackaged Chapter 11 bankruptcy filing. Unbeknownst to investors, the operational issues, project delays, cost overruns, and cash drains of the Four Focus Projects, as discussed by the CWs in CCAC §V.E., were insurmountable absent a bankruptcy reorganization and Defendants lacked any near-term plan for a *bona fide* Lummus transaction to strengthen McDermott's balance sheet. Defendants' statements were merely a scheme to maintain artificial inflation in McDermott's stock price while providing time to develop and execute a prepackaged Chapter 11 restructuring plan that wiped out common stockholders, while countering negative interim news that AlixPartners, LLP was hired and McDermott might need to sell assets, which had cratered its share price on September 18-19, 2019, as alleged in CCAC ¶¶320-323.

443. On September 20, 2019, McDermott issued a press release ("9/20/2019 Press Release") announcing that "***it recently received unsolicited approaches to acquire all or part of Lummus Technology***," McDermott's core sellable asset, and that ***"[b]ased on the receipt of these approaches, McDermott is exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through***." It added, "Separately, McDermott's previously announced processes to sell the remaining portion of its pipe fabrication

business and its industrial storage tank business are ongoing." Defendant Dickson was quoted as stating:

> Lummus is an excellent business, with incredibly impressive employees, that has earned a reputation for expertise, innovation, and reliability in the refining and petrochemical industries[.] ***The process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure, and we plan to use the proceeds from any transaction involving Lummus Technology to strengthen our balance sheet. While Lummus is an important business within McDermott, we have decided to undertake a process to fully realize its strategic and financial value.***"

444. Defendants' continuing fraud accomplished its intended effect. After trading halts and single-day stock declines of 63.3% and 22.7% on September 18-19, 2019, as alleged in CCAC ¶¶321 and 323, on September 20, 2019, following Defendants' alleged misstatements, McDermott stock rebounded on news that it was exploring the sale of its Lummus technology business. Analysts were also hopeful about a Lummus sale. For example, a Zephirin Group analyst termed the potential Lummus sale "salivating" and a way to reduce leverage by $1.2 billion, a Bloomberg industrials analyst said McDermott's Lummus sale "could help solve its liquidity crisis," and a Credit Suisse analyst, who called Lummus McDermott's "crown jewel" (the same metaphor used by CWs, as pled in CCAC ¶¶75, 76), described its potential sale as McDermott's last resort, and apprised its valuation as reasonable and its timing as early in 2020.

445. In October 2019, Defendants made a series of materially false and misleading public statements, as set forth below, regarding McDermott's agreement for up to $1.7 billion of new financing, which brought to fruition rumors that began on September 24, 2019, that it sought a loan in this amount as alleged in CCAC ¶324. Defendants' statements

intentionally created the misimpression that this financing would stave off McDermott's potential bankruptcy by enhancing its liquidity, rather than serving only to permit a prepackaged bankruptcy to be filed.

(a) On October 21, 2019, McDermott issued a press release ("10/21/2019 Press Release"), which was filed with the SEC on October 21, 2019 as Exhibit 99.1 to a Form 8-K signed by Defendant Spence ("10/21/2019 Form 8-K"), announcing that "it had entered into an agreement ("Agreement") with certain of its secured lenders…under which the Company will have access to up to $1.7 billion of additional financing, including letter of credit capacity" and "McDermott will have immediate access to $650 million of financing comprised of $550 million under a term loan facility and $100 million under a letter of credit facility, before reduction for related transaction fees and expenses." Mischaracterizing the financing as helping McDermott's capital structure and liquidity and going toward funding work on new projects, while omitting that it was really a bridge loan to permit a prepackaged bankruptcy, the press release also stated, "***[McDermott] expects to utilize the amounts available under the Agreement to finance working capital and support the issuance of required performance guarantees on new projects***." Stating that the "[n]ew facility underscores strong lender support for McDermott," it added, "***McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology and the sale process for the remaining portion of the pipe fabrication business***" but will "terminate its previously announced sale process for its industrial storage tank business." The press release quoted Defendant Dickson as stating:

> ***This new credit agreement is a continued signal from our lenders that they support McDermott, our underlying business, growth strategy and ability to achieve a long-term balance sheet solution[.] The Agreement provides near-term liquidity for the Company to manage working capital and provide performance guarantees on expected new awards***. We remain focused on serving our customers' needs, supporting our dedicated employees, and maintaining our valued relationships with our subcontractors, suppliers, and other business counterparties, all as part of our efforts to enhance our position as a premier, fully integrated provider of technology, engineering, and construction solutions to the energy industry.

(b) The 10/21/2019 Form 8-K said that McDermott entered into a new superpriority senior secured credit agreement ("Superpriority Credit Agreement"), along with related amendments ("Credit Agreement" and the "LC Agreement") to existing funding agreements executed in 2018, with certain subsidiaries as co-borrowers, a syndicate of lenders and letter of credit issuers, and administrative agents for $1.7 billion total in new funding, consisting of a $1.3 billion term loan facility ("TLF") and a $400 million letter of credit facility ("LCF"), scheduled to mature on October 21, 2021 and available in four tranches: (i) tranche one, accessible at the Superpriority Credit Agreement's closing, was $550 million in TLF funds and $100 million in LCF funds; (ii) tranche two, accessible between November 30 and December 31, 2019, was $250 million in TLF funds and $100 million in LCF funds; (iii) tranche three, accessible between December 30, 2019 and March 31, 2020, was $150 million in TLF funds; and (iv) tranche four, accessible between January 31, 2020 and March 31, 2020, would have been $350 million in TLF funds and $200 million in LCF funds. The Superpriority Credit Agreement imposed funding conditions, including the appointment of AlixPartners Managing Director John R. Castellano as Chief Transformation Officer and providing the lenders with

McDermott equity totaling up to 15% of its total issued and outstanding common stock concurrently with funding tranches two through four, while also outlining a purported plan to sell Lummus, waivable with consent of the lenders, that called for solicitation of bids by November 27, 2019, a report outlining the bids by December 15, 2019, a draft purchase agreement by December 31, 2019, and entry into a purchase agreement by January 31, 2020. The 10/21/2019 Form 8-K mischaracterized these funding terms as permitting McDermott to devise long-term liquidity solutions while securing best value for Lummus through a non-bankruptcy sale, while concealing their true purpose as bridge financing to fund operations into a prepackaged bankruptcy, by stating, "***Proceeds of the loans under the New Term Facility are to be used for general corporate purposes***…." and "***we proactively engaged legal and financial advisors to evaluate our financial position and to address our liquidity concerns. As a result of this evaluation, we determined to enter into the Credit Agreement Amendment and LC Agreement Amendment, as well as the Superpriority Credit Agreement, … which we believe will address our liquidity concerns in the near term and allow us to continue to evaluate all potential long-term solutions to our liquidity needs.***"

446. In November 2019, Defendants made further materially false and misleading public statements, as set forth below, regarding McDermott's purported ability to find long-term capital structure and liquidity solutions outside of bankruptcy, given the $1.7 billion in new financing obtained the month prior. Defendants' statements intentionally continued the misimpression that this financing would stave off McDermott's potential bankruptcy

by enhancing its liquidity, rather than serving only to permit a prepackaged bankruptcy to be filed.

(a) On November 4, 2019, McDermott issued a press release ("11/4/2019 Press Release") with 3Q 2019 earnings results which it filed with the SEC as an exhibit to a Form 8-K signed by Defendant Spence, explaining away a net loss of $1.9 billion and an operating loss of $1.7 billion by reassuring analysts and investors that the newly obtained funding, $650 million of which had been accessed, was permitting McDermott to work with lenders on long-term, non-bankruptcy solutions to its capital structure and liquidity problems, stating that McDermott was "***[c]ontinuing collaborative effort with lenders and noteholders to achieve a long-term balance sheet solution***" and "[w]e elected to enter into the 30-day grace period with respect to a November 1, 2019 interest payment on our 10.625% senior notes due in 2024 in order to ***continue collaborative discussions with our lenders and noteholders to find a long-term balance sheet solution.***" The 11/4/4019 Press Release added, "***We continue to pursue the previously announced strategic alternative process for our Lummus Technology business and the sale process for the remaining portion of our pipe fabrication business***." It also quoted Defendant Dickson as stating, "[O]ur capital structure continues to be pressured by certain legacy CB&I projects. ***Our recently announced $1.7 billion financing agreement with our lenders signals their confidence in our underlying business. We continue working with them to achieve a long-term balance sheet solution as we remain focused on delivering value for our customers, employees, subcontractors, and suppliers.***"

(b) That day, McDermott also filed a Form 10-Q with the SEC for Q3 2019 ("Q3 2019 10-Q"), SOX certified by Dickson and Spence, describing steps purportedly undertaken to address McDermott's capital structure and liquidity problems, including, *inter alia*, "***retain[ing] legal and financial advisors to help us evaluate strategic and capital structure alternatives***;" entering into the Superpriority Credit Agreement, Credit Agreement, and Letter of Credit Agreement; appointing the Chief Transformation Officer; and "***announc[ing] the commencement of a process to explore strategic alternatives for our Technology segment***." The Q3 2019 10-Q stated that "***these actions provide an opportunity for us to address our liquidity needs for the next 12 months and will allow us to continue to evaluate potential solutions to our liquidity needs.***"

447. On December 2, 2019, Defendants issued a press release ("12/2/2019 Press Release"), which was filed with the SEC that day as Exhibit 99.1 to a Form 8-K ("12/2/2019 Form 8-K"), announcing that McDermott was granted access to the second tranche (Tranche B) of financing under the Superpriority Credit Agreement, in the form of $250 million TLF funding and $100 million LCF funding. The 12/2/2019 Press Release stated that McDermott "***expects to utilize the amounts available under Tranche B to continue financing working capital and support the issuance of required performance guarantees on new projects***," the "***Tranche B funding is expected to allow McDermott to continue collaborative discussion regarding a long-term balance sheet solution***," and "***McDermott continues to pursue the previously announced strategic alternatives process for Lummus Technology***." It failed to disclose, *inter alia*, that a prepackaged bankruptcy

was forthcoming and that McDermott's lenders would not permit access to third tranche funding outside of a bankruptcy proceeding.

448. On December 13, 2019, Defendants issued a press release ("12/13/2019 Press Release"), which was filed with the SEC on December 13, 2019, as Exhibit 99.1 to Form 8-K ("12/13/2019 Form 8-K"), announcing that McDermott received written notification from the NYSE that it no longer satisfied continued listing compliance standards, with an average closing price of common stock below $1.00 over a 30 consecutive trading-day period. It added that "[i]f McDermott fails to regain compliance with [NYSE rules] during the cure period, the Common Stock will be subject to the NYSE's suspension and delisting procedures." The 12/13/2019 Press Release responded by saying, "McDermott is notifying the NYSE of its intent to cure the deficiency and return to compliance with the NYSE's continued listing requirements." This response was materially misleading, because it failed to disclose that McDermott was nearing an imminent prepackaged bankruptcy that would wipe out its common stockholders.

449. On January 15, 2020, McDermott filed with the SEC a Form 8-K ("1/15/2020 Form 8-K"), announcing that it had amended the Superpriority Credit Agreement and other credit agreements on January 9, 2020, so that acceleration of Senior Notes would not constitute an event of default and would "***allow ordinary course auto-renewals of credit despite any acceleration, bankruptcy, or other event of default***." The 1/2/2020 Form 8-K added that the deadline under the December 1, 2019, forbearance agreement between McDermott and certain Senior Note holders was set to expire on January 15, 2020, but was extended, while junior bondholders did not extend their forbearance deadline but agreed to

wait until at least January 21, 2020, before declaring a default. It added, "***Despite the expiration of the forbearance deadline, McDermott continues to engage in constructive conversations with holders of the Senior Notes***," but failed to disclose that the prepackaged bankruptcy was to be filed just days later.

450. The foregoing misstatements and omissions made during the four-month period after the September 2019 trading halt – on September 20, 2019, October 21, 2019, November 4, 2019, December 2, 2019, December 13, 2019, and January 15, 2020 – along with the earlier-pled misstatements and omissions in the Technology Business Fraud (CCAC §V.F.2.) and Capital Structure / Liquidity Fraud (CCAC §V.F.3.), were part of a continuous fraud and were materially false or misleading because Defendants did not (and could not) plan to sell Lummus timely enough to bolster McDermott's capital structure and liquidity, stave off its bankruptcy, and preserve shareholder equity, since its financial situation was so dire that the only option was bridge financing from secured creditors as a prelude to a prepackaged bankruptcy and restructuring. Instead, Defendants' misstatements and omissions merely countered negative leaks and news to buoy the stock price while buying themselves time to prepare and execute a pre-packaged bankruptcy restructuring plan that would enrich themselves while eviscerating common stockholders, as discussed below. There is ample evidence, starting by no later the hiring of AlixPartners, which leaked on September 18, 2019, if not earlier, as alleged in CCAC ¶¶14, 320-321, that McDermott's financial situation was unresolvable outside of bankruptcy, even with any potential Lummus sale, such that Defendants focused on securing necessary bridge

financing to permit pursuit of a planned, prepackaged Chapter 11 bankruptcy and restructuring, with such evidence including, *inter alia*:

(a) John R. Castellano, AlixPartners Managing Director and McDermott's Chief Transformation Officer as a condition of the Superpriority Credit Agreement, submitted a January 22, 2020, declaration in McDermott's bankruptcy, which he called a "massively consensual prepackaged restructuring," making clear that McDermott's use for AlixPartners shifted "almost immediately" to contingency planning for a comprehensive restructuring, while it announced a purported Lummus sale to calm investors and vendors. He stated, in relevant part:

> In early September 2019, AlixPartners was retained by McDermott to assist with liquidity management and review certain construction projects that were incurring significant losses and determine the impact of such losses on McDermott's business plan. ***Almost immediately, McDermott asked AlixPartners to pivot to contingency planning***, as it became clear that liquidity was an acute issue. ***My personal involvement began*** *thereafter* ***in late September because McDermott potentially needed an officer to help lead a comprehensive restructuring***. At that time, McDermott's efforts to raise additional liquidity through a sale of its "Tank" and Pipe Fabrication assets or a junior capital raise were faltering, and McDermott's vendor base was beginning to resist efforts to further stretch account payable balances. While McDermott had significant amounts of cash on their balance sheet, much was trapped within McDermott's joint venture operations. This created an acute liquidity crisis.
>
> ***On September 18, 2019, news leaked that McDermott had engaged AlixPartners.*** The market reacted swiftly, with shares plunging over 60%. ***McDermott had to calm the markets and its increasingly agitated vendor base. Two days later, McDermott announced its plan to market and sell the "Tech" asset***, a process McDermott had previously contemplated. The market welcomed the news of the sale, and McDermott's shares rose approximately 50% the following day. During that period, ***McDermott even received an unsolicited offer for the Tech asset in excess of $2.5 billion***.

> At that point, a freefall chapter 11 filing would have been disastrous to McDermott's business …. Filing without a plan would have risked already-strained vendor and customer relationships, made it virtually impossible for McDermott to win additional work, and prompted customers to draw on their letters of credit. It was becoming clear that McDermott's secured lenders were the only viable source of "emergency" capital; accordingly, ***McDermott promptly engaged in negotiations on a potential superpriority financing facility***.

(b) Mr. Castellano's January 22, 2020, declaration also made clear that even as Defendants made public reassurances outlined above, they privately worked to secure lending from their McDermott's secured creditors in a planned Chapter 11 proceeding:

> Initially, the secured lenders resisted McDermott's requests for additional capital. … ***Over a few week period in October, McDermott provided a flurry of diligence, conducted many multi-day in-person meetings and negotiation sessions in New York, and started to document the structure for a superpriority financing facility*** that would allow sufficient time to explore consensual restructuring alternatives. The secured lenders ultimately supported such a superpriority financing facility.

(c) Mr. Castellano testified at a March 12, 2020, bankruptcy proceeding hearing that it was apparent in September 2019 that bankruptcy was the only viable path forward:

> *Castellano*: … [I]t became very apparent that the company needed to turn to contingency planning, and they were going to request the need for an officer to help lead the restructuring process. So, ***starting in late September 2019****, I began working with the Company, the management team, Kirkland – Kirkland & Ellis, Evercore, and then all of the financial and legal advisors of the three constituents that* ***we were negotiating a – hopefully to negotiate a plan – a consensual plan of reorganization****.*

(d) During the same proceeding, Mr. Castellano also explained McDermott's "impossible" liquidity problems, which extended to over 10,000 unpaid vendors necessary for continued work on the Focus Projects and other large-scale projects:

> *Question:* When AlixPartners got involved, what did you observe was causing the company's liquidity challenges?

> *Castellano*: There was a number of issues. When we joined, it was clear that there were needs for liquidity. … We were involved with trying to understand exactly what the best path is to assist on a short-term basis. And the liquidity challenges really impacted the company's vendor base. ***They had to significantly stretch payment terms to vendors, which are critical to the company's day-to-day operations, roughly over 10,000 vendors***, global in nature, many of them very local to individual projects. ***And the ability to continue to maintain its business yet stretch its vendor base really became – really became just impossible*** for the company to deal with.

(e) Mr. Castellano further explained that AlixPartners and McDermott "quickly" focused on securing bridge financing to permit the preparation of a bankruptcy plan, conceding that there were no other options to a restructuring:

> *Question*: [O]nce AlixPartners got involved, what other options did the company consider pursuing?
>
> *Castellano*: Yes. So we quickly noted that ***being able to stretch the vendor base*** while we were trying to figure out what the path forward ***was*****…** ***virtually impossible***. We quickly worked with the company and its advisors, realizing that the only lenders that could provide some form of ***bridge financing***, which we felt was the right solution, as opposed to trying to file Chapter 11 on a very immediate basis to obtain debtor in possession financing without a plan, we realized that we needed to work with our existing lender base, because that ***was really the only option the company had***. And ***we began embarking on that process***, effectively, ***towards the end of September***. …
>
> [F]rom that point in time, we were able to educate the lenders that a consensual path forward would be the best option to maximize value for all the constituents, recognizing that ***the situation was very dire***. While – our existing secured lenders were reluctant initially, but ***we were able to go through a significant amount of diligence in a very short period of time, which led to the bridge financing, which we closed on October 21st, 2019***.
>
> *Question*: Once the bridge financing was in hand, did the debtors have any viable alternatives to Chapter 11?
>
> *Castellano*: … ***[T]here really weren't any other options at all, other than restructuring***.

(f) Defendant Dickson's bankruptcy declaration, which said that "***McDermott and [its] advisors ha[d] engaged in months of nearly around-the-clock negotiations with all of [its] stakeholders regarding the terms of a restructuring transaction***," corroborated Mr. Castellano's account and its timeline, for instance when he stated:

> ***In late September 2019, we were running out of cash***. ***It became clear that***… ***the company remained over-leveraged and could not continue running its business and servicing its debt***. As a first step, ***to avoid liquidating the company***, ***we obtained*** on an emergency basis a significant liquidity infusion through ***a superpriority financing facility***. ***We received the first tranche***…***on October 21, 2019***, and took advantage of the additional time to reassess our operations and financial condition.

(g) McDermott's counsel also corroborated the developments and timeline in September and October 2019, stating in relevant part:

> ***[I]n September of 2019***…, the company had recently hired Evercore, AlixPartners, and Kirkland ***to assist with these restructuring efforts***. … And then, …there were leaks and there were continued strains on the company's liquidity position. And both the equity and the debt quickly traded off and it became apparent that ***a second lien would not be able to be raised***. And so, … ***Plan Z* [(the Contingency Plan)] *became Plan A***.
>
> ***The company had an urgent need for liquidity in late September*** and we did a few things. *First, we tried to help organize our secured creditors and our unsecured creditors*, and they did in fact organize… [in] an incredibly complex capital structure…[with] three groups. There was the term loan lender group…. There was the LC lenders/revolving lenders, and that's the Linklaters and Bracewell group of banks. … And then there were the bond holder group…. So we organized our creditors and we quickly said, we're running out of cash. We need an infusion of liquidity. And they said, well, ***why shouldn't we do this through Chapter 11.***

(h) Significantly, the evidence is clear that by the fall of 2019, not only was Lummus unable to be further integrated into a financially solvent McDermott, its sale also

could not be effectuated soon enough to stave off the company's bankruptcy. For instance, Mr. Castellano stated in his bankruptcy declaration:

> [A]fter exploring ***the available offers to consummate the [Lummus] Sale***, McDermott realized that [they] ***would not fully address McDermott's immediate liquidity needs***. Based on the actionable offers received, ***any proceeds*** that would have a material effect on McDermott's operations ***would not be realized until up to six months after*** the closing of any out-of-court sale. Further, while a 100 percent sale of the Technology Business would fully repay the Superpriority Financing…, absent a comprehensive balance sheet solution, ***the pro forma business would retain significant challenges***, including: (i) unsustainably high leverage remaining following the sale, (ii) the failure of the sale to alleviate McDermott's unfunded credit requirements…, (iii) increased future LC needs as existing letters of credit under the Superpriority Facility roll off…, (iv) the lack of significant, and much needed, liquidity, as any sale proceeds would be required to pay down funded debt, and (v) the failure of the sale to alleviate McDermott's stretched vendor base. … McDermott and its advisors … concluded that ***an emergency injection of liquidity on a superpriority basis was necessary to stem the accumulation of trade claims and bridge to an in-court process***….

(i) McDermott's bankruptcy filings also made clear that the purported Lummus sales transaction process in the Superpriority Credit Agreement, unbeknownst to investors, was proceeding only as part of a bankruptcy restructuring effort. For instance, motion papers seeking bankruptcy court approval for the Lummus sale stated:

> Beginning in late September 2019, [McDermott] commenced a two-phase marketing process to ensure the sale of [Lummus] would be on the highest and best terms available. During Phase I, [McDermott's] proposed financial advisor, Evercore L.L.P., interacted with 58 potential buyers, including 34 financial investors and 24 strategic investors. Of the potential buyers contacted, 28 executed non-disclosure agreements and were provided with a first round due diligence package which included the Confidential Information Memorandum, third-party commercial and financial diligence reports and access to a secure data room. … Pursuant to Phase I, [McDermott] received 14 bids from potential purchasers (7 financial bids and 7 strategic bids), including one bid that was received late during Phase II.

> ***As discussions with [McDermott's] key stakeholders progressed and it became clear a sale of [Lummus] would be a key component of any restructuring, [McDermott] determined to select a potential buyer to act as a stalking horse bidder and consummate the sale in a chapter 11 case***. To facilitate a potential stalking horse bid, [McDermott] distributed a Phase II process letter to 7 potential purchasers and conducted further, in-depth diligence with the potential purchasers. Phase II ultimately culminated, on December 16, 2019, in 5 potential purchasers submitting refined bids, each of which indicated an interest in serving as a stalking horse bidder in a Chapter 11 sale process. …

(j) Moreover, Mr. Castellano's bankruptcy declaration made clear that McDermott's ability to access funds under the Superpriority Credit Agreement was curtailed by its lenders by December 1, 2019, the day before McDermott announced its accessing Tranche B funds, thus formally precluding any ability to fund operations long enough that Lummus could be sold outside of a restructuring proceeding, when he stated:

> ***In connection with this [Tranche B] funding, the secured lenders stated that they did not expect to fund any additional amounts on an out-of-court basis. As such, McDermott's liquidity would drive the timing of any potential chapter 11 filing***.
>
> ***McDermott told prospective purchasers of [Lummus] that the purchase was to be consummated as part of a chapter 11 process***, and provided clear milestones for the marketing process with the aim of achieving a signed "stalking horse" purchaser by the time McDermott would need to seek chapter 11 relief.

## V. ADDITIONAL PARTIAL CORRECTIVE DISCLOSURES

451. The CCAC's section captioned Partial Corrective Disclosures Incrementally Revealed the Frauds (CCAC §V.F.4.) is hereby supplemented as follows.

452. On November 4, 2019, McDermott filed the Q3 2019 10-Q with the SEC after hours, which for the first time disclosed that the ***SEC had launched an investigation*** into "disclosures [McDermott] made concerning the reporting of projected losses

associated with the Cameron LNG project" by letter dated ***July 26, 2019*** – three and one-half months earlier. McDermott added, "We have been and intend to continue cooperating with the SEC in this investigation, including by ***producing documents requested by the SEC***." The Q3 2019 10-Q offered no explanation for the delay in disclosing this investigation or McDermott's cooperation. The next day, November 5, 2019, McDermott abruptly announced Defendant Spence's resignation via a Form 8-K filed with the SEC, as detailed below.

453. On this news, McDermott's stock dropped $0.11 (-6.35%) to close at $1.62 the next trading day, November 5, 2019.

454. On January 21, 2020, before the market open, McDermott issued a press release ("1/21/20 Press Release) filed with the SEC as Exhibit 99.1 to a Form 8-K ("1/21/2020 Form 8-K"), announcing its entry into a Restructuring Support Agreement in connection with a Joint Prepackaged Chapter 11 Plan of Reorganization. Boiled down, the 1/21/2020 Press Release abruptly disclosed that Lummus was being sold for $2.725 billion, but the proceeds would protect only McDermott's debt creditors, nearly all of whom would be equitized, while ***McDermott's common stockholders*** – the Class members at issue in this lawsuit – ***would be wiped out***, as its shares would be delisted from the NYSE and cancelled as part of the restructuring. The 1/21/20 Press Release provided more detail, in relevant part, as follows.

(a) The 1/21/2020 Press Release described the overarching Chapter 11 restructuring transaction terms and vote solicitation process:

McDermott International, Inc. (NYSE: MDR) ("McDermott") today announced that it has the support of more than two-thirds of all its funded debt creditors for ***a restructuring transaction that will equitize nearly all the Company's funded debt***, eliminating over $4.6 billion of debt.

***The restructuring transaction will be implemented through a prepackaged Chapter 11 process*** that will be financed by a debtor-in-possession ("DIP") financing facility of $2.81 billion. Subject to court approval, McDermott expects the DIP financing, combined with cash generated by McDermott, to enable the Company to stabilize its cash flows, continue operating in the normal course and fulfill its commitments to key stakeholders, including customers, suppliers, joint-venture partners, business partners and employees.

The Company also has secured committed exit financing of over $2.4 billion in letter of credit facility capacity and will emerge from Chapter 11 with approximately $500 million in funded debt. The restructuring transaction will strengthen the Company's balance sheet, normalize its trade debt, and position the Company for long-term growth.

****

This morning, the Company commenced solicitation of votes from its lenders and bondholders in support of a prepackaged Chapter 11 Plan of Reorganization ("the Plan"). The Company intends to commence the prepackaged Chapter 11 filing in the U.S. Bankruptcy Court for the Southern District of Texas ("the Court") later today. The Company's support from all of its creditor constituencies is memorialized in a Restructuring Support Agreement. The Company plans to move swiftly toward Court approval of the Plan, with confirmation expected within approximately two months from filing.

(b) The 1/21/2020 Press Release disclosed that McDermott had agreed to sell Lummus and disclosed how the proceeds would be used:

As part of the restructuring transaction, subsidiaries of McDermott have entered into a share and asset purchase agreement (the "Agreement") with a joint partnership between The Chatterjee Group and Rhône Group (the "Joint Partnership") pursuant to which the Joint Partnership will serve as the "stalking-horse bidder" in a court-supervised ***sale process for Lummus Technology***.

> Under the terms of the Agreement, the Joint Partnership has agreed, and is committed, to acquire Lummus Technology for ***a base purchase price of $2.725 billion***. McDermott will have the option to retain or purchase, as applicable, a 10 percent common equity ownership interest in the entity purchasing Lummus Technology. McDermott expects to hold an auction in approximately 45 days to solicit higher or better bids for the Lummus Technology business. Either the Joint Partnership or the winning bidder at the auction will purchase Lummus Technology as part of the Chapter 11 process, subject to regulatory and court approval.
>
> ***Proceeds from the sale of Lummus Technology are expected to repay the DIP financing in full, as well as fund emergence costs and provide cash to the balance sheet for long-term liquidity.***

(c) The 1/21/2020 Press Release quoted Defendant Dickson, who tried to put a positive spin on the bankruptcy announcement, while finally admitting that both a Lummus sale and a Chapter 11 bankruptcy restructuring were necessary to "create a sustainable capital structure" and provide "robust liquidity and significant financing to execute on customer projects in our backlog," when he stated in relevant part:

> The restructuring transaction, which has the full support from all of our funded creditors, including our unsecured bondholders, is further recognition of McDermott's fundamentally solid operating business and proven strategy… Our record backlog, the majority of which has been booked in the last two years, and high rate of new project awards demonstrates our customers' continued confidence in our business, the demand for our skills and our long-term opportunities ahead.
>
> ***This financial restructuring will create a sustainable capital structure*** that matches the strength of our operating business. As a result of the transaction, we are eliminating over $4.6 billion in debt from our balance sheet ***and we will emerge with robust liquidity and significant financing to execute on customer projects in our backlog***. Throughout this process, which we expect to complete expeditiously, McDermott will continue all business operations as normal and deliver on our commitments to our customers.

(d) However, the 1/21/2020 Press Release also disclosed that McDermott's common stockholders would be completely wiped out by the bankruptcy:

> ***As a result of the upcoming Chapter 11 filing, McDermott expects to be delisted from the New York Stock Exchange within the next 10 days.*** McDermott common stock will continue to trade in the over-the-counter marketplace throughout the pendency of the Chapter 11 process. ***The shares are proposed to be cancelled as part of McDermott's restructuring.***

455. This shocking revelation caused trading of McDermott common stock to halt pre-market – the second trading halt of the §10(b) Class Period, the first having occurred back in September 2019, when news of McDermott's hiring turnaround firm AlixPartners LLP leaked, pushed its stock price down 49%, and prompted McDermott to ***deny*** any impending bankruptcy (*see* CCAC ¶¶321-322).

456. On January 22, 2020, McDermott filed with the SEC a Form 8-K ("1/22/2020 Form 8-K") that, *inter alia*, further discussed the terms of McDermott's restructuring transaction, confirmed that the bankruptcy had been filed the day before, and stated that the debtor-in-possession lenders had a first priority pledge of 100% of the stock and other equity interests in each of McDermott's direct and indirect subsidiaries. The same day, Defendants filed their Suggestion of Bankruptcy (Dkt. No. 120) in this proceeding, after missing their deadline to file the motion to dismiss the CCAC.

457. On January 23, 2020, McDermott filed with the SEC a Form 8-K ("1/23/2020 Form 8-K") confirming the bankruptcy filing and disclosing that the NYSE had notified McDermott on January 22, 2020, that the NYSE had determined as a result of the Chapter 11 cases to commence proceedings to delist McDermott's common stock and had indefinitely suspended trading of McDermott's common stock.

458. Trading did not resume until January 23, 2020. That day, McDermott common stock opened at $0.25 per share (down from its January 17, 2020, closing price of $0.70 per share), hit an intra-day low of $0.14, and closed at $0.12 per share, a nearly 83% decline from its closing price on January 17, 2021, the most recent trading day.

459. These revelations and correlating stock drops partially corrected the Defendants' fraud, both as originally pled in the CCAC and as pled through the expanded allegations herein.

## VI. ADDITIONAL SCIENTER ALLEGATIONS

460. This Court already ruled that the CCAC adequately pled that Defendants Dickson and Spence acted with scienter during the Class Period as alleged in the CCAC, spanning the 20-month time period from December 18, 2017, to September 17, 2019, inclusive. *See* Dkt. No. 168 at 20-22; 2021 WL 1421609 at *9. The time extension pled herein seamlessly expands the Class Period by just four more months, causing it to end on January 23, 2020, instead of September 17, 2019. Defendants cannot credibly argue that the circumstances of their scienter abruptly ceased on September 17, 2019 and failed to carry over to the ***next day***. Indeed, the expanded time period gives rise to pertinent additional facts that, when viewed holistically with the CCAC's robust 42-page scienter section (CCAC §V.G.), as required by *Tellabs, Inc. v. Makor Issues and Rights, Ltd.*, 551 U.S. 322 (2007) and its progeny, further cement the already strong and Court-validated pled inference of Defendants' scienter. In this context, the CCAC's Additional Facts Probative Of Scienter section (CCAC §V.G.) is hereby supplemented as follows.

### A. Defendants Dickson & Spence Were Further Financially Motivated To Continue Committing Fraud

461. As alleged in CCAC §V.G.2., which is hereby supplemented, Defendants Dickson and Spence had significant personal financial motivations, unique to them, to disregard McDermott's due diligence findings, to proceed with the substantially risker-than-disclosed Merger, to misrepresent the gravity of McDermott's post-Merger financial distress and liquidity crisis, to misstate the prospects for integrating Lummus or selling it to shore up McDermott's capital structure and stave off bankruptcy, and otherwise to engage in the securities fraud alleged in the CCAC and herein.

*Defendants Dickson & Spence Were Motivated To Commit Fraud By Compensation Increases Tied To The Bankruptcy*

462. The Court already ruled that Defendant Dickson's and Defendant Spence's insider sales from earlier in the Class Period, as alleged in CCAC ¶¶373-376, added to a strong inference of Defendants' scienter. *See* Dkt. No. 168 at 22; 2021 WL 1421609 at *9. Defendant Dickson remained at McDermott and continued selling McDermott stock into March 2020, including sales of 680,936 shares on March 5-6, 2020.

463. Both Dickson and Spence also benefitted from suspicious bonus compensation during the expanded Class Period, as McDermott careened toward an undisclosed pre-packaged bankruptcy, which likewise supports a strong scienter inference. As admitted by the 10/21/2019 8-K, McDermott's Board approved a Retention Bonus Award Agreement on October 17, 2019, in connection with McDermott's entry into the Superpriority Credit Agreement, whereby Defendants Dickson and Spence received massive cash retention bonuses: ***$3.375 million for Defendant Dickson*** and ***$1.3 million***

***for Defendant Spence***. One-third of the retention bonuses were ***payable immediately***, on the effective date of the Retention Bonus Award Agreement, while the other two-thirds were payable in equal amounts on the Tranche B and Tranche C funding dates. Thus, while analysts and investors were being misled by Defendants' misstatements in the 10/21/2019 8-K and 10/21/2019 Press Release and kept in the dark about McDermott's imminent bankruptcy, ***Defendants Dickson and Spence had already pocketed $1.125 million and $433,333***, respectively. The executive retention bonuses were authorized to be fully paid upon the bankruptcy petition's filing, despite Tranche C funding having not been obtained, and early in the bankruptcy, McDermott sought and obtained bankruptcy court approval for an executive retention plan that would pay Dickson up to $12.6 million more. The Court has already ruled that Dickson's and Spence's similar Merger-related retention bonuses and base pay increases from earlier in the Class Period, as alleged in CCAC ¶¶370-372, added to a strong inference of Defendants' scienter. *See* Dkt. No. 168 at 22; 2021 WL 1421609 at *9.

*Defendant Dickson Was Motivated To Commit Fraud*
*By Gaining An Equity Stake In The Reorganized Company*

464. The Management Incentive Plan in the bankruptcy Plan of Reorganization left McDermott management with a significant equity stake in the reorganized company, even as its common stockholders were wiped out. In relevant part, it provided, "Effective on the Effective Date, the Reorganized Debtors will reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciation rights or any

combination thereof…for grant to management employees and members of the New Board….” It added, “The New Board shall grant no less than 53.33% of the MIP Pool [reserve] to the employees of the Debtors no later than 60 days following the Effective Date…and the remainder of the MIP Pool will be available for future grants to management employees and members of the New Board with allocations with allocations, terms and conditions to be determined by the New Board.”

465. By denying McDermott would seek Chapter 11 reorganization in late September 2019 and thereafter committing the continuing fraud as alleged herein, Defendants forestalled scrutiny of McDermott’s potential bankruptcy terms until it was filed as a prepackaged *fait accompli*. In contrast to the lavish equity stake Defendants created for themselves during this period, McDermott’s restructuring plan, which was later approved by the bankruptcy court in March 2020, provided for “cancellation of all existing preferred and common equity interests.”

**B. Defendants Dickson And Spence Belatedly Disclosed An SEC Investigation While Engaging In Insider Trading**

466. McDermott’s Q3 2019 Form 10-Q, filed on November 4, 2019, disclosed ***for the first time***, that the SEC had notified it by letter on July 26, 2019 – ***four months prior*** – that “***it is conducting an investigation related to disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project***." The Court has already ruled that this disclosure delay while Defendants Dickson and Spence engaged in insider trading, which the Court considered on judicial notice in

resolving Defendants' motion to dismiss the CCAC, added to a strong inference of Defendants' scienter. *See* Dkt. No. 168 at 22; 2021 WL 1421609 at *9.

### C. Defendant Spence's Suspicious Resignation And Lavish Severance Package Evidence Scienter

467. On November 5, 2019, at the height of the fraud and just ***one day*** after McDermott both announced a ***Q3 2019 net loss of $1.9 billion and operating loss of $1.7 billion*** and finally disclosed ***the SEC subpoena it had received back in July 2019***, McDermott issued a press release ("11/5/2019 Press Release"), filed with the SEC that day as an exhibit to a Form 8-K ("11/5/2019 Form 8-K"), announcing that Defendant Spence was resigning as its CFO. The only explanation given for his suspicious resignation, deemed effective November 4, 2019, which followed shortly after his widespread and suspicious insider trading as alleged in CCAC ¶¶373-376 and his October 2019 retention bonus payment as alleged *supra*, was that Defendant Spence was resigning "to pursue other opportunities."

468. McDermott's Form 8-K filed with the SEC on November 13, 2019 ("11/13/2019 Form 8-K") disclosed the lavish terms of Defendant Spence's Separation Agreement, deemed effective November 6, 2019, including, *inter alia*: (a) a massive ***$866,666.67 lump-sum payment***; (b) ***accelerated vesting and settlement by no later than March 15, 2020 of all RSUs*** that would have vested by March 1, 2022; (c) ***immediate vesting and payment of all unvested executive compensation plan benefits***; (d) funds to cover six months of continuing health insurance; and (e) accrued, unused vacation pay.

469. Spence's suspiciously timed resignation, as McDermott's undisclosed prepackaged bankruptcy planning was at an advanced stage, and his accompanying lavish severance package, as McDermott's common stockholders faced imminent extinguishment through its forthcoming bankruptcy, support a strong scienter inference.

### D. Delayed Disclosure Of A Criminal Investigation Evidences Scienter

470. On May 8, 2020, McDermott filed a Form 10-Q with the SEC for Q1 2020 ("Q1 2020 10-Q"), which was SOX certified by Dickson, disclosing that McDermott had received a notice from the U.S. Attorney for the Southern District of Texas that a Federal Grand Jury is investigating its handling of the Cameron LNG project and requesting documents, including the forecasts at issue in this lawsuit. The Q1 2020 10-Q admitted that McDermott had been so notified ***two and one-half months*** earlier, by a letter dated February 25, 2020, which transmitted a subpoena. The Grand Jury investigation, and McDermott's delay in disclosing it, further evidence Defendants' scienter.

## VII. ADDITIONAL LOSS CAUSATION / ECONOMIC LOSS ALLEGATIONS

471. The loss causation/economic loss allegations in CCAC §VIII, including CCAC ¶405, are supplemented so that the list of partial corrective disclosure dates previously pled (October 30, 2018, February 13, 2019, July 29, 2019, and September 18, 2019) is expanded to also include November 4-5, 2019, and January 21-23, 2020.

## VIII. EXPANDED CLAIMS FOR RELIEF

472. The Claims For Relief in CCAC §XI. are hereby supplemented as follows.

473. Count I (Against All Defendants For Violations Of Exchange Act Section 10(b) And Rule 10b-5 Promulgated Thereunder), pled in CCAC ¶¶419-429, is

supplemented, expanded, restated, and reasserted herein, by repeating and realleging each and every allegation contained in the CCAC and herein as if fully set forth within Count I, by supplementing and expanding the §10(b) Class Period at issue in Count I to align with the expanded §10(b) Class Period alleged herein above, and by supplementing the allegations in Count I regarding the required elements of a §10(b) claim, including without limitation falsity, scienter, and loss causation, so as to be based on both the allegations of the CCAC and those pled herein.

474. Count II (Against The Individual Defendants For Violations Of Section 20(a) Of The Exchange Act), pled in CCAC ¶¶430-435, is supplemented, expanded, restated, and reasserted herein, by repeating and realleging each and every allegation contained in the CCAC and herein as if fully set forth within Count II, by supplementing and expanding the §10(b) Class Period at issue in Count II to align with the expanded §10(b) Class Period alleged herein above, and by supplementing the allegations in Count II regarding the required elements of a §20(a) claim, so as to be based on both the allegations of the CCAC and those pled herein.

Dated: July 15, 2026,

Respectfully submitted,

**POMERANTZ LLP**

*<u>/s/Matthew L. Tuccillo</u>*
Matthew L. Tuccillo, Attorney in Charge
(S.D. Tex. Federal Bar Number 1467939)
Jeremy A. Lieberman
(S.D. Tex. Federal Bar Number 1466757)
Jennifer Banners Sobers (*Pro Hac Vice*)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100

Facsimile: (212) 661-8665
Email: jalieberman@pomlaw.com
Email: mltuccillo@pomlaw.com
Email: jbsobers@pomlaw.com

*Counsel for §10(b) CBI Subclass Lead Plaintiff Nova Scotia Health Employees' Pension Plan and Lead Counsel for the §10(b) CBI Subclass*

**THE BRISCOE LAW FIRM, PLLC**

*/s/Willie C. Briscoe*
Willie C. Briscoe
Texas Bar No.: 24001788
Southern District No.: 25157
1980 Park Oak Blvd.
Houston, TX 77056
Telephone: 713-752-2600
Facsimile: 832-201-9950
wbriscoe@thebriscoelawfirm.com

*Additional and Local Counsel for §10(b) CBI Subclass Lead Plaintiff Nova Scotia Health Employees' Pension Plan and Liaison Counsel for the §10(b) CBI Subclass*

## PART 3: AMENDMENT ON BEHALF OF THE §10(B) MDR SUBCLASS TO COMBINED PLEADINGS AT ECF 105 (CLASS ACTION COMPLAINT) AND ECF 220 (SUPPLEMENT)

Christopher Coligado, Lead Plaintiff of the §10(b) MDR Subclass, individually and on behalf of all other persons similarly situated within the §10(b) MDR Subclass, by his undersigned attorneys, respectfully amends the pleadings by adding the following allegations:[8]

## I. ADDITIONAL NATURE OF THE ACTION ALLEGATIONS (CCAC §I)

475. From September 2019 through the end of the 10(b) Class Period, Defendants engaged in a scheme to deceive the investing marketplace about McDermott's true financial condition, artificially inflate the market price of McDermott common stock, and induce Coligado and members of the putative §10(b) MDR Subclass (*see* CCAC ¶411(b)) to purchase McDermott common stock at such artificially inflated prices. In furtherance of the scheme, Defendants knowingly or recklessly made, and caused McDermott to make materially false and misleading statements and/or omit material facts regarding a strategic alternatives process for Lummus and use proceeds from any transaction to strengthen McDermott's balance sheet. Defendants made the statements, knowing of their falsity, to counter, reverse, and/or mitigate declines in McDermott's stock price following a news leak regarding McDermott's retention of a turnaround consulting firm that threatened plans for a consensual reorganization, and avoid a freefall Chapter 11 bankruptcy filing that would likely result in the liquidation of McDermott.

[8] All capitalized terms herein are defined in the Class Action Complaint (ECF 105) unless otherwise indicated.

476. Lummus was McDermott's crown jewel and the centerpiece of its overall restructuring strategy. It provided the only path for McDermott's lenders to inject desperately needed liquidity outside of the protection of a Chapter 11 filing. Moreover, Defendants knew that an out-of-court sale of Lummus would neither timely nor fully address McDermott's immediate liquidity needs. Because an emergency injection of liquidity was critical to stabilize McDermott's operations and afford it time to negotiate a consensual Chapter 11 plan of reorganization, there was never any real intention for McDermott to execute on the stated plan to use the proceeds from an out-of-court sale of Lummus to strengthen its balance sheet and thereby maximize shareholder value. Defendants' false or misleading statements or omissions served to buy themselves time to negotiate for and execute upon the intended consensual Chapter 11 reorganization.

477. After months of stringing investors along with misrepresentations that McDermott was continuing to pursue the previously announced strategic alternatives process for Lummus as part of a long-term balance sheet solution to right the ship, on January 21, 2020, Defendants authorized the filing of a Chapter 11 petition on behalf of McDermott following the approval and entry of a restructuring support agreement that was not presented to shareholders. Defendants then caused McDermott to publicly disclose facts establishing that they knew by September 2019, at the latest, that McDermott's acute liquidity problems were impossible to resolve outside of a Chapter 11 process.

478. Pursuant to the Chapter 11 plan of reorganization, McDermott would eliminate over $4.6 billion in debt from its balance sheet, with secured lenders receiving an initial 94% of all of McDermott's new equity, and the rest of the equity ultimately going

to management, including Defendant Dickson. The proceeds from the eventual sale of Lummus, which Defendants falsely represented to investors would be used to strengthen McDermott's balance sheet, were instead used to finance the Chapter 11 debtor-in-possession facility and fund emergence costs.

## II. ADDITIONAL PARTIES ALLEGATIONS (CCAC §III)

479. Defendant Dickson resigned from his positions at McDermott as President, CEO, and Board of Directors member in June 2021.

480. Pursuant to McDermott's Annual Report on Form 10-K/A for the fiscal year ended December 31, 2019 (filed with the SEC on April 24, 2020) ("2019 Annual Report"), Dickson's 2019 base salary was $1,125,000, and 2019 total compensation was $12,406,571. Dickson also obtained a $3.375 million retention bonus ($2,250,000 of which is reflected in his total compensation for 2019) in connection with the bridge loan secured by McDermott in October 2019.

481. Defendant Spence resigned from his positions at McDermott as Executive Vice President and CFO in November 2019. As CFO, Spence was responsible for, supervised, oversaw, and had ultimate authority over the preparation of the financial information incorporated in the Company's public filings and press releases during that time, including information regarding the Company's liquidity state.

482. According to the 2019 Annual Report, Spence's 2019 base salary was $546,591, and 2019 total compensation was $4,302,027. Spence resigned from McDermott following the announcement of its third quarter 2019 earnings and belated disclosure of an SEC investigation and subpoena received in July 2019. Spence obtained severance of over

$866,667.67 consisting of the remainder of his retention bonus ($433,333 of which is reflected in his total compensation for 2019) in connection with the bridge loan secured by McDermott in October 2019.

483. Defendants: (a) directly participated in the management of McDermott; (b) were directly involved in the day-to-day operations of McDermott at the highest levels; (c) were privy to confidential, proprietary information concerning McDermott and its business and operations; (d) were directly or indirectly involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein; (e) were directly or indirectly involved in the oversight or implementation of the Company's internal controls; (f) were aware of or recklessly disregarded the fact that false and misleading statements were being issued concerning McDermott during the Class Period; and/or (g) approved or ratified these statements in violation of the federal securities laws.

484. As members of the management team at McDermott, Defendants directly participated with McDermott's financial and legal advisors in the day-to-day planning and execution of the prepackaged Chapter 11 filing and, thus, possessed contemporaneous knowledge of the facts alleged herein. Defendants also had motive and opportunity as they directly benefited from the misrepresentations and omissions identified herein and were able to enrich themselves as a result thereof.

## III. ADDITIONAL SUBSTANTIVE ALLEGATIONS (CCAC §V.A.-V.E.)

485. As disclosed in its 2020 bankruptcy proceeding (*In re McDermott International, Inc.*, No. 20-30336 (S.D. Tex. Bankr., Houston Div.) (the "Bankruptcy

Proceeding")), McDermott's $595 million accumulated accounts payable balance outstanding to vendors in January 2019 ballooned to $1 billion by September 2019.[9] Efforts for a near-term sale of McDermott's storage tank and U.S. pipe fabrication businesses for proceeds in excess of $1 billion, originally planned to close in Q3 2019, were brief and unsuccessful.[10] McDermott was forced to look elsewhere for needed liquidity.

486. In August 2019, McDermott engaged Evercore LLP ("Evercore') to explore the possibility of raising a second lien financing facility.[11] Evercore quickly determined, however, that there was no ability to obtain financing on this basis either. Without an ability to obtain financing to operate the business moving forward, McDermott requested its advisors to pivot to contingency planning.[12]

487. McDermott retained turnaround consulting firm AlixPartners in early September 2019 to assist with liquidity management. Almost immediately, McDermott asked AlixPartners to also focus on contingency planning.[13] AlixPartners Managing Director and McDermott Chief Transformation Officer John R. Castellano testified that *in* late September 2019, "[he] began working with [McDermott], ***the management team*** …

---

9 *See* January 22, 2020 Declaration of John R. Castellano, Chief Transformation Officer of McDermott International, Inc., in Support of Debtors' First Day Motions (Bankr. Proc. Dkt. No. 62) ("Castellano Decl."), ¶ 78; January 23, 2020 Transcript of First Day Proceedings (Bankr. Proc. Dkt. No. 213) ("Jan. 23 Tr.") at 38:21-39:1.

10 *See* Castellano Decl., ¶¶ 77, 79; Jan. 23 Tr. at 39:2-10.

11 *See* Jan. 23 Tr. at 39:11-14; March 12, 2020 Transcript (Bankr. Proc. Dkt. No. 690) ("Mar. 12 Tr.") at 99:15-20, 100:3-6, 115:25-116:9

12 *See* Jan. 23, Tr. at 23:5-15, 39:15-23.

13 *Id*. at 79:13-19; Castellano Decl., ¶ 8.

Kirkland & Ellis [("Kirkland")], Evercore, and then all of the financial and legal advisors of the three constituents … *negotiating … **a consensual plan of reorganization**.*"[14]

488. On September 18, 2019, McDermott's acute liquidity problems worsened after the AlixPartners' retention leaked to the public.[15] *MarketWatch* reported that McDermott's stock price "plummeted 49% in morning trading" and volume "swelled to 17.9 million shares, compared with the full-day average of 7.5 million shares, prior to [a trading] halt. It also declared that "[t]he stock was the leading loser listed on the NYSE and was headed for the biggest one-day decline since [McDermott] went public in 1982 prior to the trading halt for news." Trading was halted for hours, followed by multiple restarts that eventually were aborted due to volatility.

489. McDermott's same day response to the leak was merely that it "routinely hires external advisors to evaluate opportunities the Company [and] … is taking positive and proactive measures, as [it] ha[s] done in the past, intended to improve its capital and the long-term health of its balance sheet." Later that day, *The Wall Street Journal* published an article confirming AlixPartners' retention.

490. On September 18, 2019, McDermott's stock price fell $3.72 on volume of 77.95 million shares, a 63.3% decline from its prior day's closing price of $5.88, to close at $2.16. On September 19, 2019, McDermott's stock price declined another 22.7% on volume of 81.35 million shares, to close at $1.67. The two-day decline of $4.21 represented a 71.6% drop in the stock price.

[14] Mar. 12 Tr. at 123:17-21 (emphasis added).

[15] *See* Jan. 23 Tr. at 40:1-2, 40:6-7.

491. Evercore Senior Managing Director Roopesh Shah testified that his company's engagement to raise financing was expanded to include bankruptcy analysis in September 2019 "after word leaked that [McDermott] had potentially retained restructuring professionals and *[McDermott's] securities all declined in price and vendors started pulling credit and liquidity got tighter* …."[16] Responding to a question regarding the reason for the engagement's addition of a bankruptcy analysis, Mr. Shah stated that McDermott's "***tenuous leverage and liquidity situation****, which* ***got further exacerbated by market movements*** … ***combined to form really a bad situation***."[17]

492. On September 20, 2019, to counter the negative pressure on its stock price following the news leak and avoid a freefall Chapter 11 filing, McDermott issued a press release before market open ("9/20/2019 Press Release") (see below) announcing: (a) its recent receipt of "unsolicited approaches to acquire all or part of Lummus … with a valuation exceeding $2.5 billion;" (b) " that it is exploring strategic alternatives to unlock the value of Lummus;" and (c) a "plan to use the proceeds from any transaction involving Lummus … to strengthen its balance sheet."

493. Demand for McDermott common stock spiked the price upward 50% in premarket trading and closed at $2.01 per share, up 27.22%. *Reuters* reported in a September 20, 2019 article that a Zephirin Group analyst said the offer is "salivating" and, if accepted, should allow the company to reduce leverage by about $1.2 billion. Credit

---

[16] Mar. 12 Tr. at 116:12-15 (emphasis added).

[17] *Id*. at 116:21-24 (emphasis added).

Suisse analysts, who called Lummus the "crown jewel of the company and its last resort," said the $2.5 billion valuation was reasonable and a sale could happen in early 2020.

494. In a declaration submitted under the penalty of perjury in the Bankruptcy Proceeding, Mr. Castellano disclosed Defendants' intent in issuing the 9/20/2019 Press Release. He explained that McDermott had to do something to assuage the markets and its vendor base after news leaked about AlixPartners' retention and McDermott's stock price dived by more than 60% or risk a potential freefall Chapter 11 filing. That "something" was the announcement in the 9/20/2019 Press Release of a plan to market and sell Lummus "to strengthen [McDermott's] balance sheet." Mr. Castellano also confirmed that the Lummus announcement "bolstered market confidence" and reversed the declines in the stock price.[18] With this immediate crisis averted, McDermott swiftly turned to negotiations for emergency financing as a bridge to a consensual Chapter 11 reorganization process:

> On September 18, 2019, news leaked that McDermott had engaged AlixPartners. The market reacted swiftly, with shares plunging over 60%. ***McDermott had to calm the markets and its increasingly agitated vendor base***. ***Two days later, McDermott announced its plan to market and sell [Lummus]***, a process McDermott had previously contemplated. The market welcomed the news of the sale, and McDermott's shares rose approximately 50% the following day. During that period, McDermott even received an unsolicited offer for the Tech asset in excess of $2.5 billion.
>
> ***At that point, a freefall chapter 11 filing would have been disastrous to McDermott's business*** …. To manage liquidity, McDermott had stretched its vendor base to unsustainable level …. Delays in settling obligations with vendors caused significant operational issues, in many cases bringing projects to a halt or severely impacting project schedules. Customers and key suppliers became dissatisfied, resulting in broad, compounding negative effects on McDermott's profitability, as project disruption and timeline extensions for completing projects resulted in increased carrying costs and a

[18] Castellano Decl., ¶¶ 9, 80.

delayed revenue realization. More fundamentally, McDermott's customers require certain vendors to work in certain regions and projects based on specific skill set and specialized service offerings. In many instances, McDermott's vendors have a direct line of communication to its customers. These vendors have communicated their displeasure with McDermott's payment practices, which has strained relations with the customer base.

***Filing without a plan would have risked already-strained vendor and customer relationships, made it virtually impossible for McDermott to win additional work, and prompted customers to draw on their letters of credit.*** *It was becoming clear that McDermott's secured lenders were the only viable source of "emergency" capital; accordingly, McDermott promptly engaged in negotiations on a potential superpriority financing facility.*

*Initially, the secured lenders resisted McDermott's requests for additional capital. They needed to understand for themselves* ***why filing for chapter 11 without a plan*** *would be hugely detrimental to the business.* ***Over a few week period in October, McDermott*** *provided a flurry of diligence, conducted many multi-day in-person meetings and negotiation sessions in New York, and* ***started to document the structure for a superpriority financing facility that would allow sufficient time to explore consensual restructuring alternatives****. The secured lenders ultimately supported such a superpriority financing facility.*[19]

495. On September 24, 2019, *Bloomberg* reported that McDermott was "seeking a bridge loan to help it cover a working-capital deficit of about $1.7 billion until it can sell an asset such as … Lummus …." It also reported that McDermott "confirmed it was working with Evercore to explore unsolicited interest in its Lummus [ ] business, with a valuation exceeding $2.5 billion."

496. According to Mr. Castellano, however, Defendants knew that a standalone sale of Lummus "*would not fully address McDermott's immediate liquidity needs*" and, based on the unsolicited offers already received, "any proceeds that would have a material effect on McDermott's operations would not be realized until up to six months *after the*

[19] Castellano Decl., ¶¶ 9-12 (emphasis added).

*closing of any out-of-court sale*."[20] Moreover, "absent a comprehensive balance sheet solution, the pro forma business would retain significant challenges."[21] As a result:

> ***McDermott and its advisors*** [(AlixPartners, Kirkland, and Evercore)], ***facing an acute liquidity need and concerns regarding maintenance with certain financing covenants, concluded that an emergency injection of liquidity on a superpriority basis was necessary to*** *stem the accumulation of trade claims and* ***bridge to an in-court process*** where McDermott could (i) deleverage its business, (ii) realize maximum value for [Lummus] (and other potential asset sales) and negotiate with all potential buyers from a position of strength, and (iii) obtain additional liquidity and LC support that would allow McDermott to execute on its Business Plan.[22]

497. In a declaration submitted under the penalty of perjury in the Bankruptcy Proceeding, Defendant Dickson admitted that McDermott's precarious financial condition in September 2019 was far more dire than disclosed and the critical need for emergency funding to avoid liquidation:

> ***In late September 2019, we were running out of cash***. It became clear that … the company remained over-leveraged and could not continue running its business and servicing its debt. *As a first step*, ***to avoid liquidating the company, we obtained*** *on an emergency basis a significant liquidity infusion through* ***a superpriority financing facility***.[23]

498. Testimony provided by Mr. Castellano in the Bankruptcy Proceeding established that while McDermott's lenders were initially reluctant to provide an emergency injection of liquidity outside the protections of a Chapter 11 filing, Lummus gave them sufficient security to move forward with such funding:

---

20 *Id.*, ¶ 83 (emphasis added).
21 *Id.*
22 *Id.*, ¶ 84 (emphasis added).
23 Declaration of David Dickson, President and Chief Executive Officer of McDermott International, Inc., in Support of the Chapter 11 Petitions (Bankr. Proc. Dkt. No. 29) ("Dickson Decl."), ¶ 16 (emphasis added).

Q And what option then did AlixPartners recommend that the company pursue?

A *So working with Evercore and ... Kirkland and the management team, it became apparent that it was very important to go to the existing lender base,* both the secured lenders as well as our unsecured bondholders, *for options on injecting rescue financing into the business to stabilize the operations.*

Q Did the existing secured lenders agree at that point to inject additional financing into the company?

A Over a period of time. It became an education process with our secured lenders, and they did agree to inject liquidity, but we did have … to spend time explaining and educating that – trying to – inject[ ] this liquidity outside of a Chapter 11 filing was paramount to trying to maximize value for the operations and maximize value for all of the constituents.

Q … ***How did the [Lummus] sale relate to the bridge financing that you were discussing with the secured lenders***?

A … *[T]here was extreme concern about the company's fortunes going forward. They were very suspect about the losses that the company was incurring, and they were very concerned about injecting liquidity outside of the protections that would be afforded through a Chapter 11.*

However … one of the most valuable assets that the company has … is [Lummus]. *And* ***ultimately, starting back in the September/October time frame … the sale of [Lummus] became the centerpiece of an overall restructuring strategy given*** *the value that it could bring so* ***that there would be the ability to pay off any incremental financing that was provided to the company***.[24]

499. As these discussions with the secured lenders about an emergency injection of liquidity progressed and "it became clear a sale of … Lummus … would be a key

[24] Jan. 23 Tr. at 80:17-81:25 (emphasis added).

component of any restructuring, *[McDermott] determined to select a potential buyer to act as a stalking horse bidder and* ***consummate the sale in a chapter 11 case***."[25]

500. Mr. Castellano also testified that once McDermott obtained the emergency financing, secured by the proceeds from an eventual sale of Lummus, a Chapter 11 reorganization was *the only viable option* because the level of consensus necessary for an out-of-court restructuring was impossible to attain:

> Q Once the bridge financing was in hand, ***did the debtors have any viable alternatives to Chapter 11***?
>
> A ***There really weren't***, other – ***there really weren't any other options at all, other than restructuring***.
>
> Q ***And why not***?
>
> A *The complexity of the company's capital structure, in addition to the general complexity of the company's business with the large number of customers – global customers.* ***The company needed to repair itself in a very, very short order on a very consensual basis***. *Otherwise, there would be a significant deterioration in value.*
>
> ***And given the fact that we did not have and we were not going to be able to achieve 100 percent consensus from all of our lenders, as well as all of our shareholders*** to really recapitalize this business in the way that it should be capitalized, *it became very apparent that* ***the only means necessary would be a Chapter 11 reorganization process***.[26]

501. To be sure, a Chapter 11 reorganization process was *always* a condition to the emergency financing. Kirkland attorney Anthony R. Grossi confirmed in the

---

[25] Amended Motion for Entry of (A) an Order (I) Approving the Stalking Horse Protections, (II) Approving Bidding Procedures for the Sale of the Lummus Assets and Interests, and (III) Approving Contract Assumption and Assignment Procedures, and (B) an Order Authorizing the Debtors to Enter into a Definitive Purchase Agreement Subject to Entry of the Confirmation Order (Bankr. Proc. Dkt. No. 110) ("Amended Motion"), ¶ 13 (emphasis added).

[26] Mar. 12 Tr. at 126:25-127:16 (emphasis added).

Bankruptcy Proceeding that the negotiations for the financing facility (which began in September 2019) contemplated a Chapter 11 bankruptcy filing from the outset. Mr. Grossi stated that McDermott *committed* to the lenders that it would seek a roll of any debt funded through the emergency financing to a debtor-in-possession ("DIP") facility (elevating debt funded prepetition to super-priority administrative expense status postpetition), and that McDermott's commitment, accompanied by bankruptcy specific milestones, were explicitly set forth in the early drafts of the financing facility documents. He also *admitted* that McDermott and its advisors worked with the lenders to obtain their agreement ***to scrub McDermott's commitment and all bankruptcy specific provisions from the final draft of the financing facility documents***, thereby preserving the deception on the market by concealing the contemplated bankruptcy filing and sale of Lummus as part of a Chapter 11 case from an already jittery market:

> *Your Honor, the super-priority facility* ***always contemplated a potential bankruptcy***. ***The company and the lenders knew that this was a bridge financing*** *and it afforded us a valuable three months* that allowed us *to enter the courtroom today with the level of consensus that we have*. And when we obtained the super-priority facility, ***we committed to our lenders that we would seek to roll up any funded debt into the DIP facility***. In fact, ***that commitment was memorialized in earlier drafts of the facility documents, together with bankruptcy specific milestones***. But ***we worked with the secured lenders to give them comfort*** that we'd be here today asking for this type of relief, and ***to drop those provisions from the facility documents because the intent of the facility was to calm a jittery market, and including bankruptcy-specific provisions in that document would have had the exact opposite effect***.[27]

[27] *Id*. at 95:5-20 (emphasis added).

502. In a declaration submitted under the penalty of perjury in the Bankruptcy proceeding, Mr. Shah stated that the lenders "***required [McDermott] to roll the Prepetition Credit Obligations up into the DIP financing as part of a chapter 11 filing*** but upon entry of a final order."[28]

503. On October 21, 2019, McDermott issued a press release ("10/21/2019 Press Release"), which it filed with the SEC on October 21, 2019 as Exhibit 99.1 to a Form 8-K signed by Defendant Spence ("10/21/2019 Form 8-K"), announcing entry into a $1.7 billion Superpriority Senior Secured Credit Agreement ("SSSCA") (filed as Exhibit 10.3 to the 10/21/2019 Form 8-K) with four tranches of funding. The 10/21/2019 Press Release disclosed that the first tranche (Tranche A) would be immediately available for a $550 million loan and $100 million letter of credit, and the other three would be accessible upon McDermott meeting certain conditions. The 10/21/2019 Press Release quoted Defendant Dickson as stating: "*This new credit agreement is a continued signal from our lenders that they support McDermott*, our underlying business, *growth strategy and* ***ability to achieve a long-term balance sheet solution***." The 10/21/2019 Press Release did not disclose that the funding provided under the SSSCA was "in order to save the company."[29] Nor did it disclose McDermott's commitment to the lenders party to the SSSCA to seek the roll up

---

[28] Declaration of Roopesh Shah in Support of the Debtors' Emergency Motion for Entry of Interim and Final Orders (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Authorizing the Debtors to Use Cash Collateral, (C) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (D) Granting Adequate Protection to the Prepetition Secured Parties, (E) Modifying the Automatic Stay, (F) Scheduling a Final Hearing, and (G) Granting Related Relief (Bankr. Proc. Dkt. No. 56) ("Shah Decl."), ¶ 14 (emphasis added).

[29] Jan. 23 Tr. at 63:7-10.

of any debt funded thereunder, including the $650 million financing provided in Tranche A, into a DIP facility when a Chapter 11 proceeding was ultimately filed. The SSSCA always contemplated a Chapter 11 process. All provisions related to McDermott's commitment to seek a roll up of any funded debt into the DIP Facility and any bankruptcy specific milestones were scrubbed from the publicly filed version of the SSSCA.[30] Thus, it was not a signal of the lenders' belief in or support of McDermott's purported ability to achieve a long-term balance sheet solution.

504. The 10/21/2019 Press Release disclosed that "*McDermott continues to pursue the previously announced strategic alternatives process for Lummus* …." It did not disclose, however, that the proceeds from an eventual sale of Lummus secured the debt funded under the SSSCA.[31] It also did not disclose that McDermott had already determined to consummate the sale of Lummus as part of a Chapter 11 case,[32] or that McDermott's only viable path was through a Chapter 11 reorganization process.[33] Thus, McDermott was not pursuing a strategic alternatives process that would result in a long-term balances sheet solution and preserve shareholder equity.

505. The 10/21/2019 Press Release also disclosed that "[McDermott] is withdrawing its previously stated guidance for full-year 2019."

506. McDermott's securities jumped and then fell following the disclosures regarding the new financing under the SSSCA and withdrawal of 2019 financial guidance.

---

30 *Id.* at 95:5-20.
31 *Id.* at 81:9-25.
32 *See* Amended Motion, ¶ 13; Jan. 23 Tr. at 81:20-25.
33 *See* Mar. 12 Tr. at 126:25-127:16.

On October 21, 2019, *The Wall Street Journal* reported that McDermott's "bond prices soared early in the session after the company said it had secured an up to $1.7 billion rescue financing, then dropped when it disclosed an almost 35% decline in projected 2019 earnings. … The company's shares plotted a similar course, opening 21% higher at $2.84 before dropping to $2.04." McDermott's disclosure of new funding under the SSSCA softened the impact of the disclosure of the withdrawal of 2019 financial guidance and reduction of the estimate of earnings before interest, tax, depreciation and amortization from $725 million to $474 million because of incremental charges on existing projects Cameron and Freeport. A standalone disclosure regarding McDermott's withdrawal of guidance for full-year 2019 would have certainly resulted in a crippling drop in stock price and the freefall bankruptcy filing avoided in September.

507. The 10/21/2019 Form 8-K disclosed that McDermott would use the funding from the SSSCA to finance working capital and support the issuance of required performance guarantees on new projects. It also disclosed that, on October 21, 2019, McDermott's Board of Directors appointed Mr. Castellano, AlixPartners Managing Director and an authorized representative of AP Services, LLC ("AP Services"), to act as McDermott's Chief Transformation Officer. Mr. Castellano was appointed "pursuant to a requirement in the [SSSCA] as a condition to providing the funding thereunder."

508. The SSSCA set forth specific business plan milestones in connection with the purported sale of Lummus. Unless waived, McDermott was required to, among other things:

(a) Solicit first round bids for the sale or other disposition of all or

substantially all the assets of Lummus from potential buyers by November 27, 2019;

(b) Deliver a report to the secured lenders' advisors reflecting the first-round bids by December 15, 2019;

(c) Deliver a draft purchase agreement in form and substance satisfactory to the secured lenders' advisors with respect to the Lummus sale by December 31, 2019; and

(d) Enter into a purchase agreement with respect to the sale of Lummus by January 31, 2020.

509. At no point prior to the end of the 10(b) Class Period did McDermott disclose a waiver of the foregoing business plan milestones in the SSSCA related to the proposed out-of-court sale of Lummus.

510. As confirmed by Mr. Shah in his declaration:

> The [SSSCA] ... *was* ***vital*** *in keeping [McDermott] from liquidating,* ***as it provided liquidity and time to allow all parties to negotiate the consensual,*** *value-maximizing* ***restructuring transaction … effectuated through this chapter 11 process***. Indeed, *the [SSSCA] and particularly* ***[McDermott's] agreement to roll up advances into the DIP facility were instrumental in getting to*** *the [Restructuring Support Agreement] and* ***the reorganization it contemplates***.[34]

511. While the new financing under the SSSCA was used to provide McDermott time to negotiate a consensual Chapter 11 plan of reorganization, Defendants also used a portion of the proceeds to pay themselves and other senior executives significant retention bonuses.

---

[34] Shah Decl., ¶ 14 (emphasis added).

512. The 10/21/2019 Form 8-K disclosed that the Board of Directors approved a Retention Bonus Award Agreement on October 17, 2019, whereby: (i) Defendant Dickson would receive a $3.375 million bonus as President and CEO; and (ii) Defendant Spence would receive a $1.3 million bonus as Executive Vice President and CFO. One third of the bonus was paid out upon entry of the SSSCA, with another third paid out upon the funding of Tranche B, and the last third upon the funding of Tranche C.

513. On November 4, 2019, McDermott issued a press release ("11/4/2019 Press Release") with 3Q 2019 earnings results which it filed with the SEC as Exhibit 99.1 to a Form 8-K filing signed by Defendant Spence, reporting revenues of $2.1 billion, a net loss of $1.9 billion or $10.37 per diluted share, and an operating loss of $1.7 billion. The 11/4/2019 Press Release disclosed that "*we continue to pursue the previously announced strategic alternatives process for … Lummus ….*" The 11/4/2019 Press Release did not disclose, however, that: (a) the proceeds from an eventual sale of Lummus secured the debt funded under the SSSCA; or (b) McDermott had already determined to consummate the sale of Lummus as part of a Chapter 11 case.[35]

514. On the same day, McDermott filed a Form 10-Q with the SEC for Q3 2019 ("Q3 2019 Form 10-Q") that was SOX certified by Defendants Dickson and Spence.

515. The Q3 2019 Form 10-Q disclosed an investigation by the SEC of McDermott. It stated that: (a) McDermott was notified about the investigation in a July 26, 2019 letter from the SEC and an accompanying subpoena; and (b) the investigation related

35 *See* Jan 23 Tr. at 48:1-5; Amended Motion, ¶ 13.

to certain McDermott disclosures and reporting of projected losses associated with Cameron.

516. McDermott did not publicly disclose the investigation prior to November 4, 2019, despite notice of its existence on or about July 26, 2019.

517. In the section of the Q3 2019 Form 10-Q under the heading "Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations," McDermott stated the following:

> If, in the future, we are unable to access any of Tranche B, Tranche C or Tranche D under the [SSSCA], we may be in an immediate liquidity crisis, and, unless we are able to secure additional financing, we would not be able to pay liabilities as they become due, which would lead to events of default under the [SSSCA], the Credit Agreement, the Letter of Credit Agreement and the Senior Notes Indenture. An event of default under any of those documents could result in the acceleration of substantially all of our indebtedness, *which would create the imminent need to file for protection under Chapter 11* ….

518. Under the heading "Item 1A. Risk Factors," McDermott disclosed that: "*We may be compelled to seek an in-court solution, potentially in the form of a pre-packaged or pre-arranged filing under Chapter 11* … if we are unable to successfully negotiate a timely out-of-court restructuring agreement with our creditors."

519. At no time prior to the end of the 10(b) Class Period did McDermott amend the statements in the Q3 2019 Form 10-Q describing a Chapter 11 filing as a hypothetical risk McDermott *might* face because of a default on any of the agreements with its secured lenders or the inability to timely negotiate a restructuring agreement. In fact, McDermott and its advisors began negotiating the terms of a consensual Chapter 11 plan of reorganization in late September 2019 and concluded sometime in the September/October

2019 timeframe that "that an emergency injection of liquidity on a superpriority basis was necessary to … bridge to an in-court process …." "[W]hen [McDermott] obtained the [SSSCA], [it] committed to [the] lenders that [it] would seek to roll up any funded debt into the DIP facility." Once the bridge financing was in hand, a balance sheet restructuring through a Chapter 11 reorganization process was the ***only*** viable option that McDermott possessed or pursued.

520. Nothing in the Q3 2019 Form 10-Q corrected or negated any prior disclosures by Defendants regarding the plan for the near-term sale of Lummus or the fulfilment of the business plan milestones under the SSSCA to effect such a sale.

521. Upon information and belief, on November 4, 2019, Defendant Dickson sent a companywide communication to McDermott employees titled *Q3 Financial and Operational Results*, that stated as follows:

> To all McDermott employees:
>
> This morning we announced our Q3 2019 financial and operational results which reflected solid operational performance across the majority of our business. We added a number of new project awards to our record backlog …. The markets we work in remain strong, with a revenue pipeline of nearly $90 billion in opportunities, a near record level. The demand for McDermott's talents and capabilities, and our ability to deliver for our customers is a true testament to the hard work and dedication of all the talented employees across McDermott.
>
> While we showed sound operating performance in most of our segments this quarter, we reported a large net loss due largely to non-cash accounting charges. Basically, this means we took a charge that is not related to our operations and that does not impact our cash situation. Additionally, our capital structure continues to be pressured by certain legacy projects, which contributed to the loss. We continue to work through the legacy backlog, with most of the projects nearing completion by the mid-point of 2020. We also have implemented additional risk mitigation measures on all projects to pave

the way for us to deliver consistent margin performance through the application of the One McDermott Way.

Taking a step back, it is very important to make the distinction between our capital structure and our day-to-day business. We have a very strong fundamental operating business. The majority of our business segments are performing well, and we are delivering for our customers. As importantly, we are winning new business. *However, our balance sheet is challenged. We are working closely with our lenders to address those challenges in order* ***to position the company for long-term success****.* ***The fact that our lenders were willing to provide us with a $1.7 billion financing agreement signals their confidence in*** *our underlying business and* ***our ability to achieve a long-term balance sheet solution****.*

**In short: we are working toward a capital structure that matches and supports the strength of our operating business**.

***Even though our discussions with lenders are progressing, and we have implemented a number of actions to evaluate strategic*** *and capital structure* ***alternatives, there is still more work to be done****.* ***We will continue to keep you informed as best we can on any significant development****.*

***As this process progresses, you will see continued media speculation about our business and issues related to our capital structure efforts. I know this can be concerning, but I ask you to stay focused on your day-to-day responsibilities*** – each of us doing the individual work that collectively makes McDermott such an exceptional company.

***We have much to look forward to as we continue to see the benefits of the combination of McDermott and CB&I****.* ***Lummus Technology's recent award*** from Saudi Aramco and Total for the Admiral Complex ***is one of a growing number of revenue synergies that are a direct result from the combination***. Our existing customer relationships continue to thrive as we are able to provide additional value, which in turn provides additional opportunities for our employees.

Thank you for your continued hard work. ***We remain confident the steps we are taking will position us for long-term success***.

David

522. On November 5, 2019, McDermott issued a press release ("11/5/2019 Press Release") which it filed with the SEC on the same day as Exhibit 99.1 to a Form 8-K

("11/5/2019 Form 8-K"), announcing the resignation of Defendant Spence from his positions as Executive Vice President and CFO at the Company, effective November 4, 2019.

523. In November 2019, McDermott and its advisors prepared and delivered reports titled *Project Sprint: Business Plan Report Excerpt for Lenders* ("*Business Plan Report*") and *Customer Assistance Plan Excerpt for Lenders*. Both reports were annexed as Exhibit 99.3 to a January 21, 2020 Form 8-K filing with the SEC ("1/21/2020 Form 8-K") (see below). As stated in the 1/21/2020 Form 8-K:

> Beginning in September 2019, [McDermott] commenced discussions with certain holders of [its] Senior Notes, certain lenders under the Superpriority Credit Agreement, certain lenders under the Term Loan Facility and legal and financial advisors for such lenders and holders (the "Ad Hoc Group") regarding the possibility of a potential financing, recapitalization, material sale of assets or equity of one of [McDermott]'s subsidiaries, or alternative transactions for the Company.
>
> [McDermott] entered into confidentiality agreements (collectively, the "NDAs") with certain members of the Ad Hoc Group. Pursuant to the NDAs, [McDermott] agreed to publicly disclose certain information, including material non-public information disclosed to the Ad Hoc Group (the "Cleansing Material") upon the occurrence of certain events set forth in the NDAs. Copies of the Cleansing Material … are attached hereto as Exhibits 99.3 and 99.4, respectively.

524. The purpose of the *Business Plan Report* was to "analyze a number of alternatives for right-sizing McDermott's balance sheet …."[36] The executive summary stated in relevant part as follows:

> [McDermott] likely does not have the runway to grow into its capital structure due to significant ongoing operations challenges, and a sale of

[36] *Business Plan Report* at 3.

> [Lummus] by itself does not appear to sufficiently deleverage the balance sheet.
>
> Therefore, ***[McDermott] believes that a consensual, pre-negotiated, in-court restructuring will best facilitate a right-sizing of its balance sheet***, while minimizing cost and business disruption, and while preserving and maximizing long-term value for all stakeholders.
>
> *An in-court restructuring may take several forms, including: a debt-for-equity conversion in which the business is maintained in its current form*; [or] *a debt-for-equity conversion in conjunction with one or more asset sales*.
>
> The optimal path forward will be driven by the ability to maximize total value and stakeholder recoveries while minimizing DIP funding needs, limiting expansion of the claims pool, and mitigating execution and operational risk.
>
> Despite the significant DIP funding requirements, ***[McDermott] believes that a restructuring around the entire business is likely to be the best path forward*** to maximize total value and recovery and reduce credit exposure over the long-term, given the substantial improvements in profitability expected in 2020 and 2021.[37]

525. The restructuring alternatives section of the *Business Plan Report* analyzed three restructuring scenarios, all of which involved a Chapter 11 filing by McDermott. No other scenarios were included in the analysis:

> MDR and its advisors have prepared three scenarios estimating the quantum of funding necessary to facilitate a chapter 11 filing of MDR ("DIP Financing").
>
> The materials review and compare three alternatives:
>
> Scenario 1: Pre-arranged restructuring with first lien lenders (six to nine months duration);
>
> Scenario 2: Pre-packaged restructuring with first lien lenders (four to six months duration); [and]
>
> Scenario 3: Pre-packaged restructuring with first lien lenders and bondholders (two to three months duration).

---

[37] *Id*. at 4 (emphasis added).

526. On December 2, 2019, McDermott issued a press release ("12/2/2019 Press Release") which it filed with the SEC on the same day as Exhibit 99.1 to a Form 8-K ("12/2/2019 Form 8-K"), announcing that McDermott was granted access to the second tranche (Tranche B) under the SSSCA, in the form of a $250 million Term Loan Facility and a $100 million Letter of Credit Facility. The 12/2/2019 Press Release reiterated that "*McDermott continues to pursue the previously announced strategic alternatives process for Lummus ….*" The 12/2/2019 Press Release, however, did not disclose that: (a) the proceeds from an eventual sale of Lummus secured the debt funded under the SSSCA; (b) McDermott's lenders would not provide any further funding under the SSSCA; or (c) the sale of Lummus would be consummated only as part of a Chapter 11 process. As confirmed by Mr. Castellano in his declaration:

> *On* ***December 1, 2019***, after significant deliberation and discussion with the secured lenders on whether to fund the second tranche under a debtor-in-possession financing facility rather than on an out-of-court basis, ***McDermott gained access to the second tranche of funding under the [SSSCA]*** *providing an incremental $250 million term loan facility … and a $100 million letter of credit facility*. ***In connection with this funding, the secured lenders stated that they did not expect to fund any additional amounts on an out-of-court basis***. As such, ***McDermott's liquidity would drive the timing of any potential chapter 11 filing***.
>
> *McDermott told* ***prospective purchasers of [Lummus]*** *that the purchase was to be consummated as part of a chapter 11 process*, and provided clear milestones for the marketing process with the aim of achieving a signed "stalking horse" purchaser by the time McDermott would need to seek chapter 11 relief.
>
> *McDermott then renewed its efforts with the secured lenders to* ***reach consensus on a proposed restructuring transaction***. The secured lenders had several demands:

> The term loan lenders required certainty that McDermott would have sufficient LC capacity both during the chapter 11 cases and upon emergence for an extended period of time to provide support for existing projects and the projected valuable customer project backlog.
>
> *The LC lenders required a commitment from the term loan lenders for a sizable debtor in possession term loan to fund working capital, administer the chapter 11 cases, and provide sufficient liquidity to position McDermott for long-term success*.
>
> Both groups asked McDermott to seek support from its customers to mitigate the risk of future problematic projects and to provide additional liquidity.
>
> ***Both groups wanted assurances that****, prior to commencing the chapter 11 cases, a stalking horse bidder was committed with* ***a proposed purchase price*** *that* ***could … repay the projected debtor in possession financing facility and provide cash on the balance sheet****.*
>
> ***McDermott projected that it only had five to six weeks to meet those demands before exhausting its liquidity reserves****.*[38]

527. At no time prior to the end of the 10(b) Class Period did McDermott amend the 10/21/2019 Press Release, the 11/4/2019 Press Release, or the 12/2/2019 Press Release to make the statements therein regarding *its continued pursuit of the previously announced strategic alternatives process for Lummus* not materially false or misleading.

528. Upon information and belief, on December 2, 2019, Defendant Dickson sent a companywide communication to McDermott employees titled *Financing Progress*, that stated as follows:

> To all McDermott employees:
>
> In October, we announced an agreement with our lenders to provide access to $1.7 billion in new financing. This provided $650 million of liquidity with access to the remaining financing subject to certain conditions met. I am pleased to inform you that ***McDermott has met the conditions to access the***

[38] Castellano Decl., ¶¶ 23-25.

> ***next phase of funding giving us access to an additional $350 million of liquidity***.
>
> This second round of funding, as with the first, will provide near-term liquidity for the company to manage working capital and provide performance guarantees on new projects. ***This milestone is evidence of the confidence our lenders have in our*** *underlying business, growth strategy and* ***ability to achieve a long-term balance sheet solution***.
>
> Today's news also recognizes our continued determination, hard work and focus on addressing this year's challenges. To reiterate what I said in our third quarter earnings announcement, despite our balance sheet issues, McDermott has a solid operating business with significant growth potential, as reflected in our backlog and new awards this year. *The financing progress we have announced today*, among other things, ***helps to enable a "normal course" of business for our customers and our employees as we continue to work toward a long-term balance sheet solution***.
>
> I want to thank you for your continued dedication to our customers and each other. This progress is only made possible by your commitment to delivering excellence and ongoing pledge to safe, responsible operations.
>
> David

529. On December 13, 2019, McDermott issued a press release ("12/13/2019 Press Release") which was filed on the same day with the SEC as Exhibit 99.1 to a Form 8-K ("12/13/2019 Form 8-K"), announcing that McDermott was formally notified by the NYSE that the average closing price of its common stock had fallen below $1.00 per share over a period of 30 consecutive trading days. 12/13/2019 Press Release also disclosed that McDermott "plans to notify the NYSE of its intent to cure the deficiency and return to compliance with the NYSE continued listing requirements."

530. On January 21, 2020, before the market open, McDermott issued a press release ("1/21/2020 Press Release") which was filed on the same day with the SEC as Exhibit 99.1 to the 1/21/2020 Form 8-K, announcing its entry into a Restructuring Support

Agreement (RSA") in connection with a Joint Prepackaged Chapter 11 Plan of Reorganization. The press release stated, in relevant part, as follows:

> HOUSTON, Jan 21, 2020 – McDermott International, Inc. (NYSE: MDR) ("McDermott") today announced that it has the support of more than two-thirds of all its funded debt creditors ***for a restructuring transaction that will equitize nearly all the Company's funded debt***, eliminating over $4.6 billion of debt.
>
> *The restructuring transaction will be* ***implemented through a prepackaged Chapter 11 process*** *that will be financed by a debtor-in-possession ("DIP") financing facility* of $2.81 billion. Subject to court approval, McDermott expects the DIP financing, combined with cash generated by McDermott, to enable the Company to stabilize its cash flows, continue operating in the normal course and fulfill its commitments to key stakeholders, including customers, suppliers, joint-venture partners, business partners and employees.
>
> The Company also has secured committed exit financing of over $2.4 billion in letter of credit facility capacity and will emerge from Chapter 11 with approximately $500 million in funded debt. The restructuring transaction will strengthen the Company's balance sheet, normalize its trade debt and position the Company for long-term growth.
>
> …
>
> This morning, the Company commenced solicitation of votes from its lenders and bondholders in support of a prepackaged Chapter 11 Plan of Reorganization ("the Plan"). The Company intends to commence the prepackaged Chapter 11 filing in the U.S. Bankruptcy Court for the Southern District of Texas ("the Court") later today. The Company's support from all of its creditor constituencies is memorialized in a Restructuring Support Agreement. The Company plans to move swiftly toward Court approval of the Plan, with confirmation expected within approximately two months from filing.
>
> *As part of the restructuring transaction, subsidiaries of McDermott have entered into a share and asset purchase agreement (the "Agreement") with a joint partnership* between The Chatterjee Group and Rhône Group (the "Joint Partnership") *pursuant to which the Joint Partnership will serve as the "stalking-horse bidder" in a court-supervised sale process for Lummus ….*

*Under the terms of the Agreement, the Joint Partnership has agreed, and is committed, to acquire Lummus ... for a base purchase price of $2.725 billion. McDermott will have the option to retain or purchase, as applicable, a 10 percent common equity ownership interest in the entity purchasing Lummus Technology*. McDermott expects to hold an auction in approximately 45 days to solicit higher or better bids for the Lummus Technology business. Either the Joint Partnership or the winning bidder at the auction will purchase Lummus Technology as part of the Chapter 11 process, subject to regulatory and court approval.

***Proceeds from the sale of Lummus … are expected to repay the DIP financing in full, as well as fund emergence costs and provide cash to the balance sheet for long-term liquidity***.

…

*As a result of the upcoming Chapter 11 filing, McDermott expects to be delisted from the New York Stock Exchange within the next 10 days*. McDermott common stock will continue to trade in the over-the-counter marketplace throughout the pendency of the Chapter 11 process. ***The shares are proposed to be cancelled as part of McDermott's restructuring***.

531. On January 17, 2020, the last trading day before the Plan was announced, the price for McDermott common stock closed at $0.70 per share. After disclosing the plan to restructure through the Plan on January 21, 2020, trading of McDermott common stock was halted pre-market at 7:46 a.m. E.S.T. and did not resume until January 23, 2020. On that date, McDermott common stock closed at $0.12 per share.

532. Commenting on the path to the Plan, Mr. Castellano stated the following:

McDermott enters chapter 11 with a massively consensual prepackaged restructuring. The plan equitizes nearly all of the company's funded debt and allows all general unsecured claims to be paid in full or ride through unimpaired, permitting McDermott to swiftly emerge from bankruptcy, subject to the Court's approval, with exit financing already in place.

Given McDermott's extraordinarily complex, global business, this result was hardly a foregone conclusion. ***Getting here has been an all-out sprint for the company and its many stakeholders around the globe. Since September 2019, McDermott has negotiated for and obtained superpriority financing,***

> ***avoiding what would have been a freefall chapter 11 filing that could have resulted in immediate liquidation***; delivered a revised business plan; *engaged in extensive diligence and negotiations with its secured lenders and bondholders;* ***marketed and achieved a signed stalking-horse purchaser for the sale of [Lummus]***; and embarked on a successful customer reach out plan.[39]

## IV. ADDITIONAL POST-10(b) CLASS PERIOD ALLEGATIONS (CCAC §V)

533. On March 12, 2020, the Bankruptcy Court approved the Plan, including the cancellation of McDermott common stock.

534. On May 8, 2020, McDermott filed a Form 10-Q with the SEC for Q1 2020 ("Q1 2020 Form 10-Q"), which was SOX certified by Defendant Dickson and disclosed, in addition to the SEC investigation detailed above, receipt of a notice from the United States Attorney for the Southern District of Texas that a Federal Grand Jury was conducting a criminal investigation with respect to Cameron and requested various documents, including cost forecasts and other financial-related information. The Q1 2020 10-Q acknowledged that McDermott was notified of the investigation by a letter dated February 25, 2020, and an accompanying subpoena.

535. On June 30, 2020, the Plan became effective and McDermott emerged from bankruptcy. All previously issued and outstanding equity interests in McDermott, including its common stock, were automatically cancelled and extinguished.

536. On June 16, 2023, the SEC announced the settlement of charges against Defendants Dickson and Spence arising out of their role in the approval of an estimate-at-completion ("EAC") loss forecast by McDermott for Cameron in 2018. According to the

---

[39] Castellano Decl., ¶¶ 5-6 (emphasis added).

SEC's Order Instituting Cease-and-Desist Proceedings, Making Findings, and Imposing a Cease-and Desist Order ("SEC Order"), the SEC found, among other things, that:

(a) A McDermott executive proposed a $490 million EAC loss forecast for Cameron outside of the normal cost-estimating process;

(b) Defendants Dickson and Spence approved the $490 million EAC loss for Q2 2018 on Cameron even though they were aware that it was developed outside of the regular process for EAC cost forecasts and that the initial draft EAC loss was over $1.1 billion, which indirectly caused McDermott to maintain incorrect books and records and to file an inaccurate quarterly report;

(c) McDermott's Q2 2018 Form 10-Q included certain materially inaccurate Cameron specific information; and

(d) As a result of their conduct, Defendants Dickson and Spence caused McDermott to violate Section 13(a) of the Exchange Act and Rules 13a-11, 13a-13, and 12b-20 thereunder, Section 13(b)(2)(A) of the Exchange Act, and Section 13(b)(2)(B) of the Exchange Act and Rule 13b2-1 thereunder.

537. Dickson and Spence each consented to a cease-and-desist order and agreed to pay civil penalties of $100,000 and $40,000, respectively.

## V. ADDITIONAL MATERIALLY FALSE OR MISLEADING STATEMENTS OR OMISSIONS DURING THE 10(b) CLASS PERIOD (CCAC §V.F)

538. Defendants made materially false or misleading statements in the 9/20/2019 Press Release regarding a proposed transaction for Lummus, the proceeds of which were to be used to strengthen McDermott's balance sheet.

(a) The 9/20/2019 Press Release sets forth, as follows:

> HOUSTON, Sept. 20, 2019 /PRNewswire/ -- McDermott International, Inc. (NYSE: MDR) today *announced it recently received unsolicited approaches to acquire all or part of Lummus Technology, McDermott's industry-leading technology business, with valuation exceeding $2.5 billion. Based on the receipt of these approaches, McDermott is exploring strategic alternatives to unlock the value of Lummus Technology while maintaining the strategic rationale of engineering, procurement and construction (EPC) pull-through*.
>
> McDermott's Lummus Technology is a leading licensor of proprietary petrochemicals, refining, gasification and gas processing technologies, and a supplier of proprietary catalysts and related engineering. With a heritage spanning more than 100 years, encompassing approximately 3,100 patents and patent applications, Lummus Technology provides one of the industry's most diversified technology portfolios to the hydrocarbon processing sector.
>
> "Lummus is an excellent business, with incredibly impressive employees, that has earned a reputation for expertise, innovation and reliability in the refining and petrochemical industries," said David Dickson, President and Chief Executive Officer of McDermott. "***The process of exploring strategic alternatives is part of our ongoing efforts intended to improve McDermott's capital structure, and we plan to use the proceeds from any transaction involving Lummus Technology to strengthen our balance sheet. While Lummus is an important business within McDermott, we have decided to undertake a process to fully realize its strategic and financial value***."
>
> Separately, McDermott's previously announced processes to sell the remaining portion of its pipe fabrication business and its industrial storage tank business are ongoing.
>
> McDermott has retained Evercore as the lead advisor on the strategic alternatives process for Lummus Technology.

(b) In September 2019, McDermott was, in fact, "running out of cash" and an emergency "liquidity infusion" was necessary "to avoid liquidating the company." Defendants knew based on the actionable offers in hand at the time the statements in the 9/20/2019 Press Release were made, that a standalone sale of Lummus would not fully or timely address McDermott's immediate liquidity needs because the proceeds from such a

transaction would not be realized until up to six months after closing, and absent a comprehensive balance sheet solution significant business challenges would remain. Defendants also knew that Lummus was the only asset McDermott had to secure the emergency financing it desperately needed. Thus, there was never an intention or a plan for an out-of-court sale of Lummus and use of the proceeds to strengthen McDermott's balance sheet and either maximize or preserve shareholder value. Instead, the plan was to use the eventual sale of Lummus to achieve a consensual Chapter 11 reorganization and, thereby, avoid a freefall Chapter 11 filing and liquidation. The statement in the 9/20/2019 Press Release to investors regarding a "plan to use the proceeds from any transaction involving Lummus … to strengthen [McDermott's] balance sheet," was materially false or misleading when made.

(c) The September 18, 2019 news leak about the retention of AlixPartners exacerbated McDermott's tenuous leverage and liquidity situation. After its stock price cratered and vendors started pulling their credit, McDermott issued the 9/20/2019 Press Release with knowingly misleading information about its prospects and plans to "calm the markets and its increasingly agitated vendor base," reverse the declines in the stock price, and avoid a freefall Chapter 11 filing. As intended, the false or misleading statements in the 9/20/2019 Press Release bolstered market confidence – artificially inflating the common stock price while concealing the true nature of McDermott's liquidity crisis, outlook, and plans for the sale and proceeds from its most valuable asset.

539. Defendants made materially false or misleading statements or omissions in the 10/21/2019 Press Release and failed to amend or correct previous statements

concerning the Lummus sale process and plans for the proceeds to make them not materially false or misleading.

(a) The 10/21/2019 Press Release contained a statement from Defendant Dickson which claimed that the SSSCA signaled continued support from its lenders regarding, among other things, McDermott's "*ability to achieve a long-term balance sheet solution*." The 10/21/2019 Press Release stated that that "*McDermott continues to pursue the previously announced strategic alternatives process for Lummus ….*" The 10/21/2019 Press Release also included a single sentence announcement regarding McDermott's withdrawal of previously stated guidance for full-year 2019.

(b) The SSSCA had nothing to do with any effort to achieve a long-term balance sheet solution because all efforts were focused on achieving a consensual Chapter 11 solution and avoiding the liquidation of McDermott. Evidence submitted in the Bankruptcy Proceeding established that the parties to the SSSCA "***knew that this was a bridge financing***" that afforded McDermott and its stakeholders time to negotiate a consensual plan of reorganization. The SSSCA "***always contemplated a potential bankruptcy***" and "was ***vital in keeping [McDermott] from liquidating***." Moreover, once the facility was obtained, "[McDermott] ***committed to [its] lenders that it would seek to roll up any funded debt to the DIP facility***" after the contemplated Chapter 11 proceeding was filed. The statement in the 10/21/2019 Press Release to investors about the SSSCA signaling support from McDermott's lenders regarding its "ability to achieve a long-term balance sheet solution," was materially false or misleading when made.

(c) Having elected to speak about the SSSCA in the 10/21/2019 Press

Release, Defendants were required, but omitted to disclose that: (i) the SSSCA was a bridge to an in-court process and necessary to avoid liquidation; (ii) the proceeds from the eventual sale of Lummus secured any incremental financing provided by the lenders under the SSSCA outside of the protections of a Chapter 11 filing; (iii) McDermott committed, upon the lenders' requirement, to roll up of any funded debt into the DIP facility as part of a Chapter 11 proceeding; (iv) McDermott solicited and obtained the lenders' permission to ***scrub*** its commitment and all bankruptcy specific provisions from the SSSCA because its intent was "*to calm a jittery market*" and the disclosure of the SSSCA parties' actual agreement "*would have had the exact opposite effect*;" and (v) all bankruptcy specific provisions in the SSSCA were purged from the financing documents to conceal from investors that the SSSCA always contemplated a bankruptcy filing and a sale of Lummus as part of a Chapter 11 reorganization.

(d) The statement in the 10/21/2019 Press Release to investors regarding McDermott's continued pursuit of the previously announced strategic alternatives process for Lummus was materially false or misleading when made. By October 21, 2019, at the latest: (i) any transaction involving the eventual sale of Lummus would be accomplished only as part of a Chapter 11 plan of reorganization; (ii) the proceeds from such sale secured the debt funded under the SSSCA; and (iii) only potential purchasers who indicated an interest in serving as a stalking horse bidder in a Chapter 11 sales process would be permitted to bid.

(e) Having elected to reaffirm McDermott's continued pursuit of the previously announced strategic alternatives process for Lummus in the 10/21/2019 Press

Release, Defendants were required, but omitted to disclose that the statements in the 9/20/2019 Press Release which McDermott raised money from were not operative. Defendants omitted to disclose that McDermott was not pursuing the strategic alternatives process for Lummus previously announced in the 9/20/2019 Press Release. Defendants also omitted to disclose that any transaction involving the sale of Lummus would be accomplished only as part of a Chapter 11 plan of reorganization, the proceeds from such sale secured the debt funded under the SSSCA, and that only potential purchasers who indicated an interest in serving as a stalking horse bidder in a Chapter 11 sales process would be permitted to bid.

(f) According to McDermott's advisors, the "*intent of the [SSSCA] was to calm a jittery market*" and all bankruptcy specific provisions were purged from the final financing documents because they "*would have had the exact opposite effect*." Defendants used the announcement in the 10/21/2019 Press Release about the entry into the SSSCA to offset the disclosure of McDermott's withdrawal of its previously stated guidance for full-year 2019, as well as to mitigate anticipated declines in the artificially inflated stock price from such disclosure.

540. Defendants made materially false or misleading statements or omissions in the 11/4/2019 Press Release and failed to amend or correct previous statements concerning the Lummus sale process to make them not materially false or misleading.

(a) The 11/4/2019 Press Release stated that that McDermott continues "*to pursue the previously announced strategic alternatives process for … Lummus ….*"

(b) The statement in the 11/4/2019 Press Release to investors regarding

the continued pursuit of previously announce strategic alternatives process for Lummus was materially false or misleading when made. By October 21, 2019, at the latest: (i) any transaction involving the eventual sale of Lummus would be accomplished only as part of a Chapter 11 plan of reorganization; (ii) the proceeds from such sale secured the debt funded under the SSSCA; and (iii) only potential purchasers who indicated an interest in serving as a stalking horse bidder in a Chapter 11 sales process would be permitted to bid.

(c) Having elected to speak about McDermott's purported continued pursuit of the previously announced strategic alternatives process for Lummus in the 11/4/2019 Press Release, Defendants were required, but omitted to disclose that McDermott was not pursuing the strategic alternatives process for Lummus previously announced in the 9/20/2019 Press Release and repeated in the 10/20/2019 Press Release. Defendants also omitted to disclose that any transaction involving the sale of Lummus would be accomplished only as part of a Chapter 11 plan of reorganization, the proceeds from such sale secured the debt funded under the SSSCA, and that only potential purchasers who indicated an interest in serving as a stalking horse bidder in a Chapter 11 sales process would be permitted to bid.

541. Defendants made materially false or misleading statements or omissions in the 12/2/2019 Press Release and failed to amend or correct previous statements concerning the Lummus sale process to make them not materially false or misleading.

(a) The 12/2/2019 Press Release stated that that "*McDermott continues to pursue the previously announced strategic alternatives process for Lummus* …."

(b) The statement in the 12/2/2019 Press Release to investors regarding

the continued pursuit of previously announce strategic alternatives process for Lummus was materially false or misleading when made. By October 21, 2019, at the latest: (i) any transaction involving the eventual sale of Lummus would be accomplished only as part of a Chapter 11 plan of reorganization; (ii) the proceeds from such sale secured the debt funded under the SSSCA; and (iii) only potential purchasers who indicated an interest in serving as a stalking horse bidder in a Chapter 11 sales process would be permitted to bid.

(c) Having elected to speak about McDermott's purported continued pursuit of the previously announced strategic alternatives process for Lummus in the 12/2/2019 Press Release, Defendants were required, but omitted to disclose that McDermott was not pursuing the strategic alternatives process for Lummus previously announced in the 9/20/2019 Press Release and repeated in the 10/20/2019 and 11/4/2019 Press Releases. Defendants also omitted to disclose that any transaction involving the sale of Lummus would be accomplished only as part of a Chapter 11 plan of reorganization, the proceeds from such sale secured the debt funded under the SSSCA, and that only potential purchasers who indicated an interest in serving as a stalking horse bidder in a Chapter 11 sales process would be permitted to bid.

## VI. ADDITIONAL PARTIAL CORRECTIVE DISCLOSURES

542. The CCAC's section captioned Partial Corrective Disclosures Incrementally Revealed the Frauds (CCAC §V.F.4.) are expanded to include the allegations set forth in

the Supplement (¶¶ 16-24).[40] The Partial Corrective Disclosures are incorporated herein as follows.

543. On November 4, 2019, McDermott filed the Q3 2019 10-Q with the SEC after hours, which for the first time disclosed that the ***SEC had launched an investigation*** into "disclosures [McDermott] made concerning the reporting of projected losses associated with the Cameron LNG project" by letter dated ***July 26, 2019*** – three and one-half months earlier. McDermott added, "We have been and intend to continue cooperating with the SEC in this investigation, including by ***producing documents requested by the SEC***." The Q3 2019 10-Q offered no explanation for the delay in disclosing this investigation or McDermott's cooperation. The next day, November 5, 2019, McDermott abruptly announced Defendant Spence's resignation via a Form 8-K filed with the SEC, as detailed below.

544. On this news, McDermott's stock dropped $0.11 (-6.35%) to close at $1.62 the next trading day, November 5, 2019.

545. On January 21, 2020, before the market open, McDermott issued a press release ("1/21/20 Press Release) filed with the SEC as Exhibit 99.1 to a Form 8-K ("1/21/2020 Form 8-K"), announcing its entry into a Restructuring Support Agreement in connection with a Joint Prepackaged Chapter 11 Plan of Reorganization. Boiled down, the 1/21/2020 Press Release abruptly disclosed that Lummus was being sold for $2.725 billion,

---

[40] Paragraphs 16-24 of the Partial Corrective Disclosures in the Supplement were sustained by the Memorandum and Recommendation entered on August 30, 2022 (ECF 265) and the Order entered on September 22, 2022 (ECF 268).

but the proceeds would protect only McDermott's debt creditors, nearly all of whom would be equitized, while ***McDermott's common stockholders*** – the Class members at issue in this lawsuit – ***would be wiped out***, as its shares would be delisted from the NYSE and cancelled as part of the restructuring. The 1/21/20 Press Release provided more detail, in relevant part, as follows.

(a) The 1/21/2020 Press Release described the overarching Chapter 11 restructuring transaction terms and vote solicitation process:

> McDermott International, Inc. (NYSE: MDR) ("McDermott") today announced that it has the support of more than two-thirds of all its funded debt creditors for ***a restructuring transaction that will equitize nearly all the Company's funded debt***, eliminating over $4.6 billion of debt.
>
> ***The restructuring transaction will be implemented through a prepackaged Chapter 11 process*** that will be financed by a debtor-in-possession ("DIP") financing facility of $2.81 billion. Subject to court approval, McDermott expects the DIP financing, combined with cash generated by McDermott, to enable the Company to stabilize its cash flows, continue operating in the normal course and fulfill its commitments to key stakeholders, including customers, suppliers, joint-venture partners, business partners and employees.
>
> The Company also has secured committed exit financing of over $2.4 billion in letter of credit facility capacity and will emerge from Chapter 11 with approximately $500 million in funded debt. The restructuring transaction will strengthen the Company's balance sheet, normalize its trade debt, and position the Company for long-term growth.
>
> ****
>
> This morning, the Company commenced solicitation of votes from its lenders and bondholders in support of a prepackaged Chapter 11 Plan of Reorganization ("the Plan"). The Company intends to commence the prepackaged Chapter 11 filing in the U.S. Bankruptcy Court for the Southern District of Texas ("the Court") later today. The Company's support from all of its creditor constituencies is memorialized in a Restructuring Support Agreement. The Company plans to move swiftly toward Court approval of

the Plan, with confirmation expected within approximately two months from filing.

(b) The 1/21/2020 Press Release disclosed that McDermott had agreed to sell Lummus and disclosed how the proceeds would be used:

> As part of the restructuring transaction, subsidiaries of McDermott have entered into a share and asset purchase agreement (the "Agreement") with a joint partnership between The Chatterjee Group and Rhône Group (the "Joint Partnership") pursuant to which the Joint Partnership will serve as the "stalking-horse bidder" in a court-supervised ***sale process for Lummus Technology***.
>
> Under the terms of the Agreement, the Joint Partnership has agreed, and is committed, to acquire Lummus Technology for ***a base purchase price of $2.725 billion***. McDermott will have the option to retain or purchase, as applicable, a 10 percent common equity ownership interest in the entity purchasing Lummus Technology. McDermott expects to hold an auction in approximately 45 days to solicit higher or better bids for the Lummus Technology business. Either the Joint Partnership or the winning bidder at the auction will purchase Lummus Technology as part of the Chapter 11 process, subject to regulatory and court approval.
>
> ***Proceeds from the sale of Lummus Technology are expected to repay the DIP financing in full, as well as fund emergence costs and provide cash to the balance sheet for long-term liquidity.***

(c) The 1/21/2020 Press Release quoted Defendant Dickson, who tried to put a positive spin on the bankruptcy announcement, while finally admitting that both a Lummus sale and a Chapter 11 bankruptcy restructuring were necessary to "create a sustainable capital structure" and provide "robust liquidity and significant financing to execute on customer projects in our backlog," when he stated in relevant part:

> The restructuring transaction, which has the full support from all of our funded creditors, including our unsecured bondholders, is further recognition of McDermott's fundamentally solid operating business and proven strategy… Our record backlog, the majority of which has been booked in the last two years, and high rate of new project awards demonstrates our

> customers' continued confidence in our business, the demand for our skills and our long-term opportunities ahead.
>
> ***This financial restructuring will create a sustainable capital structure*** that matches the strength of our operating business. As a result of the transaction, we are eliminating over $4.6 billion in debt from our balance sheet ***and we will emerge with robust liquidity and significant financing to execute on customer projects in our backlog***. Throughout this process, which we expect to complete expeditiously, McDermott will continue all business operations as normal and deliver on our commitments to our customers.

(d) However, the 1/21/2020 Press Release also disclosed that McDermott's common stockholders would be completely wiped out by the bankruptcy:

> ***As a result of the upcoming Chapter 11 filing, McDermott expects to be delisted from the New York Stock Exchange within the next 10 days.*** McDermott common stock will continue to trade in the over-the-counter marketplace throughout the pendency of the Chapter 11 process. ***The shares are proposed to be cancelled as part of McDermott's restructuring.***

546. This shocking revelation caused trading of McDermott common stock to halt pre-market – the second trading halt of the §10(b) Class Period, the first having occurred back in September 2019, when news of McDermott's hiring turnaround firm AlixPartners LLP leaked, pushed its stock price down 49%, and prompted McDermott to ***deny*** any impending bankruptcy (*see* CCAC ¶¶321-322).

547. On January 22, 2020, McDermott filed with the SEC a Form 8-K ("1/22/2020 Form 8-K") that, *inter alia*, further discussed the terms of McDermott's restructuring transaction, confirmed that the bankruptcy had been filed the day before, and stated that the debtor-in-possession lenders had a first priority pledge of 100% of the stock and other equity interests in each of McDermott's direct and indirect subsidiaries. The same day,

Defendants filed their Suggestion of Bankruptcy (Dkt. No. 120) in this proceeding, after missing their deadline to file the motion to dismiss the CCAC.

548. On January 23, 2020, McDermott filed with the SEC a Form 8-K ("1/23/2020 Form 8-K") confirming the bankruptcy filing and disclosing that the NYSE had notified McDermott on January 22, 2020, that the NYSE had determined as a result of the Chapter 11 cases to commence proceedings to delist McDermott's common stock and had indefinitely suspended trading of McDermott's common stock.

549. Trading did not resume until January 23, 2020. That day, McDermott common stock opened at $0.25 per share (down from its January 17, 2020, closing price of $0.70 per share), hit an intra-day low of $0.14, and closed at $0.12 per share, a nearly 83% decline from its closing price on January 17, 2021, the most recent trading day.

550. These revelations and correlating stock drops partially corrected the Defendants' fraud, both as originally pled in the CCAC and as pled through the expanded allegations herein.

## VII. ADDITIONAL SCIENTER ALLEGATIONS (CCAC §V.G)

551. As alleged herein, Defendants Dickson and Spence acted with scienter because they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of McDermott were materially false or misleading or omitted to disclose material facts to make them not misleading; knew that such documents or statements would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such documents or statements as primary violations of the federal securities laws.

552. Defendants Dickson and Spence, as the individuals that signed, were quoted in, or orally made the allegedly false or misleading statements described herein, were obligated to familiarize themselves with the subject matter of those public statements, and to speak truthfully. Defendants Dickson and Spence violated those obligations.

553. Defendant Spence, as the individual that SOX certified the SEC filings described above, was obligated to inquire and investigate, familiarize himself with the subject matter underlying their certifications, and assure that the matters he was certifying were accurate and that McDermott was speaking truthfully when it made such disclosures.

554. While the statements above by Defendants Dickson and Spence demonstrate strong evidence of conscious misbehavior or recklessness, motive and opportunity are also evident. Defendants Dickson and Spence each had significant personal financial motivations unique to them to engage in the misconduct alleged herein.

555. Defendants Dickson and Spence, motivated by their compensation packages, retention bonuses, and continued employment, took affirmative actions to protect their financial interests as a freefall Chapter 11 filing would have been disastrous to both McDermott's business and their income streams. After news leaked that McDermott had engaged AlixPartners and its share price cratered, McDermott issued the 9/20/2019 Press Release.

556. Defendants Dickson and Spence made materially false or misleading statements in the 9/20/2019 Press Release with the knowledge that: (a) an out-of-court sale of Lummus would not be sufficient to address McDermott's immediate liquidity needs because the proceeds from any such transaction would not be realized until up to six month

after closing; and (b) absent a comprehensive balance sheet solution significant challenges would remain. Defendant Dickson confirmed that at the same time the 9/20/2019 Press Release was issued, McDermott was "running out of cash," "remained over-leveraged and could not continue running its business and servicing its debt," and needed significant emergency financing "to avoid liquidating." Given McDermott's financial condition, both Defendants Dickson and Spence knew there was no plan to use the proceeds from an out-of-court sale of Lummus to strengthen McDermott's balance sheet. It is inconceivable that McDermott's secured creditors would allow a free and clear out-of-court sale of its most valuable asset. Moreover, Lummus was central to the emergency funding McDermott needed to survive.

557. Defendants Dickson and Spence participated in and/or approved the statements in the 9/20/2019 Press Release regarding McDermott's exploration of the strategic alternatives process for Lummus. Evidence from the Bankruptcy Proceeding demonstrates that the statements in the 9/20/2019 Press Release were made knowing that there was not a plan to use the proceeds from the sale of Lummus to strengthen McDermott's balance sheet. Rather, Defendants made the statements with the intent "to calm the markets and [McDermott's] increasingly agitated vendor base," reverse market movements that exacerbated McDermott's already "tenuous leverage and liquidity situation," and avoid a freefall Chapter 11 filing.

558. As intended, the statements in the 9/20/2019 Press Release did stem the stock price losses and provided McDermott needed time following the leak of AlixPartners' retention to negotiate for and obtain an emergency injection of liquidity. McDermott's

advisors later conceded in declarations submitted in the Bankruptcy Proceeding that the 9/20/2019 Press Release "bolstered market confidence" and attributed the approximate 50% increase in McDermott's stock price to "[t]he market welcom[ing] news of the sale."

559. Defendants Dickson and Spence made materially false or misleading statements in the 10/21/2019 Press Release with the knowledge that: (a) the SSSCA was "a bridge financing" that afforded McDermott and its stakeholders time to negotiate a consensual plan of reorganization and, as such, was "vital in keeping [McDermott] from liquidating;" (b) the proceeds from the eventual sale of Lummus were to be used to secure any debt funded under the SSSCA (outside of the protections of a Chapter 11 filing); (c) McDermott committed to seek a roll up of any incremental financing provided into the DIP facility as part of a Chapter 11 filing; (d) said "commitment was memorialized in earlier drafts of the [SSSCA], together with bankruptcy specific milestones," however, "[McDermott] worked with [its] secured lenders to give them comfort … to drop [all bankruptcy specific] provisions from the SSSCA" to prevent public disclosure to investors and its vendor base and preserve the inflation in the stock price; (e) because the proceeds from the eventual sale of Lummus were being used to secure any debt funded prepetition and McDermott agreed (and its lenders required) the roll up of debt funded into the DIP facility, any transaction involving the sale of Lummus would be accomplished only as part of a Chapter 11 proceeding; and (f) once the bridge financing was in hand, McDermott had no options other than to reorganize through a Chapter 11 process that would wipe out common stockholders.

560. Defendants Dickson and Spence participated in and/or approved the statements in the 10/21/2019 Press Release announcing McDermott's entry into the SSSCA and its continued pursuit of the previously announced strategic alternatives process for Lummus. Evidence from the Bankruptcy Proceeding confirms that the "intent of the [SSSCA] was to calm a jittery market." Defendants Dickson and Spence participated in and/or approved in the ***scrubbing*** *of material information* (McDermott's commitment to seek a roll up of any debt funded to the DIP Facility and each and every bankruptcy specific milestone) *from the SSSCA* ***to, among other things, mislead investors*** *about the reality that the SSSCA (and Defendants) always contemplated a Chapter 11 filing* ***and avoid inflaming a jittery market***. Additionally, Defendants Dickson and Spence participated in and/or approved the inclusion of the statements regarding McDermott's withdrawal of full-year 2019 guidance in the 10/21/2019 Press Release so that any artificial inflation in the stock price from the false or misleading disclosures about the SSSCA would mitigate or counter expected declines from the withdrawal of guidance.

561. As intended, the deceptive statements in the 10/21/2019 Press Release about the SSSCA (purged of all provisions memorializing the commitment to roll up any funded debt into the DIP facility and all bankruptcy specific milestones), McDermott's efforts to achieve a long-term balance sheet solution, and pursuit of a strategic alternatives process for Lummus, spiked the price of McDermott stock 21% before leveling out. The statements also stabilized McDermott's stock price by diminishing losses that would have otherwise occurred from a standalone disclosure of its withdrawal of full-year 2019 guidance.

562. Defendants' knowing or reckless deception allowed them to secure retention bonuses for themselves which were paid by proceeds from the SSSCA. Upon the Plan's filing, Defendants authorized the payout of the final third of the retention bonuses to themselves, even though Tranche C under the SSSCA was never funded.

563. In addition, the Management Incentive Plan ("MIP") within the Plan provided management a significant equity stake even as common stockholders' interests were eliminated. The MIP set forth in relevant part:

> Effective on the Effective Date, the Reorganized Debtors will reserve 7.5% of New Common Stock (on a fully diluted and fully distributed basis) which may be granted in the form of options, restricted stock, restricted stock units, warrants, stock appreciations rights or any combination thereof (each an "**Award**" and such reserve, the "**MIP Pool**") for grant to management employees and members of the New Board and enter into severance and change in control arrangements ("**Severance Arrangements**") with senior executives of the Debtors that are insiders pursuant to Section 16 of the Exchange Act ("**Senior Executives**") in amounts and on terms and conditions to be agreed with and approved by the Required Consenting Lenders. The New Board shall grant no less than 53.33% of the MIP Pool to the employees of the Debtors no later than 60 days following the Effective Date (the "**Emergence Awards**") with the terms of the Emergence Awards to be determined as set forth below and the remainder of the MIP Pool will be available for future grants to management employees and members of the New Board with allocations, terms and conditions to be determined by the New Board.[41]

564. Defendant Dickson obtained substantial incentive payouts to remain at McDermott during the Bankruptcy Proceeding and throughout the pendency of the Lummus sale. On February 10, 2020, McDermott filed an Emergency Motion for Entry of an Order (I) Authorizing and Approving (A) Key Employee Incentive Plan and (B) Key

---

[41] Amended Ch. 11 Plan (Bankr. Proc. Dkt. No. 121) at 38.

Employee Retention Plan and (II) Granting related Relief (Bankr. Proc. Dkt. No. 367) ("Emergency Motion"). The Emergency Motion set forth incentive awards under a proposed Key Employee Incentive Plan ("KEIP") for each participant,[42] payable in cash at the conclusion of each performance period and upon the achievement of certain performance metrics. For Defendant Dickson, the Emergency Motion identified a Threshold Award Opportunity of $3,165,625, a Target Award Opportunity of $6,331,250, and a Maximum Award Opportunity of $12,662,500.[43] McDermott proposed the incentive award for Defendant Dickson notwithstanding the SEC's investigation of certain McDermott disclosures and the reporting of projected losses associated with Cameron, and Defendant Dickson's involvement with both the disclosures and reporting of the projected losses. On February 24, 2020, the Bankruptcy Court granted the Emergency Motion.[44]

565. McDermott's SEC filings that attempted to conceal or otherwise obfuscate Defendants' fraudulent conduct are also highly probative of scienter. For example, Defendants' repeated false assertions in the 10/21/2019, 11/4/2019 and 12/2/2019 Press Releases regarding McDermott's continued pursuit of the previously announced strategic alternatives process for Lummus, as well as the inclusion of business plan milestones in the SSSCA that did *not* reflect the actual ongoing sales process for Lummus permit further inferences of scienter.

---

[42] There are 13 participants in the KEIP, including Defendant Dickson. As acknowledged in the Emergency Motion, these participants "are generally responsible for the overall strategy and direction of [McDermott's] business enterprise as a whole and have played, and will continue to play, a central role in [its] restructuring." *Id.* at ¶ 10.

[43] *Id.* at ¶ 13.

[44] *See* Order (Bankr. Proc. Dkt. No. 473).

566. Additionally, the fraudulent conduct alleged herein implicates the core operations of McDermott, since the acute liquidity crisis threatened McDermott's very existence as a going concern. Evidence submitted in the Bankruptcy Proceeding confirmed that in late September 2019, AlixPartners started *"**working with [McDermott], the management team, Kirkland …, Evercore, and then all of the financial and legal advisors of the three constituents … negotiating … a consensual plan of reorganization**."*[45] "***McDermott and [its] advisors** … **engaged in months of nearly around-the-clock negotiations*** …."[46] "[N]egotiations, diligence sessions … *occurred **every day** … for practically* **three to four months** to ultimately get to … a consensual plan …."[47] Therefore, it is not plausible that Defendants Dickson and Spence did not have actual and repeated access to then-current information contradicting McDermott's public statements regarding, among other things, the sale process for Lummus, or that the entry of the SSSCA was a signal of support from the lenders for McDermott's growth strategy and ability to achieve a long-term balance sheet solution. Defendants did have access to information contradicting McDermott's public statements:

> … *[I]n **the months** leading up to the Petition Date,* the KEIP … Participants [(including *Defendant Dickson*)] … *spent significant time preparing Debtors for these chapter 11 cases,* including *diligently negotiating the terms of the RSA, the DIP Facility, the Exit Facility, and the Stalking Horse Purchase Agreement – the transactions which collectively serve as the foundation for the Debtors' successful restructuring.*[48]

---

[45] Mar. 12 Tr. at 123:17-21.
[46] Dickson Decl., ¶ 18 (emphasis added).
[47] Mar. 12 Tr. at 124:7-10 (emphasis added).
[48] Emergency Motion, Ex. A, ¶ 5 (emphasis added).

567. Given the roles and status of Defendants Dickson and Spence within McDermott, their knowledge of matters central to McDermott's business operations and continued existence, and their round-the-clock involvement for months in the development and negotiation of a Chapter 11 plan of reorganization, information contrary to McDermott's public statement is imputable to them under the core operations doctrine.

568. Defendant Dickson's communications to McDermott employees dated November 4, 2019 and December 2, 2019 are also probative of scienter. In the November 4 communication, Defendant Dickson touted McDermott's entry into the SSSCA to employees as a signal of confidence from lenders as to the ability to achieve a long-term balance sheet solution, *despite* knowledge that, among other things: (a) the SSSCA was intended to "calm a jittery market" and provide McDermott and its stakeholders time to negotiate a consensual plan of reorganization; (b) the proceeds from the eventual sale of Lummus secured any debt funded under the SSSCA; and (c) McDermott committed to (and the lenders required) the roll up of any debt funded under the SSSCA into the DIP facility as part of a Chapter 11 filing. He asked employees to remain focused on their day-to-day responsibilities and essentially ignore continued media speculation about McDermott's business and capital structure efforts. He also attempted to assure employees about his own confidence in the actions being taken to position McDermott for long-term success. In the December 2 communication, Defendant Dickson pushed the second tranche funding under the SSSCA as continued lender confidence regarding McDermott's ability to achieve a long-term balance sheet solution, *despite* knowledge that this was the last funding to be made on an out-of-court basis and that "McDermott's liquidity would drive the timing of

any potential Chapter 11 filing." These communications are further evidence of Defendant Dickson's culpable state of mind.

569. Defendants' flagrant violation of express corporate policy further buttresses the inference of scienter, whether based on their knowledge or their recklessness.

570. McDermott's Code of Ethics for Chief Executive Officer and Senior Financial Officers (the "Code"), applies to the Chief Executive Officer, Chief Financial Officer, Chief Accounting Officer, and other persons performing similar functions (the "Covered Employees"). Pursuant to the Code:

> **Full and fair disclosure**. It is the Company's policy that the information in its public communications, including filings with the Securities and Exchange Commission, be timely and understandable and fair, complete and accurate in all material respects. Covered Employees should exercise diligence and care to do their part in acting in furtherance of this policy. ***Covered Employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to anyone having a role in the Company's financial reporting and disclosure processes***. Covered Employees must not directly or indirectly take any action to coerce, manipulate, mislead or fraudulently influence the Company's or its subsidiaries' independent auditors or any internal accounting or auditing personnel for the purpose or with the effect of rendering the Company's financial statements misleading, or direct anyone else to do so.
>
> It is the responsibility of each Covered Employee promptly to bring to the attention of the Company's Disclosure Committee any material information of which the executive may become aware that affects the disclosures made by the Company in its public filings or otherwise, and otherwise to assist the Disclosure Committee in fulfilling its responsibilities. In addition, ***each Covered Employee shall promptly bring to the attention of the Disclosure Committee any information the employee may have concerning*** (a) significant deficiencies or material weaknesses in the design or operation of internal controls which could adversely affect the Company's ability to record, process, summarize and report financial information or (b) ***any fraud, whether or not material, that involves management or other employees who***

> ***have a significant role in the Company's financial reporting, disclosures or internal controls***.
>
> …
>
> **Reporting of violations of this code.** *Each Covered Employee is responsible for reporting any violation of this Code of Ethics, or circumstances which the Covered Employee considers to involve a probable violation, to the Compliance Officer identified below*. Employees may choose to remain anonymous in reporting violations or circumstances that may involve a violation.
>
> **Accountability.** *Each Covered Employee will be held accountable for his or her adherence to this Code of Ethics*. The failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including termination of employment. ***Violations of this Code of Ethics may also constitute violations of law that may result in civil and criminal penalties***.

571. The delayed disclosure in the Q3 2019 Form 10-Q regarding the SEC's investigation related to disclosures McDermott made concerning the reporting of projected losses associated with Cameron is also probative of scienter. As set forth above, McDermott was notified in July 2019 (by letter and accompanying subpoena) about the SEC's investigation. Significantly, the Court has already ruled that the disclosure delay, while Defendants Dickson and Spence engaged in insider trading, added to a strong inference of scienter. (ECF 168 at 22; 2021 WL 1421609 at *9).

572. On November 5, 2019, just after McDermott announced a Q3 2019 net loss of $1.9 billion and operating loss of $1.7 billion, and disclosure of the SEC subpoena received in July 2019, McDermott disclosed in the 11/5/2019 Press Release that Defendant Spence had resigned from his positions as Executive Vice President and CFO. No explanation was provided for this suspicious resignation or its timing, other than a decision "to pursue other opportunities."

573. On November 13, 2019, McDermott filed a Form 8-K filing with the SEC ("11/13/2019 Form 8-K) that disclosed the terms of Defendant Spence's separation agreement. The agreement, deemed effective November 6, 2019, included, among other things: (a) a $866,666.67 payment (consisting of the remainder of his retention bonus); (b) accelerated vesting and settlement, by no later than March 15, 2020, of all RSU (which would have not vested until March 1, 2022); (c) immediate vesting and payment of all unvested executive compensation plan benefits; and (d) funds to cover six months of continuing health insurance; and (e) accrued and unused vacation pay.

574. Defendant Spence's suspiciously timed, "voluntary" resignation and accompanying severance package, following the disclosure of the SEC's investigation concerning the reporting of projected losses associated with Cameron and while McDermott was negotiating a consensual Chapter 11 plan of reorganization with stakeholders, also supports an inference of scienter.

575. On May 8, 2020, McDermott disclosed in the Q1 2020 Form 10-Q that it had received notice in a February 25, 2020 letter (and accompanying subpoena) that a Federal Grand Jury was conducting a criminal investigation with respect to Cameron and requested documents, including forecasts and other financial-related information at issue in this action. The Grand Jury investigation, and McDermott's delay in disclosing it, similarly supports an inference of scienter.

576. On June 16, 2023, the SEC announced the settlement of charges against Defendants Dickson and Spence arising out of their role in the approval of an EAC loss forecast by McDermott for Cameron in 2018. Findings were made in the SEC Order that

Dickson and Spence caused McDermott to violate Section 13(a) of the Exchange Act and Rules 13a-11, 13a-13, and 12b-20 thereunder, Section 13(b)(2)(A) of the Exchange Act, and Section 13(b)(2)(B) of the Exchange Act and Rule 13b2-1 thereunder. Dickson and Spence each consented to a cease-and-desist order and agreed to pay civil penalties of $100,000 and $40,000, respectively. The findings in the SEC Order are also probative of Defendants' 10(b) Class Period scienter.

## VIII. EXPANDED LOSS CAUSATION / ECONOMIC LOSS ALLEGATIONS (CCAC §VIII)

577. The loss causation / economic loss allegations in the CCAC §VIII, including CCAC ¶405, are expanded to also include partial corrective disclosures on November 4, 2019, November 5, 2019, January 21, 2020, and January 23, 2020.

## IX. EXPANDED CLAIMS FOR RELIEF (CCAC §XI)

578. The Claims for Relief in the CCAC are expanded to include as follows:

579. Count I (Violations of Exchange Act Section 10(b) and Rule 10b-5 promulgated thereunder) is amended, expanded, restated, and reasserted herein by: repeating and realleging each and every allegation contained in the CCAC and herein as if fully set forth within Count I; expanding the 10(b) Class Period at issue in Count I of the CCAC to align with the period between December 18, 2017 and January 23, 2020, both dates inclusive, as determined by the Court in the August 30, 2022 Memorandum and Recommendation (ECF 265) and September 22, 2022 Order (ECF 268); and expanding the allegations in Count I regarding the required elements of a §10(b) claim, including, without

limitation, falsity, scienter, and loss causation, so as to be based on both that allegations of the CCAC and those pled herein.

580. Count II (Violations of Section 20(a) of the Exchange Act) is amended, expanded, restated, and reasserted herein by: repeating and realleging each and every allegation contained in the CCAC and herein as if fully set forth within Count II; expanding the 10(b) Class Period at issue in Count II of the CCAC to align with the period between December 18, 2017 and January 23, 2020, both dates inclusive, as determined by the Court in the August 30, 2022 Memorandum and Recommendation (ECF 265) and September 22, 2022 Order (ECF 268); and expanding the allegations in Count II regarding the required elements of a §20(a) claim, so as to be based on both that allegations of the CCAC and those pled herein.

Dated: July 15, 2026,

Respectfully submitted,

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

*/s/Malcolm T. Brown*
Malcolm T. Brown, Attorney In Charge
(NY State Bar No. 2918498)
Thomas H. Burt
(NY State Bar No. 2869550)
Patrick Donovan
(NY State Bar No. 5040688)
270 Madison Avenue
New York, NY 10016
Telephone: 212-545-4600
Facsimile: 212-686-0114
Email: brown@whafh.com
Email: burt@whafh.com
Email: donovan@whafh.com

*Counsel for §10(b) MDR Subclass Lead Plaintiff Christopher Coligado and Lead Counsel for the §10(b) MDR Subclass*

**REYNOLDS FRIZZELL LLP**

/s/Michael K, Oldham
Michael K. Oldham
Texas Bar No.: 00798405
Southern District No.: 21486
Jean C. Frizzell
Texas Bar No.: 07484650
Southern District No.: 14529
1100 Louisiana, Suite 3500
Houston, TX 77002
Telephone: 713-485-7200
Facsimile: 713-485-7250
Email: oldham@reynoldsfrizzell.com
Email: jfrizzell@reynoldsfrizzell.com

*Additional Counsel for §10(b) MDR Subclass Lead Plaintiff Christopher Coligado and Liaison Counsel for the §10(b) MDR Subclass*